```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4    EXELIXIS, INC.,                  )
                                       )
 5                   Plaintiff,        )
                                       ) C.A. No. 22-228-RGA
 6    v.                               )
                                       ) Trial Volume II
 7    MSN LABORATORIES PRIVATE         )
      LIMITED, et al.,                 )
 8                                     )
                     Defendants.       )
 9

10                                     J. Caleb Boggs Courthouse
                                       844 North King Street
11                                     Wilmington, Delaware

12                                     Tuesday, October 24, 2023
                                       8:29 a.m.
13                                     Bench Trial

14
      BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
15

16    APPEARANCES:

17               MORRIS NICHOLS ARSHT & TUNNELL LLP
                 BY:  ANTHONY D. RAUCCI, ESQUIRE
18               BY:  JACK B. BLUMENFELD, ESQUIRE

19                       -and-

20               WILMERHALE
                 BY:  KEVIN S. PRUSSIA, ESQUIRE
21               BY:  LISA J. PIROZZOLO, ESQUIRE
                 BY:  AMY KREIGER WIGMORE, ESQUIRE
22               BY:  JONATHAN A. COX, ESQUIRE
                 BY:  KEVIN M. YURKERWICH, Ph.D.
23
                                       For the Plaintiff
24

25
```

```
 1    APPEARANCES CONTINUED:

 2                    HEYMAN ENERIO GATTUSO & HIRZEL LLP
 3                    BY:  DOMINICK GATTUSO, ESQUIRE

 4                            -and-

 5                    WINSTON & STRAWN LLP
                      BY:  GEORGE LOMBARDI, ESQUIRE
 6                    BY:  BRYCE COOPER, ESQUIRE
                      BY:  KURT A. MATHAS, ESQUIRE
 7                    BY:  ELIZABETH GRDEN, ESQUIRE
                      BY:  KEVIN BOYLE, ESQUIRE
 8                    BY:  BRIAN O'GARA, ESQUIRE

 9                                  For the Defendants

10    Also Present:

11                    Dr. Kondal Reddy Bairy

12

13

14                      ***   PROCEEDINGS   ***

15

16            DEPUTY CLERK:  All rise.  Court is now in

17    session.  The Honorable Richard G. Andrews presiding.

18            THE COURT:  All right.  Good morning.  Please be

19    seated.

20            Are we ready to begin or what?

21            MR. PRUSSIA:  We are, Your Honor.  We could

22    either address the issue we discussed last night now or

23    after Lepore's cross is over.

24            THE COURT:  Well, if it's ready to be discussed

25    now, you might as well discuss it now and we'll give whoever
```

08:30:00  1    needs to be prepare more time to prepare.

08:30:03  2              MR. PRUSSIA:  May I approach, Your Honor, with

08:30:05  3    one piece of paper?

08:30:05  4              THE COURT:  Okay.

08:30:12  5              MR. PRUSSIA:  What is it, Paragraph 140?

08:30:16  6              Tom, could we put Paragraph 140 of Dr. Steed's

08:30:19  7    reply report on the screen.

08:30:20  8              So, Your Honor, there's only one issue now on

08:30:23  9    this dispute.  This is the paragraph in Dr. Steed's reply

08:30:26 10    report regarding obviousness-type double patenting.

08:30:29 11              THE COURT:  Yeah.

08:30:29 12              MR. PRUSSIA:  And if you look at the line that

08:30:30 13    starts "as I stated previously in my opening report," it's

08:30:33 14    clear to us what he's disclosed is that his opinion is as

08:30:37 15    stated in his opening report.  He's limited his

08:30:41 16    obviousness-type double patenting opinions to his opening

08:30:43 17    report.

08:30:44 18              So based on that disclosure, we think that's the

08:30:48 19    metes and bounds of his opinions that he can offer in this

08:30:51 20    case and so the practical effect of that really reduces down

08:30:53 21    to one issue and that's whether he can offer an opinion with

08:30:56 22    respect to unexpected results.  He does not offer an opinion

08:30:59 23    with unexpected results in his opening report, so our

08:31:03 24    position will be that he's not able to do that in the

08:31:06 25    context of this trial.

08:31:06 1          THE COURT:  Well, when you say he didn't offer

08:31:08 2     in his opening report, he didn't offer it in any connection

08:31:12 3     or just in connection with obviousness-type double

08:31:15 4     patenting.

08:31:15 5          MR. PRUSSIA:  In any connection whatsoever.

08:31:18 6     There's no disclosure of opinion with respect to unexpected

08:31:20 7     results in the opening report.

08:31:21 8          THE COURT:  Okay.  What do you have to say about

08:31:23 9     that?

08:31:25 10         MR. MATHAS:  Mr. Cooper will address that,

08:31:29 11    Your Honor.

08:31:29 12         THE COURT:  Thank you, Mr. Mathas.

08:31:31 13         MR. COOPER:  Your Honor, I'll give you

08:31:38 14    Dr. Trout's report.  So, Dr. --

08:31:40 15         THE COURT:  Are we talking about Dr. Trout or

08:31:42 16    Dr. Steed.

08:31:43 17         MR. COOPER:  Well, so with respect to unexpected

08:31:46 18    results, obviously Exelixis has the burden of production on

08:31:48 19    that.  So they address unexpected results in Dr. Trout's

08:31:52 20    rebuttal report.  And Dr. Trout identifies --

08:31:56 21         THE COURT:  And by the way, when you say

08:31:58 22    "rebuttal," you mean his second report in the series of

08:32:01 23    three?

08:32:01 24         MR. COOPER:  Right.  So it goes Dr. Steed in

08:32:03 25    opening, then Dr. Trout, then Dr. Steed in reply.

08:32:06  1            And so in Dr. Trout's rebuttal report, Exelixis

08:32:10  2   and Dr. Trout raise unexpected results for the first time,

08:32:14  3   which is, you know, the proper order.  We're not - that's

08:32:17  4   what we would expect.

08:32:19  5            And so Dr. Trout, in his report, identifies

08:32:22  6   objective indicia that support non-obviousness of the

08:32:25  7   inventions and he does that in his section where he is

08:32:28  8   addressing Dr. Steed's 103 obviousness opinions, and he

08:32:33  9   provides that and we can -- I can give you a copy, but I

08:32:38 10   don't think this is in dispute that Dr. Trout addresses it

08:32:41 11   in that section.

08:32:42 12            And then later on in the report, he has a

08:32:49 13   section on obviousness-type double patenting -- apologies,

08:32:55 14   Your Honor.  I wasn't ready to do this right now.  I thought

08:32:57 15   we would do it with Dr. Steed.

08:33:02 16            THE COURT:  What you're saying is -- or at least

08:33:06 17   what it sounds like you're saying is, yeah, so Dr. Steed

08:33:09 18   didn't address this, but that's because Dr. Trout didn't

08:33:11 19   address it in the right place?

08:33:13 20            MR. COOPER:  No.  Dr. Trout addressed it in the

08:33:15 21   right place, but he addressed it in 103 obviousness.  And

08:33:18 22   then when he goes to his obviousness-type double patenting,

08:33:21 23   he only has one page on that and he says -- he doesn't -- he

08:33:26 24   doesn't provide unexpected results for obviousness-type

08:33:30 25   double patenting.  He talked about it in his 103 section and

08:33:32  1    that's exactly what Dr. Steed does in reply.  He addresses

08:33:36  2    objective indicia in the third round, just as you would

08:33:39  3    expect him to do.

08:33:40  4              THE COURT:  But wait.  So, Mr. Prussia, I

08:33:43  5    thought you said he didn't address unexpected results

08:33:45  6    anywhere.

08:33:46  7              MR. COOPER:  That's incorrect.  He did in his

08:33:48  8    reply round, just when you would expect us to do so.

08:33:51  9              MR. PRUSSIA:  Your Honor, in his opening report

08:33:52 10    he did not address unexpected results.

08:33:55 11              THE COURT:  Okay.  All right.  But he addresses

08:33:57 12    it in his reply report?

08:33:59 13              MR. COOPER:  Yes.  And, of course,

08:34:00 14    Mr. Prussia --

08:34:00 15              THE COURT:  Okay.

08:34:01 16              MR. COOPER:  -- examined him on his opinions on

08:34:05 17    that.

08:34:05 18              THE COURT:  And so why isn't that the end of the

08:34:07 19    matter, he addressed it in his reply report?  He doesn't --

08:34:12 20    there's no -- the normal burden of proof means that the

08:34:20 21    Defendant is not the one who's addressing it in the opening

08:34:22 22    round; right?

08:34:24 23              MR. PRUSSIA:  That's right.

08:34:26 24              Tom, put it back on the screen.

08:34:27 25              It's just simply a matter of disclosure,

08:34:29  1    Your Honor.  He very clearly says that his opinions are as

08:34:31  2    stated in his opening report.  He doesn't make reference to

08:34:34  3    any other opinion that he's provided in his reply report.

08:34:37  4    It's really just a matter of disclosure.

08:34:39  5                THE COURT:  Well, how are you in the least bit

08:34:41  6    prejudiced by this?

08:34:42  7                MR. PRUSSIA:  It's just simply a disclosure

08:34:45  8    matter, Your Honor.  I'm not -- I'm not stating or

08:34:48  9    suggesting that they're -- he didn't disclose it in his

08:34:51 10    reply report, but they chose to disclose it this way.

08:34:54 11                THE COURT:  All right.  Well, you know, I think

08:34:59 12    it's been disclosed.  Maybe the dots are not completed

08:35:05 13    connected, but I think Mr. Prussia has candidly admitted

08:35:10 14    there's no prejudice and so I'm' going to allow it.

08:35:16 15                MR. COOPER:  Thank you, Your Honor.

08:35:17 16                THE COURT:  All right.  Leigh, charge that to

08:35:23 17    them.

08:35:23 18                Okay.

08:35:25 19                MR. MATHAS:  Your Honor, should we bring

08:35:26 20    Dr. Lepore back to the stand?

08:35:28 21                THE COURT:  If you'd like.

08:35:29 22                MR. MATHAS:  Well, he's on cross but that's

08:35:31 23    where we were at.

08:35:32 24                THE COURT:  Yeah, right.  I mean, I'm perfectly

08:35:34 25    happy to just sit here if you want, but...

Lepore - Cross

08:35:36  1              All right.  Good morning, Dr. Lepore.

08:35:50  2              And, Ms. Wigmore.

08:35:53  3              MS. WIGMORE:  Thank you, Your Honor.

08:35:53  4                  CROSS-EXAMINATION (RESUMED)

08:35:53  5  BY MS. WIGMORE:

08:35:54  6  Q.     Be a good morning, Dr. Lepore.

08:35:55  7  A.     Good morning.

08:35:55  8  Q.     We talked yesterday about your inherency opinion, so

08:35:59  9  I would now like to move to your opinions on obviousness.

08:36:02 10              Do you have that in mind?

08:36:03 11  A.     Yes.

08:36:03 12  Q.     Now, it's your opinion that a POSA would have been

08:36:06 13  motivated and found it obvious to purify by

08:36:09 14  recrystallization the cabozantinib (L)-malate produced by

08:36:14 15  the Brown process to prepare API essentially free of the 1-1

08:36:19 16  impurity; is that right?

08:36:20 17  A.     That's correct.

08:36:23 18  Q.     Now, you testified that a POSA would have been

08:36:26 19  motivated to monitor and control the 1-1 impurity in the

08:36:30 20  Brown process; correct?

08:36:31 21  A.     Correct.

08:36:33 22              MS. WIGMORE:  Could we please have DDX Lepore 5?

08:36:33 23  BY MS. WIGMORE:

08:36:47 24  Q.     This is a slide that you showed during your direct

08:36:51 25  examination; correct?

Lepore - Cross

08:36:51  1    A.       Correct.

08:36:52  2    Q.       And it says that the 1-1 impurity is a genotoxic

08:36:56  3    impurity; correct?

08:36:57  4    A.       Correct.

08:36:59  5    Q.       Now, to your knowledge, the 1-1 impurity had not been

08:37:03  6    identified as being genotoxic prior to this disclosure of

08:37:08  7    the '349 patent; correct?

08:37:10  8    A.       That's correct.

08:37:13  9    Q.       You testified that quinolines are genotoxic; correct?

08:37:17 10    A.       Correct.

08:37:19 11    Q.       Not all quinolines are genotoxic; correct?

08:37:22 12    A.       That's correct.

08:37:23 13    Q.       Cabozantinib is a quinoline; correct?

08:37:26 14    A.       It has a quinoline moiety, yes.

08:37:33 15    Q.       And cabozantinib is not genotoxic; correct?

08:37:36 16    A.       That's correct.

08:37:38 17    Q.       Now, in your direct examination, you testified about

08:37:41 18    FDA guidelines.

08:37:42 19             Do you recall that?

08:37:43 20    A.       Yes.

08:37:44 21    Q.       And you testified about a reference called Robinson.

08:37:48 22             Do you recall that?

08:37:48 23    A.       Yes.

08:37:49 24    Q.       Now, the FDA guidelines do not address cabozantinib

08:37:54 25    specifically; correct?

Lepore - Cross

08:37:54  1    A.      That's correct.

08:37:56  2    Q.      The FDA guidelines do not address the 1-1 impurity;

08:38:00  3    correct?

08:38:01  4    A.      That's correct.

08:38:02  5    Q.      And the Robinson reference does not address

08:38:05  6    cabozantinib; correct?

08:38:06  7    A.      That's correct.

08:38:07  8    Q.      The Robinson reference does not address the 1-1

08:38:10  9    impurity; correct?

08:38:11 10    A.      That's correct.

08:38:14 11    Q.      Do you agree that impurities introduced or created

08:38:18 12    early in the manufacturing process typically have more

08:38:23 13    opportunities to be removed in purification operations than

08:38:27 14    impurities generated late in the manufacturing process?

08:38:29 15    A.      I agree that as a general statement is true, mm-hmm.

08:38:35 16    Q.      And do you agree that those impurities generated

08:38:37 17    early in the process are less likely to be carried into the

08:38:42 18    drug substance?

08:38:43 19    A.      In most cases, yes.

08:38:48 20    Q.      Now, I want to focus on your opinion regarding

08:38:51 21    recrystallization.

08:38:53 22            There's a purification process at each step of

08:38:56 23    Scheme 1 in Brown; correct?

08:38:58 24    A.      Yes.

08:39:03 25    Q.      Compounds can be recrystallized in different

Lepore - Cross

08:39:06 1    conditions; correct?

08:39:07 2    A.    Yes.

08:39:09 3    Q.    And depending on the conditions, a compound may or

08:39:12 4    may not crystallize -- recrystallize; correct?

08:39:16 5    A.    That's true.

08:39:18 6    Q.    So, turning to what happened in the real world.  The

08:39:22 7    '349 patent discloses a process for making cabozantinib

08:39:27 8    (L)-malate; correct?

08:39:28 9    A.    Could you repeat that question, please?

08:39:33 10   Q.    The '349 patent discloses a process for making

08:39:38 11   crystalline (L)-malate -- cabozantinib (L)-malate; correct?

08:39:41 12   A.    That's correct.

08:39:42 13   Q.    And that process has been referred to in this case as

08:39:44 14   B-2.

08:39:45 15              Do you recall that?

08:39:46 16   A.    Yes.

08:39:47 17   Q.    You have not given the opinion that the B-2 process

08:39:52 18   disclosed in the '349 patent was known in the art before the

08:39:56 19   priority date of the '349 patent; correct?

08:40:00 20   A.    That's correct.

08:40:05 21   Q.    The procedure -- the B-2 procedure from the

08:40:08 22   '349 patent is different from the A-2 process disclosed in

08:40:13 23   Brown; correct?

08:40:14 24   A.    So the A-2 process is a name given by Exelixis, but

08:40:23 25   yes.  That's -- that's right.  The Brown process is

Lepore - Cross

08:40:25  1   different from the B-2 process, that's correct.  Mm-hmm.

08:40:36  2   Q.     Now, the inventors of the '349 patent did not achieve

08:40:41  3   the purity limitation in Claim 3 by adding a

08:40:45  4   recrystallization step to the Brown process; correct?

08:40:49  5   A.     I need to review that.  Can you point to me where I

08:41:09  6   made that statement?

08:41:10  7   Q.     Let me ask it this way:  You talked about the B-2

08:41:14  8   process being disclosed in the '349 patent.

08:41:17  9          Do you recall that?

08:41:18  10  A.     Mm-hmm.

08:41:18  11  Q.     And you reviewed the B-2 process; correct?

08:41:20  12  A.     Yes.  Mm-hmm.

08:41:21  13  Q.     The B-2 process is not simply the Brown process plus

08:41:26  14  a recrystallization step; right?

08:41:28  15  A.     That's correct.  Mm-hmm.

08:41:32  16  Q.     Now, let's turn to your opinion regarding the

08:41:36  17  crystalline (L)-malate pharmaceutical composition.  Okay?

08:41:39  18  A.     Yes.

08:41:40  19  Q.     You have not given an opinion on whether Brown

08:41:44  20  explicitly teaches pharmaceutical formulation --

08:41:48  21  pharmaceutical compositions that are essentially free of the

08:41:51  22  1-1 impurity; correct?

08:41:53  23  A.     Correct.

08:41:54  24  Q.     You have not offered expert opinions on formulation

08:41:58  25  related issues; correct?

Lepore - Cross

08:42:00  1    A.      That's correct.

08:42:02  2    Q.      Now, you testified on direct about two Exelixis

08:42:06  3    documents containing testing on capsules produced from the

08:42:12  4    Regis API.

08:42:13  5            Do you recall that?

08:42:14  6    A.      Yes.  Mm-hmm.

08:42:15  7    Q.      You have not offered an opinion as to whether any

08:42:20  8    cabozantinib (L)-malate capsules were in the prior art;

08:42:25  9    correct?

08:42:26 10    A.      That's correct.

08:42:30 11    Q.      You have not opined on anything having to do with

08:42:32 12    capsules; correct?

08:42:33 13    A.      Correct.

08:42:38 14    Q.      You did not prepare a pharmaceutical composition

08:42:41 15    comprising cabozantinib (L)-malate with a filler, glidant,

08:42:47 16    disintegrant and lubricant; correct?

08:42:48 17    A.      That's correct.

08:42:49 18    Q.      And you did not ask anyone to prepare such a

08:42:52 19    composition as part of this case; correct?

08:42:54 20    A.      That's correct.

08:42:55 21    Q.      You did not do any testing for this case; correct?

08:42:58 22    A.      That's correct.

08:43:01 23            MS. WIGMORE:  Thank you, Dr. Lepore.

08:43:03 24            No further questions, Your Honor.

08:43:04 25            THE COURT:  All right.  Mr. Mathas.

08:43:07 1          MR. MATHAS:  Briefly, Your Honor.  Kurt Mathas

08:43:09 2    for MSN.

08:43:09 3                    REDIRECT EXAMINATION

08:43:11 4    BY MR. MATHAS:

08:43:11 5    Q.      Dr. Lepore, yesterday afternoon you were asked a long

08:43:14 6    series of questions about polymorphic impurity in the

08:43:18 7    context of the Brown reference.

08:43:20 8            Do you recall that?

08:43:20 9    A.      Yes.

08:43:21 10   Q.      Let's pull up DTX-291 at Page 24 which is

08:43:27 11   Paragraph 97 of Brown, and that's the paragraph that counsel

08:43:31 12   was talking to you about; right?

08:43:33 13   A.      Yes.

08:43:34 14   Q.      And she wanted to talk to you about the word

08:43:37 15   "crystalline form" in the first sentence, do you remember

08:43:40 16   that?

08:43:40 17   A.      Yes.

08:43:41 18   Q.      All right.  Now, she didn't show you the last full

08:43:43 19   sentence on this page that says, "The remainder of the

08:43:46 20   crystalline form."

08:43:46 21            Do you see that sentence?

08:43:48 22   A.      Yes.

08:43:49 23   Q.      And it goes on to say there, "The remainder of the

08:43:52 24   crystalline form of Compound I may comprise other forms of

08:43:55 25   Compound I and/or reaction impurities and/or processing

08:43:59 1   impurities that arise, for example, when the crystalline

08:44:04 2   form is prepared."

08:44:05 3            Do you see that?

08:44:05 4   A.      Yes.

08:44:06 5   Q.      And what types of impurities are being discussed

08:44:08 6   there, reaction impurities and process impurities?

08:44:11 7            Are those polymorphic impurities or chemical

08:44:14 8   impurities?

08:44:14 9   A.      Chemical impurities.

08:44:15 10  Q.      Okay.  Now, Claim 3 that we're dealing with in this

08:44:18 11  case and the 1-1 impurity, what kind of impurity is it?  Is

08:44:23 12  it a polymorphic impurity, or is it a chemical impurity?

08:44:26 13  A.      It's a chemical impurity.

08:44:28 14  Q.      All right.  So, this -- the polymorphic impurity,

08:44:32 15  does that have anything to do with your opinions in this

08:44:34 16  case?

08:44:34 17  A.      No, it doesn't.

08:44:35 18  Q.      All right.  Let's talk about some of the things that

08:44:38 19  do matter for the case.

08:44:40 20           MR. MATHAS:  And you can take that down.

08:44:40 21  BY MR. MATHAS:

08:44:42 22  Q.      I want to talk briefly about your testimony on the

08:44:45 23  Regis batches and that the three Regis batches were

08:44:49 24  inherently free of the 1-1 impurity.

08:44:51 25           Do you recall that testimony?

Lepore - Redirect

A.      Yes.

Q.      Now, on cross, did counsel confront you with any data or evidence showing test results of Regis batches that were not -- in which -- let me get this straight.

Did counsel show you any evidence or data of Regis batches with 1-1 impurity levels that were over 200 PPMs?

A.      No.

Q.      Did counsel show you or confront you with any evidence of any Regis capsule batches that showed 1-1 levels over 200 PPMs?

A.      No.

Q.      And did counsel confront you -- with respect to your opinions on Girindus, did she show you any evidence or data that undermined your opinions that Girindus deviated from the Brown Example 1 process?

A.      No.

Q.      All right.  You were also asked some questions yesterday about a notation in the Exelixis NDA that I want to talk about for a minute.

MR. MATHAS:  And to do so, let's pull up PTX-10 at Page 9.

BY MR. MATHAS:

Q.      And the paragraph underneath the scheme there, counsel asked you some questions about.

08:46:02 1          Do you recall that?

08:46:02 2   A.    Yes.

08:46:07 3   Q.    All right.  And in counsel's questions -- in

08:46:17 4   connection with her questions about these proposed or

08:46:20 5   potential changes, did she pull out any documents out of the

08:46:26 6   millions of pages that Exelixis has produced in this case

08:46:29 7   and show you any documents where any purported changes

08:46:33 8   existed?

08:46:34 9   A.    No.

08:46:35 10  Q.    Okay.  Did she go to any Regis documents and pull out

08:46:39 11  any Regis documents and show you actual information about

08:46:42 12  how a Regis batch purportedly had some form of a change?

08:46:47 13  A.    No.

08:46:48 14  Q.    All right.  And so, in -- when you did your analysis

08:46:53 15  of the Regis batches, what did you rely on?

08:46:56 16  A.    I relied on the material that Exelixis provided to

08:46:59 17  the FDA.  That's the procedures, and I reviewed those

08:47:03 18  procedures.

08:47:04 19  Q.    Right.  And that's -- and is that shown on the next

08:47:07 20  pages of this document that counsel put in front of you?

08:47:09 21  A.    Yes.  These are the detailed procedures related to

08:47:14 22  the FDA by Exelixis regarding the Brown process.

08:47:17 23  Q.    And -- okay.  And is that the -- we walked through,

08:47:20 24  we put it on the slide, and it was Step 1 and it was Step 2

08:47:23 25  and everybody was wondering if we were ever going to get

Lepore - Redirect

08:47:26  1   finished, but did you go step by step through the process

08:47:28  2   and compare the words of the Regis process as told to the

08:47:31  3   FDA with the Brown process?

08:47:33  4            MS. WIGMORE:  Your Honor, I object to the

08:47:35  5   leading.

08:47:35  6            THE WITNESS:  Yes, I did.

08:47:36  7            THE COURT:  All right.  Well, I'll sustain it.

08:47:38  8   BY MR. MATHAS:

08:47:38  9   Q.    All right.  Dr. Lepore, did you compare the two

08:47:41 10   processes?

08:47:42 11   A.    I did.

08:47:42 12   Q.    And what did you conclude?

08:47:43 13   A.    They are virtually identical.

08:47:48 14   Q.    All right.  You were asked some questions yesterday

08:47:50 15   about --

08:47:51 16            MR. MATHAS:  You can take that down.

08:47:51 17   BY MR. MATHAS:

08:47:53 18   Q.    -- Brown Example 1's use of the word "approximately."

08:47:56 19            Do you recall that?

08:47:56 20   A.    Yes.

08:47:58 21   Q.    And does Brown's use of the word approximately mean

08:48:01 22   that a POSA would not be able to follow the Brown process?

08:48:05 23   A.    No.

08:48:06 24   Q.    All right.  And so a POSA would have still been able

08:48:09 25   to follow the Brown process?

Lepore - Redirect

08:48:10 1    A.    Yes.

08:48:11 2    Q.    And, Dr. Lepore, if a person of ordinary skill in the

08:48:14 3    art faithfully followed the Brown Example 1 process, would

08:48:18 4    the POSA have necessarily and inherently obtained

08:48:22 5    cabozantinib (L)-malate that is essentially free of the 1-1

08:48:26 6    impurity?

08:48:26 7                MS. WIGMORE:  Objection.  Leading.

08:48:28 8                THE COURT:  All right.  That's what his opinion

08:48:30 9    is so I don't think there's any particular harm.  So, I'll

08:48:34 10   overrule the objection.

08:48:36 11   BY MR. MATHAS:

08:48:36 12   Q.    Dr. Lepore, do you need the question again?

08:48:38 13   A.    Please.

08:48:41 14   Q.    So, if a POSA had faithfully followed the Brown

08:48:45 15   Example 1 process, would the POSA have necessarily and

08:48:49 16   inherently obtained cabozantinib (L)-malate that is

08:48:53 17   essentially free of the 1-1 impurity?

08:48:54 18   A.    Yes.

08:48:56 19               MR. MATHAS:  No further questions, Your Honor.

08:48:58 20               I do have some exhibits to move in.

08:49:00 21               THE COURT:  All right.  Let me just ask:

08:49:02 22   Dr. Lepore, the last question, is it -- is your opinion that

08:49:09 23   faithfully following the process leads to the substance with

08:49:17 24   less than 200 parts per million 1-1, is that based on

08:49:22 25   essentially just the three Regis batches and the various

Lepore - Redirect

08:49:29  1    tests that were done on them?

08:49:30  2                 THE WITNESS:  That's correct.

08:49:31  3                 THE COURT:  Okay.

08:49:34  4                 Anything further?

08:49:35  5                 MR. MATHAS:  I have nothing further, Your Honor.

08:49:37  6                 I do have exhibits to move in.

08:49:39  7                 THE COURT:  All right.  Let's have them.

08:49:41  8                 MR. MATHAS:  All right.  Defendants offer

08:49:44  9    DTX-522, DTX-328, DTX-291, DTX-38, DTX-80, DTX-125, PTX-98,

08:50:00 10    DTX-130, DTX-128, PTX-9, DTX-69, PTX-68, DTX-62, DTX-91,

08:50:16 11    DTX-272, DTX-313, DTX-251, and DTX-304.

08:50:28 12                 MS. WIGMORE:  No objection.

08:50:29 13                 THE COURT:  All right.  They're all admitted

08:50:32 14    without objection.

08:50:32 15                 (DTX Exhibit Nos. 38, 62, 69, 80, 91, 125, 128,

08:50:32 16    130, 251, 272, 291, 304, 313, 328 and 522 were admitted into

08:50:32 17    evidence.)

08:50:32 18                 (PTX Exhibit Nos. 9, 68, and 98 were admitted

08:50:33 19    into evidence.)

08:50:33 20                 THE COURT:  Dr. Lepore, you can step down.

08:50:35 21    Watch your step.

08:50:38 22                 MR. MATHAS:  And, Your Honor, for our next

08:50:40 23    witness we will call Dr. Maureen Donovan back to the stand

08:50:43 24    to provide her invalidity opinions.

08:50:45 25                 THE COURT:  Okay.

Donovan - Direct

08:51:03  1          Dr. Donovan, you're still sworn from yesterday.

08:51:06  2  Okay?

08:51:10  3                    DIRECT EXAMINATION

08:51:18  4  BY MR. MATHAS:

08:51:46  5  Q.     All right.  Good morning, Dr. Donovan.

08:51:47  6  A.     Good morning.

08:51:48  7  Q.     All right.  Let's pick up with your testimony.

08:51:51  8          Have you prepared some continuation slides to

08:51:54  9  assist in your invalidity testimony here today?

08:51:56 10  A.     Yes, I have.

08:51:57 11  Q.     And we can put on the slide here.  Again, we'll

08:51:59 12  follow the numbering scheme from yesterday, DDX picking up

08:52:03 13  with DDX-14.

08:52:05 14          Now, let's start by looking at the '349 patent

08:52:09 15  again which is JTX-4.  And, Dr. Donovan, you testified about

08:52:16 16  this in the context of your infringement opinions.  But

08:52:19 17  let's go and look at the related application data which is

08:52:24 18  found on Page 2.

08:52:26 19          And, Dr. Donovan, what do you understand

08:52:28 20  Exelixis to contend is the priority date for the '349

08:52:33 21  patent?

08:52:33 22  A.     I've been told they contend that it's February 10th,

08:52:36 23  2011.

08:52:36 24  Q.     All right.  And are you applying that February 2011

08:52:39 25  date informing your invalidity opinions in this case?

Donovan - Direct

08:52:43  1   A.      Yes, I am.

08:52:44  2   Q.      Okay.

08:52:44  3              MR. MATHAS:  If we can look at the claims of the

08:52:47  4   '349 patent on Page 20 and focus in on Claim 3.

08:52:47  5   BY MR. MATHAS:

08:52:53  6   Q.      Dr. Donovan, have you reviewed the asserted Claim 3

08:52:56  7   of the '349 patent for purposes of invalidity?

08:52:59  8   A.      Yes, I have.

08:53:01  9   Q.      All right.

08:53:02 10              MR. MATHAS:  Can we please pull up DDX-15?

08:53:02 11   BY MR. MATHAS:

08:53:06 12   Q.      Dr. Donovan, what are you showing on DDX-15?

08:53:08 13   A.      This is Claim 3 and then subdivided in some of the

08:53:12 14   major categories, some of which I have addressed previously.

08:53:15 15   Q.      Okay.  Now, I notice some highlighting on the left, a

08:53:19 16   color scheme.  Tell us what that's going to indicate.

08:53:23 17   A.      The color scheme, again, is the -- is for

08:53:26 18   classifications of excipients, so fillers being indicated by

08:53:29 19   green and disintegrants being indicated by blue, et cetera.

08:53:33 20   So it's just an easy way of keeping track of the categories

08:53:36 21   of excipients.

08:53:37 22   Q.      All right.  And if we look at the last limitation,

08:53:40 23   the free of the 1-1 impurity, and go to DDX-16, does the --

08:53:47 24   does the '349 patent define what essentially free is?

08:53:50 25   A.      Yes, it does.  It defines essentially free as less

Donovan - Direct

08:53:53 1  than 200 parts per million of the 1-1.

08:53:55 2  Q.     And is that what you used in your invalidity

08:53:58 3  opinions?

08:53:58 4  A.     Yes, it is.

08:53:59 5  Q.     All right.

08:54:04 6          MR. MATHAS:  Let's pull up DDX-17, please.

08:54:04 7  BY MR. MATHAS:

08:54:08 8  Q.     And starting with an overview of the opinions you're

08:54:11 9  going to offer here today, Dr. Donovan, what are you going

08:54:14 10 to be presenting to the Court in this portion of your

08:54:17 11 testimony?

08:54:17 12 A.     So, again, I'm going to provide a little bit of a

08:54:19 13 technical background just to give some context for what

08:54:22 14 we'll be talking about, and then I'll be discussing the

08:54:24 15 process that I used to review Claim 3 and determine that it

08:54:27 16 was obvious.

08:54:29 17 Q.     All right.

08:54:29 18         MR. MATHAS:  Can we go DDX-18, please?

08:54:29 19 BY MR. MATHAS:

08:54:33 20 Q.     What is the first topic in your technical background

08:54:36 21 that you're going to provide?

08:54:37 22 A.     So, a little bit of a review again about cabozantinib

08:54:40 23 (L)-malate and formulations of cabozantinib (L)-malate.

08:54:43 24 Q.     All right.  Dr. Donovan, did the prior art teach

08:54:47 25 cabozantinib (L)-malate and formulations thereof?

Donovan - Direct

08:54:50  1    A.      Yes, it did.

08:54:51  2            MR. MATHAS:  And let's look at the Brown

08:54:54  3    reference again.  DTX-291, please.

08:54:54  4    BY MR. MATHAS:

08:54:58  5    Q.      Dr. Donovan, what is DTX-291?

08:55:00  6    A.      This is a patent application publication.  We've been

08:55:04  7    referring to it -- referring to it as Brown.

08:55:06  8            MR. MATHAS:  If we can go to Page 25, Scheme 1.

08:55:06  9    BY MR. MATHAS:

08:55:11 10    Q.      You've called that up with a box in the lower

08:55:14 11    right-hand corner.  What's -- what are you showing here?

08:55:16 12    A.      And this is showing that Brown teaches cabozantinib

08:55:19 13    (L)-malate.

08:55:21 14    Q.      All right.  And is this the process that Dr. Lepore

08:55:23 15    discussed yesterday?

08:55:25 16    A.      Yes.

08:55:26 17    Q.      And are you relying on Dr. Lepore's testimony in

08:55:28 18    forming your opinions in this case?

08:55:30 19    A.      Yes, I am.

08:55:31 20    Q.      All right.  Dr. Donovan, does Brown contain any

08:55:34 21    discussion of how its compounds are formulated?

08:55:38 22    A.      It does describe pharmaceutical compositions, yes.

08:55:42 23    Q.      Okay.

08:55:43 24            MR. MATHAS:  Let's look at Page 22 of Brown,

08:55:45 25    paragraph 87.

08:55:47  1   BY MR. MATHAS:

08:55:47  2   Q.     Dr. Donovan, what is paragraph 87 of Brown

08:55:51  3   discussing?

08:55:51  4   A.     Well, it's discussing pharmaceutical compositions.

08:55:53  5   It's calling out solid dosage forms being preferred.  It's

08:55:57  6   identifying those solid dosage forms for oral

08:56:01  7   administration.  It's identifying capsules and tablets among

08:56:04  8   some other dosage forms.  And identifying those as being

08:56:07  9   particularly preferred.

08:56:08 10         And in Brown, they're suggesting the use of at

08:56:11 11   least one pharmaceutically acceptable excipient.

08:56:14 12   Q.     All right.  Let's turn and talk about excipients now.

08:56:16 13         MR. MATHAS:  And go to DDX-19.

08:56:16 14   BY MR. MATHAS:

08:56:21 15   Q.     So, the -- the next topic here is on the -- the

08:56:24 16   claimed excipient limitations.  Does Brown describe the use

08:56:28 17   of these excipients?

08:56:29 18   A.     Yes, Brown does.

08:56:30 19   Q.     All right.

08:56:31 20         MR. MATHAS:  Let's go back to Brown, which is

08:56:34 21   DTX-291, Page 21, paragraph 82.

08:56:37 22   Q.     What does Brown describe here?

08:56:39 23   A.     Brown, again, is starting to describe the

08:56:41 24   pharmaceutical compositions and their preparation.  And

08:56:44 25   Brown directs the reader to Remington's Pharmaceutical

Donovan - Direct

08:56:48  1   Sciences, a text that we've already talked about, and

08:56:53  2   suggests that there's information in Remington's that a POSA

08:56:57  3   could use to prepare those pharmaceutical compositions, and

08:57:00  4   describes solid dosage forms of Compound I being mixed with

08:57:04  5   at least one pharmaceutically acceptable excipient.

08:57:07  6   Q.    Okay.

08:57:08  7             MR. MATHAS:  Let's look at the second half of

08:57:09  8   that paragraph.

08:57:09  9   BY MR. MATHAS:

08:57:11 10   Q.    Dr. Donovan, what are some of the excipients that

08:57:13 11   Brown, in paragraph 82, says can be used in the solid oral

08:57:19 12   dosage forms of cabozantinib?

08:57:21 13   A.    So Brown, again, identifies a number of different

08:57:23 14   categories of excipients, and I've highlighted here the ones

08:57:26 15   that are of discussion.  Fillers, disintegrating agents,

08:57:29 16   lubricants.  And, again, the -- in the lubricant discussion,

08:57:33 17   they've included talc, which is a well-known glidant.

08:57:36 18   Q.    All right.  We'll come back to that in a minute, but

08:57:38 19   on the last slide we had saw reference to Remington's.  Do

08:57:41 20   you recall that?

08:57:41 21   A.    Yes.

08:57:42 22   Q.    And that reference to Remington's is -- is here in

08:57:46 23   paragraph 82 of Brown.  So, I want to take a look at

08:57:50 24   Remington's for a moment.

08:57:51 25             MR. MATHAS:  And to do so, let's pull up

Donovan - Direct

08:57:52  1   DTX-284, please.

08:57:52  2   BY MR. MATHAS:

08:57:56  3   Q.     Dr. Donovan, what is DTX-284?

08:57:58  4   A.     This is the 20th edition of Remington's Science and

08:58:04  5   Practice of Pharmacy.

08:58:04  6   Q.     And is this the edition that was cited in

08:58:06  7   paragraph 82 of Brown?

08:58:07  8   A.     No, they cited the 18th edition. But they're quite

08:58:11  9   similar. Most of the information carries from one edition

08:58:15 10   to the next.

08:58:15 11   Q.     All right. Are you aware of any meaningful

08:58:17 12   differences between the 18th and 20th editions for purposes

08:58:20 13   of your opinions?

08:58:20 14   A.     Not in the sections I reviewed for this case.

08:58:22 15   Q.     All right.

08:58:23 16           MR. MATHAS: Let's turn to Chapter 45 of

08:58:27 17   DTX-284, the Remington's reference.

08:58:27 18   BY MR. MATHAS:

08:58:32 19   Q.     And so that's on DTX-284 at Page 4.

08:58:35 20           What particular chapter are you calling out

08:58:38 21   here?

08:58:38 22   A.     So this is the chapter in Remington's that's

08:58:41 23   describing oral solid dosage forms.

08:58:43 24   Q.     All right. And looking at the -- the first sentence

08:58:45 25   here in that chapter, what does Remington's disclose?

Donovan - Direct

08:58:48  1    A.      The first sentence just starts out saying that drug

08:58:52  2    substances are frequently administered orally, and they --

08:58:55  3    identifies the use of tablets and capsules.

08:58:58  4    Q.      Is there a section in Remington's that discusses what

08:59:01  5    ingredients can be used in tablets?

08:59:04  6    A.      Yes, there is a section in this chapter.

08:59:06  7            MR. MATHAS:  Let's turn to Page 6 of the

08:59:08  8    exhibit, section on tablet ingredients.

08:59:08  9    BY MR. MATHAS:

08:59:12  10   Q.      What does Remington's disclose here?

08:59:14  11   A.      So, again, they just -- they're describing that the

08:59:17  12   active or therapeutic ingredient for the tablet is often

08:59:20  13   combined with other, what they are referring to as, inert

08:59:23  14   materials or excipients or additives, kind of

08:59:27  15   interchangeable terms at times.

08:59:29  16            And then they go on to describe what those other

08:59:31  17   types of excipients would be by classification.  And, again,

08:59:35  18   they -- they identify various classifications of excipients,

08:59:39  19   including diluents, glidants, lubricants, and disintegrants.

08:59:43  20   Q.      All right.

08:59:44  21            MR. MATHAS:  Can we please pull up DDX-20.

08:59:44  22   BY MR. MATHAS:

08:59:48  23   Q.      What are you showing on this slide, Dr. Donovan?

08:59:50  24   A.      So, in -- further into the chapter, they actually

08:59:54  25   have some sections about each of these excipient categories.

Donovan - Direct

08:59:58  1    And so what I've done is -- is highlight the beginning

09:00:01  2    portions, or the complete portions, depending on each of

09:00:04  3    those sections.

09:00:05  4    Q.    All right.

09:00:06  5            MR. MATHAS:  Let's take a closer look at the

09:00:07  6    glidant section, which is found on Page 8 of DTX-284.

09:00:07  7    BY MR. MATHAS:

09:00:13  8    Q.    What does -- what does the glidant section disclose?

09:00:17  9    A.    The glidant section, again, describes the typical

09:00:21 10    definition for glidants, and then gives a couple of examples

09:00:24 11    of glidants; one being colloidal silicon dioxide, the other

09:00:28 12    being talc.  And we've discussed talc earlier so that's

09:00:31 13    highlighted here.

09:00:32 14    Q.    And so -- and as of February 2011, would a POSA have

09:00:35 15    understood that talc could be used as glidant?

09:00:37 16    A.    Yes, they would.

09:00:39 17    Q.    All right.  Were there other textbooks available to

09:00:42 18    the persons of skill in art -- in the art discussing tablet

09:00:46 19    formulations as of February 2011?

09:00:49 20    A.    Yes, there were.

09:00:50 21            MR. MATHAS:  Let's pull up DTX-288.

09:00:50 22    YB MR. MATHAS:

09:00:54 23    Q.    Dr. Donovan, what is DTX-288?

09:00:56 24    A.    This is a text called "Pharmaceutical Dosage Forms:

09:01:00 25    Tablets, Volume I."  There's multiple volumes, even just

Donovan - Direct

1   describing tablets.  It's in a volume series of other dosage

2   forms.

3   Q.    All right.

4           MR. MATHAS:  Let's go to Chapter 2 of Lachman at

5   page -- DTX-288 at 95.

6   BY MR. MATHAS:

7   Q.    What is Chapter 2 of Lachman covering?

8   A.    Chapter 2 is describing tablet formulations and

9   design.

10          MR. MATHAS:  Let's go within Chapter 2 to Page

11  113.

12  BY MR. MATHAS:

13  Q.    Dr. Donovan, what is Lachman describing on Page 113

14  about tablets?

15  A.    So, similar to what we saw in Remington, descriptions

16  of excipients that are used in tablets.  And Lachman divides

17  those into subcategories based on their functionality.  And

18  so the first category, things -- the kinds of excipients

19  that are used to contribute to the tablet formation process;

20  so, diluents, binders, lubricants, glidants.  So diluents,

21  lubricants, and glidants that we've been talking about.

22          And then in a separate category, some of the

23  excipients that we use to -- to induce particular

24  performance categories or optimize particular performance

25  characteristics of the tablet.  And so that's where Lachman

Donovan - Direct

09:02:10  1    decided to include disintegrants.  Among others.

09:02:14  2    Q.    Okay.  Does Lachman have sections in his chapter on

09:02:19  3    each of the various categories of excipients?

09:02:22  4    A.    Yes, he does.

09:02:23  5          MR. MATHAS:  Let's go to DDX-21, please.

09:02:23  6    BY MR. MATHAS:

09:02:25  7    Q.    What are you showing here?

09:02:26  8    A.    Again, similarly, the beginning portions or the full

09:02:30  9    portion of the sections in Lachman describing those four

09:02:34 10    excipient categories.

09:02:35 11    Q.    All right.

09:02:35 12          MR. MATHAS:  Let's go forward to Chapter 3 of

09:02:37 13    Lachman, which we find on DTX-288 at 151.

09:02:37 14    BY MR. MATHAS:

09:02:43 15    Q.    What is Chapter 3 covering?

09:02:44 16    A.    Chapter 3 is covering compressed tablets using -- or

09:02:48 17    by wet granulation.

09:02:50 18    Q.    And does this chapter in Lachman have a section on

09:02:56 19    excipients that are used in wet granulation?

09:02:58 20    A.    Yes, it does.

09:02:59 21          MR. MATHAS:  Can we pull up Page 171 of the

09:03:03 22    exhibit, please?

09:03:03 23    BY MR. MATHAS:

09:03:03 24    Q.    What is this section, Dr. Donovan?

09:03:05 25    A.    This section, again, is talking about excipients used

Donovan - Direct

09:03:09  1   in tablets formed via wet granulation and it's identifying

09:03:13  2   excipients and identifies fillers, disintegrants,

09:03:16  3   lubricants, and glidants as excipients that would be used.

09:03:21  4   Q.    Okay.  Does Lachman provide any exemplary

09:03:24  5   formulations in its Chapter 3?

09:03:26  6   A.    Yes, there are a number of exemplary formulations in

09:03:30  7   the chapter.

09:03:31  8   Q.    All right.

09:03:31  9          MR. MATHAS:  Let's look at some of those,

09:03:33 10   starting with Example 6, which spans the document Pages 176

09:03:38 11   to 177.

09:03:38 12   BY MR. MATHAS:

09:03:40 13   Q.    What are you showing here Dr. Donovan?

09:03:42 14   A.    So this is one of the examples in this chapter, and

09:03:45 15   the reason I like this example is that it doesn't -- it's

09:03:47 16   not an example for a specific drug.  It teaches a POSA that

09:03:52 17   this formulation would likely be suitable as a starting

09:03:55 18   formulation for many drug substances.  And so, it tells us

09:03:59 19   about the use of a drug.

09:04:00 20          And then I'll go back to the beginning section,

09:04:02 21   where there's a little bit of instruction or information

09:04:05 22   about the design and the formulation.  And it identifies the

09:04:09 23   use of a filler, in green.  And then highlighted in green,

09:04:12 24   the substances.

09:04:13 25          In the example, the use of a disintegrant, the

Donovan - Direct

09:04:17  1  use of a lubricant, and, if necessary, the use of a glidant.

09:04:20  2  And each of those, a filler, a disintegrant, a lubricant,

09:04:23  3  and a glidant are included in this prototype formulation.

09:04:27  4  Q.    All right.  And how would a POSA, as of February of

09:04:29  5  2011, have used a drug-agnostic prototype formulation like

09:04:35  6  this?

09:04:35  7  A.    Well, if they were -- if they were attempting a -- a

09:04:38  8  formulation of a drug substance, they would look at this

09:04:41  9  example and they might choose to use exactly this as a

09:04:44 10  starting point to develop a tablet.  And they may need to

09:04:48 11  further optimize, they may need to switch out excipients for

09:04:53 12  something else in the same category if, during an excipient

09:04:57 13  compatibility study, something demonstrates that they could

09:05:00 14  choose or should choose a different excipient.  But this is

09:05:02 15  an excellent starting composition.

09:05:04 16  Q.    And would changing out those excipients, as you

09:05:07 17  mentioned, would that be routine?

09:05:08 18  A.    Yes.  Exactly.  That's what -- that's what

09:05:10 19  formulators do.

09:05:11 20  Q.    Okay.

09:05:12 21         MR. MATHAS:  Let's look at another example,

09:05:13 22  Example 16, which is found on Page 188 of Exhibit 288.

09:05:13 23  BY MR. MATHAS:

09:05:20 24  Q.    What are you showing in Example 16?

09:05:22 25  A.    So this is another example of one of the

09:05:24 1   drug-agnostic formulations that's in the chapter.  Again,

09:05:28 2   many drugs would be expected to be suitable and -- and be

09:05:33 3   able to be used with this formulation.  The formulation

09:05:37 4   describes the choice of a number of different types of

09:05:40 5   fillers and gives a different combination of disintegrant,

09:05:45 6   lubricant, and lubricant -- and glidant in the formulation.

09:05:51 7   Q.    Okay.  Now, we've heard over the course of the trial

09:05:55 8   that cabozantinib is a tyrosine kinase inhibitor; is that

09:05:58 9   right?

09:05:59 10  A.    That's right.

09:05:59 11  Q.    Okay.  And did you look at any references related to

09:06:01 12  formulating tyrosine kinase inhibitors?

09:06:04 13  A.    I did.

09:06:05 14          MR. MATHAS:  Can we pull up DTX-335, please.

09:06:05 15  BY MR. MATHAS:

09:06:09 16  Q.    What is DTX-335?

09:06:11 17  A.    This is a patent application publication.  And it's

09:06:15 18  describing tyrosine kinase inhibitors.  Describing

09:06:18 19  combinations, as indicated in the abstract.  And I'm going

09:06:22 20  to refer to this as the '081.

09:06:28 21  Q.    Okay.  Let's go -- does DTX-335 describe whether the

09:06:32 22  compounds can be formulated into dosage forms?

09:06:34 23  A.    Yes, it does.

09:06:36 24          MR. MATHAS:  Okay.  Let's go forward to

09:06:38 25  paragraph 102 of the '081 application.  DTX-335 at Page 14.

09:06:38  1   BY MR. MATHAS:

09:06:46  2   Q.     What's being disclosed in paragraph 102?

09:06:48  3   A.     So, here they're talking, again, about the

09:06:50  4   pharmaceutical compositions for kinase inhibitors and

09:06:56  5   they're described as suitable oral dosage forms, including

09:06:59  6   but are not limited to tablets and capsules, and then they

09:07:03  7   go and describe the components of those compositions; may

09:07:05  8   contain more -- they may contain excipients and those

09:07:09  9   excipients would include fillers, disintegrants, lubricants,

09:07:13 10   glidants, other categories potentially.

09:07:15 11   Q.     And does the '081 application provide further

09:07:19 12   descriptions of these exhibit categories --

09:07:21 13   A.     Yes, it does.

09:07:21 14   Q.     -- excipient categories?

09:07:22 15   A.     Yes, it does.

09:07:25 16          MR. MATHAS:  Let's take a look at the next page,

09:07:27 17   paragraphs 104 to 107.

09:07:27 18   BY MR. MATHAS:

09:07:29 19   Q.     What are you showing here, Dr. Donovan?

09:07:31 20   A.     Again, similar to the other resources, the sections

09:07:35 21   that are included here are the sections in the '081

09:07:38 22   describing glidants, describing disintegrants, describing

09:07:41 23   lubricants and describe glidants [sic].

09:07:42 24          MR. MATHAS:  All right.  Let's focus in on the

09:07:44 25   glidant paragraph, paragraph 107, if we could.

Donovan - Direct

BY MR. MATHAS:

Q.    What does paragraph 107 show, Dr. Donovan?

A.    They're identifying suitable glidants for use,
colloidal silicon dioxide and talc.

        MR. MATHAS:  All right.  Can we go to DDX-22,
please.

BY MR. MATHAS:

Q.    And we'll turn and we'll talk about the last issue in
your technical background, Dr. Donovan.

        What is that?

A.    I'm going to talk about limiting the impurities
that -- that may occur during formulation.

Q.    And did the prior art teach a formulator about
limiting impurities during formulation development?

A.    Yes, it did.

        MR. MATHAS:  Let's take a look at DTX-328.

BY MR. MATHAS:

Q.    What is DTX-328?

A.    This is the Robinson article that we've talked about
before, but it's an article talking about control of
genotoxic impurities in APIs.

Q.    All right.  And does Robinson describe limiting
impurities in drug products?

A.    Yes.  Yes, Robinson does.

        MR. MATHAS:  Okay.  Can we go to the Robinson's

09:08:48  1    introduction on Page 1 and pull that up?

09:08:48  2    BY MR. MATHAS:

09:08:52  3    Q.      What are you highlighting from the introduction of

09:08:55  4    Robinson?

09:08:55  5    A.      Well, Robinson starts with the -- the directive

09:09:00  6    essentially that ensures safety of pharmaceutical products

09:09:03  7    is a responsibility of chemists, engineers, formulators

09:09:08  8    involved in their manufacture.  So, there are a number of

09:09:10  9    individuals that are touchpoints to, again, ensure that the

09:09:15 10    pharmaceutical product is safe and in the context of this

09:09:18 11    article it's about genotoxic impurities.

09:09:21 12    Q.      Okay.  And Dr. Lepore testified earlier from the

09:09:24 13    perspective of a chemist; is that correct?

09:09:26 14    A.      That's correct, yes.

09:09:27 15    Q.      And now you are testifying from the perspective of a

09:09:30 16    formulator; is that right?

09:09:31 17    A.      Yes.

09:09:32 18    Q.      Okay.  All right.  Now, would a POSA have been aware

09:09:35 19    of any other teachings in the prior art about limiting

09:09:37 20    impurities in dosage forms?

09:09:38 21    A.      Yes.

09:09:39 22              MR. MATHAS:  Let's take a look back at

09:09:42 23    Lachman's, which is DTX-288, Page 63 of the reference at the

09:09:48 24    section entitled "Stability."

09:09:48 25    BY MR. MATHAS:

385

Donovan - Direct

09:09:51 1  Q.     What does Lachman teach us about these issues?

09:09:54 2  A.     So Lachman's teaching us that when we're designing a

09:09:57 3  solid dosage form, tablets and capsules for example, that we

09:10:01 4  need to identify the excipients that we're going to be using

09:10:04 5  and how to put them together, obviously, for the

09:10:07 6  composition.  But it's important to know that no toxic

09:10:10 7  substances are formed from those combinations.

09:10:13 8          MR. MATHAS:  Okay.  Let's look at the next

09:10:15 9  section in Lachman's on pages 98 and 99.

09:10:15 10 BY MR. MATHAS:

09:10:20 11 Q.     What does Lachman describe here?

09:10:21 12 A.     Similarly, the Lachman is describing that in -- when

09:10:26 13 formulating one of the most important activities in the

09:10:30 14 preformulation activities is a drug excipient compatibility

09:10:34 15 study.  So as we're selecting the components to include with

09:10:38 16 our API, that we demonstrate using routine experimentation

09:10:44 17 really, the combination -- that combinations of the

09:10:47 18 excipients that we're going to use do not cause -- do not

09:10:51 19 cause additional materials to form or impurities to -- to

09:10:58 20 form within the dosage form or at least in limited amounts.

09:11:02 21         MR. MATHAS:  Okay.  Let's take a look at another

09:11:04 22 guidance, DTX-325.

09:11:04 23 BY MR. MATHAS:

09:11:08 24 Q.     What is DTX-325?

09:11:09 25 A.     This is Remington's, also, in -- now in a second

Donovan - Direct

09:11:13  1    volume of Remington.

09:11:16  2           MR. MATHAS:  All right.  If we go forward to

09:11:19  3    Page 14, near the section titled "Chemical Properties."

09:11:19  4    BY MR. MATHAS:

09:11:24  5    Q.    What does Remington discuss here?

09:11:29  6    A.    Okay.  And what Remington is also discussing there,

09:11:32  7    this is within a discussion of preformulation activities,

09:11:35  8    that physical and chemical stability is important to

09:11:39  9    maintain in the pharmaceutical product and it's imperative

09:11:42 10    that during preformulation that those characteristics are

09:11:45 11    evaluated.  And again, the -- sort of a similar statement,

09:11:50 12    evaluation of physical and chemical stability of a new drug

09:11:53 13    substance is important during preformulation.

09:11:56 14    Q.    Dr. Donovan, are there any regulatory guidance

09:11:59 15    documents regarding limiting impurities in drug products?

09:12:02 16    A.    Yes.  There's quite a few of them.

09:12:04 17           MR. MATHAS:  Let's go to DDX-23, please.

09:12:04 18    BY MR. MATHAS:

09:12:07 19    Q.    What are you showing here, Dr. Donovan?

09:12:09 20    A.    So, again, I'm showing even a subset of the

09:12:11 21    regulatory guidance documents regarding impurities in

09:12:15 22    pharmaceutical products and pharmaceutical systems.  And

09:12:17 23    what I've got pulled up to the front at least are the --

09:12:20 24    certainly the genotoxic impurity guidance, which is -- which

09:12:23 25    is important for this case.

Donovan - Direct

09:12:25   1        And then another guidance that speaks to

09:12:29   2   impurities, the impurities in new drug products, and there's

09:12:32   3   other similar guidances that contain instructions to

09:12:35   4   formulator in the industry about how -- about how to

09:12:40   5   identify -- how to quantify impurities that are -- that --

09:12:46   6   that are in the formulations or in the API.

09:12:50   7   Q.    Okay.  And we'll look at some of those in more detail

09:12:53   8   later.

09:12:53   9        MR. MATHAS:  But let's go to DDX-18 at this

09:12:57  10   point -- I'm sorry.  DDX-24 at this point.

09:12:57  11   BY MR. MATHAS:

09:13:01  12   Q.    And what's the next topic that we'll be discussing?

09:13:03  13   A.    So I'm actually going to be discussing the process I

09:13:06  14   went through to evaluate Claim 3 in terms of obviousness --

09:13:12  15   obviousness and my determination that Claim 3 is obvious.

09:13:15  16   Q.    Okay.  And in reaching that opinion, Dr. Donovan, did

09:13:19  17   you apply your understanding of the applicable legal

09:13:23  18   standard for obviousness?

09:13:24  19   A.    Yes, I did.

09:13:24  20        MR. MATHAS:  Let's go to DDX-25, please.

09:13:28  21   BY MR. MATHAS:

09:13:28  22   Q.    Dr. Donovan, is this the legal standard for

09:13:31  23   obviousness that you applied in reaching your invalidity

09:13:34  24   opinions in this case?

09:13:35  25   A.    Yes, it is.

Donovan - Direct

09:13:36 1   Q.     All right.  And so, did you work through the four

09:13:40 2   steps shown here on -- in the bullets?

09:13:43 3   A.     Yes, I did.

09:13:44 4   Q.     All right.  Let's -- let's do that now.  Let's go

09:13:46 5   through them one by one.

09:13:47 6          The first point on the level of ordinary skill

09:13:51 7   in the pertinent art.

09:13:53 8          MR. MATHAS:  Can we please pull up DDX-26.

09:13:55 9   BY MR. MATHAS:

09:13:55 10  Q.     Dr. Donovan, what are you showing on the left-hand

09:14:00 11  side of DDX-26?

09:14:02 12  A.     I'm showing my definition of a POSA in this matter

09:14:05 13  and that was read into the record yesterday, I think.  And

09:14:09 14  then it's in comparison to Dr. Myerson's position or

09:14:13 15  definition of a POSA.

09:14:15 16         And they're -- they're rather similar.  They're

09:14:18 17  different in education potentially or experience, but

09:14:21 18  they're relatively the same.

09:14:23 19  Q.     All right.  Would any of your invalidity opinions

09:14:25 20  change if considered from the perspective that Exelixis has

09:14:29 21  set out for a person of ordinary skill?

09:14:31 22  A.     No.

09:14:33 23         MR. MATHAS:  Okay.  Let's turn next to DDX-27,

09:14:36 24  please, and talk about the second element in the obviousness

09:14:41 25  analysis, the scope and contents of the prior art.

Donovan - Direct

09:14:41  1   BY MR. MATHAS:

09:14:44  2   Q.    Dr. Donovan, as part of your obviousness analysis,

09:14:47  3   did you determine the scope and content of the prior art?

09:14:50  4   A.    I did.  And before the priority date there was a

09:14:54  5   significant amount of art about pharmaceutical compositions

09:14:58  6   and what I've highlighted here is, as I've already

09:15:02  7   discussed, the four pieces that are shown in the foreground,

09:15:05  8   those are primarily going to be the ones I'm talking about

09:15:08  9   this morning.

09:15:12  10  Q.    Okay.  Now as -- Dr. Donovan, at the third step of

09:15:14  11  the obviousness analysis, did you ascertain the differences,

09:15:19  12  if any, between the claimed invention and the prior art?

09:15:22  13  A.    Yes, I did.

09:15:23  14  Q.    All right.  And did you do that by comparing what is

09:15:26  15  recited in Claim 3 with what was disclosed in the prior art

09:15:30  16  references?

09:15:30  17  A.    Yes, I did.

09:15:31  18        MR. MATHAS:  All right.  Let's take a look,

09:15:34  19  again, at the claim in DDX-28.  And let's look --

09:15:34  20  BY MR. MATHAS:

09:15:41  21  Q.    Let's start by talking about the compound element of

09:15:44  22  the claim.

09:15:45  23  A.    Mm-hmm.

09:15:45  24  Q.    Dr. Donovan, does the prior art disclose the

09:15:50  25  cabozantinib (L)-malate compound that is recited in Claim 3

Donovan - Direct

09:15:54  1    of the '349 patent?

09:15:56  2    A.    Yes, it does.  I've discussed previously that Brown

09:15:59  3    discloses cabozantinib (L)-malate.

09:16:01  4    Q.    All right.  Let's check that off real quick.

09:16:04  5           MR. MATHAS:  If we go to 291, 25.  We've seen

09:16:07  6    this before.

09:16:07  7    BY MR. MATHAS:

09:16:08  8    Q.    What are you showing, Dr. Donovan?

09:16:10  9    A.    I'm showing Brown.  And the structure in the red box

09:16:14  10   on the bottom right is cabozantinib (L)-malate.

09:16:16  11   Q.    So Brown discloses cabozantinib (L)-malate compound

09:16:19  12   recited in Claim 3?

09:16:21  13   A.    Yes.

09:16:22  14          MR. MATHAS:  Okay.  Let's go to the next slide,

09:16:24  15   DDX-29.

09:16:24  16   BY MR. MATHAS:

09:16:27  17   Q.    And you've highlighted in red here two -- two

09:16:31  18   additional claim elements.  And taking these elements,

09:16:35  19   Dr. Donovan, does the prior art disclose tablet and capsule

09:16:40  20   pharmaceutical compositions for oral administration?

09:16:43  21   A.    Yes.  Brown discloses compositions and also discloses

09:16:47  22   tablets and capsules as compositions.

09:16:50  23   Q.    Okay.  Does Brown also disclose oral administration?

09:16:52  24   A.    Yes, Brown does.

09:16:53  25          MR. MATHAS:  All right.  Let's look back at

391

Donovan - Direct

09:16:55 1    DTX-291, Page 22, paragraph 87 of Brown.

09:16:55 2    BY MR. MATHAS:

09:16:59 3    Q.     What are you showing here?

09:17:00 4    A.     Again, we're just -- this is what I discussed

09:17:03 5    previously, this is the excerpt out of Brown where they're

09:17:05 6    beginning to describe pharmaceutical compositions,

09:17:08 7    identifying oral administration for those compositions,

09:17:13 8    tablets and capsules being particularly preferred.

09:17:17 9    Q.     All right.

09:17:17 10             MR. MATHAS:  Let's go to the claims of Brown,

09:17:18 11   DTX-291, 41 and 42.

09:17:18 12   BY MR. MATHAS:

09:17:21 13   Q.     Does Brown also claim pharmaceutical compositions of

09:17:25 14   cabozantinib (L)-malate?

09:17:26 15   A.     Yes.  Brown does.  So I'm going to -- Claim 11

09:17:29 16   describes a pharmaceutical composition containing

09:17:32 17   cabozantinib (L)-malate, the chemical name shown there.  And

09:17:36 18   then in -- and pharmaceutical -- with pharmaceutically

09:17:39 19   acceptable excipients, and I've also included Claim 4 as a

09:17:43 20   basis that that is cabozantinib (L)-malate.

09:17:47 21   Q.     So does Brown disclose that cabozantinib (L)-malate

09:17:50 22   can be formulated as a tablet or capsule composition for

09:17:54 23   oral administration as recited in Claim 3?

09:17:56 24   A.     Yes.

09:17:57 25   Q.     All right.

09:17:57  1              MR. MATHAS:  Let's pull up DDX-30, please, and

09:18:01  2      look at the next limitation highlighted here which is the

09:18:04  3      excipient limitation.

09:18:04  4      BY MR. MATHAS:

09:18:06  5      Q.     Does the prior art disclose, Dr. Donovan, the use of

09:18:10  6      the claimed excipients?

09:18:11  7      A.     Yes.  Lots of prior art disclosed those -- use of

09:18:16  8      those excipients.  Brown, Lachman and the 081 in particular

09:18:19  9      that I've discussed describe the use of those excipient

09:18:24 10      types.

09:18:25 11      Q.     All right.

09:18:26 12              MR. MATHAS:  Let's look at Brown Paragraph 82,

09:18:28 13      again, DTX-291 at 21.

09:18:28 14      BY MR. MATHAS:

09:18:31 15      Q.     What does Brown teach here about any significance?

09:18:35 16      A.     Brown teaches that for a pharmaceutical composition,

09:18:37 17      the use of fillers, disintegrating agents, lubricants and

09:18:41 18      then talc -- as we've discussed, talc is a glidant and is

09:18:44 19      recognized as a glidant -- those would be appropriate for

09:18:48 20      use in those compositions.

09:18:49 21      Q.     All right.

09:18:50 22              MR. MATHAS:  Let's look at Lachman Example 6,

09:18:52 23      again, DTX-288 at 176.

09:18:52 24      BY MR. MATHAS:

09:18:55 25      Q.     What does Lachman disclose with respect to the

09:18:58  1   claimed excipients?

09:18:59  2   A.      Lachman discloses a prototype formulation that

09:19:02  3   contains those exact four categories of excipients.  So,

09:19:06  4   fillers, disintegrants, lubricants and glidants.

09:19:09  5              MR. MATHAS:  And let's look at the 081

09:19:11  6   application publication, DTX-335 at 14.

09:19:11  7   BY MR. MATHAS:

09:19:16  8   Q.      What does it disclose with respect to the claimed

09:19:18  9   excipients?

09:19:19 10   A.      And the 081, again, disclosing oral dosage forms that

09:19:23 11   are tablets and capsules using fillers, disintegrants,

09:19:26 12   lubricants and glidants as excipients.

09:19:29 13   Q.      Dr. Donovan, in your opinion, would the person of

09:19:31 14   ordinary skill in the art have been motivated to combine the

09:19:35 15   teachings of the prior art references that we've been

09:19:37 16   looking at to formulate cabozantinib (L)-malate into a

09:19:42 17   tablet or capsule composition with the claimed excipients?

09:19:45 18   A.      Yes, they would.

09:19:47 19   Q.      And why is that?

09:19:47 20   A.      Well, again, they have -- with cabozantinib

09:19:51 21   (L)-malate as an API, trying to provide a convenient method

09:19:57 22   for that to be administered.  Pharmaceutical composition

09:20:01 23   that's a tablet or a capsule is well known.  And the

09:20:05 24   excipient combinations that are described are also well

09:20:08 25   known in the art for making those compositions.

Donovan - Direct

09:20:13  1    Q.      All right.  And did the three references that we've

09:20:14  2    just looked at Brown and Lachman and the 081 publication

09:20:19  3    application, would those have motivated the POSA?

09:20:22  4    A.      Yes, certainly.  Brown in particular has -- has all

09:20:27  5    of the components, again, with the proviso that talc is

09:20:32  6    known as a glidant.  And if one was uncertain, it could

09:20:35  7    easily look at Lachman for a descriptive prototype

09:20:39  8    formulation containing those four excipients.

09:20:42  9    Q.      All right.  And how would the 081 application factor

09:20:46 10    in?

09:20:46 11    A.      The '081, again, further supports in this time

09:20:49 12    specifically for tyrosine kinase inhibitors, the same

09:20:53 13    formulation would be appropriate.

09:20:54 14    Q.      All right.  In your opinion, Dr. Donovan, would the

09:20:57 15    person of ordinary skill in the art as of February of 2011

09:21:00 16    have had a reasonable expectation of success in formulating

09:21:05 17    a cabozantinib (L)-malate tablet or capsule composition with

09:21:09 18    the claimed excipients?

09:21:11 19    A.      Yes, they would.

09:21:12 20    Q.      And, again, why is that?

09:21:13 21    A.      Well, again, they -- these excipients are well known.

09:21:17 22    There are a number of different grades of materials and a

09:21:21 23    number of different materials in each of those categories.

09:21:23 24    So, if there was the need to -- even if one started with the

09:21:27 25    Lachman example and needed to change one of those excipients

Donovan - Direct

09:21:30  1    to something else in the category for whatever desired

09:21:35  2    purpose, it would be possible.  Looking at the structure of

09:21:39  3    cabozantinib (L)-malate, just as the chemical structure,

09:21:42  4    formulators oftentimes do that, looking for chemical

09:21:45  5    indicators just in the structure that they might need to be

09:21:50  6    concerned with.  I couldn't identify any structures that I

09:21:53  7    thought were concerning regarding general formulation of

09:21:58  8    cabozantinib and so, perfectly motivated to combine those

09:22:04  9    materials and be -- I would have a reasonable expectation

09:22:09 10    that I would have a successful pharmaceutical composition.

09:22:12 11    Q.    All right.  And when you say "I" there, are you

09:22:13 12    referring to the person of ordinary skill in the art?

09:22:15 13    A.    Yes.

09:22:15 14    Q.    As of February 2011?

09:22:17 15    A.    Also would do that.

09:22:18 16    Q.    All right.

09:22:19 17          MR. MATHAS:  Let's go to DDX-31, please, and

09:22:22 18    turn and talk about the last limitation of the claims.

09:22:22 19    BY MR. MATHAS:

09:22:26 20    Q.    Dr. Donovan, does the prior art disclose cabozantinib

09:22:29 21    (L)-malate that is essentially free of the 1-1 impurity?

09:22:33 22    A.    Yes, it does.

09:22:34 23    Q.    All right.  And did Dr. Lepore testify about that

09:22:39 24    during his testimony?

09:22:39 25    A.    Yes, he did.  And described how Brown discloses

09:22:44  1   essentially cabozantinib (L)-malate essentially free of the

09:22:47  2   1-1 impurity.

09:22:48  3   Q.      And that testimony was related to the cabozantinib

09:22:51  4   API; right?

09:22:51  5   A.      Yes.

09:22:52  6   Q.      And the claim here is talking about the

09:22:56  7   pharmaceutical composition containing that API being

09:22:59  8   essentially free; is that right?

09:23:00  9   A.      That's right.

09:23:01 10   Q.      Now, did the prior art include teachings about the

09:23:04 11   about formulating drug compositions to limit impurities?

09:23:08 12   A.      Yes, the prior art did.  I showed some examples.

09:23:11 13   It's well -- it's well known, and it's a tenet of

09:23:15 14   formulation to minimize or to be concerned with stability,

09:23:21 15   to be aware of stability of the API in other -- other

09:23:25 16   components in the composition.

09:23:26 17   Q.      Okay.

09:23:27 18           MR. MATHAS:  Let's look back at Lachman 288 at

09:23:29 19   Page 63.

09:23:29 20   BY MR. MATHAS:

09:23:31 21   Q.      And, again, what would a Lachman have taught the

09:23:35 22   formulator about formulating an API into a dosage form with

09:23:40 23   respect to impurities?

09:23:42 24   A.      So, again, highlighting that the formulator needs to

09:23:45 25   know about the inherent stability, needs to understand the

Donovan - Direct

09:23:49  1   excipients that are being used and that when combined with

09:23:52  2   the API that no toxic substances are formed.

09:23:54  3   Q.      And would this concept have been well known to a

09:23:57  4   formulator as of February 2011?

09:23:59  5   A.      Very well known, yes.

09:24:00  6   Q.      And in your opinion, as of February 2011, would a

09:24:04  7   formulator have been motivated to monitor for the 1-1

09:24:08  8   impurity?

09:24:08  9   A.      Yes, they would.

09:24:10  10   Q.      And why is that?

09:24:11  11   A.      Because the formulator would have learned from the

09:24:16  12   chemists involved just knowing that there -- there are

09:24:20  13   indicators that -- that there may be impurities or

09:24:25  14   carry-through substances that might be toxic that -- that

09:24:30  15   monitoring the 1-1 would be something to do during

09:24:33  16   formulation development.

09:24:34  17   Q.      Okay.  In your opinion, Dr. Donovan, would the person

09:24:37  18   of ordinary skill in the art have been motivated to use the

09:24:40  19   cabozantinib (L)-malate API that is essentially free of the

09:24:45  20   1-1 impurity from the Brown reference to formulate that into

09:24:49  21   a pharmaceutical composition that was essentially free of

09:24:54  22   the 1-1 impurity?

09:24:54  23   A.      Yes, they would.

09:24:55  24   Q.      And why is that?

09:24:56  25   A.      Well, again, the Brown -- the Brown publication

Donovan - Direct

09:25:01 1    essentially describes that.  A pharmaceutical composition,

09:25:03 2    the API that Brown is describing is free of the 1-1 -- or

09:25:07 3    essentially free of the 1-1 impurity, and the Brown

09:25:10 4    reference describes compositions with the -- with the four

09:25:14 5    categories of excipients and others -- other information in

09:25:17 6    the art about the excipients certainly supports that.

09:25:21 7    Q.    All right.  Dr. Donovan, would a -- in your opinion,

09:25:28 8    would a person of ordinary skill in the art --

09:25:29 9              MR. MATHAS:  You can take that down.

09:25:29 10   BY MR. MATHAS:

09:25:30 11   Q.    Would a person of ordinary skill in the art have had

09:25:31 12   a reasonable expectation of success in formulating a

09:25:35 13   pharmaceutical composition of cabozantinib (L)-malate that

09:25:38 14   is essentially free of the 1-1 impurity?

09:25:40 15   A.    Yes, basically starting with the cabozantinib

09:25:43 16   (L)-malate of the Brown process understand -- looking at

09:25:48 17   that molecule, a POSA would have reasonable expectation of

09:25:53 18   success of developing a pharmaceutical composition of

09:25:57 19   cabozantinib (L)-malate as described in Claim 3.

09:26:01 20   Q.    And so, the POSA would have a reasonable expectation

09:26:04 21   of success of formulating that cabozantinib (L)-malate into

09:26:07 22   a composition that was essentially free of the 1-1 impurity?

09:26:10 23   A.    Yes.

09:26:12 24   Q.    Okay.  Let's turn briefly -- Dr. Donovan, as part of

09:26:16 25   your analysis, did you also consider objective indicia of

Donovan - Direct

09:26:19 1   non-obviousness?

09:26:20 2   A.     I did.

09:26:21 3          MR. MATHAS:  Let's turn to DDX-32, please, and

09:26:26 4   start with unexpected results.

09:26:26 5   BY MR. MATHAS:

09:26:28 6   Q.     Dr. Donovan, what is your understanding of the

09:26:30 7   unexpected results that are alleged here?

09:26:32 8   A.     Well, I've come to understand that the -- there's

09:26:35 9   a -- the formation of a cabozantinib capsule or the -- yeah,

09:26:40 10  the formulation of a cabozantinib capsule was -- was

09:26:44 11  determined to be unexpected by the inventors.  The ability

09:26:47 12  to use wet granulation to develop a tablet was -- was stated

09:26:52 13  as being unexpected by the inventors.  And the ability to

09:26:56 14  have that composition have storage stability was unexpected

09:27:01 15  to them.

09:27:04 16  Q.     Let's talk about those alleged claims of

09:27:07 17  unexpectedness, and we'll start with the capsule claim.

09:27:14 18         Now, would a person of ordinary skill in the art

09:27:16 19  have expected to be able to formulate cabozantinib

09:27:20 20  (L)-malate into a capsule that was essentially free of the

09:27:24 21  1-1 impurity?

09:27:24 22  A.     Yes, they would.  Starting with the cabozantinib

09:27:28 23  (L)-malate that's essentially free of the 1-1 impurity

09:27:32 24  combining with known excipients and known manners especially

09:27:35 25  with the capsule.  Oftentimes, we can just simply premix the

09:27:40 1   components and put them into capsule shell.

09:27:43 2   Q.    All right.  And are you aware of any evidence that

09:27:46 3   supports that the cabozantinib (L)-malate from the Brown

09:27:50 4   Example 1 process could be used in capsules that are

09:27:52 5   essentially free of the 1-1?

09:27:53 6   A.    I've heard about capsules that were formulated from

09:27:57 7   the Regis batches that were -- would have been essentially

09:28:03 8   free of the 1-1.

09:28:04 9   Q.    And that was during Dr. Lepore's testimony?

09:28:06 10  A.    Yes.

09:28:07 11  Q.    All right.  And so, let's talk about the second point

09:28:11 12  here.  Would a person of ordinary skill in the art have

09:28:14 13  expected to be able to formulate a cabozantinib tablet that

09:28:18 14  was essentially free of the 1-1 impurity using wet

09:28:21 15  granulation?

09:28:22 16  A.    Yes.  Starting with a API essentially free of the 1-1

09:28:26 17  there -- a POSA would understand that using a wet

09:28:31 18  granulation process would likely maintain the essentially

09:28:37 19  free status of that 1-1 impurity.

09:28:39 20  Q.    Okay.  Does the '349 patent Claim 3 allow for the use

09:28:43 21  of tablets formulated by wet granulation?

09:28:46 22  A.    It allows for the use of tablets made by any method.

09:28:49 23  Q.    Okay.  Does the '349 patent, the specification,

09:28:55 24  describe any specific or particular ways of formulating the

09:28:59 25  claimed composition such that it limits the 1-1 impurity?

401

Donovan - Direct

09:29:09  1    A.      No, it does not.

09:29:10  2              MR. MATHAS:  Let's look at what the

09:29:11  3    specification does disclose.  That's JTX-4, Page 13,

09:29:18  4    Columns -- sorry, Column 20, Lines 36 to 52, Section 3 on

09:29:26  5    pharmaceutical compositions.

09:29:26  6    BY MR. MATHAS:

09:29:28  7    Q.      What does the patent describe about how to make the

09:29:32  8    claimed formulations, Dr. Donovan?

09:29:34  9    A.      Well, the patent is -- is directing individuals to

09:29:39 10    use techniques already known for the -- for the preparation

09:29:45 11    and production of those unit dosage forms and guides the

09:29:48 12    reader to Remington or to Swarbrick, which we've talked

09:29:52 13    about.

09:29:53 14    Q.      Okay.

09:29:53 15              MR. MATHAS:  Can we go forward to the next

09:29:55 16    column, Column 21, Lines 37 to 45.

09:29:55 17    BY MR. MATHAS:

09:29:59 18    Q.      Now, with respect to formulating compositions of the

09:30:03 19    invention, what does the '349 patent describe about how a --

09:30:08 20    that can be done?

09:30:09 21    A.      Again, similarly, pointing to using methods known to

09:30:13 22    the skilled artisan, these compositions can be easily

09:30:16 23    formulated.

09:30:17 24    Q.      All right.  Dr. Donovan, in your opinion, was there

09:30:20 25    anything unexpected about formulating a tablet or a capsule

Donovan - Direct

09:30:24  1   to be essentially free of the 1-1 impurity?

09:30:27  2   A.     No, there wasn't.

09:30:27  3   Q.     Now, in your opinion, was there anything novel about

09:30:31  4   using the claimed excipients in a formulation to formulate a

09:30:37  5   tablet or capsule that's essentially free of the 1-1

09:30:39  6   impurity?

09:30:39  7   A.     No.   Those are extremely commonly used categories of

09:30:42  8   excipients.

09:30:42  9   Q.     All right.   The last point you mentioned on

09:30:46 10   unexpected results was something about stability over shelf

09:30:48 11   life; is that right?

09:30:49 12   A.     Yes.

09:30:49 13   Q.     Now, with respect to that claim, Doctor, the alleged

09:30:55 14   secondary consideration related to shelf life, does asserted

09:30:59 15   Claim 3 of the '349 patent require any particular stability

09:31:06 16   over any particular shelf life?

09:31:07 17   A.     No, it doesn't.

09:31:08 18          MR. MATHAS:   Let's go to DDX-33, please.   And

09:31:13 19   turn and talk about the next issue here, blocking patents.

09:31:13 20   BY MR. MATHAS:

09:31:16 21   Q.     Generally, Dr. Donovan, what's your understanding of

09:31:19 22   a blocking patent?

09:31:20 23   A.     Well, my understanding is if there's a patent

09:31:23 24   that's -- that's been issued, and it has -- its claimed

09:31:27 25   materials will limit the -- the ability and/or the

Donovan - Direct

09:31:33 1   motivation to work in similar areas, because one couldn't

09:31:39 2   commercialize anything that one had worked on because there

09:31:42 3   was already a preceding patent.

09:31:43 4   Q.    Okay.  And did that type of blocking patent

09:31:48 5   deterrence exist here?

09:31:50 6   A.    Yes, it did.

09:31:51 7            MR. MATHAS:  Let's pull up DTX-192, please.

09:31:51 8   BY MR. MATHAS:

09:31:54 9   Q.    What is DTX-192, Dr. Donovan?

09:31:56 10  A.    This is an international patent publication dated in

09:32:01 11  2005.  And it describes cabozantinib and pharmaceutically

09:32:05 12  related salts.

09:32:06 13  Q.    Okay.

09:32:07 14           MR. MATHAS:  Let's then next pull up DTX-13,

09:32:11 15  please.

09:32:11 16  BY MR. MATHAS:

09:32:13 17  Q.    What is DTX-13, Dr. Donovan?

09:32:16 18  A.    Again, this is U.S. Patent '473, also describing

09:32:20 19  cabozantinib and cabozantinib salts.

09:32:22 20  Q.    And when did it issue, Dr. Donovan?

09:32:24 21  A.    2009.

09:32:25 22  Q.    All right.  In your opinion, would the existence of

09:32:28 23  the '140 publication and '473 patent have deterred

09:32:32 24  individuals in the field from pursuing cabozantinib

09:32:36 25  formulations like those claimed in the '349 patent?

Donovan - Direct

09:32:39 1    A.      Yes, it would.

09:32:40 2    Q.      Okay.

09:32:41 3              MR. MATHAS:  Let's go to DDX-34, please.  Next

09:32:44 4    point on nexus.

09:32:44 5    BY MR. MATHAS:

09:32:46 6    Q.      Again, very generally, what does nexus refer to,

09:32:50 7    Dr. Donovan, in your understanding?

09:32:51 8    A.      Well, my understanding is nexus tells us that the

09:32:53 9    claims of the patent need to be directly related to the

09:32:59 10   commercial success of the embodiment of those claims.

09:33:02 11   Q.      Okay.  And in your opinion, Dr. Donovan, could an

09:33:05 12   equally viable formulation of cabozantinib (L)-malate be

09:33:10 13   prepared that is not covered by asserted Claim 3 of the '349

09:33:14 14   patent?

09:33:14 15   A.      Yes, it could.  And even the MSN formulation

09:33:16 16   demonstrates that.

09:33:18 17   Q.      All right.  And that's based on your infringement

09:33:20 18   testimony from yesterday?

09:33:21 19   A.      Yes; that is doesn't contain a glidant.

09:33:23 20   Q.      Okay.  All right.

09:33:24 21             MR. MATHAS:  Now, let's go to DDX-35, please.

09:33:29 22   BY MR. MATHAS:

09:33:29 23   Q.      And you've highlighted some other secondary

09:33:32 24   considerations here.  Did you consider the other objective

09:33:34 25   indicia listed in reaching your opinions in this case,

Donovan - Cross

09:33:37 1    Dr. Donovan?

09:33:39 2    A.    I did consider them, and I rely on the expertise and

09:33:41 3    the opinions of Dr. Mega and Dr. McDuff for those.

09:33:45 4    Q.    Very good.  And we'll here from Dr. Mega and

09:33:48 5    Dr. McDuff tomorrow.

09:33:49 6             Finally, Dr. Donovan --

09:33:51 7             MR. MATHAS:  Let's go to DDX-36, please.

09:33:53 8    BY MR. MATHAS:

09:33:55 9    Q.    And now that we've been through your analysis, your

09:33:59 10   obviousness analysis, your obviousness opinions,

09:34:02 11   Dr. Donovan, can you please summarize your obviousness

09:34:06 12   opinion for the Court?

09:34:07 13   A.    My opinion is that Claim 3 is invalid as being

09:34:11 14   obvious.

09:34:12 15   Q.    For the reasons you've discussed during this

09:34:14 16   testimony?

09:34:14 17   A.    Yes.

09:34:15 18            MR. MATHAS:  Thank you, Your Honor.  I have no

09:34:17 19   further questions at this time.

09:34:18 20            THE COURT:  All right.  Cross-examination.

09:34:22 21            MS. PIROZZOLO:  Thank you, Your Honor.

09:34:27 22                      CROSS-EXAMINATION

09:34:27 23   BY MS. PIROZZOLO:

09:34:54 24   Q.    Good morning, Dr. Donovan.

09:34:55 25   A.    Good morning.

Donovan - Cross

09:34:56  1    Q.     I'd like to start by talking about the '349 patent,

09:35:00  2    okay?

09:35:00  3    A.     Yes.

09:35:02  4    Q.     The specification of the '349 patent teaches that the

09:35:06  5    1-1 impurity should be minimized in pharmaceutical

09:35:10  6    compositions for human administration; correct?

09:35:13  7    A.     Can you point me to a paragraph in the '349 about

09:35:17  8    that?

09:35:17  9    Q.     Sure.

09:35:18 10           MS. PIROZZOLO:  If we pull up Joint Exhibit 4,

09:35:22 11    this is Tab 5 in the second volume.  And if we go to

09:35:30 12    Column 22, Lines 8 through 27.

09:35:30 13    BY MS. PIROZZOLO:

09:35:44 14    Q.     We have it up on the screen.

09:35:45 15    A.     Okay.

09:35:46 16    Q.     The figure, that is the 1-1 impurity; correct?

09:35:50 17    A.     That's what I've been -- that's what I know as the

09:35:54 18    1-1 impurity, yes.

09:35:55 19    Q.     Okay.  And the patent refers to "minimizing the

09:36:00 20    concentration of contaminants or byproducts, such as the 1-1

09:36:05 21    impurity in pharmaceutical compositions destined for human

09:36:09 22    administration"; correct?

09:36:11 23    A.     That's what's described, yes.

09:36:12 24    Q.     Okay.  In addition to teaching about the 1-1

09:36:17 25    impurity, the specification teaches methods for synthesizing

09:36:21   1    cabozantinib (L)-malate; correct?

09:36:23   2    A.    Yes.

09:36:24   3    Q.    Okay.  The specification includes examples of

09:36:29   4    specific tablet and capsule formulations of cabozantinib

09:36:34   5    (L)-malate; correct?

09:36:34   6    A.    It describes pharmaceutical compositions of

09:36:38   7    cabozantinib (L)-malate.

09:36:40   8    Q.    Okay.

09:36:41   9          MS. PIROZZOLO:  Could -- why don't we go to

09:36:43  10    Joint Exhibit 4, the '349 patent, starting at Column 5,

09:36:48  11    please.

09:36:48  12    BY MS. PIROZZOLO:

09:36:53  13    Q.    Okay.  The patent discloses examples of specific

09:36:57  14    tablet and capsule formulations; correct?

09:37:00  15    A.    Did you say Column 5?

09:37:02  16    Q.    Yes.

09:37:03  17    A.    Yes, there are several compositions described in

09:37:10  18    Column 5.

09:37:11  19    Q.    Okay.

09:37:11  20          MS. PIROZZOLO:  Now, if we go to the claim of

09:37:13  21    the patent on the last page of Joint Exhibit 4.

09:37:17  22    BY MS. PIROZZOLO:

09:37:20  23    Q.    Claim 3 is directed to a pharmaceutical composition

09:37:23  24    for oral administration; correct?

09:37:26  25    A.    Yes.

Donovan - Cross

09:37:29   1    Q.      And it's a pharmaceutical composition of Compound IB,

09:37:34   2    which is cabozantinib (L)-malate; correct?

09:37:36   3    A.      Yes.

09:37:38   4    Q.      Claim 3 requires that the composition be in a tablet

09:37:42   5    or capsule; correct?

09:37:43   6    A.      Yes.

09:37:45   7    Q.      And Claim 3 also requires that the tablet or capsules

09:37:49   8    be essentially free of the 1-1 impurity; correct?

09:37:52   9    A.      Yes.

09:37:53  10    Q.      Okay.  And that means the tablets and capsules must

09:37:56  11    be below 200 PPM of the 1-1 impurity; correct?

09:37:59  12    A.      Yes.

09:38:03  13    Q.      Now, you agree that it's the pharmaceutical

09:38:06  14    composition that must be essentially free of the 1-1

09:38:09  15    impurity and not the API, per the claim; correct?

09:38:13  16    A.      Yes.

09:38:14  17    Q.      Okay.  Now, you've offered the opinion that Claim 3

09:38:18  18    of the '349 patent is obvious -- is invalid as obvious in

09:38:22  19    view of the prior art; is that right?

09:38:24  20    A.      Yes.

09:38:24  21    Q.      And you're relying on Dr. Lepore to support that

09:38:27  22    opinion; correct?

09:38:28  23    A.      I'm relying on Dr. Lepore's report's opinion about

09:38:32  24    the availability of a cabozantinib (L)-malate salt

09:38:37  25    essentially free of the 1-1 impurity.

Donovan - Cross

09:38:41  1    Q.     So one of Dr. Lepore's opinions you rely on is that

09:38:44  2    the Brown reference discloses a process for making

09:38:47  3    cabozantinib that inherently results in a compound that is

09:38:51  4    essentially free of the 1-1 impurity; correct?

09:38:53  5    A.     Yes.

09:38:55  6    Q.     Now, you're not an expert who performs synthetic

09:38:59  7    chemistry; correct?

09:39:00  8    A.     I do not typically perform chemical synthesis, no.

09:39:03  9    Q.     And you are not offering your own opinion on whether

09:39:06 10    the chemical synthesis process in Brown inherently creates

09:39:10 11    cabozantinib (L)-malate that's free of the 1-1 impurity;

09:39:13 12    correct?

09:39:13 13    A.     That's correct.

09:39:15 14    Q.     Now, you're also relying on Dr. Lepore's alternative

09:39:19 15    opinion that a skilled artisan would have a reasonable

09:39:22 16    expectation of success in adding a recrystallization step to

09:39:27 17    make cabozantinib (L)-malate essentially free of the 1-1

09:39:29 18    impurity; correct?

09:39:30 19    A.     Yes.

09:39:32 20    Q.     You rely on his opinion because you haven't thought

09:39:35 21    about any recrystallization schemes that could be used;

09:39:39 22    correct?

09:39:39 23    A.     I have -- I thought about recrystallization in

09:39:42 24    concept as a purification methodology, and I'm well aware of

09:39:46 25    that methodology.  I haven't thought about specific

Donovan - Cross

09:39:50  1   recrystallization purification schemes for cabozantinib

09:39:52  2   (L)-malate.

09:39:53  3   Q.    Okay.  So, you haven't thought about any

09:39:56  4   recrystallization schemes that could be used to create

09:40:00  5   cabozantinib (L)-malate that's free of the 1-1 impurity;

09:40:04  6   correct?

09:40:04  7   A.    No.  No, I have not.

09:40:06  8   Q.    Now, you're not claiming that Brown -- the Brown

09:40:10  9   reference inherently discloses a pharmaceutical composition

09:40:14 10   of Claim 3; correct?

09:40:15 11   A.    Not inherently.  I am -- it doesn't -- it describes

09:40:20 12   pharmaceutical compositions.  It describes all of the

09:40:24 13   components of the Claim 3 composition.

09:40:28 14   Q.    Okay.  But my question was:  You're not claiming

09:40:32 15   Brown inherently discloses a pharmaceutical composition of

09:40:35 16   Claim 3; correct?

09:40:36 17   A.    And it would help if you would explain to me what you

09:40:41 18   -- why you're emphasizing inherently.

09:40:46 19   Q.    Because I'm talking --

09:40:47 20   A.    Or show me.  Have I provided an opinion where I have

09:40:51 21   stated that Brown inherently describes the pharmaceutical

09:40:54 22   composition?

09:40:55 23   Q.    Well, let's go to your deposition.

09:40:58 24         MS. PIROZZOLO:  It's Tab 4, Volume I, if we pull

09:41:02 25   it up.  Okay.  At Page 160, Lines 21, to 161, Line 2.

09:41:20  1          And you were asked:

09:41:22  2          "QUESTION:  You're not offering an opinion that

09:41:24  3   the composition with claimed characteristics was inherent in

09:41:28  4   the prior art?"

09:41:29  5          And you said, "I think the API composition and

09:41:33  6   its being free from the quinol impurity is inherent from the

09:41:37  7   prior art.  The rest of the formulation aspects of the prior

09:41:41  8   art are obvious."

09:41:41  9   BY MS. PIROZZOLO:

09:41:44 10   Q.    Is that your opinion?

09:41:45 11   A.    Yes, that's my opinion.

09:41:48 12   Q.    Now, you've worked at the University of Iowa College

09:41:51 13   of Pharmacy since 1989; correct?

09:41:53 14   A.    Yes.

09:41:54 15   Q.    And you've worked on formulation issues -- issues for

09:41:58 16   about four decades?

09:41:59 17   A.    That's fair, yes.

09:42:01 18   Q.    Okay.  You have not developed a formulation of a

09:42:04 19   commercially marketed drug; correct?

09:42:05 20   A.    No, that hasn't been my focus.

09:42:08 21   Q.    Okay.  Now, you have testified it would be obvious to

09:42:11 22   make a pharmaceutical composition of cabozantinib (L)-malate

09:42:15 23   essentially free of the 1-1 impurity; is that right?

09:42:18 24   A.    Yes.

09:42:19 25   Q.    Okay.  The API is the active pharmaceutical

Donovan - Cross

09:42:23  1    ingredient; correct?

09:42:24  2    A.      Yes.

09:42:25  3    Q.      A drug product is the pharmaceutical product that

09:42:28  4    includes the API and potentially other excipients; correct?

09:42:32  5    A.      Yes.

09:42:34  6    Q.      Now, each API has unique properties; correct?

09:42:37  7    A.      Typically, yes.

09:42:40  8    Q.      These unique properties include how the API reacts

09:42:43  9    with other chemicals; correct?

09:42:45 10    A.      Yes.

09:42:46 11    Q.      And every API does not react the same way to

09:42:50 12    temperature; correct?

09:42:54 13    A.      Not exactly the same way, no.

09:42:56 14    Q.      APIs can also interact with water in different ways;

09:42:59 15    correct?

09:43:00 16    A.      Potentially, yes.

09:43:01 17    Q.      Okay.  Now, the presence of impurities in an API

09:43:06 18    would often suggest that those same impurities would be

09:43:10 19    present in the final pharmaceutical composition; correct?

09:43:13 20    A.      It would be suggestive of that, yes.

09:43:15 21    Q.      Okay.  And that would occur unless there was some

09:43:20 22    attempt to remove them; correct?

09:43:21 23    A.      Usually.

09:43:22 24    Q.      Okay.  Now, degradation products are a type of

09:43:26 25    impurity; correct?

Donovan - Cross

09:43:27 1    A.      Yes.

09:43:28 2    Q.      Degradation products may occur during formulation;

09:43:32 3    correct?

09:43:32 4    A.      They can and this is why we do excipient

09:43:34 5    compatibility studies.

09:43:36 6    Q.      Degradation impurities can occur during the

09:43:39 7    production of steps used to reach a final dosage form;

09:43:42 8    correct?

09:43:43 9    A.      They can and we oftentimes check for those even in

09:43:46 10   preformulation and formulation activities.

09:43:48 11   Q.      Okay.  Hydrolysis is a degradation reaction that can

09:43:53 12   occur in drug products; correct?

09:43:55 13   A.      Yes, it can.

09:43:56 14   Q.      Excipients can interact with an API in a way that

09:44:00 15   causes degradation; correct?

09:44:01 16   A.      Yes.  And, again, that's why we do excipient

09:44:03 17   compatibility studies.

09:44:04 18   Q.      Okay.  And excipients -- for example, degradation

09:44:08 19   could occur through oxidation; correct?

09:44:10 20   A.      That is a known degradation pathway, yes.

09:44:14 21   Q.      And you can't predict in advance every reaction that

09:44:17 22   might occur between an excipient and the API; correct?

09:44:20 23   A.      You can't predict every -- every one of them.

09:44:23 24   Oftentimes we have indicators of suspicion based on the

09:44:28 25   materials and their chemical properties and previous

Donovan - Cross

09:44:31  1   behaviors.  And, again, that's why we do excipient

09:44:33  2   compatibility studies.

09:44:35  3   Q.     So, you perform experiments to determine whether the

09:44:38  4   excipient is compatible with the FDA -- with the API;

09:44:42  5   correct?

09:44:42  6   A.     Yes.  And we choose -- choose -- oftentimes try to

09:44:48  7   choose excipients initially that we think will be

09:44:51  8   compatible, but we do the experiments to confirm.  And those

09:44:54  9   are routine, they're done all the time.

09:44:58  10  Q.     Wet granulation is a technique used in pharmaceutical

09:45:01  11  formulation; correct?

09:45:03  12  A.     In -- yes.  For tablet production, frequently.

09:45:07  13  Q.     And wet granulation can expose an API to heat;

09:45:11  14  correct?

09:45:11  15  A.     It can, yes.

09:45:12  16  Q.     And exposing an API to heat and humidity during a

09:45:16  17  pharmaceutical manufacturing process can cause degradation;

09:45:20  18  correct?

09:45:21  19  A.     It can.  We can limit those oftentimes.

09:45:23  20  Q.     Well, I'm just asking whether it can.

09:45:25  21  A.     It can.

09:45:27  22  Q.     Degradation impurities can also form during drug

09:45:31  23  storage; correct?

09:45:32  24  A.     Yes, they can.

09:45:35  25  Q.     And drug formulation involves experimentation,

Donovan - Cross

09:45:38 1    observation, and optimization; correct?

09:45:43 2    A.    Yes.

09:45:45 3    Q.    In order to address degradation, a skilled artisan

09:45:49 4    seeks to understand the degradation pathway; correct?

09:45:52 5    A.    Can you repeat that?

09:45:54 6    Q.    In order to address degradation, a skilled artisan

09:45:58 7    seeks to understand the degradation pathway; correct?

09:46:00 8    A.    They might not try to fully characterize the entire

09:46:04 9    reaction mechanism, but they may want to be at least

09:46:09 10   knowledgeable about which functional groups and which

09:46:12 11   molecules seem to be participating in a degradation

09:46:15 12   reaction.

09:46:16 13   Q.    So, they might want to be knowledgeable about how the

09:46:18 14   degradation is occurring?

09:46:20 15   A.    To a limited extent, potentially.

09:46:27 16   Q.    Now, I want to turn to what the prior art disclosed

09:46:30 17   about the 1-1 impurity in pharmaceutical compositions.

09:46:34 18   Okay?

09:46:34 19   A.    Okay.

09:46:36 20   Q.    You've discussed several prior art references during

09:46:39 21   your direct examination today; correct?

09:46:43 22   A.    Yes.

09:46:45 23   Q.    None of the prior art references you discussed

09:46:48 24   describe the mechanisms of degradation of cabozantinib

09:46:51 25   (L)-malate; correct?

09:46:52  1    A.      That's correct.

09:46:54  2    Q.      Nothing in the prior art taught that temperature was

09:46:57  3    a factor in the formation of the 1-1 impurity in

09:47:00  4    cabozantinib (L)-malate; correct?

09:47:02  5    A.      Not specifically, no.

09:47:04  6    Q.      Nothing in the prior art has information about the

09:47:07  7    role of water in the formation of the 1-1 impurity; correct?

09:47:10  8    A.      Not specifically about cabozantinib.

09:47:13  9    Q.      Nothing in the prior art spoke to the formation of

09:47:16 10    1-1 impurity under formulation relevant conditions; correct?

09:47:20 11    A.      Nothing specifically about cabozantinib.

09:47:24 12    Q.      Nothing in the prior art indicated whether the

09:47:26 13    formation of the 1-1 impurity in cabozantinib (L)-malate was

09:47:30 14    pH-dependent; correct?

09:47:32 15    A.      No, nothing specifically about cabozantinib.

09:47:34 16    Q.      Okay.  You have not cited any reference that explains

09:47:37 17    how to reduce the formation of the 1-1 impurity in a drug

09:47:41 18    product; correct?

09:47:42 19    A.      Not specifically -- wait.  I'm sorry.  Can you say

09:47:45 20    that again?

09:47:45 21    Q.      You have not cited any reference that explains how to

09:47:49 22    reduce the formation of the 1-1 impurity in a drug product?

09:47:53 23    A.      Not specifically about the 1-1, yes.

09:47:56 24    Q.      You are not aware of any actual formulation of

09:48:00 25    cabozantinib (L)-malate disclosed in the prior art; correct?

Donovan - Cross

09:48:03  1    A.      No, I am not.

09:48:05  2    Q.      You haven't identified any prior art reference that

09:48:08  3    discloses the physicochemical properties of cabozantinib

09:48:13  4    (L)-malate; correct?

09:48:13  5    A.      That's correct.

09:48:15  6    Q.      Now, I'd like to look more closely at some of the

09:48:19  7    references you discussed.

09:48:20  8            MS. PIROZZOLO:  If we could pull up the Brown

09:48:23  9    reference, which is Defendants' Exhibit 291, which is at

09:48:27 10    Tab 7 in your binder.

09:48:27 11    BY MS. PIROZZOLO:

09:48:40 12    Q.      Now, the Brown reference does not say that the 1-1

09:48:43 13    impurity is genotoxic; correct?

09:48:45 14    A.      That's correct.

09:48:49 15            MS. PIROZZOLO:  Let's turn to paragraph 82 in

09:48:53 16    Brown, which you discussed earlier.

09:48:53 17    BY MS. PIROZZOLO:

09:48:58 18    Q.      Brown doesn't disclose any specific pharmaceutical

09:49:02 19    compositions of cabozantinib (L)-malate; correct?

09:49:04 20    A.      They provide -- they provide general descriptions of

09:49:11 21    pharmaceutical compositions.

09:49:12 22    Q.      There are no specific examples of pharmaceutical

09:49:15 23    compositions; correct?

09:49:16 24    A.      No, there are not.

09:49:18 25    Q.      Now, Brown does not mention the word "glidant."  Does

Donovan - Cross

09:49:22  1    it?

09:49:23  2    A.    Not specifically as the word.

09:49:27  3    Q.    Now, you testified about some guidelines for control

09:49:32  4    of impurities.

09:49:33  5          Do you recall that?

09:49:34  6    A.    Yes.

09:49:34  7    Q.    The regulatory guidances you mentioned?

09:49:36  8    A.    Yes.

09:49:37  9    Q.    Okay.  The references you discussed are general

09:49:40 10    guidances for developers; correct?

09:49:42 11    A.    Yes.

09:49:44 12    Q.    Okay.  You have not identified any FDA guidance

09:49:47 13    documents for controlling impurities in cabozantinib

09:49:51 14    (L)-malate; correct?

09:49:51 15    A.    Not specific to cabozantinib (L)-malate.

09:49:54 16    Q.    Now, you also testified about Lachman, the volume on

09:50:00 17    pharmaceutical dosage forms.

09:50:01 18          Do you recall that?

09:50:01 19    A.    Yes.

09:50:03 20    Q.    Okay.  And that's a general reference on formulation;

09:50:07 21    correct?

09:50:07 22    A.    Well, it's a well-known textbook series.  Yes.

09:50:10 23          MS. PIROZZOLO:  Okay.  Let's turn -- Lachman is

09:50:13 24    Tab 8 in your binder.  And we have an excerpt that's

09:50:18 25    Plaintiff's Exhibit 553A.

Donovan - Cross

09:50:21   1          Could you turn to Page 76 at Tab 8?

09:50:28   2          There's a paragraph at the top of the page, but

09:50:35   3   I'd like to highlight the sentence beginning with --

09:50:39   4          THE WITNESS:  Can you wait just a moment?  I was

09:50:39   5   looking at the PDF pages.

09:50:39   6   BY MS. PIROZZOLO:

09:50:41   7   Q.    Sure.

09:50:56   8   A.    Okay.  Thank you.

09:50:57   9   Q.    Okay.  Lachman says, "The correct selection and

09:51:02  10   balance of excipient materials for each active ingredient or

09:51:06  11   ingredient combination in a tablet formulation to achieve

09:51:10  12   the desired response (i.e. production of a safe, effective,

09:51:16  13   and highly reliable product) is not in practice a simple

09:51:21  14   goal to achieve."

09:51:22  15          Is that what Lachman says?

09:51:24  16   A.    It does say that.  Yes.

09:51:31  17   Q.    Now, you talked about a section on exemplary

09:51:35  18   formulations in Lachman; correct?

09:51:37  19   A.    Yes.

09:51:39  20   Q.    Lachman doesn't have a description of how to control

09:51:43  21   for genotoxic impurities in those formulations; correct?

09:51:48  22   A.    No, but there are sections that -- that describe that

09:51:51  23   a formulator needs to be aware to control for impurities in

09:51:55  24   a formulation.

09:51:56  25   Q.    Okay.  But those specific formulations, there's no

Donovan - Cross

09:51:59  1    description of how to control for genotoxic impurities using

09:52:04  2    them; correct?

09:52:04  3    A.      Not associated directly on the page with those

09:52:07  4    examples.

09:52:08  5    Q.      Okay.  Now, you testified about the '081 application,

09:52:13  6    which is Defendants' Exhibit 335.  And it's Tab 9 of your

09:52:18  7    binder.

09:52:24  8            The '081 patent application discloses the

09:52:29  9    tyrosine kinase inhibitors, such as gefitinib, erlotinib and

09:52:34 10    lapatinib can be formulated as tablets or capsules; correct?

09:52:37 11    A.      I believe those were the specific examples of

09:52:40 12    tyrosine kinase inhibitors that were the focus of the '081.

09:52:45 13    Q.      You haven't compared the chemical structure of those

09:52:48 14    tyrosine kinase inhibitors to cabozantinib (L)-malate;

09:52:52 15    correct?

09:52:52 16    A.      Not in any serious manner.

09:52:55 17    Q.      Okay.  And you don't know whether those tyrosine

09:52:59 18    kinase inhibitors have similar physicochemical properties to

09:53:04 19    cabozantinib; correct?

09:53:05 20    A.      That's correct.

09:53:08 21    Q.      You have not identified a specific pharmaceutical

09:53:11 22    composition of cabozantinib (L)-malate that would be obvious

09:53:16 23    over the prior art and inherently and essentially free of

09:53:20 24    the 1-1 impurity; correct?

09:53:22 25    A.      That was in the prior art?

09:53:23  1    Q.      Yes.

09:53:24  2    A.      Not -- not a cabozantinib specific containing

09:53:28  3    formulation in the prior art.  But there were formulations

09:53:31  4    that would likely be successful as far as pharmaceutical

09:53:36  5    compositions -- compositions that cabozantinib (L)-malate

09:53:40  6    could be used with.

09:53:43  7    Q.      But you haven't identified a specific pharmaceutical

09:53:45  8    composition of cabozantinib (L)-malate that would be obvious

09:53:50  9    over the prior art and essentially free of the 1-1 impurity;

09:53:54 10    correct?

09:53:54 11    A.      Not one that is described to provide or to contain

09:54:02 12    cabozantinib (L)-malate and other specific excipients at

09:54:05 13    specific amounts.

09:54:07 14    Q.      Now, you've offered the opinion that given

09:54:13 15    cabozantinib (L)-malate that was essentially free of the 1-1

09:54:17 16    impurity, it would have been obvious -- a skilled artisan

09:54:21 17    would have been motivated and found it obvious to prepare a

09:54:25 18    pharmaceutical composition inherently free of the 1-1

09:54:28 19    impurity; right?

09:54:29 20    A.      Yes.

09:54:31 21    Q.      You can't recall ever having purified a

09:54:33 22    pharmaceutical product in order to eliminate genotoxic

09:54:38 23    impurities; correct?

09:54:39 24    A.      No.  That just hasn't been the focus of my research

09:54:42 25    program.

422

Donovan - Cross

09:54:43 1    Q.      You've never worked to control genotoxic impurities

09:54:45 2    in a product that was in clinical trials; correct?

09:54:48 3    A.      No, I haven't.

09:54:49 4    Q.      Okay.  Now, I'd just like to briefly touch on your

09:54:59 5    opinion on secondary considerations.

09:55:01 6    A.      Okay.

09:55:03 7    Q.      You don't dispute that Exelixis' product, Cabometyx,

09:55:07 8    embodies Claim 3 of the '349 patent; correct?

09:55:11 9    A.      No, I don't.

09:55:13 10                   MS. PIROZZOLO:  I have no further questions.

09:55:15 11                   THE COURT:  All right.  Redirect?

09:55:17 12                   MR. MATHAS:  No, Your Honor.  No questions.  I

09:55:18 13   do have some exhibits to move.

09:55:20 14                   THE COURT:  All right.  So, Dr. Donovan, you're

09:55:21 15   done.  You can step down.  Watch your step.

09:55:24 16                   Yes, Mr. Mathas.

09:55:25 17                   MR. MATHAS:  All right.  We move the admission

09:55:27 18   of DTX-284, DTX-335, DTX-325, DTX-192, DTX-013, and PTX --

09:55:48 19   strike that last one, Your Honor.  I need to check that.  So

09:55:50 20   I'm going to stop at DTX-013 for now.

09:55:59 21                   MS. PIROZZOLO:  Oh, no objection.

09:56:00 22                   THE COURT:  All right.  Admitted without

09:56:01 23   objection.

09:56:02 24                   (DTX Exhibit No. 13, 192, 284, 325 and 335 were

09:56:04 25   admitted into evidence.)

Steed - Direct

09:56:04  1              MR. MATHAS:  And that's all, Your Honor.  Thank

09:56:06  2     you.

09:56:15  3              MR. COOPER:  Your Honor, MSN calls Dr. Jonathan

09:56:28  4     Steed.

09:56:29  5              THE COURT:  All right.

09:56:39  6              DEPUTY CLERK:  Please state and spell your full

09:56:48  7     name for the record.

09:56:48  8              THE WITNESS:  Yes.  Jonathan William Steed.

09:56:52  9     J-O-N-A-T-H-A-N, W-I-L-L-I-A-M, S-T-E-E-D.

09:56:52 10              JONATHAN WILLIAM STEED, the witness herein,

09:56:52 11     after having been duly affirmed under oath, was examined and

09:57:47 12     testified as follows:

09:57:47 13              MR. COOPER:  May I proceed?

09:57:52 14              THE COURT:  Sure.

09:57:53 15              MR. COOPER:  Thank you, Your Honor.

09:57:57 16              Oh, there's two volumes.  Okay.

09:58:19 17              THE COURT:  So, Dr. Steed, do you know how many

09:58:21 18     times you've testified before me before?

09:58:24 19              THE WITNESS:  This must be at least the third

09:58:26 20     time, Your Honor.

09:58:27 21              THE COURT:  Okay.

09:58:27 22              THE WITNESS:  Hello again.

09:58:29 23              THE COURT:  Go ahead, Mr. Cooper.

09:58:31 24                        DIRECT EXAMINATION

09:58:31 25     BY MR. COOPER:

Steed - Direct

09:58:32 1    Q.     Good morning.  Could you please reintroduce yourself

09:58:35 2    to the Court?

09:58:35 3    A.     Yes.  My name is Jonathan Steed.  I'm professor of

09:58:38 4    chemistry at Durham University in the U.K.

09:58:41 5    Q.     Dr. Steed, have you prepared slides to assist in

09:58:43 6    explaining your testimony today?

09:58:44 7    A.     I have.  Yes.

09:58:45 8    Q.     Okay.

09:58:46 9           MR. COOPER:  For the record those slides are on

09:58:47 10   the screen and marked in the bottom right-hand corner as

09:58:49 11   DDX-Steed and then the slide number.

09:58:49 12   BY MR. COOPER:

09:58:54 13   Q.     I'd first like to ask you briefly about your

09:58:56 14   education, employment and qualifications.

09:58:58 15          MR. COOPER:  Mr. Figera, could we please pull up

09:59:00 16   DTX-558?

09:59:00 17   BY MR. COOPER:

09:59:03 18   Q.     Dr. Steed, could you tell us what this document is?

09:59:05 19   A.     Yes, that's my CV.

09:59:07 20   Q.     Does it accurately describe your employment,

09:59:09 21   education and publications?

09:59:10 22   A.     It does.

09:59:12 23          MR. COOPER:  Let's go to DDX Steed 2.

09:59:12 24   BY MR. COOPER:

09:59:15 25   Q.     What are your primary areas of teaching and research?

Steed - Direct

A.      I research crystallization methods, pharmaceutical solid forms and also synthetic chemistry.

Q.      And how long have you worked in the field of chemistry and crystalline forms?

A.      Over 30 years now.

Q.      Have you published any peer-reviewed papers or books relating to crystalline pharmaceutical salts and characterization methods?

A.      Yes, I have over 350 papers, along with a number of books that I both edited and written.

Q.      Are you involved in any scientific journals?

A.      Yes, I'm editor in chief of the *American Chemical Society Journal Crystal Growth & Design* which specializes in this area.

Q.      Are you a member of any associations in the field?

A.      Yes, I'm a fellow of the Royal Society of Chemistry. I'm a member of the American Chemical Society and the British Crystallographic Association.

Q.      Have you briefly been accepted as an expert in United States district courts in Delaware and elsewhere?

A.      I have.

          MR. COOPER:  Your Honor, MSN tenders Dr. Jonathan Steed as an expert in the formation, characterization and use of pharmaceutical salts.

          MR. PRUSSIA:  No objection.

Steed - Direct

10:00:19  1          THE COURT:  All right.  You may proceed.

10:00:20  2    BY MR. COOPER:

10:00:21  3    Q.     Dr. Steed, have you been engaged by MSN to render an

10:00:24  4    opinion on whether the '439, the '440 and '015 patents in

10:00:28  5    suit in this case are valid or not?

10:00:30  6    A.     I have.  Yes.

10:00:32  7    Q.     And for brevity can we refer to those patents

10:00:35  8    collectively as the malate salt patents or crystalline

10:00:38  9    malate salt patents today?

10:00:39 10    A.     We can.

10:00:40 11          MR. COOPER:  Mr. Figera, can we please pull up

10:00:41 12    JTX-1?

10:00:41 13    BY MR. COOPER:

10:00:43 14    Q.     Dr. Steed, what do you recognize JTX-1 to be?

10:00:46 15    A.     So this is the '439 patent.

10:00:49 16    Q.     When did the '439 patent issue?

10:00:51 17    A.     August 17th, 2021.

10:00:53 18          MR. COOPER:  Can we please pull up JTX-2?

10:00:53 19    BY MR. COOPER:

10:00:57 20    Q.     Dr. Steed, what do you recognize JTX-2 to be?

10:01:00 21    A.     That's the '440 patent, August 17th, 2021, as well.

10:01:06 22          MR. COOPER:  Can we please pull up JTX-3?

10:01:06 23    BY MR. COOPER:

10:01:08 24    Q.     Dr. Steed, what do you recognize JTX-3 to be?

10:01:12 25    A.     That's the '015 patent, August 24th, 2021.

Steed - Direct

10:01:17  1    Q.      Do you understand that the three malate salt patents

10:01:20  2    share the same specification?

10:01:21  3    A.      Yes.

10:01:22  4    Q.      Have you reviewed the asserted claims of these

10:01:24  5    patents?

10:01:25  6    A.      I have.  Yes.

10:01:26  7              MR. COOPER:  Let's go to DDX Steed 3.

10:01:26  8    BY MR. COOPER:

10:01:30  9    Q.      Dr. Steed, could you explain what the asserted Claim

10:01:33 10    4 of the '439 patent requires?

10:01:35 11    A.      Yes.  Claim 4 depends upon Claim 3, which in turn

10:01:39 12    depends upon Claim 1.  And it requires cabozantinib malate

10:01:44 13    salt, specifically the (L)-malate salt where the salt is

10:01:47 14    crystalline.

10:01:49 15    Q.      Dr. Steed, what does the asserted claim of the '440

10:01:53 16    patent require?

10:01:53 17    A.      It requires that same crystalline cabozantinib

10:01:58 18    (L)-malate salt as part of the pharmaceutical composition.

10:02:01 19    Q.      What does the asserted Claim 2 of '015 patent

10:02:04 20    require?

10:02:04 21    A.      Crystalline cabozantinib malate salt, using a method

10:02:08 22    for treating cancer, specifically kidney cancer.

10:02:11 23              MR. COOPER:  Let's go to Page 2 of JTX-1 and

10:02:14 24    call out the application number and the date of the U.S.

10:02:17 25    application data.

Steed - Direct

10:02:17  1    BY MR. COOPER:

10:02:18  2    Q.    Dr. Steed, when was the application filed from which

10:02:20  3    the '439 patent issued?

10:02:22  4    A.    October 14th, 2020.

10:02:25  5    Q.    Were the applications from which the '440 patent and

10:02:28  6    '015 patent issued filed after that?

10:02:30  7    A.    Yes.

10:02:31  8    Q.    What do you understand Exelixis claims to be the

10:02:34  9    priority date for all of the malate salt patents?

10:02:36 10    A.    It's January the 16th, 2009.

10:02:39 11    Q.    If I use the term "prior art" today, will you

10:02:41 12    understand that to mean published materials available to a

10:02:44 13    POSA, or a person of ordinary skill in the art, before

10:02:49 14    January 16th, 2009?

10:02:50 15    A.    I will, yes.

10:02:52 16              MR. COOPER:  Let's go to DDX Steed Slide 4.

10:02:52 17    BY MR. COOPER:

10:02:55 18    Q.    Dr. Steed, before we get into the details today, can

10:02:58 19    you please provide the Court with a brief overview of the

10:03:01 20    testimony you're going to give today on whether the malate

10:03:05 21    salt patents lack written description.

10:03:07 22    A.    Yes.  It's my opinion that they do lack written

10:03:11 23    description.  A person of skill would understand the

10:03:14 24    inventors were not in possession of all crystalline

10:03:17 25    cabozantinib malate salts.  In other words, they weren't in

10:03:19 1   possession of the full scope of the claims.

10:03:22 2           And, moreover, the two species that Exelixis

10:03:24 3   does -- does discuss within the patents' specification are

10:03:28 4   not themselves representative of the full scope of the

10:03:31 5   claims, in other words, all the possible crystalline

10:03:34 6   cabozantinib (L)-malate salts.

10:03:35 7   Q.    Can you also provide a brief overview of what you'll

10:03:38 8   be discussing on whether the malate salt patents are invalid

10:03:40 9   for obviousness-type double patenting?

10:03:43 10  A.    Yes.  It's my opinion they are invalid for

10:03:46 11  obviousness-type double patenting over Claim 5 of the

10:03:49 12  earlier '473 patent that we've already heard about today.  I

10:03:53 13  don't feel there's any meaningfully patentably distinct

10:03:56 14  differences between that Claim 5 and the malate salt

10:03:58 15  patents.

10:03:59 16          So the '473 patent is -- distinguishes

10:04:03 17  pharmaceutically acceptable cabozantinib salts in the genus,

10:04:05 18  and that includes the species, crystalline cabozantinib

10:04:08 19  (L)-malate salt species.  And the published priority

10:04:11 20  application, the '928 application, discloses compositions

10:04:15 21  and the treatment of kidney cancer.

10:04:17 22          MR. COOPER:  Let's go to DDX Steed Slide 5.

10:04:20 23  BY MR. COOPER:

10:04:20 24  Q.    When you were forming your opinions in this case, did

10:04:22 25  you consider the issues from the perspective of a POSA?

Steed - Direct

10:04:25  1    A.      I did.  Yes.

10:04:26  2    Q.      And can you read the definition of a POSA that you

10:04:28  3    applied to your analysis?

10:04:29  4    A.      Yes.  So a POSA would have a doctorate or a lesser

10:04:33  5    graduate degree in chemistry, pharmaceutical sciences or

10:04:36  6    related discipline.  I think they would have three years or

10:04:39  7    greater experience working with analytical techniques used

10:04:41  8    to characterize forms of drug substances.  And they would

10:04:45  9    have collaborated with others so the team would collectively

10:04:48 10    have had experience in synthesizing and analyzing complex

10:04:51 11    small molecule compounds or a physician with experience in

10:04:54 12    administration, dosing and efficacy of drugs for the

10:04:57 13    treatment of a particular disease state.

10:04:59 14    Q.      Would your opinions in this case change if the

10:05:01 15    definition of a POSA proposed by Exelixis on the right-hand

10:05:05 16    side of the slide is adopted?

10:05:06 17    A.      No, they wouldn't.

10:05:07 18    Q.      Were you yourself a POSA as of the priority date

10:05:10 19    using either party's proposed definition?

10:05:12 20    A.      I was.

10:05:13 21              MR. COOPER:  Can we move to DDX Steed 6?

10:05:13 22    BY MR. COOPER:

10:05:17 23    Q.      And let's start with the discussion of the technical

10:05:19 24    background and state of the prior art before getting into

10:05:22 25    the details of your invalidity opinions.

10:05:25  1          MR. COOPER:  Let's move to DDX Steed 7.

10:05:25  2     BY MR. COOPER:

10:05:28  3     Q.      Now, first, the asserted claims refer to a salt,

10:05:31  4     cabozantinib (L)-malate.

10:05:32  5              Dr. Steed, can you explain what a salt is?

10:05:34  6     A.      Yes.  As we've already heard, a salt is the product

10:05:38  7     of a reaction of an acid with a base.

10:05:41  8     Q.      And what are you showing on DDX-7?

10:05:43  9     A.      Here on this slide, I'm showing simply the formation

10:05:45 10     of very common table salt, sodium chloride.  So the acid in

10:05:49 11     question is hydrochloric acid, HCl, that reacts with sodium

10:05:53 12     hydroxide, a base.  And the hydrogen ion and the sodium ions

10:05:57 13     swap over to give a sodium chloride, common salt.  And the

10:06:00 14     byproduct is water.

10:06:02 15     Q.      Are pharmaceutical compounds ever made into salts for

10:06:05 16     use as active pharmaceutical ingredients?

10:06:07 17     A.      Yes, very commonly, around half the time or so.

10:06:10 18     Pharmaceutical salts can have considerable advantages in

10:06:13 19     terms of delivering an active ingredient to the body.

10:06:17 20     Q.      Did the prior art report on any benefits of

10:06:19 21     developing salts for use as active ingredients in

10:06:22 22     pharmaceutical products?

10:06:23 23     A.      Yes, it did.

10:06:24 24              MR. COOPER:  Can we pull up DTX-177?  And call

10:06:28 25     out the title?

10:06:28 1    By MR. COOPER:

10:06:29 2    Q.      Dr. Steed, what is this exhibit?

10:06:31 3    A.      So, this is a prior art document entitled "Trends in

10:06:35 4    Active Pharmaceutical Ingredient Salt Selection Based on

10:06:38 5    Analysis of the Orange Book Database."

10:06:40 6                And it's by first author Paulekuhn.

10:06:42 7                MR. COOPER:  Can we call out the introduction on

10:06:44 8    Page 1 of this exhibit?

10:06:46 9    BY MR. COOPER:

10:06:46 10   Q.      Dr.  What does Paulekuhn report --

10:06:46 11               (Reporter clarification.)

10:06:49 12   BY MR. COOPER:

10:06:49 13   Q.      I'm sorry.

10:06:53 14               Doctor, what does Paulekuhn report about the use

10:06:55 15   of salt formation in pharmaceutics?

10:06:58 16   A.      Yes, Paulekuhn confirms that salt formation is a

10:07:00 17   well-known technique to modify and optimize the physical

10:07:03 18   chemical properties of a drug substance.  And Paulekuhn

10:07:07 19   calls out some examples of those sorts of properties;

10:07:10 20   solubility, dissolution rate, the speed at which the -- the

10:07:14 21   drug substance dissolves in the body, hygroscopicity, its

10:07:18 22   propensity to absorb moisture, stability, impurity profiles,

10:07:23 23   and crystal habit, the shape which affects properties and

10:07:26 24   characteristics.

10:07:27 25   Q.      At the priority date, what percentage of drug

Steed - Direct

10:07:30  1    products approved by the FDA had API in salt form?

10:07:33  2    A.     Around half.

10:07:35  3    Q.     Were there methods described in the prior art about

10:07:38  4    how to prepare pharmaceutical salts and test their

10:07:41  5    properties?

10:07:42  6    A.     Yes, there were.

10:07:44  7           MR. COOPER:  Let's go to DDX Steed Slide 8.

10:07:46  8    BY MR. COOPER:

10:07:48  9    Q.     Are there typical steps that a POSA goes through in

10:07:53 10    testing or preparing salts?

10:07:55 11    A.     Yes.  I'm showing the four steps of what's called a

10:08:00 12    salt screening process in which a person of skill carries

10:08:05 13    out an experimental procedure in which they -- they identify

10:08:09 14    and optimize the salt forms of the pharmaceutical.

10:08:12 15    Q.     In pharmaceutical development, what entity typically

10:08:15 16    performs salt screening activities?

10:08:17 17    A.     It's a routine activity, so it's often outsourced to

10:08:20 18    a contract research organization.

10:08:22 19    Q.     How long does a salt screen typically take?

10:08:24 20    A.     It can be really quite quick.  Each of the individual

10:08:27 21    experiments are really quite brief.  And so, a salt screen

10:08:29 22    can be completed in a matter of a few weeks.

10:08:32 23    Q.     Can you describe the typical first step of a salt

10:08:34 24    screen?

10:08:34 25    A.     Yes.  That usually involves solubility tests of the

Steed - Direct

10:08:38  1   active pharmaceutical ingredient.  And so, a person of skill

10:08:41  2   or the contract research organization will test the

10:08:44  3   solubility of the -- in this case, free base, the non-salt

10:08:48  4   form, within a variety of common laboratory solvents.

10:08:52  5   Q.     How does a POSA choose the -- what to perform these

10:08:57  6   solubility tests in?

10:08:58  7   A.     They would use solvents that are known in the art and

10:09:01  8   common in the laboratory.  There may be some tens of

10:09:05  9   solvents.  Each individual experiment is very brief and so

10:09:08 10   many solvents can be screened.

10:09:09 11   Q.     And when you say "very brief," what do you mean?

10:09:11 12   A.     Literally a matter of a few minutes to -- to add

10:09:16 13   solvent to -- to the active pharmaceutical ingredient.  And

10:09:19 14   observe the amount that dissolves.

10:09:21 15   Q.     Can describe the typical second step of a salt

10:09:24 16   screen?

10:09:24 17   A.     Yes, then once solutions of the pharmaceutical

10:09:29 18   ingredient are available, then acids or bases have to be

10:09:31 19   selected.  Those will provide the non-pharmaceutically

10:09:34 20   active counter ion in the salt.  On the basis of a --

10:09:39 21   various roles and compatibility with -- with the active

10:09:43 22   ingredient.

10:09:44 23   Q.     How many potential counterions are typically tested

10:09:46 24   in one salt screen?

10:09:47 25   A.     Something of the order of 15 to 20.

Steed - Direct

10:09:51 1    Q.    Does the prior art identify counterions that were

10:09:53 2    known to be pharmaceutically acceptable?

10:09:55 3    A.    Yes.  It does.

10:09:57 4            MR. COOPER:  Let's go to DDX Steed Slide 9.

10:09:57 5    BY MR. COOPER:

10:10:00 6    Q.    What are you showing on this slide?

10:10:02 7    A.    So these are abstracts from three prior art documents

10:10:06 8    that have lists of counterions that have been used in

10:10:10 9    pharmaceutical drug products in the past.

10:10:14 10   Q.    And what are the prior art references that you've

10:10:16 11   reviewed that contain these lists you're referring to?

10:10:18 12   A.    Yes, so these lists are quite common.  So one is

10:10:21 13   taken from that Paulekuhn reference that I was identifying

10:10:25 14   earlier, that's DTX-177 at Page 3.  There's also a reference

10:10:30 15   by a first author Bighley, DTX-167 at Page 4.  And first

10:10:35 16   author, Berge, DTX-166 at Page 2.

10:10:39 17   Q.    And approximately how many FDA-approved

10:10:41 18   pharmaceutically acceptable acid counterions are

10:10:44 19   consistently identified in these prior art lists?

10:10:47 20   A.    There's maybe around 50 or so.

10:10:49 21   Q.    And malate is the acid counter -- malic acid is the

10:10:53 22   acid counterion at issue in this case.  Does it appear on

10:10:57 23   these prior art lists you've identified?

10:10:58 24   A.    Yes, it appears on all of them.

10:10:59 25   Q.    Does the prior art provide any guidance to a POSA

Steed - Direct

10:11:02 1   about selecting acid or base counterions that will

10:11:05 2   predictably form salts in a salt screen?

10:11:07 3   A.     It does, yes.

10:11:09 4          MR. COOPER:  Can we please pull up DTX-243 and

10:11:12 5   call out the title?

10:11:12 6   BY MR. COOPER:

10:11:16 7   Q.     Dr. Steed, what is this exhibit?

10:11:17 8   A.     This is a prior art document entitled "In Situ Salt

10:11:21 9   Screening - a Useful Technique For Discovery Support and

10:11:23 10  Preformulation Studies," first author Tong.

10:11:27 11         MR. COOPER:  Let's go to Page 4 of this exhibit

10:11:29 12  and call out the first part of the method section, down

10:11:32 13  through Step 1.

10:11:32 14  BY MR. COOPER:

10:11:34 15  Q.     And at step one there's a reference to p$K_a$.  Could

10:11:37 16  you explain what that refers to?

10:11:39 17  A.     Yes, p$K_a$ is a measure of the acidity of an acid in

10:11:43 18  this case, or basicity of a base, it's how acidic something

10:11:48 19  is and how -- how strong it's propensity is to form a salt.

10:11:52 20  Q.     Is p$K_a$ an inherent property of a compound?

10:11:56 21  A.     It is, yes.

10:11:56 22  Q.     How --

10:11:57 23  A.     That's the molecular structure.

10:11:58 24  Q.     How is the p$K_a$ of a compound of interest and its

10:12:02 25  counterion measured?

Steed - Direct

10:12:03  1    A.      It's a straightforward experimental technique called

10:12:06  2    titration that can be done in an automated way.

10:12:08  3    Q.      What instruction does Tong provide to a POSA about

10:12:12  4    acid selection?

10:12:13  5    A.      Tong teaches that in order to form a salt, the acid

10:12:16  6    needs to be strong enough to transfer a hydrogen ion to a

10:12:20  7    base.  And so the acid should be at least two pH units lower

10:11:59  8    than the p$K_a$ of the compound and the base in question in

10:12:26  9    this case.

10:12:27 10    Q.      What would a POSA expect if the p$K_a$ difference

10:12:30 11    between an acid and a base is greater than two?

10:12:32 12    A.      They would expect a solid salt to result.

10:12:36 13    Q.      And why is that?

10:12:37 14    A.      Because the acid is strong enough to transfer a

10:12:39 15    hydrogen ion to the base.

10:12:41 16                MR. COOPER:  Let's go to DDX Steed Slide 10.

10:12:41 17    BY MR. COOPER:

10:12:49 18    Q.      Could you explain what is the third typical step of a

10:12:52 19    salt screen?

10:12:52 20    A.      Yes.  Well, then having identified, in this case,

10:12:56 21    acids that can form salts with bases in solution, the person

10:13:01 22    of skill would then crystalize the range of their acid base

10:13:05 23    choices under a range of different experimental conditions,

10:13:08 24    looking to sample the possible crystallization space to

10:13:12 25    maximize their ability to isolate solids, hopefully

Steed - Direct

10:13:17 1    crystalline solids.

10:13:18 2    Q.    What are the types of experimental conditions that a

10:13:21 3    POSA would typically vary in order to crystalize a salt out

10:13:24 4    of solution?

10:13:24 5    A.    So, those might be things like crystallization

10:13:28 6    method, slow evaporation, cooling temperature, solvent,

10:13:31 7    those sorts of things.

10:13:33 8    Q.    Will a POSA be able to crystallize out of solution

10:13:36 9    all of the pharmaceutical salts that are formed during a

10:13:38 10   salt screen?

10:13:39 11   A.    Not all of them, no.  But typically they would be

10:13:42 12   able to isolate a solid, most of them, if only by

10:13:46 13   evaporating off the solvent and then characterize what the

10:13:47 14   result was.

10:13:48 15   Q.    What is the typical last step of a salt screen?

10:13:52 16            DEPUTY CLERK:  Could you slow down just a little

10:13:53 17   bit.

10:13:53 18            THE WITNESS:  Sorry.

10:13:55 19   BY MR. COOPER:

10:13:56 20   Q.    Could you explain what the typical last step of a

10:13:58 21   salt screen is?

10:13:59 22   A.    Yes.  In whatever solids arise from that

10:14:03 23   crystallization attempts, then the person of skill would use

10:14:06 24   routine analytical techniques to characterize the outcome,

10:14:09 25   characterize the residual solids.

Steed - Direct

10:14:11  1    Q.      And what are the typical properties that will be

10:14:13  2    characterized for each salt that's prepared in a screen?

10:14:16  3    A.      So typically it's crystallinity using x-ray powder

10:14:20  4    diffraction.  The sort of properties I alluded to earlier;

10:14:23  5    hygroscopicity, melting point, it's -- whether it's a

10:14:28  6    solvate or not, those sorts of things.

10:14:30  7                    MR. COOPER:  Let's go to DDX Steed Slide 11.

10:14:30  8    BY MR. COOPER:

10:14:33  9    Q.      And you mentioned one of the properties of a salt is

10:14:36 10    its crystallinity.  Can you explain the different -- what

10:14:40 11    that is?

10:14:40 12    A.      Yes.  So the outcome of the salt screen, if it's a

10:14:45 13    solid it might be either amorphous or crystalline.  If it's

10:14:48 14    a crystalline solid, then there will be a regular repeating

10:14:51 15    array of the molecules that give rise to the crystal

10:14:55 16    structure.

10:14:56 17    Q.      Could you describe what you've shown on the left-hand

10:14:58 18    side of this slide titled "Crystalline Salts" to help you

10:15:01 19    explain that further?

10:15:02 20    A.      Yes.  So here's a diagram of a randomly chosen drug,

10:15:06 21    it's a heart drug called xylazine hydrochloride.  That

10:15:10 22    exists in at least two crystalline forms.  They happen to be

10:15:13 23    called forms 1 and form 3.  And you can see from the

10:15:16 24    diagrams there, that they have a different packing

10:15:20 25    arrangement of the xylazine molecules in each of the two

Steed - Direct

10:15:23  1  different forms that I'm showing there.

10:15:25  2          So both of them are crystalline, both of them

10:15:27  3  have a theoretically infinite repeating array of the

10:15:31  4  molecules.  But the arrangement of the molecules is

10:15:34  5  different.  So if -- and that's characterized by the box

10:15:36  6  that I'm showing there, which is the -- the unit cell.

10:15:40  7          So if the crystal is a brick wall, the unit cell

10:15:42  8  will be the bricks that it's made up of.  And different

10:15:45  9  crystalline salts have different -- made up of different

10:15:48 10  bricks, different packing arrangements.

10:15:50 11  Q.     Now, we heard during Exelixis' opening statements

10:15:53 12  that the asserted claims don't have the word "form" in them.

10:15:56 13          Do you recall that?

10:15:56 14  A.     I do.  Yes.

10:15:59 15  Q.     Doctor, what would a POSA understand about a salt

10:16:01 16  that is crystalline?

10:16:02 17  A.     In order to be crystalline, a salt has to have a

10:16:06 18  regular repeating underlying arrangement.  That's what

10:16:09 19  crystallinity is.  And so it will be in a particular

10:16:12 20  crystalline arrangement, which we give the term crystal form

10:16:15 21  to.  You can't be crystalline without having an underlying

10:16:18 22  arrangement without being in a crystal form.

10:16:20 23  Q.     How is it possible to prepare a different crystalline

10:16:24 24  forms of the same salt compound?

10:16:26 25  A.     The crystalline form that comes out -- we sometimes

Steed - Direct

10:16:30 1    use the words polymorph for different crystalline forms that

10:16:33 2    have the same composition -- arises from the different

10:16:37 3    circumstances under which it's formed.  So different

10:16:40 4    crystallization methods will give rise to different

10:16:42 5    crystalline arrangements.

10:16:44 6    Q.     Can you describe now what you've shown on the

10:16:46 7    right-hand side of this slide titled "Amorphous salt"?

10:16:49 8    A.     Yes.  So if something is amorphous, then it doesn't

10:16:52 9    have crystallinity.  It doesn't have an underlying repeating

10:16:55 10   regular arrangement and the molecules are randomly arranged

10:16:58 11   and so there is no unit cell, there's no brick making up the

10:17:01 12   brick wall.  It's just like a pile of rubble.

10:17:04 13   Q.     Can both crystalline and amorphous salts be

10:17:07 14   pharmaceutically acceptable for use in drug products?

10:17:09 15   A.     Yes, they can.  Typically crystalline is preferred

10:17:13 16   because crystalline salts are usually more stable, often

10:17:16 17   less hygroscopic and so on, but amorphous -- amorphous drug

10:17:21 18   substances are known and are used.

10:17:22 19   Q.     You mentioned crystalline is preferred.  Does the

10:17:25 20   prior art report any statistics about the amount of that

10:17:29 21   preference in the use of pharmaceuticals?

10:17:31 22   A.     Yes.  It's a strong preference.  Over 90 percent of

10:17:34 23   drugs are administered in crystalline form.

10:17:37 24          MR. COOPER:  Can we please pull up DTX-392?

10:17:37 25   BY MR. COOPER:

Steed - Direct

10:17:46  1    Q.    Dr. Steed, what is this exhibit?

10:17:48  2    A.    So this is a prior art, a book reference entitled

10:17:53  3    *Pharmaceutical Preformulation and Formulation*, edited by

10:17:56  4    Gibson.

10:17:57  5              MR. COOPER:  Let's go to Page 27 of the exhibit.

10:18:00  6    And call out the part of that page that is under "amorphous

10:18:03  7    forms."  And look at paragraphs 2 and 3.

10:18:03  8    BY MR. COOPER:

10:18:06  9    Q.    What is this reference report about amorphous forms?

10:18:08 10    A.    Yeah.  Gibson teaches a preference for crystalline.

10:18:12 11    So he says:  Because of these problems with physical and

10:18:15 12    chemical stability that I was alluding to, it's not usual to

10:18:19 13    proceed into development with a candidate drug in such a

10:18:21 14    state, in other words in the amorphous state.  Attempts to

10:18:24 15    crystalize the amorphous phase should always be undertaken.

10:18:28 16    Q.    So what motivation, if any, does a POSA have to

10:18:31 17    prepare a crystalline salt of a drug compound?

10:18:33 18    A.    A strong motivation.  Typically, you wouldn't want to

10:18:36 19    use an amorphous salt unless there was a particular reason

10:18:40 20    to do so, such as a need for the high -- usually the high

10:18:45 21    solubility of amorphous.

10:18:45 22              MR. COOPER:  Let's pull up DTX-191.

10:18:45 23    BY MR. COOPER:

10:18:51 24    Q.    Dr. Steed, what is this exhibit?

10:18:52 25    A.    This is a prior art reference entitled, "Crystalline

Steed - Direct

10:18:57  1    solids," first author Vippagunta.

10:18:59  2                MR. COOPER:  Let's go to Page 2 of this exhibit

10:19:01  3    and call out the bottom left-hand paragraph.

10:19:01  4    BY MR. COOPER:

10:19:06  5    Q.    Doctor, what does Vippagunta report about crystalline

10:19:10  6    forms here?

10:19:10  7    A.    Yes.  So, Vippagunta is really confirming my

10:19:14  8    definition of crystalline polymorphs as different

10:19:17  9    crystalline forms of the same chemical substance, and he

10:19:20 10    says that they have the same chemical composition but differ

10:19:24 11    in terms of crystal structures and, therefore, they possess

10:19:26 12    different physiochemical properties, the properties come

10:19:29 13    from their underlying structure.  And he gives -- and he

10:19:31 14    goes on to say that's occurrence of polymorphism is quite

10:19:34 15    common among organic molecules such as drugs.

10:19:37 16    Q.    How does a POSA identify the internal crystalline

10:19:40 17    structure of a compound?

10:19:41 18    A.    They would use compound physical techniques, which by

10:19:45 19    far the most common would be X-ray powder diffraction.

10:19:48 20                MR. COOPER:  Let's go to DDX Steed Slide 12.

10:19:48 21    BY MR. COOPER:

10:19:51 22    Q.    Can you first, briefly, explain how XRPD works?

10:19:56 23    A.    Yes.  So, a sample of the -- of the powder, which is

10:20:01 24    really a bunch of randomly arranged crystals -- more

10:20:04 25    crystals is placed on the sample stage.  It's radiated with

Steed - Direct

10:20:08  1   X-rays and the X-rays are scattered by the underlying

10:20:11  2   regular repeating array of molecules.  And that scattering

10:20:15  3   results in the kinds of patterns that we're seeing here.  So

10:20:19  4   a plot of scattered X-ray intensity, as a function of the

10:20:21  5   angle that's scattered through, which we call two-theta.

10:20:24  6   Q.    This slide calls out Figure 13B and E from Page 18 of

10:20:29  7   the Vippagunta reference.  Can you explain what's shown in

10:20:31  8   this figure?

10:20:32  9   A.    Yes.  Just as an example of X-ray powder diffraction,

10:20:36 10   they've begun to show some powder diffraction patterns of

10:20:38 11   two polymorphs, two different crystalline forms of the

10:20:43 12   artificial sweetener aspartame.  And you can see that in B

10:20:44 13   and E they have a different pattern of peaks spread across

10:20:49 14   the two-theta range 5 to 30 degrees.

10:20:52 15           And by looking at the whole pattern as a whole,

10:20:54 16   you can see that these two patterns are different and so

10:20:57 17   therefore these are two different crystalline forms of

10:20:59 18   aspartame.

10:21:00 19   Q.    In addition to the structural differences you've

10:21:02 20   described, do different crystalline forms of salt -- of a

10:21:06 21   salt compound have different physical or chemical

10:21:08 22   properties?

10:21:09 23   A.    Yes, they do.  Each crystalline polymorph or, for

10:21:13 24   that matter, solvated crystalline form will have its own set

10:21:15 25   of unique physical and chemical properties that stem from

Steed - Direct

10:21:18  1     the underlying different structure.

10:21:20  2                 MR. COOPER:   Let's go to DDX Steed Slide 13.

10:21:20  3     BY MR. COOPER:

10:21:23  4     Q.     And what have you listed on this slide?

10:21:25  5     A.     Yes.  So this is a list of all the intrinsic

10:21:29  6     properties of crystalline salt forms, or at least a

10:21:31  7     representative array.  It's probably not all of them.  So,

10:21:34  8     obviously, the crystal structure.  And then properties, such

10:21:36  9     as melting point, hygroscopicity, the propensity to absorb

10:21:42 10     moisture, the physical and chemical stability.  So, whether

10:21:44 11     the form will remain the same crystalline form and whether

10:21:48 12     it will remain the same molecules depends upon the solid

10:21:52 13     form.  The solubility, and the rate that at which it will

10:21:57 14     dissolve both depend upon the solid form that it starts in,

10:22:00 15     the bioavailability and the process and characteristics.

10:22:03 16     All of those are intrinsic properties that depend upon the

10:22:06 17     particular crystalline form.

10:22:07 18     Q.     Could you describe specifically what melting point

10:22:09 19     refers to?

10:22:10 20     A.     Yes.  Melting point is the temperature at which a

10:22:13 21     solid transforms to a liquid.  And in pharmaceutical

10:22:16 22     development, typically you would want a reasonably high

10:22:18 23     melting point so you don't get sticky or -- sticky

10:22:22 24     materials.

10:22:22 25     Q.     What does hygroscopicity of a crystalline salt refer

10:22:22  1    to?

10:22:26  2    A.    That's the propensity of a solid to absorb moisture.

10:22:29  3    And typically a low hygroscopicity is preferred so that you

10:22:33  4    don't get weight changes upon pharmaceutical formulation.

10:22:36  5    Q.    What does physical and chemical stability of a

10:22:39  6    crystalline salt refer to?

10:22:40  7    A.    The physical stability is whether the solid form

10:22:44  8    remains stable over time.  So whether the -- to ensure that

10:22:47  9    there's not a change from one polymorph to another or

10:22:50 10    desolvation of a solvate or something like that.  The

10:22:53 11    chemical stability is whether the molecules themselves

10:22:56 12    degrade over time.  So you don't want a good drug molecule

10:23:00 13    turning to into a bad degradation impurity, for example.

10:23:03 14    Q.    What does solubility of a crystalline salt refer to?

10:23:06 15    A.    It's how much will dissolve in a solution under a

10:23:09 16    given set of conditions.

10:23:11 17    Q.    What does dissolution rate of a crystalline salt

10:23:13 18    refer to?

10:23:14 19    A.    Somewhat related to solubility.  It's how fast it

10:23:16 20    will dissolve into a given solvent under a given set of

10:23:20 21    conditions.

10:23:20 22    Q.    What does processing characteristics refer to?

10:23:23 23    A.    That's things like how we can just filter the

10:23:27 24    material, which might depend upon the crystal shape.  How it

10:23:31 25    gets compressed into a tablet.  Those sort of mechanical

Steed - Direct

10:23:31  1    aspects.

10:23:34  2    Q.    What does bioavailability of a crystalline salt refer

10:23:37  3    to?

10:23:37  4    A.    That's the percentage of the dosage form -- the

10:23:41  5    active ingredient in the dosage form that actually makes it

10:23:43  6    into the bloodstream so they can have -- so that it can

10:23:46  7    exert its therapeutic effect.  It depends, to some extent,

10:23:49  8    on solubility and dissolution rate.

10:23:51  9    Q.    And would a POSA expect one crystalline salt form of

10:23:53 10    a compound to have the same or similar properties as another

10:23:57 11    crystalline form of the compound?

10:23:58 12    A.    No.  Each crystalline form will have its own set of

10:24:01 13    properties.  Some of them may be similar to each other.

10:24:04 14    Other properties may be very distinct.  It depends upon the

10:24:06 15    underlying crystalline structure.

10:24:08 16    Q.    Does FDA provide any relevant guidance resulting from

10:24:11 17    the fact that different crystalline forms have different

10:24:13 18    physical and chemical properties?

10:24:14 19    A.    It does.  Yes.

10:24:16 20          MR. COOPER:  Can we pull up DTX-170?

10:24:16 21    BY MR. COOPER:

10:24:19 22    Q.    Dr. Steed, what is this exhibit?

10:24:21 23    A.    So this is the FDA's guideline for submitting

10:24:24 24    supporting documentation in drug applications for the

10:24:27 25    manufacture of drug substances; and this is the 1987 first

Steed - Direct

10:24:31 1   edition, if you like.

10:24:32 2           MR. COOPER:  Let's go to Page 35 of the exhibit.

10:24:35 3   And call out the bottom paragraph.

10:24:35 4   BY MR. COOPER:

10:24:38 5   Q.    What guidance does FDA provide here?

10:24:39 6   A.    Yeah.  The FDA says that by the time of a new drug

10:24:45 7   application submission, the applicant should have

10:24:46 8   established whether -- whether or not the drug substance

10:24:48 9   exists in multiple solid state forms, in other words

10:24:51 10  polymorphs, and whether these affect the dissolution and

10:24:54 11  bioavailability of the drug product.

10:24:56 12  Q.    Why is it important to FDA to determine whether a

10:24:59 13  pharmaceutical salt exists in multiple crystalline forms?

10:25:03 14  A.    Because each will have different pharmaceutical

10:25:05 15  properties of the type that I've just alluded to.  And if

10:25:08 16  there's a change on storage or in formulation, that might

10:25:12 17  affect those properties, perhaps undesirably.

10:25:14 18  Q.    Are there any well-known examples where the

10:25:17 19  properties of a crystalline form have affected the function

10:25:19 20  of a drug?

10:25:19 21  A.    There are many examples, perhaps the most famous one

10:25:23 22  is ritonavir in which Abbott Labs had, first of all, just

10:25:27 23  one form of ritonavir which they formulated as an anti-HIV

10:25:31 24  medication in the late 1990s, when it went to market, a

10:25:35 25  second, less soluble, more stable crystalline form appeared

Steed - Direct

10:25:38 1    and that meant that the -- the medicine started to fail its

10:25:42 2    dissolution test and became ineffective.  Abbott had to

10:25:45 3    recall it at the cost of hundreds of millions of dollars and

10:25:48 4    reformulate before they could get it back to market.

10:25:50 5    Q.    Were there methods described in the prior art about

10:25:52 6    how to determine whether a pharmaceutical salt exists in

10:25:55 7    multiple crystalline forms?

10:25:56 8    A.    Yes.  There were.

10:25:58 9    Q.    And could you describe those briefly?

10:26:00 10   A.    Yes.  Typically polymorphism screening is the way

10:26:03 11   it's done.  Very similar to salt screening, except there's

10:26:06 12   no need to choose a salt.  It's a case of trying to

10:26:10 13   crystallize the drug substance under a representative range

10:26:13 14   of conditions in order to see what crystalline forms result

10:26:17 15   if it's crystallized in different ways.

10:26:19 16   Q.    In pharmaceutical development, how often are drugs

10:26:22 17   under development subjected to crystalline polymorph

10:26:25 18   screening?

10:26:25 19   A.    These days, pretty much all the time.

10:26:29 20   Q.    Thank you for that technical background, Dr. Steed.

10:26:32 21   Let's --

10:26:32 22        THE COURT:  So, Mr. Cooper, if you're going on

10:26:34 23   to something else, why don't we take our morning break here.

10:26:36 24   Okay?

10:26:37 25        MR. COOPER:  Yes, sir.

Steed - Direct

10:26:37  1          THE COURT:  So, we'll have a 15-minute break.

10:26:39  2     We'll be in recess.

10:26:41  3          DEPUTY CLERK:  All rise.

10:27:19  4          (Recess was taken.)

10:39:47  5          DEPUTY CLERK:  All rise.

10:39:50  6          THE COURT:  All right.  Everyone be seated.

10:39:52  7          Let's continue.

10:39:58  8     BY MR. COOPER:

10:40:03  9     Q.    Now, Doctor, the last question I asked you before the

10:40:07 10     break was about how often drugs under development are

10:40:11 11     subjected to crystalline polymorph screening, and your

10:40:14 12     answer referred to nowadays.

10:40:16 13          Could you describe how often drugs were -- under

10:40:20 14     development were suggested to crystalline polymorph

10:40:23 15     screening as of the priority date?

10:40:24 16     A.    Also, essentially all of the time.

10:40:29 17     Q.    All right.

10:40:29 18          MR. COOPER:  And now we're on DDX Steed 14.  And

10:40:32 19     let's turn to the next part of your testimony on written

10:40:35 20     description.

10:40:35 21     BY MR. COOPER:

10:40:36 22     Q.    In forming your opinions on written description, did

10:40:39 23     you apply your understanding of the applicable legal

10:40:42 24     standard?

10:40:42 25     A.    I did.  Yes.

Steed - Direct

10:40:43  1          MR. COOPER:  Let's move to DDX Steed 15.

10:40:43  2   BY MR. COOPER:

10:40:46  3   Q.      Does this slide summarize the written description

10:40:49  4   standard that you applied to your analysis?

10:40:51  5   A.      It does, yes.

10:40:53  6          MR. COOPER:  Let's go to DDX Steed Slide 16.

10:40:53  7   BY MR. COOPER:

10:40:57  8   Q.      And first let's provide just a brief overview.  In

10:41:01  9   your opinion, did the inventors possess and disclose the

10:41:04 10   full scope of the asserted claims of the malate salt patents

10:41:08 11   with sufficient written description?

10:41:09 12   A.      No.  They did not.

10:41:11 13   Q.      What is the relevant genus for your written

10:41:14 14   description analysis?

10:41:14 15   A.      Yes, so the '439 patent claims cover any crystalline

10:41:21 16   cabozantinib (L)-malate salt.

10:41:23 17   Q.      How many different crystalline cabozantinib

10:41:25 18   (L)-malate salts are there?

10:41:26 19   A.      We know of 11 at the moment, but it's a potentially

10:41:29 20   infinite genus because there could be another one discovered

10:41:32 21   in the future or, indeed, many discovered in the future.

10:41:35 22   Q.      In your opinion, what species of crystalline

10:41:37 23   cabozantinib (L)-malate salts did Exelixis possess and

10:41:41 24   disclose in the malate salt patents?

10:41:43 25   A.      They possessed and disclosed two, two closely related

Steed - Direct

10:41:46  1   forms, the N-1 and the N-2 forms.

10:41:48  2   Q.     Would a POSA understand that N-1 and N-2 are

10:41:51  3   representative of the full scope of crystalline cabozantinib

10:41:57  4   (L)-malate salts?

10:41:57  5   A.     No.  They wouldn't understand that.  As I testified,

10:42:00  6   each solid form has its own unique set of properties.  N-1

10:42:04  7   and N-2 are just two of those solid forms and actually

10:42:07  8   happen to be quite closely related to each other.  So they

10:42:09  9   don't cover the full scope of solid form properties.

10:42:12 10   Q.     Does the specification of the malate salt patents

10:42:14 11   provide any data disclosing the crystalline cabozantinib

10:42:19 12   (L)-malate salts that the inventors possessed?

10:42:21 13   A.     It does, yes.

10:42:22 14             MR. COOPER:  Let's go to DDX Steed Slide 17.

10:42:22 15   BY MR. COOPER:

10:42:25 16   Q.     What have you excerpted from JTX-1, the '439 patent,

10:42:29 17   on this slide?

10:42:30 18   A.     Yes.  So here I'm showing various figures from the

10:42:35 19   '439 patent that contain characterization data for the two

10:42:39 20   forms that Exelixis did possess and did describe.

10:42:42 21   Q.     Can you describe what the data is that you've pulled

10:42:44 22   from Figure 1 and Figure 8?

10:42:46 23   A.     Yes, Figure 1 and Figure 8 are the X-ray powder

10:42:50 24   diffraction patterns that respectively form N-1 and form

10:42:54 25   N-2.  They're distinct from each other even though they do

Steed - Direct

10:42:57  1   have some similarities, and they identify these as having

10:42:59  2   two different underlying crystal structures.

10:43:02  3   Q.     But what do Figures 5 and 12 show?

10:43:04  4   A.     That's the thermogravimetric analysis data.  It shows

10:43:08  5   how each of those two forms changes its weight according

10:43:12  6   to -- according to temperature, and these particular cases,

10:43:15  7   they don't change weight up to a certain decomposition

10:43:18  8   point, and that means they're non-solvated forms.

10:43:20  9   Q.     What do Figures 6 and 13 show?

10:43:23 10   A.     These are the DSC, differential scanning calorimetry

10:43:28 11   traces.  They're a way of measuring melting point, and these

10:43:30 12   two have similar but not identical melting points.

10:43:33 13   Q.     What do Figures 7 and 14 show?

10:43:34 14   A.     This is analytical technique called moisture

10:43:38 15   absorption.  It tells a person of skill how these two solid

10:43:41 16   forms change -- change their mass as a function of relative

10:43:46 17   humidity, so in other words, whether they absorb moisture or

10:43:46 18   not.

10:43:49 19             MR. COOPER:  Let's go to DDX Slide 18.

10:43:49 20   BY MR. COOPER:

10:43:53 21   Q.     What are you showing on this slide?

10:43:54 22   A.     So these are two other Exelixis patents, the '776 and

10:43:59 23   '549 patents which claim specifically the N-1 and N-2 forms.

10:44:05 24   Q.     How does the specification of the malate salt patents

10:44:08 25   compare to the specification of the '776 and '549 patents?

Steed - Direct

10:44:14  1    A.    It's the same specification.  They're in the same

10:44:16  2    patent family.

10:44:17  3    Q.    And for the record, what is JTX-9 in your binder that

10:44:20  4    is referenced on the slide?

10:44:21  5    A.    That's the '776 patent which the claims are directed

10:44:25  6    to the N-2 crystalline form.

10:44:27  7    Q.    When did the '776 patent issue?

10:44:30  8    A.    It was November the 4th, 2014.

10:44:33  9    Q.    What is JTX-10?

10:44:35 10    A.    That's the '549 patent that claims the N-1 form, and

10:44:38 11    that issued on November 7th, 2017.

10:44:41 12    Q.    In reviewing Exelixis' documents during your work on

10:44:43 13    this case, did you see any evidence that the inventors ever

10:44:47 14    possessed any crystalline cabozantinib malate salts other

10:44:51 15    than N-1 and N-2?

10:44:52 16    A.    I did not see any evidence to that effect, no, and,

10:44:55 17    in fact, they stated that they did not possess any other

10:44:58 18    forms.

10:44:58 19               MR. COOPER:  Can we pull up DDX-20?

10:44:58 20    BY MR. COOPER:

10:45:04 21    Q.    Dr. Steed, what is this exhibit?

10:45:05 22    A.    This is an extract from Exelixis' NDA for

10:45:09 23    cabozantinib malate.

10:45:11 24    Q.    When did Exelixis submitted their NDA for

10:45:14 25    cabozantinib tablets?

Steed - Direct

10:45:15 1    A.    I believe it was 2015.

10:45:17 2              MR. COOPER:  Let's go to Page 2 of the exhibit

10:45:20 3    and call out Section 3.4.

10:45:20 4    BY MR. COOPER:

10:45:23 5    Q.    What is Exelixis reporting to FDA in their NDA

10:45:27 6    submission?

10:45:28 7    A.    Here they tell FDA that cabozantinib (S)-malate --

10:45:31 8    that's the same as (L)-malate -- was found to exist in two

10:45:34 9    neat -- that's what the N stands for -- closely related

10:45:37 10   crystalline solid forms, N-1 and N-2, that have similar

10:45:40 11   properties.  They go on to say that they undertook both a

10:45:45 12   manual and a high throughput crystallization polymorph

10:45:48 13   screen and no other forms were identified in those studies.

10:45:51 14   Q.    Are there additional crystalline cabozantinib

10:45:54 15   (L)-malates that are known to exist?

10:45:56 16   A.    Yes, there's at least nine more now.

10:45:59 17             MR. COOPER:  Let's go to DDX Steed Slide 19.

10:45:59 18   BY MR. COOPER:

10:46:05 19   Q.    What are you slowing on this slide?

10:46:06 20   A.    Yes.  So these are other patent or patent application

10:46:11 21   documents reporting those other nine forms that I was

10:46:13 22   alluding to.

10:46:14 23   Q.    What is DTX-333?

10:46:16 24   A.    That is MSN's '160 patent that covers MSN's form S.

10:46:22 25   Q.    What are PTX-256 and DTX-222?

Steed - Direct

10:46:25  1    A.      These are two Mylan patent documents that report

10:46:31  2    Mylan form M-1 through M-4.

10:46:33  3    Q.      What is DTX-121?

10:46:35  4    A.      It's a Cipla -- Cipla PCT document reporting Cipla's

10:46:40  5    form C-2 through C-5, so an additional four forms.

10:46:44  6    Q.      Was the MSN, Mylan and Cipla patent literature

10:46:48  7    published by October 2020?

10:46:51  8    A.      Yes, it was.

10:46:51  9    Q.      Does the patent literature report on unique

10:46:54 10    characteristics of the different crystalline cabozantinib

10:46:58 11    (L)-malate salts?

10:46:59 12    A.      Yes, the properties of each are described.

10:47:02 13            MR. COOPER:  Let's go to DDX Steed Slide 20.

10:47:02 14    BY MR. COOPER:

10:47:06 15    Q.      Could you explain, what are you showing on the

10:47:09 16    left-hand part of this slide?

10:47:10 17    A.      Yes, so these are four example powder diffraction

10:47:14 18    patterns of the total 11 forms that I was just talking

10:47:17 19    about, N-2 shown in red.  And I've got an example Mylan, an

10:47:21 20    example Cipla, and MSN's form S powder diffraction patterns

10:47:25 21    are shown on the left-hand side there.  And they're all

10:47:27 22    distinct patterns that identify these as different

10:47:30 23    crystalline forms.

10:47:31 24    Q.      And specifically you've put on the Slide M-4 and C-4;

10:47:35 25    is that right?

Steed - Direct

10:47:35 1    A.      That's right, yes.

10:47:37 2    Q.      What are you showing on the right-hand part of this

10:47:39 3    slide?

10:47:39 4    A.      These are claimed peak positions for those various

10:47:43 5    forms that have been measured from these experimental X-ray

10:47:47 6    powder diffraction patterns.  These are not all the peaks,

10:47:50 7    but they are the ones that the various patent inventors

10:47:52 8    chose to claim as being unique sets of peaks that identify

10:47:56 9    their invention.

10:47:57 10   Q.      And it looks like if you compare any one reported

10:48:00 11   crystalline form against another, there are some overlapping

10:48:05 12   XRPD peaks.  How does that affect your opinion?

10:48:08 13   A.      Yes, it doesn't affect my opinion.  It's quite normal

10:48:11 14   that there will be some peaks that overlap from one

10:48:14 15   diffraction pattern to another.  If you have a look at these

10:48:16 16   diffraction patterns, there are many peaks there.  And so,

10:48:19 17   it's not surprising that by coincidence some peaks may be

10:48:23 18   kind of -- may be in similar positions in -- in more than

10:48:26 19   one form.  That doesn't change the fact that the overall

10:48:29 20   patents are different indicating they're different solid

10:48:31 21   forms, and if you take the claimed peak positions as a set,

10:48:35 22   each set uniquely identifies a polymorphic form.

10:48:38 23   Q.      Now, you've placed a few examples on this slide.  But

10:48:41 24   did you review and draw any conclusions about whether the

10:48:44 25   crystalline structure of all 11 of the cabozantinib

Steed - Direct

10:48:49  1    (L)-malate salts identified in the patent literature were

10:48:52  2    unique?

10:48:52  3    A.     I did.  I reviewed the data for all 11 forms, and

10:48:56  4    it's my opinion there are 11 different forms.

10:48:58  5    Q.     Does the Mylan, Cipla and MSN patent literature

10:49:02  6    provide any information about how each of their different

10:49:05  7    crystalline cabozantinib (L)-malate salts were prepared?

10:49:08  8    A.     Yes.  Each document has a recipe by which it's

10:49:12  9    particular forms are made.

10:49:15 10           MR. COOPER:  Let's go to DDX Steed Slide 21.

10:49:15 11    BY MR. COOPER:

10:49:19 12    Q.     What have you placed in each of the three columns on

10:49:21 13    this slide?

10:49:22 14    A.     So these are three examples of those kinds of

10:49:25 15    procedures, typically exemplified by examples within the

10:49:30 16    patent documents.  So, here I'm showing just for

10:49:32 17    illustration the fact that different solid forms are made in

10:49:34 18    different ways.  The recipe for Exelixis' form N-2, MSN's

10:49:39 19    form S and Cipla's form C-4.

10:49:43 20    Q.     What are some of the differences in the way that they

10:49:46 21    are made that you have highlighted on this slide?

10:49:48 22    A.     Yes.  So the solid form that comes out depends upon

10:49:52 23    the circumstances under which it crystallizes, and there are

10:49:55 24    a number of different possible ways you can crystallize.

10:49:59 25    I'm highlighting, for example, for Exelixis' form N-2 in

Steed - Direct

10:50:03  1   purple there that they use seed crystals to select form N-2

10:50:08  2   and stop other forms from being produced.  That's not used

10:50:12  3   by the other methods.

10:50:12  4   Q.      What are you highlighting in blue on this slide?

10:50:14  5   A.      MSN's form S uses an antisolvent called

10:50:19  6   dichloromethane which the other forms don't use so they add

10:50:22  7   that near to the crystallization stage and that -- and so

10:50:26  8   the form S precipitates from this dichloromethane solution.

10:50:31  9   Q.      What are you highlighting in green on this slide?

10:50:33 10   A.      So, the other procedures use some different solvents.

10:50:38 11   So, form N-2 and form S further up the procedure use a

10:50:41 12   solvent called tetrahydrofuran, and N-2 uses other solvents

10:50:45 13   as well, like isobutyl ketone.  Cipla's form C-4 uses a

10:50:50 14   rather different kind of solvent.  That's dimethyl carbonate

10:50:53 15   and heptane.

10:50:54 16   Q.      What are you highlighting in orange on this slide?

10:50:56 17   A.      Again, further differences is the amount of water

10:51:00 18   added between form S and form C-4.  70 ml added in form S

10:51:05 19   and just a very small amount of water for C-4, just 50

10:51:08 20   microliters.  And these are just examples of other

10:51:11 21   differences that are in these various preparation

10:51:15 22   procedures, different temperatures, different slurrying

10:51:18 23   times, different crystallization times and so on.

10:51:20 24   Q.      And have you reviewed all of the processes for the 11

10:51:24 25   crystalline cabozantinib (L)-malate forms and found them to

Steed - Direct

10:51:27 1  be unique?

10:51:28 2  A.     I have, yes.  Each is crystallized in a different

10:51:30 3  way, as you'd expect because they're different forms.

10:51:33 4  Q.     Doctor, is there any doubt that crystalline

10:51:36 5  cabozantinib (L)-malate salts exist that the malate salt

10:51:39 6  patent inventors did not possess at the priority date?

10:51:42 7  A.     No, there's no doubt at all.  And, in fact, last time

10:51:45 8  we were here, Your Honor, you ruled that MSN's form S

10:51:47 9  doesn't infringe the form N-2 patent and so it's a different

10:51:50 10 form.

10:51:51 11 Q.     Now, even at the priority date when the Mylan Cipla

10:51:54 12 and MSN patent literature was not available, what would a

10:51:58 13 POSA have reasonably expected about the whether there were

10:52:01 14 crystalline cabozantinib (L)-malate salts other than N-1 and

10:52:05 15 N-2?

10:52:05 16 A.     Yes.  It was the Paulekuhn document demonstrating

10:52:09 17 polymorphism was well-known at the priority date.  So even

10:52:12 18 if there were no other polymorphs known, a person would have

10:52:14 19 a strong reason to expect that the other polymorphs may be

10:52:18 20 discovered in the future.

10:52:19 21 Q.     Based on the data you reviewed, is the crystalline

10:52:22 22 structure of N-1 and N-2 representative of the crystalline

10:52:26 23 structure of other crystalline cabozantinib (L)-malate salts

10:52:30 24 that exist or that could reasonably be expected by a POSA to

10:52:34 25 exist?

Steed - Direct

10:52:34 1    A.      No, each one has its own unique powder diffraction

10:52:40 2    pattern.  N-1 and N-2 are actually quite similar to each

10:52:44 3    other, and they're different to many of the other powder

10:52:46 4    diffraction patents that I've reviewed.

10:52:47 5              And so, of course, by definition, each solid

10:52:50 6    form is -- is a different solid form with a different

10:52:52 7    structure.  And N-1 and N-2 aren't representative of the

10:52:56 8    other forms we know of, and likely not any that will be

10:52:59 9    discovered in the future.

10:53:00 10   Q.    Does the specification of the malate salt patents

10:53:02 11   provide information about properties of N-1 and N-2 other

10:53:06 12   than the crystalline structure?

10:53:07 13   A.    Yes, it does.

10:53:09 14              MR. COOPER:  Let's pull up JTX-1.  And go to

10:53:13 15   Page 36 and call out Column 6, Line 56.

10:53:17 16              Over to Page 7, Column 7, Line 9.

10:53:17 17   BY MR. COOPER:

10:53:22 18   Q.    Doctor, what does Exelixis' specification report

10:53:25 19   about the benefit of the properties of crystalline

10:53:29 20   cabozantinib (L)-malate salts, also referred to as

10:53:33 21   Compound I, in the disclosed -- in the patent compared to

10:53:37 22   other salts of cabozantinib and cabozantinib free base?

10:53:40 23   A.      They speak of their properties, and in general they

10:53:43 24   say that the N-1 and N-2 forms have improved properties over

10:53:47 25   other salt forms.

Steed - Direct

10:53:49 1   Q.     What does the specification say about the scope of

10:53:52 2   the disclosure with respect to specific crystalline forms

10:53:55 3   like N-2?

10:53:56 4   A.     They make it clear that they're using the names of

10:54:00 5   polymorphs, like N-2, to indicate a material with a

10:54:03 6   particular set of properties.  And so, they're saying here

10:54:06 7   that if something has the same properties, then they don't

10:54:10 8   determine the name to be limiting, that would also be

10:54:13 9   regarded as N-2.

10:54:13 10            And, of course, the converse is true, that if

10:54:15 11   something has very different properties, that wouldn't be

10:54:17 12   form N-2.

10:54:18 13   Q.     Would a POSA expect other crystalline cabozantinib

10:54:21 14   malate salts to have similar or identical physical and

10:54:24 15   chemical characteristics as N-1 and N-2?

10:54:26 16   A.     No.  If there were similar or identical physical

10:54:31 17   chemical characteristics, that would make it N-2 or N-1.  If

10:54:34 18   the characteristics are different, then it's a different

10:54:36 19   form.

10:54:37 20            MR. COOPER:  Let's go to Page 49 and call out

10:54:41 21   Column 31, Lines 5 through 15.

10:54:41 22   BY MR. COOPER:

10:54:45 23   Q.     What property is identified in the specification

10:54:48 24   here?

10:54:48 25   A.     So here, the specification is talking about the

10:54:52  1   differential scanning calorimetry thermogram as a way of

10:54:56  2   measuring melting point for Forms N-1 and N-2.

10:54:58  3   Q.     What does it report about the melting point of N-1

10:55:01  4   and N-2?

10:55:01  5   A.     For form N-1, it gets 187 degrees C, 186 for N-2.  So

10:55:07  6   in this case, they're really quite similar to each other.

10:55:09  7   Q.     Would a POSA expect other crystalline cabozantinib

10:55:12  8   (L)-malate salts to have the same melting point?

10:55:14  9   A.     No, each one will have its own melting point.  It

10:55:18 10   might be similar, but more likely to be quite different

10:55:20 11   because it's a unique property of a particular form.

10:55:24 12           MR. COOPER:  Let's pull up DTX-222, which is the

10:55:27 13   Mylan patent application.  And go to Page 36 and call out

10:55:32 14   Figure 9.

10:55:32 15   BY MR. COOPER:

10:55:33 16   Q.     What characteristic does this figure show?

10:55:35 17   A.     So, here's a differential scanning calorimetry trace

10:55:39 18   for Mylan's form M-4.  This has a lower melting point of a

10:55:43 19   174.87.  And, of course, MSN's form S is even lower than

10:55:48 20   that, at 113.

10:55:49 21           MR. COOPER:  Let's go back to the '439 patent,

10:55:52 22   JTX-1, and go to Page 37.  Can we call out Column 7, Lines

10:55:58 23   10 through 18.

10:55:58 24   BY MR. COOPER:

10:56:01 25   Q.     What property of the crystalline cabozantinib

Steed - Direct

10:56:03  1    (L)-malate salts disclosed in the patent is identified here?

10:56:07  2    A.    So, again, the inventors are still talking about

10:56:10  3    their combination of pharmaceutical properties.  Here,

10:56:12  4    they're referring to the TGA properties.  And they say that

10:56:16  5    no solvent loss was observed for forms N-1 and N-2.  So that

10:56:20  6    indicates they're non-solvated forms.

10:56:23  7    Q.    What does -- okay.  Thank you.

10:56:26  8          Would a POSA expect other crystalline

10:56:28  9    cabozantinib (L)-malate salts to show no solvent loss in a

10:56:31 10    TGA experiment?

10:56:32 11    A.    No.  If it was a solvated crystalline form that had

10:56:36 12    solvent molecules as a regular part of the -- of the crystal

10:56:40 13    lattice then the TGA would show that by virtue of a mass

10:56:43 14    loss as the temperature was increased.

10:56:45 15          MR. COOPER:  Let's pull up DTX-222 and go to

10:56:49 16    Page 30 and call out Figure 3.

10:56:49 17    BY MR. COOPER:

10:56:52 18    Q.    What characteristics does this figure show?

10:56:54 19    A.    So this is the thermogravimetric trace of Mylan's

10:56:59 20    form M-1.  And you can see the mass loss of 4.260 percent

10:57:04 21    highlighted there occurring between room temperature and

10:57:07 22    about 125 degrees C.  That indicates solvent molecules

10:57:12 23    coming off form M-1.  So that's a solvated crystalline form.

10:57:15 24          MR. COOPER:  Let's go back to the '439 patent,

10:57:18 25    JTX-1.  And go to Page 37 and call out Table 1 and Column 7.

Steed - Direct

10:57:24  1   And the entry for (L)-malate in Column 8.

10:57:24  2   BY MR. COOPER:

10:57:27  3   Q.      What does Table 1 in the patent report on?

10:57:30  4   A.      Table 1 is a further listing of properties of the --

10:57:33  5   of the forms N-1 and N-2.  In this case, the malate salt.

10:57:38  6   Q.      What is -- what is one of the properties of the

10:57:43  7   crystalline cabozantinib (L)-malate salt disclosed in the

10:57:46  8   patent here?

10:57:46  9   A.      The crystalline malate salts are -- of the patent are

10:57:50 10   said to be nonhygroscopic.

10:57:51 11   Q.      Would a POSA expect other crystalline cabozantinib

10:57:55 12   (L)-malate salts to be nonhygroscopic?

10:57:57 13   A.      No.  Like the other properties, hygroscopicity is an

10:58:00 14   intrinsic property of a particular form.  MSN's form S

10:58:03 15   happens to be hygroscopic.

10:58:05 16   Q.      What other property of the crystalline cabozantinib

10:58:09 17   (L)-malate salts had been disclosed in the patent as

10:58:11 18   identified here?

10:58:12 19   A.      This table also lists the property of solubility

10:58:16 20   measured in number of milligrams per milliliter.  And the

10:58:20 21   (L)-malate salts have a solubility of 0.059.

10:58:23 22   Q.      Would a POSA expect other crystalline cabozantinib

10:58:25 23   (L)-malate salts to have the same solubility?

10:58:28 24   A.      No.  Solubility is another one of those intrinsic

10:58:31 25   properties of a form that will be different for each form.

466

Steed - Direct

10:58:34 1   Q.    Based on the data you have reviewed, are the

10:58:36 2   properties of the N-1 and N-2 representative of the

10:58:39 3   properties of other crystalline cabozantinib (L)-malate

10:58:43 4   salts that exist, that are known to exist, or would be

10:58:47 5   expected to exist by a POSA?

10:58:49 6   A.    No.  They're not representative.

10:58:51 7   Q.    And even if the Mylan, Cipla, and MSN patent

10:58:54 8   literature was not available at the priority date, would a

10:58:57 9   POSA have expected N-1 and N-2 to have the same or similar

10:59:00 10  properties as other crystalline cabozantinib (L)-malate

10:59:03 11  salts?

10:59:04 12  A.    No, they wouldn't.  If the properties were the same,

10:59:06 13  it wouldn't be a different form.  So they would expect the

10:59:09 14  properties to be different.

10:59:10 15  Q.    All right.  Thank you, Doctor.

10:59:12 16         MR. COOPER:  Let's move to DDX Steed 22.

10:59:12 17  BY MR. COOPER:

10:59:15 18  Q.    And turn to the next part of your testimony on

10:59:17 19  obviousness --

10:59:18 20         THE COURT:  Actually, before we do that.

10:59:20 21         Dr. Steed, would you -- in terms of your

10:59:24 22  understanding of when the word "representative" is being

10:59:28 23  used to describe different polymorphs, is N-1 representative

10:59:35 24  of N-2?

10:59:37 25         THE WITNESS:  That's a really good question.

Steed - Direct

10:59:39 1  They are slightly different to each other.  So, I would say

10:59:42 2  even those two are distinct from each other, or otherwise

10:59:45 3  they would be the same form.  But they have quite similar

10:59:47 4  properties.

10:59:47 5          THE COURT:  Well -- and I guess the point that

10:59:50 6  I'm wondering about is whether essentially your view is

10:59:56 7  that, as a practical matter, no polymorph is going to be

11:00:01 8  representative of another polymorph?

11:00:06 9          THE WITNESS:  It's an interesting question.  I

11:00:08 10 mean, I wouldn't necessarily say that possession of -- of

11:00:13 11 form N-1 and N-2, for example, would indicate also

11:00:16 12 possession of form N-1.  So, because each polymorph is

11:00:19 13 unique, then I suppose each one is only representative of

11:00:23 14 itself, would be my opinion.

11:00:24 15         THE COURT:  All right.  Go ahead.

11:00:28 16         Thank you, Doctor.

11:00:29 17         THE WITNESS:  Thank you.

11:00:30 18         MR. COOPER:  Let's move to DDX-12 -- 22.

11:00:30 19 BY MR. COOPER:

11:00:33 20 Q.     In forming your opinions, did you apply your

11:00:35 21 understanding of the applicable legal standard?

11:00:37 22 A.     I did.

11:00:39 23         MR. COOPER:  Let's move to DDX Steed 23.

11:00:39 24 BY MR. COOPER:

11:00:43 25 Q.     Does this slide summarize the obviousness-type double

Steed - Direct

11:00:46  1    patenting standard that you applied to your analysis?

11:00:48  2    A.    It does, yes.

11:00:51  3          MR. COOPER:  Let's pull up DTX-13.

11:00:51  4    BY MR. COOPER:

11:00:56  5    Q.    Dr. Steed, what is this exhibit?

11:00:57  6    A.    This is the '473 patent that we've heard of already

11:01:01  7    today.

11:01:02  8    Q.    When did the '473 patent issue?

11:01:04  9    A.    That's August 25th, 2009.

11:01:07 10    Q.    Who is the assignee of the '473 patent?

11:01:09 11    A.    Exelixis.

11:01:12 12    Q.    Doctor, did you consider whether the asserted claims

11:01:14 13    of the malate salt patents are rendered obvious over any

11:01:19 14    claims of the '473 patent under the obviousness-type double

11:01:23 15    patenting doctrine?

11:01:23 16    A.    I did.  Yes.

11:01:25 17          MR. COOPER:  Let's go to DDX Steed 24.

11:01:25 18    BY MR. COOPER:

11:01:29 19    Q.    Now, what are you showing on the left-hand side of

11:01:31 20    this slide?

11:01:32 21    A.    This is Claim 5 of the '473 patent, which is my

11:01:36 22    reference claim.

11:01:38 23    Q.    When does the '473 patent expire?

11:01:40 24    A.    2026.

11:01:42 25    Q.    On the right-hand side, you've reproduced again the

Steed - Direct

1    asserted claims of the malate salt patents.  When do those

2    expire?

3    A.     2030.

4    Q.     Is there an element of the '473 patent Claim 5 and

5    the asserted claims of the malate salt patents that you've

6    highlighted in green on this slide?

7    A.     Yes.  We've seen it quite a few times now.  That's

8    the chemical structure of the cabozantinib molecule.

9    Q.     Was the cabozantinib molecule also disclosed in the

10   prior art?

11   A.     Yes, it was in the priority application that

12   underlies the '473 patent.

13   Q.     So, is the cabozantinib molecule a patentably

14   distinct element between the two?

15   A.     No, it isn't.  It's called out by structure in

16   Claim 5 and -- and by name in the malate salt patents, but

17   it's the same thing.

18   Q.     Is there an element of the '473 patent Claim 5 and

19   the asserted claims of the malate salt patents that you've

20   highlighted in yellow?

21   A.     Yes.  Claim 5 of the '473 is also directed towards

22   the pharmaceutically acceptable salts -- the genus of

23   pharmaceutically acceptable salts of cabozantinib.

24   Q.     Is crystalline (L)-malate a pharmaceutically

25   acceptable salt of cabozantinib?

470

Steed - Direct

11:02:51 1    A.    Yes, it is.

11:02:53 2    Q.    So, in your opinion, does the genus of

11:02:55 3    pharmaceutically acceptable salts claimed in the '473 patent

11:03:00 4    include the species of crystalline (L)-malate salts claimed

11:03:03 5    in the malate salt patents?

11:03:05 6    A.    Yes, it does.

11:03:07 7    Q.    Are there any reasons a POSA would have been

11:03:10 8    motivated to prepare the (L)-malate salt specifically with a

11:03:14 9    reasonable expectation of success in being able to do so?

11:03:18 10   A.    Yes, there is.

11:03:20 11          MR. COOPER:  Let's go to DDX Steed 25.

11:03:20 12   BY MR. COOPER:

11:03:23 13   Q.    Now, have you listed those considerations on this

11:03:25 14   slide?

11:03:26 15   A.    Yes, these are the considerations that a person of

11:03:29 16   skill would be looking at in running one of those routine

11:03:32 17   and customary salt screens as applied to cabozantinib -- as

11:03:35 18   applied malate.

11:03:37 19   Q.    What is the first consideration about (L)-malic acid

11:03:40 20   that you've identified?

11:03:42 21   A.    Yes.  A person of skill would look to the prior art

11:03:45 22   in order to see which kinds of counterions had been used in

11:03:49 23   FDA approved drugs previously.

11:03:53 24   Q.    Are malic acid and malate identified in the list of

11:03:55 25   FDA approved and commonly used counterions in API salts that

Steed - Direct

11:04:00 1    were in the prior art lists that you previously discussed?

11:04:05 2    A.    Yes, they are.  They were in all the ones that I

11:04:07 3    showed.

11:04:07 4    Q.    How would a POSA rely on those prior art lists in

11:04:10 5    performing a salt screening?

11:04:12 6    A.    That would be a starting point for them to -- to go

11:04:15 7    about their choice of -- of acid in this case.

11:04:18 8    Q.    Were there any FDA approved malate salts in the prior

11:04:21 9    art that would have been notable to a POSA?

11:04:23 10   A.    Yes.  There's another tyrosine kinase inhibitor,

11:04:27 11   sunitinib, which is also formulated as an (L)-malate salt.

11:04:30 12   It's a different molecule, doesn't have the same chemical

11:04:33 13   structure but it would indicate that (L)-malate is a

11:04:35 14   suitable ion for this type -- kind of drug.

11:04:37 15   Q.    What is the second consideration you've listed?

11:04:39 16   A.    Obviously for administration to humans, you would

11:04:43 17   need it to be non-toxic.  So a person of skill would look to

11:04:46 18   non-toxic acids in their counterions and safe -- safe for

11:04:50 19   consumption.

11:04:51 20   Q.    What did the prior art report with respect to the

11:04:53 21   toxicity of malic acid?

11:04:55 22   A.    Malic acid is very much non-toxic.  It's a natural

11:04:59 23   product.  It comes from fruits, sometimes called apple acid.

11:05:02 24        MR. COOPER:  Let's pull up DTX-167.

11:05:02 25   BY MR. COOPER:

Steed - Direct

11:05:07  1    Q.      What is this exhibit?

11:05:08  2    A.      This is a prior art reference from the -- entitled

11:05:12  3    *Encyclopedia of Pharmaceutical Technology*, edited by

11:05:16  4    Swarbrick.

11:05:17  5    Q.      And did you rely on a chapter in this textbook by

11:05:21  6    Bighley?

11:05:21  7    A.      I did, yes.

11:05:23  8    Q.      Does this reference contain one of the lists of FDA

11:05:25  9    approved pharmaceutically acceptable salts that you've

11:05:28 10    previously discussed?

11:05:29 11    A.      It does, yes.

11:05:31 12            MR. COOPER:  Let's go to Page 36 and call out

11:05:33 13    the second paragraph with the heading "Preparation of

11:05:36 14    organic salts."

11:05:36 15    BY MR. COOPER:

11:05:38 16    Q.      Does the Bighley reference disclose a preference for

11:05:42 17    any of the anions from the list of FDA approved salts that

11:05:46 18    are identified in this chapter?

11:05:47 19    A.      Yes.  Bighley alludes to some problems that can be

11:05:51 20    encountered with mineral acid salts, like hydrochlorides,

11:05:54 21    and says that many of the problems can be avoided by

11:05:56 22    choosing a hydroxylated conjugate acid with a p$K_a$ of about 3

11:06:00 23    to 4.  And then Bighley goes on to list, I think, about 12

11:06:04 24    possible candidate ions, so that includes formate, acetate,

11:06:09 25    glycolate, lactate, malate, gluconate, tartrate, citrate,

Steed - Direct

11:06:16 1    succinate, malonate, fumarate, and maleate.

11:06:21 2         MR. COOPER:  Let's go back to DDX-25.

11:06:21 3    BY MR. COOPER:

11:06:24 4    Q.    What is the third consideration about (L)-malic acid

11:06:29 5    that you've listed?

11:06:30 6    A.    Yes.  And I should have said Bighley indicates those

11:06:32 7    are all -- those are non-toxic options, as I was alluding

11:06:35 8    to.

11:06:36 9         In addition to that, of course, as I was saying

11:06:39 10   when I was talking about $pK_a$, the acid has to be acidic

11:06:41 11   enough in order to actually form a salt with a base like

11:06:45 12   cabozantinib and that's the $pK_a$ Rule-of-2.

11:06:48 13   Q.    Is the $pK_a$ of cabozantinib reported in the prior art?

11:06:51 14   A.    It isn't, no, but it's readily measured by titration.

11:06:55 15   Q.    Is the $pK_a$ of malic acid and other commonly used

11:06:58 16   counterions reported in the prior art?

11:07:00 17   A.    Yes, it is.  It's about 3.4.

11:07:03 18   Q.    In forming your opinions, did you consider which

11:07:06 19   pharmaceutically acceptable anions from the FDA approved

11:07:09 20   list would meet the Rule-of-2 for cabozantinib?

11:07:12 21   A.    Yes, I did.

11:07:13 22   Q.    Did you also consider any references introduced by

11:07:17 23   Dr. Trout that identified the pharmaceutically acceptable

11:07:20 24   anions that would meet the Rule-of-2 for cabozantinib?

11:07:23 25   A.    Yes.  In addition to the list that I looked at,

Steed - Direct

11:07:26 1    Dr. Trout also mentioned an article by Stahl that has

11:07:30 2    similar kinds of lists in it handedly ranked by p$K_a$.

11:07:33 3            MR. COOPER:  Let's go to PTX-610.

11:07:33 4    BY MR. COOPER:

11:07:37 5    Q.    Dr. Steed, what is this exhibit?

11:07:38 6    A.    This is that Stahl reference.  It's from *Handbook of*

11:07:42 7    *Pharmaceutical Salts*, first author Stahl; it's a prior arts

11:07:45 8    reference.

11:07:46 9            MR. COOPER:  Let's go to Page 338 to 339, and

11:07:49 10   call out Table 2 on those two pages.

11:07:49 11   BY MR. COOPER:

11:07:52 12   Q.    And what is provided in Table 2 of the Stahl

11:07:54 13   reference?

11:07:55 14   A.    So this is a list of pharmaceutically acceptable

11:07:59 15   acids that can be used to make salts as acid addition salts

11:08:03 16   and they're ranked in order of increasing p$K_a$ value, so

11:08:07 17   decreasing acidity.

11:08:08 18   Q.    Did both -- did you consider how many of the acids in

11:08:11 19   this list that Dr. Trout identified would meet the Rule-of-2

11:08:15 20   for cabozantinib?

11:08:16 21   A.    Yes, I did.

11:08:19 22           MR. COOPER:  Let's underline D, the lactic acid

11:08:22 23   in the second column.

11:08:22 24   BY MR. COOPER:

11:08:23 25   Q.    What is the significance of this acid?

Steed - Direct

11:08:25 1    A.    So, the red line, which finishes at lactic acid, is

11:08:30 2    where the Tong Rule-of-2 cuts off.  So, anything above the

11:08:34 3    red line would be acidic enough under Tong's Rule-of-2 to

11:08:38 4    form a salt with cabozantinib.

11:08:40 5                MR. COOPER:  Let's call out the row for

11:08:42 6    (L)-malic acid.

11:08:42 7    BY MR. COOPER:

11:08:44 8    Q.    And what can you see in that row?

11:08:45 9    A.    Yeah.  So here's (L)-malic acid, we can see its p$K_a$

11:08:49 10   value and it has two.  But it's the first one that's the

11:08:52 11   important one, 3.459.

11:08:55 12   Q.    And what would a POSA conclude in evaluating these

11:08:58 13   anions -- I'm sorry.  Strike that.

11:09:02 14               Is there any other information presented in this

11:09:05 15   list that a POSA would consider in selecting a counterion?

11:09:09 16   A.    Yes.  And I think it's not quite been called on

11:09:11 17   there, but it also has a final column of GRAS status.  And

11:09:14 18   if you extend the -- the yellow a little bit, then you'll

11:09:18 19   see a plus in GRAS status.

11:09:20 20   Q.    And what significance would a POSA place on GRAS

11:09:24 21   status?

11:09:24 22   A.    So the GRAS status is the FDA's -- thank you -- is

11:09:26 23   the FDA's generally recognized as safe for administration to

11:09:29 24   humans.  So obviously if something is GRAS status, then

11:09:33 25   it's -- if you like preapproved for the use in something

Steed - Direct

11:09:36  1    that a human would consume and that's a desirable property.

11:09:39  2    Q.    And how many acids in the Stahl list meet the Tong

11:09:42  3    Rule-of-2 and are identified as GRAS?

11:09:44  4    A.    Including malic acid, it's nine.

11:09:47  5    Q.    And you said those are indicated by a plus?

11:09:50  6    A.    That's right.

11:09:51  7    Q.    Is malic acid one of the acids designed and

11:09:53  8    designated as GRAS?

11:09:54  9    A.    It is.

11:09:57 10    Q.    And so, did you consider the relative scope of

11:10:00 11    previously used pharmaceutically acceptable counterions that

11:10:03 12    would meet the Rule-of-2 for cabozantinib from your list

11:10:07 13    that you identified previously, as well as this list from

11:10:11 14    Dr. Trout and as -- strike that.

11:10:19 15          Did you consider the relative scope of

11:10:23 16    previously used pharmaceutically acceptable counterions that

11:10:26 17    would meet the Rule-of-2 for cabozantinib and were

11:10:29 18    recognized as non-toxic and safe in your analysis?

11:10:32 19    A.    I did, yes.  It's a relatively limited list, the sort

11:10:36 20    that could be easily encompassed by a routine and customary

11:10:40 21    salt screen.

11:10:42 22          MR. COOPER:  Let's go to DDX Steed 26.

11:10:42 23    BY MR. COOPER:

11:10:46 24    Q.    You also mentioned structural compatibility as a

11:10:49 25    consideration.  What would a POSA understand in that regard

Steed - Direct

11:10:53 1   based on the chemical structures of cabozantinib and

11:10:57 2   (L)-malic acid that were disclosed in the prior art?

11:10:59 3   A.     Yes.  As I just -- as I described, crystalline salts

11:11:03 4   are desirable and a POSA would look to their knowledge of

11:11:06 5   the kinds of interactions between the anion and the

11:11:09 6   counterion of the salt that might make for a stable crystal,

11:11:12 7   and I'm showing one of those kinds of interactions here

11:11:15 8   between cabozantinib and malate.  This image is taken from

11:11:18 9   the crystal structure of the N-1 form, but the interaction

11:11:22 10  notated in yellow would -- would be one that would be

11:11:24 11  well-known to somebody like myself who knows about crystal

11:11:29 12  interactions.

11:11:29 13          So, what I'm showing here is that in all salts,

11:11:32 14  there will be a positive to negative attraction, that's the

11:11:35 15  lower of the two dotted lines.  It's a strong hydrogen

11:11:38 16  bonding interaction.  Many salts will have that kind of

11:11:42 17  strength.

11:11:42 18          But in addition in the case of a quinoline

11:11:45 19  derivative like this, and carboxylate like malate, we've got

11:11:49 20  a second interaction to give us an eight-atom hydrogen

11:11:51 21  bonded ring.  And this is a reproducible motif, it's called

11:11:55 22  a supramolecular synthon parlance and a person of skill

11:11:58 23  would be aware that this kind of interaction would be a

11:12:00 24  stabilizing interaction in crystals of this type with

11:12:04 25  malate.

Steed - Direct

11:12:05 1  Q.     And so what would a POSA conclude about cabozantinib

11:12:08 2  and (L)-malic acid in evaluating their structural

11:12:12 3  compatibility?

11:12:12 4  A.     That they would be -- they would be -- I strongly

11:12:16 5  suspect that they would be likely to form a stable crystal.

11:12:19 6             MR. COOPER:  Okay.  Thank you.  You can take

11:12:20 7  that down.

11:12:20 8  BY MR. COOPER:

11:12:21 9  Q.     Now, based on a POSA's general knowledge and the

11:12:23 10 prior art that you've discussed, what is your opinion about

11:12:26 11 whether a POSA would have been motivated and found it

11:12:29 12 obvious to prepare the (L)-malate salt of cabozantinib with

11:12:33 13 a reasonable expectation of success?

11:12:35 14 A.     Yes.  I think malate is a strong candidate for

11:12:39 15 inclusion in that salt screening process that I alluded to.

11:12:41 16 And following the routine and customary path, a person of

11:12:45 17 skill would arrive at cabozantinib (L)-malate without

11:12:47 18 invention be able to analyze its properties.

11:12:50 19 Q.     Would a POSA be further motivated to prepare a

11:12:53 20 crystalline form of cabozantinib (L)-malate with a

11:12:57 21 reasonable expectation of success in being able to do so?

11:12:59 22 A.     Yes.  As I alluded to, more than 90 percent of

11:13:03 23 pharmaceuticals are in crystalline form.  Crystalline forms

11:13:06 24 have desirable properties, such as greater stability, less

11:13:10 25 hygroscopicity, and so the crystalline form would be the

Steed - Direct

11:13:13  1   go-to form.

11:13:14  2   Q.     Is there anything in the prior art that would teach

11:13:17  3   away from a POSA preparing the crystalline (L)-malate salt

11:13:21  4   of cabozantinib?

11:13:22  5   A.     No.

11:13:24  6   Q.     Now, to sum up, in your opinion are there any

11:13:28  7   patentably distinct differences between Claim 5 of the

11:13:30  8   '473 patent and the asserted claim of the '439 patent?

11:13:34  9   A.     No.  I don't think there are.

11:13:36 10          MR. COOPER:  Let's go to DDX Steed 27.

11:13:36 11   BY MR. COOPER:

11:13:40 12   Q.     And turning to the '440 patent, are there any

11:13:43 13   additional limitations of that patent that are not in the

11:13:47 14   '439 patent?

11:13:47 15   A.     Yes.  In addition the '440 patent requires a

11:13:51 16   pharmaceutical composition.

11:13:52 17   Q.     Does the '440 patent specification anywhere identify

11:13:57 18   a specific pharmaceutical composition containing

11:14:01 19   cabozantinib (L)-malate or how to make one?

11:14:03 20   A.     No, it doesn't.  It just refers to pharmaceutical

11:14:07 21   compositions in general.

11:14:08 22   Q.     Did the prior art disclose pharmaceutical

11:14:11 23   compositions of cabozantinib (L)-malate?

11:14:14 24   A.     Yes, it did.

11:14:15 25          MR. COOPER:  Let's pull up DTX-180.

Steed - Direct

11:14:19  1    Q.     Dr. Steed, what is this exhibit composition?

11:14:22  2    A.     So this is the '928 application that underlies that

11:14:25  3    '473 patent.

11:14:26  4    Q.     When was the '928 application published?

11:14:29  5    A.     March the 8th, 2007.

11:14:32  6    Q.     Under "related applications data," it states that

11:14:35  7    "The '928 publication is a continuation of an international

11:14:40  8    PCT number U.S. 04/31523."

11:14:46  9           Do you see that?

11:14:46 10    A.     I do.

11:14:48 11    Q.     And the title of the '928 application refers to c-Met

11:14:52 12    modulators.  What is your understanding of what those are?

11:14:55 13    A.     So these are anti-cancer drug, specifically tyrosine

11:15:00 14    kinase inhibitors.

11:15:01 15           MR. COOPER:  Let's go to Page 314 of this

11:15:03 16    exhibit and call out Claim 105.  And then also call out from

11:15:08 17    Page 317, entry 12.

11:15:08 18    BY MR. COOPER:

11:15:11 19    Q.     What is this compound claimed here in the '928

11:15:15 20    application?

11:15:15 21    A.     This is cabozantinib.

11:15:17 22           MR. COOPER:  Let's pull up Page 145 of the

11:15:19 23    exhibit and call out Paragraph 297.

11:15:19 24    BY MR. COOPER:

11:15:25 25    Q.     What does the '928 application disclose regarding

Steed - Direct

11:15:28  1   administration of the compounds that are claimed in the

11:15:30  2   reference?

11:15:31  3   A.     Yes.  Exelixis '928 teaches administration of the

11:15:35  4   compounds of the invention or their pharmaceutically

11:15:37  5   acceptable salts which would include the malate salt in

11:15:42  6   appropriate pharmaceutical compositions.

11:15:43  7   Q.     Does the '928 publication identify any specific

11:15:47  8   pharmaceutical compositions with cabozantinib or how to make

11:15:50  9   one?

11:15:51 10   A.     No, it doesn't in the same way as the '440 patent

11:15:54 11   doesn't.  It just talks about them in general.

11:15:57 12   Q.     Based on a POSA's general knowledge and the prior art

11:15:59 13   you've discussed, what is your opinion about whether a POSA

11:16:03 14   would have been motivated and found it obvious to prepare a

11:16:07 15   pharmaceutical composition of that crystalline (L)-malate

11:16:11 16   salt that you've discussed?

11:16:12 17   A.     I believe they would have been motivated to produce a

11:16:15 18   pharmaceutical composition and found it obvious and not

11:16:19 19   patentably distinct from Claim 5 of the -- of the reference

11:16:21 20   patent.

11:16:22 21              MR. COOPER:  Let's go to DDX Steed 28, turning

11:16:27 22   to the '015 patent.

11:16:27 23   BY MR. COOPER:

11:16:29 24   Q.     Are there any additional limitations of that patent

11:16:31 25   that are not in the '439 patent?

Steed - Direct

A.     Yes.  That has the additional requirements of a method of treating cancer, specifically kidney cancer.

Q.     Does the '015 patent anywhere identify any specific methods or other properties of kidney cancer treatment resulting from administering cabozantinib (L)-malate to a patient?

A.     No, it doesn't.  It just talks in general of treating cancer and specifically kidney cancer.

Q.     Did the prior art disclose the use of cabozantinib to treat kidney cancer?

A.     Yes, it does in that '928 application once more.

       MR. COOPER:  Let's pull up the '928 application, DTX-180, and go to Pages 4 through 5 and call out Paragraph 31.

BY MR. COOPER:

Q.     What does the '928 publication disclose here?

A.     Yes.  It's talking about treating diseases associated with the abnormal and/or unregulated Cellular activities, specifically cancer.

Q.     And does the '928 application identify the types or scopes of cancer that claimed compounds treat?

A.     It does, yes.

       MR. COOPER:  Let's go to Page 143 and call out Paragraph 285.

BY MR. COOPER:

11:17:39  1    Q.      Is kidney cancer identified in this definition of

11:17:42  2    cancer?

11:17:43  3    A.      It is, yes.  It specifically calls out kidney cancer.

11:17:48  4    Q.      Now, does the '928 publication identify any specific

11:17:52  5    methods or other properties of kidney cancer treatment

11:17:55  6    resulting from administering any of the claimed compounds to

11:17:58  7    a patient?

11:17:58  8    A.      No, it just talks about it in general in just the

11:18:01  9    same way as the '015 patent does.

11:18:04 10    Q.      Based on a POSA's general knowledge and the prior art

11:18:07 11    that you've discussed, what is your opinion about whether a

11:18:10 12    POSA would have been motivated and found it obvious to use

11:18:13 13    the crystalline cabozantinib (L)-malate salt that you've

11:18:17 14    discussed to treat kidney cancer?

11:18:18 15    A.      I believe they would have been motivated and would

11:18:21 16    have found it obvious.

11:18:23 17    Q.      And in your opinion, does the treatment of kidney

11:18:25 18    cancer element make the asserted claim of the '015 patent

11:18:29 19    patentably distinct over Claim 5 of the '473 patent?

11:18:32 20    A.      No.  I don't think it does.

11:18:36 21            MR. COOPER:  Thank you.  You can take that down.

11:18:36 22    BY MR. COOPER:

11:18:37 23    Q.      Doctor, as part of your analysis, did you also

11:18:40 24    consider purported objective indicia?

11:18:43 25    A.      I did.

Steed - Direct

11:18:45  1    Q.    We expect to hear from Exelixis about certain of

11:18:47  2    those.  But while we have you on the stand today, let's

11:18:50  3    briefly discuss your opinions with what we expect Exelixis

11:18:53  4    to assert.

11:18:55  5            Now, in forming your opinions, did you apply

11:18:58  6    your understanding of the applicable legal standard of

11:19:01  7    unexpected results?

11:19:02  8    A.    I did.

11:19:03  9            MR. COOPER:  Let's go to DDX Steed 29.

11:19:03 10    BY MR. COOPER:

11:19:08 11    Q.    Is your understanding of that standard summarized on

11:19:10 12    this slide?

11:19:11 13    A.    It is.  Yes.

11:19:13 14            MR. COOPER:  Thank you.  You can take that down.

11:19:13 15    BY MR. COOPER:

11:19:15 16    Q.    Do you understand that Exelixis' expert has asserted

11:19:18 17    that it was unexpected that the (L)-malate salt of

11:19:22 18    cabozantinib was found to be the preferred salt for

11:19:24 19    development?

11:19:25 20    A.    I do understand that.  Yes.  But I don't agree with

11:19:29 21    it.

11:19:30 22    Q.    Why not?

11:19:30 23    A.    Well, in order to have an expectation that's -- in

11:19:34 24    order to -- in order for it to be unexpected, you would have

11:19:38 25    to have an expectation that it wouldn't work.  And as I've

Steed - Direct

11:19:42 1   described the routine and customary salt screening process,

11:19:44 2   you simply select the acids and then put them through that

11:19:47 3   process.  So, you wouldn't expect a given acid to not work.

11:19:51 4   You would just apply the routine customary process.

11:19:53 5   Q.   Do you understand that Exelixis' expert has also

11:19:56 6   asserted that crystalline cabozantinib (L)-malate exhibited

11:20:01 7   unexpectedly superior dissolution compared with amorphous

11:20:05 8   cabozantinib (L)-malate?

11:20:06 9   A.   Yes, I've heard that, and I also don't agree with

11:20:09 10   that.

11:20:09 11   Q.   Why is that?

11:20:10 12   A.   There's nothing unexpected about the solubility of

11:20:14 13   crystalline cabozantinib (L)-malate.  It's the amorphous

11:20:16 14   that's weird here.  Amorphous cabozantinib (L)-malate is

11:20:21 15   quite hygroscopic and it forms clumps.  So it dissolves very

11:20:25 16   quickly.  And so it is true that the crystalline form

11:20:28 17   dissolves faster than the amorphous, but that's because the

11:20:31 18   amorphous is anomalous, it dissolves unexpectedly slowly,

11:20:34 19   not because the crystalline is unique in that way.

11:20:36 20   Q.   And is amorphous cabozantinib (L)-malate covered by

11:20:40 21   any of the asserted claims?

11:20:41 22   A.   No.

11:20:44 23   Q.   One final point on objective indicia, and it's

11:20:47 24   related to the blocking patent opinion that we will hear

11:20:49 25   from Dr. McDuff.

Steed - Direct

11:20:51  1            MR. COOPER:  Let's pull up DTX-192.

11:20:51  2    BY MR. COOPER:

11:20:57  3    Q.     Dr. Steed, what is this exhibit?

11:20:58  4    A.     This is the '140 patent application that we've seen

11:21:02  5    earlier today.

11:21:03  6    Q.     And the '140 publication issued from the

11:21:07  7    international 31523 application.  Do you see that?

11:21:13  8    A.     I do.  Yes.

11:21:14  9    Q.     Is this exhibit in the same patent family as the '928

11:21:19 10    publication and '473 patent we looked at previously?

11:21:22 11    A.     It is, yes.

11:21:23 12    Q.     In your opinion -- and have you reviewed this

11:21:26 13    exhibit?

11:21:26 14    A.     I have.

11:21:27 15    Q.     In your opinion, does the subject matter claimed by

11:21:30 16    the malate salt patents lie within the scope of the WO '140

11:21:35 17    publication and the '473 patent, which we've already looked

11:21:39 18    at?

11:21:39 19    A.     Yes, it does.

11:21:40 20    Q.     From a scientific perspective, would a POSA have been

11:21:43 21    discouraged from developing compositions comprising a

11:21:46 22    claimed crystalline cabozantinib (L)-malate salt after the

11:21:50 23    publications of the '140 publication and '473 patent?

11:21:54 24    A.     Yes, they would have done it.  It would discourage

11:21:57 25    them from adopting, of developing the kind of technology

Steed - Cross

11:22:00 1    that's covered by this patent application just in case the

11:22:03 2    application was granted and then they would infringe claims.

11:22:07 3    Q.    And we will hear from them later, but did you

11:22:10 4    consider the opinions and rely on any of MSN's other experts

11:22:14 5    regarding objective indicia asserted by Exelixis in reaching

11:22:18 6    your opinions in this case?

11:22:18 7    A.    Yes, I considered the opinions of Dr. Mega and

11:22:22 8    Dr. McDuff.

11:22:24 9    Q.    Dr. Steed, in your opinion, do objective indicia

11:22:27 10   support a finding that the asserted claims of the malate

11:22:30 11   salt patents are not rendered obvious over any claims of the

11:22:35 12   '473 patent under the obviousness-type double patenting

11:22:37 13   doctrine?

11:22:37 14   A.    They do not.

11:22:39 15              MR. COOPER:  All right.  Thank you, Dr. Steed.

11:22:41 16   We may hear from you again in rebuttal, but that may address

11:22:43 17   all of your opinions on objective indicia.

11:22:46 18              I pass the witness at this time.

11:22:49 19              THE COURT:  All right.  Thank you, Mr. Cooper.

11:23:13 20              THE WITNESS:  Thank you.

11:23:40 21              MR. PRUSSIA:  Your Honor, may I proceed.

11:23:41 22              THE COURT:  Yes.

11:23:17 23                         CROSS-EXAMINATION

11:23:18 24   BY MR. PRUSSIA:

11:23:45 25   Q.    You are not a formulator; correct?

Steed - Cross

11:23:47 1   A.      That's correct.

11:23:48 2   Q.      You don't personally formulate drug products;

11:23:51 3   correct?

11:23:51 4   A.      That's correct.

11:23:57 5   Q.      Now, during your direct, you provided a description

11:24:04 6   to the Court about salt screening.

11:24:05 7           Do you remember that?

11:24:06 8   A.      Yes.

11:24:06 9   Q.      But you do not personally conduct salt screens;

11:24:09 10  correct?

11:24:09 11  A.      To me that's a routine activity that could be

11:24:13 12  outsourced.  I certainly make a lot of salts in my research,

11:24:15 13  but I don't do a salt screen in that kind of way.

11:24:17 14  Q.      My question was correct, you do not personally

11:24:19 15  conduct salt screens; correct?

11:24:21 16  A.      That's right.

11:24:22 17  Q.      Now, consulting with a pharmaceutical drug company to

11:24:24 18  identify the correct salt form for a particular drug

11:24:28 19  substance, that's outside your typical work; right?

11:24:31 20  A.      Yes, I guess that's true.

11:24:33 21  Q.      You can't recall a situation in your entire career

11:24:37 22  where you have made a salt with malic acid; right?

11:24:39 23  A.      Not offhand.  I don't think so.  I've made many

11:24:43 24  salts.  I can't recall if I've made malic acid or not.

11:24:46 25  Q.      And, in fact, you've never made a salt with malic

Steed - Cross

11:24:48  1    acid; isn't that true, sir?

11:24:49  2    A.    Not that I can recall offhand.

11:24:51  3    Q.    Now, you're not a medical doctor; right?

11:24:53  4    A.    Correct.

11:24:54  5    Q.    You're not an expert in the clinical treatment of

11:24:55  6    people; right?

11:24:56  7    A.    Correct.

11:24:57  8    Q.    Never designed a clinical trial; right?

11:24:59  9    A.    Yes.

11:25:00 10    Q.    No expertise in treating cancer; right?

11:25:02 11    A.    That's right.

11:25:04 12    Q.    Let's talk about your opinions with respect to

11:25:06 13    obviousness-type double patenting.

11:25:07 14          MR. PRUSSIA:  And if we could have PTX-252.

11:25:10 15    This is Tab 13 in your binder if you need it.  It's the

11:25:13 16    '473 patent.

11:25:13 17    BY MR. PRUSSIA:

11:25:16 18    Q.    Now, during the prosecution of the crystalline malate

11:25:22 19    salt patents, the '473 patent was before the examiner;

11:25:25 20    correct?

11:25:25 21    A.    I can't --

11:25:28 22    Q.    We could help you if you like.  Is my question

11:25:31 23    correct, though?

11:25:32 24    A.    I believe so.  I'm not -- I'm not sure as I sit here

11:25:34 25    today, but I believe so.

Steed - Cross

11:25:35  1    Q.     We can help you.  If we go to the references cited,

11:25:39  2    about halfway down that column on the left side.  Next page.

11:25:48  3    It's Page 3.

11:25:49  4           That's the '473 patent on the screen; correct?

11:26:06  5    A.     Yes, I believe so.

11:26:07  6    Q.     So the Patent Office allowed -- the Patent Office had

11:26:09  7    the '473 patent during prosecution; correct?

11:26:12  8    A.     That's my understanding.

11:26:13  9    Q.     The Patent Office allowed the claims over the

11:26:15 10    '473 patent; right?

11:26:16 11    A.     Yes.

11:26:17 12    Q.     Now, you understand that obviousness-type double

11:26:20 13    patenting involves comparing the claims of the reference

11:26:22 14    patent to the asserted claims; correct?

11:26:24 15    A.     Correct.

11:26:25 16    Q.     So, let's look at those claims.

11:26:27 17           MR. PRUSSIA:  If we could have Claim 5 on the

11:26:29 18    screen, please.

11:26:29 19    BY MR. PRUSSIA:

11:26:33 20    Q.     Claim 5 is written in the alternative; correct?

11:26:36 21    A.     You mean in the sense that it has the word "or" in

11:26:41 22    there?

11:26:41 23    Q.     That's exactly right?

11:26:42 24    A.     Yes, that's right.

11:26:43 25    Q.     So my question is correct, that Claim 5 is written in

Steed - Cross

11:26:45 1    the alternative; right?

11:26:46 2    A.    Yes, I suppose so.

11:26:47 3    Q.    Claim 5 does not require a salt; correct?

11:26:50 4    A.    I suppose that's true, yes.

11:26:53 5    Q.    Claim 5 allows for just the free base; right?

11:26:55 6    A.    Yes, that's true.

11:26:58 7    Q.    Claim 5 does not identify any particular salt of

11:27:01 8    cabozantinib; right?

11:27:02 9    A.    No.

11:27:03 10   Q.    It doesn't identify any malate salt of cabozantinib

11:27:07 11   correct?

11:27:07 12   A.    That's correct.

11:27:08 13   Q.    It doesn't identify a crystalline salt of

11:27:10 14   cabozantinib; correct?

11:27:11 15   A.    True.

11:27:12 16   Q.    And it doesn't identify a pharmaceutical composition

11:27:14 17   of cabozantinib; correct?

11:27:16 18   A.    That's also true.

11:27:17 19   Q.    And it does not identify a method of treating kidney

11:27:20 20   cancer with cabozantinib; correct?

11:27:21 21   A.    Yes, that's true.

11:27:25 22   Q.    Now, focusing on the language "pharmaceutically

11:27:28 23   acceptable salt thereof," do you see that?

11:27:31 24   A.    I do.

11:27:32 25   Q.    And it's your opinion, as I heard you correct on

Steed - Cross

11:27:35  1    direct, it's your opinion that this includes a malate salt;

11:27:38  2    right?

11:27:39  3    A.    Yes.  A malate salt would be a species of

11:27:42  4    pharmaceutically acceptable salt.

11:27:43  5    Q.    And that would include a crystalline malate salt, in

11:27:45  6    your opinion; right?

11:27:46  7    A.    Yes.

11:27:46  8    Q.    Now, you were an expert in the first case; right?

11:27:49  9    A.    I was.

11:27:50 10    Q.    And you offered opinions with respect to validity

11:27:53 11    in -- strike that.

11:27:53 12          You initially offered opinions with respect to

11:27:55 13    validity of the '776 patent in the first case; correct?

11:27:59 14    A.    My memory is hazy, it was a while ago, but I expect

11:28:02 15    that's true.

11:28:03 16    Q.    And you came to trial, you sat in that seat, and you

11:28:06 17    testified to Your Honor with respect to infringement of the

11:28:08 18    '776 patent; correct?

11:28:09 19    A.    Correct.

11:28:09 20    Q.    Now, you never offered an opinion in the first case

11:28:13 21    that this Claim 5 was invalid for lack of written

11:28:16 22    description, did you?

11:28:16 23    A.    Not as far as I recall.

11:28:18 24    Q.    Even though it's your opinion today that this claim

11:28:21 25    covers a crystalline malate salt; correct?

Steed - Cross

11:28:24  1          MR. COOPER:  Objection; this is outside the

11:28:26  2   scope of direct.

11:28:26  3          MR. PRUSSIA:  It's cross-examination.

11:28:27  4          THE COURT:  Well --

11:28:29  5          MR. COOPER:  I didn't --

11:28:32  6          THE COURT:  So, you know, if he offered an

11:28:35  7   opinion, that's one thing.  Not offering an opinion, that's

11:28:38  8   nothing.

11:28:38  9          MR. PRUSSIA:  I'll move on, sir.

11:28:40 10   BY MR. PRUSSIA:

11:28:40 11   Q.    Now, this patent includes a definition for

11:28:42 12   pharmaceutically acceptable acid addition salts; correct?

11:28:45 13   A.    Can you direct me to that?

11:28:49 14          MR. PRUSSIA:  If we turn to Column 270, Line 15

11:28:53 15   to 25.

11:28:53 16   BY MR. PRUSSIA:

11:28:59 17   Q.    It's on the screen as well.

11:29:06 18          Do you see that?

11:29:06 19   A.    I do.

11:29:07 20   Q.    So the '473 patent includes a definition for

11:29:10 21   pharmaceutically acceptable acid addition salts; correct?

11:29:13 22   A.    I see the words there, yes.

11:29:16 23   Q.    And you did not discuss this definition for

11:29:18 24   pharmaceutically acceptable acid addition salts -- acid

11:29:23 25   addition salts during your testimony on direct; correct?

Steed - Cross

11:29:26  1    A.      I'm sorry, I'm just reading it.   (Witness reviewing.)

11:29:39  2           That's correct.

11:29:39  3    Q.      And this definition expressly lists 24 acids; right?

11:29:43  4    A.      I haven't counted them but I'm sure you're right.

11:29:46  5    Q.      And malic acid is not on that list; right?

11:29:48  6    A.      It's not explicitly on the list but it does say "and

11:29:53  7    the like" at the end.

11:29:53  8    Q.      No -- and we'll get to that.   But malic acid is not

11:29:55  9    on the list; right?

11:29:56 10    A.      That's correct.

11:29:57 11    Q.      Now, this patent provides synthetic examples of

11:29:59 12    forming salts; right?

11:30:00 13    A.      I believe so, yes.

11:30:03 14    Q.      And none of the examples of forming salts in the

11:30:08 15    '473 patent describes making a malate salt; correct?

11:30:10 16    A.      To the best of my recollection, I believe that's

11:30:12 17    right.

11:30:12 18                THE COURT:  And, Mr. Prussia, I'm sorry.

11:30:12 19                MR. PRUSSIA:  Yes, Your Honor.

11:30:15 20                THE COURT:  The question a moment ago, did you

11:30:17 21    say it's describing prophetic?

11:30:21 22                MR. PRUSSIA:  Synthetic.

11:30:22 23                THE COURT:  Synthetic.

11:30:23 24                MR. PRUSSIA:  Sorry.

11:30:23 25                THE COURT:  Okay.  Thank you.

Steed - Cross

11:30:25 1   BY MR. PRUSSIA:

11:30:27 2   Q.     So just to be clear, the '473 patent provides

11:30:30 3   synthetic examples of forming salts; correct?

11:30:32 4   A.     Yes.

11:30:33 5   Q.     And none of those synthetic examples describes making

11:30:36 6   a malate salt; correct?

11:30:37 7   A.     To the best of my recollection, no.

11:30:39 8            MR. PRUSSIA:  And if we turn to Column 324,

11:30:44 9   Example 48, we'll put it on the screen.

11:30:44 10  BY MR. PRUSSIA:

11:30:50 11  Q.     This is a synthesis of the cabozantinib free base;

11:30:53 12  correct?

11:30:53 13  A.     Yes, it's synthesis of the cabozantinib molecule

11:30:57 14  itself.

11:30:58 15  Q.     And it's the only example in the '473 patent

11:31:00 16  describing the synthesis of cabozantinib; correct?

11:31:02 17  A.     To the best of my recollection.

11:31:05 18  Q.     And it does not describe making any cabozantinib salt

11:31:08 19  at all; right?

11:31:09 20  A.     I don't recall what form it's made into.  I guess you

11:31:13 21  were just saying free base.  I have no reason to doubt that.

11:31:15 22  Q.     Okay.  Now, cabozantinib is not the only compound

11:31:19 23  disclosed in the '473 patent; right?

11:31:21 24  A.     No.

11:31:21 25  Q.     There are hundreds of other compounds exemplified in

Steed - Cross

11:31:24  1    the '473 patent; right?

11:31:25  2    A.     Yes, that's my understanding.

11:31:27  3    Q.     Now, for some of those compounds, the '473 patent

11:31:30  4    discloses examples of forming salts; right?

11:31:33  5    A.     Yes, I believe so.

11:31:35  6    Q.     But none of those examples include malate salts;

11:31:38  7    right?

11:31:39  8    A.     Also true.

11:31:40  9    Q.     And there -- but there are examples of HCl salts,

11:31:44 10    right?

11:31:44 11    A.     Yes.  That's right, that's a common salt.

11:31:46 12    Q.     And if we go back to that definition of the

11:31:49 13    pharmaceutically acceptable acid addition salts --

11:31:51 14            MR. PRUSSIA:  We can leave that on the screen.

11:31:51 15    BY MR. PRUSSIA:

11:31:58 16    Q.     -- HCl is a pharmaceutically acceptable acid addition

11:32:02 17    salt according to the '473 patent; right?

11:32:07 18            MR. PRUSSIA:  You can highlight it, Tom,

11:32:10 19    hydrochloric acid.

11:32:10 20            THE WITNESS:  Yes, I see hydrochloric acid

11:32:13 21    there.

11:32:13 22    BY MR. PRUSSIA:

11:32:13 23    Q.     And nothing in the '473 patent discloses any issues

11:32:16 24    with the HCL salts that were exemplified in the patent;

11:32:19 25    correct?

497

Steed - Cross

11:32:19 1   A.      In the case of cabozantinib, you mean, or any of

11:32:24 2   them?

11:32:24 3   Q.      Anywhere in the patent?

11:32:25 4   A.      Not as far as I'm aware.

11:32:28 5   Q.      And the patent also discloses an example of a

11:32:32 6   compound that was made with dihydrobromide salt; correct?

11:32:38 7   A.      Do you want to direct me to that?

11:32:40 8   Q.      Sure.

11:32:40 9          MR. PRUSSIA:  If we go to Example 15 at

11:32:43 10  Column 295 of the patent.

11:32:48 11         Actually, why don't we pull up your -- I can

11:32:51 12  refresh your recollection through your deposition testimony.

11:32:54 13  If it's -- it's in your binder, Volume I, Tab 6.  We'll put

11:32:59 14  it on the screen.  At Line 230 -- Page 232, Line 12 to 16.

11:33:05 15         And the question was:

11:33:10 16         "QUESTION:  And Example 15 describes a formation

11:33:12 17  of a dihydrobromide salt; correct?"

11:33:14 18         And your answer was, "Yes, the product seems to

11:33:17 19  be a dihydrobromide.  Yes."

11:33:20 20         THE WITNESS:  Okay.

11:33:20 21  BY MR. PRUSSIA:

11:33:20 22  Q.      Does that refresh your recollection?

11:33:21 23  A.      It does, yes.  I obviously said that.

11:33:23 24  Q.      And so my question is, correct, that there is an

11:33:26 25  example of a dihydrobromide salt in the '473 patent

11:33:29 1    specification; correct?

11:33:30 2    A.    Yes, seems to be.

11:33:30 3    Q.    And dihydrobromic acid is a pharmaceutically

11:33:33 4    acceptable acid addition, according to that patent; correct?

11:33:36 5    A.    I'm sorry, are you saying dihydrobromic acid?

11:33:40 6    Q.    Hydrobromic acid.

11:33:42 7    A.    Hydrobromic.  Well, the patent -- how does it define

11:33:48 8    it?

11:33:51 9          It gives that as an example of an acid, I don't

11:33:54 10   believe it's GRAS, but yeah.

11:33:56 11   Q.    Okay.  Just to sum up, the '473 patent specification

11:34:00 12   provides specific examples of salts using at least some of

11:34:04 13   the 24 listed pharmaceutically acceptable acid additions.

11:34:08 14         We agree on that; right?

11:34:09 15   A.    Correct.

11:34:10 16   Q.    And we agree that none of those salts were malate

11:34:12 17   salts; right?

11:34:13 18   A.    Correct.

11:34:14 19   Q.    And none of those salts involved cabozantinib;

11:34:16 20   correct?

11:34:16 21   A.    Correct.

11:34:17 22   Q.    And the '473 patent does not disclose a need to form

11:34:21 23   a salt with the free base form of cabozantinib; right?

11:34:24 24   A.    Not as far as I can recall.

11:34:29 25   Q.    Now, I know you started to talk about and the like,

Steed - Cross

11:34:31  1    so we'll come back to it.

11:34:33  2              In rendering your opinions in this case, you did

11:34:36  3    not identify what acids would be like, the 24 acids listed

11:34:40  4    in the '473 patent; right?

11:34:41  5    A.     No.  I mean, those would be prior art kind of acids

11:34:46  6    in the way that I've described.

11:34:47  7    Q.     You do not discuss this language in your reports in

11:34:49  8    this case; correct?

11:34:50  9    A.     Not as far as I can recall.

11:34:52 10    Q.     And in connection with forming your opinions in this

11:34:56 11    case, you did not consider the p$K_a$ values for any of the 24

11:35:00 12    listed acids when forming your opinions; right?

11:35:02 13    A.     I think many of those are on the prior art list and

11:35:05 14    so I would have considered their p$K_a$ values.

11:35:09 15              MR. PRUSSIA:  We can go to your deposition.

11:35:13 16    Page 247, Lines 10 to 13.

11:35:14 17              Sorry, it's the Tab 7.  It's Tab 7 in your

11:35:28 18    binder, Volume I.  Yeah.

11:35:37 19              The question was:  "It's not something you've

11:35:45 20    considered in connection with forming your opinions in this

11:35:47 21    case?"

11:35:48 22              And the answer was:  "I didn't look at the p$K_a$

11:35:51 23    values of this particular list of acids."

11:35:51 24    BY MR. PRUSSIA:

11:35:53 25    Q.     Is that the question and that was your answer?

500

Steed - Cross

11:35:55 1   A.      Yes.  What I meant by that is I didn't look at them

11:35:58 2   as a list as a whole.  Obviously, some of the acids on there

11:36:01 3   are on the documents that I presented.

11:36:03 4   Q.      Now, as of the priority date, there were at least 113

11:36:08 5   pharmaceutical salts that had been approved -- had been used

11:36:12 6   in approved drug products; correct?

11:36:14 7   A.      Yes, that sounds about right.

11:36:16 8   Q.      You did not evaluate which of the 113 counterions

11:36:20 9   used to make those salts were like the 24 listed in the

11:36:23 10  '473 patent; right?

11:36:24 11  A.      I suppose I didn't consider it that way; that's

11:36:28 12  correct.

11:36:28 13  Q.      And in this case, you do not offer -- strike that.

11:36:30 14          On your direct, you did not offer the opinion

11:36:33 15  that a person of skill would have at once envisaged the

11:36:39 16  crystalline malate salt from the genus of pharmaceutically

11:36:42 17  acceptable salts of cabozantinib; right?

11:36:44 18  A.      No, I'm not offering that opinion.

11:36:48 19  Q.      Now, a skilled artisan would only consider making a

11:36:51 20  salt if there were problems with the free base; right?

11:36:54 21  A.      They would consider it as part of optimization of the

11:36:59 22  properties of the active pharmaceutical ingredient.

11:37:04 23  Q.      My question was correct; right?

11:37:06 24  A.      Yes.  I suppose if there were no problems with the

11:37:08 25  free base, then -- then they might pursue the free base as a

Steed - Cross

11:37:12  1    first formulation option, that's right.

11:37:14  2    Q.     Because there would be no reason to pursue a salt;

11:37:16  3    correct?

11:37:16  4    A.     Yes.  If -- I suppose if there was a solubility issue

11:37:20  5    of the free base, as is the case here, then that would be a

11:37:22  6    reason to pursue a salt.

11:37:23  7    Q.     And there were no specific disclosures in the prior

11:37:26  8    art that the cabozantinib free base had any problems with

11:37:29  9    its oral bioavailability; correct?

11:37:31 10    A.     No disclosures, but that's part of the solubility

11:37:34 11    measurements that I mentioned.

11:37:36 12    Q.     My question was correct; right?

11:37:37 13    A.     That's right.

11:37:39 14    Q.     For example, the '473 patent does not disclose that

11:37:42 15    cabozantinib was poorly absorbed in the gastrointestinal

11:37:46 16    tract; correct?

11:37:47 17    A.     Not as far as I can recall.

11:37:49 18    Q.     And, in fact, there was no oral bioavailability data

11:37:53 19    for the cabozantinib free base reported in the prior art;

11:37:55 20    correct?

11:37:56 21    A.     Not as far as I'm aware.

11:37:58 22    Q.     So as of the priority date, a skilled artisan would

11:38:00 23    not have known what the oral bioavailability of cabozantinib

11:38:03 24    was; right?

11:38:04 25    A.     That's correct.

Steed - Cross

11:38:06  1    Q.    And you are not aware of whether the acceptable --

11:38:09  2    strike that.

11:38:09  3          And identifying an acceptable bioavailability is

11:38:16  4    not something that you are qualified to do; isn't that

11:38:19  5    right, sir?

11:38:19  6    A.    Yes.  I typically don't run p$K_a$ studies.  But

11:38:23  7    obviously you want a high bioavailability, otherwise it

11:38:26  8    wouldn't work.

11:38:26  9    Q.    Now, you agree that there's more to oral

11:38:30 10    bioavailability than solubility; correct?

11:38:33 11    A.    That's correct, yes.  Permeability is also important.

11:38:35 12    Q.    It's certainly relevant.  Permeability is certainly

11:38:38 13    relevant to bioavailability; correct?

11:38:40 14    A.    Correct.

11:38:40 15    Q.    And you did not explicitly consider the permeability

11:38:45 16    of the cabozantinib free base in connection with forming

11:38:47 17    your opinions; right?

11:38:49 18    A.    That would typically come after the sort of salt

11:38:52 19    screening that I described.

11:38:53 20    Q.    So my question was correct; right?

11:38:54 21    A.    That's right.

11:38:56 22    Q.    And so you did not consider whether the cabozantinib

11:38:59 23    free base had high permeability in connection with forming

11:39:02 24    your opinions; right?

11:39:03 25    A.    Not directly, no.  Obviously low solubility would

Steed - Cross

11:39:07 1    still give rise to low bioavailability, even with high

11:39:10 2    permeability.

11:39:10 3    Q.     And there are drugs that have low solubility that

11:39:13 4    have sufficient bioavailability as a result of their high

11:39:17 5    permeability; correct?

11:39:18 6    A.     I'm not aware of the specific example you're talking

11:39:23 7    to.  It depends how -- low is low, of course.

11:39:25 8    Q.     Well in connection with forming your opinions

11:39:27 9    regarding motivation, it was beyond your expertise to

11:39:30 10   consider whether cabozantinib was such a drug; right?

11:39:33 11   A.     Yes, that's right.

11:39:35 12   Q.     Now, as of the priority date, solubility data for

11:39:39 13   cabozantinib had not been identified in any prior art

11:39:42 14   reference; correct?

11:39:43 15   A.     That's true, but it would be easy to measure.

11:39:52 16   Q.     And as of the priority date, there was no prior art

11:39:55 17   reference describing the cabozantinib free base as

11:39:59 18   insoluble; correct?

11:39:59 19   A.     No.  But, again, easy to measure.

11:40:10 20   Q.     And as of the priority date, there was no data

11:40:13 21   whatsoever identifying cabozantinib solubility in

11:40:17 22   biorelevant media; correct?

11:40:18 23   A.     Again, no.  But it would be easy to measure.

11:40:22 24   Q.     And is it your opinion that a person of skill would

11:40:25 25   do that?

Steed - Cross

11:40:26 1    A.     Under what circumstances?

11:40:27 2    Q.     Well, under the circumstances that you considered in

11:40:29 3    this case.

11:40:29 4    A.     Measure solubility in biorelevant media, you mean?

11:40:36 5    Q.     Yes, sir?

11:40:36 6    A.     Not as an initial part of the salt screen, no.

11:40:39 7    Q.     Okay.  Now, the prior art did not disclose the target

11:40:42 8    solubility for cabozantinib; correct?

11:40:43 9    A.     That's correct.

11:40:45 10   Q.     Now, it's your opinion, as you just testified, that a

11:40:47 11   person of skill could have identified the solubility of the

11:40:51 12   cabozantinib free base through experimental testing; right?

11:40:54 13   A.     Correct.

11:40:57 14   Q.     And I believe on direct you testified, and I wrote it

11:41:00 15   down, "typically you wouldn't want to use an amorphous salt,

11:41:05 16   unless there was a particular reason to do so such as a need

11:41:09 17   to improve solubility"; correct?

11:41:10 18   A.     Correct.

11:41:12 19   Q.     And we agree that there was no data in the prior art

11:41:20 20   regarding the solubility of cabozantinib; right?

11:41:22 21   A.     That's right.

11:41:23 22   Q.     Now, with respect to testing, there are many

11:41:26 23   properties of a drug that a skilled artisan will take into

11:41:29 24   consideration early in the drug development process; right?

11:41:32 25   A.     Yes.  I suppose that's true.

Steed - Cross

11:41:34  1    Q.      And you say that a person of skill could have tested

11:41:36  2    the water solubility of cabozantinib; right?

11:41:38  3    A.      That's right.

11:41:40  4    Q.      That same person of skill could have determined the

11:41:42  5    bioavailability of the cabozantinib free base through

11:41:45  6    testing; right?

11:41:46  7    A.      Yes, that's right.  That would be like an in vivo

11:41:50  8    kind of test.

11:41:51  9    Q.      And that would be a routine experiment in your view;

11:41:53 10    right?

11:41:53 11    A.      Yes, I suppose it would.

11:41:55 12    Q.      And a skilled artisan could have developed determine

11:41:58 13    the permeability of the cabozantinib free base through

11:41:59 14    testing; correct?

11:42:00 15    A.      Correct.

11:42:04 16    Q.      But in rendering your opinions, you have not

11:42:07 17    explained why a skilled artisan would only measure the water

11:42:11 18    solubility of the cabozantinib free base without

11:42:16 19    additionally measuring the permeability or bioavailability;

11:42:18 20    right?

11:42:18 21    A.      So the experiments you're talking about would come

11:42:21 22    after the salt screen.

11:42:22 23    Q.      Now, the (L)-malic acid salt is complicated because

11:42:26 24    the anion can exist as both single and doubly deprotonated

11:42:31 25    species; right?

Steed - Cross

11:42:32 1  A.     This particular malic acid salt is not complicated

11:42:35 2  because the second p$K_a$ is not acidic enough to protonate

11:42:39 3  cabozantinib.

11:42:39 4  Q.     All right.  Let's go to your deposition.

11:42:42 5          MR. PRUSSIA:  It's Tab 7, page 304, 14 to 24.

11:42:51 6          The question is:  "If we turn to Page 1064 of

11:42:55 7  the black paper, under the discussion section, and the

11:42:58 8  second paragraph under that section on the left-hand column,

11:43:02 9  about halfway down, there is a sentence that reads, 'The

11:43:06 10 fate of the (L)-malate salt is more complicated because the

11:43:10 11 anion can exist as both single and doubly deprotonated

11:43:14 12 species.

11:43:15 13         "Do you see that?

11:43:16 14         "ANSWER:  I do.

11:43:16 15         "QUESTION:  And that is a correct statement?

11:43:19 16         "ANSWER:  That's right."

11:43:19 17 BY MR. PRUSSIA:

11:43:19 18 Q.     Those were my questions and those were your answers;

11:43:22 19 correct?

11:43:22 20 A.     That's right.  But that's not specifically

11:43:24 21 cabozantinib (L)-malate.  It's (L)-malate in general.

11:43:27 22 Q.     My question was:  The (L)-malic acid is complicated

11:43:31 23 because as anion can exist as both singly and doubly

11:43:35 24 deprotonated species; correct?

11:43:36 25 A.     Yes.  It does have two p$K_a$ values, that's right.

Steed - Cross

11:43:39 1    Q.    That would have made the (L)-malate salt acid --

11:43:41 2    strike that.

11:43:42 3          That would have made the malic acid a more

11:43:44 4    complicated choice; correct?

11:43:45 5    A.    It's not something that wouldn't be controllable.

11:43:50 6    It's just another consideration that would go into the

11:43:52 7    process.

11:43:54 8    Q.    Now, as of the priority date, the hydrochloride salt

11:43:57 9    was by far the most common salt; right?

11:43:59 10   A.    Correct.

11:43:59 11   Q.    And, in fact, in your tutorial to the Court you

11:44:02 12   showed an example of forming a salt with chlorides; right?

11:44:04 13   A.    Yes.  That's right.

11:44:06 14   Q.    And that's because it's -- in your opinion, it's the

11:44:08 15   first salt that a person of skill would consider; right?

11:44:11 16   A.    Yes, that's right.

11:44:12 17   Q.    And the reason for that is because it's a strong acid

11:44:16 18   that tends to protonate those things; right?

11:44:18 19   A.    Yes, that's one reason.

11:44:19 20          MR. PRUSSIA:  And if we go to PTX-331.  It's at

11:44:25 21   Tab 14 of your binder.  We'll pull it up.

11:44:25 22   BY MR. PRUSSIA:

11:44:26 23   Q.    This is the -- I like to call it Bighley.  I know you

11:44:30 24   said Bighley, you're British so you are probably right.

11:44:33 25          The Bighley reference, we'll put that up on the

Steed - Cross

11:44:36 1    screen.

11:44:36 2    A.      Never heard it said, so who knows.

11:44:39 3              MR. PRUSSIA:  And if you look at Page 484, about

11:44:42 4    halfway down, under the heading "Preparation of the

11:44:45 5    hydrochloride salt."

11:44:55 6    BY MR. PRUSSIA:

11:44:56 7    Q.      Bighley discloses that "Hydrochloride is by far the

11:44:58 8    most popular salt form of basic compounds"; correct?

11:45:01 9    A.      Yes.

11:45:02 10   Q.      And you agree with that; right?

11:45:04 11   A.      Yeah, I do.

11:45:04 12             MR. PRUSSIA:  And if we go Table 1.

11:45:04 13   BY MR. PRUSSIA:

11:45:14 14   Q.      The percent column gives the relative frequency of

11:45:17 15   use for each salt type based on the total number of salts

11:45:20 16   used through 1993; correct?

11:45:22 17   A.      Yes.  That's right.

11:45:23 18   Q.      And if we look at the reference for hydrochloride, we

11:45:27 19   see that it had been used almost 44 percent of the time as

11:45:30 20   of that date; right?

11:45:31 21   A.      Yeah, very common.

11:45:33 22             MR. PRUSSIA:  And if we look at the entry for

11:45:35 23   malic acid on the next page.

11:45:36 24   BY MR. PRUSSIA:

11:45:36 25   Q.      The frequency of use of that was only 0.26 percent;

Steed - Cross

11:45:42 1    right?

11:45:42 2    A.     Yeah, correct.

11:45:45 3              MR. PRUSSIA:  Now, if we turn to PTX-549.

11:45:45 4    BY MR. PRUSSIA:

11:45:49 5    Q.     This is the Paulekuhn reference that you testified

11:45:51 6    about during your direct; right?

11:45:53 7    A.     Correct.

11:45:54 8    Q.     And the article is titled, "Trends in Active

11:45:58 9    Pharmaceutical Ingredient Salt Selection Based on Analysis

11:46:01 10   of the Orange Book Database"; correct?

11:46:03 11   A.     Correct.

11:46:04 12   Q.     And so this article addresses trends in the API salt

11:46:08 13   selection process; correct?

11:46:09 14   A.     Yes.

11:46:10 15   Q.     And the authors here were affiliated with Merck;

11:46:13 16   right?

11:46:13 17   A.     Yes.  That's right.

11:46:14 18   Q.     And if we look under the study design, the authors

11:46:20 19   compiled data from the FDA Orange Book Database as of the

11:46:24 20   end of 2006; right?

11:46:26 21   A.     Yes, that's my understanding.

11:46:29 22              MR. PRUSSIA:  And if we turn to the second

11:46:34 23   sentence in that paragraph.

11:46:34 24   BY MR. PRUSSIA:

11:46:34 25   Q.     The authors identified 1,356 chemically well-defined

Steed - Cross

11:46:41  1    APIs; correct?

11:46:42  2    A.    Yes.

11:46:44  3            MR. PRUSSIA:  And if we turn to the results and

11:46:47  4    discussion section, under the next page.

11:46:47  5    BY MR. PRUSSIA:

11:46:48  6    Q.    The authors identify that 659 of those APIs were in

11:46:58  7    non-salt forms; correct?

11:47:00  8    A.    Correct.

11:47:00  9    Q.    So for nearly half of all APIs listed in the Orange

11:47:04 10    Book, the authors identified them as being in non-salt

11:47:07 11    forms; correct?

11:47:08 12    A.    Yes, that's right.

11:47:09 13    Q.    523 salts were formed from basic compounds; correct?

11:47:14 14    A.    Correct.

11:47:15 15    Q.    And that's about 38.6 percent of all APIs listed in

11:47:19 16    the Orange Book; right?

11:47:20 17    A.    Yes.

11:47:22 18    Q.    And cabozantinib appears, it would be a basic

11:47:26 19    compound; correct?

11:47:27 20    A.    That's right.

11:47:28 21            MR. PRUSSIA:  And if we turn to Table 2 at

11:47:30 22    Page 3.

11:47:30 23    BY MR. PRUSSIA:

11:47:33 24    Q.    The results of the study showed that as of 2006, over

11:47:38 25    50 percent of all salts were chloride salts; right?

Steed - Cross

11:47:41  1   A.      That's right.

11:47:43  2   Q.      By comparison, the malate salt was used in just

11:47:47  3   0.4 percent of all products across the Orange Book as of

11:47:50  4   2006; right?

11:47:51  5   A.      I'm sure you're right.  I'm just looking for it.

11:47:55  6           MR. PRUSSIA:  Can we highlight it in -- there we

11:47:56  7   go.

11:47:57  8           THE WITNESS:  Yeah, that's correct.

11:47:57  9   BY MR. PRUSSIA:

11:47:58 10   Q.      And that's about two salts total; right?

11:48:02 11   A.      I trust your math.  So, yes, that's about right.

11:48:05 12   Q.      Okay.  And then we can see that one was approved

11:48:14 13   in -- well, strike that.  We can see that one was approved

11:48:16 14   pre-19 -- in the pre-1982 time frame; right?

11:48:20 15   A.      Right.

11:48:22 16   Q.      And the other was approved in the 2002 to 2006 time

11:48:25 17   frame; correct?

11:48:26 18   A.      Right.

11:48:31 19   Q.      And in between them you have a gap between 1982 and

11:48:34 20   2002 where there wasn't a single FDA-approved drug that was

11:48:39 21   a malate salt; right?

11:48:40 22   A.      Correct.

11:48:41 23   Q.      And if we turn back to the study design on the first

11:48:44 24   page, the authors identify Category I APIs.

11:48:50 25           Do you see that?

Steed - Cross

11:48:57 1    A.      Right.

11:48:57 2    Q.      And Category I APIs were salt -- were identified as

11:49:01 3    salts formed from basic molecules containing at least one

11:49:04 4    atom suitable for protonation; correct?

11:49:06 5    A.      Correct.

11:49:07 6    Q.      And this cabozantinib would fall under Category I;

11:49:10 7    correct?

11:49:10 8    A.      Yes, I believe so.

11:49:12 9    Q.      And if we go to Figure 2, Paulekuhn includes a pie

11:49:19 10   chart depicting the overall distribution of anions of

11:49:22 11   Category I in the Orange Book; right?

11:49:26 12   A.      Yes.

11:49:26 13             MR. PRUSSIA:  And if we could pull up the PDX.

11:49:26 14   BY MR. PRUSSIA:

11:49:34 15   Q.      We can see that what I've done is I've taken the

11:49:37 16   chloride salts as depicted in the top half of the figure and

11:49:40 17   I've shaded it in green.

11:49:41 18             Do you see that?

11:49:42 19   A.      I do.

11:49:43 20   Q.      That's a pretty big piece of the pie; right?

11:49:45 21   A.      Yeah, big percentage.

11:49:46 22   Q.      Now, we have malate listed there as well; right?

11:49:49 23   A.      Correct.

11:49:50 24   Q.      Highlighted that in blue.  May be tough to see the

11:49:53 25   type.  It's a tiny sliver; right?

Steed - Cross

11:49:55  1    A.     Yes, I can see it, but I agree.

11:49:57  2    Q.     Now, you've offered the opinion that a skilled

11:49:59  3    artisan would have a relatively short list of anions that

11:50:03  4    would have been obvious to try:  Citrate, fumarate,

11:50:07  5    gluconate, lactate, malate, maleate, succinate and tartrate;

11:50:13  6    right?

11:50:13  7    A.     Yes, that's based on the reference I was alluding to.

11:50:17  8    Q.     And that was from your report in this case; right?

11:50:19  9    A.     I believe so.  Yes.

11:50:20 10    Q.     So let's put that list on this, on the PDX, and let's

11:50:25 11    compare your list of anions with the overall distribution of

11:50:28 12    anions as disclosed in Paulekuhn; okay?

11:50:33 13           So what I've done is we've shaded your anions in

11:50:36 14    purple along with malic acid in blue; okay?

11:50:40 15           Do you see that?

11:50:41 16    A.     I do.

11:50:41 17    Q.     And that represents your narrowed list of anions that

11:50:46 18    you say a person of skill in the art would have focused on;

11:50:49 19    right?

11:50:49 20    A.     Right.

11:50:50 21    Q.     And if we go to the next slide, we have the

11:50:56 22    definition of pharmaceutically acceptable acid addition

11:50:59 23    salts in the '473 patent.

11:51:01 24           Do you see that?

11:51:01 25    A.     I do.

Steed - Cross

11:51:02  1   Q.     And I've highlighted the ones from your list that

11:51:05  2   also appear in that list.  Okay?

11:51:08  3   A.     Okay.

11:51:10  4   Q.     Now, let's see what's missing from your list.

11:51:12  5   Missing from your list -- we highlighted in green -- is the

11:51:16  6   hydrochloric acid; right?

11:51:19  7   A.     Okay.

11:51:20  8   Q.     So you've excluded that from your list; correct?

11:51:23  9   A.     Yes, I think -- I think I explained the origins of my

11:51:26 10   list in the previous -- previous sections.

11:51:28 11   Q.     Well, sir, but my question is correct.  You've

11:51:30 12   excluded it from your list; right?

11:51:31 13   A.     By the time you get to this point of the report,

11:51:31 14   that's true, yes.

11:51:35 15   Q.     And the largest slice of the pie you've excluded from

11:51:38 16   your list; correct?

11:51:39 17   A.     Not in terms of what would be included in a salt

11:51:42 18   screen.  But the fact that malate would be an obvious one to

11:51:45 19   include in the salt screen.

11:51:46 20   Q.     You've excluded bromide; right?

11:51:49 21                I shaded that in green.

11:51:51 22                You've excluded mesylate; correct?

11:51:53 23                Shade that in green.

11:51:55 24                You've also excluded sulfuric acid; correct?

11:51:58 25   A.     No.  I don't think I especially excluded inorganic

Steed - Cross

11:52:02 1    acid from the salt screen.

11:52:04 2    Q.    I'm just looking at your list that we just agreed on

11:52:07 3    was your final list.  It's not -- sulfuric acid is not on

11:52:11 4    that list; correct, sir?

11:52:12 5    A.    I have to look at the context of that -- that

11:52:14 6    paragraph.

11:52:14 7    Q.    This is from your own report.

11:52:15 8    A.    Yeah.

11:52:16 9    Q.    This is the list that we just a few minutes ago

11:52:18 10   agreed on was your final list?

11:52:19 11   A.    There's a preamble discussion of that that I need to

11:52:21 12   know the context of -- of that.

11:52:22 13   Q.    Okay.  Your counsel can ask you on redirect, so --

11:52:25 14   but sulfuric acid is not on that list; correct?

11:52:28 15   A.    Not in the Paragraph 399 list.

11:52:29 16   Q.    And if we populate all of the acid that is not on

11:52:32 17   that list, what we have on the slide -- you can go ahead and

11:52:39 18   fill them all in -- we have a depiction of every acid that

11:52:42 19   you've excluded from your list shaded in green or light

11:52:47 20   green as compared to the ones that you've included in

11:52:51 21   purple; correct?

11:52:52 22   A.    Yes, I think the list at Paragraph 399 wasn't

11:52:55 23   intended to include the inorganic acids.  It's just the

11:52:59 24   organic acid list.

11:52:59 25   Q.    Now, in your opinion, the Tong and Whitesell

Steed - Cross

11:53:03 1     Rule-of-2 --

11:53:04 2              MR. PRUSSIA:  We can take that down.

11:53:04 3     BY MR. PRUSSIA:

11:53:05 4     Q.      -- is a good starting point for salt screening;

11:53:07 5     correct?

11:53:08 6     A.      Yes, that is certainly one important consideration.

11:53:11 7     Q.      And in this case, you use the Rule-of-2 to identify

11:53:13 8     acids for a cabozantinib salt screen; right?

11:53:16 9     A.      Yes, this is one of the considerations.

11:53:18 10    Q.      And you use it to eliminate potential counterions

11:53:21 11    from a cabozantinib salt screen because they don't meet the

11:53:25 12    Rule-of-2; right?

11:53:26 13    A.      Yes.  They wouldn't be acidic enough.

11:53:28 14    Q.      But in addition to a Rule-of-2, the prior art

11:53:30 15    describes a Rule-of-3; correct?

11:53:32 16    A.      Yes, we discussed this at the deposition.

11:53:34 17    Q.      And during your direct you didn't offer any opinions

11:53:38 18    regarding the Rule-of-3; right?

11:53:40 19    A.      There's a sliding scale of acidity which starts at 2

11:53:45 20    pH units and becomes increasingly likely to form a salt as

11:53:49 21    you get towards 3, 4 and so on pH units likely.

11:53:52 22    Q.      Sure.  My question was correct.  You didn't explain

11:53:55 23    anything to Judge Andrews about the Rule-of-3 during your

11:53:57 24    direct; right?

11:53:58 25    A.      From a pH difference of 2 onwards, it becomes

Steed - Cross

11:54:00  1    increasingly likely that a salt will form.

11:54:03  2    Q.    Now, the Rule-of-3 holds that for the formation of a

11:54:06  3    stable salt, there should be a minimum difference of

11:54:09  4    three units between the p$K_a$ of the free base drug and the

11:54:12  5    acid; correct?

11:54:13  6    A.    I think you're quoting from a reference that says

11:54:16  7    "around 3" if I remember rightly.

11:54:22  8         MR. PRUSSIA:  Let's pull up your deposition.

11:54:23  9    It's Tab 6, Page 298, 9 through 15.

11:54:28 10         The question was:  "Okay."

11:54:32 11         Now about halfway down, it says, "As read, it is

11:54:35 12    generally accepted that there should be a minimum difference

11:54:37 13    of 3 units between the p$K_a$ value of an ionizable group and

11:54:42 14    of the possible counterion.

11:54:44 15         "Citing Bowker in 2002; correct?

11:54:46 16         "ANSWER:  That's what it says."

11:54:49 17         THE WITNESS:  I seem to recall that there was an

11:54:51 18    approximately in there.

11:54:53 19    BY MR. PRUSSIA:

11:54:53 20    Q.    That was my question and that was your answer;

11:54:55 21    correct, sir?

11:54:56 22    A.    I think it's out of context.

11:54:57 23    Q.    Well, you do not apply the Rule-of-3 in connection

11:54:59 24    with forming your opinion in this case; right?

11:55:01 25    A.    As I explained to you at length in the deposition,

Steed - Cross

11:55:04 1    from pH difference of two units onwards, the increase in --

11:55:07 2    the formation of a salt becomes increasingly likely.

11:55:10 3    Q.    Well, let's see what you said in the deposition.

11:55:12 4              MR. PRUSSIA:  Let's go to Page 303, Lines 14 to

11:55:14 5    17.

11:55:15 6              "You only make reference to a Rule-of-2 in your

11:55:20 7    reports; right?

11:55:21 8              "ANSWER:  That's right because that's where you

11:55:22 9    start -- that's where you start to get salts forming."

11:55:25 10             That was my question and that was your answer;

11:55:27 11   correct?

11:55:28 12             THE WITNESS:  That's right.

11:55:28 13   BY MR. PRUSSIA:

11:55:29 14   Q.    Now, the p$K_a$ of cabozantinib, it was not known as of

11:55:32 15   the priority date; right?

11:55:33 16   A.    No, but as I said, easily measured.

11:55:35 17   Q.    And you offer the opinion that it would be expected

11:55:38 18   to be a 5.8 to 5.9; right?

11:55:41 19   A.    Yes, I believe that's my recollection.

11:55:43 20   Q.    And you don't cite any documents to support that

11:55:45 21   opinion; right?

11:55:46 22   A.    As you said, it wasn't known.  It would be easily

11:55:49 23   measured.

11:55:50 24   Q.    Okay.  Now, let's work with your p$K_a$ number of

11:55:54 25   cabozantinib as a p$K_a$ of 5.8 to 5.9, and let's write it on

Steed - Cross

11:55:59  1    the board.  Can I write down -- which one do you want me to

11:56:03  2    write down, 5.8 or 5.9?

11:56:06  3    A.      5.9, I guess.

11:56:13  4    Q.      What's the p$K_a$ of malic acid?

11:56:14  5    A.      It's 3.4, I think.

11:56:19  6    Q.      What's the answer to 5.9 minus 3.4?

11:56:24  7    A.      Two and a half.

11:56:34  8    Q.      So the -- so the p$K_a$ of malic acid would not be

11:56:40  9    within three units away from cabozantinib's p$K_a$; correct?

11:56:44 10    A.      That's right.  Two and a half.

11:56:46 11    Q.      So malic acid would not meet the Rule-of-3 as applied

11:56:48 12    to a cabozantinib salt screen; correct?

11:56:50 13    A.      As I explained to you, as the pH difference increases

11:56:55 14    the likelihood of salt formation increases, and there's a

11:56:58 15    well-defined study showing that from two onwards the

11:57:00 16    likelihood of salts number very high.

11:57:02 17    Q.      Had you applied the Rule-of-3 as you did the

11:57:05 18    Rule-of-2 in your opinions, you would not have identified

11:57:08 19    malic acid as a counterion for cabozantinib; correct?

11:57:12 20    A.      Well, it's not really the Rule-of-3.  It's the

11:57:14 21    Rule-of-2 and above in my opinion.  If you slavishly adopted

11:57:19 22    the three point without looking beyond it, then the

11:57:22 23    difference wouldn't be three, but that's not a way a person

11:57:24 24    of skill would proceed.

11:57:25 25    Q.      Now, during direct, you showed the Court Table 2 from

Steed - Cross

11:57:29 1    the Stahl reference; right?

11:57:30 2    A.    Correct.

11:57:31 3              MR. PRUSSIA:  Let's put that on the screen.

11:57:31 4    BY MR. PRUSSIA:

11:57:45 5    Q.    And you drew a red line for where the line -- for

11:57:53 6    where the Rule-of-2 cut off the list; correct?

11:57:56 7    A.    Correct.

11:57:57 8    Q.    And you pointed Your Honor to above the line so that

11:58:00 9    you could point to malic acid; right?

11:58:01 10   A.    I pointed to all the acids that were above the line.

11:58:05 11   Q.    Right.  Now, let's see what happens when you draw the

11:58:07 12   red line applying the Rule-of-3.

11:58:18 13             Malic acid is not above the line; correct?

11:58:19 14   A.    That's correct.  But that's not the way a person

11:58:22 15   would proceed.

11:58:24 16   Q.    Now, the Rule-of-3 was widely accepted by skilled

11:58:26 17   artisans as of the priority dates; correct?

11:58:28 18   A.    I think skilled artisans had a much broader

11:58:32 19   understanding than just going with numbers 2 or 3, 2 and

11:58:36 20   above.

11:58:36 21   Q.    The Rule-of-3 was reported in the literature as of

11:58:38 22   the priority date; correct?

11:58:39 23   A.    There was discussion in the literature about the

11:58:42 24   kinds of p$K_a$ difference that were needed.

11:58:45 25   Q.    And the literature reported that the Rule-of-3

Steed - Cross

11:58:49 1    especially applied when the drug substance is a particularly

11:58:52 2    weak base; right?

11:58:53 3    A.    Some people said that kind of thing.  But that's --

11:58:57 4    that's an out-of-context discussion.

11:58:59 5    Q.    Actually, I just want to make one thing clear.  Do

11:59:01 6    you or do you not agree that the Rule-of-3 was widely

11:59:04 7    accepted by persons of skill as of the priority date?

11:59:06 8    A.    I don't know that I could say widely or not.  I've

11:59:11 9    read the details of this and there's a well-informed study

11:59:14 10   that shows how salt formation increases as the $pK_a$

11:59:17 11   difference increases, as I explained to you at the

11:59:20 12   deposition.

11:59:20 13   Q.    Okay.

11:59:21 14         MR. PRUSSIA:  Let's mark -- let's go to PTX-322.

11:59:21 15   BY MR. PRUSSIA:

11:59:24 16   Q.    This is a paper titled "Salt Selection and

11:59:27 17   Optimisation Procedures For Pharmaceutical New Chemical

11:59:30 18   Entities."

11:59:31 19         Do you see that?

11:59:31 20   A.    I do.

11:59:32 21   Q.    And it was published in 2000; correct?

11:59:34 22   A.    Yes.

11:59:36 23   Q.    And the last name of the first listed author is

11:59:39 24   Bastin; correct?

11:59:40 25   A.    Correct.

Steed - Cross

Q.     And this Bastin publication was available to skilled artisans as of the priority date; right?

A.     Yes.

Q.     And I believe a minute ago you couldn't agree with my question as to whether the Rule-of-3 was widely accepted in the literature; correct?

A.     Yes, I don't personally have an opinion whether it's wide or not.

Q.     Okay.  So if we go to the bottom of the paragraph in the right-hand of the column of the first page, we can see the sentence starting "for formation of a stable salt."

       Do you see that?

A.     Yes.

Q.     You can see that Bastin discloses that it is widely accepted that there should be a minimum difference of about three units; correct?

A.     Yes, about three units.

Q.     Right.  Widely accepted; correct?

A.     That's what this particular paper is suggesting.

Q.     By everyone except you; right?

A.     No, not by everyone except me.

Q.     Because if you had applied the Rule-of-3, malic acid would have been excluded; right?

A.     Like I said, it's not a hard-and-fast rule.  It's a tendency increasing from p$K_a$ and its two onwards.

Steed - Cross

12:00:49 1    Q.      Now, Bastin goes on to disclose that this is

12:00:52 2    especially true when the drug substance is a particularly

12:00:56 3    weak acid or base; correct?

12:00:59 4    A.      Yes.  If it was a strong acid or base then they

12:01:02 5    wouldn't really be talking about the importance of small

12:01:04 6    differences of p$K_a$ units.

12:01:05 7    Q.      Now, you don't offer any opinion in your reports

12:01:10 8    explaining why a person of skill in the art would have ruled

12:01:14 9    -- ignored the Rule-of-3, like you did, in favor of the

12:01:16 10   Rule-of-2; correct?

12:01:17 11   A.      I can't recall exactly what I say in my report.  But

12:01:22 12   as I said to you at deposition quite extensively, there's an

12:01:25 13   increasing tendency from two p$K_a$ units onwards for salts to

12:01:29 14   form.

12:01:35 15   Q.      Now, during your direct, you talked a little bit

12:01:37 16   about Sutent, sunitinib.

12:01:41 17           Do you remember that?

12:01:42 18   A.      Yes, I mentioned that.

12:01:43 19   Q.      And you offered the opinion that a skilled person

12:01:46 20   would have been motivated to select malate because it had

12:01:49 21   been used as a salt form for Sutent; right?

12:01:53 22   A.      I mentioned that that was also around the literature,

12:01:56 23   although I did point out that it's a different compound, of

12:01:58 24   course.

12:01:58 25   Q.      Now, when you say "it was in the literature," just to

Steed - Cross

12:02:01  1   be clear, you didn't identify it; correct?

12:02:02  2   A.    No, it wasn't me that found that article, that's

12:02:05  3   correct.

12:02:05  4   Q.    The Sutent label was given to you by MSN's lawyers;

12:02:09  5   right?

12:02:09  6   A.    That's correct.

12:02:10  7   Q.    So it's not something that you, as a skilled person,

12:02:12  8   came across in the regular course; right?

12:02:15  9   A.    It would have been available to a skilled person, but

12:02:17 10   yeah, I personally didn't find it.

12:02:19 11   Q.    And you didn't research other FDA-approved kinase

12:02:22 12   inhibitors or identify their salt forms; right?

12:02:25 13   A.    No, I didn't undertake a literature study of that

12:02:27 14   kind.

12:02:27 15   Q.    You only picked out Sutent; correct?

12:02:30 16   A.    As an example.

12:02:38 17   Q.    Let's talk a little bit about reasonable

12:02:41 18   expectations, all right?

12:02:41 19            Now, the malate salt of cabozantinib, it's not

12:02:45 20   the most soluble salt; right?

12:02:47 21   A.    It's among the most soluble salts that have a nice

12:02:50 22   favorable balance of pharmaceutical properties.

12:02:53 23   Q.    It's not the most soluble salt, sir, is it?

12:02:56 24   A.    Numerically, no, I think there's a couple of alkane

12:02:58 25   sulfonate salts that are somewhat more soluble but have

Steed - Cross

issues.

Q.     So if a person of skill in the art -- strike that.

          MR. PRUSSIA:  Let's pull up PTX-265.

BY MR. PRUSSIA:

Q.     Now, this is an Exelixis patent publication ending in

166.  And you've seen this patent before; right?

A.     Was this the one you showed me at deposition?

Q.     That's right, sir.

A.     Yeah, I think I saw it there for the first time.

          MR. PRUSSIA:  Now, if we turn to paragraph 3 on

Page 69.

BY MR. PRUSSIA:

Q.     The structure of cabozantinib is shown here, and it's

defined as Compound I, do you see that, sir?

A.     Yeah.

Q.     And the 166 publication describes salts of

cabozantinib; right?

A.     I believe so.

          MR. COOPER:  Objection; Your Honor, this is not

prior art.

          MR. PRUSSIA:  It's cross-examination.

          THE COURT:  Well, I'm going to overrule the

objection.

          MR. PRUSSIA:  Turn to paragraph 501, please.

BY MR. PRUSSIA:

526

Steed - Cross

12:03:58  1   Q.    Now, the patent discloses the pyruvate salt of

12:04:01  2   cabozantinib; right?

12:04:02  3   A.    Yes, I believe so.

12:04:03  4   Q.    And the patent discloses that the pyruvate salt has

12:04:07  5   an aqueous solubility of 0.33 mgs per ml.  Do you see that?

12:04:11  6   A.    Yes.

12:04:13  7   Q.    And that's more soluble than the malate salt of

12:04:17  8   cabozantinib; right?

12:04:17  9   A.    It is.  It makes mention of a particular pH, so I

12:04:20 10   don't know what cabozantinib's solubility at that pH is.

12:04:23 11   Q.    Now, pyruvic acid has a p$K_a$ of 2.39, you know that;

12:04:27 12   right?

12:04:27 13   A.    I hadn't remembered it offhand but I'll take your

12:04:30 14   word for it.

12:04:32 15   Q.    Do you want to be refreshed on that?

12:04:33 16   A.    I'll take your word for it.

12:04:34 17   Q.    Okay.

12:04:35 18   A.    It sounds right.

12:04:23 19   Q.    So pyruvic acid would have satisfied the Rule-of-2

12:04:23 20   for cabozantinib --

12:04:23 21             THE REPORTER:  I'm sorry.  Can you repeat the

12:04:23 22   question?

12:04:23 23             THE WITNESS:  You said 2.89; right?

12:04:41 24             MR. PRUSSIA:  I'm just -- we need to -- for the

12:04:42 25   reporter.

527

Steed - Cross

12:04:43  1    BY MR. PRUSSIA:

12:04:43  2    Q.    So pyruvic acid would have satisfied the Rule-of-2

12:04:46  3    for cabozantinib; correct?

12:04:47  4    A.    You said 2.89; right?

12:04:50  5    Q.    2.39.

12:04:52  6    A.    2.39, yes, it would.

12:04:55  7    Q.    So if a skilled person had included pyruvic acid in a

12:04:59  8    salt screen for cabozantinib, that skilled person would have

12:05:02  9    learned that the pyruvate salt has better water solubility

12:05:06 10    than the malate salt; right?

12:05:07 11    A.    Yes, I suppose that's true.  I can't speak to its

12:05:10 12    other properties.

12:05:13 13    Q.    But you don't offer any explanation for why a person

12:05:17 14    of skill would have picked the malate salt over the pyruvic

12:05:20 15    salt; correct?

12:05:21 16    A.    That's true.

12:05:23 17    Q.    Now, a skilled person would not have known whether a

12:05:27 18    counterion would form a salt with cabozantinib until they

12:05:30 19    tried it; correct?

12:05:31 20    A.    Yes, that's what the screen process is.  Although --

12:05:35 21    yeah, just repeat the question.

12:05:36 22    Q.    Sure.  A skilled person would not have known whether

12:05:39 23    a counterion would form a salt with cabozantinib until they

12:05:42 24    tried it; correct?

12:05:43 25    A.    Wouldn't have known whether it was an isolated or

528

Steed - Cross

12:05:46  1    solid crystalline salt that's nonhygroscopic and so on in

12:05:51  2    solution.   The p$K_a$ would tell you.

12:05:53  3    Q.     No, that's not my question, sir.

12:05:55  4           A skilled person would not know whether a

12:05:56  5    counterion would form a salt with cabozantinib until they

12:06:00  6    tried it; correct?

12:06:01  7    A.     In solution, they would know because of the p$K_a$

12:06:03  8    difference.  As a crystalline or isolated solid, they

12:06:07  9    wouldn't know, they would try it.

12:06:09 10    Q.     Okay.  Now, salt selection is an empirical process;

12:06:12 11    right?

12:06:12 12    A.     Yes, that's right.

12:06:14 13    Q.     You actually need to form each salt and study it in

12:06:16 14    order to determine which one is the right one; right?

12:06:19 15    A.     Yes, that's correct.

12:06:20 16    Q.     And the typical way the field proceeds is to make the

12:06:23 17    salts and then study their properties; correct?

12:06:25 18    A.     That's correct.

12:06:27 19           MR. PRUSSIA:  If you pull up PTX-333.

12:06:27 20    BY MR. PRUSSIA:

12:06:33 21    Q.     This is a paper by Simon Black; correct?

12:06:36 22    A.     Correct.

12:06:37 23    Q.     It's title "Structure, Solubility, Screening, and

12:06:39 24    Synthesis of Molecular Salts"; correct?

12:06:42 25    A.     Correct.

Steed - Cross

12:06:42 1   Q.     And it was published in 2007; correct?  2006, sorry.

12:06:48 2   A.     Yes.

12:06:50 3   Q.     And if we take a look at the abstract, and focus on

12:06:53 4   the third sentence that starts "this means that as of" -- as

12:07:00 5   of the priority date, Black disclosed that "the ability to

12:07:03 6   predict which salt forms will have desirable physical

12:07:05 7   properties is essentially non-existent"; correct?

12:07:08 8   A.     Yes, that's what it says, yeah.  And that's why we do

12:07:11 9   screen.

12:07:12 10          MR. PRUSSIA:  If we pull up PTX-327.

12:07:12 11  BY MR. PRUSSIA:

12:07:18 12  Q.     This is the Berge reference that you testified about

12:07:21 13  on your direct; correct?

12:07:23 14  A.     Correct.

12:07:24 15  Q.     And it's published in 1977; correct?

12:07:26 16  A.     That's right.

12:07:27 17  Q.     So it was available to a skilled person; right?

12:07:29 18  A.     Correct.

12:07:30 19  Q.     And if we turn to the paragraph under table of

12:07:33 20  contents, and there's a line starting with "choosing the

12:07:37 21  appropriate salt."

12:07:39 22          Are you with me?

12:07:40 23  A.     Yes.

12:07:42 24  Q.     As of the priority date, Berge disclosed that

12:07:44 25  "choosing the appropriate salt can be a very difficult

Steed - Cross

12:07:47  1   task."  Correct?

12:07:48  2   A.    Yes.  And I think he's referring to choosing the

12:07:51  3   appropriate salt for the final formulation, because he's

12:07:54  4   talking of properties here, not choosing what to include in

12:07:57  5   the salt screen.

12:07:57  6   Q.    And Berge disclosed that this is because each salt

12:08:01  7   imparts unique properties to the parent compound; correct?

12:08:03  8   A.    Correct, yes.

12:08:04  9   Q.    And turning to the top of the next paragraph, Berge

12:08:09 10   disclosed that "salt-forming agents are often chosen

12:08:12 11   empirically."  Correct?

12:08:14 12   A.    Correct.

12:08:14 13   Q.    And you agree with that; right?

12:08:15 14   A.    Well, empirically, I suppose, refers to the actual

12:08:20 15   making that you were describing.  So, I think what he's

12:08:23 16   saying here is that you run the salt screen and then you

12:08:26 17   choose which one that you're going to pursue based upon that

12:08:29 18   empirical salt screen.

12:08:30 19   Q.    And Berge goes on to disclose, "Unfortunately, there

12:08:33 20   is no reliable way of predicting the influence of a

12:08:37 21   particular salt species on the behavior of the parent

12:08:40 22   compound"; correct?

12:08:42 23   A.    Yes.  That's right.  That's why you do the empirical

12:08:45 24   salt screen to see experimentally what the behavior would

12:08:48 25   be, although you'd have an expectation that typically salts

531

Steed - Cross

12:08:50  1    are more soluble.

12:08:51  2    Q.      Now, not all salts are crystalline; correct?

12:08:54  3    A.      Correct.  Although, the majority are.

12:08:56  4            MR. PRUSSIA:  Pull it down.

12:08:56  5    BY MR. PRUSSIA:

12:08:57  6    Q.      A salt can either be crystalline or amorphous; right?

12:08:59  7    A.      Correct.

12:09:00  8    Q.      And the Rule-of-2 does not guarantee that a

12:09:02  9    crystalline material will be formed; right?

12:09:04 10    A.      That's right.

12:09:05 11    Q.      You actually have to make the material and see what

12:09:07 12    properties it has; right?

12:09:09 13    A.      Yes.  Very often it will crystallize, but it's not

12:09:12 14    guaranteed, might be hygroscopic, for example.

12:09:15 15    Q.      And, in fact, you made reference on your direct to

12:09:18 16    the Tong reference.

12:09:18 17            Do you remember that?

12:09:18 18    A.      Correct.

12:09:19 19    Q.      And, in fact, in that paper itself there's an example

12:09:22 20    where one-third of the salts that were formed did not result

12:09:29 21    in crystalline material; correct?

12:09:31 22    A.      I think the Tong reference is a method development

12:09:35 23    paper that only looks at six, and by one-third you mean two

12:09:38 24    of them weren't crystalline?

12:09:39 25    Q.      Yes, sir.  My question was correct?

532

Steed - Cross

12:09:40  1   A.      So, yes.  They weren't obviously trying to

12:09:44  2   crystallize them.  They were trying to develop a method

12:09:46  3   to -- to fast track the solubility measurements.

12:09:50  4   Q.      I understand all that, sir.

12:09:51  5          My question was correct; right?

12:09:52  6   A.      So I think two of the six they studied didn't

12:09:56  7   crystallize in their study, if I recall correctly.

12:09:58  8   Q.      Now, when conducting a salt screen, you wouldn't have

12:10:01  9   an expectation as to whether a particular counterion would

12:10:04 10   be the right choice for a particular drug substance; right?

12:10:08 11   A.      That's right.  You wouldn't know the outcome of the

12:10:11 12   salt screen before you did it.

12:10:13 13   Q.      You have to do the salt screen; right?

12:10:15 14   A.      Correct.

12:10:16 15   Q.      And then have you to characterize the products of

12:10:18 16   that salt screen; right?

12:10:19 17   A.      Yes, that's right.

12:10:21 18   Q.      And a person of skill would not have had an

12:10:24 19   expectation in advance of what particular acid would provide

12:10:28 20   the right properties for the drug substance when it's formed

12:10:31 21   as a salt; right?

12:10:33 22   A.      That's right, yes.  That's why they would do the

12:10:35 23   screen.

12:10:35 24   Q.      And the selection of the ultimate salt is determined

12:10:38 25   on a case-by-case basis; right?

Steed - Cross

12:10:40 1   A.      Yes.  Based on the properties of the -- of the

12:10:43 2   materials that are isolated in the salt screen.

12:10:45 3   Q.      Now, shifting gears a little bit.  You agree that a

12:10:48 4   person of skill would expect that low water solubility will

12:10:52 5   correlate with a slow dissolution rate; right?

12:10:54 6   A.      Typically that's right, yes.

12:10:57 7   Q.      And you agree with the general statement that a

12:11:00 8   amorphous solids typically undergo dissolution at a faster

12:11:04 9   rate, as compared to crystalline solids; right?

12:11:07 10  A.      Yes.  They do, unless there's a particular issue with

12:11:09 11  clumping or something like that, as there is here.

12:11:11 12  Q.      Now, you also offer opinions in this case regarding

12:11:14 13  Section 112; right?

12:11:15 14  A.      Correct.

12:11:17 15  Q.      And you offered some opinions this morning to

12:11:23 16  Your Honor with respect to the meaning of the word

12:11:25 17  "crystalline"; right?

12:11:25 18  A.      Yes.

12:11:27 19           MR. PRUSSIA:  Now let's take a look the '439

12:11:32 20  patent, Claim 1.

12:11:32 21  BY MR. PRUSSIA:

12:11:36 22  Q.      And just focusing on the claim, we can agree that

12:11:39 23  there are just three elements of the claim; right?

12:11:43 24  A.      I suppose so, yes.

12:11:47 25  Q.      The first element is that the material is

Steed - Cross

12:11:49 1    cabozantinib; right?

12:11:50 2    A.      Correct.

12:11:53 3    Q.      The second element is that the material is a malate

12:11:56 4    salt of cabozantinib; correct?

12:11:57 5    A.      Correct.

12:11:58 6    Q.      And the third element is that the material is

12:12:00 7    crystalline; right?

12:12:01 8    A.      That's right.

12:12:01 9    Q.      And in the context of this claim, the word

12:12:04 10   crystalline is being used as an adjective to describe the

12:12:07 11   solid matter of cabozantinib; right?

12:12:09 12   A.      Yes.  It has to be -- has to be crystalline in the

12:12:12 13   sense that it has to have that regular underlying

12:12:15 14   arrangement of the molecules.

12:12:16 15   Q.      And this is generally true throughout all of the

12:12:19 16   claims; right?  All in which crystalline is being used.

12:12:23 17   A.      Yes, I think it's consistent.

12:12:25 18   Q.      Yeah.  And crystalline refers to a crystal in which

12:12:29 19   the structural units are repeated regularly in three

12:12:32 20   dimensions; correct?

12:12:33 21   A.      Yes, that's right.  That's a good, broad definition

12:12:36 22   of crystalline.

12:12:36 23   Q.      And that definition reflects the plain and ordinary

12:12:38 24   meaning of the term crystalline as of the priority date;

12:12:41 25   correct?

Steed - Cross

12:12:41 1   A.      Yes, I suppose so.  I mean there some nuances to it,

12:12:46 2   but yes.  It would have that regular, repeating periodic

12:12:49 3   arrangement as I described.

12:12:50 4   Q.      Right.  So just to be clear, the plain and ordinary

12:12:52 5   meaning, you would agree, is a crystal in which the

12:12:55 6   structural units are repeated regularly in three dimensions;

12:12:58 7   correct?

12:12:58 8   A.      Yes.  That would be one good definition of

12:13:01 9   crystallinity.  As I say, there may be some nuances to it.

12:13:04 10  Those are layman's definitions.

12:13:05 11  Q.      And if the material has no repeating internal

12:13:09 12  structure, then it's amorphous; right?

12:13:10 13  A.      Yes.  I suppose that's true as well.

12:13:11 14  Q.      So that means that a solid that is not amorphous is

12:13:14 15  not -- strike that.

12:13:15 16          That means that a solid that is amorphous is not

12:13:18 17  crystalline; correct?

12:13:19 18  A.      Yes, that's right.  Amorphous solid is not

12:13:23 19  crystalline.

12:13:23 20  Q.      And that's how the patent defines it too; correct?

12:13:25 21  A.      How it defines amorphous, you mean?

12:13:28 22  Q.      Right.

12:13:28 23  A.      I don't recall offhand, but we can look at that.

12:13:32 24  Q.      Maybe we'll come back to it.

12:13:33 25          But just focusing on the claims, the word

Steed - Cross

12:13:35 1   "forms," it doesn't appear anywhere in this -- in the

12:13:38 2   asserted claims; right?

12:13:39 3   A.     The word is not there, but of course it's implicit.

12:13:42 4   You can't be crystalline without be being in a particular

12:13:45 5   crystalline form.

12:13:45 6   Q.     Well, the literal word does not appear in the claim.

12:13:48 7   So you can agree on that basic concept; right?

12:13:50 8   A.     You're right.  The word isn't there in the language.

12:13:52 9   Q.     And you agree that the claims do not require all

12:13:55 10  crystalline forms; right?

12:13:57 11  A.     The claims encompass anything that is an (L)-malate

12:14:03 12  salt, which is crystalline.

12:14:04 13  Q.     Well, the claim doesn't require all crystalline

12:14:08 14  forms, that's your opinion; right?

12:14:09 15  A.     In -- you mean in order to satisfy the written

12:14:14 16  description requirement?

12:14:14 17  Q.     Well, let's refresh you.

12:14:16 18        MR. PRUSSIA:  Let's go to deposition, Page 97,

12:14:20 19  Lines 17 to 24.

12:14:25 20        The question is:  "Under this scenario where the

12:14:27 21  claim is not interpreted to require all crystalline forms,

12:14:30 22  you don't have an opinion with respect to 112; right?

12:14:34 23        "The claim doesn't require all crystalline

12:14:37 24  forms.  It requires the cabozantinib malate to be

12:14:40 25  crystalline, that's the way the claim is written and the way

537

Steed - Cross

12:14:43 1    a person of skill would understand it."

12:14:43 2    BY MR. PRUSSIA:

12:14:46 3    Q.     That was my question, that was your answer; correct?

12:14:48 4              MR. COOPER:  Objection.  Improper impeachment,

12:14:50 5    Your Honor.

12:14:51 6              THE COURT:  All right.  Overruled.

12:14:53 7    BY MR. PRUSSIA:

12:14:53 8    Q.     So the claims -- you agree that claims do not require

12:14:56 9    all crystalline forms; right?

12:14:58 10   A.     Yes.

12:15:03 11   Q.     The claims simply require cabozantinib malate to be

12:15:06 12   crystalline; correct?

12:15:07 13   A.     Yes.  And I've explained that needs to be in a

12:15:09 14   particular crystalline form and the claim does encompass

12:15:12 15   anything that is in a crystalline form that's cabozantinib

12:15:14 16   malate.

12:15:15 17   Q.     Well, the way the claim is written is simply to

12:15:19 18   require the cabozantinib malate to be crystalline; correct?

12:15:21 19   A.     Yes, that's correct.

12:15:24 20   Q.     And that's the way a person of skill would understand

12:15:26 21   it; correct?

12:15:27 22   A.     A person of skill would know what crystalline meant

12:15:32 23   and know that there had to be a regular repeating underlying

12:15:34 24   arrangement of molecules to be crystalline, and I think they

12:15:36 25   would interpret it that way.

Steed - Cross

12:15:38  1    Q.     Now, you reviewed the prosecution history for the

12:15:40  2    crystalline malate salt patents; correct?

12:15:42  3    A.     Yes.  It's been a while, but yes.

12:15:44  4    Q.     And the patent examiner did not issue any rejections

12:15:48  5    under 112 during prosecution; correct?

12:15:51  6    A.     Not to my recollection, no.

12:15:53  7    Q.     The patent examiner never issued a rejection saying,

12:15:56  8    hey, these claims require a genus of forms, you don't

12:15:59  9    describe that; correct?

12:16:00 10    A.     That's correct.

12:16:02 11    Q.     Now, this -- let's talk about what is disclosed in

12:16:05 12    the specification.

12:16:06 13               Cabozantinib is disclosed; correct?

12:16:08 14    A.     I believe so.

12:16:09 15    Q.     The (L)-malate salt of cabozantinib is disclosed;

12:16:12 16    correct?

12:16:12 17    A.     Correct.

12:16:13 18    Q.     The (D)-malate salt of cabozantinib is disclosed;

12:16:17 19    correct?

12:16:17 20    A.     Can you direct me to that?

12:16:20 21    Q.     Sure.

12:16:21 22               MR. PRUSSIA:  Let's go to JTX-1, Column 6,

12:16:26 23    Line 56 to 64.  And I believe you also showed this on your

12:16:31 24    direct.

12:16:32 25               Keep it up and I'll just re-ask the question.

Steed - Cross

12:16:32  1    BY MR. PRUSSIA:

12:16:35  2    Q.    The specification discloses the (D)-malate salt of

12:16:38  3    cabozantinib; correct?

12:16:39  4    A.    Yes.  It describes it in the disclosure.  I don't

12:16:42  5    think there are any actual examples of them actually making

12:16:46  6    a (D)-malic acid salt, if I remember rightly.

12:16:48  7    Q.    The specification discloses the (D)-malate salt of

12:16:49  8    cabozantinib; correct?

12:16:50  9    A.    Yes, I see it written there.

12:16:51 10    Q.    Okay.  The specification discloses how to make

12:16:54 11    cabozantinib (L)-malate; correct?

12:16:55 12    A.    Yes, I believe it does.

12:16:57 13    Q.    And the prep -- in the preparative examples in the

12:17:00 14    specification, right?

12:17:02 15    A.    Correct.

12:17:02 16    Q.    And those preparative examples disclose how to make

12:17:05 17    crystalline cabozantinib (L)-malate; correct?

12:17:07 18    A.    In forms N-1 and N-2, yes.

12:17:10 19    Q.    My question is correct, the preparative examples

12:17:13 20    disclose how to make crystalline cabozantinib (L)-malate;

12:17:16 21    right?

12:17:16 22    A.    Yes.

12:17:19 23    Q.    Now, the specification discloses the chemical formula

12:17:22 24    for crystalline cabozantinib (L)-malate; correct?

12:17:25 25    A.    I believe it does, yes.

540

Steed - Cross

12:17:27 1    Q.    And you agree that all crystalline cabozantinib

12:17:30 2    (L)-malate will have the same chemical formula; right?

12:17:34 3    A.    They will unless they're solvates, in which case

12:17:37 4    there will be solvent molecules there as well.

12:17:39 5    Q.    And all crystalline cabozantinib (L)-malate will have

12:17:42 6    the same chemical makeup; correct?

12:17:44 7    A.    They will unless they're solvates in crystalline

12:17:47 8    forms, in which case there will be the solvent there as

12:17:50 9    well.

12:17:54 10   Q.    Now, let's talk a little bit about your opinions

12:17:57 11   regarding polymorphs.

12:17:58 12          You agree that the pharmaceutically relevant

12:18:02 13   polymorphs are those crystalline forms that are likely to

12:18:05 14   arise during the normal course of drug development; right?

12:18:09 15   A.    Yes.   I guess that's true.

12:18:11 16   Q.    And typically the most pharmaceutically relevant

12:18:13 17   forms are those that are the most stable; right?

12:18:16 18   A.    Yes, let me suppose it's an important consideration.

12:18:22 19   Q.    And the N-1 form is the most thermodynamically stable

12:18:26 20   form of cabozantinib malate; right?

12:18:28 21   A.    It is of the ones that we know of so far, as far as I

12:18:30 22   understand it.

12:18:30 23   Q.    And you generally agree that it is important to

12:18:33 24   identify stable polymorphic forms for pharmaceutical

12:18:36 25   development; right?

541

Steed - Cross

12:18:37 1    A.    Yes, absolutely.

12:18:38 2    Q.    And the first form that a person of skill would look

12:18:41 3    at is the thermodynamically stable form; right?

12:18:45 4    A.    Yes, I think that's true, that that's an obvious

12:18:48 5    choice for formulation.

12:18:49 6    Q.    So the specification of the crystalline malate salt

12:18:52 7    patents disclose the polymorphic form that a person of skill

12:18:56 8    would look to first; right?

12:18:58 9    A.    Yes, they are the most thermodynamic stable form that

12:19:03 10   we know of, would certainly be an option for formulation

12:19:06 11   unless there was some issue such as very low solubility.

12:19:10 12   Q.    And the reason why a person would look for that most

12:19:14 13   thermodynamically stable form first is because it's

12:19:16 14   typically the starting point for development because of the

12:19:20 15   possibility that other polymorphs may convert to the most

12:19:23 16   stable form; right?

12:19:24 17   A.    Yes, that's correct.

12:19:26 18   Q.    And the choice of a less stable form is less common

12:19:29 19   and would typically be made to overcome a specific

12:19:32 20   disadvantage inherent in the most stable form; right?

12:19:35 21   A.    Yes, I think that's true.

12:19:36 22   Q.    And you haven't offered any opinion identifying any

12:19:39 23   specific disadvantage inherent in the N-1 and N-2 forms;

12:19:44 24   right?

12:19:44 25   A.    No, I don't think I have.

Steed - Cross

12:19:46  1    Q.      In fact, to the contrary, you showed Your Honor that

12:19:48  2    the specifications of these patents expressly describe the

12:19:51  3    favorable stability properties of the N-1 and N-2 forms;

12:19:56  4    right?

12:19:56  5    A.      Correct.

12:19:57  6    Q.      So a person of skill would understand from the

12:20:00  7    specification that the N-1 and N-2 are highly stable forms;

12:20:04  8    right?

12:20:05  9    A.      Yes, I believe that's true.

12:20:06  10   Q.      Now, as of the priority date, a skilled person could

12:20:10  11   typically use a microscope to determine if a solid was

12:20:14  12   crystalline; right?

12:20:15  13   A.      Typically, yes.  A polarizing microscope would be a

12:20:19  14   way to do that.

12:20:20  15   Q.      You could also do it with XRPD; right?

12:20:22  16   A.      That's right.  That would be perhaps the most common.

12:20:24  17   Q.      You could also do it with DSC; right?

12:20:27  18   A.      You can certainly measure a melting point which would

12:20:31  19   indicate there was something crystalline there, yes.

12:20:33  20   Q.      And so a person of skill could use a microscope,

12:20:36  21   XRPD, DSC to identify crystalline material; right?

12:20:40  22   A.      You can't always use DSC and a microscope to

12:20:44  23   establish definitively if something is crystalline.

12:20:46  24   Q.      But you can; right?

12:20:47  25   A.      Typically, but not always.  It --

543

Steed - Cross

12:20:49 1    Q.      You -- and you showed Your Honor --

12:20:50 2    A.      It depends on the material.

12:20:51 3    Q.      Sorry.

12:20:51 4    A.      It depends on the material.

12:20:53 5    Q.      And you showed Your Honor that the specification of

12:20:55 6    the crystalline malate salt patents disclose using XRPD and

12:21:02 7    DSC to disclose crystalline -- to identify crystalline

12:21:05 8    material; correct?

12:21:05 9    A.      To characterize the material of which the X-ray

12:21:09 10   diffraction is really the one that's relevant to the

12:21:11 11   crystallinity.

12:21:12 12   Q.      And you could identify that it's crystalline without

12:21:15 13   identifying its form; right?

12:21:17 14   A.      In some cases, but not all.

12:21:20 15   Q.      Now, let's talk more about polymorphs.  As of the

12:21:23 16   priority date, you agree that polymorph screens were well

12:21:26 17   known; right?

12:21:27 18   A.      Yes.

12:21:28 19   Q.      And a polymorph screen involves running experiments

12:21:31 20   in parallel to search for different polymorphs of a

12:21:34 21   compound; right?

12:21:34 22   A.      Yes.

12:21:36 23   Q.      And you have offered the opinion that such screens

12:21:37 24   are routine procedure; right?

12:21:39 25   A.      Correct.

544

Steed - Cross

12:21:40 1    Q.      It's your opinion that such a screen takes no more

12:21:42 2    than a few weeks; right?

12:21:44 3    A.      That's right.

12:21:45 4    Q.      And it's your opinion that such a screen is highly

12:21:47 5    effective at identifying polymorphs; right?

12:21:50 6    A.      Yes, it is, but not all possible polymorphs, of

12:21:53 7    course.

12:21:53 8    Q.      You say that stable forms of a polymorph would have

12:21:55 9    been readily identified by a person of skill as of the

12:21:58 10   priority date; right?

12:21:59 11   A.      Yes, that's true unless there's an issue with

12:22:02 12   something like ritonavir where there's difficulty in the

12:22:06 13   nucleation.

12:22:06 14   Q.      And it's your opinion that a person of skill who was

12:22:08 15   aware of cabozantinib would also have been motivated to

12:22:11 16   identify the pharmaceutically relevant polymorphs; right?

12:22:14 17   A.      Yes, I think that's true.

12:22:16 18   Q.      And you've offered the opinion that such an effort to

12:22:18 19   identify the pharmaceutically relevant polymorphs of

12:22:21 20   cabozantinib, that would be routine; right?

12:22:24 21   A.      Yes.  You could undertake a routine polymorph screen

12:22:27 22   and certainly identify, you would hope, some solid forms,

12:22:31 23   but not all.

12:22:32 24   Q.      And you've also offered the opinion that a person of

12:22:34 25   skill could identify them with a reasonable expectation of

Steed - Cross

12:22:37  1    success; isn't that true, sir?

12:22:39  2    A.      Yes, but not all of them, not the full scope.

12:22:42  3    Q.      Now, let's talk a little bit about those forms as you

12:22:45  4    showed the Court earlier today.  None of those forms were

12:22:53  5    identified as of the priority date of the crystalline malate

12:22:57  6    salt patents; correct?

12:22:57  7    A.      That's correct.

12:22:59  8    Q.      They all came after; right?

12:23:01  9    A.      Yes.

12:23:03 10    Q.      Now, if we go to -- actually we'll come back to that.

12:23:13 11            You've offered the opinion that a little over --

12:23:17 12    strike that.

12:23:18 13            You've previously offered the opinion that a

12:23:20 14    little over half of molecules are polymorphic; correct?

12:23:23 15    A.      Yes.  I think that's what the statistics say.

12:23:26 16    Q.      And so that means for half of all molecules there's

12:23:28 17    only one form; right?

12:23:30 18    A.      That we know of so far, that's right.

12:23:31 19    Q.      And for the other half, it can range up to at most 14

12:23:35 20    pure polymorphic forms; right?

12:23:37 21    A.      Pure in the sense of characterized by single crystal

12:23:42 22    crystallography.  For things like atorvastatin, calcium

12:23:42 23    and --

12:23:42 24            (Reporter clarification.)

12:23:45 25            THE WITNESS:  Sorry.  For things like

Steed - Cross

12:23:49 1   atorvastatin, calcium, it's 70-plus forms.

12:23:51 2   BY MR. PRUSSIA:

12:23:51 3   Q.     We'll come back to that, but typically they can range

12:23:54 4   up to 14 pure polymorphic forms; right?

12:23:57 5   A.     So that's the raw example where there are well

12:23:59 6   established single crystal structures.  That's a very high

12:24:02 7   standard of characterization.

12:24:03 8   Q.     So I think before you took the stand Your Honor asked

12:24:05 9   you how many times you testified before him, and I think you

12:24:07 10  said three, right?

12:24:09 11  A.     To my recollection.

12:24:09 12  Q.     One of those was in the Entresto trial; right?

12:24:12 13  A.     Correct.

12:24:13 14  Q.     And I believe Your Honor asked you specifically --

12:24:16 15  and we can pull it up -- "What do you as a solid state

12:24:22 16  chemist -- solid state chemist expect in terms of the number

12:24:27 17  of polymorphic forms of a particular compound or even a

12:24:32 18  supramolecular complex?"

12:24:33 19         And then there was some back and forth, and you

12:24:35 20  said, "Well, for obviously half it's just one, but it can

12:24:38 21  range all the way up to 14 pure forms of a molecule, for

12:24:38 22  example."

12:24:42 23         That's what you told Judge Andrews in the

12:24:44 24  Entresto case; right?

12:24:45 25  A.     That's correct, and that's pure forms so that's not

Steed - Cross

12:24:47  1    including solvates.

12:24:48  2    Q.    That was my question, sir.  My question to you about

12:24:51  3    a minute ago was, for the other half, it can range up to 14

12:24:54  4    pure polymorphic forms; right?

12:24:56  5    A.    Yes.

12:24:56  6    Q.    Okay.  Now, the number of polymorphs is quite

12:24:59  7    dependent on the system; right?

12:25:01  8    A.    Yes.  That's certainly true, and the amount it is

12:25:04  9    studied.

12:25:04 10    Q.    And here, cabozantinib has been studied for 14 years;

12:25:08 11    right?

12:25:08 12    A.    I believe so, yes.

12:25:11 13    Q.    Four different pharmaceutical companies have looked

12:25:13 14    at it; right?

12:25:13 15    A.    Sorry?

12:25:16 16    Q.    As far as you know?

12:25:18 17    A.    Yes.

12:25:18 18    Q.    So Exelixis has; right?

12:25:21 19    A.    Correct.

12:25:21 20    Q.    MSN has; right?

12:25:22 21    A.    Correct.

12:25:23 22    Q.    Mylan and Cipla have, too; right?

12:25:25 23    A.    Yes.

12:25:26 24    Q.    And no one has identified any solvate form of

12:25:29 25    cabozantinib; right?

548

Steed - Cross

A.      Identified what?  Sorry.

Q.      Any solvate form of cabozantinib; right?

A.      Yes, they have.  I think we discussed it at my
deposition that the TGA weight loss is indicating a solvate
form.

                MR. PRUSSIA:  So, let's pull up Volume I, Tab 6.
                Deposition 153, Line 11 to 15.
                The question -- the question was:  "Are any of
Mylan M-1, M-2, M-3 and M-4 solvate forms?"
                "ANSWER:  Yeah.  I don't know as I sit here
today.  I could look at the data again, but I didn't address
that.  Correct."
                MR. COOPER:  Objection, Your Honor.  This is
incomplete.  Later in the deposition, his recollection was
refreshed and he discusses.
                MR. PRUSSIA:  You can do that on redirect.  This
is -- that was the question.  This was his answer.
                THE COURT:  So, do you have the citation of
where else this occurred?
                MR. COOPER:  Yes, at 328 there's a discussion
about the figure that -- we're discussing here 328 starting
at 22 and going over to 329:11.
                THE COURT:  All right.  So why don't you just
bring that up later because the answer here is he doesn't
know.  And because he hasn't looked at it -- so I don't

Steed - Cross

12:26:48  1    understand why -- how that really impacts anything.

12:26:50  2    BY MR. PRUSSIA:

12:26:51  3    Q.     So we can move on.  An XRPD diffractogram of a

12:26:54  4    material indicates it's crystalline based on the presence of

12:26:57  5    peaks; right?

12:26:57  6    A.     Yes.  That's right.

12:27:01  7    Q.     Now, the trial last year, you told the Court that to

12:27:04  8    differentiate polymorphic forms based on the XRPD

12:27:08  9    diffractogram, a person of skill may need to identify the

12:27:11 10    ten strongest peaks in the XRPD diffractogram?

12:27:15 11    A.     Yes.  That is the United States Pharmacopeia and the

12:27:18 12    way in which a form is identified with respect to a

12:27:21 13    reference.

12:27:22 14    Q.     Right.  So, again, my question was:  To differentiate

12:27:27 15    polymorphic forms, based on their XRPD diffractograms, a

12:27:31 16    person of skill may need to identify the ten strongest peaks

12:27:34 17    in the XRPD diffractogram; correct?

12:27:37 18    A.     Yes, that's the USP way of doing it.  Of course, even

12:27:40 19    that's a shorthand for looking at the entire diffraction

12:27:43 20    pattern, which whenever it's got ten peaks.

12:27:45 21    Q.     Okay.  But that was your testimony that you offered

12:27:48 22    to Judge Andrews in the first trial; correct?

12:27:49 23    A.     Yes, I think but that's within the context that I was

12:27:53 24    describing it.

12:27:53 25    Q.     Okay.

12:27:54  1        MR. PRUSSIA:  Let's pull up DDX-20 from your

12:27:58  2   demonstratives.

12:27:58  3   BY MR. PRUSSIA:

12:28:00  4   Q.     In offering your opinions in this case for the Court

12:28:02  5   today for form S, you only identify three peaks; correct?

12:28:05  6   A.     These are the peaks that are listed in claims in

12:28:10  7   MSN's patent, so these are the claimed peaks.

12:28:12  8   Q.     You identify three peaks, not ten; correct?

12:28:14  9   A.     I'm reciting claims of the patent.  So MSN in their

12:28:18 10   patent identified three peaks.

12:28:19 11   Q.     And for form M-4, you identified four peaks not ten;

12:28:23 12   correct?

12:28:23 13   A.     Again, the claims list four peaks.

12:28:26 14   Q.     And for form C-4, you offer nine peaks, not ten;

12:28:31 15   correct?

12:28:31 16   A.     Again, these are claimed peaks that are recited in

12:28:34 17   the patent claims.

12:28:35 18   Q.     And for one of those peaks for C-4, it overlaps with

12:28:39 19   form N-2; right?

12:28:40 20   A.     Yes, that's not uncommon for there to be a peak, as I

12:28:44 21   explained.

12:28:47 22   Q.     Now, just a couple questions and then we're I think

12:28:54 23   almost done.

12:28:55 24        With respect to form S, you're not offering the

12:29:15 25   opinion that form S is an unstable form; correct?

JONATHAN WILLIAM STEED - REDIRECT

12:29:18  1    A.      Just repeat the question, please.

12:29:23  2    Q.      Sure.  With respect to form S, you're not offering

12:29:25  3    the opinion that form S is an unstable form; correct?

12:29:27  4    A.      So, we discussed this at my deposition.  Stability is

12:29:32  5    always with respect to a particular set of circumstances.

12:29:35  6    So, it's not unstable under ambient conditions.  But

12:29:39  7    obviously, as I said to you at the deposition, it would be

12:29:42  8    unstable if there's a melting point.

12:29:42  9    Q.      And a high -- a hygroscopic polymorph is not always

12:29:46 10    more unstable than a nonhygroscopic polymorph; right?

12:29:49 11    A.      Yes, that's right.  Not -- not by definition,

12:29:52 12    although often that's the case.

12:29:54 13                MR. PRUSSIA:  No further questions, Your Honor.

12:29:55 14                THE COURT:  All right.  Thank you, Mr. Prussia.

12:29:58 15                Mr. Cooper, any redirect?

12:30:06 16                MR. PRUSSIA:  Your Honor, I do need to move in a

12:30:08 17    few exhibits.  Sorry, Bryce.

12:30:09 18                It's PTX-322, PTX-610, PTX-265, PTX-333, and

12:30:17 19    PTX-327.

12:30:32 20                MR. COOPER:  No objection.

12:30:32 21                THE COURT:  No objection.  All right.  Thank

12:30:34 22    you.  Admitted without objection.

12:30:35 23                (PTX Exhibit Nos. 322, 610, 265, 333, 327 were

12:30:35 24    admitted into evidence.)

12:30:35 25

Steed - Redirect

REDIRECT EXAMINATION

12:30:36  1

12:30:36  2  BY MR. COOPER:

12:30:44  3  Q.      Now, Dr. Steed, you spent some time on

12:30:47  4  cross-examination talking about various other potential

12:30:51  5  counterions that a POSA might consider putting in a salt

12:30:56  6  screen for cabozantinib.

12:30:57  7           Do you recall that?

12:30:58  8  A.      I do.

12:30:59  9  Q.      And counsel asked you a number of questions about

12:31:03 10  hydrochloride, do you recall that?

12:31:04 11  A.      Correct.

12:31:05 12  Q.      Is hydrochloride the most common counterion or common

12:31:08 13  salt that's been FDA approved?

12:31:10 14  A.      Correct.

12:31:11 15  Q.      Now, are you offering any opinion that a POSA would

12:31:15 16  not include hydrochloric acid in a salt screen for

12:31:19 17  cabozantinib?

12:31:20 18  A.      No, I'm not.  That's an obvious one to include.

12:31:23 19  Q.      And how many different counterions does a POSA

12:31:26 20  include in a typical salt screen?

12:31:28 21  A.      Around 15 to 20.

12:31:30 22  Q.      And counsel showed you the chart from Bighley, do you

12:31:34 23  recall that?

12:31:34 24  A.      Yes.

12:31:35 25  Q.      And he pointed you to hydrochloride; is that right?

Steed - Redirect

12:31:38 1     A.      Correct.

12:31:38 2     Q.      Are there any other salts or anions on that chart, to

12:31:42 3     your recollection, that are over 6 percent, other than

12:31:46 4     hydrochloride?

12:31:47 5     A.      Not to my recollection, no.

12:31:52 6             MR. COOPER:  Can we pull up PDX-9.3?

12:32:24 7             (Discussion held off the record:)

12:32:26 8             MR. COOPER:  PDX.  PDX-9.3.  Thank you.

12:32:26 9     BY MR. COOPER:

12:32:30 10    Q.      Okay.  Counsel asked you some questions about this

12:32:33 11    chart.  Do you see that -- do you recall that?

12:32:35 12    A.      Yes.

12:32:36 13    Q.      All right.  And, again, he focused on chloride.

12:32:40 14            Dr. Steed, do you see the besylate salt -- salt

12:32:42 15    on this list from Bighley?

12:32:45 16    A.      Mesylate?

12:32:45 17    Q.      Besylate.

12:32:46 18    A.      Besylate.  I do not -- oh, yes, I do, right at top.

12:32:51 19    Q.      It's a tiny sliver up at the top.

12:32:54 20    A.      I see it.

12:32:54 21    Q.      And do you see that it was used four times, as

12:32:57 22    reported in Figure 2 of Bighley?

12:32:58 23    A.      Yes.

12:33:01 24            MR. COOPER:  And now can we pull up PDX-9.5?

12:33:05 25    Thank you.

554

Steed - Redirect

12:33:05  1  BY MR. COOPER:

12:33:07  2  Q.    And counsel asked you some questions and pulled out a

12:33:12  3  paragraph from 399 on -- from your expert report.  Do you

12:33:17  4  recall questions on that this?

12:33:18  5  A.    I do.

12:33:19  6  Q.    Now, paragraph 399 is discussing a number of salts

12:33:26  7  that were identified, that we talked about on direct, that

12:33:28  8  were non-toxic; is that right?

12:33:29  9  A.    Correct.

12:33:30 10  Q.    Now, is paragraph 399, is that expressing your

12:33:34 11  opinion of the salts that a POSA would include in a salt

12:33:38 12  screen for cabozantinib?

12:33:42 13          That is -- does paragraph 399 represent an

12:33:47 14  opinion from you about the scope of all of the salts that

12:33:50 15  would be included in a cabozantinib salt screen?

12:33:53 16  A.    No, it doesn't.

12:33:54 17  Q.    And so what exactly are you just saying in

12:33:57 18  paragraph 399?

12:33:57 19  A.    This is part of the logic of whittling down, the

12:34:01 20  organic salts listed, to what a person would regard as

12:34:04 21  obvious to include.

12:34:06 22  Q.    And so, just to be clear, paragraph 399 does not

12:34:08 23  represent a final list, as counsel described it, of the

12:34:12 24  salts that you would include in a cabozantinib salt screen;

12:34:15 25  is that right?

Steed - Redirect

12:34:16  1   A.      Correct.

12:34:20  2   Q.      Counsel -- speaking of other salts, counsel also

12:34:23  3   showed you -- thank you.

12:34:24  4           Counsel also showed you PTX-265.  And this is

12:34:34  5   a -- an Exelixis patent; is that right?

12:34:36  6   A.      Correct.

12:34:36  7   Q.      And what is the publication date of this Exelixis

12:34:39  8   patent?

12:34:39  9   A.      May 26th, 2022.

12:34:42 10   Q.      Okay.  So is this prior art?

12:34:43 11   A.      No.

12:34:44 12   Q.      Would a POSA have been aware of this as of the

12:34:47 13   priority date?

12:34:47 14   A.      They would not have.

12:34:48 15   Q.      Would a POSA have considered anything in this

12:34:52 16   reference as of the priority date?

12:34:52 17   A.      No.

12:34:56 18   Q.      And counsel asked you some questions about

12:35:00 19   essentially the predictability of identifying properties of

12:35:03 20   salts before a salt screen is run, do you recall that line

12:35:06 21   of questioning?

12:35:07 22   A.      I do.

12:35:07 23   Q.      And specifically he referred to the Black reference

12:35:10 24   that quoted something to the effect that it was -- it is

12:35:13 25   essentially nonexistent -- the ability is essentially

556

Steed - Redirect

12:35:16 1    nonexistent to identify the properties in advance of running

12:35:20 2    the salt screen.

12:35:21 3                Do you recall that?

12:35:21 4    A.    I do.

12:35:21 5    Q.    Is that inconsistent with anything you've said so far

12:35:24 6    today?

12:35:25 7    A.    No, not at all.  You wouldn't know the outcome of the

12:35:28 8    salt screen before you did it, otherwise you wouldn't need

12:35:31 9    to do it.

12:35:31 10   Q.    And counsel referred to some other properties that

12:35:33 11   ultimately are measured for cabozantinib -- for a salt after

12:35:37 12   a salt screen, including bioavailability, permeability.

12:35:40 13                Do you recall that line of questioning?

12:35:42 14   A.    I do.

12:35:42 15   Q.    And when would bioavailability and permeability and

12:35:46 16   things like that be measured in the course of drug

12:35:48 17   development?

12:35:48 18   A.    Those are measured after the salt screen, further

12:35:52 19   down the line.

12:35:53 20   Q.    In the Exelixis asserted malate salt patents, is

12:35:57 21   there any data about bioavailability or permeability of a

12:36:01 22   crystalline cabozantinib malate salt that is ultimately put

12:36:06 23   into a composition?

12:36:07 24   A.    No, there isn't.

12:36:19 25   Q.    Okay.

Steed - Redirect

12:36:19  1           MR. COOPER:  Turning to written description.
12:36:21  2   The -- thank you.  You can take that down.
12:36:21  3   BY MR. COOPER:
12:36:27  4   Q.     You referred to the definition of crystalline, and
12:36:31  5   counsel asked you some questions about that, do you recall?
12:36:33  6   A.     Yes.  In a layman's kind of definition.
12:36:36  7   Q.     And you've said before that the definition is a
12:36:39  8   crystal in which the crystal units are repeated; is that
12:36:42  9   right?
12:36:42 10   A.     Yes.
12:36:43 11   Q.     Now -- and you talked about this on your direct, you
12:36:46 12   showed a slide, but can the repeating crystalline units, the
12:36:49 13   unit cells be different from one crystalline form to
12:36:52 14   another?
12:36:53 15   A.     Yes.  That's what makes them different crystalline
12:36:55 16   forms.  They have a different unit cell, a different
12:36:57 17   underlying packing arrangement.
12:36:59 18   Q.     And counsel asked you some questions about whether
12:37:01 19   the asserted claims require all of the cabozantinib
12:37:06 20   crystalline (L)-malate forms, do you recall that?
12:37:08 21   A.     I do.
12:37:09 22   Q.     Now, are you giving an infringement opinion in this
12:37:11 23   case?
12:37:11 24   A.     No, it's a legal term.  I am not a lawyer, so I'm
12:37:15 25   not -- I'm certainly not giving an infringement opinion.

Steed - Redirect

12:37:17  1    Q.    Okay.  So then could -- for written description, can

12:37:19  2    you describe as far as what crystalline cabozantinib malate

12:37:23  3    salts fall within the scope of the asserted claims?

12:37:25  4    A.    Yes, within the scope of the asserted claims, it's my

12:37:29  5    opinion that the -- all crystalline cabozantinib (L)-malate

12:37:32  6    salts fall within that scope.

12:37:34  7    Q.    And counsel asked you some questions about whether

12:37:36  8    the specification discloses a way to make a crystalline

12:37:42  9    cabozantinib (L)-malate salt.

12:37:43 10          Do you recall that discussion?

12:37:45 11    A.    I do, yes.

12:37:47 12    Q.    And does the -- and you said that a POSA could run a

12:37:58 13    polymorph screen and could routinely potentially identify

12:38:00 14    more.

12:38:01 15          Do you recall that line of questioning?

12:38:02 16    A.    Yes, potentially.

12:38:03 17    Q.    Now, you -- are you giving an enablement opinion at

12:38:07 18    trial today?

12:38:07 19    A.    No.

12:38:10 20    Q.    Did Exelixis run a polymorph screen in the course of

12:38:13 21    their development?

12:38:13 22    A.    Yes, they did.  And that polymorph screen revealed

12:38:16 23    only the N-1 and N-2 forms.

12:38:23 24    Q.    And counsel asked you some questions about whether

12:38:27 25    all crystalline cabozantinib malate salts have the same

12:38:31  1  chemical formula and chemical makeup, and you said yes.

12:38:34  2            Do you recall that testimony?

12:38:35  3  A.    They do unless they're solvates.

12:38:36  4  Q.    And -- but do all crystalline cabozantinib (L)-malate

12:38:40  5  salts have the same crystalline structure?

12:38:43  6  A.    No, no, they don't.  They're all --

12:38:45  7  Q.    Do they all have the same physical properties?

12:38:47  8  A.    No.

12:38:47  9  Q.    Do they all have the same chemical properties?

12:38:49 10  A.    No.

12:38:50 11  Q.    Do they all have the same functional properties?

12:38:52 12  A.    No.

12:38:53 13  Q.    Counsel also asked you some questions about whether

12:38:56 14  the form N-1 and N-2 are the most pharmaceutically relevant

12:39:01 15  crystalline cabozantinib salts.

12:39:03 16            Do you recall that line of questioning?

12:39:05 17  A.    Yes, I do.

12:39:05 18  Q.    Is there anything in the claims of the asserted

12:39:08 19  patents that are limiting the scope of the asserted claims

12:39:11 20  to pharmaceutically or most pharmaceutically relevant

12:39:14 21  crystalline cabozantinib malate salts?

12:39:17 22  A.    No, nothing at all.

12:39:18 23  Q.    Is there anything in the asserted claims that limit

12:39:20 24  them to the most thermodynamically stable or most common

12:39:25 25  thermodynamically stable salts?

560

Steed - Redirect

12:39:28 1   A.      No, there isn't.

12:39:28 2   Q.      Is there anything in the asserted the claims that

12:39:31 3   limit them to crystalline cabozantinib malate salts with any

12:39:35 4   particular properties?

12:39:36 5   A.      No, there isn't.  It's address -- it addresses all of

12:39:39 6   them.

12:39:40 7   Q.      And counsel asked you some questions about whether

12:39:44 8   you could identify whether a sample of a -- of a

12:39:50 9   cabozantinib malate salt was crystalline or not without

12:39:54 10  doing XRPD testing and further types of testing.

12:39:58 11          Do you recall that line of questioning?

12:40:00 12  A.      I do.

12:40:00 13  Q.      Now, but whether it has been identified or not, is a

12:40:04 14  crystalline cabozantinib malate salt still existing in a

12:40:08 15  crystalline packing arrangement or form regardless of

12:40:11 16  whether or not you have measured it yet?

12:40:14 17  A.      It is, yes.  It can't be crystalline without actually

12:40:17 18  having an underlying crystal structure and the

12:40:20 19  characteristics of that crystal structure or crystal form.

12:40:24 20  Q.      You -- he also asked you about some testimony you

12:40:27 21  gave to Judge Andrews, and he quoted you about saying a POSA

12:40:31 22  may have to review at least ten peaks.

12:40:34 23          Do you recall that?

12:40:35 24  A.      Yes.

12:40:36 25  Q.      Now -- and we looked at your chart again where you

Steed - Redirect

12:40:40  1    called out the claimed peaks for each of the crystalline

12:40:43  2    cabozantinib malate salts.

12:40:44  3              Do you recall that?

12:40:45  4    A.    Yes.

12:40:45  5    Q.    And what was the data on the right-hand side?  Why

12:40:48  6    did you select that for the chart?

12:40:50  7    A.    That's because those are the peaks that the authors

12:40:54  8    of those documents chose to claim in their claims.

12:40:57  9    Q.    And did you look at not only those claims, but did

12:41:02 10    you look at the entire diffractograms for each of those

12:41:05 11    crystalline cabozantinib salts?

12:41:06 12    A.    I certainly did.  That's the best practice, to look

12:41:09 13    at the entire diffraction patent.

12:41:11 14    Q.    And is that what a POSA would do?

12:41:13 15    A.    Yes.

12:41:13 16    Q.    And what was your conclusion after looking at the

12:41:15 17    entire scope of the diffractogram?

12:41:17 18    A.    Looking at the whole diffraction pattern, it's clear

12:41:19 19    these are different forms to each other.

12:41:21 20    Q.    And counsel also asked you some questions about some

12:41:23 21    testimony you gave confirming that one of the -- or the most

12:41:28 22    pure crystal structures that have been categorized is 13.

12:41:31 23              Do you recall that?

12:41:32 24    A.    Yes.  I think it's 14 now.

12:41:34 25    Q.    Fourteen.  And there was some back and forth about

Steed - Redirect

12:41:38  1   what pure meant in that context.

12:41:39  2          Could you explain that?

12:41:40  3   A.    Yeah.  So that -- that discussion was around

12:41:44  4   non-solvated polymorphs.  I think the most that we know of

12:41:46  5   is 14 now.  Once you -- once you start about solvates, then

12:41:51  6   there are more forms.  I mentioned earlier Atorvastatin

12:41:57  7   example, which the literature says is around 70.

12:41:59  8   Q.    And counsel referred to some testimony you gave at

12:42:01  9   trial last year.  Do you recall testifying in front of

12:42:05 10   Judge Andrews last year that the MSN S form is a hydrate?

12:42:08 11   A.    I do.  Yes.

12:42:09 12   Q.    Okay.

12:42:10 13          MR. COOPER:  No further questions, Your Honor.

12:42:12 14          THE COURT:  All right.  Thank you, Dr. Steed.

12:42:14 15   You may step down.

12:42:15 16          THE WITNESS:  Thank you.

12:42:16 17          THE COURT:  All right.  Let's take a lunch break

12:42:19 18   of an hour, and I will see you again after the hour is up.

12:42:23 19          DEPUTY CLERK:  All rise.

12:43:21 20          (Luncheon recess was taken.)

01:41:38 21          DEPUTY CLERK:  All rise.

01:41:39 22          THE COURT:  All right.  Everyone be seated.

01:41:46 23          MR. COOPER:  Your Honor, we have some exhibits

01:41:48 24   to move in from the last exam.

01:41:49 25          THE COURT:  Sorry.  What now?

Steed - Redirect

01:41:51 1                MR. COOPER:  We have some exhibits to move in

01:41:52 2    from the last --

01:41:53 3                THE COURT:  All right.  Sorry.

01:41:54 4                MR. COOPER:  Some of these may have been moved

01:41:56 5    in before, so...  But for completeness:  JTX-1, JTX-2,

01:42:01 6    JTX-3, JTX-9, JTX-10.  DTX-558, DTX-177, DTX-243, DTX-392,

01:42:17 7    DTX-191, DTX-170, DTX-20, DTX-333.  PTX-256.  DTX-222,

01:42:32 8    DTX-121, DTX-13, DTX-167.  PTX-610.  DTX-180, DTX-192, and

01:42:47 9    DTX-166.

01:42:51 10               MR. PRUSSIA:  No objection, Your Honor.

01:42:52 11               I just have one additional from our side.

01:42:54 12               THE COURT:  All right.

01:42:55 13               MR. PRUSSIA:  That flip chart is going to be

01:42:57 14   marked as PDX-9.13.

01:43:01 15               We're taking a picture for the Court.

01:43:10 16               THE COURT:  That seems really pointless.

01:43:15 17               MR. PRUSSIA:  It's not being offered for

01:43:16 18   evidence, Your Honor.

01:43:17 19               THE COURT:  Well, you know, there was -- so I'm

01:43:24 20   going to deny that.

01:43:25 21               MR. PRUSSIA:  Okay.

01:43:26 22               THE COURT:  It's pointless.

01:41:57 23               (JTX Exhibit Nos. 1, 2, 3, 9, and 10, were

01:41:57 24   admitted into evidence.)

01:42:05 25               (DTX Exhibit Nos. 13, 20, 121, 166, 167, 170,

Wilson - Video

01:42:10  1    177, 180, 191, 192, 222, 243, 333, 392, and 558 were

01:43:28  2    admitted into evidence.)

01:43:28  3

01:42:25  4              (PTX Exhibit Nos. 256 and 610 were admitted into

01:42:25  5    evidence.)

01:43:29  6              THE COURT:  All right.  So what's now?

01:43:31  7              MS. GRDEN:  Good afternoon, Elizabeth Grden from

01:43:33  8    MSN.  We would like to play a video now from the March 9th,

01:43:37  9    2023, deposition of Dr. Jo Ann Wilson.  She's the former

01:43:41 10    vice president of chemistry manufacturing and control.

01:43:44 11              THE COURT:  And just to remind me, Doctor --

01:43:46 12    this is going to -- because I remember the Plaintiffs

01:43:49 13    talking about her in opening, or at least I thought they

01:43:52 14    did.

01:43:53 15              This is going to cover everything she's ever

01:43:57 16    going to testify about in this trying; right?

01:44:00 17              MS. GRDEN:  This is everything the parties would

01:44:01 18    say like to present for her testimony.

01:44:02 19              THE COURT:  Yeah.  Okay.

01:44:03 20              MS. GRDEN:  She is one of the two inventors of

01:44:04 21    '349 patent.  We will be offering certain exhibits into

01:44:10 22    evidence.  With your permission, I'll hand those up.

01:44:10 23              THE COURT:  All right.

01:44:17 24              MS. GRDEN:  And those exhibits will be 291 --

01:44:19 25    DTX-291, which is identified in the deposition as Exhibit 8.

Wilson - Video

01:44:22  1   PTX-35, which is identified as Exhibit 6.  And PTX-10, which

01:44:27  2   is identified as Exhibit 7.

01:44:28  3           The time allotment:  MSN, 9 minutes 13 seconds.

01:44:33  4   Exelixis, 8 minutes, 28 seconds.  And 18 seconds of joint

01:44:37  5   testimony.

01:44:41  6           (Beginning of videotape deposition excerpt.)

01:44:41  7   Q.    Could you state your full name for the record?

01:44:43  8   A.    Jo Ann Zbur Wilson.

01:44:44  9   Q.    And you joined Exelixis in December of 2002; right?

01:44:48 10   A.    Correct.

01:44:50 11   Q.    And at Exelixis, you served as a senior director from

01:44:54 12   2002 to 2004, and then a vice president of chemistry,

01:44:57 13   manufacturing and controls from 2004 to 2014; is that right?

01:45:02 14   A.    That's correct.

01:45:04 15   Q.    Okay.  What CMC activities were you responsible for

01:45:08 16   in support of Cabometyx?

01:45:12 17   A.    We had started developing the tablet formulation for

01:45:15 18   cabozantinib when I was employed by Exelixis, but I left the

01:45:21 19   company before that product was launched.

01:45:24 20   Q.    And so were you involved in selecting the synthetic

01:45:29 21   route to prepare cabozantinib for use in potential capsule

01:45:33 22   and tablet -- tablet formulations?

01:45:35 23   A.    I was involved in evaluating the medicinal chemistry

01:45:38 24   route that was used to manufacture XL184, as it was known at

01:45:42 25   the time, and then the process optimization and, you know,

Wilson - Video

01:45:47 1  modifying that synthesis route to what, eventually, became

01:45:53 2  the commercial route for the manufacture of cabozantinib

01:45:56 3  (L)-malate.

01:45:58 4  Q.    Okay.  And so the -- the medicinal chemistry route

01:46:01 5  that you referred to, that -- was that the first synthetic

01:46:03 6  route that Exelixis developed for manufacturing

01:46:05 7  cabozantinib?

01:46:06 8  A.    Yes, that's correct, for -- for producing small

01:46:11 9  quantities of XL184.

01:46:16 10 Q.    Did you have any role in determining what excipients

01:46:20 11 would be used for cabozantinib capsule and tablet -- tablet

01:46:25 12 formulations?

01:46:25 13 A.    Yes, I did.

01:46:26 14 Q.    And could you describe what your roles and

01:46:28 15 responsibilities were in that regard?

01:46:29 16 A.    Well, I oversaw the activities that were required for

01:46:34 17 developing the initial capsule formulation through my

01:46:38 18 formulation development group and the CDMO that we were

01:46:41 19 working with for manufacturing the -- the early batches

01:46:44 20 for -- for the clinic through the commercial batches.

01:46:50 21      And then, as I mentioned to you earlier, we had

01:46:52 22 started developing the tablet formulation.  I was involved

01:46:55 23 in the -- through management of my formulation development

01:46:58 24 group and oversight of them and their activities, the

01:47:01 25 development of the tablet formulation as well.

567

Wilson - Video

01:47:06 1   Q.      Are formulation scientists in the field generally

01:47:10 2   motivated to minimize genotoxic impurities in drug products

01:47:15 3   as much as they can?

01:47:16 4              THE WITNESS:  Yeah, I can't speak in general

01:47:18 5   terms.  I can tell you what we did at Exelixis.

01:47:21 6   Q.      And in your experience, is -- is minimizing genotoxic

01:47:26 7   impurities in drug products as much as possible important?

01:47:29 8   A.      Yes, I believe it is.

01:47:32 9   Q.      And what did you rely on when developing GTI control

01:47:35 10  strategies?  Is that something that you consulted scientific

01:47:39 11  literature for?  Relied on your experience as a person in

01:47:41 12  the field?  Just generally.

01:47:43 13  A.      Well -- pardon me -- at the time that we were doing

01:47:47 14  this with respect to cabozantinib, there was a draft

01:47:53 15  guidance from the FDA, the one that you -- that we mentioned

01:47:57 16  previously, regarding potential genotoxic impurities.  And

01:48:04 17  we used that guidance to direct our activities towards the

01:48:08 18  GTI control strategy.

01:48:12 19  Q.      To -- to your knowledge, did anyone at Exelixis or at

01:48:15 20  the direction of Exelixis ever prepare a crystalline form of

01:48:20 21  cabozantinib (L)-malate other than N-1 or N-2?

01:48:24 22             THE WITNESS:  No not to my knowledge, no.

01:48:28 23  Q.      Doctor, do you recognize Exhibit 6 as Section 6 from

01:48:32 24  the Exelixis NDA for cabozantinib capsule products?

01:48:37 25  A.      I believe this is Section 3.2.S.2.6 of the NDA for

568

Wilson - Video

01:48:44 1    cabozantinib capsules.

01:48:46 2    Q.    Now, were you involved in designing the Process A or

01:48:50 3    Process B synthetic routes for the API?

01:48:54 4    A.    Process A is this -- is the synthesis group that was

01:49:00 5    used by medicinal chemistry.  So A and B refer more to the

01:49:05 6    synthetic route processes, the actual conditions that were

01:49:10 7    utilized for execution at each step going from, you know, A

01:49:15 8    to B to C to D, if you will.  So Process A was initially

01:49:20 9    used by Exelixis' medicinal chemistry to make small

01:49:24 10   quantities of XL184.

01:49:27 11           And then, when the compound got moved over into

01:49:33 12   development status, my group took over and we did all the

01:49:38 13   subsequent process development around Process A and then,

01:49:42 14   ultimately, Process B.

01:49:45 15   Q.    And API batches made by Process A were used in both

01:49:49 16   non-clinical and initial -- initial clinical studies by

01:49:53 17   Exelixis; is that right?

01:49:54 18   A.    That's correct.

01:49:56 19   Q.    And Process B was developed as the synthetic route

01:50:00 20   that was ultimately used for the commercialized Exelixis

01:50:04 21   products; correct?

01:50:05 22   A.    That's correct.

01:50:07 23   Q.    What -- approximately, what was the time frame of

01:50:09 24   process A-1 when it was developed?

01:50:11 25   A.    That was early on in the development.  I believe that

569

Wilson - Video

01:50:17 1   we made our first batch of XL184 using Process A-1 in 2004,

01:50:25 2   and we moved away from Process 1 shortly thereafter.

01:50:33 3   Q.    The second version of Process A, known as Process

01:50:38 4   A-2, was developed and used by Exelixis for non-clinical

01:50:41 5   safety studies and also for use in the clinical program;

01:50:44 6   correct?

01:50:44 7   A.    That's what it says, yes.

01:50:47 8   Q.    So as far as the synthetic route for process A-2,

01:50:51 9   that was something that Exelixis developed and provided to

01:50:55 10  their contract organizations; correct?

01:50:57 11  A.    Correct.

01:50:59 12  Q.    And on this page, in Section 6.4.2.2.1, there's a --

01:51:05 13  it says "key issues identified with Process A-2."

01:51:11 14           Do you see that?

01:51:12 15  A.    I do.

01:51:15 16  Q.    And in the first bullet it says, "the competing" --

01:51:20 17  in the third sentence, "The competing decomposition pathway

01:51:24 18  of XL184-1-3" to that impurity 1-1 "under the reaction

01:51:30 19  conditions could not be controlled."

01:51:32 20           Do you see that?

01:51:33 21  A.    I do.

01:51:36 22  Q.    Could you explain?

01:51:37 23  A.    Yes.  So when -- when 1-3 is formed in -- one of the

01:51:43 24  competing side reactions, undesirable side reactions, is

01:51:47 25  the -- the decomposition of XL184-1-3 to form XL184-1-1.

Wilson - Video

01:52:00  1    Q.    And so after process A-2, Exelixis developed

01:52:03  2    Process B; correct?

01:52:04  3    A.    Correct.

01:52:06  4    Q.    If you recall, or could you describe the genotoxic

01:52:10  5    impurity assessment that was performed by BMS?

01:52:13  6    A.    In general terms?  Yes.

01:52:16  7    Q.    In general.

01:52:17  8    A.    Yeah.  So in accordance with the draft guidance by

01:52:21  9    the FDA, an assessment of all starting materials,

01:52:28 10    intermediates, impurities, and potential impurities were

01:52:32 11    evaluated in an in silico computational model that can be

01:52:37 12    predictive of the outcome of bacterial genotoxic -- or

01:52:43 13    bacterial mutagenicity assays.  And then compounds that were

01:52:49 14    flagged as containing structural alerts were then evaluated

01:52:52 15    in said bacterial mutagen -- mutagenicity assays to either

01:53:00 16    confirm or not whether or not these impurities had a

01:53:04 17    potential to be genotoxic.

01:53:08 18    Q.    And this section on this page describes the

01:53:10 19    commercial process B-2, correct?

01:53:12 20    A.    Correct.

01:53:16 21    Q.    And it states that process B-2 evolved from process

01:53:20 22    B-1 to better control the final crystal form and to better

01:53:23 23    control the GTI levels; right?

01:53:25 24    A.    That's correct.

01:53:26 25    Q.    In the third paragraph in this section, it begins,

Wilson - Video

01:53:35 1   "Process improvements with respect to reaction temperature,

01:53:38 2   volumes and reagent charge quantities were made to the

01:53:40 3   cabozantinib free base process."

01:53:42 4              Do you see that?

01:53:43 5   A.     I do.

01:53:45 6   Q.     Is changing reaction temperature -- was that a

01:53:50 7   well-known strategy to try to minimize levels of GTIs?

01:53:56 8              THE WITNESS:  So minimizing the level of, you

01:54:03 9   know -- and GTIs, you know, we're talking about four that

01:54:06 10  were identified, and they have -- they have -- they are

01:54:09 11  introduced at various stages in the manufacturing process.

01:54:13 12  They're removed or purged at various stages of the

01:54:17 13  manufacturing process, so you -- I can't just lump them all

01:54:23 14  together and speak of GTIs.

01:54:24 15             In particular, what we were concerned with here

01:54:27 16  was the GTI 1-1 because it was a degradation product.  And

01:54:34 17  so the things like temperature, volumes, reagent charges

01:54:38 18  required a very intimate knowledge of the chemistry.  So

01:54:42 19  it's not just something with a broad brush that you can say,

01:54:46 20  "Oh, I'm going change the reaction temperature, and that's

01:54:50 21  going to, you know, reduce the GTIs."

01:54:53 22             So this was -- this is a -- this was one

01:54:56 23  sentence that sort of encompasses an incredible amount of

01:54:59 24  work that was done to be able to come up with a final

01:55:01 25  process that would, you know, give us the -- the API with

Wilson - Video

01:55:04  1    the levels of 1-1 that we were striving for.

01:55:07  2    Q.     And the next sentence, it says, "A recrystallization

01:55:10  3    step was introduced in order to minimize the levels of

01:55:14  4    GTIs."

01:55:14  5           Do you see that?

01:55:15  6    A.     I'm sorry.  Which paragraph again?

01:55:18  7    Q.     Still in that third paragraph, the second sentence.

01:55:23  8           Could you explain how recrystallization reduces

01:55:26  9    GTIs?

01:55:27 10    A.     Well, remember, recrystallization is the technique

01:55:32 11    that's used to purify solid crystalline materials.  So

01:55:37 12    it's -- it is -- it is generally -- the general principle of

01:55:42 13    that is that, you know, once you do a recrystallization,

01:55:47 14    that the -- that the solid that crystallized -- so you take

01:55:52 15    a solid.  You take it up into solution, usually with heat,

01:55:55 16    to get a complete solution.  And then when you cool it down,

01:55:58 17    the -- the compound, you know, that you're looking at

01:56:01 18    crystallizes out.

01:56:02 19           And the idea is, is that impurities would stay

01:56:05 20    in the liquid portion.  So that's kind of the general

01:56:08 21    principle of purification, in general, by recrystallization.

01:56:13 22    Q.     Was recrystallization a known method to reduce

01:56:17 23    genotoxic impurities from API at the time that you were

01:56:23 24    developing this process?

01:56:27 25           THE WITNESS:  So recrystallization is a

Wilson - Video

01:56:29  1    procedure that's used to purify solids, whether it's from

01:56:33  2    GTIs, regular impurities.  So it can be used to -- to remove

01:56:39  3    genotoxic impurities if it's -- you know, but it's not

01:56:45  4    necessarily going to do that.  So it's not just, you know,

01:56:48  5    that simple.

01:56:50  6    Q.    All right.  Doctor, do you recognize Exhibit 7?

01:56:52  7    A.    I recognize this, yes.

01:56:57  8    Q.    And what is this document?

01:56:58  9    A.    This appears to be -- this appears to be information

01:57:07  10   from an IND.

01:57:11  11   Q.    Can you turn to the page that ends Bates No. 969.

01:57:18  12         And Section 7.2.2.1 here identifies the

01:57:24  13   manufacturer of several batches of API, correct?

01:57:28  14   A.    Correct.

01:57:32  15   Q.    Figure 7.2-8 provides the synthetic route for the

01:57:37  16   preparation of the API that was produced in Lot No.

01:57:44  17   P172-27-1 and used in that phase 1 clinical study, correct?

01:57:47  18   A.    Correct.

01:57:49  19   Q.    Do you recognize Exhibit 8 as an international

01:57:52  20   publication with the number W0 2010/083414?

01:58:01  21   A.    Yes, that's -- that's what it says, yes.

01:58:05  22   Q.    And this is a -- this is an international publication

01:58:11  23   where the applicant is Exelixis.

01:58:15  24         Do you see that?

01:58:16  25   A.    I do.

Wilson - Video

01:58:18  1   Q.      And the inventors are Adrian St. Clair Brown, Peter

01:58:22  2   Lamb, and William Gallagher, correct?

01:58:24  3   A.      That's correct.

01:58:25  4   Q.      Can -- if I call this the Brown reference, are you

01:58:28  5   okay with that?

01:58:29  6   A.      Yes, of course.

01:58:31  7   Q.      And Example 1 is directed to preparation of

01:58:33  8   cabozantinib and the (L)-malate salt thereof, correct?

01:58:37  9   A.      Correct.

01:58:38 10   Q.      And compound -- the cabozantinib (L)-malate salt is

01:58:42 11   referred to as Compound I in this publication, I believe; is

01:58:47 12   that correct?

01:58:47 13   A.      That's what it says.

01:58:49 14   Q.      And Scheme 1 provides a synthetic route for the

01:58:53 15   preparation of cabozantinib (L)-malate, correct?

01:58:56 16   A.      Correct.

01:58:58 17   Q.      And looking at this route -- the synthetic route for

01:59:02 18   preparing cabozantinib (L)-malate that's in the Brown

01:59:04 19   reference is the Exelixis process A-2 that we discussed

01:59:07 20   earlier, correct?

01:59:08 21   A.      Correct.  Yeah.  So this -- the syn- -- Exelixis used

01:59:13 22   the synthetic process here that's identified in the Brown

01:59:17 23   reference in order to prepare the API Lot No. P172-27-1 that

01:59:23 24   we saw in Exhibit 7; is that right?

01:59:28 25              THE WITNESS:  This synthesis route here

01:59:33  1   (indicating) and what appears to be described here, yes,

01:59:34  2   is -- is -- looks to be the route that we used to prepare

01:59:37  3   that lot.

01:59:39  4   Q.     What about adding purification steps, is that a known

01:59:42  5   way to potentially reduce genotoxic impurities?

01:59:47  6          THE WITNESS:  It's a way that could be used to

01:59:49  7   reduce the level of genotoxic impurities.

01:59:54  8   Q.     And was it known at the time that quinoline compounds

02:00:05  9   could be potentially mutagenic?

02:00:08 10   A.     Well, I -- I believe that there were a lot of

02:00:13 11   examples in the literature of quinoline compounds being

02:00:18 12   mutagenic, but I'm not a toxicology expert, so I can't say

02:00:23 13   for sure.

02:00:26 14   Q.     Okay.  You don't recall any other HPLC methods that

02:00:29 15   had a higher limit of detection that you used for this

02:00:31 16   project than 0.02 percent --

02:00:34 17   A.     I'm sorry.

02:00:36 18   Q.     -- is that right?

02:00:37 19   A.     I -- I don't -- 0.02 percent is pretty much the

02:00:42 20   standard LOD for an HPLC method.

02:00:46 21   Q.     Okay.  Is the limit of quantification for HPLC, is

02:00:52 22   the -- is that -- is the standard 0.05 percent?

02:00:56 23   A.     That seems to be pretty standard, yes.

02:01:02 24   Q.     Was Exelixis' goal in its process development to

02:01:06 25   reduce the level of 1-1 impurity by as much as it could?

576

Wilson - Video

02:01:12 1    A.    So the goal -- it was twofold.  I -- I'll answer your

02:01:18 2    question with regard to the drug product, to this tablet

02:01:21 3    formulation.

02:01:23 4            The goal was not to increase the level of 1-1

02:01:26 5    more than what was already present in the incoming API

02:01:31 6    batches.

02:01:32 7    Q.    Got it.

02:01:34 8            And did Exelixis also have a goal at the outset

02:01:43 9    of its process development to ensure that the API and drug

02:01:49 10   product exhibited little to no increase in genotoxic

02:01:52 11   impurity levels during long-term storage?

02:01:55 12   A.    Yes.

02:01:58 13   Q.    Now, does the work that resulted in your '349 patent

02:02:03 14   in Exhibit 4, can you distill that down to one step?

02:02:06 15   A.    No.

02:02:08 16   Q.    Why not?

02:02:09 17   A.    It was a -- a lot of work.  So I -- I was referring

02:02:13 18   to the number of steps in the synthesis scheme, which is

02:02:18 19   quite different than the process.  In -- the time that it

02:02:23 20   took going from Scheme 1, which is process A, to the point

02:02:28 21   where we came up with the final commercial process was a

02:02:31 22   time that spanned eight years.  So it was much more

02:02:35 23   complicated than just reducing one step out of the synthesis

02:02:40 24   sequence.

02:02:40 25           (Conclusion of videotape deposition excerpt.)

Lamb - Video

02:02:46  1            MS. GRDEN:  Your Honor, we'll now play video

02:02:49  2     from the August 11th, 2021, and March 23rd, 2023,

02:02:55  3     depositions of Peter Lamb, executive vice president,

02:02:58  4     scientific strategy, and chief scientific officer of

02:03:01  5     Exelixis, and named inventor of the '439, '440, and '015

02:03:06  6     patents.  And in connection with Mr. Lamb's testimony, MSN

02:03:09  7     will be offering DTX-035, if I can hand those up.

02:03:13  8            THE COURT:  Okay.

02:03:23  9            MS. GRDEN:  The time allotment is MSN, four

02:03:25 10     minutes, 51 seconds; Exelixis, six minutes and 13 seconds.

02:03:29 11            THE COURT:  Okay.

02:03:29 12            (Beginning of videotape deposition excerpt.)

02:03:33 13     Q.    Okay.  You understand, sir, that you've been

02:03:36 14     designated by Exelixis to give testimony on behalf of the

02:03:40 15     company today?

02:03:40 16     A.    Yes, I understand with respect to certain designated

02:03:46 17     topics.

02:03:47 18     Q.    Okay.  Can you tell me why Exelixis decided to do a

02:03:52 19     salt screen through Pharmorphix?

02:03:56 20     A.    Yeah, so, you know, it is important, as we're

02:04:00 21     advancing a compound towards the clinic and, ultimately,

02:04:03 22     commercialization, to identify a suitable solid state form

02:04:10 23     for the drug.  There were multiple options, it's my

02:04:14 24     understanding, of what that form can take, and it differs in

02:04:19 25     an unpredictable way depending upon the compound.  A salt

Lamb - Video

02:04:24  1    screen is one process that you can use to help identify

02:04:27  2    potentially suitable forms, suitable solid state forms, so

02:04:32  3    that's the rationale for proceeding with one form.

02:04:38  4    Q.    Do you know who the kind of key contact at Exelixis

02:04:42  5    was with Pharmorphix beginning in 2004?

02:04:46  6    A.    I don't think I could say who the key contact was

02:04:49  7    with certainty.

02:04:52  8    Q.    Do you know anybody who was in contact with them?

02:04:54  9    A.    I suspect John Nuss, who was the head of medicinal

02:04:59 10    chemistry at the time, was the contact.

02:05:02 11    Q.    Okay.  What were your contributions to Claim 1?

02:05:05 12    A.    So when we received the initial report on the salt

02:05:12 13    screen from Pharmorphix, with the 22 counterions, I was -- I

02:05:19 14    reviewed that document in a meeting with Dr. Nuss, John

02:05:25 15    Nuss.  We reviewed it, and we came to the conclusion or I

02:05:28 16    came to the conclusion that the (L)-malate salt was the best

02:05:32 17    salt to move forward.

02:05:35 18            MR. WARNER:  Let's have Lamb Exhibit 10 on the

02:05:39 19    screen.

02:05:41 20    Q.    And if you could have that available, sir.

02:05:45 21            MR. WARNER:  I -- I think I said this.  This is

02:05:47 22    EXEL68747 through 68789.

02:05:52 23            And have you seen this document before, sir?

02:05:55 24    A.    I have, yes.

02:05:58 25    Q.    Okay.  This is a document from Pharmorphix called

579

Lamb - Video

02:06:06 1  primary salt screen on EXEL7184 for Exelixis, Inc.  Correct?

02:06:12 2  A.     That is correct.

02:06:15 3  Q.     EXEL-7184 is the internal name for cabozantinib?

02:06:18 4  A.     Yes, correct.

02:06:21 5  Q.     And then if you go to the second page, the document

02:06:25 6  has a date of September 15, 2004.  Right?

02:06:28 7  A.     Correct.

02:06:31 8  Q.     Okay.  Now, you received this document on or about 15

02:06:36 9  September 2004?

02:06:36 10 A.     Well, again, I saw this document in my meeting with

02:06:41 11 John Nuss.  I don't recall the date of that meeting.

02:06:46 12 Q.     Okay.  It would have been after mid-September 2004?

02:06:50 13 A.     Presumably.

02:06:54 14 Q.     And so just to make sure I understand, did you have

02:06:57 15 any involvement with Pharmorphix prior to the time when you

02:07:00 16 first saw this report?

02:07:01 17 A.     No, I didn't.

02:07:05 18 Q.     And once the decision was made to have Pharmorphix do

02:07:09 19 a salt screen, you had no input into how it was going to be

02:07:12 20 conducted.  Is that all fair?

02:07:13 21 A.     That's fair, yes.  I mean, we hired Pharmorphix

02:07:16 22 because they're experts in the field.  It's -- you know,

02:07:19 23 solid state chemistry is a whole field in and of itself, not

02:07:22 24 something that we conducted internally at Exelixis at the

02:07:25 25 time, hence we went to experts.

Lamb - Video

02:07:30 1  Q.    And I guess what I'm trying to understand is, is

02:07:32 2  there a reason you just went forward with one opposed to,

02:07:37 3  say, two or three?

02:07:38 4  A.    Again, (L)-malate salt looked to be the one with the

02:07:43 5  most desirable properties.

02:07:46 6  Q.    Okay.  How long did the process take you to evaluate

02:07:50 7  this and choose the (L)-malate salt?

02:07:52 8  A.    The meeting was somewhere between 30 minutes to an

02:07:56 9  hour.

02:08:01 10  Q.    Had you spent time reviewing the report prior to

02:08:03 11  that?  Prior to the meeting?

02:08:04 12  A.    No.  That was the first time I saw the report.

02:08:08 13  Q.    Okay.  So if I understand you correctly, you -- you

02:08:10 14  got the report at some point after it issued, and over the

02:08:14 15  course of a 30- to 45-minute meeting with John Nuss decided

02:08:17 16  that the (S)-malate was best?

02:08:20 17  A.    30 to one hour meeting.  But yes.

02:08:23 18  Q.    To one hour?

02:08:25 19  A.    Yes.

02:08:25 20  Q.    Okay.  All right.  And so Exelixis decided to pursue

02:08:28 21  the (L)-malate form of cabozantinib for further pre-clinical

02:08:31 22  development based upon your recommendation and decision; is

02:08:35 23  that right?

02:08:36 24  A.    That's correct, yes.

02:08:37 25  Q.    And I -- I understand that your recommendation and

581

Lamb - Video

02:08:41  1    decision was based on your review of the results of the salt

02:08:46  2    screen conducted by Pharmorphix; is that right?

02:08:49  3    A.    That's partly right.  So that played a -- you know,

02:08:53  4    played a big role in it for sure.  We had the data from

02:08:56  5    Pharmorphix in that -- in that time frame.  They had

02:08:59  6    identified and characterized a number of different salts, a

02:09:02  7    number of which were crystalline and had been scaled up.

02:09:06  8          Looking at that report, it certainly, you know,

02:09:10  9    suggested to me that the (L)-malate salt looked like a very

02:09:13 10    promising candidate to take forward.  But beyond that, there

02:09:16 11    was some additional testing that was done on the malate salt

02:09:20 12    before the final decision was made.

02:09:25 13    Q.    What additional testing was that?

02:09:30 14    A.    Yeah, I would say, you know, one of the main pieces

02:09:33 15    of testing was called an in vivo pharmacokinetic experiment.

02:09:37 16    So what we did, we actually -- I think I took -- took four

02:09:41 17    of the salts, including the L -- the (L)-malate.  And we

02:09:45 18    dosed them to -- to animals, it was rats.

02:09:49 19          I would say the most crucial part of that

02:09:50 20    experiment was we actually administered what we called a

02:09:53 21    solid oral dosing form, which essentially was solid

02:09:56 22    cabozantinib (L)-malate put into little -- little capsules

02:09:59 23    that were then administered to the rats, sort of the closest

02:10:02 24    thing that we could get to on the pre-clinical side to, you

02:10:06 25    know, how you would actually dose people, ultimately.

Lamb - Video

02:10:08 1          So what we were looking for, you know, with the

02:10:12 2     malate salt, and you know, we also did this with some of the

02:10:14 3     other salts is, you know, will that solid drug actually

02:10:17 4     dissolve either in the stomach or in the intestines of the

02:10:20 5     animal and then actually get, you know, through the

02:10:22 6     intestinal wall and into the bloodstream.  So we were

02:10:26 7     essentially looking for, you know, does the solid form of

02:10:29 8     the salt have good oral bioavailability.  And in the case

02:10:32 9     with the (L)-malate salt, it did have -- it had very good

02:10:36 10    oral bioavailability.

02:10:37 11         So there was that data.  There was some

02:10:39 12    additional data.  I know we looked at the photostability of

02:10:43 13    -- of the (L)-malate salt and a few other salts, again, just

02:10:46 14    looking to see if it would break down in any way in the

02:10:48 15    presence of lights.

02:10:50 16         THE WITNESS:  Lights.  Yeah, you'd much prefer

02:10:53 17    to have a drug that is stable in the presence of light so

02:10:56 18    you don't have to keep it in the dark all the time.  So that

02:10:59 19    was one piece of data.

02:11:00 20         We did do some broad screening of the solubility

02:11:04 21    of the salts in -- in what we typically called various

02:11:09 22    different matrices.  You know, a lot of the early data on

02:11:14 23    solubility that was done, and some of this was done at

02:11:18 24    Pharmorphix as well, was just done in water.  That's -- you

02:11:22 25    know, that's -- you know, it's a piece of data that's --

Lamb - Video

02:11:25  1    that can be useful, but it's -- it's not the most relevant

02:11:28  2    fluid in which to look at solubility.

02:11:31  3              There are things called simulated gastric fluids

02:11:34  4    and simulated intestinal fluids that more try to mimic the

02:11:37  5    kind of fluid environment that you actually find in -- in --

02:11:41  6    in people and in patients.  So I know we did some assessment

02:11:44  7    of the solubility in -- in those kind of fluids as well.

02:11:47  8              So it's that package of data which really got

02:11:50  9    assembled in that -- in that sort of -- finally got

02:11:52 10    assembled in that late July, early August period that led to

02:11:56 11    the declaration of cabozantinib (L)-malate as the compound

02:12:00 12    that we would advance into pre-clinical development.

02:12:04 13    Q.    You -- you said a moment ago that the -- the in vivo

02:12:08 14    rat studies included four salts.  What were the four salts

02:12:12 15    that were in the rat studies?

02:12:14 16              THE WITNESS:  Yeah, from -- from memory, the

02:12:16 17    (L)-malate was obviously one.  There was the maleate, I

02:12:20 18    believe, we tested.  I want to say the hydrochloride, maybe

02:12:24 19    the phosphate.  There is a -- you know, if I'm -- you asked

02:12:31 20    -- tech evidence document and want to refresh my memory, we

02:12:34 21    can look there.  It's -- there's also a report.  But that's

02:12:37 22    -- that's what I have from memory.

02:12:39 23    Q.    Okay.  And so the -- that in vivo data is presented

02:12:43 24    or summarized in the technical evidence document?

02:12:47 25    A.    That's correct, yes.

Lamb - Video

02:12:51  1    Q.      The photosensitivity testing, is that also reported

02:12:56  2    or summarized in the technical evidence document?

02:12:59  3    A.      Yes, it is.

02:13:03  4    Q.      And is the solubility, the -- the additional

02:13:06  5    solubility testing also reported in the technical evidence

02:13:11  6    document?

02:13:11  7    A.      Yes, it is.

02:13:17  8    Q.      Okay.  And based on the -- the data in the

02:13:22  9    Pharmorphix report, it was -- it was clear to you that the

02:13:27 10    (L)-malate salt form was the -- was the salt to advance into

02:13:32 11    pre-clinical development; is that right?

02:13:34 12    A.      Well, I would -- I would put it as based on the

02:13:37 13    Pharmorphix data, that the (L)-malate salt looked like a

02:13:40 14    promising candidate.  However, I would say that the -- for

02:13:44 15    example, the PK experiments, I -- I outlined for you, you

02:13:49 16    know, it was -- it was possible that we could have dosed

02:13:52 17    solid cabozantinib malate and it would not be absorbed well,

02:13:55 18    or it would not dissolve well, and therefore would have poor

02:13:59 19    oral bioavailability.  So we did need this additional data

02:14:02 20    to make a final decision.

02:14:03 21    Q.      And do you believe based just on the data in the

02:14:06 22    Pharmorphix report that (L)-malate salt was the most

02:14:11 23    promising salt based on the salt screen data?

02:14:14 24    A.      Well, I said -- like I said, it looked like -- it

02:14:18 25    looked like a promising candidate.  And it was certainly one

Lamb - Video

02:14:21  1    that -- that I wanted to see characterized further.

02:14:24  2            But, again, no final -- no final decision could

02:14:26  3    be made until we -- we'd really done that additional work.

02:14:29  4    And as you saw, we carried forward not just the malate salt

02:14:33  5    but a few of the others as well.

02:14:39  6            (Conclusion of videotape deposition excerpt.)

02:14:39  7            MS. GRDEN:  Your Honor, we'd like to formally

02:14:45  8    offer DTX-291, PTX-35, PTX-10, and DTX-35.

02:14:55  9            MR. PRUSSIA:  I think 291 is already in but no

02:14:58 10    objection.

02:14:59 11            MS. GRDEN:  Sure.

02:14:59 12            THE COURT:  All right.  Admitted without

02:15:01 13    objection.

02:15:07 14            (DTX Exhibit Nos. 291 and 35 were admitted into

02:15:07 15    evidence.)

02:15:07 16            (PTX Exhibit Nos. 35 and 10 were admitted into

02:15:08 17    evidence.)

02:15:08 18            MR. MATHAS:  Your Honor, at this point, that is

02:15:09 19    the end of our responsive case and we'll pass the case back

02:15:12 20    over.

02:15:13 21            THE COURT:  All right.

02:15:16 22            MR. PRUSSIA:  Your Honor, Exelixis calls

02:15:24 23    Dr. Khalid Shah.

02:15:27 24            THE COURT:  Okay.

02:15:29 25            DEPUTY CLERK:  Please state and spell your full

Shah - Direct

02:15:45  1      name for the record.

02:15:45  2              THE WITNESS:  My full name is Khalid Shah,

02:15:49  3      K-H-A-L-I-D, last name Shah, S-H-A-H.

02:15:54  4              KHALID SHAH, the witness herein, after having

02:15:54  5      been duly affirmed under oath, was examined and testified as

02:15:54  6      follows:

02:15:54  7              THE WITNESS:  Yes, I do.

02:16:01  8                      DIRECT EXAMINATION

02:16:01  9      BY MR. PRUSSIA:

02:16:05 10      Q.      Good afternoon.

02:16:05 11      A.      Good afternoon.

02:16:06 12      Q.      Please introduce yourself to the Court.

02:16:08 13      A.      My name is Khalid Shah.

02:16:10 14      Q.      What is your educational background?

02:16:13 15      A.      I have a BSC in pharmacy and I have a Ph.D. in

02:16:16 16      pharmaceutics.

02:16:17 17      Q.      Where do you work, Dr. Shah?

02:16:18 18      A.      I work at Exelixis.

02:16:21 19      Q.      What is your title at Exelixis?

02:16:22 20      A.      My title is senior vice president of pharmaceutical

02:16:26 21      operations and manufacturing and supply chain.

02:16:28 22      Q.      What are your responsibilities?

02:16:30 23      A.      My responsibilities include, obviously, in the

02:16:33 24      commercial manufacturing of our drug products that are

02:16:36 25      approved, Cabometyx, and Cometriq.  I also oversee the

Shah - Direct

02:16:39  1   manufacturing of the active ingredient, cabozantinib.  As

02:16:42  2   well as all the raw materials for the commercial products.

02:16:46  3   And I also oversee development of all new products, from the

02:16:50  4   discovery stage all the way through to commercialization.

02:16:53  5   Q.     What were your responsibilities --

02:16:55  6                DEPUTY CLERK:  Can you try to slow down as best

02:16:58  7   you can?

02:16:59  8   BY MR. PRUSSIA:

02:17:00  9   Q.     What were your responsibilities with respect to

02:17:03 10   preparing and submitting the new drug applications for

02:17:07 11   cabozantinib?

02:17:07 12   A.     So for cabozantinib specifically, I oversaw

02:17:11 13   submission of the NDA, the complete NDA for Cabometyx.  And

02:17:16 14   I oversaw the drug product sections for the Cometriq

02:17:21 15   submission and application.

02:17:23 16   Q.     How long have you worked at Exelixis?

02:17:25 17   A.     I worked at Exelixis for just over 14 years.

02:17:29 18   Q.     When did Exelixis begin investigating potential

02:17:33 19   tyrosine kinase inhibitors?

02:17:34 20   A.     That would be in the early 2000s.

02:17:38 21   Q.     How many compounds did the company investigate?

02:17:40 22   A.     I would say about in the region of around 5,000.

02:17:44 23   Q.     How many compounds did the company take into clinical

02:17:46 24   trials?

02:17:47 25   A.     Around 15.

Shah - Direct

02:17:49  1    Q.      How many of those compounds were successful in those

02:17:52  2    trials and ultimately approved by the FDA?

02:17:54  3    A.      One.

02:17:55  4    Q.      What is that approved compound?

02:17:56  5    A.      That approved compound is cabozantinib.

02:17:59  6    Q.      When was cabozantinib first approved by the FDA?

02:18:02  7    A.      The initial approval was for the Cometriq submission

02:18:06  8    in 2012.

02:18:08  9    Q.      Has the compound received any additional approvals

02:18:10 10    from the FDA?

02:18:11 11    A.      Yes.

02:18:12 12    Q.      When was that additional approval?

02:18:14 13    A.      That was in 2016.

02:18:18 14            MR. PRUSSIA:  Let's mark -- let's pull up PTX-4.

02:18:18 15    BY MR. PRUSSIA:

02:18:23 16    Q.      This is Tab 1 in your binder, if you need it,

02:18:25 17    Dr. Shah.

02:18:26 18            What is this document?

02:18:27 19    A.      This is the prescribing information on package insert

02:18:31 20    for Cometriq.

02:18:33 21            MR. PRUSSIA:  If we go to PTX-1.

02:18:33 22    BY MR. PRUSSIA:

02:18:35 23    Q.      This is Tab 2 in your binder, Dr. Shah, if you need

02:18:38 24    it.

02:18:38 25            What is this document, Dr. Shah?

Shah - Direct

02:18:40  1   A.      This is the prescribing information or package insert

02:18:45  2   for Cabometyx.

02:18:46  3              MR. PRUSSIA:   If we could turn, please, to

02:18:48  4   Section 11.

02:18:58  5   BY MR. PRUSSIA:

02:18:58  6   Q.      What is the active ingredient of Cabometyx?

02:19:01  7   A.      So the active ingredient of Cabometyx is the

02:19:04  8   cabozantinib (L)-malate salt.

02:19:06  9   Q.      Now, the document makes reference to an (S)-malate

02:19:08  10  salt.

02:19:09  11             What is that?

02:19:09  12  A.      So the (S)-malate is just another designation for the

02:19:14  13  (L)-malate salt.   Just a different naming convention.

02:19:17  14  Q.      You mentioned the word "salt."   What is a salt?

02:19:20  15  A.      Right.   So at a really high level, a salt is where an

02:19:25  16  ionizable compound, such as cabozantinib free base, is

02:19:28  17  combined with a counterion, in this particular case, a salt.

02:19:32  18  And the combination of the two together is what results in a

02:19:36  19  pharmaceutical salt.

02:19:37  20  Q.      What is the free base of the salt in Cabometyx?

02:19:41  21  A.      That would be cabozantinib.

02:19:43  22  Q.      And what is the counterion in Cabometyx?

02:19:46  23  A.      The counterion is a malic acid.

02:19:49  24  Q.      Now, did Exelixis initially pursue development of the

02:19:52  25  free base of cabozantinib?

Shah - Direct

02:19:54  1    A.      The free base was initially evaluated by Exelixis.

02:19:58  2    Q.      And what did -- what conclusions did the company

02:20:01  3    reach regarding the suitability of the free base?

02:20:03  4    A.      Yeah.  So after evaluation of the free base, Exelixis

02:20:07  5    decided that it was not a form that would be developable and

02:20:12  6    it exhibited a considerable amount of polymorphic

02:20:16  7    instability in that it appeared to be able to convert to

02:20:21  8    other polymorphs very readily.

02:20:24  9    Q.      What do you mean when you say it exhibited

02:20:25 10    polymorphic instability?

02:20:26 11    A.      Yes.  So what I mean by that is some polymorphs can

02:20:30 12    be unstable and if certain polymorphs are unstable, they

02:20:34 13    have the propensity to convert to other polymorphs and

02:20:36 14    that's extremely undesirable.

02:20:39 15    Q.      What were the risks of developing the cabozantinib

02:20:41 16    free base?

02:20:42 17    A.      There were considerable risks.  You know, each --

02:20:46 18    polymorphs are characterized by different levels of

02:20:48 19    solubility.  So, if, you know, the free base were to convert

02:20:53 20    to a different polymorph and that polymorph would have a

02:20:56 21    different solubility, either higher or lower, you know, the

02:20:59 22    risk is that the patient taking the drug could experience

02:21:02 23    significantly higher amount of dose or lower amount of dose.

02:21:04 24    The higher dose would be a safety issue and could cause harm

02:21:08 25    and the lower dose would likely be subtherapeutic.  So it

591

Shah - Direct

1    was a considerable concern.

2    Q.    Did Exelixis try to develop a salt of cabozantinib?

3    A.    Yes.

4    Q.    What salt did Exelixis experiment with first?

5    A.    So initially Exelixis used an HCl salt and that was

6    simply for the purposes of dissolving cabozantinib in the

7    vials, which were being used for the initial animal toxicity

8    studies.

9    Q.    Now, at some point did Exelixis investigate other

10   salts?

11   A.    Yes.

12   Q.    And what did the company do to investigate other

13   salts?

14   A.    Yeah.  So Exelixis partnered with a contract research

15   organization called Pharmorphix and Pharmorphix performed a

16   salt screen to identify additional salts.

17   Q.    What is a salt screen?

18   A.    So at a high level, a salt screen is a fairly

19   complicated process whereby in order to attempt to form

20   crystalline salts and multiple counterions of salt species

21   are evaluated, different solvents are looked at and used in

22   order to evaluate these counterion in an attempt to identify

23   and form crystalline salts.

24   Q.    How did Exelixis identify the best salts from the

25   Pharmorphix salt screen?

Shah - Direct

02:22:24  1    A.      Right.  So Pharmorphix identified five of the most

02:22:28  2    promising salt candidates and then Exelixis took those

02:22:32  3    candidates through further evaluation and conducted PK

02:22:38  4    animal experiments and looked at the in vivo bioavailability

02:22:44  5    data and subsequent to all that work a final decision was

02:22:47  6    made to progress the particular salt, which was the

02:22:52  7    (L)-malate in this case.

02:22:53  8    Q.      So, ultimately, what properties did Exelixis consider

02:22:56  9    in deciding which salt to move forward with?

02:22:58 10    A.      So, of particular importance was the solid-state

02:23:04 11    stability of the (L)-malate salts, but also, more

02:23:07 12    importantly, the in vivo bioavailability data that was

02:23:11 13    generated in the animal species was considered to be of

02:23:14 14    particular importance.

02:23:16 15    Q.      So you mentioned bioavailability.  What is that?

02:23:18 16    A.      So, bioavailability is essentially when a tablet or

02:23:23 17    capsule intended for oral administration, which is what

02:23:25 18    cabozantinib is, is swallowed and travels down the GI tract,

02:23:31 19    and the drug from the tablet or capsule will then be

02:23:34 20    absorbed through what we call the epithelium layer,

02:23:37 21    basically the barrier between the GI tract and the blood

02:23:39 22    vessels and the drug will essentially then pass through the

02:23:43 23    liver and be metabolized and then it ends up in the blood

02:23:46 24    circulation.  And when the drug ends up in the blood

02:23:49 25    circulation, it's available to get to its target sites to

Shah - Direct

02:23:52 1    achieve its therapeutic effect.  We measure that as the oral

02:23:55 2    bioavailability.

02:23:56 3    Q.    What are the reasons that Exelixis considered

02:23:59 4    bioavailability in identifying the right salt?

02:24:02 5    A.    Well, it was extremely important because we were

02:24:05 6    developing cabozantinib as an oral administration drug.  So,

02:24:10 7    it was critical that cabozantinib have higher

02:24:15 8    bioavailability in the high blood -- high drug concentration

02:24:18 9    in the blood levels.

02:24:20 10   Q.    What factors affect the oral bioavailability of

02:24:23 11   cabozantinib?

02:24:23 12   A.    So, cabozantinib in particular, was quite unique with

02:24:28 13   respect to its features that resulted in high

02:24:31 14   bioavailability.  Cabozantinib was seen to have a high

02:24:34 15   permeability, which is essentially its ability to pass

02:24:37 16   through that epithelial wall.

02:24:40 17              It also was seen to have a long half-life.  And,

02:24:43 18   you know, most drugs can have half-lives of around, you

02:24:47 19   know, 10 to 12 of hours.  Cabozantinib had a half-life of

02:24:50 20   around 96 hours, which meant that it would stay in the blood

02:24:53 21   circulation for almost four days, which was also extremely

02:24:57 22   important because it would then continue to achieve its

02:24:59 23   bioavailability.

02:25:01 24              An then lastly, but also importantly,

02:25:04 25   cabozantinib when metabolized by the liver actually had an

Shah - Direct

02:25:08  1   active metabolite, which again meant that once the active

02:25:11  2   metabolite was circulating in the blood circulation, it was

02:25:15  3   continuing to help achieve a therapeutic effect.

02:25:18  4            So those are the three things that were

02:25:19  5   particularly important for cabozantinib.

02:25:22  6   Q.    You mentioned permeability.  What is that?

02:25:23  7   A.    Yeah.  So permeability is -- is the ability of a

02:25:27  8   compound to essentially travel from the GI tract through the

02:25:30  9   epithelial wall into the blood stream.  And in this

02:25:34 10   particular case, cabozantinib demonstrated a high

02:25:37 11   permeability based on the data that was generated.

02:25:40 12   Q.    What role does permeability play in the oral

02:25:43 13   bioavailability of cabozantinib?

02:25:44 14   A.    It's extremely important because as we discussed

02:25:48 15   since the tablet or capsule has to release the drug and the

02:25:53 16   drug has to pass through the epithelial wall, if it were not

02:25:57 17   for the high bioavailability of cabozantinib, you would not

02:26:00 18   get as much drug across the wall and into the blood

02:26:02 19   circulation.  So it was extremely important.

02:26:04 20   Q.    What role does dissolution play in the oral

02:26:07 21   bioavailability of cabozantinib?

02:26:08 22   A.    Dissolution was extremely important because, again,

02:26:12 23   we're dealing with cabozantinib, which was an oral -- oral

02:26:16 24   drug and it was extremely important that the tablet or

02:26:20 25   capsule dissolve and disintegrate immediately so that the

Shah - Direct

02:26:24 1   contents of the tablet/capsule would be released into the

02:26:27 2   bloodstream, therefore available for obviously the

02:26:30 3   activation.

02:26:31 4   Q.    What role does solubility play in the oral

02:26:34 5   bioavailability of cabozantinib?

02:26:35 6   A.    So, while solubility was a factor for cabozantinib

02:26:40 7   development, really what the -- what was more of a key

02:26:44 8   driver was the high bioavailability of cabozantinib combined

02:26:48 9   with the, you know, excellent solid state properties.

02:26:52 10  Q.    So how did all of these properties that we've been

02:26:54 11  discussing influence salt selection for cabozantinib?

02:26:56 12  A.    Right.  So really based on that -- based on all the

02:26:59 13  work that was done, all the properties are evaluated, the

02:27:02 14  key driver was really the fact that we were seeing great

02:27:06 15  oral bioavailability from the (L)-malate salt and that was

02:27:10 16  one of the key drivers for selecting the malate salt.

02:27:13 17          MR. PRUSSIA:  If we could have PTX-94.  It's

02:27:16 18  Tab 4 in your binder if you need it.

02:27:16 19  BY MR. PRUSSIA:

02:27:19 20  Q.    What is this document?

02:27:19 21  A.    This is what we call the technical evidence candidate

02:27:24 22  selection document for cabozantinib.

02:27:25 23  Q.    Is this an Exelixis document?

02:27:27 24  A.    Yes.

02:27:29 25  Q.    Is it the type of document that the company creates

Shah - Direct

02:27:32 1   in the ordinary course of its business?

02:27:33 2   A.      Yes, it is.

02:27:34 3   Q.      What is a technical evidence candidate selection

02:27:37 4   report?

02:27:38 5   A.      Right.  So at a high level, it essentially summarizes

02:27:42 6   the, obviously, enormous work that's generated when taking a

02:27:47 7   compound from the discovery phase through the evaluation

02:27:51 8   phase, as the medical chemists do, in order to get to the

02:27:54 9   point where a compound is ready to be nominated to proceed

02:27:57 10  through the -- to the development phase.

02:28:00 11          And some of the key highlights in the document

02:28:02 12  are biochemical assays, cell assays, the results are a

02:28:07 13  considerable amount of what we call PKPD,

02:28:09 14  pharmacokinetic—pharmacodynamic data.  And it also include

02:28:14 15  things like tumor regression analysis showing that tumors

02:28:18 16  are shrinking when the drug is delivered and also a

02:28:22 17  considerable amount of in vivo data as well.

02:28:26 18  Q.      There's a reference to EXEL-02977184.  What does that

02:28:34 19  refer to?

02:28:34 20  A.      Yeah, so that's just an old code for cabozantinib.

02:28:40 21  Q.      Now, what salts had Pharmorphix identified for

02:28:43 22  further consideration for Exelixis' use?

02:28:45 23  A.      Right.  So there were five salts evaluated and

02:28:49 24  recommended for further evaluation by Pharmorphix.  There

02:28:53 25  were obviously the (L)-malate salts, hydrochloride salts,

Shah - Direct

1   phosphate salts, maleate salts, not to be confused with the

2   malate salt, and (L)-tartaric salts.

3   Q.    By when did Exelixis ultimately select the malate

4   salt for further development?

5   A.    You know, it was around the time of this report and

6   that kind of middle of 2004.

7   Q.    What solid form did the company select for commercial

8   manufacturing?

9   A.    That would be the (L)-malate crystalline salts.

10  Q.    Did you submit a declaration during the prosecution

11  of the crystalline malate salt patents?

12  A.    Yes.

13        MR. PRUSSIA:  Let's please bring up PTX-225.

14  BY MR. PRUSSIA:

15  Q.    What is this document?

16  A.    So this is the declaration that was submitted, as you

17  mentioned.

18        MR. PRUSSIA:  And if we turn to Figure 2.

19  BY MR. PRUSSIA:

20  Q.    Generally, what information did you provide to the

21  Patent Office in your declaration?

22  A.    Yeah.  So at a high level, the data included in this

23  document was summarizing the effect of studying the

24  dissolution of the (L)-malate crystalline salts in tablets

25  or capsules, as compared with adding amorphous malate salt

Shah - Direct

02:30:19  1    to those tablets and capsules and then assessing the

02:30:23  2    performance of the dissolution.  And this graph is an

02:30:26  3    illustration of that.

02:30:28  4    Q.    What does the top line reflect?

02:30:29  5    A.    So the top line reflects when the capsule in this

02:30:33  6    particular case was produced using the 100 percent

02:30:37  7    crystalline malate salt material.

02:30:39  8    Q.    And what does the bottom line reflect?

02:30:42  9    A.    So in the bottom line, the capsule had 20 percent of

02:30:48 10    the amorphous salt added to it.  And as you can see, there

02:30:52 11    was a significant difference in the profiles.

02:30:54 12    Q.    And what were the results of the dissolution

02:30:56 13    experiments?

02:30:56 14    A.    Yeah.  So the results were particularly surprising in

02:31:00 15    that the crystalline -- 100 percent crystalline material

02:31:04 16    dissolves extremely fast, rapidly compared with the capsules

02:31:09 17    that were spiked with the amorphous material.

02:31:12 18    Q.    What are the reasons that you found this surprising?

02:31:15 19    A.    So it was particularly surprising because, generally

02:31:18 20    speaking, amorphous compounds and materials dissolve faster

02:31:21 21    than the crystalline material.  So in this case, having

02:31:24 22    formulated 100 percent crystalline material compared with

02:31:29 23    the amorphous and seeing such a difference in dissolution

02:31:32 24    was -- was very surprising.

02:31:34 25    Q.    What is the impact of the rapid dissolution of the

Shah - Direct

02:31:37 1    crystalline malate salt on the oral bioavailability of

02:31:42 2    Cabometyx and Cometriq?

02:31:42 3    A.     Yeah.  Extremely important because, again, we're

02:31:45 4    developing an oral, bioavailable drugs and ensuring that the

02:31:49 5    tablet or capsule was dissolving as quickly as possible was

02:31:52 6    fundamentally important.

02:31:53 7    Q.     What did the Patent Office do in response to the

02:31:55 8    evidence presented in your declaration?

02:31:57 9    A.     They accepted the claims.

02:32:00 10            MR. PRUSSIA:  If we can pull that down.

02:32:00 11   BY MR. PRUSSIA:

02:32:02 12   Q.     I'd like to shift gears and talk about another topic.

02:32:04 13            What were -- manufacturing in particular.

02:32:07 14            What were some of the challenges Exelixis faced

02:32:09 15   during the manufacturing of Cabometyx and Cometriq?

02:32:13 16   A.     Yeah, significant challenges.  You know, Exelixis was

02:32:16 17   taking med chem -- a chemistry process and scaling it up,

02:32:24 18   developing it over a number of years in order to scale it,

02:32:27 19   in order to produce suitable API for use in the clinic.

02:32:31 20            There were many experiments that were performed

02:32:34 21   on the chemistry side of things to get the active ingredient

02:32:37 22   to the point where it had been optimized and the process was

02:32:42 23   acting robustly and consistently, and then the tablets

02:32:46 24   formulation work was also particularly important in order to

02:32:50 25   get -- to produce, you know, tablets that optimize the

600

Shah - Direct

02:32:52  1    tablet manufacturing process and gets the tablets to

02:32:57  2    produce, you know, consistent product.

02:33:00  3              And in particular, I would say there was

02:33:03  4    obviously lots of -- lots of areas that had to be optimized

02:33:08  5    for the API and the product, particularly for the API, there

02:33:11  6    was an impurity, the 6,7-dimethoxy-quinoline-4-ol, and that

02:33:17  7    was particular challenge, certainly from the API standpoint.

02:33:21  8    Q.    What challenges were presented -- presented in

02:33:24  9    controlling the impurity profile of the API?

02:33:29 10    A.    Right.  So in particular with this 1-1 impurity,

02:33:33 11    because it was a starting material in the API synthetic

02:33:37 12    process and an impurity but also a degradant, it was

02:33:41 13    particularly challenging because the degradant would form

02:33:44 14    during the subsequent manufacturing steps of the API,

02:33:48 15    therefore particularly challenging to control.

02:33:51 16    Q.    Now, can we refer to the 6,7-dimethoxy-quinoline-4-ol

02:33:55 17    impurity as the 1-1?

02:33:56 18    A.    Yes.

02:33:57 19    Q.    Okay.  What is the significance that 1-1 appears as

02:34:01 20    both starting material and as a degradant?

02:34:04 21    A.    Well, particularly challenging because, you know, if

02:34:07 22    it was just a starting material, you would expect that with

02:34:10 23    subsequent chemistry steps.  You would be able to purge that

02:34:13 24    material and essentially eliminate it prior to the

02:34:16 25    completion of the manufacturing process, but in this

Shah - Direct

02:34:18  1    particular case, because the 1-1 was a degradant, it was

02:34:23  2    basically decomposing from the subsequent chemistry steps.

02:34:26  3    And as it was decomposing, it was showing itself up in the

02:34:30  4    finished API and, therefore, quite challenging to control.

02:34:35  5    Q.      How did Exelixis discover the 1-1 impurity?

02:34:37  6    A.      Right.  So Exelixis, initially there was a in silico

02:34:43  7    screen that was conducted where all the different potential

02:34:46  8    impurities and actual impurities of the API were examined

02:34:50  9    through the in silico process which is a computational

02:34:54 10    process that provides structural alerts for impurities, and

02:34:58 11    the 1-1 impurity was found to be positive in that particular

02:35:03 12    evaluation.  And then the unequivocal confirmation that the

02:35:07 13    1-1 impurity was indeed positive for genotoxicity was

02:35:13 14    through what's called an Ames assay or a bacterial assay,

02:35:17 15    which essentially confirmed that the 1-1 was indeed a

02:35:20 16    genotoxic impurity.

02:35:22 17    Q.      What is a genotoxic impurity?

02:35:23 18    A.      So at a high level, a genotoxic impurity is

02:35:28 19    essentially a compound that could damage DNA and potentially

02:35:33 20    cause cancer in humans.

02:35:37 21    Q.      Please mark PTX-35 on the screen.

02:35:40 22            It's Tab 6 of your binder.  What is this

02:35:43 23    document?

02:35:43 24    A.      This is the manufacturing process development section

02:35:48 25    of the NDA that was submitted to the FDA.

Shah - Direct

Q.     And if I could direct your attention to Table 2,

which is on the last page of the exhibit, at a high level,

what is shown on Table 2?

A.     Yeah, so at a very high level, Table 2 is essentially

showing the evolution of the chemistry process from the

initial scale-up of the med chem route to what's called

process A1 in this table, and over years of work, the

evolution of the process from A-1 to A-2 where, obviously,

lots of optimization experiments that were performed.  And

then the process was optimized to what was called process

B-1 with, again, considerable experiments were performed.

          And then, finally, the process continued to be

optimized in order to produce what we refer to as process

B-2.  That was considered to be the acceptable process that

we commercialized eventually.

Q.     In the fourth column there's a reference to Exelixis

184-1-1.

          What does that refer to?

A.     Yes, so as we've discussed, that the 1-1 is a

genotoxic impurity that we were just discussing.

Q.     There's a reference to PPM in that column.

          What does PPM refer to?

A.     Yeah, so PPM is essentially parts per million.  It's

a very -- I would say it's a very small, low number in

detection.

Shah - Direct

02:37:18  1    Q.    Are the ranges of 1-1 levels reported here in this

02:37:22  2    table, are they for the API or for the formulated drug

02:37:25  3    product?

02:37:25  4    A.    The levels here are for the API only.

02:37:28  5    Q.    Focusing on process A-2, that row there, what did

02:37:32  6    Exelixis tell the FDA regarding the presence of the 1-1

02:37:36  7    impurity in API batches made using process A-2?

02:37:39  8    A.    Yeah, so as we can see from this table, the amount of

02:37:45  9    1-1 that was produced from process A-2 varied from around 35

02:37:49 10    PPM to about 411 PPM.  So, you know, Exelixis considered

02:37:54 11    that to be quite variable and inconsistent relative to the

02:37:59 12    1-1 that was being produced from that process.

02:38:02 13    Q.    Who made the API batches using process A-2?

02:38:04 14    A.    So there was two contract manufacturers that Exelixis

02:38:08 15    had contracted out to and in those times.  One was called

02:38:13 16    Regis, and one was a company called Girindus.

02:38:16 17    Q.    What conclusions did Exelixis reach regarding the 1-1

02:38:20 18    levels produced by process A-2?

02:38:22 19    A.    Yeah, so Exelixis' conclusion was that the process

02:38:25 20    A-2 was inconsistent relative to the amount of 1-1 that was

02:38:30 21    being produced and that the levels report as shown here, 35

02:38:35 22    to 411 PPM were unacceptable from a -- from a from a 1-1

02:38:43 23    standpoint in particular.

02:38:44 24    Q.    Now, just focusing on that 35 PPM number, what are

02:38:47 25    the reasons that it would not have been sufficient for the

Shah - Direct

02:38:50  1    company to move forward with a process that generates 35 PPM

02:38:54  2    of 1-1 at the lowest level?

02:38:55  3    A.      Yeah, for a few reasons.  I mean, Number 1, as we

02:38:58  4    discussed, the 1-1 was a genotoxic impurity.  So as a

02:39:02  5    genotoxic impurity, the 1-1 could potentially cause cancer

02:39:05  6    to humans.  So, we considered it extremely important to try

02:39:10  7    to minimize the levels of the 1-1 to the lowest levels that

02:39:14  8    we possibly could get to.

02:39:15  9           And secondly and importantly, the API, the

02:39:19 10    active ingredient has to be formulated into a product, in

02:39:22 11    this particular case, the capsule or the tablet.  And there

02:39:26 12    was a manufacturing process in the drug product and there's

02:39:29 13    a formulation.

02:39:30 14           So, ultimately, patients take the product.  So

02:39:34 15    it's critically important for us to ensure that we have the

02:39:36 16    lowest levels of the 1-1 impurity possible in the active

02:39:39 17    ingredient knowing that there was going to be a likelihood

02:39:43 18    of the 1-1 increasing in the drug product because we knew

02:39:47 19    that the 1-1 increase in the presence of moisture, heat, and

02:39:51 20    oxygen in particular.

02:39:53 21    Q.      Just on that point, why would 1-1 levels be higher in

02:39:56 22    the final drug product?

02:39:57 23    A.      Well, our concern was that because the 1-1 was a

02:40:01 24    degradant, and as a degradant, the 1-1 was seen to, with all

02:40:06 25    the experiments that had been performed, increase in the

Shah - Direct

02:40:08 1    presence of heat, moisture, and oxygen.  And the drug

02:40:13 2    product manufacturing process has all those things at

02:40:16 3    different steps, and so there was ample opportunities for

02:40:19 4    the 1-1 to increase during the manufacturing of the drug

02:40:22 5    product.  So, that was why we particularly considered the

02:40:26 6    numbers here to be, you know, too high.

02:40:28 7    Q.    Now, focusing on B-2 now, what did Exelixis tell the

02:40:32 8    FDA regarding the presence of 1-1 in API batches made with

02:40:36 9    process B-2?

02:40:37 10   A.    Right.  So as we can see here, you know, with the

02:40:41 11   sufficient -- with a significant amount of development and

02:40:44 12   process optimization work, that was carried out between

02:40:48 13   process A-2 all the way through process B-2.  And Exelixis

02:40:52 14   found that the levels of 1-1 were very low.  They were in

02:40:57 15   the range of, you know, less than 2 PPM to 12 PPM.  So we

02:41:02 16   felt -- Exelixis felt that this was a process by which we

02:41:04 17   were producing the lowest levels of the 1-1 impurity that we

02:41:07 18   possibly could.

02:41:09 19   Q.    So, what are the reasons that the company needed to

02:41:11 20   control the presence of the 1-1 all the way down to the 2

02:41:14 21   PPM level?

02:41:15 22   A.    Yeah, again, it was extremely important to ensure

02:41:18 23   that we had the lowest levels possible in the API because

02:41:21 24   the API was going to be formulated into a drug product.  It

02:41:25 25   was going to be exposed to all the conditions that, you

Shah - Direct

02:41:28 1   know, we knew could cause a 1-1 to form.  And, of course,

02:41:33 2   the drug product needed to be able to be stable as well.

02:41:36 3   So, it was extremely important to have at the lowest levels

02:41:40 4   of 1-1 possible because, again, the 1-1 was a genotoxic

02:41:44 5   impurity that could cause cancer to patients.

02:41:46 6   Q.    Let's move to DTX-291.  It's Tab 7 in your binder.

02:41:51 7         What is this document?

02:41:53 8   A.    This is an international publication WO 2010/083414.

02:42:01 9   Q.    Who is the first applicant?

02:42:02 10  A.    Exelixis.

02:42:04 11  Q.    What's the last name of the first listed inventor?

02:42:07 12  A.    Brown.

02:42:09 13  Q.    And if we -- if I could direct your attention to

02:42:13 14  property example Number 1, what process is described here?

02:42:24 15  A.    This is the process A-2.

02:42:29 16  Q.    You can put that down and move to PTX-47.  It's Tab 8

02:42:34 17  in your binder.

02:42:35 18        What is this document?

02:42:35 19  A.    Yeah.  So this is a section of the NDA titled

02:42:42 20  components of the drug product which was submitted to the

02:42:44 21  FDA.

02:42:46 22  Q.    If we turn to Table 4, which is on Page 18.

02:42:51 23        What is the title of Table 4?

02:42:52 24  A.    Yeah.  This is an excipient compatibility study.

02:42:57 25  Q.    And what conditions did Exelixis use for this study?

Shah - Direct

02:43:00 1   A.      So Exelixis used conditions of 40-75, accelerated

02:43:06 2   conditions, so higher temperature and humidity as well as

02:43:09 3   dry and wet.

02:43:11 4   Q.      What are the reasons that Exelixis selected these

02:43:14 5   conditions?

02:43:15 6   A.      All right.  So since we knew that the 1-1 impurity

02:43:18 7   was -- you know, was seen to increase through moisture,

02:43:22 8   heat, and oxygen, it was particularly important for us to

02:43:25 9   study the effect of the excipients on its active ingredient,

02:43:30 10  monitor the levels of 1-1 in the conditions of, you know,

02:43:34 11  high temperature, as well as water so we could understand

02:43:38 12  how the 1-1 would behave.

02:43:40 13  Q.      What process was used to make the API that was used

02:43:44 14  in these studies?

02:43:45 15  A.      That would be the final process, the commercial

02:43:47 16  process B-2.

02:43:49 17  Q.      Generally what happened to the levels of 1-1 for each

02:43:53 18  excipient in this study?

02:43:54 19  A.      Yeah, so generally as you can see, from the table,

02:43:58 20  pretty much with most of the excipient combinations we saw

02:44:01 21  an increase in the 1-1.  But I'll point out importantly the

02:44:06 22  starting point for the -- for the 1-1 was low, which was --

02:44:11 23  which was something that we found to be extremely important,

02:44:14 24  given that most of these excipients could give rise to the

02:44:18 25  1-1.

Shah - Direct

02:44:19 1    Q.    So what conclusions did the company reach regarding

02:44:22 2    1-1 formation during drug product manufacturing?

02:44:25 3    A.    Yeah, so, again, it reinforced why it was extremely

02:44:30 4    important to have the lowest levels of the 1-1 possible in

02:44:34 5    the API given that, you know, these excipients combinations

02:44:39 6    and in the presence of moisture, heat and oxygen, which

02:44:42 7    these conditions were representing, that the 1-1 would

02:44:48 8    likely increase in the presence of those -- you know, of

02:44:52 9    those conditions.  So, it was a -- it was extremely

02:44:55 10   important information.

02:44:56 11   Q.    Let's pull that down and move to JTX-4.  It's Tab 9

02:45:01 12   in your binder.

02:45:02 13        Dr. Shah, what is this document?

02:45:04 14   A.    This is a patent 11,298,349.

02:45:08 15   Q.    Are you an inventor on this patent?

02:45:10 16   A.    Yes.

02:45:12 17   Q.    What was your role in the '349 patent invention?

02:45:15 18   A.    Yeah, so my role was overseeing the drug product

02:45:18 19   activities specifically.

02:45:21 20   Q.    Who is Jo Ann Wilson?

02:45:23 21   A.    So Jo Ann Wilson is a former Exelixis employee who

02:45:27 22   oversaw the CMC development activities.

02:45:29 23   Q.    Now, what synthetic process is disclosed in this

02:45:32 24   patent?

02:45:32 25   A.    This was the commercial B-2 process.

Shah - Direct

02:45:35  1    Q.     And if we turn to Claim 3, do you see the reference

02:45:41  2    to one or more fillers, one or more disintegrants, one or

02:45:45  3    more glidants and one or more lubricants?  Do you see that?

02:45:48  4    A.     Yes.

02:45:52  5    Q.     Does Cabometyx include one or more fillers, one or

02:45:55  6    more disintegrants, one or more glidants and one or more

02:45:58  7    lubricants?

02:45:58  8    A.     Yes, it does.

02:45:59  9    Q.     And what are the reasons that Exelixis uses a glidant

02:46:01 10    in its formulation for Cabometyx?

02:46:04 11    A.     Well, the glidant was extremely important because

02:46:07 12    cabozantinib is a poor flowing API, and a glidant is

02:46:11 13    designed to improve flow.  Therefore, it was necessary for

02:46:14 14    the formulation.

02:46:14 15    Q.     And what type of granulation process does Exelixis

02:46:17 16    use to manufacture the Cabometyx tablets?

02:46:19 17    A.     That's a wet granulation process.

02:46:23 18    Q.     Does Exelixis add the glidant before or after the wet

02:46:26 19    granulation?

02:46:26 20    A.     So Exelixis adds the glidant after the wet

02:46:30 21    granulation.

02:46:31 22    Q.     And what are the reasons that Exelixis adds the

02:46:33 23    glidant after the wet granulation?

02:46:34 24    A.     Well, it's extremely important because the glidant is

02:46:38 25    supposed to enhance the flow properties.  And when you --

Shah - Direct

02:46:44 1    when you perform the wet granulation, and produce the

02:46:47 2    granules themselves, the granules are then mixed with what's

02:46:50 3    called the extragranular blend, which includes an

02:46:53 4    disintegrant.

02:46:54 5          And in order to have the granules and that --

02:46:57 6    that excipient material flow consistently, and particularly

02:47:03 7    not segregated in that particular powder blend, the glidant

02:47:07 8    is added because a glidant is intended to help with the flow

02:47:10 9    of that material.  So it's particularly important.

02:47:13 10   Q.    Now, what step in the manufacturing process does

02:47:16 11   Exelixis add its glidant?

02:47:18 12   A.    So that would be the step right before we added

02:47:22 13   lubricant.

02:47:22 14   Q.    And what are the reasons that Exelixis adds the

02:47:25 15   glidant at that step?

02:47:26 16   A.    Well, the reasons why the glidant is added there is

02:47:29 17   to help with the flow of the actual wet granulation, along

02:47:33 18   with the extragranular excipients, right before the

02:47:36 19   lubricant is added, because the glidant is supposed to help

02:47:39 20   with the flow of the powder between the granules and the

02:47:43 21   excipients that are in the powder blend.  And the lubricant

02:47:45 22   is intended to help the powder with respect to sticking on

02:47:48 23   the tablet surface.

02:47:49 24   Q.    Did you submit a declaration during prosecution of

02:47:52 25   this patent?

Shah - Direct

02:47:53 1    A.      Yes.

02:47:55 2              MR. PRUSSIA:  If we could pull this down and

02:47:56 3    pull up JTX-8 A.

02:47:56 4    BY MR. PRUSSIA:

02:48:00 5    Q.      Which is Tab 10 in your binder.

02:48:02 6              What is this document?

02:48:03 7    A.      So this is the declaration you referenced.

02:48:07 8    Q.      And if we could focus on paragraphs 9 through 12.  At

02:48:11 9    a high level, what does this declaration describe?

02:48:13 10   A.      So at a high level, the declaration contains

02:48:18 11   stability data that Exelixis had generated -- that we had

02:48:22 12   generated which showed the behavior of the 1-1 upon

02:48:27 13   stability in the tablets and in the capsules.

02:48:30 14   Q.      And what process was used to manufacture the API in

02:48:33 15   the batches that are reported in your declaration?

02:48:36 16   A.      The commercial process B-2.

02:48:40 17   Q.      And what are the reasons that Exelixis conducted the

02:48:42 18   experiments that are described in your declaration?

02:48:45 19   A.      Well, it was extremely important because, again, as

02:48:47 20   we're dealing with the 1-1, we wanted to ensure that we had

02:48:49 21   the minimum amounts possible, so we needed to study how the

02:48:53 22   1-1 would behave on stability in both products.

02:48:55 23             MR. PRUSSIA:  If we go to the table at Page 6 in

02:48:58 24   the document.

02:48:58 25   BY MR. PRUSSIA:

Shah - Direct

02:49:02  1    Q.     What were the results of the stability testing?

02:49:04  2    A.     Yeah, so the results were interesting and surprising.

02:49:08  3    You know, we saw growth of the 1-1 levels in the drug

02:49:13  4    product, in the capsules.  And not as much as we thought

02:49:16  5    that we would see, given the 1-1, you know, was seen to

02:49:21  6    increase in the presence of moisture, heat, and oxygen.

02:49:26  7    But, again, we were starting at the very low levels of 1-1

02:49:30  8    in the API.

02:49:31  9             So, you know, we were -- ultimately we were --

02:49:34 10    we were satisfied that in the drug product we were able to

02:49:37 11    maintain, you know, low levels of the 1-1.

02:49:39 12    Q.     So what did these results tell you about the

02:49:42 13    significance of process B-2?

02:49:44 14    A.     Well, process B-2 was really the only way that we

02:49:47 15    were able to keep the 1-1 levels consistently --

02:49:51 16    consistently low in the API, which enabled us to have

02:49:55 17    essentially a product that was able to minimize and keep the

02:50:00 18    1-1 levels as low as we possibly could.

02:50:03 19    Q.     Now, did Exelixis submit tablet and capsule stability

02:50:06 20    data to the FDA?

02:50:07 21    A.     Yes.

02:50:09 22             MR. PRUSSIA:  If we could pull this down and

02:50:10 23    pull up PTX-19.

02:50:10 24    BY MR. PRUSSIA:

02:50:12 25    Q.     It's Tab 11 in your binder.

Shah - Direct

02:50:14   1          What is this document?

02:50:15   2    A.     So this is another section of the NDA titled

02:50:19   3    "Stability" that was submitted to the FDA.

02:50:22   4    Q.     And which drug product is the subject of this

02:50:26   5    submission?

02:50:26   6    A.     This is the Cometriq capsule.

02:50:31   7          MR. PRUSSIA:  And if we go to PTX-43.

02:50:31   8    BY MR. PRUSSIA:

02:50:35   9    Q.     It's Tab 12 in your binder.

02:50:36  10          What is this document?

02:50:37  11    A.     This is a stability section for the Cabometyx tablets

02:50:44  12    that were submitted to the FDA.

02:50:45  13          MR. PRUSSIA:  And if you go to PTX-29.

02:50:48  14    BY MR. PRUSSIA:

02:50:48  15    Q.     What is this document?

02:50:49  16    A.     This is a section of the NDA called "justification of

02:50:54  17    specifications" for the capsule that was submitted to the

02:50:56  18    FDA.

02:50:57  19          MR. PRUSSIA:  And if we turn to Figure 3 at

02:50:59  20    Page 8.

02:50:59  21    BY MR. PRUSSIA:

02:51:00  22    Q.     What is shown at Figure 3?

02:51:01  23    A.     Right.  So, at a high level, the graph is showing us

02:51:05  24    what we call linear regression.  And what it's essentially

02:51:10  25    showing is when you have a particular amount of 1-1 in the

614

Shah - Direct

02:51:14  1    API to start with, which essentially is -- if we look on the

02:51:18  2    left-hand side of the graph, the Y axis is 1-1.  And if you

02:51:23  3    look at the low -- the left bottom of the graph, we can see

02:51:27  4    that when we start off with a 1-1 level of around -- you

02:51:30  5    know, around 5 PPM, as you -- as you -- as you go over time,

02:51:36  6    all the way to 36 months, which is, getting to the right of

02:51:39  7    the graph, you can see that there are results at 1-1 level

02:51:43  8    in the capsules is at 29 PPM.

02:51:46  9              And as you go up the graph, where now the GTI

02:51:52 10    1-1 is 19 PPM, that then results in 1-1 after 36 months of

02:51:59 11    44 PPM.  So we can see the 1-1 level increasing over time

02:52:03 12    consistently all the way through to 36 months.

02:52:06 13    Q.    And what process was used to develop the API that's

02:52:09 14    used in this analysis?

02:52:10 15    A.    This was the commercial process B-2.

02:52:14 16    Q.    Now, what conclusions did Exelixis reach regarding

02:52:16 17    this analysis?

02:52:17 18    A.    Well, the conclusions were consistent in that it was,

02:52:22 19    again, extremely important to have the lowest levels of the

02:52:26 20    1-1 possible.  Because, as we can see, the 1-1 was

02:52:30 21    increasing in the product.  Therefore, we wanted to minimize

02:52:32 22    that.  And it was important to have the -- again, the lowest

02:52:35 23    levels possible in the active ingredient.

02:52:37 24    Q.    What conclusions did Exelixis reach regarding the

02:52:39 25    ability of process A-2 to consistently and reliably meet

Shah - Direct

02:52:44 1   release specifications regarding 1-1?

02:52:46 2   A.    Yeah, so we didn't think that process A-2 was

02:52:49 3   acceptable.  The range of 1-1, 35 PPM to 411 PPM, was

02:52:55 4   inconsistent and variable.  We weren't comfortable that that

02:52:59 5   was -- that that was the lowest level of 1-1 that we

02:53:02 6   could -- we could produce.  So it was really important for

02:53:06 7   us to continue until we had the commercial B-2 process that

02:53:10 8   minimized those levels.

02:53:12 9   Q.    Has the company conducted any experiments to

02:53:14 10   demonstrate the robustness of process B-2?

02:53:17 11   A.    Yes.  Many experiments.

02:53:19 12   Q.    Just generally what types of experiments?

02:53:20 13   A.    Yeah, so, you know, we did hundreds of experiments.

02:53:23 14   And Exelixis did hundreds of experiments looking at, you

02:53:26 15   know, every step of the synthetic scheme, including things

02:53:30 16   like varying heats, varying water, varying order of

02:53:35 17   addition, varying solvent conditions.

02:53:38 18         There were multiple experiments to identify and

02:53:40 19   optimize every single step in order to apply the right

02:53:44 20   controls.  One experiment in particular, that I recall, was

02:53:49 21   the -- you know, what Exelixis had done was, at the first

02:53:53 22   step of the synthetic process, to demonstrate that knowing

02:53:57 23   that the 1-1 was going to degrade during the manufacturing

02:54:00 24   process, Exelixis had taken 50,000 PPMs of the 1-1 and added

02:54:06 25   it to the very start of the reaction.  And subsequently

Shah - Direct

02:54:10  1    proceeded with the reaction.  And this was obviously with

02:54:14  2    the final commercial process B-2.

02:54:16  3              And Exelixis saw that, even with adding 50,000

02:54:20  4    PPM to the beginning of that reaction, with the finished

02:54:23  5    API, there was non -- there was non-detected amount of 1-1.

02:54:26  6    So I think it's just one example of many that demonstrated

02:54:30  7    that really B-2, the process B-2 was a consistent

02:54:33  8    reproducible manufacturing process that had all the controls

02:54:39  9    in it, in order for it to be a suitable process for

02:54:43 10    commercializing and obviously providing to cancer patient.

02:54:45 11    Q.    Roughly, how many commercial batches of Cometriq and

02:54:48 12    Cabometyx have been generated using process B-2?

02:54:51 13    A.    Since we had approval for process B-2, we've made

02:54:56 14    around 180 -- 180, 190 commercial batches.

02:55:01 15    Q.    And roughly how many tablets and capsules does that

02:55:04 16    translate to?

02:55:05 17    A.    It translated roughly to around 50 -- I think 50

02:55:08 18    million tablets and millions of capsules.

02:55:10 19    Q.    What were the levels of 1-1 in those batches, at a

02:55:13 20    high level?

02:55:14 21    A.    That's easy to answer.  Every single batch had the --

02:55:19 22    met the specification.  Every batch had the extreme low

02:55:21 23    levels of 1-1.  Every capsule, every tablet, every API

02:55:26 24    batch.

02:55:26 25    Q.    And just to -- just remind us, how many batches of

617

Shah - Direct

02:55:29 1    process A-2 have been created?

02:55:30 2    A.     In total, I believe there were four.

02:55:34 3    Q.     Now, what role does process B-2 play in the

02:55:39 4    commercialization of Cometriq and Cabometyx?

02:55:41 5    A.     It's extremely important.  Had we not -- if we were

02:55:46 6    not able to develop process B-2, develop the chemistry,

02:55:51 7    optimize the process, put the necessary controls in place,

02:55:54 8    and in particular to minimize the 1-1, you know, we would

02:55:57 9    not have been able to develop a product that essentially was

02:56:00 10   able to keep the 1-1 levels as low as possible.

02:56:02 11          And it was extremely important for us because

02:56:05 12   the 1-1 was a genotoxic impurity and, you know, our trials

02:56:10 13   are for patients with cancer.  So we wanted to make sure

02:56:12 14   that the 1-1 was at the lowest levels possible.

02:56:15 15   Q.     Just a few more questions.

02:56:16 16          Since you are involved in the submission of

02:56:19 17   documents to the FDA, we looked at several documents today

02:56:22 18   that the company submitted to the FDA; right?

02:56:24 19   A.     Yes.

02:56:25 20   Q.     And what is the process for preparing and reviewing

02:56:28 21   these documents before they are submitted to the FDA?

02:56:30 22   A.     Yeah, so, the process is extremely vigorous.  First

02:56:34 23   of all, we start with the data being provided from the

02:56:38 24   contract manufacturer, who, you know, manufactures the

02:56:40 25   product.  And that data is scrutinized line by line.  Every

Shah - Direct

line of the batch record, every piece of raw data is

analyzed and looked at by the technical experts within

Exelixis, the S subject matter experts, so to speak.

We have a quality assurance team that reviews

data very carefully and meticulously, compares it to the

source data to make sure that it's accurate and correct.  We

have a regulatory team within Exelixis that then reviews the

entire submissions, again, very meticulously.

And then finally we have a formal company, you

know, leadership sign off on documents before they're

submitted to regulatory agencies.

MR. PRUSSIA:  That you, Dr. Shah.

I have no further questions, Your Honor.  May I

move the exhibits now.

THE COURT:  Sure.

MR. PRUSSIA:  Exelixis moves PTX-4, PTX-1,

PTX-94, 225, 47, 19, 43, 29, and JTX-8 A.

MR. COOPER:  No objection.

MR. MATHAS:  No objections, Your Honor.

THE COURT:  Admitted without objections.

(PTX Exhibit Nos. 4, 1, 94, 225, 47, 19, 43, 29

were admitted into evidence.)

(JTX Exhibit No. 8 A was admitted into

evidence.)

THE COURT:  Cross.

Shah - Cross

02:57:47 1          MR. MATHAS:  Thank you, Your Honor.  May I hand

02:57:49 2     up come cross binders.

02:57:50 3                    THE COURT:  Sure.

02:58:16 4                    THE WITNESS:  Thank you.

02:58:17 5                         CROSS-EXAMINATION

02:58:17 6     BY MR. MATHAS:

02:58:18 7     Q.     Good afternoon, Dr. Shah.

02:58:19 8     A.     Good afternoon.

02:58:20 9     Q.     Let's start talking with -- talking about salt

02:58:24 10    screening.  Now, salt screening is performed to identify

02:58:27 11    pharmaceutically developable -- a pharmaceutically

02:58:30 12    developable salt of a compound; is that right?

02:58:33 13    A.     Yes.  That's correct.

02:58:35 14    Q.     And one of the reasons for running a salt screen is

02:58:38 15    to try to find a salt that increases the solubility as

02:58:42 16    compared to the free base of a compound; right?

02:58:44 17    A.     I'd say that's a general assumption.  I suppose it

02:58:48 18    depends what the purpose of the salt screen is for and the

02:58:53 19    nature of the particular compound.

02:58:54 20    Q.     It is certainly one of the factors that can be a

02:58:57 21    reason for running a salt screen; right?

02:58:59 22    A.     Sure.

02:58:59 23    Q.     All right.  Now, in 2004, I think you told us that

02:59:03 24    Exelixis hired a company called Pharmorphix to run a salt

02:59:07 25    screen on the cabozantinib free base; is that right?

620

Shah - Cross

02:59:09  1    A.      Yes.

02:59:10  2    Q.      And Pharmorphix had expertise in running salt

02:59:13  3    screens; true?

02:59:14  4    A.      I believe so.  Yes.

02:59:15  5    Q.      All right.  And Exelixis provided Pharmorphix with a

02:59:19  6    cabozantinib free base; right?

02:59:21  7    A.      Yes.

02:59:22  8    Q.      And Pharmorphix was charged with conducting the salt

02:59:25  9    screen on Exelixis' behalf; right?

02:59:28 10    A.      That's my understanding, yes.

02:59:30 11    Q.      Okay.  And there was nothing unique about the

02:59:33 12    cabozantinib molecule that would make a salt screen of

02:59:37 13    cabozantinib free base complex; isn't that right?

02:59:40 14    A.      I'd say based on my experience, salt screens are

02:59:44 15    always complex.  There's nothing really straightforward

02:59:47 16    about them because there's a lot of trial and error in art

02:59:50 17    and, you know, significant science involved in salt

02:59:52 18    screening.

02:59:52 19    Q.      I don't think that was my question, Dr. Shah.

02:59:55 20            Is there -- it's true, isn't it, that there was

02:59:58 21    nothing about the cabozantinib molecule that made running a

03:00:02 22    salt screen on it complex?

03:00:04 23            That's true; isn't it?

03:00:06 24    A.      I suppose I couldn't say that because Pharmorphix,

03:00:10 25    you know, were the experts who performed the salt screen, so

Shah - Cross

03:00:14  1    they applied their expertise at the time.

03:00:16  2              MR. MATHAS:  Okay.  Let's look at your

03:00:17  3    deposition; this is your 2021 deposition.  And we'll call up

03:00:24  4    page 141, starting at Line 22.

03:00:33  5              And you were asked here:  "So you said

03:00:35  6    Pharmorphix is capable of performing complex experiments, I

03:00:38  7    think were your words.  Is there anything about the

03:00:42  8    cabozantinib molecule that made these experiments complex?"

03:00:47  9              And then your answer there, sir, was:  "I can't

03:00:50 10    think of anything specifically."

03:00:50 11    BY MR. MATHAS:

03:00:51 12    Q.    Is that right?

03:00:52 13    A.    Yes.

03:00:53 14    Q.    And were you asked that question and did you give

03:00:55 15    that answer?

03:00:55 16    A.    Yes.  Looks like I did, yes.

03:00:58 17    Q.    All right.  So let's look at that Pharmorphix report

03:01:01 18    that you alluded to but didn't show us during your direct.

03:01:05 19              MR. MATHAS:  And for that, let's pull up PTX-87.

03:01:05 20    BY MR. MATHAS:

03:01:13 21    Q.    And this is the report that came out of the work

03:01:17 22    that -- excuse me -- Pharmorphix did on behalf of Exelixis;

03:01:21 23    right?

03:01:21 24    A.    Sorry.  Just give me one second.

03:01:25 25    Q.    Sure.  It will be on the screen.  If you want the

Shah - Cross

03:01:26  1    hard copy, that's fine too.  Whichever is better for you.

03:01:30  2            Dr. Shah, you recognize this document, PTX-87,

03:01:34  3    as the report that Pharmorphix presented to Exelixis; right?

03:01:39  4    A.    Yes.

03:01:39  5            MR. MATHAS:  All right.  And I want to take a

03:01:41  6    look at the third page of the document, about halfway down

03:01:46  7    there.  There's a paragraph starting "A suitable" -- let's

03:01:49  8    pull that up.

03:01:49  9    BY MR. MATHAS:

03:01:51 10    Q.    All right.  And so Pharmorphix reports that "a

03:01:54 11    suitable acid screening set consisting of 22 acids was

03:01:58 12    selected."  I'm going to stop there.

03:02:00 13            Do you see that?

03:02:00 14    A.    Yes.

03:02:01 15    Q.    And so what Pharmorphix did was they selected 22

03:02:06 16    suitable acids to include in their salt screen; right?

03:02:10 17    A.    That's my understanding.

03:02:11 18    Q.    Okay.  And -- and the way that they selected those

03:02:14 19    acids was based on a measure of $pK_a$ and Tong and Whitesell

03:02:21 20    Rule-of-2 guideline; isn't that true?

03:02:23 21    A.    That's what is written, yes.

03:02:26 22    Q.    And that's how they did it; right?

03:02:29 23    A.    Well, I mean I can't speak to exactly what the

03:02:32 24    Pharmorphix scientists used.  Certainly the Tong rule was a

03:02:35 25    guideline that existed.  I'm sure that was referenced as --

Shah - Cross

03:02:38 1    as we can see here.

03:02:39 2    Q.    Well, Pharmorphix told Exelixis that that's what they

03:02:42 3    did; right?

03:02:43 4    A.    Sure.  It's referenced here.  Yes.

03:02:45 5    Q.    And you're not aware of any evidence in your history

03:02:47 6    with the company that somehow this wasn't what Pharmorphix

03:02:50 7    did.  Are you, sir?

03:02:51 8    A.    I am not.

03:02:52 9    Q.    All right.  Now, and you, yourself, you were aware of

03:02:58 10   Tong's Rule-of-2 as of the mid-2000s as a person working in

03:03:01 11   this field; right?

03:03:02 12   A.    Yes.  I was aware.

03:03:04 13   Q.    Okay.  And Tong -- the Tong paper -- there's a Tong

03:03:09 14   paper that refers to this Rule-of-2; right?

03:03:11 15   A.    Yes.

03:03:12 16   Q.    Okay.  And it is referred to by the Pharmorphix folks

03:03:19 17   as the Rule-of-2 in this document as well; right?

03:03:21 18   A.    Correct.  Yes.

03:03:23 19   Q.    Now, in conducting their salt screen that Exelixis

03:03:27 20   hired Pharmorphix to run, Pharmorphix did not use any

03:03:32 21   Rule-of-3, did they?

03:03:33 22   A.    I'm not aware of -- of whether they did or did not.

03:03:38 23   Q.    Right.  You're not aware of any evidence that in

03:03:40 24   conducting this salt screen they used the Rule-of-3; isn't

03:03:42 25   that true?

Shah - Cross

03:03:43  1    A.      I'm not aware.  I mean I guess the only thing I could

03:03:46  2    say contextually is they -- they performed a salt screen

03:03:50  3    with different counterions and I don't think all of them

03:03:52  4    worked per se with the Rule-of-2.  So, that's -- that's

03:03:56  5    about all I know relevant to what was produced.

03:03:59  6    Q.      Very simple question, Dr. Shah.  You have no evidence

03:04:02  7    that Pharmorphix used a Rule-of-3 in selecting its

03:04:05  8    counterions; right?

03:04:06  9    A.      No, I do not.

03:04:07 10    Q.      All right.  And the evidence that we've seen shows

03:04:09 11    they used the Rule-of-2; isn't that right?

03:04:12 12    A.      According to what's written here.

03:04:13 13    Q.      All right.  And malic acid was one of the 22 suitable

03:04:19 14    salts that Pharmorphix selected for inclusion in salt screen

03:04:25 15    based on Tong's Rule-of-2; right?

03:04:27 16    A.      Yes.

03:04:28 17    Q.      All right.  Now, originally in the development --

03:04:35 18              MR. MATHAS:  And you can take that down.

03:04:35 19    BY MR. MATHAS:

03:04:36 20    Q.      In the development of cabozantinib, Dr. Shah,

03:04:39 21    Exelixis believed that cabozantinib (L)-malate existed in

03:04:43 22    only one polymorphic form; right?

03:04:46 23    A.      That's correct.

03:04:47 24    Q.      And in 2010, Exelixis' development partner, Bristol

03:04:53 25    Myers Squibb, identified two separate forms of cabozantinib;

Shah - Cross

03:04:56  1    right?

03:04:56  2    A.     Closely related, yes, two forms.

03:05:00  3    Q.     Two forms, N-1 and N-2; true?

03:05:03  4    A.     Yes.

03:05:03  5    Q.     All right.  And BMS characterized the forms to show

03:05:07  6    that N-1 and N-2 were two different polymorphs; right?

03:05:11  7    A.     Yes, that's right.  BMS showed that they were two

03:05:16  8    polymorphs, the N-1 and the N-2.

03:05:18  9    Q.     Right.  And so it was BMS -- excuse me -- BMS

03:05:21 10    scientists that first identified the existence of form N-1

03:05:25 11    and N-2; right?

03:05:26 12    A.     Yes.

03:05:27 13    Q.     And form N-1 and N-2 are obviously different forms;

03:05:30 14    right?

03:05:31 15    A.     N-1 and N-2 are closely related, but they are two

03:05:35 16    distinct polymorphs.

03:05:36 17    Q.     Right.  They're similar, but obviously different;

03:05:38 18    right?

03:05:41 19    A.     Yes.  They're two -- they are two different

03:05:42 20    polymorphs.

03:05:43 21    Q.     But they're obviously different; right?

03:05:45 22    A.     Sorry.  Could you -- could you clarify your question?

03:05:48 23    What do you mean by "obviously different"?

03:05:50 24    Q.     Well, let me ask you this:  In order to determine

03:05:54 25    that they were different forms, BMS conducted

Shah - Cross

03:05:59  1    characterization tests on form N-1 and N-2 right?

03:06:03  2    A.     That's my recollection, yes.

03:06:04  3    Q.     Okay.  And what characterization tests did BMS

03:06:08  4    perform?

03:06:09  5    A.     Well, it's been a while since I've seen the report,

03:06:13  6    but I know they -- they conducted multiple solid state

03:06:17  7    evaluations.  If memory serves, they performed DSC, TGA,

03:06:24  8    obviously XRPD, MMR.  There was a plethora of experiments

03:06:29  9    that I believe that they performed.

03:06:31 10    Q.     All right.  And those are standard ways to

03:06:33 11    characterize different polymorphs; aren't they?

03:06:35 12    A.     Well, there are certainly different techniques that

03:06:38 13    can be used to characterize different polymorphs.  Yeah.

03:06:40 14    Q.     And different polymorphs will have different

03:06:42 15    characteristics; true?

03:06:43 16    A.     Are you asking me generally?

03:06:45 17    Q.     Yeah.

03:06:46 18    A.     Generally speaking, yes.  Different polymorphs can

03:06:48 19    have different characteristics.

03:06:49 20    Q.     Right.  And different polymorphs can have different

03:06:52 21    properties; right?

03:06:53 22    A.     Yes.  I'd say different polymorphs can have different

03:06:57 23    properties.

03:06:57 24    Q.     All right.  And some polymorphs may have more

03:07:00 25    favorable properties for drug development than other

Shah - Cross

03:07:04 1   polymorphs; right?

03:07:04 2   A.      In a general sense.

03:07:06 3   Q.      Yeah.  And in drug development, companies choose

03:07:09 4   whether to develop a polymorph based on the polymorph's

03:07:11 5   characteristics; right?

03:07:14 6   A.      Well, again, I suppose it depends on what they -- the

03:07:17 7   development goals are relative to the compound.

03:07:19 8   Q.      Sure.  For example, one compound or one polymorph

03:07:22 9   might be more stable than another polymorph, which causes a

03:07:25 10  company to choose the more stable form.

03:07:27 11          That can happen; can't it?

03:07:28 12  A.      Yes.  Certainly they would not want to move an

03:07:33 13  unstable form forward.

03:07:34 14  Q.      All right.  And so as of 2015, the only polymorphic

03:07:41 15  forms of cabozantinib that Exelixis was aware of were the

03:07:45 16  N-1 and N-2 forms; right?

03:07:47 17  A.      I believe so.  Yes.

03:07:49 18  Q.      Okay.  And you're familiar with FDA guidance

03:07:54 19  documents, Dr. Shah; right?

03:07:55 20  A.      Oh, yes.  Yeah.

03:07:57 21  Q.      And you review them and you use them in your line of

03:07:59 22  work and you follow them and Exelixis follows them when

03:08:02 23  submitting things to the FDA; true?

03:08:04 24  A.      We absolutely do, yes.

03:08:05 25          MR. MATHAS:  Okay.  Let's look at one of those

Shah - Cross

03:08:07 1    real quick, DTX-67.

03:08:07 2    BY MR. MATHAS:

03:08:16 3    Q.    All right.  And this is a -- you recognize this as a

03:08:19 4    FDA guidance document from 2004 Guidance For Industry?

03:08:23 5    A.    Yes.  Yes, I do.

03:08:25 6                MR. MATHAS:  Okay.  I want to go to Page 8 of

03:08:28 7    this document.

03:08:28 8    BY MR. MATHAS:

03:08:29 9    Q.    And you're familiar with what this requires; right?

03:08:32 10   A.    Yes.  It's been awhile since I've looked at this.

03:08:35 11   But, yeah, I'm sure I was very familiar at the time.

03:08:37 12   Q.    Sure.  And one of the things that this document

03:08:39 13   requires is that -- that in submitting NDAs that -- that

03:08:43 14   companies like Exelixis have to identify the polymorphic

03:08:46 15   forms that they are aware of; right?

03:08:47 16   A.    Yeah.  The goal is to identify any polymorphs

03:08:51 17   relative to the active ingredient.

03:08:55 18                MR. MATHAS:  All right.  And if we look there in

03:08:56 19   the third line down, 3.2.S.3.1.

03:08:56 20   BY MR. MATHAS:

03:09:02 21   Q.    Second sentence there it says, "The total number of

03:09:04 22   polymorphs should be listed here"; is that right?

03:09:07 23   A.    That's what is stated here, yes.

03:09:09 24   Q.    Okay.  So the FDA tells companies like Exelixis to

03:09:11 25   tell us how many polymorphs you have; right?

Shah - Cross

03:09:14  1   A.     Yeah, I'll add that there is actual a Q and A

03:09:21  2   follow-up document to this document that specifically

03:09:24  3   provides more specific guidance about what should be

03:09:28  4   included and that document actually states the polymorphs

03:09:31  5   that could be formed relative to the active ingredient only

03:09:35  6   should be provided and other polymorphs should not be

03:09:37  7   provided.

03:09:38  8   Q.     All right.  Well, in any event, Exelixis decided to

03:09:42  9   tell the FDA what polymorphs it had identified and what it

03:09:46 10   hadn't; right?

03:09:46 11   A.     Exelixis provided the information for the N-2 and the

03:09:52 12   N-1 polymorphs since that was relevant to the active

03:09:54 13   ingredient, yes.

03:09:55 14   Q.     Sure.  And we can look at that.

03:09:57 15          MR. MATHAS:  Let's go to DTX-20 at Page 2.  And

03:10:06 16   if we can see there, we'll just call out the first

03:10:08 17   paragraph.  I think we'll see what we need to see.

03:10:08 18   BY MR. MATHAS:

03:10:11 19   Q.     There you were referring to Exelixis identified that

03:10:14 20   cabozantinib was found to exist in two neat, closely related

03:10:18 21   crystalline solid forms, N-1 and N-2; right?

03:10:21 22   A.     That's correct.  Yes.

03:10:22 23   Q.     And so Exelixis followed the guidance and told FDA

03:10:25 24   the forms that cabozantinib existed in; right?

03:10:29 25   A.     That's correct, we followed the guidance.  This is

Shah - Cross

03:10:32 1    what the -- this is the information we disclosed.  We

03:10:35 2    actually met at the FDA as well to discuss this data and

03:10:38 3    what would be submitted to them.

03:10:39 4    Q.    Okay.  Now, if we look down a couple more lines we

03:10:41 5    see there, there's a sentence that says "no other forms were

03:10:44 6    identified in those studies."

03:10:46 7              Do you see that?

03:10:46 8    A.    That's right.

03:10:47 9    Q.    And that's information that FDA or that Exelixis told

03:10:51 10   the FDA in their NDA as well; right?

03:10:53 11   A.    Yes.

03:10:54 12   Q.    Okay.  Now, I want to talk for a minute about the --

03:11:02 13             MR. MATHAS:  You can take that down.

03:11:02 14   BY MR. MATHAS:

03:11:03 15   Q.    -- and talk about the malate salt patents.  Now,

03:11:06 16   you're not an inventor on the malate salt patents; right?

03:11:09 17   A.    No.

03:11:10 18   Q.    But you gave us some testimony today about how malic

03:11:15 19   acid was chosen and things that were done about the malate

03:11:19 20   salt patents; right?

03:11:20 21   A.    Yes.

03:11:20 22   Q.    Okay.  And, in fact, during the course of the case,

03:11:22 23   you were designated as Exelixis '30(b)(6) witness to testify

03:11:26 24   as to certain topics of the malate salt patents; right?

03:11:30 25   A.    I believe so.  I'm not familiar with the number that

Shah - Cross

03:11:34  1    you mentioned specifically, but I would assume so, yes.

03:11:36  2    Q.    Oh, I'm sorry, I'm sorry.  But you gave a deposition.

03:11:39  3    I got to ask you some questions about topics.

03:11:40  4             Do you recall that?

03:11:41  5    A.    I do.

03:11:42  6    Q.    And some of the topics related to the malate salt

03:11:44  7    patents?

03:11:44  8    A.    Yes.

03:11:45  9    Q.    Okay.  And one of the topics that I got to ask you

03:11:48  10   questions about had to do with the crystalline forms that

03:11:52  11   were disclosed in the specification of the malate salt

03:11:55  12   patents other than N-1 and N-2.

03:11:58  13            Do you recall that?

03:11:58  14   A.    Not specifically.  But I'm -- if you say so, I'm sure

03:12:02  15   it came up.

03:12:03  16   Q.    Okay.  All right.  And I took your deposition and I

03:12:06  17   asked you about the disclosure of the patent, and you and I

03:12:09  18   looked at it.  And I asked you -- if you could identify for

03:12:12  19   me where in the malate salt patent it identified any form,

03:12:17  20   polymorphic form, other than form N-1 and N-2.

03:12:20  21            Do you recall that?

03:12:20  22   A.    I believe so.  Yeah.

03:12:23  23   Q.    Okay.  All right.  And I asked you and we went around

03:12:25  24   and around.  And I said, "Can you identify for me by name or

03:12:28  25   number any form other than N-1 and N-2?"

Shah - Cross

1          Do you recall that?

2   A.    I believe so.

3   Q.    All right.  And it's true, isn't it, that you in the

4   deposition as Exelixis' 30(b)(6) witness, you were not able

5   to identify for me by name or number any polymorphic form of

6   cabozantinib in the malate salt patent specifications other

7   than N-1 and N-2; that's true, isn't it?

8          MR. PRUSSIA:  Your Honor, I object.  There's no

9   impeachment.  He can't just read --

10          THE COURT:  No, I don't think it is.  It's not

11  impeachment.

12          MR. PRUSSIA:  He's reading the deposition.  He's

13  just -- he should just ask the question.

14          THE COURT:  Yeah, in the ideal world, there

15  wouldn't be all that lead-up.  But we're not in the ideal

16  world, so why don't we just answer the question and move on,

17  if you remember the question.

18          THE WITNESS:  Could you repeat the question.

19  BY MR. MATHAS:

20  Q.    As -- when I asked you to identify by name or number

21  any other polymorphic form other than N-1 or N-2 in the

22  specification of the malate salt patents as Exelixis'

23  30(b)(6) witness, you didn't give -- you didn't identify any

24  other polymorphic form by name or number; isn't that right?

25  A.    Yes.

Shah - Cross

Q.      All right.  Let's talk for a minute about capsule

development.  Now, you joined Exelixis in mid-2009; true?

A.      That's correct.

Q.      And by then, Exelixis had already developed a

cabozantinib (L)-malate capsule dosage form; right?

A.      Yes.

Q.      And by that time, in 2009, that capsule dosage form

had already been used in clinical trials; true?

A.      I believe the phase 1 study had already been started,

yes.

Q.      Right.  And the phase 1 study included capsules that

had API in them that had been manufactured by Regis who you

talked about during your direct; right?

A.      I believe so.  Yes.

Q.      Okay.  And now, in addition to the cabozantinib

(L)-malate in those clinical trial capsules, those capsules

included a filler, a disintegrant, a lubricant, and a

glidant; right?

A.      You're asking me to recall what was in it because

it's been awhile since I've looked at those documents.  I

assume so, yes.

Q.      Well, if you need to refresh your recollection, I can

do that.  Do you know, sitting here, sir, whether or not the

capsules in the clinical trials included a filler, a

disintegrant, a lubricant and a glidant?

Shah - Cross

03:14:58 1  A.      I believe so.

03:14:59 2  Q.      Okay.  All right.

03:15:01 3          Now, formulating an oral dosage form with a

03:15:04 4  filler, a disintegrant, a lubricant and a glidant would have

03:15:08 5  been well known as of 2009; isn't that true?

03:15:11 6  A.      Are you asking me a general question?

03:15:15 7  Q.      Yes.

03:15:16 8  A.      I'd say it mostly depends upon the type of

03:15:21 9  formulation that's being developed.

03:15:22 10 Q.      Okay.  But you -- you yourself, sir, as a person in

03:15:25 11 this field, you were familiar with the use of those four

03:15:28 12 excipients in formulations as of 2009, weren't you?

03:15:33 13 A.      I was certainly aware of these different types of

03:15:35 14 excipients, yes.

03:15:36 15 Q.      All right.  And, in fact, these four types of

03:15:39 16 excipients, they were commonly used standard excipients;

03:15:44 17 right?

03:15:44 18 A.      Other specific excipients are you asking me about or

03:15:50 19 just the general excipients.

03:15:52 20 Q.      I'm talking about the four excipients that are in the

03:15:54 21 claims that were in the capsules in the clinical studies.

03:15:57 22 Those were commonly used standard excipients; right?

03:16:00 23 A.      I guess, based on my experience, I would say, sure,

03:16:07 24 people would have been aware that there are glidants,

03:16:09 25 fillers, binders and lubricants.

Shah - Cross

03:16:13   1    Q.     Well, let's look at what Exelixis told the FDA then.

03:16:16   2             MR. MATHAS:  Pull up DTX-82.

03:16:18   3             THE COURT:  Is this really in dispute?

03:16:19   4             MR. MATHAS:  I hope not, Your Honor, but we

03:16:21   5    asked for a stipulation on it, and we're still here, so...

03:16:28   6             DTX-82 at 12, please.

03:16:28   7    BY MR. MATHAS:

03:16:33   8    Q.     This is one of the NDA documents; right?

03:16:37   9    A.     I believe so.  Yes.

03:16:40  10    Q.     All right.  And Exelixis explained about the capsule

03:16:44  11    formulations, that they used standard excipients that

03:16:46  12    offered accepted functionality; right?

03:16:49  13    A.     Correct.

03:16:55  14    Q.     Now, there was nothing novel about using a filler, a

03:16:58  15    disintegrant, a lubricant and a glidant; right?

03:17:00  16    A.     Sorry, I'm not sure what you mean by "novel."

03:17:04  17    Q.     Well, it's true, isn't it, that Exelixis --

03:17:07  18             THE COURT:  That sounds a lot like a question to

03:17:11  19    ask the expert.  I understand that he's got expertise, but

03:17:13  20    he's not the expert.  So why don't you save that for the

03:17:16  21    expert.

03:17:17  22             MR. MATHAS:  Yes, Your Honor.

03:17:27  23             Let's look at a document you looked at during

03:17:30  24    your direct, PTX-35 at Page 16.  And you can pull up this

03:17:41  25    table here.

Shah - Cross

BY MR. MATHAS:

Q.      This is another table out of the NDA; right?

A.      That's correct, yes.

Q.      And you showed this table during your direct, and you focused on the column, the fourth column over on the contents of the 1-1 impurity in cabozantinib; right?

A.      Yes.

Q.      And specifically focusing in on the A-2 line, now, it's true, isn't it, Dr. Shah, that that A-2 line includes batches that were manufactured both by Regis and by Girindus?

A.      Excuse me.  That's correct, yes.

Q.      Okay.  And you did not in the course of your direct, present the Court with any underlying data from which these numbers were derived; true?

A.      I don't believe we looked at any data, no.

Q.      Okay.  And, in fact, Exelixis doesn't even have the underlying data from which these numbers were derived; isn't that true?

A.      I'm sorry.  I'm not exactly sure what your question was.

Q.      Well, you've -- you've not seen the underlying data that supports this 35 to 411; right?

A.      I -- I'm -- no, I'm not as familiar with this source data.

Shah - Cross

03:18:53  1    Q.      And you've not seen -- during your direct, you didn't

03:18:56  2    present any data that showed testing on the Regis lots, the

03:19:02  3    Regis A-2 lots that had a level of the 1-1 impurity over 200

03:19:07  4    PPMs; isn't that right?

03:19:09  5    A.      Yeah, I mean, this is the table that we looked at.

03:19:12  6    Q.      Okay.  And this table includes both Regis and

03:19:14  7    Girindus; true?

03:19:15  8    A.      Yes.

03:19:16  9    Q.      All right.  Skip forward here.  Let's talk -- you

03:19:34 10    talked about two declarations during your direct, one that

03:19:37 11    you submitted in connection with the malate salt patents,

03:19:40 12    and I want to start there.  So I think that was DDX-225.

03:19:45 13               MR. MATHAS:  If we can pull that up.

03:19:50 14               I'm sorry.  PTX-225.

03:19:50 15    BY MR. MATHAS:

03:19:54 16    Q.      And, Dr. Shah, this was a declaration that you

03:19:57 17    submitted in the malate salt prosecution?

03:19:59 18    A.      Yes.  That is right.

03:20:02 19    Q.      And this had to did with some dissolution profiles

03:20:04 20    between the amorphous and N-2; right?

03:20:07 21    A.      Yes, that's right.

03:20:10 22    Q.      Okay.  And I think you said on direct that these

03:20:12 23    results were particularly surprising; yeah?

03:20:16 24    A.      Yes.

03:20:17 25    Q.      Now, it's true that nowhere in this declaration that

638

Shah - Cross

03:20:19  1    you submitted to the Patent Office do you use the word

03:20:22  2    "unexpected" or "surprising"; right?

03:20:24  3    A.     I'd have to look at it to see whether that language

03:20:29  4    was used or not.

03:20:31  5    Q.     All right.  Now, let me ask you this, the -- this

03:20:35  6    document doesn't rule out that the dissolution of the

03:20:39  7    amorphous was unexpectedly bad; right?

03:20:41  8    A.     Sorry.  I'm not exactly sure what you -- what your

03:20:46  9    question is.

03:20:46 10    Q.     Well, I think what you said on direct is that the

03:20:49 11    dissolution of the N-2 was unexpectedly good; is that right?

03:20:54 12    A.     Well, no, what I said was -- I believe what I said

03:20:56 13    was the -- when comparing the dissolution.

03:20:58 14           Could we pull up the dissolution curve, if

03:21:00 15    that's okay.

03:21:01 16    Q.     Sure.  If we go forward a page or two, probably.  Is

03:21:11 17    that what you were looking for?

03:21:13 18           THE COURT:  I think once more.

03:21:15 19           THE WITNESS:  Yeah, just go a little bit more.

03:21:16 20    BY MR. MATHAS:

03:21:16 21    Q.     One more?

03:21:17 22    A.     Yeah, okay.  There you go.

03:21:20 23    Q.     Okay.  So --

03:21:21 24    A.     Okay.  So I believe what I recall that I said was in

03:21:24 25    comparing the dissolution profiles that -- we actually

03:21:28  1    looked at the dissolution curve with capsules, but that's

03:21:31  2    fine.  Comparing the dissolution profiles, the drug products

03:21:34  3    with the hundred percent crystalline material exhibited a

03:21:37  4    much faster dissolution rate compared with the drug product

03:21:40  5    that had the amorphous API added to it.  And that was

03:21:45  6    surprising in that the dissolution rate was faster with the

03:21:49  7    hundred percent crystalline material.

03:21:51  8    Q.    All right.  Now, back in 2004, Exelixis conducted

03:21:55  9    some dissolution studies comparing the amorphous contents

03:21:58 10    versus crystalline cabozantinib; right?

03:22:00 11    A.    Sorry, you lost me there.  Did you say back in 2004?

03:22:05 12    Q.    I'm sorry, 2014.  And to do --

03:22:09 13           MR. MATHAS:  Let's pull up PTX-161.

03:22:09 14    BY MR. MATHAS:

03:22:16 15    Q.    PTX-161 is reporting on a amorphous XL184 is

03:22:23 16    amorphous dissolution comparison.

03:22:25 17           Do you see that, Dr. Shah?

03:22:26 18    A.    I see the title.  I've not seen this document before,

03:22:29 19    but I do see the title you're referring to.

03:22:31 20    Q.    Okay.  Now, one of the authors down there underneath

03:22:34 21    it, it says, "K Shah."  That's you; right?

03:22:36 22    A.    I believe so, yes.

03:22:37 23    Q.    Okay.  And if we go forward to the fourth page of

03:22:40 24    this document, what you found in this study comparing the

03:22:46 25    amorphous in the crystalline forms was that "chunks of

Shah - Cross

1   undissolved material (gel-like lumps) were found in the

2   amorphous material."  Right?

3   A.    Well, it's been a long time since I've seen this, but

4   yeah that's what seems to be what was reported here.

5   Q.    Okay.  And if we go to Page 8 of the document.

6   A.    By the way, is this in the binder?

7   Q.    It is.  It should be in your binder, yes.

8   A.    Because by the way the binder just fell apart.  It

9   wasn't doing well.  There's papers everywhere.  So I'll do

10  my best to keep up.

11  Q.    I think this is the last page we're going to look at

12  in this document, which is Page 8.

13  A.    Okay.  So if it's okay, if I need more, I may ask you

14  to go up and down because I can't open the binder.

15  Q.    Sure.  And so there's a conclusion in this document.

16  Do you see that there, Dr. Shah?

17  A.    Sure.

18  Q.    And the conclusion here was -- was that "amorphous

19  material in contact with aqueous media tends to form

20  gel-like lumps that do not disburse and are very slow to

21  dissolve."

22          Is that right?

23  A.    Are you asking me to confirm that -- the sentence at

24  the bottom of the slide; right?  That's what you just called

25  out.

641

Shah - Cross

03:23:59  1    Q.     That's the conclusion from this document; right?

03:24:01  2    A.     Yeah, I mean, if I recollect -- I mean, this work was

03:24:05  3    a very long time ago.  The dissolution profiles were

03:24:10  4    evaluated from the crystalline amorphous material.  And

03:24:16  5    yeah, I think these were the conclusions that the scientists

03:24:18  6    had at the time.

03:24:19  7    Q.     Okay.

03:24:20  8             MR. MATHAS:  Let's turn and talk about your

03:24:21  9    other declaration, which is JTX-8 A.

03:24:28 10             THE COURT:  Before you do that.

03:24:29 11             Dr. Shah, the conclusions that were up there for

03:24:33 12    2014, or what they said about it, is that entirely

03:24:39 13    consistent with what you said about it in your declaration

03:24:41 14    that you submitted to the PTO?

03:24:43 15             THE WITNESS:  Yeah.  I think -- I think the

03:24:45 16    reference on the slide that was just shown was -- at the

03:24:49 17    bottom of the slide, was an inference back to the initial

03:24:53 18    observations that BMS has had, whereby they saw slowing of

03:24:57 19    the dissolution when they added small amounts of amorphous

03:25:00 20    contents.

03:25:00 21             The declaration that we submitted was looking at

03:25:02 22    that more extensively.  So we had -- we had evaluated both

03:25:06 23    the tablet formulation and the capsule formulation and added

03:25:09 24    in 0 to 20 percent amorphous.  So we could be really sure

03:25:13 25    what the differences would be.  And we included all of that

Shah - Cross

03:25:15 1    in the actual declaration itself.

03:25:17 2                    THE COURT:  All right.  Thank you.

03:25:20 3                    MR. MATHAS:  All right.  Let's go forward to

03:25:21 4    JTX-8 A, please.

03:25:21 5    BY MR. MATHAS:

03:25:22 6    Q.     Which is your other declaration that you showed.  And

03:25:25 7    I want to focus on paragraph 12, Dr. Shah.

03:25:30 8    A.     Okay.

03:25:32 9    Q.     All right.  And in paragraph 12, you talk about the

03:25:35 10   development of a storage-stable pharmaceutical composition;

03:25:39 11   is that right?

03:25:39 12   A.     Sure.

03:25:43 13   Q.     And you say that "it was made difficult because

03:25:46 14   exposure to water, atmospheric moisture or even residual

03:25:49 15   moisture can cause degradation to form the 1-1 impurity";

03:25:54 16   true?

03:25:54 17   A.     Yes.

03:25:55 18   Q.     Okay.  Now, in connection with this declaration, you

03:25:58 19   did not submit any underlying data to support that

03:26:03 20   proposition to the FDA; right?

03:26:05 21   A.     Sorry, to the FDA?

03:26:07 22   Q.     I'm sorry, to the PTO.

03:26:09 23   A.     As part of the declaration?

03:26:11 24   Q.     Correct.

03:26:12 25   A.     Right.  So the declaration -- again, I don't have the

Shah - Cross

03:26:15  1    entire document in front of me.  But the declaration

03:26:18  2    provides the stability data that was generated for tablets

03:26:21  3    and capsules, and those data contain the 1-1, and showed the

03:26:27  4    1-1 change over time as part of the stability data.  And

03:26:32  5    that's what's in this declaration.

03:26:33  6    Q.    Right.  And I think, on your direct, you said that it

03:26:35  7    was that -- it was surprising -- the stability data was

03:26:38  8    surprising; is that right?

03:26:40  9    A.    So I believe -- I believe what I said was through the

03:26:45 10    extensive understanding that we had learned about the 1-1,

03:26:48 11    and the fact that it was increasing in the presence of

03:26:51 12    moisture, heat, and oxygen, we were surprised because once

03:26:56 13    we had taken the -- again, this reminds me -- this was the

03:26:59 14    commercial B-2 process.

03:27:00 15          Once we had taken the active ingredient, the API

03:27:03 16    from commercial process B-2 at low levels, we were expecting

03:27:08 17    to see a larger increase of the 1-1, because we were

03:27:13 18    subjecting the 1-1 impurity -- we were subjecting the drug

03:27:17 19    product to heat, moisture, and oxygen throughout the

03:27:20 20    manufacturing processes.  And then on stability as well.

03:27:23 21          So it was surprising that the levels of 1-1 were

03:27:26 22    ratcheted up that high, as we had thought they couldn't be,

03:27:29 23    based on all that knowledge.

03:27:30 24    Q.    Okay.  All right.  So during your direct, you did use

03:27:32 25    the term "surprising" in this context; right?

Shah - Cross

03:27:34 1   A.      I -- yes, I did.

03:27:37 2   Q.      Okay.  And in your declaration, you don't use the

03:27:39 3   word "surprising"; right?

03:27:40 4   A.      Again, I -- I would have to read it to confirm it.

03:27:45 5   So, I am not sure if that was used or not.

03:27:47 6   Q.      Okay.

03:27:48 7           MR. MATHAS:  Let's look real quick at PTX-29,

03:27:50 8   Page 8, Figure 3.

03:27:50 9   BY MR. MATHAS:

03:27:58 10  Q.      And this was the linear regression that you showed

03:28:01 11  us.  And just to make sure it's clear, this was a document

03:28:04 12  that Exelixis used to determine if a particular material

03:28:09 13  started at a particular PPM level, what would be expected to

03:28:14 14  -- where would it be expected to be in 36 months; is that

03:28:18 15  right?

03:28:18 16  A.      Well, this document is what is characterized as a

03:28:22 17  linear regression analysis.  And, essentially, what it's

03:28:24 18  showing is, if you start with the active ingredient at time

03:28:28 19  0 at a particular PPM, it shows the increase over that

03:28:33 20  period of time, which you can see on the right-hand side.

03:28:36 21  So it's showing you what you start with and then it's

03:28:38 22  showing you up to what you can get to.

03:28:40 23  Q.      Right.  And -- and the way this works is the bottom

03:28:43 24  line there is an actual result.  And then the top line is a

03:28:47 25  predicted result based on the slope; is that right?

Shah - Cross

03:28:50  1    A.      Well, I suppose a couple of things.  In the bottom

03:28:54  2    line, as you can see, there are certain points on that line.

03:28:56  3    That's where we had the actual data.  So that line that you

03:29:01  4    see at the bottom is projected out to the line -- the line

03:29:05  5    on the right.  So it's showing you what the potential

03:29:09  6    detailed level would be in the line at the bottom.

03:29:13  7            And then essentially knowing that the rate of

03:29:16  8    growth of the 1-1 would be fairly consistent with same

03:29:20  9    formulation.  We're now showing that if we increase the 1-1

03:29:24  10   level to 19 PPM, the resultant -- sorry, I'm pointing at my

03:29:29  11   screen.  Can't see my finger.  But the resultant PPM would

03:29:33  12   be 44 PPM, where the arrow is on that.

03:29:36  13   Q.      Right.  But the way that you got that was -- was

03:29:38  14   using linear regression; right?

03:29:40  15   A.      Yes.

03:29:40  16   Q.      And linear regression uses the slope of the bottom

03:29:43  17   line to plot the top line; correct?

03:29:44  18   A.      That is correct.

03:29:45  19   Q.      All right.  That's all I wanted.

03:29:48  20            All right.  Last topic.  It's true, isn't it,

03:29:50  21   Dr. Shah, that Exelixis did a significant amount of work on

03:29:54  22   API synthesis in order to achieve a process for preparing

03:29:58  23   API with low levels of the 1-1 impurity?

03:30:01  24   A.      That's correct.

03:30:02  25   Q.      Okay.  And Dr. Wilson oversaw the API synthesis work;

Shah - Cross

03:30:07 1  true?

03:30:07 2  A.      That's right.

03:30:09 3  Q.      And through that synthetic chemistry process and

03:30:13 4  process chemistry, Dr. Wilson and Exelixis were able to

03:30:16 5  control for the 1-1 impurity in cabozantinib; right?

03:30:18 6  A.      Yes.

03:30:20 7  Q.      In the API; right?

03:30:21 8  A.      Yes.

03:30:22 9  Q.      Okay.  And your role in the process then was to

03:30:24 10 oversee drug product development; true?

03:30:26 11 A.      Yeah, I saw also drug product development.  I also

03:30:30 12 participated in CMC meetings and interacted with Jo Ann

03:30:34 13 Wilson, obviously, as part of the CMC team.  And I oversaw

03:30:37 14 the NDA submission for Cabometyx that included the API and,

03:30:41 15 of course, the drug product as well.

03:30:42 16 Q.      All right.  And your formulation development team's

03:30:45 17 job was to control the 1-1 impurity in the capsule and

03:30:48 18 tablet dosage forms; right?

03:30:49 19 A.      Well, my formulation team's job was to develop a

03:30:52 20 formulation that had all the suitable characteristics that

03:30:55 21 would be, you know, sufficient to have a formulation that

03:31:00 22 would be suitable for commercialization at large scale.

03:31:03 23 Q.      And part of that included ensuring that you minimized

03:31:07 24 the genotoxic 1-1 impurity; right?

03:31:10 25 A.      Well, certainly we -- we looked and monitored the 1-1

Shah - Cross

1   impurity after we had performed experiments in the tablets

2   and the capsules.

3   Q.    Yeah, part of -- part of your responsibility and your

4   team's responsibility was ensuring that you minimized the

5   genotoxic 1-1 impurity; true?

6   A.    Well, we certainly didn't want to make it worse with

7   the tablet or the capsule.

8   Q.    Okay.  Now, ultimately, you got -- you're a named

9   inventor on the '349 patent; right?

10  A.    I'm an inventor on the patent.

11  Q.    Okay.  And as part of that patent, it discloses

12  information about how to synthesize the cabozantinib

13  (L)-malate API to be free of the 1-1 impurity; right?

14  A.    Yes.

15  Q.    Okay.  But the '349 patent does not require any

16  specific way of formulating a tablet or capsule such that

17  the tablet or capsule remains essentially free of the 1-1

18  impurity; right?

19  A.    Yeah, I can't recall specifically what the language

20  is in the patent, I'm not a patent expert.  I mean, my job

21  is to do the science and, you know, leave that job to our

22  patent experts to put those -- information together.

23  Q.    Sure.  Well, let's -- let's look at it real quick.

24        MR. MATHAS:  '349 patent, Column 21, Lines 37 to

25  45.

648

Shah - Cross

03:32:32   1   BY MR. MATHAS:

03:32:35   2   Q.     And -- and this is -- this is from your '349 patent,

03:32:41   3   Dr. Shah.  And in the '349, you say that "tablet and capsule

03:32:48   4   compositions can be prepared according to methods available

03:32:52   5   to the skilled artisan"; is that right?

03:32:55   6   A.     That's what's stated here.

03:32:56   7   Q.     Okay.

03:32:57   8          MR. MATHAS:  And if we go back to Column 20,

03:33:00   9   Lines 38 to 49.

03:33:00  10   BY MR. MATHAS:

03:33:04  11   Q.     You describe that "known techniques for the bulk

03:33:08  12   preparation and production into unit dosage forms can be

03:33:13  13   used to make composition of the invention"; right, Dr. Shah?

03:33:16  14   A.     I think you read a line from that paragraph.  Sorry.

03:33:24  15   Q.     That's right.  "Various carriers used in formulating

03:33:28  16   pharmaceutically acceptable compositions and known

03:33:31  17   techniques for their bulk preparation and subsequent

03:33:35  18   production into unit dosage forms are employed to make the

03:33:38  19   pharmaceutical compositions disclosed herein" and then it

03:33:41  20   goes on; right?

03:33:42  21   A.     That's what's written here, yes.

03:33:43  22   Q.     Okay.  And that's -- that's a true statement in your

03:33:45  23   patent; right?

03:33:46  24   A.     Yes, that's what's stated in the patent.

03:33:49  25          MR. MATHAS:  All right.  No further questions.

649
Shah - Redirect

03:33:50  1          THE COURT:  All right.  Is there any redirect?

03:33:56  2          MR. MATHAS:  Your Honor, before that, I'd move a

03:34:00  3  couple of exhibits.  PTX-87, DTX-67, DTX-20, DTX-82 -- I'm

03:34:12  4  sorry -- yeah, DTX-82, and PTX-161.

03:34:20  5          MR. PRUSSIA:  I have no objection.

03:34:22  6          THE COURT:  All right.  They're admitted without

03:34:24  7  objection.

03:34:25  8          (PTX Exhibit Nos. 87 and 161 were admitted into

03:34:25  9  evidence.)

03:34:25 10          (DTX Exhibit Nos. 67, 20, and 82 were admitted

03:34:25 11  into evidence.)

03:34:25 12                  REDIRECT EXAMINATION

03:34:25 13  BY MR. PRUSSIA:

03:34:28 14  Q.    So, Dr. Shah, on this last point, what are the

03:34:31 15  reasons why a pharmaceutical composition of cabozantinib

03:34:38 16  (L)-malate, that only -- that does not -- that includes

03:34:41 17  those excipients, generally, without identifying any

03:34:45 18  specific type of excipient, what are the reasons that that

03:34:48 19  pharmaceutical composition can be achieved and be

03:34:54 20  essentially free of the 1-1 impurity?

03:34:57 21  A.    Right.  Well, as we discussed before, the only way

03:35:02 22  that that could be achieved would be having the lowest

03:35:04 23  levels of the 1-1 impurity possible in the active

03:35:07 24  ingredients.  Hence, the commercial process B-2.

03:35:11 25  Q.    And what is -- sorry.  You answered it.

Shah - Redirect

03:35:13  1                MR. PRUSSIA:  Okay.  Nothing further,

03:35:14  2     Your Honor.

03:35:14  3                THE COURT:  All right.  Dr. Shah, thank you.

03:35:16  4     Watch your step stepping down.  Okay.

03:35:18  5                All right.  Well, we'll recess for 15 minutes.

03:35:23  6     See you then.

03:35:24  7                DEPUTY CLERK:  All rise.

03:35:26  8                (Recess was taken.)

03:49:42  9                DEPUTY CLERK:  All rise.

03:49:43 10                THE COURT:  All right.  Let's continue.

03:49:45 11                MR. PRUSSIA:  One quick housekeeping thing,

03:49:47 12     Your Honor.  The Pretrial Order required fact witnesses to

03:49:50 13     be sequestered.  Now that Dr. Shah has testified, MSN has

03:49:53 14     consented for him to return to the courtroom.  Thank you.

03:49:55 15                THE COURT:  Okay.

03:50:03 16                Ms. Wigmore?

03:50:03 17                MS. WIGMORE:  Your Honor, for our next witness

03:50:05 18     Exelixis calls Dr. David MacMillan.

03:50:08 19                THE COURT:  Okay.

03:50:25 20                DEPUTY CLERK:  Please state and spell your full

03:50:27 21     name for the record.

03:50:27 22                THE WITNESS:  David MacMillan.  D-A-V-I-D.

03:50:33 23     W-I-L-L-I-A-M.  C-R-O-S-S.  M-A-C-M-I-L-L-A-N.

03:50:33 24                DAVID MacMILLAN, the witness herein, after

03:50:33 25     having been duly affirmed under oath, was examined and

MacMillan - Direct

03:50:33 1    testified as follows:

03:50:49 2                    THE WITNESS:  I do.

03:50:49 3                    MS. WIGMORE:  May I proceed?

03:50:50 4                         DIRECT EXAMINATION

03:50:51 5    BY MS. WIGMORE:

03:50:51 6    Q.    Good afternoon, Dr. MacMillan.  Would you please

03:50:53 7    introduce yourself?

03:50:54 8    A.    Yes.  My name is David MacMillan.

03:50:56 9    Q.    Have you been retained by an expert -- as an expert

03:50:59 10   by Exelixis, Inc. in this case?

03:51:01 11   A.    Yes, I have.

03:51:02 12   Q.    Are you being compensated for the time you spend on

03:51:04 13   the case?

03:51:04 14   A.    Yes.

03:51:05 15                   THE COURT:  You know, that's not the correct

03:51:07 16   second question.  The correct second question is:  Have you

03:51:10 17   won any recent prizes you want to tell me about?

03:51:14 18                   MS. WIGMORE:  I was working up to that,

03:51:15 19   Your Honor.

03:51:17 20                   THE COURT:  Sorry.  I'm -- go ahead.

03:51:23 21                   Well, so we were debating whether you wouldn't

03:51:26 22   change your resume to put Nobel prize up a little higher on

03:51:30 23   the first page, maybe even right underneath your name.

03:51:34 24                   THE WITNESS:  I was thinking about changing my

03:51:35 25   daughter's middle name, but...

MacMillan - Direct

03:51:39  1          THE COURT:  All right.  I'm sorry.  Go ahead.

03:51:41  2   BY MS. WIGMORE:

03:51:42  3   Q.     Dr. MacMillan, does the compensation you are

03:51:43  4   receiving have any influence of the opinions you're offering

03:51:46  5   here?

03:51:46  6   A.     No.

03:51:47  7          MS. WIGMORE:  If we could please have PDX-2.

03:51:47  8   BY MS. WIGMORE:

03:51:51  9   Q.     Where do you work, Dr. MacMillan?

03:51:52 10   A.     I'm a professor of chemistry at Princeton University.

03:51:56 11   Q.     And do you conduct research as part of your role at

03:52:01 12   Princeton?

03:52:01 13   A.     Yes, I do.

03:52:03 14   Q.     Aside from Princeton, have you been a professor at

03:52:04 15   any other universities?

03:52:05 16   A.     Yes.  I began my career at Berkeley and then moved to

03:52:10 17   Caltech, where I became a chair professor.  And then in

03:52:14 18   2006, moved across to Princeton.

03:52:16 19   Q.     What is your educational background?

03:52:18 20   A.     I grew up in Scotland.  Went to university at the

03:52:22 21   University of Glasgow, where I got my undergraduate degree.

03:52:25 22   Came across to the States to do my Ph.D., which I did at UC,

03:52:30 23   Irvine.  And then went up to Harvard to do a post doc.

03:52:33 24   Q.     What is the focus of your research?

03:52:35 25   A.     The focus of my research is chemical synthesis, which

MacMillan - Direct

03:52:40  1    includes synthetic chemistry, medicinal chemistry, chemical

03:52:43  2    biology, and a little bit of biology.

03:52:46  3    Q.     How many peer-reviewed publications do you have?

03:52:48  4    A.     I looked this up last night; 185.

03:52:51  5    Q.     And what generally do those publications relate to?

03:52:54  6    A.     Same research areas; chemical synthesis, medicinal

03:52:59  7    chemistry, chemical biology.

03:53:00  8    Q.     Have you done any consulting work for the

03:53:03  9    pharmaceutical industry?

03:53:03 10    A.     Yes.  Over the last 20 years, I've been working with

03:53:09 11    approximately ten major pharmaceutical companies.

03:53:11 12    Q.     Have you received any honors or awards for your work

03:53:15 13    in the field of chemistry?

03:53:16 14    A.     Recently I won the Nobel prize in chemistry.

03:53:20 15    Q.     And what did you win the Nobel prize for?

03:53:22 16    A.     It was for -- it's called asymmetric organocatalysis.

03:53:27 17            MS. WIGMORE:  If you could turn, please, to

03:53:28 18    Tab 1 of your binder, which is PTX-776.

03:53:28 19    BY MS. WIGMORE:

03:53:34 20    Q.     Would you please identify that document?

03:53:34 21    A.     Yeah.  It's my most recent CV.

03:53:37 22    Q.     Is PTX-776 an accurate summary of your educational

03:53:41 23    and professional experience?

03:53:43 24    A.     Yes.

03:53:44 25            MS. WIGMORE:  Your Honor, Exelixis offers

MacMillan - Direct

03:53:46  1  Professor David MacMillan as an expert in chemistry.

03:53:49  2          MR. MATHAS:  No objection, Your Honor.

03:53:50  3          THE COURT:  You sure you don't want to voir dire

03:53:53  4  him?

03:53:53  5          MR. MATHAS:  No thanks, Your Honor.

03:53:54  6          THE COURT:  All right.  You may proceed.

03:53:55  7  BY MS. WIGMORE:

03:53:56  8  Q.     Dr. MacMillan, could you please turn to JTX-4, which

03:54:00  9  is Tab 2?

03:54:01 10  A.     Yeah.

03:54:03 11  Q.     What patent will you be addressing here today?

03:54:06 12  A.     The '349 patent.

03:54:07 13  Q.     Are you offering an ultimate validity opinion with

03:54:10 14  respect to the '349 patent?

03:54:15 15  A.     No, I'm not.

03:54:16 16          MS. WIGMORE:  If we could please have Claim 3 of

03:54:17 17  the '349 patent.

03:54:17 18  BY MS. WIGMORE:

03:54:18 19  Q.     Do you recognize Compound IB as the (L)-malate salt

03:54:25 20  of cabozantinib?

03:54:26 21  A.     Yes, I do.

03:54:27 22          MS. WIGMORE:  And if we could highlight the last

03:54:28 23  limitation of Claim 3.

03:54:28 24  BY MS. WIGMORE:

03:54:30 25  Q.     Is that the limitation that you'll be addressing here

MacMillan - Direct

03:54:33 1   today?

03:54:33 2   A.    Yes, it is.

03:54:35 3   Q.    And the compound referred to in that last limitation,

03:54:39 4   6,7-dimethoxy-quinoline-4-ol, can we refer to that as the

03:54:44 5   1-1 impurity?

03:54:45 6   A.    Yes.

03:54:47 7   Q.    Do you understand the parties have agreed that the

03:54:49 8   priority date for the '349 patent is February 10th of 2011?

03:54:53 9   A.    Yes.

03:54:54 10   Q.    Is that the priority date you applied in forming your

03:54:57 11   opinions in this case?

03:54:58 12   A.    I did.

03:55:00 13   Q.    Have you considered the qualifications of a person of

03:55:03 14   ordinary skill in the art for the '349 patent as of that

03:55:06 15   date?

03:55:06 16   A.    Yes, I have.

03:55:08 17   Q.    And have you reviewed both parties' definitions?

03:55:10 18   A.    Yes, I have.

03:55:11 19   Q.    Under both parties' definitions, do you qualify as a

03:55:15 20   person who would be a member of a team a POSA would consult

03:55:18 21   with?

03:55:18 22   A.    Yes.

03:55:19 23   Q.    Would your opinions in this case change depending on

03:55:22 24   whether one party or the others definition were applied?

03:55:25 25   A.    No, they would not.

MacMillan - Direct

03:55:27 1   Q.    Now, we'll come to the details of your opinion

03:55:29 2   shortly, but let's first address them at a high level.

03:55:32 3           Are you responding to certain opinions offered

03:55:35 4   by Dr. Lepore?

03:55:36 5   A.    Yes.

03:55:39 6   Q.    What is your opinion as to whether, as of the

03:55:41 7   priority date, a POSA would have expected the 1-1 impurity

03:55:45 8   to form from the Brown process?

03:55:47 9   A.    As of the priority date, a POSA would not have

03:55:52 10  expected the 1-1 impurity to have formed as a result of the

03:55:55 11  Brown process.

03:55:56 12  Q.    What is your opinion as to whether, as of the

03:55:58 13  priority date, a POSA would have been motivated to control

03:56:02 14  for the 1-1 impurity after completion of the Brown process?

03:56:05 15  A.    Because they would not have expected to have the 1-1

03:56:10 16  impurity at the end of the Brown process, they would not

03:56:12 17  have been motivated to control for that impurity at the end

03:56:15 18  of the same process.

03:56:16 19  Q.    Now, were you here just now for the testimony of

03:56:18 20  Dr. Khalid Shah?

03:56:20 21  A.    Yes.

03:56:21 22  Q.    And were you here when he testified that Exelixis

03:56:24 23  discovered that the 1-1 impurity was not adequately

03:56:28 24  controlled by the Brown process?

03:56:30 25  A.    Yes, I was.  Yes.

MacMillan - Direct

03:56:32 1   Q.    With that in mind, what is your opinion as to whether

03:56:34 2   a POSA would have had a reasonable expectation of success in

03:56:39 3   controlling the 1-1 impurity by modifying the Brown process?

03:56:43 4   A.    I don't believe they would have had a reasonable

03:56:47 5   expectation of success or been able to modify the Brown to

03:56:50 6   achieve that required level of impurity.

03:56:55 7   Q.    And we'll dive into those opinions shortly.

03:56:56 8         But in terms of question of inherency, did you

03:56:59 9   hear Dr. Lepore's opinions on that and Dr. Donovan's

03:57:02 10  opinions?

03:57:02 11  A.    Yes, I did.

03:57:03 12  Q.    Are you responding to those opinions today,

03:57:06 13  Dr. MacMillan?

03:57:06 14  A.    No, I am not.

03:57:07 15  Q.    Do you understand that's being handled by a different

03:57:09 16  Exelixis expert?

03:57:10 17  A.    Yes.

03:57:11 18  Q.    Now, before we get into your opinions, what is an

03:57:14 19  impurity?

03:57:15 20  A.    Impurity is a molecule, a compound, that comes about

03:57:20 21  either during a process where you're performing chemical

03:57:24 22  reactions where a chemical reaction happens on the molecule

03:57:27 23  that's not desirable to generate a molecule that you don't

03:57:31 24  desire, or it can come from a reagent which you're using as

03:57:35 25  part of that process, or it can happen to be an degradation

MacMillan - Direct

03:57:39  1   product, either during a process or after a process.

03:57:41  2   Q.     What is degradation?

03:57:43  3   A.     Degradation is when you have a desired molecule and

03:57:48  4   due to exposure to conditions, whether it's chemicals,

03:57:50  5   whether it's environment, whether it's heat, whether it's

03:57:53  6   light, it will undergo chemical change to, again, become a

03:57:56  7   molecule that you don't necessarily want either, again,

03:58:00  8   during a process or after a process, maybe on storage.

03:58:04  9   Q.     So when you say after a process, can a degradation

03:58:07 10   product form after a compound has been formulated?

03:58:09 11   A.     Yes, it can.

03:58:11 12   Q.     Now, let's start with your first opinion.

03:58:14 13          Were you here when Dr. Lepore testified that a

03:58:17 14   POSA would have expected the 1-1 impurity to form from the

03:58:21 15   Brown process?

03:58:21 16   A.     Yes, I was.

03:58:22 17   Q.     Do you agree with him?

03:58:23 18   A.     No, I do not.

03:58:26 19          MS. WIGMORE:  If you could please turn to Tab 3

03:58:28 20   in your binder, which is DTX-291.

03:58:28 21   BY MS. WIGMORE:

03:58:31 22   Q.     Do you recognize this as the Brown reference

03:58:34 23   Dr. Lepore testified about?

03:58:35 24   A.     Yes, I do.

03:58:37 25          MS. WIGMORE:  If we could please turn to

MacMillan - Direct

03:58:38  1    Scheme 1 in paragraph 99 of Brown, which is on Page 24.

03:58:38  2    BY MS. WIGMORE:

03:58:47  3    Q.      What is described in Scheme 1 of Brown?

03:58:49  4    A.      Scheme 1 is a synthetic sequence of multiple chemical

03:58:54  5    steps that in combination leads to the production of the

03:58:57  6    (L)-malate salt of cabozantinib.

03:59:00  7    Q.      Do you see the reference to Compound I at the end of

03:59:03  8    Scheme 1?

03:59:04  9    A.      Yes.

03:59:05 10    Q.      What is that?

03:59:05 11    A.      The end of Scheme 1, that is the (L)-malate salt of

03:59:09 12    cabozantinib.

03:59:10 13    Q.      Now, Scheme 1 of Brown, is that part of Example 1?

03:59:14 14    A.      Yes, it is.

03:59:16 15    Q.      And what is described in Examples 1 through 6 of

03:59:20 16    Brown?

03:59:21 17    A.      1 through 6 of Brown is various processes to generate

03:59:25 18    the (L)-malate salt of cabozantinib.

03:59:27 19    Q.      What, if anything, does Brown disclose about whether

03:59:31 20    the 1-1 compound is a degradation product?

03:59:34 21    A.      It does not disclose that the 1-1 compound is a

03:59:37 22    degradation product.

03:59:38 23    Q.      What, if anything, does Brown disclose about whether

03:59:41 24    the 1-1 compound is a process impurity?

03:59:44 25    A.      It does not disclose it's a process impurity.

MacMillan - Direct

03:59:48 1  Q.      Have you heard testimony in the course of this case

03:59:51 2  about genotoxic impurities?

03:59:52 3  A.      Yes, I have.

03:59:54 4  Q.      What, if anything, does Brown disclose about whether

03:59:56 5  the 1-1 compound is genotoxic?

03:59:59 6  A.      The Brown document does not disclose that the 1-1

04:00:03 7  impurity is genotoxic.

04:00:05 8  Q.      Are you familiar with a term "hydrolysis"?

04:00:07 9  A.      I am.

04:00:08 10 Q.      What is hydrolysis?

04:00:10 11 A.      Hydrolysis, as the name suggests, is basically taking

04:00:14 12 the atoms, the elements of water and adding it to any other

04:00:19 13 compound to either create a new compound that incorporates

04:00:22 14 water or multiple compounds that incorporates the constant

04:00:25 15 the elements of water.

04:00:26 16 Q.      You testified about degradation.  Can hydrolysis play

04:00:31 17 a role in degradation?

04:00:32 18 A.      Yes, it can.

04:00:35 19 Q.      Is that a desirable or undesirable result?

04:00:38 20 A.      Most of the time, it's undesirable.  There are a few

04:00:41 21 occasions where hydrolysis is desired, but it's when

04:00:43 22 degradation happens, but for the most part, it's

04:00:47 23 undesirable.

04:00:47 24          MS. WIGMORE:  If we could please have PDX-5.

04:00:47 25 BY MS. WIGMORE:

661

MacMillan - Direct

04:00:51  1    Q.     Dr. MacMillan, in February of 2011, would a POSA,

04:00:55  2    looking at the synthetic scheme, Scheme 1 in Brown, have

04:00:58  3    expected the 1-1 impurity to form through hydrolysis?

04:01:02  4    A.     No, they would not.

04:01:03  5    Q.     And using PDX-5, can you please explain why not?

04:01:07  6    A.     Yes.  Would it be okay if I use a laser pointer?

04:01:10  7                  THE COURT:  Sure.

04:01:11  8                  THE WITNESS:  Okay.  Thank you.

04:01:12  9                  So, just to explain this the way I think an

04:01:16  10   organic chemist or a POSA would look at this, if you look at

04:01:19  11   this molecule, you can see there's these two hexagons, which

04:01:23  12   are aromatic rings.  And you can see in red these are two

04:01:27  13   chemical rings and the O for oxygen.  That's the ether.

04:01:29  14   That's the biaryl ether.

04:01:32  15                  To organic chemists, this is a very, very, very

04:01:35  16   stable compound.  It's a stable functional group to the

04:01:38  17   point that they would not expect that that would undergo

04:01:41  18   hydrolysis.

04:01:41  19   BY MS. WIGMORE:

04:01:43  20   Q.     Dr. MacMillan, the compound shown on this slide is

04:01:45  21   what compound?

04:01:46  22   A.     Oh, I apologize.  This compound shown on the slide is

04:01:49  23   cabozantinib, and it's referring to the two red bonds in the

04:01:53  24   red oxygen on the slide.

04:01:55  25   Q.     Now, would the formation of the malate salt make

MacMillan - Direct

04:01:58 1  hydrolysis more likely?

04:02:00 2  A.     No.

04:02:02 3  Q.     What are the reasons for that?

04:02:03 4  A.     Well, so the formation of a malate salt means if --

04:02:07 5  what would happen is this nitrogen which is shown here will

04:02:10 6  undergo, which is the bottom of the hexagon of cabozantinib,

04:02:13 7  would undergo the proton -- the protonation of the acid

04:02:16 8  would go right there.  That would make it more electron

04:02:19 9  deficient.  However, you can see on the left-hand side of

04:02:22 10 these two oxygens shown in blue, and these are donating

04:02:27 11 electron density into these ring systems.

04:02:29 12        What that's doing is effectively deactivating or

04:02:33 13 negating the impact of this proton being on the nitrogen.

04:02:37 14 So, again, the stability of this is such the person of

04:02:40 15 ordinary skill would not expect it to undergo hydrolysis.

04:02:42 16 Q.     Would a POSA have expected that malic acid could

04:02:47 17 catalyze the formation of the 1-1 impurity?

04:02:49 18 A.     No, they would not.

04:02:51 19 Q.     What are the reasons for that?

04:02:52 20 A.     Malic acid is a relatively weak acid in the grand

04:02:57 21 scheme of acids because the proton being here would not

04:03:02 22 sufficiently activate this because of this electron density

04:03:05 23 being added in.  As such the person of ordinary skill in the

04:03:08 24 art would not expect that the malic acid to activate this to

04:03:12 25 towards hydrolysis.

MacMillan - Direct

Q.     And just for the record, the proton you're referring

to is the nitrogen at the bottom of the hexagon in the

cabozantinib diagram?

A.     Yeah, there's three nitrogens in this compound.  It's

the one lowest on the slide at the bottom of the hexagon.

That's the one that would undergo what's called protonation

where the hydrogen would associate with it.

Q.     So, what did you conclude about whether a POSA would

have expected the 1-1 impurity to form by degradation in the

Brown process?

A.     They would not expect that to happen.

Q.     Was the structure that we know today as cabozantinib

in clinical development as of the priority date for the

'349 patent?

A.     Yes, it was.

Q.     What was the compound known today as cabozantinib

referred to in the published literature before 2010?

A.     In the -- excuse me.  In the public literature it had

that anonymous name.  It was known as XL184.  That was the

name that was given to it for those -- while it was in

clinical development.

Q.     Was there any definitive connection in the literature

between XL184 and cabozantinib at the time of the

'349 patent invention?

A.     As I said, it was -- XL184 was an anonymous name,

MacMillan - Direct

04:04:25  1   meaning there was no relationship between that name and the

04:04:27  2   structure of what we now know to be cabozantinib.

04:04:31  3   Q.    Before February of 2011, did any of the clinical

04:04:35  4   publications concerning XL184 reveal any concerns about

04:04:40  5   potential impurities or degradation products?

04:04:42  6   A.    No, they did not.

04:04:45  7         MS. WIGMORE:  Now, let's turn to your second

04:04:47  8   opinion.  If we could return to the Brown reference,

04:04:51  9   DTX-291, Paragraph 99, again, looking at Scheme 1.

04:04:51 10   BY MS. WIGMORE:

04:04:57 11   Q.    Where, if at all, does the 1-1 compound appear in

04:05:01 12   this scheme?

04:05:01 13   A.    The 1-1 compound in this scheme is in the top

04:05:05 14   left-hand corner of the scheme.  This would be the starting

04:05:08 15   material for this overall process.

04:05:12 16   Q.    Do you recall Dr. Lepore's testimony that a POSA

04:05:15 17   would have monitored and controlled for the 1-1 impurity

04:05:19 18   because it was a starting material in Scheme 1?

04:05:22 19   A.    I do remember that.  Yes.

04:05:24 20   Q.    Do you agree with Dr. Lepore?

04:05:25 21   A.    I agree with it, to the extent that it would monitor

04:05:30 22   it for being after the first step.  So this is the first

04:05:32 23   chemical reaction, which is the first arrow next to that top

04:05:36 24   left-hand structure.  The POSA would be interested in

04:05:40 25   controlling for it at this stage.  But beyond that, because

MacMillan - Direct

04:05:43  1    of the number of steps involved, subsequently, it's not a

04:05:47  2    material that you want to be controlling for by the time you

04:05:50  3    got to the end of these numerous steps in that synthetic

04:05:53  4    sequence.

04:05:53  5    Q.    So let's break that down.  Still looking at Scheme 1,

04:05:56  6    what product is made by the overall process?

04:05:59  7    A.    The overall process of all these chemical steps ends

04:06:03  8    up at the bottom right-hand corner which is the cabozantinib

04:06:07  9    (L)-malate salt.

04:06:08 10    Q.    If you could look to Paragraphs 101 and 102 of Brown

04:06:13 11    which begin on Page 24 --

04:06:16 12    A.    Mm-hmm.

04:06:16 13    Q.    -- and carry over to 25.  What is the first step in

04:06:19 14    this process designated as Step 1.1?

04:06:22 15    A.    This first step is the formation of what's called the

04:06:28 16    4-chloro-6,7-dimethoxyquinoline.

04:06:32 17    Q.    And from what is that product formed?

04:06:35 18    A.    That product is formed from what we know now refer to

04:06:38 19    as the 1-1 impurity, in that case a starting material.

04:06:41 20    Q.    If you could please turn to the fourth sentence in

04:06:45 21    Paragraph 102 beginning with "The reaction was deemed

04:06:49 22    complete."

04:06:50 23          Do you see that?

04:06:50 24    A.    Yes.

04:06:52 25    Q.    Could you read that sentence, please?

MacMillan - Direct

04:06:54  1    A.      Okay.  Hold on.

04:06:56  2    Q.      It's in -- under Section 1.1.

04:06:58  3    A.      I'll let it be blown up.

04:07:03  4            "The reaction was deemed complete (approximately

04:07:05  5    nine hours) when less than 2 percent of the starting

04:07:08  6    material remained (in process high-performance liquids

04:07:12  7    chromatography HPLC analysis)."

04:07:14  8    Q.      So, again, here we're referring to the first step of

04:07:17  9    the Brown Scheme 1; is that right?

04:07:19 10    A.      Yes.

04:07:21 11    Q.      And what would that sentence have conveyed to a

04:07:23 12    person of ordinary skill in the art?

04:07:24 13    A.      So, to a person of ordinary skill in the art, that

04:07:27 14    means they're only actually halfway through the first step,

04:07:30 15    and yet they're seeing it's still below -- 2 percent of that

04:07:33 16    starting material remains only halfway through the first

04:07:36 17    step.

04:07:37 18    Q.      Reviewing the remainder of Step 1.1, what would that

04:07:41 19    have conveyed to a person of skill in the art?

04:07:43 20    A.      The remainder of this step, the information detailed

04:07:48 21    below is effectively a process to further purify that

04:07:54 22    process, meaning you would expect that the amount of the

04:07:58 23    starting material would be removed to an even larger extent.

04:08:01 24    Q.      So, you have less than 2 percent and then engage in

04:08:05 25    further purification; is that right?

MacMillan - Direct

04:08:07  1    A.      That is correct.

04:08:08  2    Q.      And is that all part of the first step of Brown

04:08:11  3    Scheme 1?

04:08:11  4    A.      That is just the first step, yes.

04:08:13  5    Q.      What would a person of skill in the art have expected

04:08:16  6    regarding the amount of the 1-1 impurity if any, that would

04:08:20  7    remain after Step 1.1?

04:08:22  8    A.      They would expect it to be a very small amount of any

04:08:26  9    starting material left at that stage.

04:08:29 10    Q.      Is Step 1.1 the only step disclosed in Example 1?

04:08:33 11    A.      No, it's not.

04:08:34 12            MS. WIGMORE:  If we could please have PDX-6.

04:08:34 13    BY MS. WIGMORE:

04:08:37 14    Q.      What is shown here?

04:08:38 15    A.      This is all of the steps involved in Scheme 1, and

04:08:43 16    the critical part here is you can see there's multiple

04:08:45 17    chemical steps beyond just this first step.

04:08:48 18            MS. WIGMORE:  Let's have PDX-7.

04:08:48 19    BY MS. WIGMORE:

04:08:51 20    Q.      What is shown on PDX-7?

04:08:53 21    A.      What I'm showing here is you can see there's Step 1.

04:08:56 22    That's the one we just stalked about, but you can see

04:08:58 23    there's Step 2.  And then there's the purification process

04:09:02 24    associated with this.  Step 3, same again.  Step 4,

04:09:06 25    purification process.  Step 5, purification process all the

MacMillan - Direct

04:09:10  1    way before you get to the (L)-malate salt of cabozantinib.

04:09:14  2    Q.    Now, I noticed you haven't marked the bottom

04:09:17  3    left-hand corner with any step.  Why is that?

04:09:19  4    A.    So the bottom left-hand corner, these are a branching

04:09:23  5    point.  You can see this is a synthetic sequence where you

04:09:26  6    have one sequence.  They're called the longest linear

04:09:29  7    sequence.  That makes sense because you can see it's the

04:09:32  8    longest number of steps.

04:09:33  9          You can also see there's this branching point

04:09:35 10    that comes in at this point here which is a shorter number

04:09:37 11    of steps.  So I've only focused on the steps which begin

04:09:41 12    from the 1-1 impurity starting material.

04:09:45 13    Q.    So if we're looking at Scheme 1, it's basically the

04:09:47 14    first two rows; is that right?

04:09:49 15    A.    That's correct.

04:09:51 16    Q.    Now, looking at Scheme 1 as a whole, would a person

04:09:55 17    of skill in the art have been motivated to control for the

04:09:57 18    starting material after all those steps were completed?

04:10:01 19    A.    No, they would not.

04:10:02 20    Q.    And what are the reasons they would not?

04:10:04 21    A.    Because as we've already mentioned, there's basically

04:10:08 22    very little of this starting material after Step 1.  Now,

04:10:11 23    keep in mind you have all of these other steps and each one

04:10:15 24    of these has a purification component to it.  But beyond

04:10:18 25    that, you're also adding reagents which could also react

MacMillan - Direct

04:10:22  1   with it to also remove or purge as we've heard earlier

04:10:26  2   today.

04:10:27  3            Because of all these purification steps, these

04:10:29  4   purging steps, a person of ordinary skill would not believe

04:10:32  5   there would be any of this material way over here ending up

04:10:34  6   way down here.

04:10:35  7   Q.    And by "way over here," you're referring to Step 1?

04:10:40  8   A.    At the beginning of Step 1, ending up at the end of

04:10:43  9   Step 5.

04:10:43 10   Q.    And so what does that mean as to whether they would

04:10:45 11   be motivated to control for it?

04:10:47 12   A.    Well, if they don't believe that it would be there,

04:10:50 13   they would have no expectation it would be there.  There

04:10:53 14   would not be a motivation to control for it.

04:10:55 15   Q.    Now, moving to your next opinion.  You were here for

04:11:01 16   Dr. Shah' testimony; is that right?

04:11:02 17   A.    Yes.

04:11:03 18   Q.    And what did he explain about what Exelixis learned

04:11:08 19   about the 1-1 impurity and their development program?

04:11:11 20   A.    They learned --

04:11:12 21            MR. MATHAS:  I object.  Dr. Shah just testified,

04:11:14 22   and asking this witness to repeat it is cumulative and

04:11:18 23   irrelevant.

04:11:19 24            THE COURT:  Well, I assume he's going to have

04:11:21 25   some opinion about it or say it somehow -- can you rephrase?

04:11:26  1          MS. WIGMORE:  I can rephrase the question,

04:11:27  2   Your Honor.

04:11:27  3          MR. MATHAS:  Your Honor, I would also like to

04:11:29  4   pose an objection to what I think this line of testimony is

04:11:31  5   going to be about.  I think counsel said that this is going

04:11:34  6   to be about reasonable expectation of success.

04:11:37  7          THE COURT:  I didn't -- oh.

04:11:38  8          MR. MATHAS:  And Dr. MacMillan only has two

04:11:41  9   disclosed opinions on reasonable expectation of success, and

04:11:44 10   neither of which responds to the reasonable expectation of

04:11:47 11   success presented by Dr. Lepore which was recrystallization.

04:11:51 12          MS. WIGMORE:  He responded to Dr. Lepore's

04:11:53 13   opinion, and I'll refer the Court, I believe, to

04:11:57 14   Paragraph 11.

04:11:59 15          MR. MATHAS:  I agree he has responded to

04:12:01 16   Dr. Lepore but not on recrystallization.

04:12:04 17          MS. WIGMORE:  Your Honor, he's testifying about

04:12:06 18   reasonable expectation of success.  Dr. Lepore gave broad

04:12:10 19   testimony about what a person of skill would have been

04:12:13 20   motivated to do and whether they would expect success.

04:12:15 21   Dr. MacMillan is responding to those opinions.  And he

04:12:18 22   disclosed that he would do so, among other places, in

04:12:22 23   paragraph 11 of his expert report.

04:12:24 24          THE COURT:  All right.  Well, I'm going to allow

04:12:26 25   it, so go ahead.

MacMillan - Direct

BY MS. WIGMORE:

Q.     Now, were you here when Dr. Shah testified that
Exelixis discovered an impurity after the Brown process was
completed?

A.     Yes.

Q.     And were you here when Dr. Lepore testified a person
of skill in the art would have added a recrystallization
step to the Brown process?

A.     Yes.

Q.     In terms of the '349 patent, did Exelixis achieve the
claimed purity level for the 1-1 compound by adding a
recrystallization step to the Brown process?

A.     No.

Q.     At a high level, what did they do instead?

A.     At a high level, they introduced multiple changes,
including changing the substrates, changing reagents,
changing the number of steps, changing the solvents,
changing purification methods.

        They came up with a very different process able
to effectively achieve the removal of the 1-1 impurity.

Q.     Dr. MacMillan, if you could please turn to Tab 4 in
your binder, which is PTX-36.

        What is this document?

A.     This is the manufacturing process development
document from Exelixis.

MacMillan - Direct

Q.      And if you could just page through Figures 7

through 10 on Pages 7 through 13 of this document, and

explain generally what is shown in those figures.

A.      So, 7 through 10 is basically beginning with the

process route that the medicinal chemists started with --

those are the chemists who are in the lab, discovered the

molecule on a very small scale.  And from that process, is

the evolution from that all the way through to what became

eventually the commercialized manufacturing of cabozantinib

(L)-malate salt.

            MS. WIGMORE:  Please turn to Figure 8 on Page 9

of this exhibit, PTX-36.

BY MS. WIGMORE:

Q.      What is shown in Figure 8?

A.      Figure 8 is what's known as the A-2 process.

Q.      And do you understand that the A-2 process is the

process disclosed in Brown?

A.      Yes.  I have heard this referred to a number of times

in the case as A-2 is equal to the Brown process.

Q.      And what is the B-2 process?

A.      The B-2 process is what is now the commercialized

process, the process of the '349 patent.

Q.      Have you analyzed the differences between the A-2

process and the B-2 process?

A.      Yes, I have.

04:14:51  1   Q.     Now, focusing on Figure 8, which is process A-2, can

04:14:56  2   you please walk us through the differences between the A-2

04:15:00  3   process from Brown and the B-2 process from the '349 patent?

04:15:04  4   A.     Sure.  So, if you focus on the very top series of

04:15:11  5   chemical reactions, if you look at the molecule in the

04:15:13  6   middle called 184-1-2.  And you'll notice to the right of it

04:15:18  7   is an arrow.  That arrow means chemical reaction.

04:15:21  8           If you look above the arrow, there's this

04:15:23  9   hexagon with an $NO_2$, that's a nitro group.  Those are the

04:15:27 10   kind of groups you would find on, like, explosives like TNT

04:15:31 11   and things like that.

04:15:32 12           Now, when you go to the B-2 process from the

04:15:34 13   A-2, they don't use this molecule.  They actually get rid of

04:15:37 14   this nitro.  This now becomes what's called an amino.

04:15:40 15   That's a significant difference, a big difference.

04:15:42 16           If you go below that same arrow, it says DMAP

04:15:46 17   26, that's the base.  This is a relatively mild base.

04:15:50 18           When you move to the B-2 process, this now

04:15:52 19   becomes sodium pentoxide.  Pentoxide is a relative

04:15:55 20   aggressive, very strong base.  So, two very large

04:15:58 21   differences.

04:15:59 22           Now, as a result of this change, this product

04:16:02 23   you generate, 184-1-3 is a completely different molecule

04:16:07 24   that doesn't even show up in the B-2 process.  Because it's

04:16:11 25   got this nitrogen group here.  Because it's a completely

MacMillan - Direct

04:16:14  1    different molecule, they have to use a completely different

04:16:16  2    chemical step over here.  This is on the left-hand side the

04:16:19  3    arrow with PD/C, that's palladium.  They have to employ this

04:16:24  4    step to remove that nitro to make into what's called a $NH_2$.

04:16:28  5    When you Form 184-1-4.

04:16:30  6             So that's going to have its own set of

04:16:32  7    impurities associated with it again.  And then beyond that,

04:16:35  8    if you go to the very last step, you can see the last step

04:16:39  9    on the right-hand side, there's -- down this vertical arrow.

04:16:42 10    To the right of it, it says EtOH, that's ethanol, and water,

04:16:46 11    H2O.

04:16:47 12             They remove this and use a completely different

04:16:50 13    solvent in that part of the process as well.  There's a

04:16:52 14    number of other changes they make along the way.  I would

04:16:57 15    argue some of the most significant ones.

04:16:58 16    Q.    How does the number of steps in the B-2 process

04:17:02 17    compare to the number of steps in the A-2 process.

04:17:04 18    A.    The B-2 process is shorter.  It's one step shorter

04:17:07 19    than the A-2 process.

04:17:09 20    Q.    But is it fair to say they're different steps?

04:17:11 21    A.    Oh, yeah.  I mean, it's -- if you've got a different

04:17:15 22    number of steps, it means you have to have different

04:17:17 23    chemistries involved and you have to have different

04:17:19 24    molecules involved, which you can plainly see, for example,

04:17:22 25    184-1-3.

675

MacMillan - Direct

04:17:25  1    Q.      Do you agree with Dr. Lepore that a person of skill

04:17:28  2    in the art would have had a reasonable expectation of

04:17:30  3    success in achieving the claimed purity level of Claim 3 by

04:17:35  4    adding a recrystallization step to the Brown process?

04:17:38  5    A.      No, I do not.

04:17:40  6    Q.      Why not?

04:17:40  7    A.      Because if it was that simple, I don't think Exelixis

04:17:44  8    would have went to all of these -- extent of effort to be

04:17:47  9    able to solve this problem for all these many different

04:17:50 10    changes if it just involved introducing a simple

04:17:53 11    recrystallization step.

04:17:54 12    Q.      Were there purification steps in the existing Brown

04:17:57 13    process?

04:17:57 14    A.      Yes, there were.

04:17:58 15    Q.      Would there have been reason to believe that adding

04:18:00 16    another purification step in the form of recrystallization

04:18:04 17    would lead to a different outcome?

04:18:05 18    A.      No, there would not.

04:18:08 19    Q.      Would a person of skill in the art have had a

04:18:10 20    reasonable expectation of success in achieving a claimed

04:18:14 21    purity level by making any other changes to the Brown

04:18:18 22    process, including the ones that you just walked us through?

04:18:21 23    A.      Not with any reasonable expectation of success, no.

04:18:25 24            MS. WIGMORE:  Thank you, Dr. MacMillan.

04:18:26 25            I would like to move in PTX-776 and PTX-36.

MacMillan - Cross

04:18:34  1         MR. MATHAS:  No objections, Your Honor.

04:18:34  2         THE COURT:  All right.  Admitted without

04:18:36  3    objection.

04:18:36  4         (PTX Exhibit Nos. 776 and 36 were admitted into

04:18:43  5    evidence.)

04:18:43  6         MR. MATHAS:  Your Honor, may I hand up a small

04:18:45  7    cross binder?

04:18:46  8         THE COURT:  Sure.

04:20:07  9         MR. MATHAS:  Your Honor, I think I'm going to do

04:20:09 10    it without a binder.

04:20:10 11         THE COURT:  Well, it's all right if you -- I

04:20:13 12    mean, your choice.

04:20:14 13         MR. MATHAS:  I think the only thing would be the

04:20:16 14    report of the deposition, maybe something else that we could

04:20:18 15    look at.  So I think we can proceed, if it's all right.

04:20:20 16         THE COURT:  All right then.  Go ahead then.

04:20:22 17                     CROSS-EXAMINATION

04:20:22 18    BY MR. MATHAS:

04:20:23 19    Q.    Good afternoon, Dr. MacMillan.

04:20:23 20    A.    Good afternoon, Mr. Mathas.

04:20:26 21    Q.    Real quick, on this point about hydrolysis, just so

04:20:30 22    I'm clear, hydrolysis is when a compound reacts with water;

04:20:34 23    is that right?

04:20:34 24    A.    Yes.

04:20:35 25    Q.    Okay.  Now, you agree that the 1-1 is -- the 1-1

04:20:39  1    compound is the starting material that is used in the Brown

04:20:43  2    Example 1 process; right?

04:20:44  3    A.      Yes.

04:20:45  4    Q.      And you agree that it is possible for a starting

04:20:48  5    material to carry through a synthesis into the final step;

04:20:52  6    is that right?

04:20:53  7    A.      Oh, sure, yeah, it's possible.

04:20:56  8    Q.      Okay.  And you said during your direct that you

04:20:59  9    didn't believe -- and let's just take one brief moment and

04:21:03 10    we'll give you a binder.

04:21:04 11           All right.  Dr. MacMillan, so on your direct,

04:21:11 12    you said that in your opinion, you didn't believe that the

04:21:15 13    1-1 would carry through in the Brown process because there

04:21:18 14    were five intermediate steps; is that right?

04:21:20 15    A.      Yeah.  I mean, it's always possible a starting

04:21:23 16    material can get to the end of a sequence, that's why I

04:21:25 17    mentioned at the end of Step 1.  But for that overall

04:21:28 18    process, because of all the purification and also chemical

04:21:31 19    reactions, I thought it would be -- it would be unlikely.

04:21:34 20    Q.      Okay.  So simpler question than that, though, and it

04:21:37 21    would be unlikely because it would have to go through 5

04:21:39 22    intermediate steps; right?

04:21:40 23    A.      It's more -- it's not the number of steps, it's the

04:21:43 24    number of purification steps and other reagents that would

04:21:46 25    be exposed to.

MacMillan - Cross

04:21:47 1   Q.     And -- but when you put your slide up, you showed us

04:21:50 2   five steps that you said it would go; through right?

04:21:53 3   A.     I did, sure, yes.

04:21:54 4   Q.     Okay.  Now, previously, you opined that the synthetic

04:21:57 5   route in Brown disclosed seven intermediate steps; right?

04:22:01 6   A.     It does, yes.

04:22:03 7   Q.     All right.  Now, two of those steps are side steps;

04:22:05 8   right?

04:22:05 9   A.     Yeah, those are the ones I was talking about, you

04:22:08 10  know, the branching point, coming in from the left-hand

04:22:11 11  side.

04:22:11 12  Q.     Those are side steps; right?

04:22:12 13  A.     Yes.

04:22:13 14  Q.     Okay.  And -- and for purposes of your testimony

04:22:16 15  here, five intermediate steps is the reason why we wouldn't

04:22:19 16  expect the 1-1 to carry through from the starting material

04:22:22 17  into the final product; true?

04:22:24 18  A.     It's not the number of steps, it's the details of

04:22:27 19  those steps.  It's because it's the purifications and the

04:22:30 20  reagents.  You could find five chemical steps that wouldn't

04:22:33 21  do anything.  But it's not the number, it's the details of

04:22:37 22  what's under each of those chemical steps.

04:22:39 23  Q.     Okay.  Now, Brown, as we looked at -- as you looked

04:22:42 24  at on direct, allows there to be 2 percent of the starting

04:22:47 25  material I think you said halfway through Step 1; is that

MacMillan - Cross

04:22:50  1    right?

04:22:50  2    A.    That's correct.

04:22:52  3    Q.    And now, 2 percent, that's 20,000 PPMs

04:22:57  4    mathematically; right?

04:22:57  5    A.    That's correct.

04:22:58  6    Q.    Okay.  And so that's halfway through Brown Step 1.

04:23:02  7    And then at that point, it's true, isn't it, that additional

04:23:11  8    amounts of the 1-1 would be further removed by the

04:23:15  9    crystallization that occurs at the end of Step 1?

04:23:18 10    A.    Based on the details of the fact that was presented

04:23:21 11    in that description, that would be the expectation.

04:23:24 12    Q.    Right.  The POSA would reasonably expect that

04:23:27 13    crystallization at the end of Step 1 would further reduce

04:23:30 14    the 1-1 impurity level; right?

04:23:32 15    A.    Because of the nature of the expect -- of the

04:23:35 16    crystallization shown, not just any crystallization, that

04:23:38 17    specific crystallization.

04:23:39 18    Q.    And I get that, but in the context of the Brown

04:23:42 19    process, Step 1, it's your opinion that the crystallization

04:23:47 20    at Step 1 would further reduce the 1-1 impurity level;

04:23:50 21    right?

04:23:50 22    A.    Yes.

04:23:51 23    Q.    And then, as I understand your opinion, you suggest

04:23:54 24    that remaining 1-1 impurity would be purged into subsequent

04:23:58 25    Steps 2 through 5; right?

MacMillan - Cross

04:24:00 1   A.      Correct.

04:24:01 2   Q.      Okay.  Now, you're not giving the opinion that there

04:24:05 3   would be 0 PPM of the 1-1 left at the end of the process;

04:24:10 4   right?

04:24:11 5   A.      Just below detectable levels.

04:24:14 6   Q.      Okay.  And so that is some non 0 amount of the 1-1

04:24:19 7   impurity; right?

04:24:20 8   A.      Yeah, it's not to waste the Court's time, but it's

04:24:23 9   one of those things, once it's below detectable, you can

04:24:2610   never see an absolute 0, it's impossible.

04:24:2811   Q.      Okay.  Now, and -- but even though it is a non-zero

04:24:3412   amount of the 1-1, it's your opinion that the POSA would

04:24:3813   have no motivation to monitor for it; right?

04:24:4014   A.      If the POSA believes that it's not there, there's no

04:24:4515   reason to monitor to for it.

04:24:4816   Q.      Now, in reaching your opinions on motivation,

04:24:5217   Dr. Lepore, you do not consider any FDA or other regulatory

04:24:5518   guidance -- I called you Dr. Lepore.  I apologize.

04:24:5919           In reaching your opinions, Dr. MacMillan, you

04:25:0120   did not consider any FDA or other regulatory guidance

04:25:0621   documents on controlling impurities; right?

04:25:0922   A.      Well, no because if the person of ordinary skill does

04:25:1223   not believe that the molecule is going to be there, then,

04:25:1524   yeah, that would -- you don't need to sort of worry about

04:25:1725   that -- those guidelines for that component of it.

681

MacMillan - Cross

04:25:19 1   Q.     Okay.  So you -- just to make sure the answer is

04:25:22 2   clear:  You did not, for example, consider the FDA's

04:25:26 3   guidance on controlling genotoxic impurities; correct?

04:25:29 4   A.     Correct.

04:25:30 5   Q.     Okay.  And, in fact, you didn't even consider whether

04:25:32 6   or not the 1-1 impurity was potentially genotoxic; right?

04:25:37 7   A.     I mean I've subsequentially learned it is genotoxic,

04:25:40 8   but I don't believe a POSA looking at it would have any

04:25:44 9   notion that it would be genotoxic.

04:25:45 10  Q.     As of the time that we took your deposition, you

04:25:50 11  didn't know whether or not the 1-1 impurity was genotoxic;

04:25:53 12  right?

04:25:54 13  A.     That is correct.  I think I said I didn't -- I

04:25:56 14  couldn't remember.

04:25:57 15  Q.     Okay.  And so in forming -- in forming your opinions

04:26:00 16  prior to that, you didn't have an understanding that the 1-1

04:26:02 17  was genotoxic; right?

04:26:04 18  A.     I couldn't remember, yes.

04:26:05 19  Q.     Okay.

04:26:06 20  A.     That's correct.

04:26:06 21  Q.     And so, therefore, you didn't consider whether or not

04:26:09 22  a POSA would treat genotoxic impurities differently than

04:26:14 23  they would treat other impurities; correct?

04:26:16 24  A.     Yeah, I don't think -- at that stage that's not

04:26:19 25  something I thought about, whether we treat them differently

Myerson - Direct

04:26:23  1    or not because, quite frankly, there was nothing in the --

04:26:26  2    the Brown document that suggested it would be genotoxic.  A

04:26:30  3    person of ordinary skill in the art would not be thinking

04:26:31  4    about that.

04:26:31  5    Q.    Simpler question, Dr. MacMillan:  You didn't consider

04:26:35  6    whether a POSA would treat genotoxic impurities differently

04:26:39  7    than other impurities; true?

04:26:40  8    A.    That is correct, yeah.

04:26:41  9                MR. MATHAS:  No further questions, Your Honor.

04:26:43 10                THE COURT:  All right.  Any redirect?

04:26:44 11                MS. WIGMORE:  No, Your Honor.

04:26:46 12                THE COURT:  All right.  Dr. MacMillan, thank

04:26:48 13    you.  You're -- watch your step stepping down.

04:26:55 14                MS. PIROZZOLO:  Plaintiffs call Dr. Allan

04:27:00 15    Myerson.

04:27:28 16                DEPUTY CLERK:  Please state and spell your full

04:27:33 17    name for the record.

04:27:33 18                THE WITNESS:  Yes.  Allan, A-L-L-A-N.  Stuart,

04:27:38 19    S-T-U-A-R-T.  Myerson, M-Y-E-R-S-O-N.

04:27:38 20                ALLAN MYERSON, the witness herein, after having

04:27:38 21    been duly affirmed under oath, was examined and testified as

04:27:38 22    follows:

04:27:38 23                THE WITNESS:  I do.

04:27:57 24                          DIRECT EXAMINATION

04:27:57 25    BY MS. PIROZZOLO:

Myerson - Direct

04:28:10  1    Q.      Could you please introduce yourself to the Court?

04:28:12  2    A.      Yes.  My name is Allan Myerson.

04:28:15  3    Q.      Have you been retained by the Plaintiff as an expert

04:28:18  4    witness in this case?

04:28:19  5    A.      I have.

04:28:21  6    Q.      Generally, what issues have you been asked to

04:28:23  7    address?

04:28:24  8    A.      I've been asked to respond to the opinions of

04:28:29  9    Dr. Donovan and Lepore on the validity of the '349 patent.

04:28:34 10    Q.      Are you being compensated for the time you're

04:28:35 11    spending on working on this case?

04:28:37 12    A.      I am.

04:28:38 13    Q.      Does your compensation depend on the substance of

04:28:41 14    your opinions or the outcome of the case?

04:28:43 15    A.      It does not.

04:28:45 16    Q.      Have you prepared some slides for your discussion

04:28:48 17    today?

04:28:48 18    A.      I have.

04:28:50 19           MS. PIROZZOLO:  Okay.  Let's call up Plaintiff's

04:28:52 20    Demonstrative Exhibit 4.

04:28:52 21    BY MS. PIROZZOLO:

04:28:55 22    Q.      Dr. Myerson, where do you work?

04:28:57 23    A.      I work at the Massachusetts Institute of Technology

04:29:00 24    in Cambridge, Massachusetts.

04:29:02 25    Q.      What do you do at MIT?

Myerson - Direct

04:29:04 1   A.      I'm a professor of chemical engineering.

04:29:06 2   Q.      How long have you been a professor of chemical

04:29:09 3   engineering?

04:29:09 4   A.      It will be 47 years in January.

04:29:13 5   Q.      What are your responsibilities at MIT?

04:29:16 6   A.      Research and teaching.

04:29:18 7   Q.      What courses do you teach?

04:29:19 8   A.      I teach an elective course in pharmaceutical

04:29:23 9   engineering to seniors and graduate students, and a graduate

04:29:28 10  course in crystallization science and technology to graduate

04:29:31 11  students.

04:29:32 12  Q.      Do you perform research?

04:29:34 13  A.      I do.

04:29:36 14  Q.      What is the primary focus of your academic research?

04:29:40 15  A.      My primary focus is pharmaceutical manufacturing with

04:29:44 16  an emphasis on continuous pharmaceutical manufacturing,

04:29:48 17  separation and purification processes, particularly

04:29:51 18  crystallization-related problems.  Also, the development of

04:29:57 19  novel pharmaceutical dosage forms.

04:29:59 20  Q.      Have you published any scientific papers?

04:30:02 21  A.      Yes.  Approximately 290 refereed papers.

04:30:07 22  Q.      What do those publications generally relate to?

04:30:09 23  A.      Basically the same subjects that I just described in

04:30:13 24  my research; pharmaceutical manufacturing, separation

04:30:18 25  processes, particularly crystallization, pharmaceutical

Myerson - Direct

04:30:22  1    formulations and fundamental studies of crystallization

04:30:27  2    mechanisms.

04:30:28  3    Q.    Could you briefly describe your experience with

04:30:31  4    pharmaceutical formulations?

04:30:32  5    A.    Yes.  A few examples.  I helped develop a formulation

04:30:40  6    of aliskiren hemifumarate, which is a Novartis drug during

04:30:43  7    our work on the -- work with the Novartis-MIT Center for

04:30:48  8    Continuous Manufacturing.

04:30:51  9             Another project that myself and some colleagues

04:30:53 10    had at MIT was called Pharmacy on Demand, where we developed

04:30:58 11    refrigerator-size units that could synthesize, purify, and

04:31:02 12    formulate 15 different generic drugs.  And I was responsible

04:31:07 13    for the purification and the formulation of all 15 different

04:31:10 14    drugs.

04:31:11 15             And just recently, I've been working on a

04:31:13 16    project with Takeda Pharmaceuticals in developing a new

04:31:18 17    formulation of one of their existing drugs, which is a

04:31:21 18    polyclonal antibody.

04:31:24 19             MS. PIROZZOLO:  Could you turn to Tab 1 in your

04:31:26 20    binder, which is Plaintiff's Exhibit 773.

04:31:26 21    BY MS. PIROZZOLO:

04:31:31 22    Q.    Is this a copy of your CV?

04:31:32 23    A.    Yes.

04:31:34 24    Q.    Does it have an accurate summary of your educational

04:31:37 25    and professional experience?

Myerson - Direct

04:31:38  1    A.    It does.

04:31:41  2            MS. PIROZZOLO:  Your Honor, Plaintiff offers

04:31:42  3    Dr. Myerson as an expert in the subject of separation and

04:31:46  4    purification methods, crystallization, pharmaceutical

04:31:49  5    formulation, and pharmaceutical manufacturing.

04:31:54  6            MR. LOMBARDI:  No objection, Your Honor.

04:31:54  7            THE COURT:  All right.  You may proceed.

04:31:58  8            MS. PIROZZOLO:  Let's turn to the '349 patent,

04:32:02  9    which is Tab 2 in your binder.  And let's go to Column 3,

04:32:07 10    Line 29.

04:32:07 11    BY MS. PIROZZOLO:

04:32:13 12    Q.    There's a paragraph beginning with the word

04:32:17 13    "accordingly."

04:32:18 14            What is your understanding, based on this

04:32:22 15    paragraph, of the need the '349 patent is directed to?

04:32:26 16    A.    Well, it's indicating it's directed to developing

04:32:32 17    pharmaceutical compositions such that they are essentially

04:32:38 18    free process byproducts and they're talking about

04:32:42 19    pharmaceutical compositions of Compound AI, which is

04:32:46 20    cabozantinib.

04:32:46 21            MS. PIROZZOLO:  Let's go to Column 22, at

04:32:49 22    Lines 8 through 27.

04:32:49 23    BY MS. PIROZZOLO:

04:32:53 24    Q.    What does the patent teach about the 1-1 impurity

04:32:58 25    that we've been talking about?

Myerson - Direct

04:32:59  1    A.      This part of the patent first shows the structure of

04:33:05  2    the -- the impurity that we're talking about, the 1-1

04:33:11  3    impurity, and indicates it needs to be minimized.

04:33:15  4    Q.      Does the '349 patent teach a skilled artisan how to

04:33:20  5    minimize the 1-1 impurity?

04:33:21  6    A.      It does.

04:33:23  7    Q.      What does the '349 patent teach in that regard?

04:33:25  8    A.      It teaches a synthetic process, which results in a

04:33:29  9    very low level of the 1-1 impurity.

04:33:32 10            MS. PIROZZOLO:  Now, let's go to Claim 3 of the

04:33:34 11    patent.

04:33:34 12    BY MS. PIROZZOLO:

04:33:36 13    Q.      In general, what is Claim 3 of the '349 patent

04:33:40 14    directed to?

04:33:41 15    A.      Well, first, it's developed to a pharmaceutical

04:33:45 16    composition for oral administration of Compound IB, Compound

04:33:53 17    IB being cabozantinib (L)-malate, and that pharmaceutical

04:33:58 18    composition needs to be essentially free of the 1-1

04:34:01 19    impurity, it has to contain one or more of four different

04:34:07 20    classes of excipients, and it needs to be a tablet or a

04:34:11 21    capsule.

04:34:12 22    Q.      And what does the patent say with regard to the term

04:34:16 23    "essentially free"?

04:34:17 24    A.      The patent defines essentially free as being less

04:34:22 25    than 200 parts per million of the 1-1 impurity.

Myerson - Direct

04:34:26  1    Q.     And can you explain what parts per million means?

04:34:29  2    A.     Yes.  A parts per million means one part in a million

04:34:33  3    parts by weight.  So, to give it a simple example something

04:34:38  4    that has a 1 percent -- 1 percent of something has 10,000

04:34:42  5    parts per million.  A tenth of a percent is a thousand parts

04:34:47  6    per million.  So 200 parts per million is 0.02 percent.

04:34:55  7    Q.     Now, in terms of Claim 3, what must be essentially

04:34:59  8    free of the impurity?

04:35:00  9    A.     The pharmaceutical composition.

04:35:03 10           MS. PIROZZOLO:  Okay.  Let's turn to Slide 3.

04:35:03 11    BY MS. PIROZZOLO:

04:35:08 12    Q.     Is the invention described in Claim 3 of the

04:35:12 13    '349 patent embodied in any Exelixis products?

04:35:16 14    A.     Yes.  In the two Exelixis products Cabometyx, which

04:35:22 15    is the tablets, and Cometriq, which are the capsules.

04:35:26 16    Q.     In your opinion, did the invention of the '349 patent

04:35:31 17    offer benefits?

04:35:31 18    A.     Yes.  It was necessary, as we've heard from various

04:35:39 19    witnesses, to control the 1-1 impurity because it turns out

04:35:43 20    it was genotoxic to lower levels, and control of the

04:35:47 21    impurities in the drug product is very important, both on

04:35:51 22    the manufactured drug product and on stability so it has a

04:35:55 23    shelf life.

04:35:57 24    Q.     Now, you mentioned you're responding to Drs. Lepore

04:36:01 25    and Donovan.

Myerson - Direct

04:36:03  1          MS. PIROZZOLO:  Turning to Slide 4.

04:36:03  2   BY MS. PIROZZOLO:

04:36:06  3   Q.     Could you briefly summarize your response?

04:36:09  4   A.     Yeah.  First, there's no motivation to control for

04:36:16  5   the 1-1 impurity since the prior art didn't teach that it

04:36:21  6   was an impurity that needed to be avoided in a

04:36:25  7   pharmaceutical composition.

04:36:28  8          There was no reasonable expectation of success

04:36:31  9   in controlling the impurity giving any lack of teaching in

04:36:35 10   how the -- in the prior art and how the impurity formed, and

04:36:39 11   that the Brown method would not necessarily produce API

04:36:43 12   essentially free of the 1-1 impurity.  And much less, it

04:36:48 13   would not lead a skilled artisan to create a pharmaceutical

04:36:51 14   composition essentially free of the 1-1 impurity.

04:36:56 15          MS. PIROZZOLO:  Now, let's turn to Slide 5.

04:36:56 16   BY MS. PIROZZOLO:

04:36:59 17   Q.     Can you explain how impurities can arise in a

04:37:02 18   pharmaceutical composition?

04:37:04 19   A.     Yes.  We have four places that impurities can -- can

04:37:12 20   arise.  First, in the synthesis of the API, that is making

04:37:17 21   the API, and that can include process impurities and

04:37:22 22   byproducts.

04:37:23 23          Secondly, when we blend the API with excipients,

04:37:28 24   the API can react with excipients to form impurities.

04:37:33 25          Third, when we manufacture the drug product,

04:37:38 1   particularly making a tablet, the -- the drug product or

04:37:45 2   the -- the formulated drug product undergoes a process where

04:37:49 3   it sees pressure, heat, humidity, various physical stress,

04:37:55 4   and that can cause impurities.

04:37:57 5          And, of course, the impurities can form during

04:38:02 6   the shelf life because of degradation of the API.

04:38:07 7   Q.    Now, let's focus on the active pharmaceutical

04:38:10 8   ingredient, and Dr. MacMillan touched on this, but what kind

04:38:15 9   of impurities can form in the API?

04:38:18 10  A.    Yeah.  There are -- there are three general -- three

04:38:22 11  general classes.  We can have unreactive reactants or

04:38:27 12  solvents, we can have process intermediates or side

04:38:34 13  products, and we can have degradation impurities.

04:38:37 14  Q.    Okay.  How can carry through of starting intermediate

04:38:44 15  reactants cause impurities?

04:38:46 16  A.    Right.  So -- so, again, if we look at a very simple

04:38:51 17  process that we have, a multi-step process, and in each step

04:38:54 18  we are doing the chemical reaction and that chemical

04:38:59 19  reaction involves reagents and solvents, and hopefully we're

04:39:05 20  making what we want to make.  But not all of our components

04:39:09 21  will react and we'll get some components that go into side

04:39:13 22  reactions, and we might get some degradation products.

04:39:17 23         Now, typically, we would do what are called work

04:39:22 24  up steps or purification steps between each stage so that in

04:39:27 25  the next stage we have something that's at least fairly pure

691

Myerson - Direct

04:39:32   1    of what we're trying to make and we carry that through to

04:39:35   2    the next stage going on to the final product.

04:39:39   3    Q.      How can byproducts and process impurities form?

04:39:43   4    A.      Byproducts form when we have chemical reactions that

04:39:48   5    occur which are not the chemical reactions we want to occur.

04:39:52   6    So, that's -- that's what I would call a byproduct.

04:39:56   7    Q.      And how do degradation products form?

04:39:58   8    A.      When something that we tried to form reacts to

04:40:04   9    breakdown to something else.

04:40:06   10   Q.      Can steps be taken to eliminate or minimize these

04:40:10   11   types of impurities in synthesis of an API?

04:40:13   12   A.      Yes.  Well, typically, we have what are called work

04:40:16   13   up steps or purification steps between each stage; these

04:40:20   14   include things like solvent extraction, distillations,

04:40:25   15   crystallization, among others.

04:40:27   16   Q.      Are these steps always effective?

04:40:29   17   A.      No.

04:40:31   18   Q.      Now, you mentioned that impurities can also arrive

04:40:35   19   during formulation of the pharmaceutical composition.

04:40:37   20   A.      Yes.

04:40:38   21   Q.      Could you explain how that may occur?

04:40:40   22   A.      Yes.  So, we have -- we have the blending with

04:40:46   23   excipients.  And as we've seen previously in other

04:40:50   24   testimony, the API can react with excipients forming

04:40:54   25   degradation products.

Myerson - Direct

04:41:01  1    Q.     Now, going back to the invention in the '349 patent,

04:41:06  2    did you review information about Exelixis' work to develop

04:41:10  3    that invention?

04:41:11  4    A.     I did.

04:41:13  5    Q.     Could you briefly summarize the types of materials

04:41:16  6    you reviewed?

04:41:17  7    A.     Yes.  I reviewed the Exelixis NDA, other Exelixis

04:41:25  8    development documents that weren't in the NDA, some lab

04:41:29  9    notebooks at various times, as well as other background

04:41:33 10    material that was produced in the case.

04:41:35 11            MS. PIROZZOLO:  Could you turn to Tab 4, which

04:41:38 12    is Plaintiff's Exhibit 35?

04:41:42 13            THE WITNESS:  Yes.

04:41:42 14    BY MS. PIROZZOLO:

04:41:42 15    Q.     What is Plaintiff's Exhibit 35?

04:41:46 16    A.     This is an excerpt from Exelixis NDA called the

04:41:51 17    "manufacturing process development of cabozantinib

04:41:55 18    (S)-malate," and -- and it was part of the FDA submission.

04:42:01 19            MS. PIROZZOLO:  Now, could you turn to Figure 7

04:42:03 20    on Page 7 of Plaintiff's Exhibit 35.

04:42:08 21            THE WITNESS:  Yes.

04:42:08 22    BY MS. PIROZZOLO:

04:42:08 23    Q.     What is shown in Figure 7?

04:42:10 24    A.     Figure 7 is a process that was called Process A-1,

04:42:16 25    and it was one of the small scale -- early small scale

Myerson - Direct

04:42:21 1    processes used by Exelixis to produce cabozantinib

04:42:25 2    (L)-malate.

04:42:26 3    Q.      Did Exelixis discover any problems with the A-1

04:42:30 4    process?

04:42:30 5    A.      They did.

04:42:32 6    Q.      What were the problems?

04:42:33 7    A.      Well, one of the biggest problems they discovered was

04:42:37 8    if we look at the synthesis group, we start with 1-1 and we

04:42:43 9    react that to form 1-2.  And then we react 1-2, to form the

04:42:49 10   next one in the sequence, 1-3.  But, unfortunately, the 1-3

04:42:54 11   was decomposing to form 1-1.  And, in fact, 20 percent of

04:42:59 12   the 1-3 was decomposing to 1-1, which is the first

04:43:06 13   discussion in paragraph 6.4.2.1.1.

04:43:13 14   Q.      Did Exelixis attempt to control for the formation of

04:43:18 15   1-1 in the A-1 process?

04:43:19 16   A.      They did a couple of things.  They did what's called

04:43:25 17   a re-slurry of the 1-3 to try to purge the 1 -1, and --

04:43:35 18   which was not wildly successful.  They also did some other

04:43:40 19   things related to problems with other steps in the process.

04:43:44 20   Q.      Okay.  Did they add a reagent at the intermediate

04:43:49 21   step?

04:43:49 22   A.      Yes.

04:43:54 23   Q.      Were the modifications successful at controlling the

04:43:57 24   1-1 impurity?

04:43:58 25   A.      No.

Myerson - Direct

04:44:00  1          MS. PIROZZOLO:  Okay.  Could you turn to Page 8

04:44:02  2   of Plaintiff's Exhibit 35.

04:44:05  3          THE WITNESS:  Yes.

04:44:05  4   BY MS. PIROZZOLO:

04:44:05  5   Q.     Did Exelixis encounter problems other than the

04:44:09  6   formation of the 1-1 impurity with the A-2 process?

04:44:11  7   A.     Yes.  Well, the A-2 process, they first still were

04:44:18  8   having trouble with the 1-2 to 1-3 conversion, and they were

04:44:23  9   still seeing 1-1 there.  But they also found that the use of

04:44:29 10   ethanol in the final salt forming step was producing ethanol

04:44:35 11   esters of malic acid in the product stream which were

04:44:37 12   difficult to detect and remove.

04:44:41 13   Q.     Did Exelixis modify the A-2 process in an attempt to

04:44:46 14   minimize the 1-1 impurity?

04:44:47 15   A.     They did.

04:44:50 16   Q.     What did Exelixis do?

04:44:51 17   A.     Well, they -- they -- as we heard from Dr. MacMillan,

04:44:56 18   they actually changed the chemistry.  So, what they did was

04:45:00 19   they eliminated the step from 1-2 to 1-3 and they changed

04:45:06 20   the chemistry to go directly from 1-2 to 1-4, thus

04:45:11 21   eliminating the 1-3 that was decomposing to form 1-1.

04:45:17 22   Q.     Did these changes control formation of the 1-1

04:45:20 23   impurity?

04:45:21 24   A.     They did.

04:45:23 25   Q.     Did Exelixis further -- did Exelixis modify the B-1

Myerson - Direct

04:45:28  1    process?

04:45:29  2    A.      They did.  They modified the conditions used in the

04:45:34  3    final salt formation step by adding a vacuum distillation to

04:45:39  4    reduce the heat and water required such that they would do

04:45:43  5    things at a -- at a lower temperature with less water.

04:45:46  6    Again, that helped minimize 1-1.

04:45:49  7    Q.      Okay.  Were these modifications enough to control for

04:45:53  8    the formation of 1-1?

04:45:54  9    A.      Yes.  The B-2 process was very effective in

04:45:59 10    controlling for 1-1.

04:46:01 11    Q.      Okay.  Now, looking at Plaintiff's Exhibit 35, are

04:46:06 12    the process modifications that we just discussed described

04:46:10 13    in Exhibit 35?

04:46:11 14    A.      Yes.

04:46:13 15            MS. PIROZZOLO:  Could you turn to Table 2 on

04:46:15 16    Page 16 of Exhibit 35?

04:46:20 17            THE WITNESS:  Yes.

04:46:20 18    BY MS. PIROZZOLO:

04:46:21 19    Q.      What does Table 2 show?

04:46:23 20    A.      Table 2 is a table that shows, first, lists on the

04:46:28 21    left the four processes A-1, A-2, B-1 and B-2.  And it looks

04:46:35 22    at the contents of the 1-1 impurity made in each of these

04:46:41 23    processes and we see in the A-2 process, it ranges from 35

04:46:46 24    to 411 PPM.  In the B-1 process, 84 PPM.  And in the B-2

04:46:54 25    process, less than 2 to 12 PPM.  In addition, the yields in

Myerson - Direct

04:47:03 1    the B-2 process and the overall purity in the B-2 process

04:47:08 2    were very good.

04:47:09 3    Q.      What is the process used for the commercial

04:47:12 4    manufacturer of Cabometyx and Cometriq?

04:47:15 5    A.      It is the B-2 process.

04:47:18 6            MS. PIROZZOLO:  Okay.  Now, could you turn to

04:47:21 7    Tab 5 in your binder, which is Plaintiff's Exhibit 47?

04:47:21 8    BY MS. PIROZZOLO:

04:47:27 9    Q.      What is Exhibit 47?

04:47:29 10   A.      Exhibit 47 is from the NDA for the cabozantinib

04:47:37 11   tablets and it talks about the drug product development.

04:47:43 12           MS. PIROZZOLO:  Please turn to Page 18 of

04:47:46 13   Plaintiff's Exhibit 47.  And turn to Table 4.

04:47:46 14   BY MS. PIROZZOLO:

04:47:53 15   Q.      What is depicted in Table 4?

04:47:55 16   A.      Yes.  Table 4 is an excipient compatibility study

04:48:02 17   particularly aimed at looking at the two genotoxic

04:48:06 18   impurities that had been identified, 1-1 and 1-4, and how

04:48:13 19   they would occur -- increase over time when the API was

04:48:20 20   mixed with various excipients and various combinations at

04:48:25 21   both a wet condition at 40 degrees C and a dry condition at

04:48:30 22   40 degrees C.

04:48:31 23   Q.      What does Table 4 show about the formation of the 1-1

04:48:36 24   impurity with different excipients?

04:48:38 25   A.      Yes.  Well, if we compare the amount of the 1-1

04:48:44  1    impurity, for example, in any column compared to the amount

04:48:51  2    that was in the A -- that's in the API at that time, we see

04:48:56  3    that any mixture of the API and excipients generally

04:49:01  4    resulted in an increase in the amount of 1-1 impurity.

04:49:05  5    Thus, 1-1 impurity was forming at a higher rate when

04:49:11  6    excipients were in contact with the API than the API itself.

04:49:19  7    Q.     Was this information relevant to making a

04:49:22  8    pharmaceutical composition of cabozantinib (L)-malate that

04:49:25  9    was essentially free of the 1-1 impurity?

04:49:28 10    A.     Yes.  What it tells you is you want to start with a

04:49:31 11    very low level of the 1-1 impurity to ensure that the

04:49:37 12    formulated drug product remains essentially free, both when

04:49:43 13    manufactured and on the shelf.

04:49:47 14    Q.     Were there any concerns at Exelixis about formation

04:49:51 15    of the 1-1 impurity occurring during manufacturing of

04:49:55 16    tablets or capsules?

04:49:56 17    A.     Yes.

04:49:57 18    Q.     What were those concerns?

04:50:00 19    A.     Again, we have interaction with excipients and then

04:50:04 20    we also have interaction with water, heat, and physical

04:50:11 21    stress or -- or force.

04:50:14 22    Q.     Now, we've talked about the B-2 process.  Is that the

04:50:18 23    process disclosed in the '349 patent?

04:50:21 24    A.     Yes.

04:50:23 25    Q.     Did the development of the B-2 process for

Myerson - Direct

04:50:25 1   synthesizing cabozantinib (L)-malate contribute to

04:50:29 2   minimizing the formation of the 1-1 impurity in

04:50:32 3   pharmaceutical compositions?

04:50:34 4   A.    Yes.  It was the key feature of the '349 patent

04:50:37 5   because it teaches a POSA how to make cabozantinib

04:50:43 6   (L)-malate with exceptionally low levels of the 1-1

04:50:46 7   impurity.

04:50:46 8          MS. PIROZZOLO:  Okay.  Now, let's take a look at

04:50:48 9   the '349 patent again, which is joint Exhibit 4, at

04:50:55 10  Columns 5 through 7.

04:50:55 11  BY MS. PIROZZOLO:

04:50:56 12  Q.    What is shown in Columns 5 through 7 of the patent?

04:51:02 13  A.    Column 5 through 7 show six examples of

04:51:06 14  pharmaceutical formulations, including that of a tablet and

04:51:10 15  a capsule.

04:51:13 16  Q.    Okay.  Before Exelixis' work was it known that 1-1

04:51:17 17  was a degradation impurity?

04:51:18 18  A.    It was not.

04:51:20 19  Q.    What is a genotoxic impurity?

04:51:23 20  A.    A genotoxic impurity is an impurity that reacts or

04:51:29 21  impacts your DNA or a person's DNA.

04:51:31 22  Q.    Can a skilled artisan tell without testing whether an

04:51:35 23  impurity is genotoxic?

04:51:36 24  A.    No.  A test, generally -- generally the Ames test is

04:51:41 25  required.

699

Myerson - Direct

04:51:42 1  Q.     At some point, did Exelixis discover that the 1-1

04:51:45 2  impurity was genotoxic?

04:51:47 3  A.     Yes.  It was in the period they were developing the B

04:51:51 4  processes that they -- that they discovered that the 1-1

04:51:55 5  impurity was genotoxic.

04:51:57 6  Q.     Now, you mentioned the Ames test.  Could you describe

04:52:00 7  how Exelixis discovered that the 1-1 impurity was genotoxic?

04:52:04 8  A.     Yes.  So, when they were in the period of developing

04:52:11 9  the B processes, they looked at potential structures that

04:52:18 10 were genotoxic and performed the Ames test on them.  I think

04:52:24 11 they did the Ames test on four compounds.

04:52:26 12 Q.     Okay.  Please look at --

04:52:30 13         MS. PIROZZOLO:  Let's pull up Slide 9 of your

04:52:32 14 presentation.

04:52:32 15 BY MS. PIROZZOLO:

04:52:34 16 Q.     What is shown on Slide 9?

04:52:35 17 A.     Slide 9 are the four compounds that -- that were

04:52:43 18 tested for genotoxicity by the Ames test.

04:52:49 19 Q.     Okay.  And what did -- what does this testing show

04:52:54 20 about these four compounds that were tested?

04:52:59 21 A.     Well, what -- what I think is very interesting is if

04:53:02 22 we look at the -- the first one on the left, which is Ames

04:53:06 23 positive, that's the 1-1 impurity.  But if we wanted to look

04:53:10 24 at the one right next to it, which is Ames negative, the

04:53:14 25 only difference between the two is a chlorine in place of

Myerson - Direct

04:53:19  1    the OH group.  And that's Ames negative.

04:53:24  2              It shows that you cannot just look at structures

04:53:26  3    and know if they're going to be Ames positive or Ames

04:53:29  4    negative, you have to do the test.

04:53:31  5    Q.    Before Exelixis identified the 1-1 impurity as a

04:53:36  6    genotoxin, was that fact publicly known?

04:53:38  7    A.    No.

04:53:40  8              MS. PIROZZOLO:  Now, let's turn to Slide 10.

04:53:40  9    BY MS. PIROZZOLO:

04:53:43 10    Q.    We've talked walked through some of your -- some of

04:53:46 11    Exelixis' work.  Could you summarize, in your opinion, the

04:53:50 12    key findings made by Exelixis about the 1-1 impurity?

04:53:53 13    A.    Well, the first is very important, that they found

04:53:58 14    that 1-1 could form as a degradation product during the

04:54:01 15    synthesis of the API.  They also found that 1-1 could form

04:54:08 16    when the cabozantinib (L)-malate was exposed to heat and

04:54:12 17    water.

04:54:13 18              Also, that it could form when cabozantinib

04:54:18 19    (L)-malate was exposed to certain excipients.

04:54:28 20              And, of course, as we know --

04:54:30 21              MR. LOMBARDI:  I thought --

04:54:31 22              MS. PIROZZOLO:  This is a mistake.

04:54:32 23              MR. LOMBARDI:  I thought it might have been.  I

04:54:34 24    just wanted to check.

04:54:34 25              MS. PIROZZOLO:  Yeah, yeah.  I apologize.  We

04:54:37 1   had a replacement slide.

04:54:39 2                   Here.

04:54:39 3                   THE COURT:  Oh, okay.

04:54:40 4                   MS. PIROZZOLO:  Can we get the --

04:54:48 5   BY MS. PIROZZOLO:

04:54:49 6   Q.     And the last bullet point, Dr. Myerson?

04:54:51 7   A.     The 1-1 impurity is genotoxic, which we just

04:54:55 8   discussed.

04:54:56 9                   MS. PIROZZOLO:  Okay.  Now, could you turn to

04:55:02 10  Tab 9 in your binder, which is a abbreviated version of

04:55:08 11  Joint Exhibit 8.

04:55:08 12  BY MS. PIROZZOLO:

04:55:10 13  Q.     Is this a portion of the file history of the

04:55:15 14  '349 patent?

04:55:16 15  A.     Yes.

04:55:18 16  Q.     Did you consider -- did you review the prosecution

04:55:21 17  history of the '349 patent in rendering your opinions?

04:55:25 18  A.     Yes.

04:55:28 19  Q.     Now, I'd like to turn to your opinions on validity.

04:55:37 20  And in your response to Drs. Donovan and Lepore, what are

04:55:43 21  your key disagreements with Drs. Donovan and Lepore?

04:55:47 22  A.     Well, first, I don't agree that the Brown reference,

04:55:55 23  which is what we've heard a lot about which is the A-2

04:56:00 24  process, will always produce cabozantinib (L)-malate that's

04:56:06 25  essentially free of the 1-1 impurity.

702

Myerson - Direct

04:56:11  1        I also think there's a significant gap in the

04:56:17  2   opinions of Dr. Lepore and Dr. Donovan.  From Dr. Lepore, we

04:56:23  3   heard about the API.  From Dr. Donovan we heard about the

04:56:29  4   formulation and the final drug product.  But no one really

04:56:33  5   discussed how -- what the 1-1 impurity could form during the

04:56:40  6   manufacturing of the drug product and on the shelf.  Thus, I

04:56:47  7   don't -- I don't think that that gap has been closed.

04:56:52  8        In addition, it's clear that a key feature of

04:56:59  9   the invention was the ability to formulate -- ability to

04:57:05 10   manufacture API, as described in the '349 process, that was

04:57:11 11   very, very low in the 1-1 impurity.  And, thus, can be

04:57:15 12   formulated into a drug product that could be reliably

04:57:19 13   manufactured and be essentially free of the 1-1 impurity.

04:57:22 14   Q.    Now, turning to Slide 11.  What did you consider in

04:57:29 15   forming your response to Drs. Donovan and Lepore?

04:57:32 16   A.    Well, first, I looked at the scope and contents of

04:57:37 17   the prior art, the differences between the prior art and the

04:57:40 18   claimed invention, whether there was any motivation to

04:57:45 19   modify Brown.  And whether there was a reasonable

04:57:48 20   expectation of success in reaching the claimed invention.

04:57:56 21   And then objective indicia of non-obviousness.

04:58:00 22        MS. WIGMORE:  Now, turning back to the patent,

04:58:03 23   Joint Exhibit 4.

04:58:04 24   BY MS. WIGMORE:

04:58:04 25   Q.    What is the priority date of the '349 patent?

Myerson - Direct

04:58:16  1   A.      Yes, it's February 10th, 2011.

04:58:23  2   Q.      Now, your definition of a skilled artisan is on

04:58:26  3   Slide 12; correct?

04:58:27  4   A.      Yes.

04:58:34  5   Q.      Did you apply this definition in forming your

04:58:37  6   opinions in this case?

04:58:38  7   A.      I did.

04:58:40  8   Q.      Are you familiar with Dr. Donovan's definition of a

04:58:43  9   skilled artisan?

04:58:43 10   A.      I am.

04:58:45 11   Q.      Would your opinions change under Dr. Donovan's

04:58:48 12   definition?

04:58:49 13   A.      It would not.

04:58:51 14   Q.      As of February 2011, did you meet the definition of a

04:58:56 15   skilled artisan under both parties' definitions?

04:58:59 16   A.      Yes.

04:59:03 17   Q.      Now, Drs. Donovan and Lepore, if we look at

04:59:08 18   Slide 12 -- or 13, mention several references in rendering

04:59:18 19   their -- their obviousness opinions --

04:59:20 20           THE COURT:  Ms. Pirozzolo, I think maybe this is

04:59:23 21   the appropriate place to stop for the day.

04:59:25 22           MS. PIROZZOLO:  Okay.

04:59:25 23           THE COURT:  Before you start getting into new

04:59:27 24   things.  So, we'll -- so that's it for today.

04:59:33 25           Dr. Myerson, you can step down.  Watch your

Myerson - Direct

04:59:37  1   step.

04:59:37  2                    Just looking ahead to tomorrow, Plaintiff,

04:59:47  3   you're still expecting to call Dr. Trout, Dr. George, and

04:59:51  4   Mr. Tate?

04:59:51  5                    MS. PIROZZOLO:  And, also, Dr. Koleng.

04:59:53  6                    THE COURT:  Oh, okay.  All right.

04:59:58  7                    All right.  Well, we'll be in recess until

05:00:00  8   tomorrow.

05:00:01  9                    MS. PIROZZOLO:  Thank you, Your Honor.

05:00:02 10                    DEPUTY CLERK:  All rise.

11                    (Court was recessed at 5:00 p.m.)

12                    I hereby certify the foregoing is a true and

13   accurate transcript from my stenographic notes in the

14   proceeding.

15                    /s/ Heather M. Triozzi
                       Certified Merit and Real-Time Reporter
16                     U.S. District Court

17

18

19

20

21

22

23

24

25