```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF DELAWARE

 3

 4     EXELIXIS, INC.,                  )
                                        )
 5                    Plaintiff,        )
                                        ) C.A. No. 22-228-RGA
 6     v.                               )
                                        ) Trial Volume III
 7     MSN LABORATORIES PRIVATE         )
       LIMITED, et al.,                 )
 8                                      )
                      Defendants.       )
 9

10                                       J. Caleb Boggs Courthouse
                                         844 North King Street
11                                       Wilmington, Delaware

12                                       Wednesday, October 25, 2023
                                         8:30 a.m.
13                                       Bench Trial

14
       BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
15

16     APPEARANCES:

17               MORRIS NICHOLS ARSHT & TUNNELL LLP
                 BY:  ANTHONY D. RAUCCI, ESQUIRE
18               BY:  JACK B. BLUMENFELD, ESQUIRE

19                       -and-

20               WILMERHALE
                 BY:  KEVIN S. PRUSSIA, ESQUIRE
21               BY:  LISA J. PIROZZOLO, ESQUIRE
                 BY:  AMY KREIGER WIGMORE, ESQUIRE
22               BY:  JONATHAN A. COX, ESQUIRE
                 BY:  KEVIN M. YURKERWICH, Ph.D.
23
                                         For the Plaintiff
24

25
```

1    APPEARANCES CONTINUED:

2              HEYMAN ENERIO GATTUSO & HIRZEL LLP
               BY:  DOMINICK GATTUSO, ESQUIRE

3                        -and-

4
               WINSTON & STRAWN LLP
5              BY:  GEORGE LOMBARDI, ESQUIRE
               BY:  BRYCE COOPER, ESQUIRE
6              BY:  KURT A. MATHAS, ESQUIRE
               BY:  ELIZABETH GRDEN, ESQUIRE
7              BY:  KEVIN BOYLE, ESQUIRE
               BY:  BRIAN O'GARA ESQUIRE

8
                              For the Defendants
9
     Also Present:
10
               Dr. Kondal Reddy Bairy
11
08:18:06                ***   PROCEEDINGS   ***
08:18:06 12
08:20:27
08:20:27 13            DEPUTY CLERK:  All rise.  Court is now in

08:30:57 14   session.  The Honorable Richard G. Andrews presiding.

08:30:57 15            THE COURT:  All right.  Good morning, everyone.

08:30:59 16   Please let's continue.

08:31:08 17            MS. PIROZZOLO:  Thank you, Your Honor.  One

08:31:09 18   housekeeping matter, we inadvertently put up the wrong

08:31:12 19   version of the slide that --

08:31:13 20            THE COURT:  That's right.  I remember.

08:31:15 21            MS. PIROZZOLO:  -- Dr. Myerson referenced, and

08:31:17 22   I'd agree with Mr. Lombardi that Lines 18 to 19 of Page 700

08:31:23 23   of the transcript could be stricken.

08:31:26 24            THE COURT:  All right.  Well, I will strike

08:31:28 25   those two lines, and I'm sure the court reporter will take

08:31:33  1   care of it.

08:31:35  2            MS. PIROZZOLO:  Thank you, Your Honor.

08:31:36  3                 DIRECT EXAMINATION (Continued)

08:31:36  4   BY MS. PIROZZOLO:

08:31:38  5   Q.     Good morning, Dr. Myerson.

08:31:39  6   A.     Good morning.

08:31:41  7   Q.     Now, Dr. Lepore and Dr. Donovan mentioned several

08:31:44  8   references offering your obviousness opinions.

08:31:47  9            MS. PIROZZOLO:  Could we put up Slide 13 of your

08:31:50 10   presentation?

08:31:50 11   BY MS. PIROZZOLO:

08:31:53 12   Q.     Do any of the references discussed by Drs. Donovan

08:31:57 13   and Lepore teach the method for synthesizing cabozantinib

08:32:00 14   (L)-malate that's disclosed in the '349 patent?

08:32:03 15   A.     No.

08:32:04 16   Q.     Do any of the references discussed by Drs. Donovan

08:32:08 17   and Lepore teach that 1-1 could be a process impurity or a

08:32:12 18   degradation process in the synthesis of cabozantinib

08:32:17 19   (L)-malate?

08:32:17 20   A.     No.

08:32:19 21   Q.     Do any of the references discussed by Drs. Donovan

08:32:23 22   and Lepore teach that the 1-1 compound was genotoxic?

08:32:27 23   A.     No.

08:32:28 24   Q.     Do any of the references discussed by Drs. Donovan

08:32:32 25   and Lepore describe a formulation of cabozantinib (L)-malate

Myerson - Direct (Continued)

08:32:36 1   essentially free of the 1-1 impurity?

08:32:39 2   A.     No.

08:32:40 3         MS. PIROZZOLO:  Now, let's look more closely at

08:32:42 4   the Brown reference which is in -- at Tab 10 of your binder,

08:32:47 5   and it's Defendants' Exhibit 291.  And if we can put that

08:32:53 6   up.

08:32:53 7   BY MS. PIROZZOLO:

08:32:57 8   Q.     This is the reference that Drs. Lepore and Donovan

08:32:59 9   referred to; correct?

08:33:00 10   A.     Yes.

08:33:01 11   Q.     What is Brown directed to?

08:33:04 12   A.     It's directed to the malate salt of cabozantinib and

08:33:11 13   discloses two crystalline forms of the malate salt.

08:33:14 14   Q.     Does Brown suggest that one with -- the 1-1 impurity

08:33:18 15   should be minimized in its synthesis of cabozantinib

08:33:22 16   (L)-malate?

08:33:22 17   A.     It does not.

08:33:24 18   Q.     Does Brown suggest that the 1-1 is a harmful

08:33:28 19   impurity?

08:33:28 20   A.     It does not.

08:33:30 21   Q.     Now, Brown refers to the 1-1 compound; correct?

08:33:34 22   A.     Yes.

08:33:36 23   Q.     Dr. Lepore has offered the opinion that a skilled

08:33:39 24   artisan would be motivated to control for 1-1 because it is

08:33:42 25   a starting material in the Brown synthesis.

Myerson - Direct (Continued)

08:33:47  1          Do you recall that?

08:33:47  2   A.     I do.

08:33:49  3   Q.     Do you agree with that opinion?

08:33:50  4   A.     I do not.

08:33:52  5   Q.     Could you explain why not?

08:33:53  6   A.     Yes.  Well, of course, starting materials can carry

08:34:00  7   through to the final product, but as we heard from

08:34:04  8   Dr. MacMillan, we have a continuous process with multiple

08:34:10  9   steps.  98 percent of the 1-1 starting material is used up

08:34:16 10   at the beginning of the first step, and then there are

08:34:20 11   multiple purification processes and other steps with

08:34:24 12   purification processes, thus that at the end of the fifth

08:34:28 13   step, we would not expect any significant amount of 1-1 to

08:34:34 14   carry through.  We just would expect it to be de minimis.

08:34:39 15   Q.     Would a skilled artisan looking at Brown understand

08:34:43 16   that the 1-1 impurity forms as a degradation process during

08:34:47 17   synthesis?

08:34:48 18   A.     No.  Again, as we heard from Dr. MacMillan, that

08:34:53 19   would not be expected by a person of ordinary skill.

08:34:58 20   Q.     Now, Brown refers to the process that you discussed

08:35:01 21   earlier that Exelixis referred to as the A- 2 process;

08:35:06 22   correct?

08:35:06 23   A.     That's correct.

08:35:09 24   Q.     Is Example 1 in Brown that Dr. Lepore discussed

08:35:14 25   different from the synthetic scheme for making cabozantinib

08:35:19  1   (L)-malate that's disclosed in the '349 patent?

08:35:22  2   A.    Oh, yes.  It's significantly different.

08:35:27  3   Q.    Now, let's turn -- and could you describe what you

08:35:31  4   view as the key differences?

08:35:32  5   A.    Well, there are multiple differences, but the key

08:35:36  6   difference is that the step in the Brown process that goes

08:35:42  7   from 1-2 to 1-3 was eliminated.  There's no 1-3.  You go

08:35:50  8   directly from 1-2 to 1-4.  In addition, changes to the

08:35:55  9   solvent and temperature of the salt formation step were

08:35:58 10   made, both of those are significant changes.  There are

08:36:01 11   other changes as well.

08:36:03 12             MS. PIROZZOLO:  Now, let's turn to Paragraph 97

08:36:05 13   of Brown.

08:36:05 14   BY MS. PIROZZOLO:

08:36:11 15   Q.    Dr. Lepore testified that Paragraph 97 of Brown

08:36:16 16   describes cabozantinib (L)-malate that is essentially free

08:36:19 17   of the 1-1 impurity.

08:36:22 18             Do you agree with that?

08:36:23 19   A.    I do not.

08:36:26 20   Q.    Could you explain why not?

08:36:28 21   A.    Well, if we look at the paragraph, it's really

08:36:32 22   focused on crystalline form purity.  That is, how much of

08:36:36 23   one crystalline form is present in a mixture of crystalline

08:36:39 24   forms.  And that's the focus of this.

08:36:43 25             Now, what I will agree that it does say at the

08:36:46  1  very end, that some process in the purities could be

08:36:53  2  present, but even with that, you can still -- it doesn't

08:36:55  3  disclose something that would essentially a 1-1 impurity,

08:36:56  4  but even with that, you can still -- it doesn't disclose

08:36:59  5  something that would be essentially free of the 1-1

08:37:02  6  impurity.

08:37:03  7  Q.     Could you explain why, even though it refers to

08:37:05  8  process impurities, it doesn't disclose anything --

08:37:08  9  something that would be essentially free of the 1-1

08:37:11 10  impurity?

08:37:11 11  A.     Right.  Because we're talking that the 1-1 impurity,

08:37:15 12  essentially free means that we have 0.02 percent of the 1-1

08:37:21 13  impurity.  And you could have something that met these

08:37:25 14  crystalline form purities still had 0.02 percent of the 1-1

08:37:31 15  purity.  In fact, even if you say about 100 percent, about

08:37:36 16  100 percent encompasses 99.98 percent.  So, I don't see how

08:37:41 17  this could tell somebody that it would be essentially free

08:37:45 18  of the 1-1 impurity.

08:37:48 19  Q.     Does Brown disclose pharmaceutical compositions of

08:37:54 20  cabozantinib (L)-malate that are essentially free of the 1-1

08:37:57 21  impurity?

08:37:57 22  A.     It does not.

08:38:00 23          MS. PIROZZOLO:  Now, turning to slide -- well,

08:38:08 24  let me strike that.

08:38:08 25  BY MS. PIROZZOLO:

Myerson - Direct (Continued)

08:38:09  1   Q.     To summarize, what are your opinions on the key

08:38:11  2   differences between Brown and the '349 patent?

08:38:17  3   A.     Well, the first key difference is that the '349

08:38:21  4   patent has a different synthetic process which was designed

08:38:25  5   to minimize the 1-1 impurity at very low levels.

08:38:30  6          Secondly, the '349 discloses formulation of the

08:38:37  7   1-1 impurity that's essentially free -- I'm sorry,

08:38:41  8   formulation of cabozantinib (L)-malate which is essentially

08:38:45  9   free of the 1-1 impurity.  Brown does not disclose any

08:38:49 10   specific formulation or discuss specific formulations.

08:38:54 11   Q.     Okay.  So, let's turn to Dr. Lepore's inherency

08:39:01 12   opinion.

08:39:01 13          MS. PIROZZOLO:  And go to slide 15, please.

08:39:01 14   BY MS. PIROZZOLO:

08:39:04 15   Q.     Looking at the first point on this slide, for the

08:39:11 16   asserted claim of the '349 patent, what must be essentially

08:39:15 17   free of the 1-1 impurities?

08:39:17 18   A.     The pharmaceutical composition.

08:39:20 19   Q.     Now, if an API has less than 200 PPM of 1-1, will the

08:39:27 20   formulated composition necessarily be free of the 1-1

08:39:30 21   impurity?

08:39:30 22   A.     No, because as we've seen, the process of blending

08:39:36 23   with excipients and making it into a drug product can result

08:39:41 24   in increase in the 1-1 impurity.  Thus, it's possible to

08:39:44 25   start with an API that's essentially free, but end up with a

Myerson - Direct (Continued)

08:39:49   1   drug product that's not essentially free due to the

08:39:51   2   additional formation of the 1-1.

08:39:54   3   Q.     Did Exelixis' own work show that the 1-1 impurity

08:39:57   4   could form during manufacturing of a drug product?

08:40:00   5   A.     Yes.

08:40:02   6   Q.     Could you explain why that's your opinion?

08:40:06   7   A.     Well, certainly.  We first saw the excipient

08:40:08   8   compatibility studies which showed that the 1-1 could --

08:40:14   9   would increase in contact with a number of different

08:40:16  10   excipients.  Secondly, we see the Exelixis studies that

08:40:20  11   showed that the 1-1 impurity would increase when exposed to

08:40:26  12   temperature, heat -- heat, moisture, and potentially

08:40:33  13   physical force, which are used in manufacturing of tablets

08:40:37  14   and capsules.

08:40:39  15   Q.     Now, let's turn to your second point.

08:40:48  16          Do you agree with Dr. Lepore that the synthetic

08:40:52  17   process in Brown does not inherently result in less than

08:40:55  18   200 PPM?

08:40:56  19   A.     I do not.

08:40:58  20          MS. PIROZZOLO:  Let's pull up Brown, Defendants'

08:41:03  21   Exhibit 291, at paragraph 213.

08:41:03  22   BY MS. PIROZZOLO:

08:41:08  23   Q.     What does this paragraph in Brown teach?

08:41:11  24   A.     Okay.  I'm just getting it on my...

08:41:19  25   Q.     I think it's on the screen, if that's...

Myerson - Direct (Continued)

08:41:21  1   A.      Yeah.  I -- it's easier for me to read.

08:41:23  2   Q.      Okay.

08:41:24  3   A.      What tab is that?  I'm sorry.

08:41:26  4   Q.      It's -- let me get it.  It's Tab 10.

08:41:33  5   A.      Tab 10.  And paragraph 213.

08:41:43  6           Yes.  Okay.  Thank you.

08:41:46  7   Q.      What does this paragraph in Brown teach?

08:41:48  8   A.      Well, it actually specifically says, "The foregoing

08:41:55  9   disclosure has been described in some detail by way of

08:41:57 10   illustration and examples for purposes of clarity and

08:42:00 11   understanding."

08:42:04 12           We skip a sentence and then it says, "However,

08:42:06 13   it should be understood that many variations and

08:42:10 14   modifications can be made while remaining within the spirit

08:42:13 15   and scope of the invention.  It will be obvious of one of

08:42:16 16   skill in the art that changes and modifications can be

08:42:18 17   practiced within the scope of is the appended claims.

08:42:22 18   Therefore, it is to be understood that the above description

08:42:25 19   is intended to be illustrative and not restrictive."

08:42:30 20   Q.      Now, Dr. Lepore has testified that the Brown process

08:42:37 21   inherently produces cabozantinib (L)-malate with less than

08:42:42 22   200 PPM of the impurity.

08:42:46 23           MS. PIROZZOLO:  Could you turn in your binder to

08:42:48 24   Tab 11, which is Plaintiff's Exhibit 38.

08:42:51 25           THE WITNESS:  Yes.

Myerson - Direct (Continued)

08:42:51  1    BY MS. PIROZZOLO:

08:42:53  2    Q.     What is -- what does this document show?

08:42:56  3    A.     This is a document from the Exelixis NDA for the

08:43:03  4    capsules, and it talks about batch analysis.

08:43:07  5         MS. PIROZZOLO:  Could you turn to Table 1 on

08:43:09  6    Page 2 of Plaintiff's Exhibit 38?

08:43:13  7         THE WITNESS:  Yes.

08:43:13  8    BY MS. PIROZZOLO:

08:43:14  9    Q.     What does Table 2 -- what does Table 1 show?

08:43:18 10    A.     It shows five lots of cabozantinib (L)-malate that

08:43:26 11    were manufactured and it looks at test results for various

08:43:34 12    impurities and overall purity.

08:43:36 13    Q.     Okay.  Now, Dr. Myerson, do you agree with Dr. Lepore

08:43:44 14    that the synthetic process does not inherently result in

08:43:47 15    less than 200 PPM of the 1-1 impurity?

08:43:50 16    A.     I'm sorry.  Could you repeat that, please?

08:43:53 17    Q.     Do you agree with Dr. Lepore that the synthetic

08:43:56 18    process in Brown does not inherently result in less than

08:44:01 19    200 PPM of the 1-1 -- strike that.

08:44:06 20         Do you agree with Dr. Lepore that the Brown

08:44:09 21    synthetic process inherently results in less than 200 PPM of

08:44:14 22    the 1-1 impurity?

08:44:15 23    A.     I do not.

08:44:16 24         MS. PIROZZOLO:  Okay.  And going back to Table 1

08:44:20 25    in Plaintiff's Exhibit 38.

Myerson - Direct (Continued)

08:44:22  1    BY MS. PIROZZOLO:

08:44:22  2    Q.    Could you explain why you disagree?

08:44:25  3    A.    Well, of the -- of the five lots described there,

08:44:32  4    four of them are made by the A-2 process.  Those are the

08:44:37  5    lots listed; Regis, Regis, Regis, and Girindus.

08:44:42  6            Now, the three Regis lots show non-detected

08:44:46  7    amounts of the 1-1 impurity and since the limit of detection

08:44:51  8    of this test was 200 PPM, that would indicate it was below

08:44:56  9    200 PPM.  While the Girindus batch showed a result of

08:45:01 10    0.06 percent, which is 600 PPM, which is not below 200 PPM.

08:45:07 11    Q.    Okay.  Now, you mentioned the .06 percent being

08:45:17 12    600 parts per million; is that right?

08:45:19 13    A.    Correct.

08:45:20 14    Q.    Now, Dr. Lepore has testified that the Girindus batch

08:45:24 15    is not representative of the Brown process.

08:45:26 16            Do you agree with that?

08:45:27 17    A.    I do not.

08:45:29 18    Q.    Could you explain the basis of your disagreement with

08:45:32 19    Dr. Lepore?

08:45:33 20    A.    Yes.  Well, first, the -- Exelixis in their

08:45:40 21    submission to the FDA represented that the batches made by

08:45:44 22    both the Regis and Girindus processes were made according to

08:45:48 23    A-2, which is the Brown process -- I mean, the -- the Brown

08:45:53 24    process.

08:45:55 25            In addition, while I agree the Girindus lot had

Myerson - Direct (Continued)

08:46:00  1    some planned deviations, those planned deviations still

08:46:05  2    fall, in my opinion, within the scope of Brown.

08:46:10  3    Q.    Now, you mentioned the deviations, but did you

08:46:14  4    consider the deviations discussed by Dr. Lepore?

08:46:16  5    A.    I did.

08:46:18  6    Q.    Okay.  What was the effect of the Girindus deviations

08:46:24  7    in your opinion?

08:46:25  8    A.    Well, all of these deviations were made with the

08:46:30  9    purpose of both increasing yield and reducing the amount of

08:46:34  10   impurities.

08:46:34  11          And, in fact, if we look at the total impurities

08:46:39  12   at the bottom of this table, we'll see that the purest batch

08:46:44  13   made of all these batches actually is the Girindus batch

08:46:48  14   with 0.36 percent impurity.  So, actually the planned

08:46:53  15   deviations resulted in a purer batch of cabozantinib

08:46:58  16   (L)-malate than was -- was obtained from the Regis batches.

08:47:04  17   Q.    And how is that relevant to your opinion?

08:47:06  18   A.    Well, it demonstrates that the deviations were made

08:47:09  19   in such a way as to reduce the overall amount of impurities.

08:47:14  20   In addition, if we look the deviations were done in steps

08:47:18  21   that would not be expected to produce the 1-1 impurity.

08:47:23  22   Q.    Now, in your opinion, do the deviations referenced by

08:47:27  23   Dr. Lepore take the Girindus lot outside the scope of

08:47:31  24   Example 1 in Brown?

08:47:32  25   A.    No.

Myerson - Direct (Continued)

08:47:33  1   Q.     Could you explain why not?

08:47:34  2   A.     Again, because Example 1 -- Example 1 of Brown allows

08:47:40  3   for deviation and I believe this is -- again, just falls in

08:47:46  4   within the scope of Example 1.

08:47:49  5   Q.     Now, turning from the Girindus batch to the Regis

08:47:53  6   batches.  Do you recall Dr. Lepore's testimony about GTI

08:48:00  7   testing on those batches?

08:48:01  8   A.     Yes.

08:48:02  9   Q.     GTI specific.

08:48:04 10        Do you dispute the results of the GTI specific

08:48:08 11   tests that Dr. Lepore discussed?

08:48:10 12   A.     No.  The GTI tests are very accurate.

08:48:15 13        MS. PIROZZOLO:  Let's turn to Plaintiff's

08:48:17 14   Exhibit --

08:48:17 15        THE COURT:  And I'm sorry.  I may have lost a

08:48:21 16   thread of it here, but in terms of the three Regis batches

08:48:27 17   actually producing the API with less than 200 parts per

08:48:36 18   million, do you agree that -- that that's a fact?

08:48:42 19        THE WITNESS:  Yes, certainly.

08:48:44 20        THE COURT:  Okay.

08:48:46 21        MS. PIROZZOLO:  Now, let's turn to Plaintiff's

08:48:48 22   Exhibit 35, which is the Cometriq NDA.

08:48:51 23        Could you took look at Table 2 on Page 16?

08:48:55 24        THE WITNESS:  Yes.

08:48:55 25   BY MS. PIROZZOLO:

Myerson - Direct (Continued)

08:48:57  1    Q.      Does the information in this table inform your

08:49:00  2    opinion on inherency?

08:49:03  3    A.      Yes.

08:49:05  4    Q.      Could you explain why?

08:49:06  5    A.      Again, this is -- submitted to the FDA -- indicating

08:49:12  6    that batches made by the A-2 process had within 35 and

08:49:18  7    411 parts per million indicating that at least some batches

08:49:26  8    had more than 200 parts per million.

08:49:30  9    Q.      Does that inform your opinion as to whether the Brown

08:49:35 10    process would necessarily produce cabozantinib (L)-malate

08:49:39 11    inherently free of the 1-1 impurity?

08:49:42 12    A.      It does.

08:49:42 13    Q.      Could you explain why?

08:49:44 14    A.      Again, it specifically says that -- well, that API

08:49:50 15    made by the A-2 process could have as high as 411 ppms over

08:49:55 16    the 1-1 impurity.

08:49:57 17    Q.      Okay.  Now, were you here when Dr. Lepore discussed

08:50:00 18    what he called the Regis process?

08:50:02 19    A.      Yes.

08:50:04 20            MS. PIROZZOLO:  Can we pull up Dr. Lepore's

08:50:09 21    Slide 14, please?

08:50:09 22    BY MS. PIROZZOLO:

08:50:12 23    Q.      Now, Dr. Lepore' Slide 14 refers to Defendants'

08:50:18 24    Exhibit 38; correct?

08:50:18 25    A.      Yes.

Myerson - Direct (Continued)

08:50:21  1            MS. PIROZZOLO:  Let's look at Exhibit 38, that's

08:50:24  2   at Tab 23 in your binder.

08:50:24  3   BY MS. PIROZZOLO:

08:50:37  4   Q.     What is Defendants' Exhibit 38?

08:50:38  5   A.     That's an Exelixis document.

08:50:41  6   Q.     Okay.  Is Defendants' Exhibit 38 a Regis document?

08:50:45  7   A.     No.

08:50:47  8   Q.     Okay.  What does Defendants' Exhibit 38 describe?

08:50:52  9   A.     It describes information on the drug substance,

08:50:57 10   different properties, and then it talks about the synthetic

08:51:05 11   route for the preparation of XL184, which is cabozantinib.

08:51:09 12   Q.     Were you here when Dr. Lepore testified about

08:51:12 13   capsules containing XL184?

08:51:14 14   A.     Yes.

08:51:16 15            MS. PIROZZOLO:  Okay.  Let's pull up Plaintiff's

08:51:18 16   Exhibit 9 that Dr. Lepore referred to.

08:51:18 17   BY MS. PIROZZOLO:

08:51:22 18   Q.     What is Exhibit 9?

08:51:23 19   A.     Exhibit 9 -- done with that.

08:51:33 20            This is, again, from the -- it's an Exelixis

08:51:48 21   document talking about the drug product of XL184 with

08:51:55 22   cabozantinib (L)-malate in 25- and 100-milligram capsules.

08:52:00 23   Q.     Was Defendants' Exhibit 9 in the prior art?

08:52:03 24   A.     No.

08:52:05 25   Q.     Does the prior art disclose capsules with the

Myerson - Direct (Continued)

08:52:08 1  formulation of the capsules in Exhibit 9?

08:52:11 2  A.    No.

08:52:15 3  Q.    Now, Dr. Lepore testified that even if Brown does not

08:52:20 4  inherently teach the essentially free limitation, a person

08:52:25 5  of ordinary skill would be motivated to modify Brown to

08:52:28 6  obtain a pharmaceutical composition essentially free of the

08:52:32 7  1-1 impurity.

08:52:34 8        Do you agree with Dr. Lepore on that?

08:52:36 9  A.    I do not.

08:52:38 10 Q.    Okay.  Let's go to some of your reasons for

08:52:43 11 disagreeing with Dr. Lepore.

08:52:45 12       Dr. Lepore testified that a skilled artisan

08:52:49 13 would have been motivated to control for 1-1 during the

08:52:53 14 synthesis of the API in Brown because it was a starting

08:52:56 15 material.

08:52:58 16       Do you agree with that?

08:52:59 17 A.    No.  As I've already noted, because it's a starting

08:53:03 18 material it's essentially mainly used up in the first step

08:53:08 19 and then there are multiple purification steps, an

08:53:16 20 additional synthesis step with purification steps.

08:53:19 21       By the time you make cabozantinib (L)-malate,

08:53:21 22 you would expect very small amounts, if any, of detectable

08:53:26 23 1-1 impurity, so there wouldn't be a motivation to control

08:53:29 24 for it.  Particularly since it hadn't been identified as a

08:53:33 25 genotoxic impurity either.

Myerson - Direct (Continued)

08:53:36 1    Q.    Now, Dr. Lepore testified that a skilled artisan

08:53:40 2    would have been motivated to modify Brown because they would

08:53:43 3    have expected the 1-1 impurity to form as a degradation

08:53:47 4    product.

08:53:48 5            Do you recall that?

08:53:48 6    A.    I do.

08:53:49 7    Q.    Do you agree with Dr. Lepore?

08:53:51 8    A.    No.  As we heard from Dr. MacMillan, it would not be

08:53:55 9    expected that the 1-1 impurity would form as a degradation

08:53:5910    product.

08:54:0011    Q.    And how does that affect motivation?

08:54:0212    A.    Well, you're not motivated to control for something

08:54:0513    that you don't think is going to form during your process.

08:54:1114    Q.    Now, Dr. Lepore testified that a skilled artisan

08:54:1415    would have been motivated to monitor --

08:54:1816            MS. PIROZZOLO:  And we can put up Slide 20.

08:54:1817    BY MS. PIROZZOLO:

08:54:2118    Q.    -- and control for 1-1 because it has a quinoline

08:54:2419    structure.  Do you agree with that?

08:54:2520    A.    No.

08:54:2821            MS. PIROZZOLO:  Can you put up Slide 20?

08:54:2822    BY MS. PIROZZOLO:

08:54:3123    Q.    Why do you disagree with Dr. Lepore?

08:54:3324    A.    Well, many quinoline are actually drugs.  I mean,

08:54:3925    cabozantinib is a quinolines.  And there are lots and lots

08:54:43 1    of quinoline drugs, so clearly not all quinolines are

08:54:47 2    problematic, they're not all genotoxic.

08:54:49 3    Q.      Okay.  Does cabozantinib have a quinoline structure?

08:54:52 4    A.      It does.

08:54:53 5    Q.      Is it genotoxic?

08:54:55 6    A.      No.

08:54:56 7    Q.      Could you turn to Tab 13 in your binder and put up

08:54:59 8    the Nagao paper that Dr. Lepore discussed?

08:55:03 9    A.      Yes.

08:55:07 10   Q.      Does the Nagao paper discuss the compound at issue

08:55:09 11   for the '349 patent?

08:55:11 12   A.      I'm sorry.  I couldn't hear that.

08:55:13 13   Q.      Does the Nagao paper disclose the 1-1 compound at

08:55:18 14   issue for the '349 patent?

08:55:20 15   A.      No.

08:55:21 16   Q.      Are all the quinoline structures reported in Nagao

08:55:27 17   genotoxic?

08:55:27 18   A.      No.

08:55:28 19   Q.      Did Nagao describe any correlation between the

08:55:32 20   structure of the quinolines and genotoxicity?

08:55:35 21   A.      No.

08:55:36 22   Q.      Can you explain why you don't see -- let me ask this:

08:55:41 23   Do you see a correlation between a quinoline structure and

08:55:45 24   genotoxicity in the Nagao paper?

08:55:48 25   A.      No.

Myerson - Direct (Continued)

08:55:48  1   Q.      Can you explain why not?

08:55:50  2   A.      Well, if we look in the table in the Nagao paper --

08:55:59  3   Q.      Is this Table 1?

08:56:00  4   A.      Yes.

08:56:02  5           And if, for example, we look at Compound 16 and

08:56:09  6   17, if we look, that the only difference between 16 and 17

08:56:19  7   is that in Compound 17, we have an additional chloride on

08:56:25  8   the -- on the wing on the bottom left.  Otherwise, it's

08:56:30  9   identical to 16.

08:56:32 10           And 17 is Ames negative and 16 is Ames positive.

08:56:39 11   Q.      And how does that impact your opinion on whether a

08:56:45 12   person of ordinary skill in the art would be motivated to

08:56:46 13   control for the 1-1 impurity because it was a quinoline?

08:56:49 14   A.      Well, again, you can't look at these structures and

08:56:52 15   know if they're genotoxic or not.  Very similar structures.

08:56:56 16   Some will be genotoxic and some will not be genotoxic.  So

08:57:00 17   you only know when you do the AMES test.

08:57:02 18           MS. PIROZZOLO:  So, let's turn to Defendants'

08:57:02 19   Exhibit 272.

08:57:02 20   BY MS. PIROZZOLO:

08:57:06 21   Q.      Which is Tab 14 in your binder.

08:57:12 22           Did you hear Dr. Lepore discuss Defendants'

08:57:17 23   Exhibit 272?

08:57:17 24   A.      I did.

08:57:19 25   Q.      What is Defendants' Exhibit 272?

Myerson - Direct (Continued)

08:57:22  1   A.      It's an EPA toxicological review of quinoline.

08:57:29  2   Q.      Does the EPA toxicological review discuss the 1-1

08:57:34  3   compound?

08:57:34  4   A.      It does not.

08:57:37  5   Q.      In your opinion, does the EPA toxicological review

08:57:42  6   suggest that all of the quinoline structures are -- all

08:57:45  7   quinoline structures are genotoxic?

08:57:47  8   A.      No, it does not.

08:57:48  9   Q.      Could you explain why not?

08:57:50 10   A.      Again, it's really just talking about quinoline.

08:57:52 11   It's not talking about all quinoline derivatives and

08:57:55 12   structures.

08:57:56 13   Q.      Okay.  Let's turn to Plaintiff's Exhibit 299 at

08:58:01 14   Tab 15.  Is this a -- an article you considered in rendering

08:58:06 15   your opinions in this case?

08:58:08 16   A.      Yes.

08:58:09 17   Q.      Could you explain what the article describes?

08:58:12 18   A.      Yes.  This is an article from RSC Advances and it's

08:58:17 19   on recent advances in the chemistry and therapeutic

08:58:20 20   potential of functionalized quinoline motifs, a review.

08:58:26 21   Q.      Could you -- did this paper inform your opinions in

08:58:29 22   this case?

08:58:29 23   A.      Yes.

08:58:30 24   Q.      Could you explain how?

08:58:31 25   A.      Well, it talks about, in fact, quinolines that are

Myerson - Direct (Continued)

08:58:36  1   actually drugs.  And if we go to Figure 1 in the paper.

08:58:42  2   Q.     Is that at Page 3?

08:58:44  3   A.     Yes.  We have some examples of marketed drugs that

08:58:49  4   are quinolines.  And we see, we have antimalarials,

08:58:53  5   antibacterials, anti-cancers, local anesthetics,

08:58:58  6   anti-tubercular drugs, and these are just examples.  There

08:59:01  7   are actually a lot more quinolines that are marketed drugs.

08:59:07  8   Q.     And how is this paper relevant to your opinions in

08:59:11  9   this case?

08:59:12 10   A.     Well, it just it generally shows that not all

08:59:15 11   quinolines are genotoxic.  In fact, many of them are useful

08:59:19 12   as drugs.

08:59:20 13   Q.     Did Dr. Lepore or Dr. Donovan provide any scientific

08:59:25 14   explanation for why some quinoline structures are genotoxic

08:59:29 15   and some are not?

08:59:30 16   A.     No.

08:59:32 17   Q.     In 2011, would a skilled artisan have been motivated

08:59:35 18   to control for 1-1 simply because it was a quinoline?

08:59:39 19   A.     No.

08:59:42 20   Q.     Now, let's turn to the next motivation that

08:59:48 21   Dr. Lepore provides to modify Brown.

08:59:52 22          These are regulatory guidances; correct?

08:59:55 23   A.     Yes.

08:59:56 24   Q.     Okay.

08:59:57 25          MS. PIROZZOLO:  Let's put up Tab 18, which is

Myerson - Direct (Continued)

08:59:59 1   Defendants' Exhibit 291.  Is -- sorry.  Defendants'

09:00:08 2   Exhibit 91.

09:00:08 3   BY MS. PIROZZOLO:

09:00:14 4   Q.     Is Defendants' Exhibit 91 a guidance that Dr. Lepore

09:00:19 5   discussed?

09:00:20 6   A.     Yes.

09:00:21 7   Q.     Could you describe your understanding of this

09:00:23 8   particular guidance?

09:00:24 9   A.     Yes.  This is the guidance for industry on genotoxic

09:00:28 10  and carcinogenic impurities in drug substances.  And it

09:00:33 11  talks about approaches, and it actually gives recommended

09:00:36 12  limits for daily ingestion of these potential impurities in

09:00:45 13  drug products.

09:00:46 14  Q.     Okay.  In 2011, would these guidelines have provided

09:00:51 15  a skilled artisan with the motivation to control for the 1-1

09:00:56 16  impurity in drug substances and products?

09:00:59 17  A.     Only if they were aware that the 1-1 impurity was

09:01:04 18  genotoxic.

09:01:05 19  Q.     Okay.  And at the time -- does anything in the prior

09:01:08 20  art disclose that the 1-1 impurity was genotoxic?

09:01:11 21  A.     No.

09:01:12 22  Q.     Are these guidelines applicable if the impurity is

09:01:15 23  not genotoxic?

09:01:16 24  A.     No.

09:01:18 25  Q.     Okay.  Now, Drs. Donovan and Lepore also discussed a

Myerson - Direct (Continued)

09:01:25  1    few other guidelines.  Do any of those guidelines refer to

09:01:30  2    1-1 or describe methods for limiting byproducts or

09:01:34  3    contaminants in cabozantinib (L)-malate?

09:01:36  4    A.     No.

09:01:39  5    Q.     So, let's go to the formulation references.  Now,

09:01:50  6    we've been focusing on the essentially free limitation.  But

09:01:55  7    Claim 3 of the '349 patent also requires certain classes of

09:01:59  8    excipients; correct?

09:02:00  9    A.     Correct.

09:02:02 10    Q.     Do all pharmaceutical compositions have each of these

09:02:05 11    four classes of excipients?

09:02:07 12    A.     No.

09:02:08 13    Q.     Why not?

09:02:09 14    A.     Well, it really depends on the formulation and its

09:02:13 15    purpose.  So, for example, let's look at tablets.  So,

09:02:18 16    immediate release tablets, which are tablets that you take

09:02:22 17    and -- and are supposed to dissolve in your body immediately

09:02:26 18    always will have a disintegrant.  But controlled-release

09:02:30 19    tablets, which are designed to dissolve over time, don't

09:02:38 20    necessarily have a disintegrant.

09:02:40 21           Capsules often do not have a disintegrant

09:02:44 22    because you don't have to break apart a capsule.  They

09:02:48 23    sometimes can for other reasons, but that's -- this is one

09:02:52 24    example.  And, of course, not all formulations have to have

09:02:59 25    glidants.  If you have a well-flowing formulation, you don't

09:03:04  1    have to add a glidant.  Generally, all capsules and -- all

09:03:12  2    capsules and tablets will have fillers.

09:03:16  3              MS. PIROZZOLO:  So, let's put up Claim 3 of the

09:03:20  4    '349 patent.

09:03:20  5    BY MS. PIROZZOLO:

09:03:21  6    Q.    Now, you heard Dr. Donovan testify that a skilled

09:03:24  7    artisan would have been motivated to formulate cabozantinib

09:03:29  8    (L)-malate as set forth in Claim 3.

09:03:32  9              Do you agree with that?

09:03:33 10    A.    No.

09:03:38 11    Q.    Could you explain why not?

09:03:39 12    A.    Well, first of all, the formulation of any drug

09:03:50 13    product requires you to understand the dosage form, the

09:03:56 14    dose, and the physicochemical properties of the API.  So,

09:04:01 15    before you know how you're -- how you're going to formulate

09:04:06 16    something, you have to do all that work.  And then you can

09:04:09 17    decide what classes of excipients you're going to employ.

09:04:13 18    Q.    Okay.  Have you heard the term "physicochemical

09:04:16 19    properties"?

09:04:17 20    A.    Yes.

09:04:18 21    Q.    What physicochemical properties are important to

09:04:22 22    formulation scientists?

09:04:24 23    A.    Well, certainly the solubility, the permeability, the

09:04:30 24    crystal size distribution, the crystal shape, the

09:04:35 25    hygroscopicity, the carrying electric charge, the

Myerson - Direct (Continued)

09:04:38 1   compressibility, the flowability.  There are probably some

09:04:43 2   more but those are some of the main ones you're interested

09:04:46 3   in.

09:04:47 4   Q.    Is chemical stability important?

09:04:49 5   A.    Yes.

09:04:49 6   Q.    And why is that?

09:04:50 7   A.    Well, chemical stability will determine whether the

09:04:57 8   API is going to decompose, either due to interaction with

09:05:02 9   the excipients or through the manufacturing process.

09:05:09 10  Q.    What were some of the kinds of physicochemical

09:05:12 11  properties that turned out to be important to how

09:05:16 12  cabozantinib (L)-malate was formulated?

09:05:18 13  A.    Well, first was the chemical stability.  And second

09:05:22 14  was the flowability.

09:05:24 15  Q.    And why were those important?

09:05:25 16  A.    Well, it turns out that cabozantinib (L)-malate could

09:05:33 17  decompose to the 1-1 impurity when exposed to moisture,

09:05:37 18  heat, and in the presence of certain excipients.  In

09:05:42 19  addition, it was poorly flowing.  The API was poorly

09:05:48 20  flowing.

09:05:48 21  Q.    Okay.  As of 2011, was the chemical stability of

09:05:52 22  cabozantinib (L)-malate known in the prior art?

09:05:55 23  A.    No.

09:05:57 24  Q.    As of 2011, was the flowability of cabozantinib

09:06:01 25  (L)-malate known in the prior art?

09:06:02  1   A.      No.

09:06:04  2   Q.      Okay.

09:06:05  3           MS. PIROZZOLO:  Let's put up paragraph 82 of the

09:06:08  4   Brown reference, Defendants' Exhibit 291.

09:06:08  5   BY MS. PIROZZOLO:

09:06:11  6   Q.      At Tab 10 in your binder.

09:06:16  7           Dr. Donovan referred to paragraph 82 in Brown in

09:06:20  8   her testimony.  Do you recall that?

09:06:21  9   A.      Yes.

09:06:23 10   Q.      In your opinion, does paragraph 82 in Brown suggest

09:06:27 11   formulating cabozantinib with a glidant?

09:06:30 12   A.      No.  A glidant is not a class of excipients that's

09:06:33 13   listed in paragraph 82.

09:06:36 14   Q.      Now, Dr. Donovan pointed in this paragraph to the

09:06:39 15   excipient talc.  Do you recall that?

09:06:42 16   A.      I do.

09:06:43 17   Q.      Is talc listed as a glidant in this paragraph?

09:06:46 18   A.      No, it's listed as a lubricant.

09:06:49 19   Q.      Okay.  Have you seen any reference identified by

09:06:54 20   Dr. Donovan that would motivate a skilled artisan to include

09:06:58 21   a glidant?

09:07:00 22   A.      To include a glidant in the --

09:07:03 23   Q.      In a composition for cabozantinib (L)-malate?

09:07:05 24   A.      No.

09:07:12 25           MS. PIROZZOLO:  Now, let's pull up Defendants'

Myerson - Direct (Continued)

09:07:19  1    Exhibit 335, which is a patent application.

09:07:19  2    BY MS. PIROZZOLO:

09:07:23  3    Q.    Do you recall Dr. Donovan discussing this patent

09:07:26  4    application?

09:07:26  5    A.    Yes.

09:07:28  6    Q.    Does this patent application relate to cabozantinib?

09:07:32  7    A.    No.

09:07:33  8    Q.    What, at a general level, does this patent

09:07:36  9    application relate to?

09:07:37  10   A.    It relates to several other APIs that are tyrosine

09:07:43  11   kinase inhibitors.

09:07:45  12   Q.    Does the -- does the '081 application, which is

09:07:49  13   Defendants' Exhibit 35 -- 335, teach that cabozantinib

09:07:54  14   (L)-malate should be formulated with a filler, disintegrant,

09:07:57  15   glidant, and lubricant?

09:07:59  16   A.    No.

09:08:00  17   Q.    Could you explain why not?

09:08:01  18   A.    Well, it's because it's about different APIs, and

09:08:05  19   different APIs have different properties.  It doesn't really

09:08:08  20   inform you if you have formulation for a completely

09:08:14  21   different API how you're going to formulate a different API.

09:08:18  22   Because you don't know -- the physicochemical properties are

09:08:21  23   going to be different.

09:08:24  24   Q.    Now, let's turn to the Lachman reference that

09:08:27  25   Dr. Donovan discussed which is Plaintiff's Exhibit 553A.

09:08:34  1    What is the Lachman reference?

09:08:36  2    A.      This is a reference on pharmaceutical dosage forms.

09:08:43  3    Q.      Did you hear Dr. Donovan testify that a skilled

09:08:46  4    artisan would be motivated by Lachman to formulate

09:08:50  5    cabozantinib (L)-malate with one or more fillers,

09:08:54  6    disintegrants, glidants and lubricants?

09:08:56  7    A.      I did.

09:08:57  8    Q.      Do you agree with Dr. Donovan's opinion?

09:08:59  9    A.      No, Lachman is -- is a general reference on

09:09:02  10   formulation.  And, of course, it talks about all classes of

09:09:06  11   excipients, but it also -- I think we saw the paragraph

09:09:10  12   already -- talks about how each formulation is a unique --

09:09:15  13   unique development project where you develop the formulation

09:09:21  14   based on the properties of the API.

09:09:25  15          MS. PIROZZOLO:  So, let's turn to Page 76 of

09:09:27  16   Lachman, which is Page 3 of the PDF.

09:09:27  17   BY MS. PIROZZOLO:

09:09:33  18   Q.      And looking at the sentence that begins with, "The

09:09:35  19   correct selection," is that what you're referring to,

09:09:39  20   Dr. Myerson?

09:09:39  21   A.      Yes.  "The correct selection and balance of excipient

09:09:43  22   materials for each active ingredient or ingredient

09:09:48  23   combination in a tablet formulation to achieve the desired

09:09:52  24   response (i.e. production of a safe, effective, and highly

09:09:58  25   reliable product) is not in practice a simple goal to

Myerson - Direct (Continued)

09:10:02 1    achieve."

09:10:04 2    Q.    Do you agree with that statement in Lachman?

09:10:06 3    A.    Yes.

09:10:07 4    Q.    Could you explain why?

09:10:08 5    A.    Well, because, again, each -- each formulation of a

09:10:15 6    new API is a unique problem.  And you might run into

09:10:19 7    problems with flow or chemical stability or the ability to

09:10:24 8    make a tablet that is -- doesn't break into pieces or is --

09:10:35 9    has appropriate hardness, has the right dissolution

09:10:38 10   properties.  So, in fact, in my own experience, you go

09:10:43 11   through lots and lots of iterations of excipients and blends

09:10:47 12   and tablet press pressures and various other things to make

09:10:53 13   a safe and effective and reliable formulation.

09:10:59 14   Q.    So, we've talked about Brown, the '081 application

09:11:04 15   and the Lachman reference.  Do any of those, in your

09:11:08 16   opinion, provide a motivation to formulate cabozantinib

09:11:12 17   (L)-malate in the manner claimed in Claim 3 of the '349

09:11:17 18   patent?

09:11:17 19   A.    No.

09:11:19 20          MS. PIROZZOLO:  Now, let's go to "Reasonable

09:11:21 21   Expectation of Success."  That's Slide 17 of your slides.

09:11:21 22   BY MS. PIROZZOLO:

09:11:32 23   Q.    Going to the first point, you heard Dr. Lepore

09:11:37 24   testify that a skilled artisan would have simply added a

09:11:41 25   recrystallization step to the synthetic process in Brown to

Myerson - Direct (Continued)

09:11:45  1    achieve an API that is essentially free of the 1-1 impurity.

09:11:50  2             Do you recall that?

09:11:50  3    A.     I do.

09:11:52  4    Q.     Do you agree with that?

09:11:52  5    A.     I do not.

09:11:57  6    Q.     Do you have an opinion -- strike that.

09:12:01  7             Are there any reasons that recrystallization

09:12:03  8    might be difficult in the context of cabozantinib

09:12:07  9    (L)-malate?

09:12:07 10    A.     Yes.  So, we're trying to reduce an impurity to below

09:12:13 11    200 PPM which is 0.02 percent.  And the 1-1 impurity is

09:12:24 12    structurally similar to the API cabozantinib (L)-malate.

09:12:29 13    And often in crystallizations, when have you structurally

09:12:31 14    similar materials, the impurity substitutes in the

09:12:36 15    crystalline lattice as an impurity making it very difficult

09:12:39 16    to achieve that level of purification.

09:12:43 17             This is something I've been doing for more than

09:12:46 18    40 years.  Crystallization is one of my main areas, and I've

09:12:50 19    seen this in many cases when you're trying to reduce

09:12:53 20    impurities to very low levels.  They just won't be removed.

09:12:56 21    So you have to come up with a different separation process

09:12:59 22    or different synthetic process to achieve that level of

09:13:04 23    purity.

09:13:07 24             MS. PIROZZOLO:  Let's call up Plaintiff's

09:13:10 25    Exhibit 494 which is Tab 21 in your binder.

Myerson - Direct (Continued)

09:13:10  1  BY MS. PIROZZOLO:

09:13:15  2  Q.    What is Exhibit 494?

09:13:17  3  A.    This is Chapter 3 of the *Handbook of Industrial*

09:13:21  4  *Crystallization*, which is the second edition, which is a

09:13:25  5  book I edited.

09:13:28  6          MS. PIROZZOLO:  Let's turn to Figure 3.10 on

09:13:32  7  Page 6.

09:13:32  8  BY MS. PIROZZOLO:

09:13:34  9  Q.    What does Figure 3.10 show?

09:13:37 10  A.    Well, this is a figure actually illustrating, among

09:13:41 11  other things, the point I just made about substitution of

09:13:45 12  impurities.

09:13:48 13  Q.    Could you explain with reference to the circles in

09:13:53 14  the figure how this would be relevant to recrystallizing

09:13:58 15  cabozantinib (L)-malate?

09:13:58 16  A.    Yes, so if the cabozantinib (L)-malate are the -- the

09:14:04 17  white circles, and the 1-1 impurity is structurally

09:14:09 18  similar -- it's A -- A can substitute in the crystalline

09:14:15 19  lattice and, thus, is a substitutional impurity.  And again

09:14:21 20  substitutional impurities are impurities that have an

09:14:23 21  affinity for the lattice, and they're very hard to reduce to

09:14:27 22  very low levels.

09:14:29 23  Q.    In your experience, is this kind of substitutional

09:14:33 24  impurity common in crystallization of active pharmaceutical

09:14:37 25  ingredients?

Myerson - Direct (Continued)

09:14:37 1   A.     Yes, it's actually a problem that I work on quite

09:14:41 2   often and companies ask me about quite often because it's --

09:14:45 3   it's a difficult issue when you're trying to get an impurity

09:14:48 4   that to these kinds of levels.

09:14:50 5   Q.     How does this relate to your opinion as to whether a

09:14:54 6   skilled artisan would have had a reasonable expectation of

09:14:57 7   success in recrystallizing cabozantinib (L)-malate to obtain

09:15:02 8   API essentially free of the 1-1 impurity?

09:15:05 9   A.     Well, based on this mechanism, you would think they

09:15:08 10  wouldn't have a reasonable expectation of success.  In

09:15:11 11  addition, of course, there's another reason.  It's because

09:15:16 12  the 1-1 impurity is a decomposition product of the API.  So,

09:15:21 13  when you -- it's just the act of redissolving it before you

09:15:26 14  recrystallize could produce additional 1-1 impurity, making

09:15:30 15  it even harder to get it essentially free.

09:15:35 16          MS. PIROZZOLO:  Now, let's turn to Defendants'

09:15:39 17  Exhibit 304 which is Tab 22 in your binder.

09:15:39 18  BY MS. PIROZZOLO:

09:15:46 19  Q.     Did you hear Dr. Lepore discuss Defendants'

09:15:50 20  Exhibit 304?

09:15:50 21  A.     I did.

09:15:51 22  Q.     What is Defendants' Exhibit 304?

09:15:54 23  A.     It's a guidance for industry on manufacturing active

09:16:00 24  pharmaceutical ingredients.

09:16:01 25  Q.     Okay.  In your opinion, would this reference motivate

Myerson - Direct (Continued)

09:16:06  1   a skilled artisan with reasonable expectation of success to

09:16:11  2   add a recrystallization step to the Brown process to achieve

09:16:15  3   cabozantinib (L)-malate essentially free of the 1-1

09:16:18  4   impurity?

09:16:18  5   A.      No.

09:16:20  6   Q.      Could you explain your opinion?

09:16:22  7   A.      Well, I mean, this -- this talks about purification

09:16:26  8   and mentions that you can try to purify something via

09:16:31  9   crystallization, but that wouldn't motivate a person to

09:16:35 10   modify Brown because, first of all, they don't know the 1-1

09:16:41 11   impurity is a decomposition product.  And, as I note, a

09:16:48 12   recrystallization step could be ineffective in this type of

09:16:51 13   process.  So, no, I don't believe it would.

09:16:55 14            MS. PIROZZOLO:  Let's go to Slide 17.

09:16:55 15   BY MS. PIROZZOLO:

09:17:00 16   Q.      So, we've talked about whether there would be a

09:17:04 17   reasonable expectation of success for controlling 1-1 in the

09:17:08 18   API of cabozantinib (L)-malate.  Let's move to controlling

09:17:14 19   1-1 in the pharmaceutical composition.  Okay?

09:17:17 20   A.      Yes.

09:17:19 21   Q.      Without the information provided by the '349 patent,

09:17:23 22   would a skilled artisan looking at the Brown reference have

09:17:27 23   had a reasonable expectation of success in achieving

09:17:30 24   cabozantinib (L)-malate composition with the claimed

09:17:34 25   excipients free of the 1-1 impurity?

Myerson - Direct (Continued)

09:17:36 1    A.      No.

09:17:36 2    Q.      Could you explain why not?

09:17:38 3    A.      Because the Brown process, first of all, would make

09:17:45 4    API with variable amounts of the 1-1 impurity, including

09:17:49 5    cases where the 1-1 impurity would already be greater than

09:17:54 6    200 PPM.  But even if it was below 200 PPM, it doesn't

09:17:59 7    describe any information on excipient compatibility or any

09:18:05 8    other thing that would allow you to formulate into a drug

09:18:09 9    product that was essentially free.

09:18:16 10   Q.      What were the properties of cabozantinib (L)-malate

09:18:20 11   that were not in the prior art that would be needed to

09:18:24 12   formulate cabozantinib (L)-malate essentially free of the

09:18:27 13   1-1 impurity?

09:18:28 14   A.      Well, first of all, you would have to know about its

09:18:32 15   chemical stability.  You'd have to understand whether it

09:18:38 16   decomposed under various conditions, and you would also have

09:18:43 17   to know the list of physicochemical properties I mentioned

09:18:48 18   before, including the excipient compatibility studies, and

09:18:56 19   because you're formulating it, you would still have to know

09:18:58 20   about the flowability and the crystal size, crystal shape,

09:19:04 21   all of those other things.

09:19:05 22   Q.      Okay.  Were those properties you just mentioned known

09:19:09 23   in the prior art?

09:19:10 24   A.      No.

09:19:13 25   Q.      Without knowing about these properties and without

09:19:18  1    the benefit of the teaching of the '349 patent, could a

09:19:21  2    person of skill have predicted how cabozantinib (L)-malate

09:19:26  3    or levels of the 1-1 impurity would be affected by

09:19:30  4    formulation?

09:19:30  5    A.      No.

09:19:31  6    Q.      Could you explain why not?

09:19:32  7    A.      Again, there's no information on the effect of

09:19:39  8    excipients, heat, moisture and processing conditions on the

09:19:45  9    formation of the 1-1 impurity.  In fact, we don't even know

09:19:48 10    it's a degradation product, which is the key piece of

09:19:51 11    information.

09:19:53 12    Q.      Okay.  Now, did you consider objective indicia in

09:19:57 13    rendering your opinions in this case?

09:20:00 14    A.      I did.

09:20:02 15    Q.      What products -- and we can look at Plaintiff's

09:20:05 16    Demonstrative Slide 3.  What products practice Claim 3 of

09:20:12 17    the '349 patent?

09:20:12 18    A.      The tablets, Cabometyx, and the capsules, Cometriq.

09:20:21 19    Q.      Did you consider whether there was a nexus between

09:20:26 20    the objective indicia in Claim 3 of the '349 patent?

09:20:29 21    A.      I did.

09:20:31 22    Q.      What is your understanding of the nexus between the

09:20:37 23    '349 patent and the objective indicia.

09:20:39 24    A.      Well, the '349 patent was crucial because it

09:20:42 25    disclosed a synthetic process to produce cabozantinib

Myerson - Direct (Continued)

09:20:48  1    (L)-malate at exceptionally low levels of the 1-1 impurity.

09:20:52  2    That allowed it to be formulated into a drug product which

09:20:58  3    continued to have low enough levels at of a 1-1 impurity

09:21:02  4    after manufacturing and in storage to be sold and given to

09:21:07  5    patients.

09:21:10  6    Q.     Did you consider opinions of Dr. George?

09:21:13  7    A.     I did.

09:21:14  8    Q.     Okay.  Dr. George will testify later, but did his

09:21:19  9    opinions, as you understand them, inform your opinions in

09:21:24 10    this case?

09:21:24 11    A.     Yes, because Dr. George -- I relied on Dr. George for

09:21:28 12    the usefulness of these formulated cabozantinib tablets and

09:21:35 13    capsules for the use in treating cancer.

09:21:38 14    Q.     Okay.  Does the claimed invention as embodied in the

09:21:43 15    Cabometyx product provide benefits over the prior art?

09:21:48 16    A.     Yes.  That's -- I'm relying on Dr. George for that.

09:21:57 17    Q.     Were there benefits to the formulation that were

09:22:01 18    relevant to patients?

09:22:04 19    A.     Yes.  Again, the formulation of the API that

09:22:11 20    maintained formulation that was essentially free of the 1-1

09:22:15 21    impurity is a key feature of this.

09:22:18 22    Q.     Now, you understand Dr. George has offered opinions

09:22:24 23    that Cabometyx is a clinical success.

09:22:29 24           Does that inform your opinions?

09:22:30 25    A.     Yes.  Of course.  The -- if the drug is clinical -- a

Myerson - Direct (Continued)

09:22:36  1   clinical success, a key feature of that is that it had been

09:22:42  2   formulated into a drug product.  It can help people.

09:22:46  3   Q.      Now, did you consider the opinions of Mr. Tate?

09:22:52  4   A.      Yes.

09:22:54  5   Q.      What opinions of Mr. Tate did you consider?

09:22:57  6   A.      Commercial success.

09:22:59  7   Q.      Does Mr. -- what was Mr. Tate's opinion on commercial

09:23:04  8   success that we'll hear from him later?

09:23:07  9   A.      Yes.  That -- that these drug products have been

09:23:12 10   commercially successful in the marketplace.

09:23:14 11   Q.      Okay.  How did Mr. Tate's opinions relate to your

09:23:18 12   ultimate opinion on obviousness?

09:23:22 13   A.      Again, these have -- for -- since I'm relying on

09:23:27 14   Mr. Tate for commercial success, part of the commercial

09:23:30 15   success has to be due to the successful formulation of the

09:23:36 16   API into the drug product.

09:23:38 17   Q.      Okay.  Dr. Myerson, what is your conclusion

09:23:41 18   concerning whether Claim 3 of the '349 patent is obvious?

09:23:44 19   A.      It's my opinion that it is not obvious.

09:23:48 20           MS. PIROZZOLO:  Thank you, Dr. Myerson.  I have

09:23:50 21   no further questions.

09:23:52 22           THE COURT:  All right.  Mr. Lombardi.

09:23:54 23           MR. LOMBARDI:  Your Honor, may we pass up some

09:23:58 24   binders?

09:23:58 25           THE COURT:  Yeah.  Sure.

Myerson - Cross

09:23:59  1          MR. LOMBARDI:  Thank you.

09:24:08  2                    CROSS-EXAMINATION

09:24:26  3   BY MR. LOMBARDI:

09:24:26  4   Q.     Good morning, Dr. Myerson.

09:24:35  5   A.     Good morning.

09:24:36  6   Q.     My name is George Lombardi.  We haven't met, have we?

09:24:39  7   A.     Nice to meet you.

09:24:41  8   Q.     Nice to meet you.

09:24:42  9          Sir, yesterday you spent a fair amount of time

09:24:45 10   going through various processes that had been developed by

09:24:50 11   Exelixis for the creation of the cabozantinib compound; is

09:24:56 12   that right?

09:24:56 13   A.     Correct.

09:24:57 14   Q.     And you started with Process A-1, I think, that was

09:25:02 15   the first one they had.

09:25:04 16   A.     Yes.

09:25:04 17   Q.     And then you went through A-2?

09:25:07 18   A.     Yes.

09:25:08 19   Q.     And B-1?

09:25:09 20   A.     Yes.

09:25:10 21   Q.     And B-2; correct?

09:25:11 22   A.     Correct.

09:25:12 23   Q.     And B-2, as I understood your testimony, was the one

09:25:16 24   that ended up getting the lowest amounts of the 1-1

09:25:19 25   impurity; is that correct?

Myerson - Cross

09:25:20  1    A.      Yes.

09:25:21  2    Q.      And, approximately, what were the parts per million

09:25:24  3    on that?

09:25:24  4    A.      It was from less than 2 PPM to 12 PPM.

09:25:28  5    Q.      Okay.  Now, you understand that we're here talking

09:25:34  6    about Claim 3 of the '349 patent; is that right?

09:25:39  7    A.      Yes.

09:25:40  8    Q.      And you're testifying specifically on whether that's

09:25:43  9    obvious or not; is that right?

09:25:44 10    A.      Correct.

09:25:45 11    Q.      So, here's Claim 3.  You see it up there on the

09:25:48 12    screen; is that right?

09:25:49 13    A.      Yes.

09:25:51 14    Q.      And it does make reference in the last paragraph, as

09:25:54 15    you pointed out, to essentially free, which in the terms of

09:25:59 16    the patent means 200 PPM or less; right?

09:26:02 17    A.      Correct.

09:26:03 18    Q.      It does not specify any particular way of

09:26:09 19    accomplishing that -- that level of impurity; is that right?

09:26:14 20    A.      In the claim itself, that's correct.

09:26:17 21    Q.      And the claim itself is what we're determining for --

09:26:21 22    looking at for obviousness; is that right?

09:26:23 23    A.      Well, the claim itself looks for obviousness but of

09:26:28 24    course a POSA interprets a claim based on the specification.

09:26:32 25    And the specification, of course, has the synthetic process

Myerson - Cross

09:26:35 1    in it.

09:26:36 2    Q.    Okay.  So -- well, is it your testimony then that the

09:26:39 3    synthetic -- what is the synthetic process in this spec?

09:26:41 4    It's B-2 in this instance?

09:26:42 5    A.    That's correct.

09:26:43 6    Q.    Is it your testimony that to infringe this claim a

09:26:49 7    POSA would have to use B-2?

09:26:51 8    A.    No.

09:26:52 9    Q.    Okay.  So, there is no method of controlling the

09:27:02 10   1-1 impurity specifically claimed in the patent; is that

09:27:05 11   right?

09:27:06 12   A.    You mean -- oh, specific -- did you say specifically

09:27:10 13   claimed?  I'm sorry.

09:27:10 14   Q.    Yes, I did.

09:27:11 15   A.    Yeah, not specifically in the claim.  I agree with

09:27:14 16   that.

09:27:14 17   Q.    Okay.  And the claim -- actually, the B-2, I think

09:27:20 18   you just said was -- it was single digits, I think, for

09:27:23 19   parts per million or up to 10 perhaps?

09:27:26 20   A.    It was up to 12.  Less than 2 and up to 12.

09:27:29 21   Q.    Okay.  And so the amount that the claim calls for is

09:27:33 22   considerably higher than that as an upper limit on the

09:27:37 23   impurities; is that right?

09:27:39 24   A.    Right.  But of course, I think you're -- you're doing

09:27:43 25   something that happens all the time.  You're talking about

Myerson - Cross

09:27:45  1    the API and the claim is to the pharmaceutical composition.

09:27:49  2    Q.    Yeah.  And the claim is to something considerably

09:27:52  3    higher than the level that could be accomplished with B-2;

09:27:57  4    isn't that right?

09:27:58  5    A.    Again, that's right, but you're connecting something

09:28:01  6    that's not exactly the same.

09:28:03  7    Q.    200 is greater than 12; is that right, Doctor?

09:28:06  8    A.    200 is in the pharmaceutical composition and the less

09:28:09  9    than 2 to 12 is in the API.  But I agree with you that the

09:28:13 10    number 200 is greater than the --

09:28:15 11    Q.    Thank you.

09:28:16 12    A.    -- the number 12.

09:28:17 13    Q.    Thank you.

09:28:17 14          Now, also in Claim 3, Doctor, there is reference

09:28:22 15    to excipients.  You talked about that; correct?

09:28:25 16    A.    Correct.

09:28:25 17    Q.    And in the reference to the excipients, it talks

09:28:28 18    about four categories of excipients; is that right?

09:28:32 19    A.    Correct.

09:28:33 20    Q.    Fillers, disintegrants, glidants and lubricants; is

09:28:36 21    that right?

09:28:36 22    A.    Correct.

09:28:37 23    Q.    It does not specify particular excipients; is that

09:28:42 24    right?

09:28:42 25    A.    That's correct.

Myerson - Cross

09:28:43  1    Q.     And -- and there are many, many fillers, for

09:28:47  2    instance; is that right?

09:28:48  3    A.     Yes.

09:28:48  4    Q.     Okay.  Can you give me a ballpark?

09:28:50  5    A.     Not really.  I mean there -- there are more common

09:28:55  6    fillers and less common fillers.  You'd have to go make a

09:28:58  7    list and take a look.

09:28:58  8    Q.     Okay.  There are many, many disintegrants; is that

09:29:01  9    right?

09:29:01 10    A.     Actually, not many, many disintegrants, but I'll say

09:29:04 11    that there are a number of different disintegrants.

09:29:06 12    Q.     Okay.  There are a number of different glidants; is

09:29:09 13    that correct?

09:29:09 14    A.     Again -- there are a number of different ones, yes.

09:29:13 15    Q.     And there are a number of different lubricants; is

09:29:16 16    that right?

09:29:16 17    A.     A limited set of lubricants, but there are -- there

09:29:19 18    are a number of different ones.

09:29:21 19    Q.     Okay.  And so for purposes of your analysis here,

09:29:25 20    we're not talking about specific -- it's -- they don't claim

09:29:29 21    in Claim 3 specific quantities of a particular filler; is

09:29:34 22    that right?

09:29:34 23    A.     That's correct.

09:29:35 24    Q.     And they don't claim specific quantities of a

09:29:38 25    particular filler that should be used with specific

Myerson - Cross

09:29:40  1    quantities of a particular disintegrant; is that right?

09:29:43  2    A.    That's correct.

09:29:43  3    Q.    And it's true for all four, they don't claim an

09:29:47  4    entire group of those four disintegrants where a particular

09:29:52  5    disintegrant -- or excuse me.  I got a word wrong.  I'll

09:29:56  6    start again, Doctor.

09:29:57  7            They don't -- they don't claim one group of

09:30:03  8    those four excipients that specifies every excipient and the

09:30:07  9    amounts of those excipients; right?

09:30:08 10    A.    That's correct.

09:30:10 11    Q.    They leave it to the person of skill in the art to

09:30:14 12    make that determination; right?

09:30:15 13    A.    Correct.

09:30:16 14    Q.    And that's something well within the level of skill

09:30:19 15    in the art; is that right?

09:30:20 16    A.    Correct.  And they do have examples in the patent

09:30:24 17    that inform a POSA.

09:30:26 18    Q.    Okay.  And so what's at issue here is whether it

09:30:29 19    would be obvious to use fillers, disintegrants, glidants,

09:30:32 20    and lubricants; is that right?  That's the issue?

09:30:34 21    A.    No, the issue -- actually, the issue is --

09:30:37 22    Q.    Well --

09:30:37 23    A.    -- the entire claim.

09:30:39 24    Q.    Fair enough, Doctor.  Fair enough.

09:30:41 25            But with respect to the excipient part of the

749

Myerson - Cross

09:30:43 1  claim --

09:30:44 2             MS. PIROZZOLO:  Your Honor, can he finish his

09:30:46 3  answer?

09:30:46 4             THE COURT:  He said it's the entire claim.  That

09:30:49 5  is the obvious answer, I think he's done.

09:30:50 6             Go ahead.

09:30:51 7             MR. LOMBARDI:  Okay.

09:30:56 8  BY MR. LOMBARDI:

09:30:56 9  Q.    And so, Doctor, what's at issue here is would it have

09:30:59 10 been obvious on this part of the claim -- the whole claim is

09:31:02 11 at issue, but for this part of the claim is whether it would

09:31:04 12 have been obvious to use these categories of excipients;

09:31:06 13 correct?

09:31:06 14 A.    You know, I -- I mean I understand what you're

09:31:15 15 saying, I guess.  Don't you do an obvious analysis looking

09:31:19 16 at all the elements of the claim together?

09:31:22 17           So -- so, to me, it's whether they do these four

09:31:26 18 categories to make a pharmaceutical composition of

09:31:29 19 cabozantinib that's essentially free.

09:31:32 20 Q.    Okay.  Fair enough.

09:31:33 21           All right.  Doctor, you -- as part of your

09:31:36 22 obviousness analysis, we know that the Brown application --

09:31:42 23 published application was disclosed.  That's prior art;

09:31:47 24 correct?

09:31:47 25 A.    Correct.

Myerson - Cross

09:31:48  1    Q.     Okay.  And you talked about Brown yesterday and this

09:31:51  2    morning; correct?

09:31:52  3    A.     Correct.

09:31:53  4    Q.     And you assumed for your obviousness analysis that a

09:31:56  5    person of skill in the art would have known about the

09:32:00  6    cabozantinib crystalline malate salt based on Brown;

09:32:06  7    correct?

09:32:06  8    A.     Yes.  They would have known about the malate salt,

09:32:08  9    that's correct.

09:32:09 10    Q.     Okay.  And you would have -- they would have -- you

09:32:11 11    would have known a person of skill in the art -- you're

09:32:14 12    assuming that a person of skill in the art would know --

09:32:15 13    would have known that Brown teaches its use as a treatment

09:32:19 14    for disease; is that right?

09:32:21 15    A.     Yes.  I believe Brown discloses that.

09:32:24 16    Q.     Okay.  Given that assumption -- well, let me put up

09:32:27 17    on the screen just something to help guide our discussion.

09:32:32 18           This is --

09:32:33 19           MR. LOMBARDI:  Could we put up the Doctor's

09:32:35 20    slide PDX-4.10, please.

09:32:35 21    BY MR. LOMBARDI:

09:32:51 22    Q.     Doctor, this is one of your slides -- there we go.

09:32:54 23           This is one of your slides from early in your

09:32:57 24    testimony; is that right?

09:32:58 25    A.     Yes.

751

Myerson - Cross

09:32:59 1    Q.    And it's --

09:32:59 2          MR. LOMBARDI:  Just for the record, it's PDX 4.4

09:33:02 3    and it's titled "Summary of opinions."

09:33:02 4    BY MR. LOMBARDI:

09:33:05 5    Q.    Did I get that right?

09:33:06 6    A.    Yes.

09:33:07 7    Q.    Now, given that knowledge of the person of skill in

09:33:12 8    the art about cabozantinib with a crystalline form and its

09:33:16 9    use as a pharmaceutical, each of these -- there it is.

09:33:26 10         All right.  Let me step back.

09:33:28 11         Each of -- you put forward on this slide four

09:33:31 12   things that you considered discoveries that were made by

09:33:33 13   Exelixis involving the 1-1 impurity; is that right?

09:33:37 14   A.    Yes.

09:33:39 15   Q.    And given knowledge that cabozantinib was out there

09:33:45 16   known in the art and could be used for pharmaceutical

09:33:47 17   purposes, a person of skill in the art would have been

09:33:51 18   motivated to do each of these things; isn't that correct?

09:33:54 19   A.    I'm sorry.  I don't think -- I think that's -- maybe

09:34:04 20   I'm not following the phrasing of your question, but the

09:34:07 21   first one is --

09:34:08 22         THE COURT:  So, actually, you know, can't you

09:34:10 23   rephrase the question because I think it doesn't actually

09:34:13 24   make any sense.

09:34:14 25         MR. LOMBARDI:  Maybe I got something wrong.

09:34:15 1    I'll try -- let me try again, Your Honor.

09:34:15 2    BY MR. LOMBARDI:

09:34:17 3    Q.     So you set forth on this slide Exelixis' discoveries

09:34:23 4    regarding the 1-1 impurity; is that right?

09:34:25 5    A.     Yeah.

09:34:25 6    Q.     And you talk about that Exelixis discovered the

09:34:29 7    formation of a degradation product in the first bullet;

09:34:33 8    right?

09:34:35 9    A.     Yes.  During the synthesis, right.

09:34:37 10   Q.     And then discovered the degradation product when

09:34:40 11   exposed to heat and water in the next one; is that right?

09:34:42 12   A.     Right.

09:34:43 13   Q.     And then they thought -- discovered that due to

09:34:45 14   chemical interactions 1-1 could form; is that right?

09:34:49 15   A.     Yes.

09:34:50 16   Q.     And discovered that the 1-1 impurity is genotoxic.

09:34:55 17          Do you see that?

09:34:56 18   A.     Yeah.

09:34:56 19   Q.     And so my question is:  Each of those discoveries --

09:35:00 20   for each of those discoveries, a person of skill in the art

09:35:04 21   would have been motivated to do the work that led to them;

09:35:07 22   isn't that true?

09:35:08 23   A.     Well, I think that's kind of a hindsight analysis

09:35:12 24   because, of course, you're not motivated to know that

09:35:16 25   something is a degradation product.  When you're -- when

Myerson - Cross

09:35:19  1   you're working on development, you might discover it's a

09:35:22  2   degradation product but that's something you're not

09:35:26  3   motivated for.  It's just -- it's just something you would

09:35:28  4   find out when you were doing further development --

09:35:32  5   Q.     Okay.

09:35:32  6   A.     -- of the compound.

09:35:33  7   Q.     Okay.  Well, let's talk about it.  Let's talk about

09:35:35  8   the first one first, the first bullet point.

09:35:37  9   A.     Yes.

09:35:38 10   Q.     Doctor, it's the 1-1 could form as a degradation

09:35:41 11   product during the synthesis of the API.

09:35:44 12          Do you see that?

09:35:44 13   A.     Yes.

09:35:45 14   Q.     So, we -- we're making the assumption that

09:35:49 15   cabozantinib is out there and known; is that right?

09:35:52 16   A.     Right.  It's out there and known, and there's a

09:35:57 17   process to make it in Brown.

09:35:58 18   Q.     And understanding the physiochemical characteristics

09:36:03 19   of an API is an important step in the drug development

09:36:08 20   process; correct?

09:36:09 21   A.     That's correct.

09:36:09 22   Q.     In every drug development project, the team will be

09:36:12 23   motivated to figure out what the physiochemical

09:36:16 24   characteristics of the API are?

09:36:17 25   A.     That's correct.

Myerson - Cross

09:36:18   1    Q.      And in this case, that would be cabozantinib; right?

09:36:21   2    A.      Correct.

09:36:22   3    Q.      And it would be a normal progression in the drug

09:36:26   4    development process for a POSA to do pre-formulation

09:36:30   5    studies?

09:36:31   6    A.      That's correct.

09:36:32   7    Q.      This helps the POSA determine how to develop the

09:36:35   8    product?

09:36:35   9    A.      That's correct.

09:36:36  10    Q.      And to determine suitable technologies to use the

09:36:39  11    formulation, to use in the formulation?

09:36:41  12    A.      That's correct.

09:36:43  13    Q.      Now, it's important to know the degradation products

09:36:47  14    that are made in the synthesis of an API?

09:36:51  15    A.      That's correct.

09:36:52  16    Q.      And a POSA would consider it important to know that?

09:36:56  17    A.      Yes.

09:37:00  18    Q.      And actually, a person of skill in the art would be

09:37:05  19    very concerned about having degradation products in this

09:37:09  20    drug that they're making because they want to make the best

09:37:12  21    drug they can; right?

09:37:14  22    A.      That's correct.  Of course, there are -- when

09:37:21  23    developing a drug and looking at degradation products, as I

09:37:24  24    think I talked about a lot at my deposition, you're often

09:37:30  25    looking at known impurities and unknown impurities and, in

Myerson - Cross

09:37:34 1    fact, part of the development process might be to determine

09:37:37 2    what these unknown degradation products are.

09:37:40 3    Q.    And that's something formulation scientists do all

09:37:42 4    the time; correct?

09:37:43 5    A.    You're skipping a step.  We're talking about the

09:37:47 6    synthetic people, the -- which are looking at the synthetic

09:37:52 7    process and then separately the formulation people do

09:37:56 8    additional work that -- that we talked about.

09:38:00 9    Q.    And there are -- they're both looking for degradation

09:38:02 10   products; correct?

09:38:03 11   A.    Yeah, at different times, for different purposes, but

09:38:06 12   yes.

09:38:06 13   Q.    And actually it's not just that a person of skill in

09:38:09 14   the art would be motivated to find these degradation

09:38:12 15   products, the FDA requires it, doesn't it?

09:38:15 16   A.    Okay.  So now if we talk about that, we actually -- I

09:38:21 17   don't think anybody put up the actual numbers of guidance

09:38:25 18   for impurities in drug products, but typically you have to

09:38:30 19   identify impurities that are over a thousand PPM and those

09:38:36 20   impurities that are under a thousand PPM could be listed as

09:38:40 21   unknown impurities unless they're determined to be -- unless

09:38:43 22   you have a reason to think they're genotoxic or

09:38:46 23   carcinogenic.

09:38:47 24   Q.    But have you to find the impurities.  The FDA tells

09:38:50 25   you to find the impurities; is that right?

Myerson - Cross

09:38:52  1   A.      No.  What I just said is exactly correct.  A thousand

09:38:57  2   PPM, you have to identify what they are.  Under a thousand

09:39:01  3   PPM, they get listed as unknown impurities.  And eventually

09:39:05  4   you might determine what they are particularly if they turn

09:39:10  5   out to be genotoxic.

09:39:12  6   Q.      Okay.  Let's put up -- I think you have this.  It's

09:39:15  7   DTX-274 and -- and if you want your binder -- and I can put

09:39:20  8   it on the screen.  I will put it on the screen.

09:39:22  9   A.      I'm having a little trouble.

09:39:23 10   Q.      With the screen?  Okay.

09:39:24 11   A.      I'd like to like look in the binder.

09:39:27 12   Q.      Fine.  DTX-274.

09:39:29 13   A.      Yes.  Right.

09:39:38 14   Q.      Got it?

09:39:38 15   A.      Yeah.

09:39:39 16   Q.      Okay.  Just to make sure we're on the right page,

09:39:42 17   Doctor, it's -- what you're looking at is the guidance for

09:39:44 18   industry Q3A impurities in new drug substances; is that

09:39:50 19   right?

09:39:50 20   A.      Actually, I was giving you the number of this that

09:39:53 21   I -- that I just happened to know.

09:39:56 22   Q.      Okay.  But that's what you have in front of you;

09:39:57 23   right?

09:39:57 24   A.      Yes.

09:39:58 25               MR. LOMBARDI:  Okay.  Let's go to Page 3.  Yes.

Myerson - Cross

09:40:07 1   There.

09:40:07 2   BY MR. LOMBARDI:

09:40:08 3   Q.      And at the top it says, "Rationale for the reporting

09:40:10 4   and control of impurities."

09:40:12 5           Do you see that, Doctor?

09:40:13 6   A.      I do.

09:40:14 7   Q.      And then the first sentence says, "The applicant

09:40:19 8   should summarize the actual and potential impurities most

09:40:22 9   likely to arise during the synthesis, purification and

09:40:25 10  storage of a new drug substance."

09:40:28 11          Do you see that?

09:40:29 12  A.      Yes.

09:40:29 13  Q.      And when we're talking about a new drug substance,

09:40:32 14  we're talking about something like cabozantinib; right?

09:40:34 15  A.      Correct.  Something that hasn't been approved yet.

09:40:37 16  Q.      Okay.  And so, a person of skill in the art would be

09:40:42 17  motivated when they start to work with a compound that

09:40:46 18  they've synthesized to find degradation products during the

09:40:50 19  synthesis of the API; is that right?

09:40:52 20  A.      Yes.  Again, they'll see them in the HPLC.  They

09:40:57 21  won't necessarily identify what they are.

09:41:00 22  Q.      Okay.  And, sir, when you look at the claims in this

09:41:04 23  case, the inventors here did not claim any new methods of

09:41:08 24  looking for degradation products in the synthesis of the

09:41:13 25  API; is that right?

Myerson - Cross

09:41:14  1    A.    I'm sorry.  Maybe --

09:41:15  2                MR. LOMBARDI:  Let's -- can we put the slide

09:41:17  3    back up?  PDX 4.10.

09:41:21  4                THE WITNESS:  I just didn't get the question.

09:41:22  5    BY MR. LOMBARDI:

09:41:22  6    Q.    I'm going to give it to you again.  I think it'll

09:41:25  7    help maybe.  It's at -- I'm reading from the slide, so --

09:41:26  8    A.    It might help.

09:41:27  9    Q.    The inventors did not claim any new methods of

09:41:31 10    looking for degradation products that could arise during the

09:41:35 11    synthesis of the API?

09:41:37 12    A.    New method, no.

09:41:39 13    Q.    And, in fact, the inventors said use known techniques

09:41:42 14    to do that; is that correct?

09:41:43 15    A.    That's correct.

09:41:44 16    Q.    And there's nothing in the patent that says that a

09:41:46 17    person of skill in the art would not have been able to

09:41:49 18    locate the degradation products; is that right?

09:41:53 19    A.    That's correct.

09:41:54 20    Q.    And, in fact, the presence of reaction impurities and

09:41:58 21    or processing impurities may be determined by analytical

09:42:02 22    techniques known in the art; is that right?

09:42:04 23    A.    That's correct.

09:42:05 24    Q.    And actually, that's -- that was a quote from Brown;

09:42:09 25    right?

Myerson - Cross

09:42:09 1    A.     If you tell me it is, that's fine.  But -- but I

09:42:14 2    agree with the statement.

09:42:15 3    Q.     And Brown is an Exelixis patent application; correct?

09:42:19 4    A.     Yes.

09:42:21 5    Q.     Yes.  Okay.

09:42:22 6                MR. LOMBARDI:  Let's go to the second one.

09:42:22 7    BY MR. LOMBARDI:

09:42:25 8    Q.     1-1 could form as a degra -- de -- excuse me.  1-1

09:42:29 9    could form as a degradation product when cabozantinib

09:42:32 10   (L)-malate was exposed to heat and water.

09:42:37 11               Do you see that?

09:42:37 12   A.     Yes.

09:42:38 13   Q.     That's another one of the discoveries that you talked

09:42:40 14   about; correct?

09:42:42 15   A.     Yes.

09:42:43 16   Q.     Okay.  And a person of skill in the art would have

09:42:46 17   been motivated to determine what the degradation products

09:42:51 18   would be when cabozantinib (L)-malate was exposed to heat

09:42:55 19   and water; is that right?

09:42:59 20   A.     I would agree that at some point somebody would have

09:43:01 21   done a stress test on probably cabozantinib (L)-malate to

09:43:04 22   look at the effects of heat and water on the API

09:43:08 23   incompetent.  Agree with that.

09:43:08 24   Q.     That's routine work for formulation scientists; isn't

09:43:11 25   that right?

09:43:12 1   A.      Actually, that's -- that's work that's done on the

09:43:17 2   API in terms of chemical stability at some point in the

09:43:22 3   development process.  I'm not sure who's going to do it, but

09:43:26 4   it's done.

09:43:26 5   Q.      Okay.  You're making a distinction between perhaps a

09:43:30 6   chemist that does its synthesis and somebody who does the

09:43:33 7   formulation?

09:43:33 8   A.      Yeah, and sometimes there's actually a material

09:43:36 9   science group in between.

09:43:37 10  Q.      Okay.  But persons of skill in the art would do it --

09:43:39 11  A.      Yeah.

09:43:40 12  Q.      -- is that right?

09:43:41 13          And they'd know how to do it; correct?

09:43:42 14  A.      Yes.

09:43:43 15  Q.      And it's another thing that the FDA requires to be

09:43:48 16  done; isn't that right?

09:43:49 17  A.      At some point in development; that's correct.

09:43:53 18  Q.      Okay.  And the FDA, when it's looking for degradation

09:43:57 19  products, they're specifically looking for impurities that

09:44:02 20  result from a chemical change in the drug substance brought

09:44:05 21  about by the manufacture or storage of the new drug product

09:44:10 22  by effect of light, temperature, pH, water, things like

09:44:16 23  that; is that right?

09:44:16 24  A.      Yes, because those are very important both in the

09:44:19 25  manufacturing and the stability of the drug on the shelf.

Myerson - Cross

09:44:22  1    Q.     Now, the patent doesn't claim any novel ways of

09:44:27  2    determining a degradation product when cabozantinib

09:44:32  3    (L)-malate was exposed to heat and water; is that correct?

09:44:36  4    A.     That's correct.

09:44:42  5    Q.     I'm sorry.  I didn't hear you.

09:44:44  6              And what -- the patent assumes or says is that

09:44:53  7    the POSA, the person of ordinary skill in the art could use

09:44:56  8    known techniques to make that kind of determination; isn't

09:45:00  9    that right?

09:45:00 10    A.     Sorry.  Which -- what are we talking about now?

09:45:03 11    Q.     Well, the patent doesn't claim any novel ways of

09:45:06 12    determining degradation products when cabozantinib is

09:45:10 13    exposed to heat and water; is that right?

09:45:12 14    A.     Yes, I understand that.  Yeah.

09:45:13 15    Q.     Okay.  A POSA would use known techniques; is that

09:45:17 16    right?

09:45:17 17    A.     Known techniques to -- to look for degradation

09:45:21 18    products, yes, I agree with that.

09:45:22 19    Q.     And the patent -- and you would expect a person of

09:45:26 20    skill in the art, it's within their skill to make a

09:45:29 21    determination of the degradation to products when

09:45:32 22    cabozantinib is exposed to heat and water; is that right?

09:45:35 23    A.     Yes.  Yes.  It can be quite a bit of work, but that's

09:45:41 24    correct.

09:45:41 25    Q.     Okay.  All right.

09:45:43 1            MR. LOMBARDI:  Let's go to the third one.

09:45:43 2     BY MR. LOMBARDI:

09:45:46 3     Q.      1-1 could form due to chemical interactions between

09:45:50 4     cabozantinib (L)-malate and certain excipients.  That is the

09:45:55 5     third of the discoveries on your chart; is that right?

09:45:57 6     A.      Correct.

09:45:58 7     Q.      Now, we talked about preformulation.  What this

09:46:04 8     describes -- or let me strike the question and start again,

09:46:10 9     Doctor.

09:46:10 10            Determining the chemical interactions between a

09:46:15 11    active ingredient and excipients is part of what we've

09:46:20 12    talked about being preformulation; right?

09:46:22 13    A.      That's correct.  It's -- we've heard this described

09:46:25 14    as excipient compatibility studies, which is what it's

09:46:28 15    usually described as.

09:46:29 16    Q.      Okay.  And these excipient compatibility studies is

09:46:33 17    part of the normal process of pharmaceutical development;

09:46:36 18    correct?

09:46:36 19    A.      Yes.  In this case, this is formulation development;

09:46:40 20    correct.

09:46:40 21    Q.      One of the first things you do when you're -- I've

09:46:43 22    got the right scientists now.  It's formulators now; right?

09:46:46 23    A.      Right.

09:46:47 24    Q.      And one of the first things you do as a formulator is

09:46:51 25    excipient compatibility studies; right?

763

Myerson - Cross

09:46:53 1    A.      Yes.

09:46:55 2    Q.      This is what formulators do day in and day out; is

09:46:58 3    that right?

09:46:58 4    A.      Every time they have a new API, they do excipient

09:47:03 5    compatibility studies.  I agree with that.

09:47:05 6    Q.      And then the person of skill in the art determines

09:47:07 7    which excipients are necessary; is that right?

09:47:10 8    A.      After they do the excipient compatibility studies and

09:47:16 9    they have determined a dose and a type of drug product, they

09:47:20 10   then start selecting individual excipients to make -- to

09:47:26 11   make trial formulations.

09:47:28 12   Q.      Okay.  And you determined which excipients will be

09:47:35 13   compatible with a particular API; is that right?

09:47:40 14           The formulation scientists?

09:47:41 15   A.      That's correct.  You're looking, of course, to

09:47:43 16   minimize any decomposition.

09:47:46 17   Q.      Okay.  Ultimately, a POSA knows that you want to use

09:47:50 18   only the excipients that are physically and chemically

09:47:54 19   compatible with the API; is that right?

09:47:57 20   A.      Right.  That's the first step.  Yes.

09:47:59 21   Q.      Okay.  And that's something that persons of skill in

09:48:02 22   the art are well qualified to do?

09:48:05 23   A.      I agree with that.

09:48:07 24   Q.      The patent doesn't claim any novel ways of

09:48:11 25   determining whether there's a chemical interaction between

Myerson - Cross

09:48:14  1    cabozantinib and the excipients used; is that right?

09:48:19  2    A.    That's correct.

09:48:21  3    Q.    It's done using known methods; correct?

09:48:25  4    A.    I'm sorry?

09:48:29  5    Q.    Let me -- that was not a great question.  Let me ask

09:48:32  6    that again.

09:48:33  7          The patent suggests just using known methods to

09:48:36  8    make that kind of determination; isn't that right?

09:48:38  9    A.    I don't actually remember the passage related to

09:48:42 10    that, so we'd have to see it.  But it wouldn't surprise me.

09:48:45 11    Q.    Okay.  That's consistent with your understanding as

09:48:47 12    an expert in this field; is that right?

09:48:50 13    A.    (Witness nods head.)  Yes.

09:48:51 14    Q.    Now, let's go to the last one, the discovery that the

09:48:54 15    1-1 impurity is genotoxic, do you see that one?

09:48:57 16    A.    Yes.

09:48:58 17    Q.    Okay.  Now, a person of skill in the art would have

09:49:01 18    been motivated to determine whether any of the impurities in

09:49:06 19    the compound -- in the composition are genotoxic; correct?

09:49:11 20    A.    Yes.  And at somewhere in the development process,

09:49:17 21    that would be the case.

09:49:18 22    Q.    Okay.  A POSA would have wanted to control for

09:49:23 23    genotoxic impurities in a formulation; right?

09:49:26 24    A.    Yes.  Generally you wish to control within certain

09:49:30 25    limits on genotoxic impurities.

Myerson - Cross

09:49:33 1   Q.     Okay.  And genotoxic impurities, I mean, just so --

09:49:38 2   genotoxic is -- refers to testing that has shown that

09:49:42 3   something can cause the chromosomal makeup of cells; isn't

09:49:48 4   that right?

09:49:48 5   A.     It -- well, it's -- a genotoxic impurity is something

09:49:53 6   that will interact with DNA.  And the initial test, of

09:49:59 7   course, is a bacterial test called the Ames test.

09:50:02 8   Q.     Okay.  All right.  But the idea is that you're

09:50:06 9   concerned with the genotoxic impurity -- if something is

09:50:0910   genotoxic, it can harm DNA; is that right?

09:50:1211   A.     Yes; potentially harm DNA in people, though not

09:50:1512   always.

09:50:1613   Q.     Yeah, not always.  But you do laboratory tests on

09:50:1914   this?

09:50:1915   A.     That's right.

09:50:2016   Q.     And genotoxic impurity can cause genetic or

09:50:2317   chromosomal damages -- damage.  And some of those, some

09:50:2718   could be carcinogenic; is that right?

09:50:2919   A.     That's correct.

09:50:3020   Q.     And that's why a POSA is particularly interested in

09:50:3321   making the determination whether impurities are genotoxic;

09:50:3622   is that right?

09:50:3723   A.     That's correct.

09:50:3824   Q.     Now, a genotoxic impurity is particularly concerning,

09:50:4525   isn't it?

Myerson - Cross

09:50:46 1    A.      Yes.

09:50:48 2    Q.      Because, in the worst case, it could show that

09:50:51 3    something's carcinogenic; right?

09:50:53 4    A.      Correct.

09:50:54 5    Q.      And so when a genotoxic impurity is identified,

09:51:00 6    additional investigation is always warranted?

09:51:04 7    A.      Yes.

09:51:06 8    Q.      And the conservative approach, Doctor, is to assess

09:51:09 9    known genotoxic compounds as potential carcinogens, unless

09:51:14 10   there's experimental evidence to the contrary; is that

09:51:17 11   right?

09:51:17 12   A.      Yes.

09:51:18 13   Q.      And obviously -- I mean, a person of skill in the art

09:51:22 14   is obviously going to make determinations of whether

09:51:28 15   impurities are genotoxic; that's within the level of skill

09:51:31 16   in the art, isn't it?

09:51:33 17   A.      Well, they, of course, will look for structures that

09:51:38 18   they think are concerning and then determine if they're

09:51:40 19   genotoxic.  That is correct.

09:51:42 20   Q.      Okay.  That's -- that is what a person of skill in

09:51:44 21   the art would do, look for structures they think are

09:51:47 22   concerning?

09:51:47 23   A.      At some point in the development process, that's

09:51:49 24   correct.

09:51:50 25   Q.      All right.  And are -- is that -- your reference to

Myerson - Cross

09:51:53 1    structures that are concerning, is that also sometimes

09:51:56 2    called structural alerts?

09:51:57 3    A.      That's right.

09:51:58 4    Q.      Okay.  And these structural alerts are known in the

09:52:02 5    art; is that right?

09:52:03 6    A.      Right.

09:52:05 7    Q.      And you can use structural alerts which you then have

09:52:11 8    to test out experimentally, but you can use structural

09:52:14 9    alerts to give you an indication about what the nature of

09:52:17 10   the impurity is you're dealing with; is that correct?

09:52:20 11   A.      Well, I would -- I would phrase it this way:  Use

09:52:23 12   structural alerts to identify compounds that you're going to

09:52:30 13   further test via the Ames test, do an experimental test to

09:52:33 14   determine genotoxicity.

09:52:35 15   Q.      Okay.  They're called alerting structures or

09:52:40 16   structure alerts because they're intended to give an alert

09:52:43 17   that there might be genotoxicity?

09:52:45 18   A.      That's right.

09:52:46 19   Q.      Okay.  And these structural alerts are actually

09:52:50 20   pretty accurate in predicting whether you'll get

09:52:53 21   genotoxicity, not 100 percent but they're pretty accurate?

09:52:56 22   A.      I would -- I would kind of differ -- maybe we're

09:52:59 23   differing about what "pretty accurate" means.

09:53:00 24   Q.      How about 70 percent of the time?

09:53:02 25   A.      Yeah, that's -- yes.  65, 70 percent of the time.

Myerson - Cross

09:53:06 1    Q.    Okay.  And then, the next step, if the structural

09:53:11 2    alerts give you some indication, is to do an Ames test?

09:53:15 3    A.    That's right.  In fact, always -- always follow

09:53:19 4    through with the Ames test.

09:53:20 5    Q.    And that's what a person of skill in the art would

09:53:22 6    do, is always follow through with an Ames test; is that

09:53:24 7    right?

09:53:25 8    A.    That's right.

09:53:25 9    Q.    And when you follow through with the Ames test, you

09:53:27 10   make a determination whether an impurity is genotoxic; is

09:53:30 11   that right?

09:53:31 12   A.    Right.  If it's positive on the AMES test, it -- it

09:53:33 13   at least appears to be genotoxic.

09:53:36 14   Q.    Okay.  And with respect to the regulators, regulators

09:53:44 15   expect to be told about whether an impurity is genotoxic or

09:53:49 16   not; is that right?

09:53:50 17   A.    That's correct.

09:53:51 18   Q.    And when the -- when an impurity is genotoxic, then

09:53:58 19   you take steps in the way you formulate the product; is that

09:54:04 20   right?

09:54:04 21   A.    You take steps in controlling the level of that

09:54:10 22   impurity in the formulated product and on storage.

09:54:14 23   Q.    Okay.  Now, a POSA would have known that cabozantinib

09:54:21 24   was potentially genotoxic based on structural alerts; is

09:54:25 25   that right?

Myerson - Cross

09:54:26  1  A.      Right.  Yeah.  The quinoline, so you would have --

09:54:29  2  you would have checked.  But that's right.

09:54:31  3  Q.      Okay.  So, that's -- you got one step ahead of me,

09:54:35  4  but 1-1 is something called a quinoline; correct?

09:54:40  5  A.      Right.  I mean, cabozantinib is a quinoline.  1-1's a

09:54:43  6  quinoline.  And we're talking about a lot of quinoline

09:54:46  7  structures here.

09:54:47  8  Q.      Okay.  And a quinoline structure is a kind of

09:54:49  9  chemical structure?

09:54:50 10  A.      That's right.

09:54:51 11  Q.      And it's a kind of chemical structure that you find

09:54:54 12  in cabozantinib?

09:54:55 13  A.      Yes.

09:54:56 14  Q.      And it's in 1-1?

09:54:57 15  A.      Yes.

09:54:58 16  Q.      And -- and that is a red flag for a person of skill

09:55:02 17  in the art?

09:55:03 18  A.      It's -- it's -- it's a structure that has to be

09:55:09 19  furtherly -- further evaluated.  Because, of course, as we

09:55:13 20  know, there are lots of quinolines that are actually drugs.

09:55:17 21  And there are quinolines that are -- that are genotoxic.  So

09:55:22 22  you have to -- you have to say -- you have to study each

09:55:24 23  particular quinoline to determine whether it's useful, not

09:55:29 24  harmful or harmful.

09:55:31 25  Q.      So, to a person of skill in the art, determining that

Myerson - Cross

09:55:35  1   something's a quinoline, which they could tell -- let me

09:55:38  2   just ask you this first:  You can tell if something's a

09:55:40  3   quinoline or not by looking at the chemical structure?

09:55:43  4   A.     That's right.

09:55:44  5   Q.     The drawing on the page.  Somebody of skill in the

09:55:46  6   art could say, "That is or is not a quinoline based on that

09:55:51  7   structure"?

09:55:51  8   A.     That's correct.

09:55:52  9   Q.     And when something is a quinoline, you actually --

09:55:55 10   that is a structural alert right there; isn't that right?

09:55:58 11   A.     That's correct.

09:56:00 12   Q.     So, a person of skill in the art would then take the

09:56:02 13   quinoline and put it in the Ames test; is that right?

09:56:05 14   A.     Yes, again, at some point, that's correct.

09:56:08 15   Q.     Yeah.  And the Ames test is -- it's A-M-E-S; correct?

09:56:12 16          Named after a person; isn't that right?

09:56:15 17   A.     That's right.

09:56:15 18   Q.     Bruce Ames; right?

09:56:16 19   A.     Right.

09:56:17 20   Q.     And the Ames test is -- it's really one of the most

09:56:20 21   famous tests out there, isn't it?

09:56:23 22   A.     That's right.

09:56:24 23   Q.     It's widely used?

09:56:25 24   A.     Yes.

09:56:26 25   Q.     Persons of skill in the art know how to use the Ames

Myerson - Cross

09:56:29  1  test?

09:56:29  2  A.     Yes.

09:56:29  3  Q.     Persons of skill in the art use the Ames test

09:56:32  4  routinely?

09:56:33  5  A.     Yes, I would agree with that.

09:56:35  6  Q.     And persons of skill in the art understand the

09:56:38  7  results they get from an Ames test; is that right?

09:56:40  8  A.     Yes.

09:56:43  9  Q.     Okay.  And a person of skill in the art, who had the

09:56:47 10  1-1 impurity, would determine -- first they determine that

09:56:52 11  the API was potentially genotoxic based on the quinoline

09:56:58 12  structure; isn't that right?

09:56:59 13  A.     You mean the cabozantinib?

09:57:00 14  Q.     Cabozantinib, I'm sorry.  Did I say -- let me give

09:57:03 15  you another -- thank you.  I'll give you another question.

09:57:05 16  I apologize.

09:57:06 17          Person of skill in the art would -- would look

09:57:11 18  at the structure for the 1-1 impurity and say, "That's

09:57:15 19  potentially genotoxic because it's a quinoline"?

09:57:19 20  A.     Yes.

09:57:22 21  Q.     And then they would do the Ames test?

09:57:24 22  A.     Yes.

09:57:26 23  Q.     And then they would find out in the Ames test that

09:57:28 24  it's positive?

09:57:29 25  A.     Yes.

Myerson - Cross

09:57:30 1    Q.    And then they would know that, in their formulation,

09:57:34 2    they need to do what they can to minimize that component?

09:57:38 3    A.    That's correct.

09:57:41 4    Q.    Okay.  Now, there's no claim made in the patent as to

09:57:46 5    a novel way of determining genotoxicity; right?

09:57:50 6    A.    Correct.

09:57:51 7    Q.    You can use known techniques?

09:57:52 8    A.    Correct.

09:57:56 9    Q.    There's nothing claimed in the patent that's -- that

09:58:01 10   claims a novel way of determining that there's been --

09:58:06 11   there's an impurity that is genotoxic; is that right?

09:58:10 12   A.    Could you repeat that?

09:58:13 13   Q.    I'm sorry.  I think I'm repeating myself, so I'll

09:58:16 14   just move on, Doctor.

09:58:17 15         Let me move to another subject here -- well,

09:58:40 16   actually, Doctor, while we're here lets -- you talked about

09:58:43 17   the pharmaceutical composition.

09:58:47 18         MR. LOMBARDI:  If you could just put the

09:58:49 19   Doctor's demonstrative PDX-4.15 up.

09:58:49 20   BY MR. LOMBARDI:

09:58:58 21   Q.    And, Doctor, I'm just focused, for the moment, on the

09:59:02 22   top one there.  The essentially free limitation applies to

09:59:07 23   the pharmaceutical composition; is that right?

09:59:10 24   A.    Correct.

09:59:11 25   Q.    Okay.  And your testimony was that it's not just the

Myerson - Cross

09:59:16  1   API that has to be essentially free of the impurity.  It's

09:59:20  2   the entire pharmaceutical composition?

09:59:23  3   A.     That's correct.

09:59:23  4   Q.     Which would include the excipients; correct?

09:59:28  5   A.     Pharmaceutical composition is the final drug product,

09:59:33  6   which includes the API plus all excipients.

09:59:36  7   Q.     Okay.  And the patent doesn't claim any novel way of

09:59:42  8   coming up with a composition that controls for those

09:59:47  9   impurities; is that right?

09:59:49 10   A.     Other than disclosing a synthetic process that makes

09:59:54 11   an API exceptionally low, it doesn't then have an

09:59:59 12   additional -- anything additional that would control for the

10:00:03 13   1-1.

10:00:04 14   Q.     And what the -- what the patent actually says is as a

10:00:08 15   matter of composition, people should use -- persons of skill

10:00:13 16   in the art should use known techniques; is that right?

10:00:15 17   A.     I'm sorry, composition of?

10:00:17 18   Q.     Pharmaceutical composition.  The pharmaceutical

10:00:20 19   composition in this case, they should use known techniques?

10:00:23 20   A.     I'm sorry.  Known techniques to determine the

10:00:27 21   pharmaceutical composition, is that...

10:00:28 22   Q.     To make it, yes.  To make the pharmaceutical

10:00:30 23   composition.

10:00:30 24   A.     Yes, that's correct.

10:00:32 25           MR. LOMBARDI:  Okay.  And if we look at the

774

Myerson - Cross

| | | |
|---|---|---|
| 10:00:34 | 1 | '349 patent, which is JTX-4, again.  Column 20, please. |
| 10:00:47 | 2 | THE WITNESS:  What is that in your binder or... |
| 10:00:47 | 3 | BY MR. LOMBARDI: |
| 10:00:51 | 4 | Q.    JTX-4.  It's just the patent. |
| 10:00:54 | 5 | A.    Yeah, I'm just -- I'm -- |
| 10:00:55 | 6 | Q.    In my binder, it should be -- it's around the middle |
| 10:00:59 | 7 | of the binder I'm told. |
| 10:01:00 | 8 | A.    I got it. |
| 10:01:01 | 9 | Q.    Okay.  And tell me when you're to Column 20, Doctor. |
| 10:01:10 | 10 | A.    Yes, I'm there. |
| 10:01:11 | 11 | Q.    Okay.  And do you see there's a heading about halfway |
| 10:01:14 | 12 | down that says "Pharmaceutical compositions"; is that right? |
| 10:01:17 | 13 | A.    Yes. |
| 10:01:18 | 14 | MR. LOMBARDI:  And at Line 40, if we could |
| 10:01:21 | 15 | highlight that. |
| 10:01:21 | 16 | BY MR. LOMBARDI: |
| 10:01:22 | 17 | Q.    You see the patent says, "Various carriers used" -- |
| 10:01:27 | 18 | first of all, it's under the heading "Pharmaceutical |
| 10:01:29 | 19 | compositions"; right? |
| 10:01:30 | 20 | A.    Correct. |
| 10:01:31 | 21 | Q.    It says, "Various carriers used in formulating |
| 10:01:34 | 22 | pharmaceutically acceptable compositions and known |
| 10:01:37 | 23 | techniques for their bulk preparation and subsequent |
| 10:01:41 | 24 | production into unit dosage forms are employed to make the |
| 10:01:46 | 25 | pharmaceutical compositions disclosed herein." |

Myerson - Cross

10:01:49 1          Do you see that?

10:01:50 2  A.     Yes.

10:01:50 3  Q.     That's what the patent says?

10:01:52 4  A.     Correct.

10:01:53 5  Q.     And it specifically cites to a couple of sources.

10:01:56 6          Remington is a very well-known source; is that

10:01:59 7  right?

10:01:59 8  A.     Correct.

10:01:59 9  Q.     And Swarbrick is as well; is that right?

10:02:01 10 A.     Correct.

10:02:02 11 Q.     On Column 21, if you go down to Line 37, it talks --

10:02:13 12 it's talking -- tell me when you have it, Doctor.

10:02:15 13 A.     Yes.

10:02:16 14 Q.     Okay.  You see this is the paragraph that begins "in

10:02:19 15 another aspect."

10:02:21 16         Do you see that?

10:02:22 17 A.     In another embodiment, yes.

10:02:25 18 Q.     I'm reading from where it says "in another aspect."

10:02:29 19 I just want to make sure we're in the same place.

10:02:31 20 A.     Column 21 you said?

10:02:33 21 Q.     Column 21, Line 37.

10:02:37 22 A.     Oh, 37, yes.  "In another aspect," yes.

10:02:40 23 Q.     Got it.  Okay.

10:02:41 24         It says, "In another aspect, the disclosure

10:02:44 25 provides a pharmaceutical composition according to" various

Myerson - Cross

10:02:47  1    tables.

10:02:48  2                  Do you see that?

10:02:48  3    A.    Yes.

10:02:49  4    Q.    "The compositions are prepared according to methods

10:02:53  5    available to the skilled artisan."

10:02:55  6                  Do you see that?

10:02:56  7    A.    Yes.

10:02:57  8    Q.    "For example, the tablet formulations are prepared by

10:03:00  9    combining, blending, and compacting the components of the

10:03:04 10    tablet compositions."

10:03:07 11                  Do you see that?

10:03:07 12    A.    Yes.

10:03:09 13    Q.    "The capsule compositions are prepared by combining

10:03:11 14    and blending the components and then placing the blend in a

10:03:15 15    gelatin capsule."

10:03:16 16                  Do you see that?

10:03:17 17    A.    Yes.

10:03:18 18    Q.    And so, the patent is -- well, let me go to one more

10:03:22 19    spot.

10:03:22 20                  MR. LOMBARDI:  Column 30, please.

10:03:22 21    BY MR. LOMBARDI:

10:03:28 22    Q.    Tell me when you've got that, Doctor.

10:03:30 23    A.    Yes.

10:03:30 24    Q.    All right.  At the very bottom -- the bottom

10:03:33 25    paragraph under the heading "Stability studies."

Myerson - Cross

10:03:37  1          MR. LOMBARDI:  A little bit farther down.  There

10:03:39  2     you go.

10:03:39  3     BY MR. LOMBARDI:

10:03:39  4     Q.      "Stability studies of pharmaceutical compositions."

10:03:42  5              Do you see that?

10:03:42  6     A.      Yes.

10:03:43  7     Q.      "The pharmaceutical capsule composition of Tables 3

10:03:46  8     and 4 were prepared by mixing the ingredients according to

10:03:49  9     processes known in the art."

10:03:51 10              Do you see that?

10:03:53 11     A.      Yes.

10:03:54 12     Q.      So, what the patent says in those places is that it's

10:03:57 13     up to the person of skill in the art to do those kinds of

10:04:00 14     tasks; isn't that right?

10:04:02 15     A.      Yes.

10:04:04 16     Q.      Okay.  All right.  Now, I'm ready to move to

10:04:08 17     something else, Doctor.  Get a couple things out of the way

10:04:16 18     here.

10:04:17 19              Let me go to, again, one of your slides, just to

10:04:29 20     make sure we're in the right place.

10:04:32 21              MR. LOMBARDI:  It's the slide number PDX-4.15,

10:04:38 22     please.

10:04:38 23     BY MR. LOMBARDI:

10:04:41 24     Q.      And the second part of this slide, Doctor, you talked

10:04:46 25     about inherency; correct?

Myerson - Cross

10:04:48  1    A.     Yes.

10:04:50  2    Q.     All right.  And we've had a lot of discussion about

10:04:51  3    inherency, both in your testimony and others; is that right?

10:04:55  4    A.     Correct.

10:04:57  5    Q.     Okay.  And so I want to talk a little bit about

10:04:59  6    inherency.  You talked in A about Brown Example 1 allowing

10:05:06  7    for variation.  And I think it was in that context that you

10:05:09  8    put up PTX-35.  And I'm going to --

10:05:15  9            MR. LOMBARDI:  Let me put it up on the screen,

10:05:16 10    so you can see exactly what we're talking about.

10:05:16 11    BY MR. LOMBARDI:

10:05:19 12    Q.     Do you remember this document, PTX-0035?

10:05:21 13            And it should be in your binder if you prefer to

10:05:24 14    look at that, whichever may way you prefer to do it.

10:05:27 15    A.     Okay.  I do remember the document.

10:05:28 16    Q.     Okay.  While you're looking, can you tell us what the

10:05:30 17    document is?

10:05:31 18    A.     Yes.  This is the Exelixis' NDA discussing

10:05:39 19    manufacturing processes.

10:05:43 20    Q.     Okay.  An Exelixis doc -- and you -- an Exelixis

10:05:46 21    document and you used this on your direct examination;

10:05:49 22    correct?

10:05:49 23    A.     That's correct.

10:05:51 24            MR. LOMBARDI:  And I want to turn to -- Page 16,

10:05:55 25    I believe, is specifically where you looked.  There was a

779

Myerson - Cross

10:05:59  1    table there called Table 2.

10:06:01  2              THE WITNESS:  Yes.

10:06:01  3    BY MR. LOMBARDI:

10:06:02  4    Q.    And you were looking -- these are those four

10:06:06  5    processes that you described for us in detail yesterday?

10:06:09  6    A.    Yes.

10:06:11  7    Q.    And you highlighted across A-2 because that was Brown

10:06:18  8    Example 1; right?

10:06:18  9    A.    Correct.

10:06:19 10    Q.    And you noted --

10:06:23 11              MR. LOMBARDI:  Why don't we go ahead and

10:06:24 12    highlight across there just so we're tracking what you did

10:06:27 13    before.

10:06:27 14    BY MR. LOMBARDI:

10:06:27 15    Q.    And you noted that there is a column for the 1 to

10:06:33 16    1 -- I said 1 to 1 -- it's the 1-1 impurity; is that right?

10:06:37 17    A.    Yes.

10:06:38 18    Q.    And in that column, it shows a range of impurities.

10:06:42 19              Do you see that?

10:06:43 20    A.    Yes.

10:06:44 21    Q.    Which you pointed out; correct?

10:06:47 22    A.    Correct.

10:06:48 23    Q.    And the range is 35 to 411 parts per million;

10:06:53 24    correct?

10:06:53 25    A.    Correct.

780

Myerson - Cross

10:06:54  1    Q.      And you pointed out that 411 is above 200; correct?

10:06:58  2    A.      Correct.

10:06:59  3    Q.      Now, there's nothing on this document that says what

10:07:05  4    lot is being tested there or what lots are being tested

10:07:10  5    there; is there?

10:07:13  6    A.      Not -- not in this table, that is correct.

10:07:16  7    Q.      Okay.  And have you seen the underlying data for

10:07:22  8    this?

10:07:22  9    A.      I've seen lots of underlying data and this has to be

10:07:27 10    using the GTI specific method.  And the reason I say that is

10:07:31 11    because the old methods could not get a number under 200.

10:07:36 12    Q.      Okay.

10:07:36 13    A.      So -- so, I have seen tables for the GTI specific

10:07:41 14    methods, but the numbers are slightly different from the

10:07:44 15    numbers reported in this table.

10:07:47 16    Q.      Okay.  Well, I guess what I'm referring to is you

10:07:53 17    don't -- have you seen the lab notebooks where the result

10:07:56 18    say the 411 result was received?

10:07:59 19            Have you seen those lab notebooks?

10:08:01 20    A.      I've seen -- again, I've seen -- I think it was put

10:08:09 21    up in Court already.  I've seen a document that had the --

10:08:16 22    result for the GTI specific method for four batches and it

10:08:21 23    included numbers that were consistent with these, but not

10:08:24 24    exactly the same.

10:08:25 25    Q.      Okay.  But -- so that's my question.

Myerson - Cross

10:08:28 1    A.       Yeah.

10:08:28 2    Q.       I'm talking about the number -- I want to know what

10:08:32 3    the underlying documents are for the 411 and you can't help

10:08:36 4    me with that; is that right?

10:08:37 5    A.       I -- I don't believe -- I mean, if we could look at

10:08:41 6    that GTI specific test result that was put up in Court

10:08:46 7    before, I'm not sure -- I don't think it was 411.  It was --

10:08:51 8    it was over 200, but I don't remember what it was.  But

10:08:54 9    that's the only document that I've seen that has the GTI

10:08:59 10   specific results for A-2 batches.

10:09:06 11   Q.       Okay.  So this document doesn't tell us, for

10:09:11 12   instance -- it doesn't say on the face of the document what

10:09:14 13   the method was that was used for that -- what the method was

10:09:19 14   to make that particular lot; correct?

10:09:25 15   A.       I'm sorry.  It says it's the A-2 method.

10:09:27 16   Q.       The A-2 method.  It doesn't say -- it doesn't say who

10:09:31 17   made the lots?

10:09:32 18   A.       That's correct.

10:09:33 19   Q.       So, it doesn't say whether it was Regis, for

10:09:36 20   instance?

10:09:36 21   A.       That's correct.

10:09:38 22   Q.       It doesn't say whether it was -- do you say Girindus

10:09:41 23   or Girindus?

10:09:42 24   A.       I've been saying Girindus.

10:09:44 25   Q.       Girindus.  So I think --

Myerson - Cross

10:09:45  1    A.      Whatever you prefer.

10:09:46  2    Q.      Yeah, I think we're on the same page.  So I'll call

10:09:48  3    it Girindus.

10:09:49  4            So it doesn't say whether it's Girindus?

10:09:51  5    A.      That's correct.

10:09:53  6    Q.      We would need to see more documents to understand

10:09:57  7    what the testing is that's being referred to here; correct?

10:10:00  8    A.      Again, we do have the little A next to the results

10:10:09  9    there that say the GTI -- that it used GTI testing.  And so,

10:10:15 10    the only documents we have are a result that show GTI

10:10:20 11    testing and we'd have to match those and see how they line

10:10:23 12    up.

10:10:23 13    Q.      But what we're interested here -- what you testified

10:10:27 14    about was whether Brown, the Brown example inherently

10:10:34 15    produces essentially -- impurity essentially -- composition

10:10:39 16    essentially free of an impurity; is that right?

10:10:41 17    A.      That's correct.

10:10:43 18    Q.      And we can't tell from this, what's here, what the

10:10:47 19    method of manufacture was?

10:10:48 20    A.      No.  I think you're misspeaking again.  We know it's

10:10:53 21    the A-2 process.  We don't know which -- which entity

10:11:02 22    manufactured it, but we know it was manufactured by the A-2.

10:11:05 23            We know two things looking at this and it's very

10:11:07 24    clear.  We know it's made by the A-2 process and we know it

10:11:10 25    was tested by the GTI specific method.  And because of that,

Myerson - Cross

10:11:15  1    we know, actually by looking at another document,

10:11:20  2    that whether it's 35 to 411 PPM or 34 to 350 PPM, we know at

10:11:28  3    least one batch is above 200 PPM.

10:11:31  4    Q.    Okay.  So, just to close this out, and I think

10:11:37  5    maybe -- you can keep that up for one more second.  Got it?

10:11:46  6    Okay.

10:11:47  7             I just want to make sure we're clear because we

10:11:50  8    went back and forth a little bit on that.  We don't know who

10:11:54  9    manufactured these lots?

10:11:55 10    A.    It doesn't -- okay.  I'm going to -- I'm going to

10:12:01 11    phrase that slightly differently.  It doesn't say who

10:12:03 12    manufactured these lots.  But as far as I know, in all the

10:12:07 13    documents we've seen, the only four lots manufactured by the

10:12:11 14    A-2 process, that were submitted to the FDA, were the three

10:12:17 15    Regis batches and the one Girindus batch.

10:12:18 16    Q.    It would help if we had the underlying lab notebooks

10:12:22 17    for this; right?

10:12:22 18    A.    It would be useful, yes.

10:12:24 19    Q.    Okay.  Thank you.

10:12:25 20             So, sir, let me -- you mentioned Girindus, and I

10:12:31 21    think -- well, let me put up a document you had.

10:12:36 22             MR. LOMBARDI:  PTX-38, please.

10:12:36 23    BY MR. LOMBARDI:

10:12:43 24    Q.    And that one, it's in -- it might be easier from your

10:12:46 25    direct binder, it's Tab 11.

Myerson - Cross

10:12:48 1   A.      Okay.

10:12:49 2   Q.      For you to find that.

10:13:01 3           Tell me when you've got it.

10:13:03 4   A.      Okay.  I do.

10:13:04 5   Q.      All right.  And I believe it's the second page?  The

10:13:09 6   second page, I believe, was the chart you were looking at,

10:13:13 7   Doctor.

10:13:14 8           Does that look familiar?

10:13:15 9   A.      Yes.  That's -- that's the chart that makes use of

10:13:22 10  one -- of the older -- one of the older HPLC methods, but

10:13:25 11  that's correct.

10:13:26 12  Q.      Okay.  And just so that we are all back on the same

10:13:31 13  page, what you looked at was -- there's a -- below there,

10:13:37 14  just a little bit lower, for the 1-1 impurity.

10:13:41 15          Do you see that?  And I'll try to highlight it.

10:13:43 16          There you go.  Right there.

10:13:44 17          That's one of the things you highlighted; right,

10:13:47 18  Doctor?

10:13:47 19  A.      Correct.

10:13:48 20  Q.      All right.  And then you noted that -- that tells you

10:13:54 21  how much of the 1-1 impurity is detected; right?

10:13:58 22  A.      Well, in this particular method, it tells you if it

10:14:02 23  was -- if it was above or below 200 PPM, because that's the

10:14:07 24  limit of detection of this particular test.

10:14:08 25  Q.      Fair enough.  And if it's ND, then it's below 200?

785

Myerson - Cross

10:14:13  1    A.      Correct.

10:14:14  2    Q.      All right.  And you noted in the far right column,

10:14:19  3    that's the Girindus lot; that right?

10:14:24  4    A.      Correct.

10:14:25  5    Q.      And the Girindus lot had something above 200;

10:14:30  6    correct?

10:14:30  7    A.      Correct.

10:14:31  8    Q.      And the .06 translates to 600 parts per million; is

10:14:35  9    that right?

10:14:36 10    A.      Correct.

10:14:37 11    Q.      And you said, you pointed out, well look, it's --

10:14:40 12    it's also got a difference in total impurities, do you see

10:14:44 13    that?

10:14:45 14    A.      Yes.

10:14:45 15    Q.      And you said the total impurities -- you were

10:14:48 16    pointing down at the bottom, at the 0.36; is that right?

10:14:52 17    A.      Correct.

10:14:52 18    Q.      Now, so, Girindus comes out differently than Regis;

10:14:58 19    is that right?

10:14:59 20    A.      It's actually purer than Regis.

10:15:02 21    Q.      Okay.  And Regis used exactly the method of example

10:15:09 22    two; is that right?

10:15:10 23    A.      Well, when you say "exactly," what you mean is they

10:15:15 24    followed Example 2 of the -- of Brown.  But, of course, in

10:15:22 25    any long synthetic process, there's always variability.  So,

Myerson - Cross

10:15:27 1   they followed Brown within the variability of Brown.

10:15:33 2   Q.    The language used by Exelixis in its IND to describe

10:15:38 3   how the clinical material was manufactured is identical to

10:15:43 4   Example 1 Brown; is that right?

10:15:45 5   A.    That's right.  But Example 1 of Brown, as we've

10:15:48 6   heard, says the word about 27 times, which means it's

10:15:52 7   variable.  In fact, all synthetic processes are variable.

10:15:56 8   Q.    Yeah, well -- right.  So, sir, about that, the word

10:16:00 9   -- it's actually the word "approximately."

10:16:01 10  A.    I'm sorry, I should have said "approximately."

10:16:03 11  Q.    And you didn't express any opinion on approximately

10:16:06 12  before in this case; right?

10:16:08 13  A.    I didn't express an opinion about approximately in

10:16:13 14  the example, that's true.  Though, I did quote from other

10:16:16 15  parts of the patent.  And I also, in my deposition, noted

10:16:19 16  that synthetic processes vary from batch to batch.

10:16:25 17  Q.    Yeah.  You have didn't testify about the word

10:16:26 18  "approximately," did you?

10:16:27 19  A.    I would agree with that.

10:16:28 20  Q.    Okay.  So this is the first you're talking about

10:16:31 21  approximately?

10:16:31 22  A.    Yes.  But I've actually sat in the courtroom and

10:16:34 23  heard testimony about the term "approximately."

10:16:37 24  Q.    And -- and did you know that the word "approximately"

10:16:40 25  is used in the '394 patent?

Myerson - Cross

10:16:45 1    A.     In the 39 -- in the '394 patent, probably.  I would

10:16:50 2    expect it is used.

10:16:51 3    Q.     '349, I'm sorry.

10:16:53 4    A.     '349.

10:16:54 5           And it goes to the fact that synthetic processes

10:16:57 6    are never exactly the same when done every time.  There's

10:17:02 7    always variability in a synthetic process.

10:17:06 8    Q.     Well, for something --

10:17:06 9    A.     And we don't have a batch record.  You know, no one

10:17:12 10   has actually discussed this in this case.  But the reason,

10:17:15 11   when you manufacture a batch, you have something called a

10:17:18 12   batch record, is it has -- it has a procedure.  And then

10:17:23 13   next to it somebody has to write in pen what the actual

10:17:27 14   conditions were.

10:17:28 15          And so, it says, you know, heat to 70 degrees.

10:17:31 16   And it might say we heat it to 68 degrees.  Right.  And so

10:17:36 17   that's how -- that's how synthetic processes are done.

10:17:40 18   Unfortunately, we've never seen a batch record for any of

10:17:42 19   these.

10:17:46 20   Q.     That's -- Exelixis would have those; right?

10:17:48 21   A.     I've never seen a batch record for any of the four

10:17:51 22   processes.

10:17:51 23   Q.     Okay.  Now, "approximately" is used all the time in

10:17:55 24   pharmaceutical -- in pharmaceutical formulations; correct?

10:17:59 25          That -- that term is used frequently?

Myerson - Cross

10:18:01 1   A.      I think we're talking about synthetic processes, not

10:18:04 2   formulations.

10:18:05 3   Q.      Okay.  Fair enough.

10:18:06 4   A.      And it's used all the time.

10:18:08 5   Q.      Yeah.  And it's used when the quantities in question

10:18:11 6   do not have to be precise; is that right?

10:18:14 7   A.      Its quantities, its temperature, and its time.

10:18:18 8   Q.      Right.  Correct.  And they use it when those -- those

10:18:22 9   parameters don't have to be precise; is that right?

10:18:25 10  A.      They use it to say you want to be in this range, but

10:18:31 11  they don't have to be exactly the same.

10:18:33 12  Q.      Right.  Because there are other places where precise

10:18:37 13  quantities are used; isn't that right?

10:18:39 14  A.      There are places where the word "approximately"

10:18:44 15  doesn't appear, and it will say something very precise, I

10:18:47 16  agree with that.

10:18:48 17  Q.      Right.  So the -- and you know that's the case for

10:18:52 18  the Brown formulation, too, for the -- for Example 1 of

10:18:56 19  Brown; isn't that right?

10:18:57 20  A.      Yeah.  Again, you're using the word "formulation."

10:18:59 21  Q.      I apologize.  I apologize.  I'll start again so that

10:19:02 22  you can get a clean question.

10:19:04 23  A.      Yeah.

10:19:05 24  Q.      In Brown, Example 1, the word "approximately" is not

10:19:09 25  used with respect to all quantities; is that right?

789

Myerson - Cross

10:19:12 1    A.      That's correct.

10:19:14 2    Q.      Okay.  In fact, precise numbers are used with some of

10:19:19 3    the quantities; is that right?

10:19:21 4    A.      That's correct.

10:19:22 5    Q.      Now, you agree that the Regis process -- well, the

10:19:31 6    Regis process and Girindus got different results in this

10:19:35 7    Table 1 that you put up; is that right?

10:19:37 8    A.      I mean, they -- they have different amounts of the

10:19:43 9    1-1 impurity, certainly, that we talked about.  And the

10:19:47 10   overall purity is different, meaning that the Girindus is

10:19:52 11   purer than the -- than the three Regis batches.

10:19:55 12   Q.      Okay.  So, the Girindus 1-1 is, what, it's at least

10:20:02 13   three times as much, at least three times as much as what's

10:20:06 14   detected in the Regis batches; is that right?

10:20:09 15   A.      Yeah, using -- using this HPLC method, of course, we

10:20:14 16   actually have more accurate data on this, using the GTI

10:20:19 17   method.  And so your -- your multiplier would be better than

10:20:23 18   three, you know, if we looked at that, but they're certainly

10:20:26 19   different.

10:20:26 20   Q.      Okay.  Well, I'm just using your exhibit; right?

10:20:29 21   A.      Right.

10:20:29 22   Q.      And your exhibit, you said --

10:20:31 23   A.      Yeah.

10:20:32 24   Q.      -- that there's more for Girindus than for the Regis;

10:20:35 25   is that right?

790

Myerson - Cross

10:20:36  1   A.      That's correct.

10:20:37  2   Q.      And it's over 200.  And it's 600; is that right?

10:20:42  3   A.      In -- in this method, yes.  It says 600.

10:20:45  4   Q.      Okay.  There were no deviations in the Regis process

10:20:53  5   from Example 1 in Brown; is that right?

10:20:56  6   A.      I don't believe that's what it says in the document.

10:21:00  7   I've seen a document at some point that does say there were

10:21:06  8   deviations.  And, actually, Dr. Lepore was cross-examined

10:21:09  9   about that and was shown a document that was up in Court

10:21:14 10   that said there were deviations.

10:21:16 11   Q.      Sir, it's correct that the Regis process does not

10:21:19 12   include deviations from Example I of Brown; correct?

10:21:23 13   A.      You're quoting my deposition because I hadn't seen

10:21:27 14   that document before.  But, of course, I've been sitting in

10:21:29 15   court and I get to watch what goes on, and there is a

10:21:32 16   document that says there are deviations, so that's a factual

10:21:36 17   statement.

10:21:36 18           You know, I can't not know what I saw in Court.

10:21:39 19   So, if you want to impeach me with what I said in my

10:21:43 20   deposition, that's fine.  But I learned something in Court,

10:21:45 21   which I'm aloud to talk about.

10:21:46 22   Q.      Okay.  Well, I think you handled it for me, which is,

10:21:48 23   you testified at your deposition differently than you're

10:21:52 24   testifying today --

10:21:52 25   A.      Right.

Myerson - Cross

10:21:53 1   Q.      -- on that point; is that right?

10:21:54 2   A.      Right, because I saw something with -- it's a factual

10:21:57 3   statement that was brought out in Court that I saw, and it

10:22:00 4   does say that.

10:22:01 5   Q.      Okay.  You admit that there are deviations in the

10:22:05 6   Girindus process, deviations from Brown Example 1?

10:22:09 7   A.      Sure.

10:22:09 8   Q.      And there are a number of things called planned

10:22:14 9   deviations in Girindus; is that right?

10:22:16 10  A.      That's correct.

10:22:17 11  Q.      And I don't think we have to go through them all, but

10:22:20 12  you're aware that Dr. Lepore, during his testimony, went

10:22:26 13  through and pulled out some of those -- or all of those

10:22:29 14  deviations; is that right?

10:22:30 15  A.      That's correct.

10:22:31 16  Q.      And -- and you don't disagree with the things he

10:22:34 17  pulled out that were called planned deviations; is that

10:22:37 18  right?

10:22:37 19  A.      Yes, they're clearly listed in the Girindus document

10:22:40 20  as planned deviation.  And they are deviations.

10:22:43 21  Q.      Okay.  And so, we have planned deviations in Girindus

10:22:47 22  from the Brown Example 1 method; is that right?

10:22:50 23  A.      That's correct.

10:22:51 24  Q.      And when we do those planned -- we test that batch

10:22:56 25  with the planned deviations, we get different results; is

Myerson - Cross

10:23:00  1    that right?

10:23:01  2    A.      The results are different, I agree with that.

10:23:03  3    Q.      And the results are well above the 200 parts per

10:23:07  4    million; is that right?

10:23:08  5    A.      Correct.

10:23:09  6    Q.      And there's a difference in the overall purity; is

10:23:13  7    that correct?

10:23:13  8    A.      Correct.

10:23:25  9    Q.      And I think I just have one other thing for you,

10:23:29 10    Doctor.  Just one moment.  Just a couple of questions.

10:23:44 11                MR. LOMBARDI:  And we can take that down now.

10:23:44 12    BY MR. LOMBARDI:

10:23:46 13    Q.      You gave some testimony about crystallization and

10:23:50 14    recrystallization; is that right?

10:23:53 15    A.      Yes.

10:23:53 16    Q.      And you talked about -- you've talked about

10:23:56 17    crystallization and recrystallization in your reports; is

10:23:59 18    that right?

10:24:00 19    A.      Yes.

10:24:00 20    Q.      And you talked about it in your testimony; is that

10:24:02 21    right?

10:24:02 22    A.      Yes.

10:24:03 23    Q.      And crystallization is recommended by the FDA; is

10:24:09 24    that right?

10:24:09 25    A.      That's right.

Myerson - Cross

10:24:11  1   Q.     For all impurities at or above .1 percent; is that

10:24:15  2   right?

10:24:16  3   A.     I'm -- I -- I -- it's recommended -- it's recommended

10:24:23  4   as a final purification step irregardless if they're below

10:24:27  5   or above 1 percent.  It's actually usually the final

10:24:31  6   purification step in the manufacture of any API purification

10:24:35  7   step.

10:24:35  8   Q.     And you -- there's a -- are you familiar with the

10:24:38  9   Robinson reference you cited in your expert report?

10:24:41 10   A.     Yes.

10:24:41 11   Q.     Okay.  And in the Robinson reference, you saw that it

10:24:47 12   says, "Conventional processes such as fractional

10:24:51 13   crystallization and recrystallization can be used"; is that

10:24:54 14   right?

10:24:55 15   A.     Correct.

10:24:55 16   Q.     And you agree that those are conventional processes;

10:24:59 17   is that right?

10:24:59 18   A.     That's correct.

10:25:00 19   Q.     And actually one method for dealing -- you said in

10:25:03 20   your report, one method for dealing with removing genotoxic

10:25:08 21   impurities is recrystallization; correct?

10:25:10 22   A.     There's always something that you're -- that you're

10:25:13 23   interested in doing, but, of course, as I noted, it doesn't

10:25:17 24   always work.

10:25:17 25   Q.     Okay.  As a general rule, crystallization will

Myerson - Redirect

10:25:21 1    improve purity; is that right?

10:25:23 2    A.     As a general rule, it will -- it will improve

10:25:29 3    overall -- overall purity, but won't necessarily improve the

10:25:36 4    purity of each individual component if there are multiple

10:25:40 5    impurities.

10:25:40 6    Q.     Is it true that more often than not in your

10:25:43 7    experience crystallization improves the overall purity of a

10:25:47 8    material?

10:25:47 9    A.     Oh, yeah.  Generally it will improve the overall

10:25:50 10   impurity, but, again, might have problem with the specific

10:25:53 11   impurity.

10:25:54 12   Q.     A person of skill in the art would have known how to

10:25:57 13   perform crystallization; is that right?

10:26:00 14   A.     Certainly.

10:26:00 15   Q.     And they would have known how to perform

10:26:03 16   recrystallization?

10:26:03 17   A.     Yes.

10:26:04 18   Q.     And the patents don't claim a novel method of

10:26:08 19   recrystallization; is that right?

10:26:09 20   A.     Correct.

10:26:10 21   Q.     And they don't claim a novel method of

10:26:12 22   crystallization; is that right?

10:26:13 23   A.     Correct.

10:26:14 24   Q.     Okay.

10:26:14 25          MR. LOMBARDI:  No further questions, Your Honor.

Myerson - Redirect

10:26:16  1        THE COURT:  All right.  So, I think we need to

10:26:18  2    take our morning break here.  So we'll take a 15-minute

10:26:21  3    break.

10:26:21  4        THE CLERK:  All rise.

10:26:27  5        (Recess was taken.)

10:43:45  6        DEPUTY CLERK:  All rise.

10:43:46  7        THE COURT:  All right.  Redirect.

10:43:47  8        Everyone be seated.

10:43:48  9        MS. PIROZZOLO:  Thank you, Your Honor.

10:43:49 10            REDIRECT EXAMINATION

10:43:49 11    BY MS. PIROZZOLO:

10:43:49 12    Q.    Could we pull up Plaintiff's Exhibit 38, which is

10:43:53 13    Tab 11, Dr. Myerson?

10:43:57 14        MS. PIROZZOLO:  And go to the page with Table 1.

10:44:01 15    A.    Yes.

10:44:02 16    Q.    Now, you were asked questions about Table 1; correct?

10:44:05 17    A.    Yes.

10:44:07 18    Q.    Now, focusing on the columns for the Regis batches,

10:44:14 19    let's go to the line on total impurities.

10:44:17 20        Do total impurities vary among the different

10:44:21 21    Regis batches?

10:44:22 22    A.    Yes.  They vary significantly between 0.87 percent to

10:44:29 23    0.54 percent.

10:44:30 24    Q.    Why would that occur if Regis was using the same A-2

10:44:34 25    process?

796

Myerson - Redirect

10:44:35  1   A.      Again, they're always -- they're -- there's always

10:44:39  2   variations in synthetic processes so you never get exactly

10:44:42  3   the same purity or impurity profile when going through any

10:44:47  4   five-step synthetic process.

10:44:50  5   Q.      Did the invention of the '349 patent include solving

10:44:54  6   the problem of the genotoxic impurity identified by

10:44:59  7   Exelixis?

10:44:59  8   A.      It did.

10:45:00  9   Q.      How did Exelixis solve that problem?

10:45:02 10   A.      By developing the B-2 process, that consistently made

10:45:09 11   cabozantinib (L)-malate with exceptionally low levels of a

10:45:14 12   1-1 impurity from below 2 to 12 parts per million.

10:45:18 13   Q.      And the B-2 process is the process described in the

10:45:21 14   '349 patent?

10:45:21 15   A.      Correct.

10:45:23 16   Q.      Have you seen any evidence that adding a

10:45:27 17   recrystallization step to the Brown process would have

10:45:30 18   resulted in the claimed purity levels for cabozantinib

10:45:33 19   (L)-malate?

10:45:33 20   A.      No.

10:45:36 21           MS. PIROZZOLO:  No further questions.

10:45:38 22           THE COURT:  All right.  Dr. Myerson, thank you.

10:45:40 23   You may step down.  Watch your step.

10:45:43 24           MS. PIROZZOLO:  May I move for the admission of

10:45:46 25   Plaintiff's Exhibit 773, Plaintiff's Exhibit 38, PTX-299,

797

Koleng - Direct

10:45:53  1  PTX-494, and Joint Exhibit 8.

10:45:58  2              MR. LOMBARDI:  No objection.  Your Honor.

10:45:59  3              THE COURT:  All right.  Admitted without

10:46:01  4  objection.

10:46:01  5              (PTX Exhibit Nos. 773, 38, 299, and 494 were

10:46:01  6  admitted into evidence.)

10:46:44  7              (JTX Exhibit No. 8 was admitted into evidence.)

10:46:44  8              THE COURT:  Dr. Koleng, you're still sworn, all

10:46:47  9  right.

10:46:47 10              THE WITNESS:  Yes, sir.

10:46:49 11              MR. YURKERWICH:  May it please the Court, Kevin

10:46:53 12  Yurkerwich on behalf of Exelixis.

10:46:53 13                         DIRECT EXAMINATION

10:46:55 14  BY MR. YURKERWICH:

10:46:55 15  Q.      Good morning, Dr. Koleng.

10:46:59 16  A.      Good morning.

10:46:59 17  Q.      You testified earlier in the trial on the issue of

10:47:02 18  infringement of the '349 patent; correct?

10:47:04 19  A.      Correct.

10:47:05 20  Q.      What patents will you address today?

10:47:06 21  A.      The crystalline (L)-malate salt patents.

10:47:10 22              MR. YURKERWICH:  Can we pull up PDX-5.2, please?

10:47:10 23  BY MR. YURKERWICH:

10:47:13 24  Q.      What is the relationship between these patents?

10:47:16 25  A.      They share a common specification and priority date.

Koleng - Direct

10:47:19  1    Q.      What is that priority date?

10:47:21  2    A.      As highlighted here, January 16, 2009.

10:47:26  3    Q.      At a very high level, can you remind us of your

10:47:30  4    experience with formulation development?

10:47:31  5    A.      Yes, I'm a pharmaceutical scientist that's

10:47:34  6    responsible for working with drug substances and drug

10:47:38  7    products to create useable drug products.

10:47:41  8    Q.      And what is the -- just stepping back a moment, what

10:47:44  9    is the relationship between these three patents?

10:47:45 10    A.      Again, they all relate to the crystalline (L)-malate.

10:47:49 11    They share a common specification.

10:47:51 12    Q.      Do you have -- and turning to your experience for a

10:47:53 13    moment, do you have experience with poorly water soluble

10:47:56 14    compounds?

10:47:56 15    A.      Yes.

10:47:57 16    Q.      What is your experience?

10:47:58 17    A.      Most of my career has actually been addressing

10:48:02 18    performance issues associated with what would be called

10:48:06 19    poorly soluble drugs.

10:48:07 20    Q.      What experience do you have with the preparation of

10:48:09 21    pharmaceutical salts?

10:48:10 22    A.      I've executed programs throughout my career where we

10:48:14 23    have evaluated possible salt formation as one way to address

10:48:19 24    problems with a drug substance.

10:48:21 25    Q.      Do you have any experience with salt screening?

10:48:23 1   A.      Yes, I do.

10:48:24 2   Q.      Could you tell us about your experience?

10:48:25 3   A.      I have executed -- salt screen, first, is a broad

10:48:30 4   term encompassing a large set of experimentation where we --

10:48:35 5   in cases where we were interested in pursuing a potential

10:48:38 6   salt, we would utilize a salt screen type of experiment as a

10:48:43 7   first step on the road to potentially selecting one, if

10:48:47 8   available.

10:48:48 9   Q.      How many compounds have you tested in services?

10:48:50 10  A.      Ten.

10:48:51 11  Q.      Have you ever consulted for a pharmaceutical company

10:48:55 12  for the purpose of identifying the best salt for a

10:48:58 13  particular drug?

10:48:58 14  A.      Yes.

10:49:00 15          MR. YURKERWICH:  Let's turn to PDX-5.3, please.

10:49:00 16  BY MR. YURKERWICH:

10:49:04 17  Q.      Looking at the slide, what opinions will you offer

10:49:08 18  here today?

10:49:08 19  A.      The preparation of pharmaceutical salts is

10:49:11 20  unpredictable, that the (L)-malic acid would not have been

10:49:15 21  selected for cabozantinib as a counterion and that

10:49:19 22  identifying a suitable pharmaceutical salt for development

10:49:22 23  depends upon a wide range of considerations.

10:49:25 24  Q.      Are you offering an ultimate opinion on validity with

10:49:27 25  respect to any of the asserted patents?

800

Koleng - Direct

10:49:29 1    A.       No, sir.

10:49:30 2               MR. YURKERWICH:  Can we turn to PDX-5.4?

10:49:30 3    BY MR. YURKERWICH:

10:49:34 4    Q.       What is shown here?

10:49:35 5    A.       These are the definitions of a person of ordinary

10:49:38 6    skill in the art proffered by Exelixis and MSN in this case.

10:49:42 7    Q.       Which definition did you apply?

10:49:44 8    A.       Exelixis'.

10:49:45 9    Q.       At the time of the invention, would you have

10:49:4910    qualified as a person of skill in the art under either of

10:49:5111    the definitions?

10:49:5212    A.       Yes.

10:49:5413    Q.       Would your opinions change depending on which

10:49:5614    definition was applied?

10:49:5715    A.       No.

10:49:5916    Q.       Let's introduce the concepts you'll be addressing

10:50:0217    very briefly.  What is a drug substance?

10:50:0418    A.       At the highest level we've heard it's the active

10:50:0719    pharmaceutical ingredient, API.  It's the active -- it's the

10:50:1020    chemical that is attributed with the therapeutic activity.

10:50:1521    Q.       Dr. Steed discussed salt screening.  Is salt

10:50:1822    screening the only approach to formulating low solubility

10:50:2123    compounds?

10:50:2124    A.       No.

10:50:2225    Q.       What other approaches are there?

Koleng - Direct

10:50:23 1    A.      There's a host of other approaches, including things

10:50:26 2    like nanomilling, micronization, lipid base formulation

10:50:31 3    approaches, solid amorphous dispersion, cyclodextrin

10:50:36 4    complexation, among others.

10:50:37 5    Q.      Were those techniques known in 2009?

10:50:39 6    A.      Yes.

10:50:40 7    Q.      Could those techniques have been used to formulate

10:50:42 8    low solubility compounds?

10:50:43 9    A.      Yes.

10:50:46 10   Q.      What experience do you have with those techniques?

10:50:48 11   A.      I've used them continuously and continue to do so

10:50:51 12   throughout my career.

10:50:53 13   Q.      How would a skilled artisan have evaluated which of

10:50:57 14   those techniques to pursue?

10:50:58 15   A.      Well, they would have had to take a holistic approach

10:51:01 16   in assessing one, what problem they were trying to solve.

10:51:04 17   And then, with an eye toward potential limitations

10:51:10 18   associated with the starting materials, as well as taking

10:51:13 19   into consideration the requirements of the entire product

10:51:17 20   development program.

10:51:18 21              MR. YURKERWICH:  Now, if we turn to PDX-5.5.

10:51:18 22   BY MR. YURKERWICH:

10:51:22 23   Q.      Can you describe for the Court how a salt is formed?

10:51:25 24   A.      Sure.  We've seen this slide several times already.

10:51:29 25   It's the reaction between an acid and a base.

Koleng - Direct

10:51:32 1    Q.      And remind us, what is a salt screen?

10:51:35 2    A.      A salt screen generally is a general term for a set

10:51:38 3    of -- a set of experiments with very specific conditions and

10:51:42 4    considerations that is used to evaluate if a salt can be

10:51:46 5    formed.  And if formed, what, if any, physical properties

10:51:50 6    that material may have.

10:51:52 7    Q.      Now, is a salt -- is every salt screen carried out

10:51:55 8    the same way?

10:51:55 9    A.      No.

10:52:04 10   Q.      How many counterions are typically tested in a salt

10:52:07 11   screen?

10:52:07 12   A.      There's no defined number.  But I would say you -- it

10:52:12 13   could be as -- be as many as a few up to several.  My

10:52:17 14   experience has been it could be, like I said, a couple up to

10:52:21 15   maybe 10 to 20.

10:52:23 16            MR. YURKERWICH:  Now, if we turn to PDX-5.6.

10:52:23 17   BY MR. YURKERWICH:

10:52:26 18   Q.      Can you -- can we talk about salt formation and how

10:52:30 19   that can be impacted by different variables?

10:52:33 20            Can you describe what's on the slide?

10:52:35 21   A.      These are all variables that have to go in that are

10:52:38 22   all considered when performing what's been termed a salt

10:52:41 23   screen.

10:52:42 24   Q.      Directing your attention to the top left, how does

10:52:45 25   the active ingredient affect salt formation?

Koleng - Direct

10:52:50 1    A.      This is quite key.  The first assessment a POSA has

10:52:53 2    to do is to have a reasonable assessment of whether or not

10:52:55 3    the compound will even form a salt.  And if it -- if it has

10:52:58 4    functionality that may support salt selection or salt

10:53:02 5    formation, then they have to assess whether or not that's an

10:53:05 6    acid or a base, for instance.  An assessment or an idea of

10:53:10 7    chemical liability, say stability is also a key -- is also a

10:53:12 8    key here.

10:53:14 9    Q.      Now, over the course of the trial we've heard the

10:53:17 10   term $pK_a$.  Could you describe what a $pK_a$ is at a very high

10:53:21 11   level?

10:53:21 12   A.      Generally, it's a numeric number given to an acid

10:53:25 13   that allows you to compare whether or not it's a relatively

10:53:29 14   weak or strong acid.

10:53:31 15   Q.      Do you recall Dr. Steed's testimony that differences

10:53:33 16   in $pK_a$ can impact salt section?

10:53:37 17   A.      Yes.

10:53:38 18   Q.      What's your response to that testimony?

10:53:40 19   A.      It's only one of many factors that need to be

10:53:42 20   considered in salt selection.

10:53:44 21   Q.      In 2009, could a skilled artisan have predicted

10:53:48 22   whether a salt formation would occur based on the

10:53:51 23   differences between the $pK_a$, the counterion, and the active

10:53:54 24   ingredient?

10:53:54 25   A.      No.

Koleng - Direct

10:53:56  1    Q.      What are the reasons for your opinion?

10:53:57  2    A.      First that, again, the -- the differences are only

10:54:02  3    one consideration.  The other is then looking at all the

10:54:05  4    different considerations here, including the specific

10:54:09  5    attributes of the starting material.

10:54:11  6    Q.      Now, in 2009, could a person of skill in the art have

10:54:15  7    predicted the properties of any salt that was produced based

10:54:18  8    on the differences between the p$K_a$, the counterion, and the

10:54:21  9    active ingredient?

10:54:22 10    A.      Not at all.

10:54:25 11    Q.      Let's turn our attention to solvents.

10:54:28 12            How does the solvent affect salt formation?

10:54:30 13    A.      So the solvents are quite key in a salt screen.

10:54:35 14    First, the reaction that we just discussed is typically

10:54:37 15    conducted in solution.  So there's a requirement that the

10:54:39 16    starting material be in solution, as well as the

10:54:42 17    corresponding counterion.  The choice of solvent will also

10:54:48 18    drive whether, you know, can affect certain properties of

10:54:50 19    the materials as well.  And it also, as we've learned

10:54:54 20    through testimony, that the choice of salts can impact the

10:54:58 21    characteristics of whatever solid material you may

10:55:01 22    ultimately recover.

10:55:02 23            MR. YURKERWICH:  Can I direct your attention to

10:55:05 24    Tab 2 in your binder, where you'll find PTX-0087?

10:55:10 25    BY MR. YURKERWICH:

Koleng - Direct

10:55:10  1   Q.      Would you please identify this document?

10:55:13  2   A.      This is the Pharmorphix report, I believe it's been

10:55:18  3   shared previously, on the salt screen for EXEL-7184.

10:55:23  4              MR. YURKERWICH:  Can we turn to Page 6 where

10:55:25  5   you'll find Table 2 of this document?

10:55:25  6   BY MR. YURKERWICH:

10:55:26  7   Q.      What is the name of Table 2?

10:55:28  8   A.      "Solvents used in solvent screen."

10:55:32  9   Q.      And what information is provided in Table 2?

10:55:34 10   A.      So these are -- this is first, it provides a list of

10:55:38 11   solvents that were evaluated to assess the solubility of the

10:55:43 12   cabozantinib free base and it also -- and it has a row --

10:55:47 13   column with the Xs and checkmarks where they've determined

10:55:51 14   whether or not those solvents exhibited suitable solubility

10:55:54 15   to continue with the salt -- with this experiment.

10:55:56 16   Q.      Would a person of ordinary skill in the art have been

10:55:59 17   familiar with the solvents here in Table 2?

10:56:00 18   A.      Yes.

10:56:03 19   Q.      Do all the solvents in Table 2 share the same

10:56:06 20   properties?

10:56:06 21   A.      Not at all.

10:56:07 22   Q.      How do the properties vary among the solvents?

10:56:10 23   A.      They vary widely in properties, such as melting

10:56:13 24   point, boiling point, dielectric constant, densities among

10:56:16 25   others, admissibility with each other for instance.

Koleng - Direct

Q.      How many solvents were tested in Table 2?

A.      I believe 27.

Q.      And focusing on the column with results, how many solvents were deemed acceptable?

A.      Just two, THF, tetrahydrofuran and acetone.

Q.      What were the results of the other solvents?

A.      They were deemed not -- not suitable or providing sufficient solubility.

Q.      In 2009, how many solvents were available for a skilled artisan to have used in a salt formation experiment?

A.      I think the list could be two times this, maybe three.

Q.      Could a skilled artisan have formed a reasonable expectation in advance as to which, if any, of the solvents tested would have been successful?

A.      No.  That's why we do this work.

        MR. YURKERWICH:  Now, if we turn back to the demonstratives about salt formation.

BY MR. YURKERWICH:

Q.      Can you discuss experimental conditions and how experimental conditions can -- can affect salt formation?

A.      Of course.  Experimental conditions, first, I'll -- well, they typically include things like determining the concentration of the materials to use, the temperatures at which the reactions are run, whether or not the samples are

Koleng - Direct

10:57:36  1   agitated, for instance, and say how long they're -- they're

10:57:38  2   reacted.

10:57:39  3   Q.     And how, if at all, does an experimental procedure

10:57:43  4   and the conditions used affect whether a salt will form or

10:57:46  5   not?

10:57:46  6   A.     They can directly impact it.  They can either -- they

10:57:49  7   can inhibit it, facilitate it, or -- and potentially change

10:57:53  8   the outcome.

10:57:55  9   Q.     What expectations, if any, would a skilled artisan

10:57:57 10   have had regarding the conditions necessary for salt

10:58:01 11   formation?

10:58:01 12   A.     They wouldn't have had an expectation.  They would

10:58:04 13   have had to have started with something and then made

10:58:07 14   adjustments through the experimentation.

10:58:10 15   Q.     Do you agree with Dr. Steed's testimony that salt

10:58:14 16   screening involves routine experimentation?

10:58:15 17   A.     No, I do not.

10:58:17 18   Q.     What are the reasons you disagree?

10:58:18 19   A.     As we just discussed, salt screening is a very

10:58:22 20   generic term that describes a very complex and

10:58:24 21   individualized set of experiments for a given API.

10:58:27 22   Q.     Can you give us an example from your own experience

10:58:29 23   where a salt -- a salt screen led to unpredictable and

10:58:33 24   unexpected results?

10:58:34 25   A.     Of course.  We were working with one client on three

808

Koleng - Direct

10:58:37  1    structurally related compounds where we were asked to

10:58:41  2    consider salt screening as part of development.

10:58:45  3          We actually did this work at Pharmorphix, as

10:58:48  4    well.  We chose -- we did a very similar assessment.  We

10:58:53  5    chose about, I think, 15 or 16 counterions per active

10:58:57  6    ingredient.  We executed the study for two of the three.  We

10:59:03  7    actually nominated the free form or the starting form

10:59:05  8    because it -- the salts that were formed didn't have any

10:59:09  9    better properties.  And for the third, it was only one of

10:59:13 10    two that formed and it showed some beneficial properties

10:59:16 11    that was nominated for progression.

10:59:18 12    Q.    Were the results of your salt screening experiments

10:59:21 13    consistent?

10:59:21 14    A.    No.

10:59:22 15    Q.    Were they predictable?

10:59:23 16    A.    No.

10:59:25 17          MR. YURKERWICH:  Turning to PDX 5.8.

10:59:25 18    BY MR. YURKERWICH:

10:59:28 19    Q.    At a high level, can you describe what's on the

10:59:32 20    screen and why a person of skill in the art -- well, can you

10:59:37 21    describe what's on the screen?

10:59:38 22    A.    Yeah.  So this is a -- this stems from my second

10:59:41 23    point that malic acid would not have been selected as a

10:59:45 24    counterion and that's based on three reasons.  First, that

10:59:47 25    malic acid was -- is a weak acid.  There are hierarchical

10:59:51  1   approaches that favor stronger, more commonly used acids

10:59:55  2   that a POSA would understand.  And, again, malic acid

10:59:58  3   stemming from that is a rarely used acid.

11:00:02  4   Q.    Now, before we dig into your opinions here, can we

11:00:06  5   step back and take a moment to talk about the properties of

11:00:09  6   cabozantinib.

11:00:10  7              MR. YURKERWICH:  Can we pull up PDX-5.9?

11:00:10  8   BY MR. YURKERWICH:

11:00:14  9   Q.    What is shown here?

11:00:15 10   A.    This is the chemical structure of cabozantinib base.

11:00:19 11   Q.    In 2009, would a skilled artisan have known the

11:00:23 12   aqueous solubility of cabozantinib based on this structure?

11:00:27 13   A.    No.

11:00:27 14   Q.    Was there any information in the prior art indicating

11:00:31 15   that there were any concerns about the solubility of

11:00:33 16   cabozantinib?

11:00:33 17   A.    No.

11:00:35 18   Q.    What, if any, information about cabozantinib's $pK_a$

11:00:38 19   was disclosed in the prior art?

11:00:40 20   A.    None.

11:00:42 21              MR. YURKERWICH:  Turning to the next

11:00:43 22   demonstrative, PDX 5.10.

11:00:43 23   BY MR. YURKERWICH:

11:00:46 24   Q.    In 2009, what, if any, information would a skilled

11:00:49 25   artisan have been able to understand about whether

Koleng - Direct

11:00:52 1    cabozantinib was an acid or a base based on its structure?

11:00:55 2    A.    As I discussed previously, a POSA would look at the

11:00:59 3    structure to look for certain functional groups.  They would

11:01:03 4    identify the clinical group that's highlighted in blue and

11:01:06 5    recognize that it was basic.

11:01:09 6    Q.    Now that we've talked about the properties of

11:01:14 7    cabozantinib, let's turn back to the opinions on your

11:01:17 8    earlier demonstrative.

11:01:20 9          MR. YURKERWICH:  And I'd like to turn our

11:01:21 10   attention to PDX-5.11.

11:01:21 11   BY MR. YURKERWICH:

11:01:24 12   Q.    What is your first reason why a skilled artisan would

11:01:26 13   not have been motivated to pursue malic acid?

11:01:28 14   A.    Malic acid is a weak acid.

11:01:32 15         MR. YURKERWICH:  If you turn in your materials

11:01:33 16   to Tab 3.

11:01:33 17   BY MR. YURKERWICH:

11:01:38 18   Q.    Let me know when you're there.

11:01:40 19   A.    I'm there.

11:01:41 20   Q.    Could you identify the document marked as PTX-373?

11:01:45 21   A.    Yes.  This is the *CRC Handbook of Chemistry and*

11:01:49 22   *Physics*, edited by David Lide.

11:01:53 23         MR. YURKERWICH:  Would you turn in this exhibit

11:01:54 24   to Page 6.

11:01:54 25   BY MR. YURKERWICH:

Koleng - Direct

11:02:02  1    Q.    Could you describe the table of information beginning

11:02:05  2    at Page 6?

11:02:06  3    A.    Yeah.  This is a reference on dissociation constants

11:02:09  4    of organic acids and bases.

11:02:12  5                MR. YURKERWICH:  Now, turning to Page 13.

11:02:12  6    BY MR. YURKERWICH:

11:02:14  7    Q.    I'd like to direct your attention to the third row of

11:02:17  8    the left-hand column.

11:02:24  9    A.    I'm there.

11:02:25 10    Q.    Do you see the reference to quinoline?

11:02:27 11    A.    I do.

11:02:27 12    Q.    What is the p$K_a$ of a quinoline?

11:02:30 13    A.    As shown here, 4.90.

11:02:35 14    Q.    What does that tell you about a quinoline?

11:02:36 15    A.    That it's a weak base.

11:02:41 16                MR. YURKERWICH:  Now, I'd like to direct your

11:02:42 17    attention to the bottom right of Page 7 in this exhibit.

11:02:48 18    And it will be, I think, eight lines from the bottom.

11:02:48 19    BY MR. YURKERWICH:

11:02:52 20    Q.    Do you find malic acid?

11:02:56 21    A.    Yes.

11:02:57 22    Q.    What is the relevant p$K_a$ of malic acid?

11:03:00 23    A.    The relevant p$K_a$ is 3.40.

11:03:05 24    Q.    What would that have indicated to the skilled artisan

11:03:08 25    about malic acid?

Koleng - Direct

11:03:08  1   A.      That it's a weak acid.

11:03:11  2   Q.      Do you recall Dr. Steed's testimony about the

11:03:13  3   Rule-of-2?

11:03:14  4   A.      Yes.

11:03:16  5   Q.      Were you aware of the Rule-of-2 before this case?

11:03:18  6   A.      I was generally aware of rules related to -- or

11:03:23  7   recommendations related to differences in p$K_a$ values.  I was

11:03:28  8   generally aware of differences of two to three or more in

11:03:32  9   looking at counterions.

11:03:34 10   Q.      Now, if we pull up from the Lide reference, the

11:03:38 11   entries for malic acid and quinoline, in view of the p$K_a$

11:03:45 12   information for malic acid and quinoline, what, if anything,

11:03:49 13   would the Rule-of-2 have told a POSA about whether or not to

11:03:52 14   pursue a malic salt of a quinoline-containing compound?

11:03:56 15   A.      Based upon the information available to a POSA in the

11:03:59 16   literature, it would not have satisfied at least the

11:04:02 17   Rule-of-2.

11:04:02 18   Q.      Now, does the combination of malic acid and

11:04:05 19   cabozantinib ultimately satisfy the Rule-of-2?

11:04:07 20   A.      That's my understanding, yes.

11:04:09 21   Q.      Could that have been reasonably expected beforehand?

11:04:12 22   A.      No.

11:04:13 23   Q.      Does a less than two p$K_a$ unit difference mean that a

11:04:16 24   salt will not form?

11:04:17 25   A.      No.

Koleng - Direct

11:04:17 1   Q.     Does a greater than two p$K_a$ unit difference mean that

11:04:20 2   a salt will form?

11:04:21 3   A.     No.

11:04:24 4   Q.     Turning to PDX 5.12.  What is your second reason why

11:04:29 5   a person of skill in the art would not have been motivated

11:04:32 6   to select malic acid in a salt screen?

11:04:34 7   A.     Well, so a POSA would have been aware of hierarchical

11:04:38 8   approaches that favored stronger, more commonly used acids.

11:04:42 9   Q.     What does the term "hierarchical approach" refer to?

11:04:45 10   A.     A stepwise approach.

11:04:48 11   Q.     Was that approach described in the literature?

11:04:50 12   A.     Yes, it was.

11:04:53 13   Q.     Would you turn in your binder to Tab 4 where you'll

11:04:56 14   find DTX-167?

11:04:59 15   A.     I'm there.

11:05:00 16   Q.     Would you please identify this document?

11:05:01 17   A.     This is the Bighley reference.

11:05:10 18   Q.     Turning to Page 480 of Bighley -- or Bighley, we'll

11:05:14 19   go with Bighley -- can you read when we get there -- let me

11:05:18 20   know when you're at Page 480.

11:05:20 21   A.     480?

11:05:21 22   Q.     4 -8 -0.

11:05:23 23          And I'll direct your attention to the last two

11:05:26 24   sentences of the first paragraph.

11:05:33 25   A.     Okay, I'm there.

Koleng - Direct

11:05:36 1  Q.      Would you please read the last two sentences of the

11:05:38 2  first paragraph on Page 480 of Bighley?

11:05:41 3  A.      "Hence, there is a need for a decision tree to create

11:05:45 4  a prototype thought process whereby a suitable salt form can

11:05:49 5  be chosen in an efficient and timely manner with few false

11:05:54 6  starts and the minimum expenditure of resources.  The

11:05:58 7  following decision tree (Figure 1) is proposed to aid in

11:06:01 8  this selection."

11:06:03 9  Q.      Now, if we turn to the next page, 481 in Bighley,

11:06:09 10 what's shown here?

11:06:09 11 A.      This is the decision tree that was referenced in the

11:06:14 12 passage we just read.

11:06:16 13 Q.      How, if at all, does this decision tree and this

11:06:18 14 excerpt from Bighley compare with your personal experience

11:06:22 15 with salt screening?

11:06:23 16 A.      It's consistent.

11:06:24 17 Q.      Based on the approach shown in Bighley, would a -- or

11:06:28 18 which acid would a skilled artisan have begun with?

11:06:30 19 A.      Hydrogen chloride.

11:06:32 20 Q.      And what are the reasons that a skilled artisan would

11:06:34 21 have begun with hydrogen chloride?

11:06:36 22 A.      As we've heard during testimony, it's a very strong

11:06:39 23 acid.  It's very common in pharmaceutical salts.  And the

11:06:44 24 counterion, the chloride, is not one that would be expected

11:06:47 25 to react readily with other parts of the compound.

Koleng - Direct

11:06:52  1   Q.      Based on the approach shown in Bighley, where would a

11:06:56  2   skilled artisan have turned after hydrogen chloride?

11:06:59  3   A.      As we look down, to other mineral acid salts.

11:07:04  4   Q.      And what are mineral acid salts?

11:07:08  5   A.      There's salts of mineral acids where mineral acids

11:07:10  6   are also -- often called inorganic acids.

11:07:13  7   Q.      What are inorganic acids?

11:07:15  8   A.      Those that typically don't include carbon.

11:07:22  9   Q.      Can you please provide an example or two of some

11:07:25 10   inorganic acids or mineral acids?

11:07:28 11   A.      Sure.  Other examples include hydrogen bromide, for

11:07:32 12   instance.  Sulfuric acid, nitric acid, phosphoric acid,

11:07:36 13   among others.

11:07:37 14   Q.      What are the reasons a skilled artisan would have

11:07:39 15   considered inorganic acids or mineral acids at this stage in

11:07:42 16   the decision tree?

11:07:43 17   A.      First, they're still very strong acids.  The other

11:07:47 18   reason would be that they didn't find -- they weren't either

11:07:51 19   able to form a salt with the hydrogen chloride.  Or any

11:07:54 20   resulting salt didn't display any beneficial properties.

11:07:59 21   Q.      Now, I'd like to you to turn in Bighley to Page 486.

11:08:03 22   It's a little bit further into the reference.  And I'll

11:08:09 23   direct your attention to the paragraph under preparation of

11:08:13 24   organic salts.

11:08:15 25           Do you see that section?

816

Koleng - Direct

11:08:15 1    A.      I do.

11:08:16 2    Q.      Do you recall Dr. Steed's testimony that a skilled

11:08:18 3    artisan would have disfavored inorganic acids based on this

11:08:22 4    excerpt from the Bighley reference?

11:08:23 5    A.      I do.

11:08:24 6    Q.      What's your response to that testimony?

11:08:25 7    A.      I believe that it's misplaced.  If we consider the

11:08:29 8    context of this entire paragraph, the POSA would recognize

11:08:34 9    that it's specifically addressing an issue associated with

11:08:37 10   salt selection for injectable drugs, those that are

11:08:41 11   typically administered as solutions and injected directly

11:08:45 12   into the body.

11:08:46 13   Q.      Are -- this is straightforward, but are oral dosage

11:08:50 14   forms injectable drugs?

11:08:51 15   A.      No.

11:08:51 16   Q.      Is Cabometyx an injectable drug?

11:08:54 17   A.      No.

11:08:58 18   Q.      Now, if we turn back to the decision tree, which I

11:09:01 19   believe is on Page 481.  As part of the hierarchical

11:09:09 20   approach, described in Bighley, would a skilled artisan have

11:09:13 21   considered organic acids?

11:09:14 22   A.      Potentially.

11:09:15 23   Q.      Under what circumstances would a skilled artisan have

11:09:18 24   considered organic acids?

11:09:19 25   A.      Well, we have, one, if you're developing an

Koleng - Direct

11:09:21  1   injectable product.  Number two, you weren't able to obtain

11:09:27  2   either salts with the inorganic acids.  Or there's any salt

11:09:32  3   that was obtained didn't have desirable properties.

11:09:36  4   Q.     Can you please provide an example or two of an

11:09:40  5   organic acid?

11:09:40  6   A.     Sure.  These would be things like maleic acid,

11:09:45  7   methane sulfonic acid, for instance.

11:09:48  8   Q.     Now, what type of organic acids would have been

11:09:50  9   considered at this stage in the decision tree?

11:09:52 10   A.     Stronger ones, like the examples I gave.

11:09:54 11   Q.     And why is that?

11:09:55 12   A.     Again, because you're still looking for stronger

11:09:58 13   acids.

11:10:01 14   Q.     Would you turn to PDX 5.13, please?

11:10:06 15          What's displayed on the demonstrative?

11:10:08 16   A.     So organic acids have limitations in their use as

11:10:13 17   counterions.  This is a list of four that a POSA would need

11:10:16 18   to consider.

11:10:17 19   Q.     Could you describe some of the limitations?

11:10:19 20   A.     Sure.  They're usually weaker.  They have higher $pK_a$s

11:10:24 21   than the inorganic acids.  They themselves have reduced

11:10:29 22   aqueous solubility.  They typically include multiple

11:10:32 23   functional groups that can complicate the chemistry or have

11:10:35 24   side reactions, things of that nature.  And they usually

11:10:37 25   have larger molecular weights, which add bulk to the API

Koleng - Direct

11:10:42  1   which can create issues in formulating products.

11:10:45  2   Q.      Have organic acids been used in pharmaceutical salts?

11:10:48  3   A.      Yes, they have.

11:10:49  4   Q.      Turning to PDX-5.14.  What were the most common

11:10:54  5   organic acids used?

11:10:56  6   A.      As shown here, mesylate, maleate, the citrate,

11:11:00  7   tartrate, and acetate.

11:11:02  8   Q.      What type of acid is malic acid?

11:11:05  9   A.      Organic.

11:11:06 10   Q.      Is malic acid included in the list of the five most

11:11:11 11   common organic acids on PDX-5.14?

11:11:14 12   A.      No.

11:11:16 13   Q.      Did you hear Dr. Steed's testimony that malic acid

11:11:18 14   would have been favored over other potential acids because

11:11:21 15   it was identified as generally recognized as safe?

11:11:24 16   A.      I recall that testimony.

11:11:26 17   Q.      Have you ever considered a GRAS designation in

11:11:30 18   identifying a counterion for selection in a salt screen?

11:11:32 19   A.      No.

11:11:33 20   Q.      What are the reasons for that?

11:11:34 21   A.      Mainly that the GRAS designation, GRAS regulations

11:11:38 22   are related to food additives of the pure materials.  It's

11:11:42 23   really not directly applicable to pharmaceuticals.  The

11:11:46 24   other consideration is that the combination of a counterion

11:11:50 25   and the active ingredient are qualified together.  So that

Koleng - Direct

11:11:54 1    it's the safety and toxicity of the salt, not the starting

11:11:58 2    counterion acid in this case.

11:12:00 3                It's a particularly -- particularly interesting

11:12:02 4    to note that the two most common anions listed here,

11:12:07 5    actually their corresponding acids are non-GRAS designated.

11:12:10 6    Q.    Now, turning to PDX-5.15.

11:12:13 7                Do you agree with Dr. Steed that malate salts

11:12:16 8    were commonly used in pharmaceutical compounds?

11:12:18 9    A.    No, I do not agree with him.

11:12:20 10   Q.    What are the reasons you disagree?

11:12:22 11   A.    Mainly that the information that -- part of what's

11:12:25 12   already been put up during this trial shows that it was only

11:12:27 13   rarely used.

11:12:28 14   Q.    Now, I want to direct your attention to -- back to

11:12:33 15   Tab 4 in your materials, which is DTX-167, the Bighley

11:12:37 16   reference we discussed earlier.

11:12:39 17   A.    Yes, sir.

11:12:39 18   Q.    Can you turn to Page 453?

11:12:48 19   A.    I'm there.

11:12:49 20   Q.    And turning your attention to the second-to-last

11:12:52 21   paragraph on the page, what information is addressed in

11:12:56 22   Table 1 in Bighley?

11:12:57 23   A.    "Salt forms that have been clinically evaluated in

11:13:00 24   humans or were commercially marketed through 1993."

11:13:06 25   Q.    Now, turn the page to Pages 454 and 455.

Koleng - Direct

11:13:12 1          Do you find Table 1?

11:13:13 2   A.     I do.

11:13:15 3   Q.     What is the name of Table 1?

11:13:16 4   A.     Anionic pharmaceutical salt forms currently in use.

11:13:21 5   Q.     And what is an anionic pharmaceutical salt form?

11:13:25 6   A.     So this is a salt where the active ingredient is a

11:13:29 7   base and the corresponding counterion comes from an acid,

11:13:33 8   like cabozantinib (L)-malate.

11:13:36 9   Q.     Have you analyzed the salts in Table 1?

11:13:38 10  A.     I have.

11:13:40 11  Q.     Can you turn to Tab 5 in your materials, where you'll

11:13:43 12  find PTX-782?

11:13:48 13         Can you please identify this document?

11:13:50 14  A.     Yeah, so this is the data from Table 1 that we just

11:13:55 15  reviewed.  Table 1 presented it alphabetically.  This table

11:14:00 16  that shows the -- the same salt, the same anionic salts but

11:14:07 17  ranked by frequency of occurrence.

11:14:09 18  Q.     So, I think you may have just said two different

11:14:12 19  things.

11:14:12 20         How are the salts arranged in this table on

11:14:15 21  PTX-782?

11:14:17 22  A.     By order of occurrence.  So, from most current to

11:14:21 23  least current, least -- most frequent to least frequent.

11:14:24 24  Q.     Now, focusing on the anionic salts in PTX-782, how

11:14:30 25  many salts are listed here?

Koleng - Direct

11:14:31  1    A.     I believe 113.

11:14:36  2              MR. YURKERWICH:  Mr. Lee, can you write the

11:14:37  3    number 113 on the -- PTX-782?

11:14:37  4    BY MR. YURKERWICH:

11:14:45  5    Q.     Are these 113 salts all pharmaceutically acceptable

11:14:49  6    salts?

11:14:49  7    A.     Yes.

11:14:52  8    Q.     Now, I want to direct your attention to the bottom

11:14:54  9    left of the table.  And focus your attention on the malate

11:14:54 10    salt.

11:15:02 11              How often was the malate salt used in

11:15:04 12    pharmaceutical -- anionic pharmaceutical salts?

11:15:07 13    A.     As highlighted here, it's 0.26 percent.

11:15:10 14    Q.     Now, coming back and taking a look at the whole

11:15:13 15    chart, how many anions used in 1 percent or fewer

11:15:18 16    pharmaceutical salts?

11:15:19 17    A.     I believe it's about 98.

11:15:29 18    Q.     Would you turn in your materials to Tab 6.  We're

11:15:34 19    going to take a quick look at another reference that's been

11:15:36 20    discussed.  You'll find DTX-177.

11:15:40 21              Would you please identify that document?

11:15:41 22    A.     This is the Paulekuhn reference that's been in

11:15:46 23    evidence.

11:15:46 24    Q.     Now, if you look on -- farther down on the first page

11:15:50 25    of this reference, do you see the section "Study Design"?

11:15:52  1   A.      I do.

11:15:57  2   Q.      What kind of compounds were studied in the Paulekuhn

11:16:00  3   reference?

11:16:00  4   A.      So as they note here, they studied chemically

11:16:03  5   well-defined APIs.  They would be drug substances.  They

11:16:06  6   represent about 1,300 from the FDA Orange Book at the time.

11:16:11  7   Q.      Now, turning two pages forward to Page 6667, do you

11:16:16  8   find Table 2.

11:16:17  9   A.      I do.

11:16:19 10   Q.      What is the title of Table 2?

11:16:20 11   A.      "Distribution of Anions Used in APIs of Category I."

11:16:27 12   Q.      Can you remind us, what is Category I?

11:16:30 13   A.      Yes.  These would be the same sorts of anionic

11:16:33 14   pharmaceutical salts we just discussed.  The API is basic.

11:16:36 15   The counterion comes from an acid.

11:16:39 16   Q.      Now, focusing on the first column in Table 2 and

11:16:43 17   looking at the malate entry, how often was the malate salt

11:16:48 18   used in terms of the overall sample studied?

11:16:51 19   A.      0.4 percent.  I believe you have the -- there we go.

11:16:56 20   Q.      And if you look to the right-hand side of the

11:16:59 21   column -- or the right -- far right column in Table 2, how

11:17:04 22   often was the malate salt used between 2002 and 2006?

11:17:08 23   A.      Once.  It was roughly 3 percent of 36 drugs approved

11:17:13 24   during that period.

11:17:14 25   Q.      Did you reach any conclusions based on your review of

Koleng - Direct

11:17:16 1    the Bighley and Paulekuhn references?

11:17:19 2    A.    Yes, that the malate salt is only rarely used.

11:17:22 3    Q.    How does that compare with your experience?

11:17:24 4    A.    It compares correctly.  It's not one I've ever

11:17:28 5    considered.

11:17:29 6    Q.    How many of your salt screen projects included malic

11:17:32 7    acids among the acids tested?

11:17:34 8    A.    None.

11:17:36 9    Q.    By 2009, how many acids were known and could have

11:17:39 10   been considered by a skilled artisan in attempting to form a

11:17:42 11   pharmaceutically acceptable salt?

11:17:44 12   A.    Bighley lists at least 113.

11:17:49 13   Q.    Can you please turn to Tab 7 in your binder where

11:17:52 14   you'll find DTX-287?  Would you please identify this

11:17:57 15   document?

11:17:58 16   A.    This is the Sutent product label.

11:18:03 17   Q.    What is Sutent?

11:18:05 18   A.    It's a pharmaceutical composition comprising

11:18:08 19   sunitinib malate.

11:18:10 20   Q.    Do you recall Dr. Steed's testimony that a skilled

11:18:12 21   artisan would have been motivated to use malic acid because

11:18:15 22   the active ingredient in Sutent is in the form of malate

11:18:20 23   salt?

11:18:20 24   A.    I recall that.

11:18:22 25   Q.    What's your response to that?

824

Koleng - Direct

11:18:24 1    A.    I disagree.  Although Sutent has a similar

11:18:29 2    indication, a POSA doesn't select counterions based on

11:18:34 3    indication.  It's based upon the actual attributes of the

11:18:39 4    chemical that they're studying.

11:18:40 5    Q.    Well, let's talk about some of those attributes.  I

11:18:43 6    want to direct your attention to the second paragraph on the

11:18:44 7    first page of DTX-287.  Would you please read the first

11:18:48 8    sentence in that paragraph?

11:18:49 9    A.    "Sunitinib malate is a yellow to orange powder with a

11:18:54 10   p$K_a$ of 8.95."

11:18:57 11   Q.    How do the chemical properties of sunitinib compare

11:19:01 12   to cabozantinib?

11:19:02 13   A.    With this p$K_a$, sunitinib would be would have been

11:19:08 14   considered a strong base even relative to cabozantinib.

11:19:11 15   Q.    And what are the consequences of that difference.

11:19:15 16   A.    Well, first, the choice of acids that one would

11:19:18 17   consider would be different.  And then the like -- the

11:19:23 18   likely outcomes would be different.

11:19:28 19   Q.    Turning to PDX-5.16, what is your third opinion

11:19:32 20   you're offering here today?

11:19:33 21   A.    Pharmaceutical development is a complex process.

11:19:38 22   There has to be a range of considerations that go into

11:19:42 23   identifying the pharmaceutical salt, if selected, that

11:19:46 24   ultimately goes into the final products.

11:19:48 25   Q.    Can you give us some examples of considerations or

Koleng - Direct

11:19:52  1    factors in development that would have been considered in

11:19:55  2    the course of salt development in 2009?

11:19:58  3    A.    Yes.  I believe we've heard several already.  They

11:20:02  4    include elements such as bioavailability, solubility,

11:20:06  5    dissolution, physical and chemical stability, the PK

11:20:11  6    potentially resulting from that particular salt.

11:20:14  7    Manufacturability is key as well, among others.

11:20:17  8    Q.    Now, let's assume the skilled artisan wanted to make

11:20:19  9    a salt with a favorable solubility.  Could a skilled artisan

11:20:23 10    have had a reasonable expectation as to what salt would give

11:20:26 11    the best solubility?

11:20:28 12    A.    No.

11:20:30 13    Q.    In your experience, does making a salt result in

11:20:33 14    improved solubility relative to the free form of the active

11:20:37 15    ingredient?

11:20:37 16    A.    No.  Not always.

11:20:40 17    Q.    Dr. Steed testified that a skilled artisan would have

11:20:42 18    been motivated to pursue a malate salt of cabozantinib to

11:20:45 19    improve solubility.  What impact did forming a malate salt

11:20:48 20    actually have on solubility of cabozantinib?

11:20:51 21    A.    As we've learned, the solubility in biorelevant media

11:20:57 22    which is more predictive of bioavailability, was not

11:21:00 23    greater.

11:21:00 24    Q.    How, if at all, does that bear on your opinion

11:21:03 25    regarding reasonable expectation of success?

Koleng - Direct

11:21:05  1    A.      Again, I don't believe it supports a POSA having a

11:21:09  2    reasonable expectation of success.

11:21:10  3    Q.      What is your overall response to Dr. Steed's

11:21:13  4    testimony that it would have been obvious to prepare the

11:21:17  5    (L)-malate salt of cabozantinib as part of a salt screen?

11:21:19  6    A.      First, I don't think, from everything we just

11:21:22  7    discussed, they wouldn't have been motivated to evaluate it.

11:21:26  8    And they wouldn't have had a reasonable expectation of

11:21:29  9    success.

11:21:30 10            MR. YURKERWICH:  Thank you, Dr. Koleng.  I have

11:21:32 11    no further questions for you at this time.

11:21:33 12            Your Honor, Exelixis would move to admit

11:21:36 13    PTX-373, PTX-782, and DTX-287.

11:21:43 14            MR. MATHAS:  No objection, Your Honor.

11:21:44 15            THE COURT:  Admitted without objection.

11:21:46 16            (PTX Exhibit No. 373 and 782 were admitted into

11:21:46 17    evidence.)

11:21:46 18            (DTX Exhibit No. 287 was admitted into

11:21:52 19    evidence.)

11:21:52 20            MR. MATHAS:  Your Honor, may we hand up a cross

11:21:54 21    binder?

11:21:55 22            THE COURT:  Sure.

11:22:05 23            THE WITNESS:  Are you going to reference

11:22:06 24    anything in here?  Otherwise, I'll put it on the floor.

11:22:09 25            MR. MATHAS:  I may.  So go ahead and keep it

Koleng - Cross

11:22:11 1    handy.  This other one is small.

11:22:17 2                THE WITNESS:  Thank you, sir.

11:22:13 3                     CROSS-EXAMINATION

11:22:20 4    BY MR. MATHAS:

11:22:21 5    Q.    All right.  Good morning, Dr. Koleng.

11:22:23 6    A.    Good morning, sir.

11:22:24 7    Q.    Now, as of 2009, the basic principles associated with

11:22:29 8    salt formation reactions were understood; isn't that true?

11:22:32 9    A.    I believe acid base reactions were reasonably

11:22:37 10   understood.

11:22:38 11   Q.    All right.  And by 2009, salt screening was a known

11:22:44 12   technique for identifying salt forms of compounds; true?

11:22:47 13   A.    It's a -- it's a way to identify salt forms, yes.

11:22:53 14   Q.    All right.  And it was a known technique as of 2009;

11:22:56 15   right?

11:22:56 16   A.    Yes.

11:22:59 17   Q.    And you yourself, as of 2009, were involved in doing

11:23:03 18   salt screening; right?

11:23:03 19   A.    Correct.

11:23:05 20   Q.    And as of 2009, a salt screen would have been a tool

11:23:08 21   in the formulator's toolbox; isn't that true?

11:23:11 22   A.    Yes.

11:23:12 23   Q.    All right.  Now, I want to -- you gave some opinions

11:23:17 24   about variables -- excuse me -- variables that would be

11:23:21 25   considered in setting up a salt screen.

Koleng - Cross

11:23:24 1            Do you recall that?

11:23:25 2   A.    I do.

11:23:25 3   Q.    And you testified, I believe, that salt screening is

11:23:32 4   unpredictable because you couldn't predict or guarantee the

11:23:35 5   results of the salt screen; is that your testimony?

11:23:38 6   A.    It's unpredictable.  Yes.

11:23:41 7   Q.    Okay.  And because you say it's unpredictable, you

11:23:44 8   say you can't guarantee that a salt will form; right?

11:23:47 9   A.    Correct.

11:23:48 10  Q.    And you say you can't guarantee what the properties

11:23:51 11  of the salt will be in advance; right?

11:23:53 12  A.    Correct.

11:23:55 13  Q.    Okay.  Now, a person of ordinary skill in the art

11:23:58 14  would have been able to assess these variables that you

11:24:01 15  talked about and select suitable conditions to conduct a

11:24:05 16  salt screen, wouldn't they?

11:24:06 17  A.    I believe they would have the capability to, you

11:24:12 18  know, set up the experiment, react to the data, make the

11:24:16 19  necessary changes on a trial and error basis, yes.

11:24:19 20  Q.    And they would have been able to do that as of 2009,

11:24:21 21  wouldn't they?

11:24:22 22  A.    Yes.

11:24:24 23  Q.    You also talked about a hierarchical order of

11:24:30 24  proceeding through a salt screen.

11:24:31 25            Do you recall that?

Koleng - Cross

11:24:32  1   A.      I do.

11:24:33  2   Q.      And you pulled up the Bighley reference, and there

11:24:35  3   was a decision tree in there that you talked about; right?

11:24:38  4   A.      Correct.

11:24:40  5   Q.      Now, but you agree, don't you, Dr.  Koleng that a

11:24:43  6   person of ordinary skill in the art as of 2009 would not

11:24:46  7   have been beholden to following prior art decision trees in

11:24:51  8   a hierarchical order in setting up a salt screen?

11:24:55  9   A.      Correct.

11:24:56 10   Q.      All right.  You also talked about the fact that malic

11:25:01 11   acid was a weak acid; right?

11:25:02 12   A.      Correct.

11:25:03 13   Q.      Okay.  Now, you agree that there are a significant

11:25:06 14   number of organic acids that have been used to make

11:25:10 15   pharmaceutically acceptable salts, don't you?

11:25:12 16   A.      Bighley shows a fair number, yes.

11:25:16 17   Q.      All right.  And you highlighted a couple of those in

11:25:18 18   your testimony; right?

11:25:19 19   A.      Correct.

11:25:20 20   Q.      Okay.  And you also talked a little bit about the

11:25:32 21   Tong's Rule-of-2 and the use of p$K_a$ during your direct;

11:25:36 22   right?

11:25:36 23   A.      I don't think I specifically addressed Tong's

11:25:39 24   Rule-of-2.  I said I acknowledge that I heard Dr. Steed's

11:25:43 25   testimony and I was aware of the principle.

Koleng - Cross

11:25:46  1  Q.      Okay.  So you're aware of the principle of using p$K_a$

11:25:49  2  for selecting salts for a salt screen; right?

11:25:51  3  A.      As one variable, yes.

11:25:53  4  Q.      And that was something you were aware of back in

11:25:55  5  2009; right?

11:25:56  6  A.      Correct.

11:25:57  7  Q.      And something that the POSA would have been aware of

11:25:59  8  back in 2009?

11:26:00  9  A.      I believe so, yes.

11:26:01 10  Q.      Okay.  Now, it's true, isn't it, Dr. Koleng, that a

11:26:05 11  POSA could have determined the p$K_a$ of a compound by

11:26:09 12  performing a titration test; right?

11:26:11 13  A.      Potentially, yes.

11:26:13 14  Q.      And that's a routine test that POSAs like yourself as

11:26:17 15  of 2009 would have been able to perform and interpret;

11:26:20 16  right?

11:26:20 17  A.      It was a test in use at that time, yes.

11:26:23 18  Q.      Okay.  Now, you showed us an entry on quinolines in

11:26:27 19  connection with their p$K_a$; is that right?

11:26:30 20  A.      Correct.

11:26:31 21  Q.      And you didn't show us an entry on the p$K_a$ of

11:26:35 22  cabozantinib; isn't that right?

11:26:37 23  A.      That's correct.  It wasn't available at the 2009

11:26:40 24  time.

11:26:40 25  Q.      Right.  And so when you said that the quinolines

Koleng - Cross

11:26:43 1    wouldn't have fallen within the p$K_a$ of a Rule-of-2, that was

11:26:49 2    quinolines generally.  You weren't saying that cabozantinib

11:26:52 3    wouldn't fall within the Rule-of-2; right?

11:26:53 4    A.    That's correct.  It's what would have been available

11:26:56 5    without experimentation.

11:26:58 6    Q.    Right.  And you're not disputing, are you, sir, that

11:27:01 7    cabozantinib falls within the Rule-of-2?

11:27:03 8    A.    Ultimately, correct.

11:27:05 9    Q.    Okay.  And I think you said this, but just so the

11:27:17 10   record is very clear, you agree, Dr. Koleng, that malate

11:27:22 11   salt is a pharmaceutically acceptable salt; right?

11:27:25 12   A.    Yes.

11:27:26 13   Q.    And you agree that as of 2009, malate salt had been

11:27:30 14   used in FDA-approved drugs; right?

11:27:32 15   A.    A small number, yes.

11:27:35 16   Q.    They had been used in FDA-approved drugs since at

11:27:37 17   least the 1970s; true?

11:27:39 18   A.    I believe there's one going that far back, yes.

11:27:41 19   Q.    Okay.  And malate salt had been used in FDA-approved

11:27:44 20   drugs in the decade leading up to the priority date here;

11:27:47 21   right?

11:27:47 22   A.    In the small numbers that I showed, yes.

11:27:50 23   Q.    Okay.  Now, there was some discussion about malic

11:27:53 24   acid and whether it was GRAS or not.

11:27:56 25                  Do you recall that?

Koleng - Cross

11:27:56 1    A.      I do.

11:27:57 2    Q.      And that's G-R-A-S, generally recognized as safe;

11:28:01 3    right?

11:28:01 4    A.      Right.

11:28:02 5    Q.      And I think what you said on your direct was, "Well,

11:28:06 6    GRAS isn't relevant because that's just something that

11:28:08 7    matters for food additives"; is that right?

11:28:10 8    A.      No.  I said that GRAS status is specific for foods

11:28:14 9    and it's not a consideration that I've ever taken into

11:28:18 10   account.

11:28:18 11   Q.      Okay.  Now, but persons of ordinary skill as of 2009

11:28:22 12   did take into account the GRAS status of counterions in

11:28:26 13   selecting salts for salt screening.  Didn't they?

11:28:28 14   A.      I don't think I'd agree with that generally.

11:28:31 15   Q.      Okay.  Now -- well, let me ask you this:  As of 2009,

11:28:35 16   isn't it true that the literature taught the GRAS status of

11:28:38 17   counterions and to consider it in selecting salts for

11:28:42 18   development?

11:28:43 19   A.      So they have GRAS designation like in some of the

11:28:47 20   experiment -- like in some of the literature that's been put

11:28:49 21   up?  It was -- it wasn't -- not every salt was GRAS.  I

11:28:54 22   think it's one of consideration, if it was important to a

11:28:56 23   POSA.  But it's obviously not -- it doesn't -- it's not a

11:29:01 24   definitive no if it's not GRAS designated.

11:29:04 25   Q.      All right.  So let's look at -- let's look at some of

Koleng - Cross

11:29:07 1    that literature then.

11:29:07 2               MR. MATHAS:  Can we pull up PTX-610, please?

11:29:07 3    BY MR. MATHAS:

11:29:10 4    Q.    And we'll put it on the screen here, Dr. Koleng.

11:29:16 5               This is the Stahl reference that's been

11:29:16 6    discussed --

11:29:18 7               MR. YURKERWICH:  Your Honor.

11:29:21 8               THE COURT:  Yes.

11:29:21 9               MR. YURKERWICH:  We object.  The document now

11:29:23 10   before the witness isn't in the cross binder.

11:29:25 11              MR. MATHAS:  We can hand up a copy, Your Honor,

11:29:27 12   if we may.

11:29:28 13              THE COURT:  Okay.

11:29:29 14              MR. MATHAS:  It's in a bunch of these other

11:29:30 15   binders.  I didn't know we were going to talk about it, but

11:29:33 16   here we are.

11:29:34 17   BY MR. MATHAS:

11:29:35 18   Q.    All right.  So this is the Stahl reference,

11:29:38 19   Dr. Koleng?

11:29:39 20   A.    Is that a question or a statement?

11:29:40 21   Q.    Either.  That's what it is; right?

11:29:43 22   A.    Yes.

11:29:45 23   Q.    And you were in the courtroom for Dr. Steed's

11:29:48 24   testimony about this?

11:29:48 25   A.    Yes.

Koleng - Cross

11:29:49  1    Q.    And you referenced in an answer a moment ago that

11:29:51  2    there might be some tables that had GRAS status indicated;

11:29:55  3    right?

11:29:55  4    A.    Yes.

11:29:55  5    Q.    Okay.  Now, this -- this reference is -- it's in the

11:29:59  6    *Handbook of Pharmaceutical Salts*; right?

11:30:01  7    A.    I'm sure we're going to get to that.

11:30:05  8    Q.    All right.  It's not the *Handbook of Food Additives*;

11:30:09  9    right?

11:30:09 10    A.    Agreed.

11:30:10 11    Q.    Okay.  And let's go back to one of the tables that

11:30:13 12    Dr. Steed showed that maybe you were -- you were referring

11:30:17 13    to a moment ago.

11:30:18 14            MR. MATHAS:  And I think we can find that back

11:30:20 15    in Table 2, which begins on Page 336 of the exhibit.

11:30:33 16            THE WITNESS:  So 336?

11:30:34 17    BY MR. MATHAS:

11:30:34 18    Q.    Well, it's -- it's the Bates page 33 -- or the

11:30:37 19    Exhibit Page 336, Document Page 334.

11:30:40 20    A.    I'm looking for the document page.  Yeah.

11:30:46 21    Q.    The page number on the bottom middle of the page has

11:30:49 22    the 336.

11:30:50 23    A.    All right.

11:30:56 24    Q.    Did you find Table 1 there?

11:30:57 25    A.    Well -- oh, you're -- it's 334 on the document.

Koleng - Cross

11:31:05 1          Yes, I'm there.

11:31:06 2     Q.     Okay.  So Table 1 starts there on -- on Exhibit

11:31:12 3     Page 336.  And then if you go forward, Table 2 starts on

11:31:17 4     Exhibit Page 338.

11:31:19 5          Are you with me?

11:31:20 6     A.     Table 2 on 336 you said.  Okay.  Yeah.

11:31:25 7     Q.     All right.  And Table 2 is a list of acids sorted by

11:31:29 8     increasing p$K_a$ value.  That's been looked at; right?

11:31:33 9     A.     The table says "Acids sorted by increasing p$K_a$

11:31:38 10    value."

11:31:38 11    Q.     Okay.  And in this list of acids in this textbook on

11:31:43 12    pharmaceutical salts, in the far right-hand there's a column

11:31:47 13    on GRAS status; right?

11:31:48 14    A.     I see that.

11:31:50 15    Q.     All right.  And that's information that would have

11:31:51 16    been available to the person of ordinary skill in the art as

11:31:55 17    of 2009; right?

11:31:57 18    A.     This reference would suggest so.

11:31:59 19    Q.     Okay.  And persons of ordinary skill in the art could

11:32:03 20    have used this information about whether or not a compound

11:32:06 21    was GRAS or not in determining counterions to include in a

11:32:13 22    salt screen; right?

11:32:14 23    A.     If they were concerned about the GRAS status, yes.

11:32:17 24          MR. MATHAS:  Okay.  And if we can go to Page 334

11:32:20 25    of the exhibit.

Koleng - Cross

11:32:20  1    BY MR. MATHAS:

11:32:27  2    Q.    You see there there's a section GRAS and ADI?

11:32:32  3    A.    Okay.

11:32:32  4    Q.    All right.  And so --

11:32:34  5    A.    Sorry.  What page?

11:32:37  6    Q.    Your -- it's?

11:32:37  7    A.    Now we're in text.  I thought you said the table.

11:32:39  8    I'm sorry.  Oh, here we go.  Okay.

11:32:41  9    Q.    Yeah.  There's a section here, GRAS and ADI.

11:32:45 10          Are you with me?

11:32:46 11    A.    I do.

11:32:47 12    Q.    Okay.  And this is a section on GRAS in this -- in

11:32:51 13    this text on the *Handbook of Pharmaceutical Salts*; right?

11:32:54 14    A.    Okay.

11:32:56 15    Q.    And so this -- this textbook that would have been

11:32:59 16    known to the POSA about selecting pharmaceutical salts

11:33:02 17    includes a section on GRAS; right, Dr. Koleng?

11:33:05 18    A.    Yes.

11:33:07 19    Q.    Actually -- oh, sorry.

11:33:07 20    A.    As shown here.

11:33:08 21    Q.    And look at second sentence there.

11:33:11 22          MR. MATHAS:  Let's call that out.

11:33:11 23    BY MR. MATHAS:

11:33:12 24    Q.    This textbook says that, "Some substances may be

11:33:15 25    considered unobjectionable because they are used profusely

837

Koleng - Cross

11:33:18 1   in food processing"; right?

11:33:21 2   A.    Okay.

11:33:22 3   Q.    That's what it says.  You agree?

11:33:23 4   A.    I see the words.  I agree with the words.

11:33:25 5   Q.    And you --

11:33:26 6   A.    I agree the words are there.

11:33:28 7   Q.    Right.  And this is talking about substances being

11:33:32 8   unobjectable for use as pharmaceutical salts because of

11:33:34 9   their GRAS status; isn't that right?

11:33:3710   A.    No.  I'm going to say that it's -- some substance

11:33:4111   here refer to the acid not the pharmaceutical salt.

11:33:4412   Q.    Okay.

11:33:4513   A.    Which includes the combination of the API and the

11:33:4814   base and the salt.

11:33:4915   Q.    Okay.  So, the -- the acids may be considered

11:33:5416   unobjectionable in the salt screen because of their GRAS

11:33:5717   status.  That's what it's teaching?

11:33:5918   A.    Well, they would be unobjectable on themselves, how

11:34:0419   they're used in a salt screen, et cetera, within it.

11:34:0720   Ultimately, the resulting drug substance would still have to

11:34:0921   be assessed.

11:34:1022   Q.    All right.  Now, in -- and you're not disputing that

11:34:1223   malic acid was known and recognized as GRAS as of the

11:34:1624   priority date here; right?

11:34:1725   A.    No, I'm not.

Koleng - Cross

11:34:19  1           MR. MATHAS:  No further questions.

11:34:20  2           THE COURT:  Dr. Koleng --

11:34:24  3           THE WITNESS:  Yes, sir.

11:34:25  4           THE COURT:  -- if you had a base and you didn't

11:34:28  5      know what its p$K_a$ was, how much effort goes into determining

11:34:34  6      that?

11:34:34  7           THE WITNESS:  It can be quite a bit.  So, you

11:34:38  8      can start with what's known about the functionality and then

11:34:42  9      you can then work from there.  So, that gives you an idea of

11:34:46 10      the -- functionality gives you an idea where to start and

11:34:48 11      then I don't disagree that you could run experimentation to

11:34:52 12      identify the p$K_a$ ultimately.  Yeah, the ionization constant

11:34:58 13      for that base.

11:34:59 14           The issue would be is that it depends on the

11:35:01 15      conditions under which it's conducted and the -- and the

11:35:03 16      test to do it.  So, you would still have to do enough

11:35:06 17      experimentation to gets an accurate value, so there's -- you

11:35:09 18      may be able to improve the estimate, but work would continue

11:35:13 19      to try to fine tune that.

11:35:15 20           THE COURT:  So if you wanted to do that and you

11:35:17 21      had a fully equipped lab and you were a person of ordinary

11:35:21 22      skill, how many days, weeks, months, years would you set

11:35:25 23      aside to do that?

11:35:26 24           THE WITNESS:  I would say a couple weeks.

11:35:31 25           THE COURT:  All right.  The solvent streams

Koleng - Cross

11:35:38  1    where if you had, again, your base and you wanted to find

11:35:44  2    out what solvent would work with it, how long does it take

11:35:47  3    to do the solvent screening?

11:35:50  4               THE WITNESS:  The solvent screenings can take on

11:35:52  5    the order of a couple weeks as well because you have to

11:35:55  6    select the solvent, you have to prep the samples, have

11:35:57  7    analytical methodology in order to assess the amount that is

11:36:00  8    dissolved, prepare the samples, analyze the samples, and

11:36:03  9    then get the results.

11:36:05 10               THE COURT:  All right.

11:36:07 11               MR. YURKERWICH:  No redirect, Your Honor.

11:36:09 12               THE COURT:  Okay.  All right.  Dr. Koleng, thank

11:36:12 13    you.  You're done.  Please watch your step.

11:36:14 14               THE WITNESS:  Thank you, sir.

11:36:19 15               MR. PRUSSIA:  Your Honor, Plaintiffs call

11:36:21 16    Dr. Bernhardt Trout.

11:36:24 17               THE COURT:  All right.

11:36:32 18               DEPUTY CLERK:  Please state and spell your full

11:36:46 19    name for the record.

11:36:46 20               THE WITNESS:  Bernhardt Trout.

11:36:51 21    B-E-R-N-H-A-R-D-T, T-R-O-U-T.

11:36:51 22               BERNHARDT TROUT, the witness herein, after

11:36:51 23    having been duly sworn under oath, was examined and

11:37:04 24    testified as follows:

11:37:04 25               THE WITNESS:  Yes, I do.

| 11:37:19 | 1 | MR. PRUSSIA:  May I proceed? |

11:37:19  1          MR. PRUSSIA:  May I proceed?

11:37:12  2                    DIRECT EXAMINATION

11:37:12  3   BY MR. PRUSSIA:

11:37:21  4   Q.     Good morning.  Would you please introduce yourself to

11:37:24  5   the Court?

11:37:24  6   A.     Good morning.  My name is Bernhardt Trout.

11:37:28  7   Q.     Dr. Trout, have you been retained by Exelixis as an

11:37:31  8   expert witness in this case?

11:37:32  9   A.     Yes, I have.

11:37:33 10   Q.     Are you being compensated for your work in this case?

11:37:35 11   A.     Yes, I am.

11:37:37 12   Q.     Does your compensation depend on the outcome or the

11:37:40 13   substance of your opinions?

11:37:41 14   A.     No.

11:37:41 15          MR. PRUSSIA:  Let's please have PDX-2.

11:37:44 16   BY MR. PRUSSIA:

11:37:44 17   Q.     Where do you work, sir?

11:37:45 18   A.     I work at MIT.  It's Massachusetts Institute of

11:37:48 19   Technology.

11:37:50 20   Q.     And what is your position at MIT?

11:37:51 21   A.     I'm a professor of chemical engineering.

11:37:54 22   Q.     And how long have you been a professor of chemical

11:37:56 23   engineering?

11:37:57 24   A.     Over 25 years.

11:37:59 25   Q.     What is your educational background?

841

Trout - Direct

11:38:00  1    A.    Well, I got my undergraduate degree and my master's

11:38:03  2    degree at MIT.  My Ph.D. at the University of California,

11:38:07  3    Berkeley in 1996.  All in chemical engineering.

11:38:11  4             And then I did a post-doctoral research at the

11:38:13  5    Max-Planck Institute in Stuttgart, Germany.

11:38:17  6    Q.    Generally, what are your job responsibilities as a

11:38:20  7    professor of chemical engineering at MIT?

11:38:23  8    A.    Well, generally there are three aspects.  One is

11:38:24  9    research, run a research lab.  Another is education, meaning

11:38:30 10    specifically classroom room teaching, which I also do.  And

11:38:33 11    then the third area is service, helping the department, and

11:38:37 12    the institute in committees and other ways.

11:38:39 13    Q.    You mentioned teaching.  What is the primary focus of

11:38:42 14    your teaching?

11:38:42 15    A.    Well, chemical engineering.

11:38:44 16    Q.    And are there any courses that you've taught that are

11:38:46 17    relevant to the issues in this case?

11:38:47 18    A.    Yeah.  Yes, there are.  I've taught, for example,

11:38:50 19    thermodynamics at the undergraduate and graduate level.

11:38:54 20    I've taught chemical kinetics and reactor design, again, at

11:38:57 21    the undergraduate and graduate level.  I've taught process

11:39:01 22    laboratory and a whole host of other courses.

11:39:03 23    Q.    You mentioned research.  What is the focus of your

11:39:06 24    research?

11:39:06 25    A.    Well, the focus is pharmaceutical development and

842

Trout - Direct

11:39:10  1    manufacturing research.

11:39:11  2    Q.     What experience do you have with crystalline

11:39:14  3    pharmaceutical salts?

11:39:15  4    A.     Well, I have quite a bit of experience in my own lab

11:39:18  5    at MIT and also as a consultant with pharmaceutical

11:39:22  6    companies.

11:39:23  7    Q.     What type of consulting work do you do?

11:39:25  8    A.     Well, there are two aspects.  One is kind of

11:39:29  9    higher-level consulting as, for example, serving on a

11:39:32 10    scientific advisory board.  And then the other aspect is

11:39:36 11    helping companies solve kind of targeted technical problems.

11:39:39 12    Q.     And generally what type of companies do you work

11:39:42 13    with?

11:39:42 14    A.     Generally larger companies, companies we'd be

11:39:47 15    familiar with.  But also medium size and smaller and

11:39:50 16    startups.

11:39:50 17    Q.     If you could please take a look at your binder at

11:39:54 18    Tab 1, it's PTX-774.

11:39:56 19           Would you please identify it?

11:39:56 20    A.     Yes.  That is my CV.

11:40:02 21    Q.     And does it contain an accurate summary of your

11:40:04 22    education and professional experience?

11:40:06 23    A.     Yes.

11:40:07 24           MR. PRUSSIA:  With that, Your Honor, I tender

11:40:08 25    Dr. Trout as an expert in pharmaceutical development and

Trout - Direct

11:40:11  1   manufacturing, including with respect to crystallization of

11:40:14  2   pharmaceutical salts.

11:40:17  3              MR. LOMBARDI:  No objection.

11:40:18  4              THE COURT:  All right.  You may proceed.

11:40:18  5   BY MR. PRUSSIA:

11:40:19  6   Q.    Let's move into your opinions, sir.

11:40:20  7              MR. PRUSSIA:  Let's please have PDX-3.

11:40:20  8   BY MR. PRUSSIA:

11:40:22  9   Q.    What issues will you be addressing today?

11:40:24 10   A.    Well, I'm going to be responding to MSN's experts

11:40:28 11   and, in particular, Dr. Steed with respect to written

11:40:32 12   description, and also obviousness-type double patenting.

11:40:34 13              MR. PRUSSIA:  Can I have the next slide, please,

11:40:36 14   PDX-4?

11:40:36 15   BY MR. PRUSSIA:

11:40:37 16   Q.    What does this slide show?

11:40:38 17   A.    Well, this shows the cover page of the three asserted

11:40:42 18   crystalline malate salt patents.  The '439, the '440, and

11:40:47 19   the '015, together with the cover page of the respective

11:40:52 20   file histories.

11:40:52 21   Q.    And have you reviewed the file histories for these

11:40:55 22   patents?

11:40:55 23   A.    Yes, I have.

11:40:57 24   Q.    And if you look in your binder at Tabs 2, 3, and 4,

11:41:00 25   they are JTX-1, 2, and 3.

Trout - Direct

11:41:01  1          Could you just briefly identify what those are?

11:41:04  2   A.      Yes.  2, 3, and 4 are respectively those three

11:41:09  3   patents in the same order.

11:41:11  4   Q.      And what do these patents generally disclose?

11:41:13  5   A.      Well, they generally disclose crystalline

11:41:16  6   cabozantinib malate.

11:41:18  7   Q.      What is the priority date for these patents?

11:41:20  8   A.      Priority date is January 16th, 2009.

11:41:28  9   Q.      And have you offered an opinion regarding the

11:41:30 10   qualifications of a person of ordinary skill in the art for

11:41:32 11   these patents as of that date?

11:41:34 12   A.      Yes, I have.

11:41:35 13          MR. PRUSSIA:  And if we turn to PDX-5.

11:41:35 14   BY MR. PRUSSIA:

11:41:38 15   Q.      What qualifications would that person have?

11:41:39 16   A.      Well, that person would have had at least a

11:41:42 17   bachelor's degree in chemistry, chemical engineering,

11:41:46 18   pharmaceutical sciences, or a related discipline.  Along

11:41:49 19   with several years of experience working in pharmaceutical

11:41:52 20   development and/or solid-state chemistry.

11:41:55 21          And a POSA would have also been part of a team

11:41:58 22   which would have included synthetic organic chemists and

11:42:01 23   process chemists, formulation scientists, and analytical

11:42:05 24   scientists, and clinicians.

11:42:07 25   Q.      And did you apply this definition of a person of

Trout - Direct

11:42:11 1   skill in connection with forming your opinions in this case?

11:42:13 2   A.     Yes, I did.

11:42:13 3   Q.     And you understand that MSN has in -- and its expert

11:42:16 4   has offered a different opinion?

11:42:17 5   A.     Yes, I do.

11:42:18 6   Q.     And would your opinions change regardless of which

11:42:20 7   definition is adopted?

11:42:21 8   A.     No, they wouldn't.

11:42:22 9   Q.     And as of the priority date, did you meet the

11:42:25 10  qualifications of a person of ordinary skill in the art

11:42:26 11  under either side's definition?

11:42:28 12  A.     Yes.

11:42:29 13  Q.     Now, let's move into -- before moving into your

11:42:31 14  opinions, let's briefly cover some background concepts,

11:42:34 15  okay?

11:42:34 16  A.     Okay.

11:42:35 17          MR. PRUSSIA:  Let's move to PDX-6.

11:42:35 18  BY MR. PRUSSIA:

11:42:38 19  Q.     What is shown on this slide?

11:42:39 20  A.     This is a very high-level slide, Your Honor.  But it,

11:42:43 21  I think, presents the starting point for understanding these

11:42:46 22  patents.  I think we're all familiar, but the starting point

11:42:49 23  here is that there are three important states of matter.

11:42:52 24  Solid, liquid, and gas.

11:42:55 25  Q.     And what's the relevant state for this case?

846

Trout - Direct

11:42:57  1    A.     It's a solid.

11:42:58  2           MR. PRUSSIA:  And if we could turn to PDX-7.

11:42:58  3    BY MR. PRUSSIA:

11:43:01  4    Q.     What are the different types of solids?

11:43:02  5    A.     Well, there are two different types of solids.  I

11:43:05  6    think Your Honor's heard that throughout the first part of

11:43:08  7    the week here.

11:43:09  8           On the left, I have the crystalline solid.  You

11:43:12  9    can see in the large circle, it's a cartoon emblematic of

11:43:18 10    the repeating pattern of the atoms and molecules over three

11:43:22 11    dimensions in crystalline material.  And that smaller insert

11:43:27 12    is an actual picture of an actual crystal, you can see the

11:43:31 13    facets there.

11:43:33 14           On the other hand, there's amorphous material,

11:43:36 15    and you can see that on the right side.  So the amorphous

11:43:39 16    material does not contain long-range order.  There's a

11:43:43 17    randomness there.  And then you can see there's a picture,

11:43:46 18    again, from -- a microscope picture of an amorphous

11:43:51 19    material.  It looks very different.

11:43:52 20           MR. PRUSSIA:  So let's turn to PDX-8.

11:43:52 21    BY MR. PRUSSIA:

11:43:54 22    Q.     What is shown here?

11:43:55 23    A.     These are the asserted claims of the crystalline

11:43:58 24    malate salt patents.

11:43:59 25    Q.     And what are the common elements of the three

Trout - Direct

11:44:01  1   asserted claims?

11:44:02  2   A.    Well, first of all -- well, you can see highlighted

11:44:05  3   here, crystalline, also the chemical formula cabozantinib,

11:44:09  4   and then the malate.

11:44:12  5            MR. PRUSSIA:  Can we turn to JTX-1.  It's Tab 2

11:44:15  6   in the binder.  It's the '439 patent.  And if we turn to

11:44:18  7   Scheme 1.  Which begins at Column 19.

11:44:18  8   BY MR. PRUSSIA:

11:44:23  9   Q.    What is Compound I?

11:44:25 10   A.    Compound I is cabozantinib (L)-malate.

11:44:33 11            MR. PRUSSIA:  And if we turn to Column 5 of the

11:44:35 12   patent, there's a structure starting at Line 50.

11:44:35 13   BY MR. PRUSSIA:

11:44:40 14   Q.    What is that structure?

11:44:40 15   A.    That structure is (L)-malic acid.

11:44:45 16            MR. PRUSSIA:  And if we turn to the next column,

11:44:47 17   there's a structure starting at Line 1.

11:44:47 18   BY MR. PRUSSIA:

11:44:50 19   Q.    What is that structure?

11:44:51 20   A.    That structure is (D)-malic acid.

11:44:55 21   Q.    And what is the difference between the (L)- and the

11:44:58 22   (D)-malic acid?

11:44:58 23   A.    Well, the two are mirror images of each other.

11:45:02 24            MR. PRUSSIA:  Let's go back to Column 6 and look

11:45:06 25   at a paragraph that starts at about Line 56.

Trout - Direct

BY MR. PRUSSIA:

Q.     Do you see the phrase "this disclosure relates to malic salts"?

A.     Yes.

Q.     What malic salts are disclosed in this paragraph of the patents?

A.     Well, there are three starting at Line 59; the (L)-malate salt of cabozantinib, the (D)-malate salt of cabozantinib, and the (DL)-malate salt of cabozantinib.

Q.     So, what, if any, significance would a skilled person have attributed to the patent's use of the term "malate salts" here?

A.     Well, as the patent shows right here, the malate salts are those three salts.

          MR. PRUSSIA:  If we turn to Column 7.

BY MR. PRUSSIA:

Q.     What does the first sentence in the paragraph beginning at Line 10 say about the malate salts addressed in these patents?

A.     That line says, "The salts of cabozantinib, and particularly Compound I" -- again, that's the cabozantinib (L)-malate -- "have a preferred combination of pharmaceutical properties for development."

Q.     And if we turn to the second sentence, what properties are described there?

Trout - Direct

11:46:16 1   A.      Well, under two different conditions of temperature

11:46:20 2   and relative humidity, Compound I, again, cabozantinib

11:46:24 3   (L)-malate, showed no change in assay, purity, moisture, and

11:46:29 4   dissolution.

11:46:31 5   Q.      And continuing to the next sentence, at Line 16, what

11:46:34 6   properties are described there?

11:46:35 7   A.      "The DSC/TGA" -- so those are thermal analytical

11:46:41 8   methods -- "showed the Compound (I) to be stable up to

11:46:44 9   185 degrees Celsius.

11:46:46 10  Q.      So what, if any, significance would a skilled person

11:46:49 11  have attributed to these disclosures in the crystalline

11:46:52 12  malate salt patent?

11:46:53 13  A.      Well, the crystalline cabozantinib (L)-malate is

11:46:59 14  stable and, in general, it has good pharmaceutical

11:47:03 15  properties for development.

11:47:05 16  Q.      Now, if we turn to the sentence beginning at Line 21

11:47:09 17  of this same paragraph, and it starts with "the (L)-malate

11:47:13 18  salt," what properties are described there?

11:47:16 19  A.      Well, it says the (L)-malate salt was synthesized

11:47:21 20  with good yield and purity and had sufficient solubility for

11:47:24 21  use in a pharmaceutical composition.

11:47:27 22  Q.      And what, if any, significance would a person of

11:47:30 23  skill have attributed to that disclosure in the patent?

11:47:33 24  A.      Well, again, that is suitable for a

11:47:34 25  manufacturability, it could be manufactured.  And it had

Trout - Direct

11:47:37  1   suitable properties for use in a pharmaceutical composition,

11:47:41  2   in particular, solubility.

11:47:43  3   Q.     Look at the last sentence of this paragraph, at

11:47:46  4   Column 7, Lines 26 to 31.  What does this sentence convey to

11:47:51  5   a skilled person regarding the (D)- and (L)-malate salts?

11:47:55  6   A.     Well, this sentence says, "The (D)-malate salt of

11:47:59  7   cabozantinib will have the same properties as the (L)-malate

11:48:03  8   salt of cabozantinib."

11:48:05  9            MR. PRUSSIA:  If we move over to Column 8 at

11:48:09 10   Lines 34 to 39.

11:48:09 11   BY MR. PRUSSIA:

11:48:11 12   Q.     What does this passage disclose about the properties

11:48:13 13   of the crystalline cabozantinib (D)-malate?

11:48:17 14   A.     Yeah.  Okay.  It says, "As known in the art, the

11:48:24 15   crystalline (D)-malate salt will form the same crystalline

11:48:27 16   form and have the same properties as crystalline compound

11:48:32 17   (1)" -- in other words, the (L)-malate salt.

11:48:34 18            MR. PRUSSIA:  Let's take a look at Table 1 in

11:48:37 19   this patent.  Table 1 spans two columns.  I want to focus on

11:48:41 20   the right-hand side, which is on Column 8.

11:48:41 21   BY MR. PRUSSIA:

11:48:43 22   Q.     Do you see the reference to (L)-malate salt in the

11:48:46 23   bottom row?

11:48:47 24   A.     Yes, I do.

11:48:48 25   Q.     What information does Table 1 disclose concerning the

11:48:51 1   (L)-malate salt of cabozantinib?

11:48:52 2   A.   Well, it discloses the solubility.  And then it says

11:48:55 3   that it's crystalline, nonhygroscopic with no indication of

11:49:00 4   hydrate formation.  It's got suitable solubility.  And

11:49:03 5   chemical and physical stability.

11:49:05 6   Q.   How do the properties of the (L)-malate salt compare

11:49:08 7   to the properties of the other salts disclosed in Table 1?

11:49:10 8   A.   Well, as the patent teaches, the properties

11:49:13 9   altogether show that it has the most suitable suite or

11:49:16 10   combination of properties for pharmaceutical development.

11:49:20 11   Q.   Was cabozantinib malate the most soluble salt?

11:49:22 12   A.   No.

11:49:23 13   Q.   And were you here in Court yesterday for the

11:49:25 14   testimony of Dr. Khalid Shah?

11:49:27 15   A.   Yes, I was.

11:49:28 16   Q.   What was the explanation he provided for why Exelixis

11:49:31 17   pursued the (L)-malate salt despite its low solubility?

11:49:35 18   A.   Well, even though it doesn't have the best solubility

11:49:37 19   and, in general, has a low solubility, it has the best

11:49:41 20   combination of properties.

11:49:43 21   Q.   Staying on Column 8, there's a paragraph right below

11:49:45 22   this table.  Please read the first sentence there beginning

11:49:49 23   at Line 25.

11:49:50 24   A.   Certainly.  "Another aspect of this disclosure

11:49:53 25   relates to crystalline forms of Compound (I), which include

Trout - Direct

11:49:57 1    the N-1 and/or the N-2 crystalline form of Compound (I), as

11:50:02 2    described herein."

11:50:04 3    Q.     So, a couple things on this sentence.  First, there's

11:50:06 4    a reference to crystalline form, we're seeing that for the

11:50:09 5    first time.  What is a crystalline form?

11:50:11 6    A.     Well, a crystalline form is a particular polymorph or

11:50:15 7    a particular repeating pattern of a given crystal.

11:50:19 8    Q.     Now, this sentence starts with the phrase "another

11:50:23 9    aspect."  What, if any, significance would a skilled person

11:50:26 10   attach to the use of the term "another aspect of this

11:50:28 11   disclosure"?

11:50:29 12   A.     Well, the skilled person would understand that the

11:50:31 13   inventors are saying in addition and separate to crystalline

11:50:37 14   cabozantinib (L)-malate salt, another aspect of the

11:50:41 15   disclosure relates to the specific crystalline polymorphic

11:50:46 16   forms, the N-1 and the N-2.

11:50:49 17   Q.     Can you please read the next sentence?

11:50:51 18   A.     Certainly.  "Each form of Compound (I) is a separate

11:50:55 19   aspect of the disclosure."

11:50:58 20   Q.     What, if any, significance would a skilled person

11:51:01 21   attach to the patents' use of the term "separate aspect of

11:51:04 22   the disclosure"?

11:51:05 23   A.     Well, I think this is -- just reinforces the previous

11:51:08 24   sentence that, again, it's a separate aspect of the

11:51:11 25   disclosure or separate aspect of the invention.  The

Trout - Direct

11:51:15  1    specific crystalline polymorphic forms, the N-1 and N-2,

11:51:20  2    separate from crystalline cabozantinib (L)-malate.

11:51:24  3    Q.     Now, do any of the crystalline malate salt patents

11:51:27  4    contain claims to an N-1, N-2, or any other crystalline

11:51:31  5    forms?

11:51:31  6    A.     No.

11:51:34  7    Q.     Let's talk more about the word "crystalline."  What

11:51:36  8    is the plain and ordinary meaning of the term "crystalline"

11:51:39  9    in the context of the asserted claims?

11:51:41 10    A.     Well, it's what I just said when we had the slide up

11:51:45 11    for crystalline.  It's a solid material in which there's a

11:51:50 12    regular repeating pattern over -- many over three dimensions

11:51:54 13    and over large spatial dimensions in contrast to an

11:51:58 14    amorphous form.  And it's consistent with what I heard

11:52:01 15    Dr. Steed say yesterday.

11:52:02 16    Q.     Dr. Steed used slightly different words.  He said --

11:52:05 17    I wrote it down -- "a crystal in which the structural units

11:52:08 18    are repeated regularly in three dimensions."

11:52:11 19             Do you remember that testimony?

11:52:11 20    A.     Yes, I do.

11:52:13 21    Q.     Is there a meaningful difference between that and

11:52:15 22    your plain and ordinary meaning?

11:52:16 23    A.     No.

11:52:18 24    Q.     How many crystalline cabozantinib salts exist?

11:52:22 25    A.     Well, there are three.  There's the (L)-malate, the

854

Trout - Direct

11:52:26 1   (D)-malate and the (DL)-malate.

11:52:28 2   Q.    And what is the basis for that opinion?

11:52:30 3   A.    Well, that's what's written and disclosed in the

11:52:34 4   patent.

11:52:35 5             MR. PRUSSIA:  And if you pull back up Column 6,

11:52:38 6   Line 56.

11:52:38 7   BY MR. PRUSSIA:

11:52:38 8   Q.    Is this the passage that you're referring to?

11:52:42 9             MR. PRUSSIA:  We can highlight "this disclosure

11:52:44 10  related to" -- yeah.

11:52:45 11            THE WITNESS:  Yes, it is.  Again, that's the

11:52:47 12  disclosure of malate salts.

11:52:47 13  BY MR. PRUSSIA:

11:52:50 14  Q.    Now, Dr. Steed testified yesterday that the claims

11:52:54 15  require a genus of crystalline malate salt forms.

11:52:58 16            Do you remember that?

11:52:59 17  A.    Yes.  I do.

11:53:00 18  Q.    Do the claims require a genus of crystalline malate

11:53:03 19  salt forms?

11:53:04 20  A.    No.

11:53:06 21  Q.    And why not?

11:53:07 22  A.    Well, the word "form," first of all, is not in the

11:53:10 23  claims.  And the claims do not require a particular genus of

11:53:14 24  specific polymorphs.  They just require the property of

11:53:18 25  crystalline and, of course, cabozantinib malate.

Trout - Direct

11:53:21 1          MR. PRUSSIA:  Let's look back at the claims,

11:53:23 2     PDX-8.

11:53:23 3     BY MR. PRUSSIA:

11:53:24 4     Q.     And just to be clear, you just testified to this, but

11:53:26 5     I have to ask the question:  Do any of the asserted claims

11:53:29 6     contain the word "form"?

11:53:30 7     A.     No.

11:53:32 8          MR. PRUSSIA:  Let's turn to PDX-9.

11:53:32 9     BY MR. PRUSSIA:

11:53:35 10    Q.     What is shown here?

11:53:35 11    A.     Well, this is Claim 1 on the right and left of two

11:53:42 12    different patents, not the asserted crystalline malate

11:53:46 13    cabozantinib patents.  This on the left is the '776 patent,

11:53:52 14    and on the right is the '549 patent.  These are in the same

11:53:56 15    family as the asserted crystalline cabozantinib and malate

11:54:00 16    patents, and they have the same specification.

11:54:03 17    Q.     Do the claims in these patents contain the word

11:54:06 18    "form"?

11:54:06 19    A.     Yes.

11:54:08 20    Q.     How, if at all, does that bear on your opinions in

11:54:10 21    this case?

11:54:10 22    A.     Well, again, this is from the same inventors and the

11:54:14 23    same family, so it shows, I guess, as additional evidence of

11:54:19 24    what I was talking about before, that the inventors could

11:54:22 25    have claimed forms if they wanted to, and, in fact, they

Trout - Direct

11:54:26  1    did.

11:54:27  2                    MR. PRUSSIA:  So returning to PDX-8, and we're

11:54:30  3    looking at the claims of the crystalline malate salt

11:54:33  4    patents.

11:54:33  5    BY MR. PRUSSIA:

11:54:34  6    Q.    How was the term "crystalline" being used in the

11:54:37  7    asserted claims?

11:54:38  8    A.    Well, crystalline meaning that they're a solid.

11:54:42  9    They're crystalline as I've been defining it, and they're

11:54:46 10    not amorphous.

11:54:47 11    Q.    Now, as of the priority date, would a skilled person

11:54:49 12    have been able to distinguish between a crystalline material

11:54:52 13    and an amorphous material?

11:54:54 14    A.    Yes.

11:54:56 15                    MR. PRUSSIA:  Let's have PDX-10, please.

11:54:56 16    BY MR. PRUSSIA:

11:54:59 17    Q.    Just explain for the Court, please, how a skilled

11:55:01 18    person would have done that.

11:55:02 19    A.    Well, this is an example of via microscopy.  That's

11:55:07 20    one method.  And the Court can, I think, see and

11:55:12 21    distinguish, but between the amorphous and crystalline, just

11:55:15 22    by looking at it.  The crystalline has these facets.  That's

11:55:19 23    a consequence of the regular repeating pattern where the

11:55:22 24    amorphous does not.

11:55:24 25    Q.    Yesterday we heard some discussion about different

Trout - Direct

11:55:26 1    forms.  Now, as of the priority date, could a person of

11:55:30 2    skill in the art identify a crystalline salt without knowing

11:55:33 3    what specific form the salt was in?

11:55:36 4    A.    Yes.

11:55:37 5    Q.    And how does this relate to your opinions regarding

11:55:40 6    written description?

11:55:40 7    A.    Well, again, because crystalline is exactly as I've

11:55:45 8    been explaining it -- and this is an example of a method

11:55:48 9    that the skilled person could use to distinguish between

11:55:51 10   crystalline and amorphous without knowing, you could see it

11:55:54 11   quite plainly there without knowing what specific

11:55:58 12   crystalline or amorphous material it is.

11:56:01 13   Q.    Now, what would a skilled person have done if the --

11:56:04 14   that person wanted to evaluate the particular polymorph,

11:56:08 15   polymorphic form?

11:56:09 16   A.    Well, the person could use other techniques, for

11:56:13 17   example, more detailed analysis with X-ray powder

11:56:17 18   diffraction.  I think the Court might be familiar with this.

11:56:19 19   It was discussed earlier this week.

11:56:22 20   Q.    Now -- so let's turn now to your opinions regarding

11:56:25 21   written description, and what is your opinion regarding

11:56:27 22   whether the specification conveys that the inventors

11:56:30 23   possessed the claimed invention?

11:56:31 24   A.    Well, my opinion is, for the reasons that I've been

11:56:35 25   given, that the inventors did possess the claimed invention.

Trout - Direct

| | | |
|---|---|---|
| 11:56:39 | 1 | Q.    Is there any dispute that the specification discloses |
| 11:56:42 | 2 | cabozantinib? |
| 11:56:43 | 3 | A.    No. |
| 11:56:44 | 4 | Q.    Is there any dispute that the specification discloses |
| 11:56:47 | 5 | cabozantinib malate salts? |
| 11:56:48 | 6 | A.    No. |
| 11:56:50 | 7 | MR. PRUSSIA:  Let's turn to the crystalline |
| 11:56:51 | 8 | limitation, and let's have PDX-11. |
| 11:56:51 | 9 | BY MR. PRUSSIA: |
| 11:56:54 | 10 | Q.    Does the specification disclose crystalline salts? |
| 11:56:57 | 11 | A.    Yes.  And I have here in this table a summary of the |
| 11:57:02 | 12 | various places in the patent specification in which it's |
| 11:57:06 | 13 | disclosed.  You can see there are quite a few.  I won't list |
| 11:57:10 | 14 | all of them verbally. |
| 11:57:11 | 15 | Q.    You have a reference to preparative examples on the |
| 11:57:15 | 16 | right-hand side of this table.  What is disclosed by the |
| 11:57:20 | 17 | preparative examples? |
| 11:57:21 | 18 | A.    Well, by preparative examples, I mean, the examples |
| 11:57:25 | 19 | in the patent that are named and listed as examples in which |
| 11:57:29 | 20 | they describe actual chemical processes to generate |
| 11:57:34 | 21 | crystalline cabozantinib (L)-malate.  And for that matter |
| 11:57:38 | 22 | one of the examples generates the amorphous version of the |
| 11:57:41 | 23 | material. |
| 11:57:42 | 24 | MR. PRUSSIA:  If we could put up DDX Steed 13. |
| 11:57:42 | 25 | BY MR. PRUSSIA: |

Trout - Direct

11:57:45 1   Q.      Now, yesterday Dr. Steed offered the opinion that no

11:57:48 2   two forms are representative of one another because of the

11:57:52 3   different intrinsic properties of crystalline salt forms.

11:57:55 4            Do you recall that?

11:57:55 5   A.      Yes, I do.

11:57:56 6   Q.      Now, two questions about this.  First, is that

11:57:59 7   opinion relevant under the plain and ordinary meaning of

11:58:02 8   crystalline?

11:58:02 9   A.      No.

11:58:04 10   Q.      Second, is that opinion correct?

11:58:06 11   A.      No.

11:58:07 12   Q.      And can you explain why?

11:58:08 13   A.      Yes.  Certainly.  So, as I said, under the -- plain

11:58:13 14   and ordinary meaning of crystalline, it's not relevant at

11:58:15 15   all.  But if we assume for some reason that form is read

11:58:19 16   into the claim, then the patents disclosed representative

11:58:24 17   species of those crystalline forms.

11:58:27 18   Q.      So, let's turn to that.

11:58:29 19            Would your opinion concerning written

11:58:30 20   description change if Dr. Steed's version of the claims were

11:58:33 21   applied?

11:58:33 22   A.      No.

11:58:35 23   Q.      Let's have PDX-12, please.  And at a high level, what

11:58:38 24   are the reasons that your opinion is unchanged under his

11:58:41 25   view?

860

Trout - Direct

11:58:41  1   A.     Well, as I just said, representative crystalline

11:58:44  2   forms are disclosed in the specification.  In addition to

11:58:48  3   that, the purported forms that the Court heard about

11:58:52  4   yesterday are not distinct forms.

11:58:55  5            And, finally, there are common structural

11:58:57  6   features disclosed in the specification.

11:58:59  7   Q.     So if you go to PDX-13 and start with your first

11:59:03  8   reason, what are the representative forms of cabozantinib

11:59:06  9   salts?

11:59:07 10   A.     Well, those are the N-1, N-2 forms explicitly

11:59:11 11   disclosed in the specification which are the

11:59:14 12   pharmaceutically most relevant forms.

11:59:15 13   Q.     And what makes forms N-1 and N-2 representative

11:59:19 14   polymorphs?

11:59:20 15   A.     Well, they exhibit properties that make them suitable

11:59:23 16   for pharmaceutical development.

11:59:25 17   Q.     What are those properties?

11:59:26 18   A.     Well, the properties are what we discussed before.

11:59:29 19   They're crystalline, so they have good crystallinity.

11:59:33 20   Nonhygroscopic, they have good stability, both chemical and

11:59:37 21   physical.

11:59:38 22   Q.     Generally, you mentioned stability.  Generally what

11:59:40 23   role does stability play in identifying a pharmaceutically

11:59:43 24   relevant form?

11:59:44 25   A.     Well, stability is very important.  The API, as we've

11:59:49  1    heard throughout the week, in its pharmaceutical

11:59:52  2    composition, needs to be stable over the lifetime of the

11:59:55  3    drug.  Otherwise, it wouldn't be a good drug.  It wouldn't

11:59:58  4    be useable.

11:59:59  5    Q.    Now, we walked through the specification of the

12:00:02  6    crystalline malate salt patents.  There are also figures.

12:00:04  7    We didn't show the Court those, but have you considered the

12:00:07  8    figures?

12:00:07  9    A.    Yes, I have.

12:00:08 10    Q.    What do the figures disclose regarding the stability

12:00:10 11    of forms N-1 and N-2?

12:00:12 12    A.    Well, the figures disclose that they have good

12:00:15 13    thermal stability.  So they're stable thermally.

12:00:19 14              MR. PRUSSIA:  Let's turn to PDX-14.

12:00:19 15    BY MR. PRUSSIA:

12:00:22 16    Q.    And your second reason, what is your response

12:00:24 17    regarding the other purported forms that he identified?

12:00:26 18    A.    Well, I went through those forms in detail that

12:00:31 19    Dr. Steed identified yesterday.  They're all disclosed in my

12:00:35 20    report.  My conclusion is that those purported forms are not

12:00:40 21    distinct forms, at least there's no clear evidence that

12:00:42 22    they're distinct forms.

12:00:44 23              MR. PRUSSIA:  Can we have the next slide,

12:00:46 24    PDX-15?

12:00:46 25    BY MR. PRUSSIA:

Trout - Direct

12:00:47  1   Q.    Now, there's a reference to XRPD overlay.  Could you

12:00:51  2   start please by explaining to the Court what that is?

12:00:53  3   A.    Yes.  And I think Your Honor is familiar with XRPDs.

12:00:59  4   I'm sure you've heard of them before and earlier this week.

12:01:02  5   So these are diffractograms or the products of an X-ray

12:01:07  6   powdered fraction experiment, and actually it might be

12:01:11  7   helpful.

12:01:11  8         THE WITNESS:  May I use my laser pointer?

12:01:13  9         THE COURT:  Sure, yes.

12:01:14 10         THE WITNESS:  Okay.  So, again, I know it's

12:01:17 11   basic, but there are various peaks.  I'll focus on the

12:01:20 12   bottom one, and this combination of peaks across the X-axis

12:01:25 13   gives an indication of a specific crystalline or polymorphic

12:01:30 14   form.  And the overlay is if I take two of these and put

12:01:35 15   them together, make sure the x-axis is the same scale, and

12:01:39 16   so, that's what I've done here on this slide.

12:01:42 17   Q.    Now, who prepared this overlay?

12:01:44 18   A.    I did.

12:01:44 19   Q.    And based on what data?

12:01:46 20   A.    Well, the blue curve is based on MSN's data for their

12:01:51 21   purported form M.  And the orange curve is based on

12:01:55 22   Exelixis' data for its free base Form 3.  In other words,

12:02:00 23   not cabozantinib (L)-malate.

12:02:02 24   Q.    So, what conclusions did you reach about whether form

12:02:07 25   M is a true crystalline salt form of cabozantinib malate?

Trout - Direct

```
12:02:11  1   A.     Well, that it's not.  You can see from the overlay
12:02:14  2   the peaks match.  In other words, MSN's purported form M is
12:02:19  3   a free base form, the free base Form III, not a salt, not a
12:02:26  4   malate salt.
12:02:26  5   Q.     Now, did Dr. Steed point to form M as a purported
12:02:30  6   form?
12:02:30  7   A.     He did originally.
12:02:32  8   Q.     And what's your understanding of his reliance on form
12:02:35  9   M now?
12:02:36 10          MR. LOMBARDI:  So, Your Honor, I'm just going to
12:02:37 11   object because now Dr. Steed didn't present this at trial.
12:02:41 12   So, it's irrelevant, I guess.
12:02:45 13          There shouldn't be any mistake.  Dr. Steed did
12:02:48 14   not present anything about form M at trial, didn't say it
12:02:51 15   was crystalline form.
12:02:52 16          THE COURT:  I forget what I'm -- is that like
12:02:55 17   form S or something?
12:02:57 18          MR. LOMBARDI:  Yes, form S.
12:02:59 19          So this is something that was never presented.
12:03:01 20          THE COURT:  Right.  I think the relevant
12:03:03 21   universe is the 111 that he did present.
12:03:06 22          MR. PRUSSIA:  Your Honor, the next question will
12:03:09 23   get to the point of this; right?
12:03:09 24   BY MR. PRUSSIA:
12:03:10 25   Q.     So he initially relied on it, but now he doesn't
```

864

Trout - Direct

12:03:13 1    because of why?

12:03:16 2            Why doesn't -- why doesn't Dr. -- why -- what's

12:03:18 3    your understanding as to why Dr. Steed did not present this

12:03:20 4    form to the Court, even though he initially presented it in

12:03:23 5    his opinions?

12:03:23 6            MR. LOMBARDI:  Your Honor, that would have been

12:03:25 7    a question for Dr. Steed.

12:03:26 8            THE COURT:  Well, I tend to think it is but it's

12:03:27 9    hard to say without hearing what the answer is.  So, I

12:03:30 10   reserve the right to strike the answer after I hear it.

12:03:33 11           So, I'm sorry.  You may want the question

12:03:37 12   re-asked.

12:03:38 13           THE WITNESS:  Maybe one more time, counsel,

12:03:39 14   please.

12:03:39 15   BY MR. PRUSSIA:

12:03:40 16   Q.    What is your understanding as to why Dr. Steed no

12:03:42 17   longer relies on this form?

12:03:44 18   A.    I think he agrees with me that it's not a true form.

12:03:47 19   It's actually not a form of cabozantinib (L)-malate salt.

12:03:51 20           MR. PRUSSIA:  Let's have PTX-16.

12:03:53 21           THE WITNESS:  Polymorphic forms.

12:03:54 22           THE COURT:  So I'm not going to strike it, it's

12:03:56 23   just irrelevant.  So we'll just continue.

12:03:59 24           MR. PRUSSIA:  PDX-16, please.

12:03:59 25   BY MR. PRUSSIA:

Trout - Direct

12:04:01  1    Q.      What does this slide show?

12:04:02  2    A.      Okay.  So this is XRPD pattern for purported Mylan

12:04:07  3    form M-1.  Dr. Steed did have this explicitly in his table,

12:04:12  4    although he didn't show the Court this particular

12:04:16  5    diffractogram.

12:04:16  6    Q.      And what conclusions did you reach whether form M-1

12:04:19  7    is a true form?

12:04:20  8    A.      Well, I think you can see in contrast to the previous

12:04:26  9    XRPD diffractograms, this has this broad halo indicative of

12:04:32 10    amorphous material.  It does have some broad features here

12:04:36 11    which show that there's some kind of crystalline material.

12:04:40 12    It's not fully amorphous, it seems primarily amorphous, but

12:04:44 13    it's unclear what this material is.  Certainly not clear

12:04:47 14    that it's a new form.

12:04:50 15    Q.      Now --

12:04:51 16    A.      It's not a new crystalline polymorphic form.  I

12:04:55 17    should be careful myself.

12:04:56 18            That's not a new crystalline polymorphic form.

12:04:56 19    Q.      So, generally, what is your opinion regarding form

12:04:58 20    M-1 and the other forms that Dr. Steed identified?

12:05:00 21    A.      Well, I went through them in some detail.  Again, I

12:05:05 22    outlined it in multiple pages of my report.

12:05:08 23            In going through each of those forms from Mylan

12:05:10 24    and Cipla, my conclusion is there's no clear evidence that

12:05:14 25    these are new or distinct forms.  The evidence says that

Trout - Direct

12:05:18  1   they're not.

12:05:19  2   Q.     Now, do you recall Dr. Steed's testimony concerning

12:05:22  3   solvates?

12:05:22  4   A.     Yes.

12:05:23  5   Q.     And what is your response to that?

12:05:25  6   A.     Well, there's no evidence that there's actual

12:05:30  7   solvates of crystalline cabozantinib (L)-malate.

12:05:33  8               MR. PRUSSIA:  Let's have PDX-17.

12:05:33  9   BY MR. PRUSSIA:

12:05:36 10   Q.     Move to your third point.

12:05:37 11               What is that?

12:05:38 12   A.     That there are common structural features disclosed

12:05:40 13   in the specification.

12:05:42 14               MR. PRUSSIA:  And let's have PDX-18.

12:05:42 15   BY MR. PRUSSIA:

12:05:44 16   Q.     What are those common structural features?

12:05:46 17   A.     Well, there's the structure, meaning that they're

12:05:52 18   crystalline, as opposed to amorphous.  There's the formula,

12:05:55 19   like what you can see up on the screen.  The cabozantinib

12:05:59 20   malate.  And then there's the actual name, the chemical name

12:06:03 21   also in the specification.

12:06:05 22   Q.     Now, to just be clear, what's -- when you reference

12:06:08 23   structure, what are you referring to?

12:06:09 24   A.     Oh, that it's crystalline.

12:06:11 25   Q.     Now, do these structural features allow a skilled

Trout - Direct

12:06:14  1  artisan to recognize and identify other crystalline

12:06:18  2  cabozantinib salts?

12:06:19  3  A.     Yes.

12:06:19  4  Q.     Which, if any, of these structural features are

12:06:21  5  present in form N-1?

12:06:23  6  A.     All of them.

12:06:24  7  Q.     Which are present in form N-2?

12:06:26  8  A.     All of them.

12:06:27  9  Q.     Which are present in MSN's form S?

12:06:29 10  A.     All of them.

12:06:30 11  Q.     Which, if any, of these structural features are

12:06:34 12  present in the other purported forms discussed by Dr. Steed?

12:06:37 13  A.     Well, to the extent that they're crystalline

12:06:40 14  cabozantinib (L)-malate or malate broadly, then they're

12:06:44 15  present.

12:06:45 16  Q.     So just to recap:  What is your opinion regarding

12:06:47 17  whether the inventors possessed the full scope of the claims

12:06:50 18  under Dr. Steed's interpretation?

12:06:52 19  A.     My opinion is that they did.

12:06:54 20  Q.     Let's shift topics now and move to obviousness-type

12:06:57 21  double patenting.

12:06:58 22         Now, have you formed an opinion on whether the

12:07:00 23  asserted claims are patentably distinct over Claim 5 of --

12:07:04 24  over -- of the '473 compound patent?

12:07:07 25  A.     Yes, I did.

Trout - Direct

12:07:07  1    Q.     And what is your opinion?

12:07:08  2    A.     My opinion is that they are, indeed, patentably

12:07:11  3    distinct over Claim 5 of the '473 patent.

12:07:15  4              MR. PRUSSIA:   Let's please have PDX-19.

12:07:15  5    BY MR. PRUSSIA:

12:07:17  6    Q.     At a high level, what are the reasons for your

12:07:19  7    opinion?

12:07:19  8    A.     Well, first of all, there are very significant

12:07:21  9    differences between claims and there's no motivation to

12:07:27 10    pursue the salt based on the prior art.  Even if there were,

12:07:31 11    there was no motivation to include malic acid in the salt

12:07:35 12    screen based on the prior art.

12:07:36 13              Even if the skilled person were to pursue a salt

12:07:41 14    screen with malic acid, there was no reasonable expectation

12:07:43 15    of success.

12:07:44 16              And then finally, objective evidence confirms

12:07:47 17    non-obviousness.

12:07:48 18    Q.     So, let's take each one of these in turn and start

12:07:51 19    with your first reasoning for that.

12:07:54 20              MR. PRUSSIA:   And we'll pull up PTX-252.   It's

12:07:58 21    Tab 6 in the binder.

12:07:58 22    BY MR. PRUSSIA:

12:07:58 23    Q.     And what is this document?

12:08:01 24    A.     This document is the '473 patent.

12:08:07 25    Q.     What is the issue date of the '473 patent?

Trout - Direct

12:08:09  1    A.      That's August 25th, 2009.

12:08:13  2    Q.      Have you offered an opinion on whether the '473

12:08:16  3    patent is prior art to the asserted claims?

12:08:18  4    A.      Yes, I have.

12:08:18  5    Q.      What is your opinion?

12:08:19  6    A.      It is not prior art.

12:08:21  7    Q.      And in your opinion, when were the asserted claims

12:08:25  8    reduced to practice?

12:08:25  9    A.      Well, we heard from Dr. Shah yesterday they were

12:08:29 10    reduced to practice a lot earlier, I believe 2004.

12:08:33 11    Q.      And what is the priority date of the asserted claims?

12:08:35 12    A.      The priority date of the asserted claims is

12:08:39 13    January 16th, 2009.

12:08:41 14    Q.      Now, let's look at Claim 5 itself.

12:08:43 15            MR. PRUSSIA:  If we turn to Column 412 of the

12:08:48 16    '473 patent.

12:08:48 17    BY MR. PRUSSIA:

12:08:49 18    Q.      What is Claim 5 directed to?

12:08:50 19    A.      Well, it's directed to cabozantinib, that's, again,

12:08:54 20    the molecular structure that is on the screen.  That's the

12:08:59 21    free base or a pharmaceutically acceptable salt thereof.

12:09:03 22    Q.      Does Claim 5 require a pharmaceutically acceptable

12:09:07 23    salt?

12:09:07 24    A.      No.

12:09:08 25            MR. PRUSSIA:  Let's have PDX 20.

12:09:08  1   BY MR. PRUSSIA:

12:09:11  2   Q.      What are the differences between Claim 5 of the

12:09:15  3   '473 patent and the asserted claims?

12:09:17  4   A.      Well, quite a few differences and forgive me --

12:09:20  5   forgive us, Your Honor, for including a whole bunch of

12:09:24  6   different colors.

12:09:24  7           But just to point out the differences here, in

12:09:27  8   yellow there's the malate salt, (L) or (D) for example.  In

12:09:33  9   red, pharmaceutical composition.  Neither of those, I should

12:09:38 10   make clear, are in Claim 5 of the '473.

12:09:41 11           Crystalline, in blue, is also not in Claim 5 of

12:09:45 12   the '473.  And the method of treating cancer where said

12:09:50 13   cancer is kidney cancer, that's in green in the asserted

12:09:54 14   malate crystalline salt patents, also is not in Claim 5 of

12:09:58 15   the '473.

12:10:00 16   Q.      So just on a pure comparison of the claims, in your

12:10:04 17   opinion, are the claims of the crystalline malate salt

12:10:06 18   patents patentably distinct from Claim 5?

12:10:09 19   A.      Yes.

12:10:10 20   Q.      Now, let's focus on the disclosures of the

12:10:13 21   '473 patent specification.  What, if any, cabozantinib salts

12:10:17 22   are exemplified in the '473 patent?

12:10:19 23   A.      Well, there's a -- oh, cabozantinib salts?  None.

12:10:25 24   Q.      So what, if any, information is disclosed in the

12:10:29 25   '473 patent regarding a (L)-malate salt of cabozantinib?

Trout - Direct

12:10:30 1    A.    Nothing.

12:10:32 2    Q.    What, if any, information is disclosed in the

12:10:36 3    '473 patent regarding a (D)-malate salt of cabozantinib?

12:10:38 4    A.    Nothing.

12:10:39 5    Q.    What crystalline cabozantinib is exemplified

12:10:43 6     in the '473 patent?

12:10:44 7    A.    None.

12:10:45 8    Q.    What, if any, information does the '473 patent

12:10:48 9    disclose about crystalline polymorphs of any crystalline

12:10:53 10    cabozantinib salt?

12:10:53 11    A.    Nothing.

12:10:55 12    Q.    What, if any, pharmaceutical compositions of

12:10:58 13    cabozantinib are exemplified in the '473 patent?

12:11:01 14    A.    None.

12:11:02 15    Q.    What, if any, methods of treating kidney cancer with

12:11:04 16    cabozantinib are exemplified in the '473 patent?

12:11:07 17    A.    None.

12:11:09 18    Q.    Let's turn back to Claim 5 itself.  And now I want to

12:11:13 19    focus on the language regarding a pharmaceutically

12:11:15 20    acceptable salt.

12:11:17 21    A.    Okay.

12:11:17 22    Q.    What information is disclosed in the '473 patent

12:11:21 23    regarding a pharmaceutically acceptable salt?

12:11:22 24    A.    Well, there's a definition of pharmaceutically

12:11:26 25    acceptable salts or particular acids that could be used to

Trout - Direct

12:11:30 1    form pharmaceutically acceptable salts in the patent.

12:11:33 2              MR. PRUSSIA:  Let's turn to Column 270, Lines 15

12:11:37 3    through 25.

12:11:37 4    BY MR. PRUSSIA:

12:11:42 5    Q.    What is listed -- what is identified at this portion

12:11:44 6    of the '473 patent specification?

12:11:46 7    A.    Well, starting at Line 15 -- yeah, and I think we can

12:11:52 8    just start at Line 15 there -- "pharmaceutically acceptable

12:11:56 9    acid addition salt," that's under the definition section in

12:12:01 10   the patent; that's in quotes.  And so, this is the

12:12:04 11   definition of pharmaceutically acceptable acid addition

12:12:07 12   salts.

12:12:08 13   Q.    And how many acids are listed by name in this

12:12:11 14   definition?

12:12:11 15   A.    Twenty-four.

12:12:15 16              MR. PRUSSIA:  Can we write 24 on the screen?

12:12:15 17   BY MR. PRUSSIA:

12:12:17 18   Q.    Now, does the '473 patent identify malic acid as a

12:12:24 19   pharmaceutically acceptable acid addition salt?

12:12:27 20   A.    No, it's not identified in this list.

12:12:30 21   Q.    And what acids would -- a skilled person looking at

12:12:32 22   the '473 patent specification, what would they have started

12:12:37 23   with as a potential counterion for cabozantinib?

12:12:40 24   A.    Well, the acids that are identified in this list.

12:12:44 25   Q.    Now, what is your response -- you heard Dr. Steed's

Trout - Direct

12:12:49 1    testimony about "the words at the end" and the like?

12:12:52 2    A.    Yes.

12:12:52 3    Q.    What is your response to that testimony?

12:12:54 4    A.    Well, Dr. Steed said "and the like" might mean 50

12:12:58 5    other acids.  We heard today from the Bighley reference that

12:13:02 6    there were 113.  Of course, some of these were on that list,

12:13:06 7    but all in all there are over 113.  I think that would be

12:13:10 8    the reasonable way of thinking of "and the like."

12:13:13 9    Q.    So, would a skilled person reading Claim 5 of the

12:13:20 10   '473 patent and its definition of a pharmaceutically

12:13:22 11   acceptable salt, would that person have a immediately

12:13:26 12   envisioned cabozantinib malate salt from that genus?

12:13:29 13   A.    No.

12:13:30 14   Q.    And what are the reasons for that?

12:13:32 15   A.    Well, again, the genus is very large, over 113, at

12:13:35 16   least, potential salts.

12:13:38 17   Q.    Now, you just heard Dr. Koleng's testimony about 113

12:13:42 18   pharmaceutically acceptable anionic salts; right?

12:13:45 19   A.    Correct.

12:13:46 20   Q.    Does that reflect the entire genus of

12:13:48 21   pharmaceutically acceptable salts that were known as of the

12:13:51 22   priority date?

12:13:51 23   A.    No, that was just from that one reference.  There are

12:13:54 24   additional ones.

12:13:56 25         MR. PRUSSIA:  Let's have PDX 21, please.  And

Trout - Direct

12:13:58  1   turn to your opinions regarding motivation to pursue a salt.

12:13:58  2   BY MR. PRUSSIA:

12:14:02  3   Q.     Now, first, what -- when you were here yesterday,

12:14:05  4   what opinions did you hear from Dr. Steed regarding a

12:14:08  5   motivation to form a salt?

12:14:10  6   A.     Frankly, I don't recall hearing any opinions.  He had

12:14:16  7   mentioned solubility, but I wasn't sure even if that was the

12:14:20  8   motivation.  But that was the closest that he mentioned.

12:14:23  9           MR. PRUSSIA:  Can we have PDX-22, please.  And

12:14:25 10   let's turn to your opinions on this point.

12:14:25 11   BY MR. PRUSSIA:

12:14:28 12   Q.     At a high level, what are the reasons that a skilled

12:14:30 13   person would not have been motivated to pursue a salt?

12:14:32 14   A.     Well, overall, first of all, there were no reported

12:14:36 15   problems with cabozantinib in the prior art.  Even if one

12:14:41 16   were to focus in on solubility, solubility is not

12:14:45 17   determinative of oral bioavailability.  And even if one

12:14:49 18   wanted to improve solubility, there were multiple methods to

12:14:52 19   improve solubility.

12:14:54 20   Q.     So as of the priority date, what, if any, information

12:14:57 21   was disclosed in the prior art regarding the reasons to form

12:15:00 22   a salt with cabozantinib?

12:15:01 23   A.     Nothing.

12:15:02 24   Q.     Does the '473 disclose anything regarding the reasons

12:15:06 25   to form a salt with cabozantinib?

Trout - Direct

12:15:07  1    A.      No.

12:15:09  2    Q.      As of the priority date, what, if anything, was known

12:15:11  3    about cabozantinib's bioavailability?

12:15:13  4    A.      Nothing.

12:15:15  5    Q.      As of the priority date, what, if anything, was known

12:15:17  6    about cabozantinib's solubility?

12:15:19  7    A.      Nothing.

12:15:20  8    Q.      Does the '473 disclose anything about cabozantinib's

12:15:24  9    bioavailability or its solubility?

12:15:26 10    A.      No.

12:15:27 11            MR. PRUSSIA:  Let's have PDX-23, please.

12:15:27 12    BY MR. PRUSSIA:

12:15:30 13    Q.      What is your second reason that a skilled person

12:15:32 14    would not have been motivated to pursue a salt of

12:15:35 15    cabozantinib?

12:15:35 16    A.      Well, even if one did want to focus on solubility,

12:15:40 17    solubility itself is not determinative of oral

12:15:43 18    bioavailability.

12:15:44 19    Q.      And just taking a step back, what are the reasons

12:15:47 20    that oral bioavailability -- what's the reason that it's

12:15:49 21    relevant to your opinion?

12:15:50 22    A.      Well, it's quite relevant.  This is an oral drug, so

12:15:55 23    it would be taken through the mouth into the GI system and

12:15:58 24    then absorbed into the body.  And the degree to which it's

12:16:02 25    absorbed and then can reach the therapeutic site is its

Trout - Direct

12:16:05  1    bioavailability.

12:16:07  2              MR. PRUSSIA:  And if we could have PTX-625,

12:16:10  3    Tab 16 in the binders.

12:16:10  4    BY MR. PRUSSIA:

12:16:11  5    Q.      What is this document?

12:16:12  6    A.      This is the Takagi reference.

12:16:15  7    Q.      And what is the title?

12:16:16  8    A.      Title is "A Provisional Biopharmaceutical

12:16:20  9    Classification of the Top 200 Oral Drug Products in the

12:16:24 10    United States, Great Britain, Spain, and Japan."

12:16:28 11    Q.      And what is the date?

12:16:29 12    A.      The date is February 21st, 2006.

12:16:33 13              MR. PRUSSIA:  And if we turn to Figure 2.

12:16:35 14    BY MR. PRUSSIA:

12:16:35 15    Q.      What does this chart disclose to a person of skill as

12:16:41 16    of the priority date?

12:16:41 17    A.      This is a histogram, and you can see in the Y axis,

12:16:47 18    it's percentage of immediate-release oral drugs.  So those

12:16:53 19    are the relevant drugs that we're talking about here.  So it

12:16:55 20    goes from 0 to about 45 percent.  On the left side is the

12:17:01 21    categories.  The different colors just mean the different

12:17:03 22    countries or jurisdictions.  It shows very soluble.

12:17:07 23              And then at the end, not available.  So that's

12:17:10 24    not so important here.  But the far end -- or sorry, one

12:17:14 25    next to the far end, practically insoluble, is the lowest

Trout - Direct

12:17:19  1    category.  And one can see that the practically insoluble,

12:17:24  2    on average, is about 40 percent of all immediate-release

12:17:28  3    oral drugs, or at least the top ones.

12:17:31  4    Q.     So can a compound with poor water solubility

12:17:33  5    nonetheless be bioavailable.

12:17:35  6    A.     Yes.

12:17:36  7    Q.     If you turn to PDX-24.

12:17:39  8           At a high level, what are the reasons that a

12:17:41  9    compound with poor water solubility could nonetheless still

12:17:44 10    have sufficient bioavailability?

12:17:45 11    A.     Well, as I've been saying, poor water or aqueous

12:17:50 12    solubility is not determinative of bio -- oral

12:17:53 13    bioavailability.  There's also potency, permeability, and

12:17:58 14    solubility in bio-relevant media.

12:18:01 15    Q.     And what's known today about the role that potency

12:18:03 16    plays in the bioavailability of cabozantinib?

12:18:05 17    A.     Well, as Dr. Shah testified yesterday, it turns out

12:18:09 18    that cabozantinib has high potency.

12:18:11 19    Q.     What is known today about the role that permeability

12:18:15 20    plays in the oral bioavailability of cabozantinib?

12:18:17 21    A.     Well, again, as we heard from Dr. Shah yesterday,

12:18:21 22    cabozantinib is highly -- or is -- is absorbed very well, so

12:18:27 23    it's considered highly permeable.

12:18:29 24    Q.     What does solubility in bio-relevant media refer to?

12:18:33 25    A.     So we've been talking earlier about aqueous

Trout - Direct

12:18:36  1    solubility.  So, solubility just in water, per se.  But

12:18:40  2    solubility in bio-relevant media would be in media that's

12:18:45  3    made to mimic various kind of places in the body.  For

12:18:49  4    example, simulated stomach fluid and also simulated

12:18:53  5    intestinal fluid.

12:18:55  6    Q.     So, to be clear, though, as of the priority date, was

12:18:57  7    there any information in about cabozantinib's solubility,

12:19:01  8    its permeability, or its in vivo potency?

12:19:04  9    A.     No.

12:19:04 10    Q.     And were you here -- again, you heard Dr. Steed

12:19:06 11    testify that a skilled person could have identified the

12:19:10 12    water solubility of cabozantinib experimentally?

12:19:13 13    A.     Yes.

12:19:14 14    Q.     But I think he said they wouldn't go beyond that, do

12:19:18 15    you remember that?

12:19:18 16    A.     Right.

12:19:18 17    Q.     Just focusing on whether, if that is correct, that a

12:19:22 18    skilled person could have experimentally identified the

12:19:26 19    water solubility, in your opinion, would that POSA have

12:19:29 20    continued to -- continued to experimentally identify the in

12:19:36 21    vivo potency, the permeability, and the solubility and

12:19:39 22    bio-relevant media of cabozantinib?

12:19:41 23    A.     They could have.

12:19:42 24    Q.     And if that skilled person did so, what would -- what

12:19:46 25    would they have learned with respect to the need to form a

Trout - Direct

12:19:49 1  salt with cabozantinib?

12:19:50 2  A.    Well, again, under that assumption, as we now know

12:19:54 3  after the fact, that there wasn't an issue actually with

12:19:59 4  solubility, per se.

12:20:01 5              MR. PRUSSIA:  Let's turn to PDX-25.

12:20:01 6  BY MR. PRUSSIA:

12:20:03 7  Q.    What is your third reason that a skilled person would

12:20:05 8  not have been motivated to pursue a salt of cabozantinib?

12:20:08 9  A.    Well, even if the skilled person did want to improve

12:20:12 10 solubility for cabozantinib or another drug, there were

12:20:17 11 multiple methods to improve solubility.

12:20:20 12 Q.    And generally, as of the priority date, what sorts of

12:20:22 13 methods existed to do so?

12:20:23 14 A.    Well, again, Dr. Koleng testified just a little while

12:20:27 15 ago, so I won't go through all of them again, but one is,

12:20:31 16 for example, to make it into amorphous material.  Another is

12:20:35 17 to try to reduce particle size, if you wanted to keep it in

12:20:38 18 crystalline, for example.

12:20:40 19             MR. PRUSSIA:  So, let's shift gears and move to

12:20:42 20 PDX-26.

12:20:42 21 BY MR. PRUSSIA:

12:20:44 22 Q.    What is the next reason for your opinion that there

12:20:47 23 is no obviousness-type double patenting?

12:20:49 24 A.    Well, even if one did want to pursue a salt, there

12:20:52 25 was no motivation to include malic acid in the salt screen.

Trout - Direct

```
12:20:55  1        MR. PRUSSIA:  And if we turn to PDX-27.
12:20:57  2    BY MR. PRUSSIA:
12:20:57  3    Q.    How do Dr. Koleng's opinions relate to your opinion
12:21:01  4    on whether a skilled person would have included malic acid
12:21:03  5    in a salt screen?
12:21:04  6    A.    Well, again, these are Dr. Koleng's opinions just
12:21:07  7    from a little while ago.  I won't repeat them.  But I would
12:21:10  8    agree with those opinions.
12:21:12  9        MR. PRUSSIA:  And if we go to PDX-28.
12:21:14 10    BY MR. PRUSSIA:
12:21:14 11    Q.    Do you have additional reasons -- strike that.
12:21:18 12        Do you have additional responses to Dr. Steed's
12:21:20 13    opinions regarding use of malic acid?
12:21:21 14    A.    Yes.  The Rule-of-2 we've heard about is just one
12:21:26 15    guideline.  It's also not an absolute rule.  And,
12:21:31 16    furthermore, properties of malic acid would not have said --
12:21:35 17    would not have led the POSA to seek malate salts.
12:21:38 18    Q.    Let's focus on the first one first.  What's your
12:21:40 19    opinion regarding Dr. Steed's reliance on the Rule-of-2?
12:21:43 20    A.    Well, I think Dr. Steed himself said that it's a
12:21:47 21    starting point or it's a starting point for a scale.  So,
12:21:52 22    Rule-of-2 is a guideline.  There are other rules.
12:21:56 23    Q.    You mentioned there are other rules.  What is -- you
12:21:59 24    heard some discussion yesterday about the Rule-of-3.  Were
12:22:01 25    you familiar with that?
```

Trout - Direct

12:22:01  1    A.      I did, Counsel, and I was familiar with that.  Yes.

12:22:06  2    Q.      And if a skilled person would have followed the

12:22:11  3    Rule-of-3, what conclusions would that person have reached

12:22:14  4    regarding malic acid as a potential counterion for

12:22:17  5    cabozantinib?

12:22:17  6    A.      Well, I think you showed yesterday that the skilled

12:22:20  7    person following the Rule-of-3, again, just another

12:22:24  8    guideline.  If the person did follow that absolutely, malic

12:22:28  9    acid would have been excluded.

12:22:30 10    Q.      Just to be clear, though, in your opinion, would a

12:22:32 11    person of skill have been motivated to follow either

12:22:35 12    Rule-of-2 or a Rule-of-3 in identifying counterions to

12:22:39 13    potentially pair with cabozantinib in a salt screen?

12:22:41 14    A.      No, those are guidelines.  The skilled person

12:22:45 15    certainly would have taken them into account, but they would

12:22:47 16    not have been determinative of the choice of potential

12:22:50 17    counterions.

12:22:51 18              MR. PRUSSIA:  Let's have PDX-29, please.

12:22:51 19    BY MR. PRUSSIA:

12:22:55 20    Q.      How do Dr. Koleng's opinions relate -- relate to

12:22:58 21    yours regarding the properties of malic acid?

12:23:00 22    A.      Well, again, malic acid, even if one were to pursue

12:23:06 23    the salt screen, had some properties that would have made it

12:23:09 24    undesirable.  Dr. Koleng just talked about the weak acidity

12:23:13 25    and the heavy molecular weight.  Those would have made it

Trout - Direct

12:23:16  1  undesirable.

12:23:17  2          In addition to that, malic acid actually has two

12:23:20  3  acid groups so it's doubly ionizable.  That can create

12:23:25  4  complexity and would make it less favorable.  In addition to

12:23:29  5  that, it's subject to pseudodimerism so two molecules of

12:23:34  6  malic acid could actually react to each other to form one

12:23:36  7  larger molecule which would have also turned away the

12:23:40  8  skilled person from malic acid.

12:23:42  9          MR. PRUSSIA:  If I could have DTX Steed 26,

12:23:46 10  please.

12:23:46 11  BY MR. PRUSSIA:

12:23:47 12  Q.      Do you recall Dr. Steed's testimony regarding how

12:23:48 13  hydrogen bonds would have informed salt selection for a

12:23:52 14  skilled artisan?

12:23:53 15  A.      I do.

12:23:53 16  Q.      Do you agree that the potential for an eight atom

12:23:56 17  hydrogen-bonded ring would have led a person of skill to

12:23:59 18  select malic acid in a salt screen?

12:24:01 19  A.      No, and Dr. Steed didn't give any reference for this.

12:24:04 20  I presume he made it himself, but as far as I can tell, it's

12:24:08 21  not based on data.  And at any rate it's retrospective.  It

12:24:12 22  wouldn't have been known ahead of time.

12:24:14 23  Q.      And if Dr. Steed is correct about this -- this

12:24:18 24  rationale, what would it do to some of the status of what --

12:24:22 25  strike that.

Trout - Direct

12:24:22  1          If Dr. Steed's theory with respect to hydrogen

12:24:26  2   binding and its role in identifying counterions were

12:24:28  3   correct, what would it do -- what would be the result for

12:24:30  4   the -- as the status of some of the more commonly used

12:24:34  5   counterions for -- as potential salt formers?

12:24:37  6   A.    Well, the more commonly used ones could also form

12:24:40  7   such structures, just an acid group that Dr. Steed has

12:24:43  8   there.  Maybe I'll point it out to the Court.  This is just

12:24:46  9   a general acid group, so any organic acid could form this

12:24:50 10   making this assumption.

12:24:53 11          MR. PRUSSIA:  Now, let's turn to PDX-32, please,

12:24:56 12   and move to your opinions regarding expectation of success.

12:24:56 13   BY MR. PRUSSIA:

12:24:59 14   Q.    At a high level what's your basis for why a skilled

12:25:01 15   person would not have had a reasonable expectation of

12:25:03 16   success?

12:25:04 17   A.    Well, there's no expectation of salt formation as

12:25:07 18   such or isolation of salts.  There's no expectation of

12:25:10 19   crystalline salt formation even if the skilled person could

12:25:14 20   form a salt.  And even if a skilled person formed

12:25:18 21   crystalline salt of cabozantinib (L)-malate, there would be

12:25:21 22   no expectation that that salt would have properties suitable

12:25:25 23   for pharmaceutical development.

12:25:27 24          MR. PRUSSIA:  And if we have PDX-33.

12:25:27 25   BY MR. PRUSSIA:

Trout - Direct

12:25:29 1    Q.    Focusing on your first point, how do Dr. Koleng's

12:25:33 2    opinions relate to yours on reasonable expectation of

12:25:35 3    success?

12:25:36 4    A.    Well, I think Dr. Koleng said it quite well

12:25:38 5    explaining the complexity of salt formation and Your Honor

12:25:42 6    already saw that.  I won't go through it again.

12:25:44 7              MR. PRUSSIA:  If we move to PDX-34 to your

12:25:47 8    second point.

12:25:47 9    BY MR. PRUSSIA:

12:25:47 10   Q.    If the skilled person had chosen to perform a salt

12:25:50 11   screen on cabozantinib.  What, if any, expectations would

12:25:52 12   they have had for obtaining a crystalline cabozantinib

12:25:56 13   malate salt?

12:25:56 14   A.    There wouldn't have been an expectation.  Could have

12:26:00 15   been amorphous, or oily or not crystalline.

12:26:03 16   Q.    And generally can you say more about what your

12:26:05 17   reasoning is for why a person of skill would not have had an

12:26:08 18   expectation about obtaining crystalline material?

12:26:11 19   A.    Yes.  Because it's not predictive.

12:26:13 20   Q.    And do you recall Dr. Steed's testimony regarding the

12:26:16 21   Tong Rule-of-2 as providing a person of skill with such

12:26:19 22   expectation?

12:26:20 23   A.    Yes.

12:26:21 24   Q.    Do you agree with him?

12:26:22 25   A.    No.  I think --

Trout - Direct

12:26:23 1    Q.    What are the reasons?

12:26:24 2    A.    Oh, sorry.

12:26:25 3    Q.    It's okay.

12:26:26 4    A.    Again, it's -- thank you, counsel.

12:26:28 5          It's one guideline that could be used, and again

12:26:32 6    as you asked Dr. Steed about this yesterday in the Tong

12:26:36 7    paper itself, two of the six examples didn't end up forming

12:26:41 8    crystalline salt.

12:26:43 9          MR. PRUSSIA:  If we can have PDX-35.

12:26:43 10   BY MR. PRUSSIA:

12:26:45 11   Q.    What is your third reason for why a skilled artisan

12:26:47 12   would not have had a reasonable expectation of success?

12:26:50 13   A.    Well, even if the skilled person did form a

12:26:52 14   crystalline salt, there was no expectation that the

12:26:55 15   properties would be suitable for pharmaceutical development.

12:26:58 16   One couldn't have predicted those properties in advance.

12:27:01 17         MR. PRUSSIA:  If you go to PDX-36.

12:27:01 18   BY MR. PRUSSIA:

12:27:03 19   Q.    What properties go into identifying the best salt

12:27:06 20   from the salt screen?

12:27:06 21   A.    Well, just a few key properties are the ease of

12:27:11 22   formation.  It's important for manufacturability.

12:27:15 23   Solubility, we've been talking about.  Still important.

12:27:19 24   Yield.  Stability.  Hygroscopicity.  Flowability.  The type

12:27:24 25   of drug product.  Dosage form, for example, tablet.  And the

886

Trout - Direct

12:27:28  1     expected dose.

12:27:30  2              MR. PRUSSIA:  If we could please go to PTX-327.

12:27:34  3     It's Tab 10 in the binders.  Please identify this reference

12:27:37  4     for the Court.

12:27:37  5     BY MR. PRUSSIA:

12:27:37  6     Q.     Please identify this reference article.

12:27:37  7     A.     This is the Berge article -- sorry, Counsel, which

12:27:40  8     tab did you say it was?

12:27:42  9     Q.     Tab 10 in the binders.

12:27:42 10     A.     Got it.  Thank you.

12:27:52 11     Q.     And sorry.  I don't know.

12:27:54 12     A.     I'm there.  Yes.

12:27:55 13     Q.     Okay.  And what does what is the date of this

12:27:58 14     reference?

12:27:59 15     A.     It's 1977.  January 1977.

12:28:02 16     Q.     And if we go to the first full paragraph on under

12:28:07 17     the -- yeah, right there.

12:28:09 18              What does Berge disclose about choosing the

12:28:13 19     appropriate salts?

12:28:13 20     A.     Well, just that second sentence there at the bottom,

12:28:17 21     "choosing the appropriate salts, however, can be a very

12:28:20 22     difficult task, since each salt imparts unique properties to

12:28:24 23     the parent compound."

12:28:26 24     Q.     How does this disclosure relate to your opinions in

12:28:28 25     this case?

887

Trout - Direct

12:28:28  1   A.     Well, it's consistent with my opinions.

12:28:31  2   Q.     If we turn to the next paragraph and focusing on the

12:28:34  3   sentence beginning with "unfortunately."

12:28:37  4   A.     Okay.

12:28:37  5   Q.     What does Berge disclose to a skilled artisan about

12:28:40  6   salt selection?

12:28:41  7   A.     Well, Berge says, "Unfortunately, there is no

12:28:44  8   reliable way of predicting the influence of a particular

12:28:48  9   salt species on the behavior of the parent compound."

12:28:52 10   Q.     How does this disclosure relate to your opinions in

12:28:55 11   this case?

12:28:56 12   A.     Well, again, it's consistent with what I've been

12:28:59 13   saying.

12:29:00 14          MR. PRUSSIA:  Now, you can pull that down.

12:29:00 15   BY MR. PRUSSIA:

12:29:02 16   Q.     You testified earlier that there were more than 113

12:29:05 17   pharmaceutically acceptable salts that were known as of the

12:29:08 18   priority date; right?

12:29:08 19   A.     Yes.

12:29:09 20   Q.     Now, what, if any, information is disclosed in the

12:29:14 21   '473 patent regarding the desired properties of a

12:29:16 22   cabozantinib salt?

12:29:16 23   A.     Nothing.

12:29:18 24   Q.     And as of the priority date, what information was

12:29:20 25   disclosed regarding the problems that needed to be addressed

Trout - Direct

12:29:23 1  by forming a salt with cabozantinib?

12:29:26 2  A.     None.

12:29:27 3  Q.     So what information would have been available to

12:29:29 4  identify which of the entire genus of pharmaceutically

12:29:32 5  acceptable salts would have resulted in the right salt for

12:29:35 6  cabozantinib?

12:29:36 7  A.     Nothing.

12:29:39 8           MR. PRUSSIA:  If we turn to PDX-37, please.

12:29:39 9  BY MR. PRUSSIA:

12:29:42 10  Q.     What is your fifth reason for why the claims are not

12:29:45 11  invalid for obviousness-type double patenting?

12:29:47 12  A.     That objective evidence also confirms

12:29:51 13  non-obviousness.

12:29:51 14           MR. PRUSSIA:  And if we go to PDX-38, please.

12:29:51 15  BY MR. PRUSSIA:

12:29:53 16  Q.     At a high level what objective indicia did you

12:29:56 17  consider?

12:29:56 18  A.     Well, there are unexpected results technically.  That

12:30:01 19  is, the malate unexpectedly featured the best suite of

12:30:05 20  properties, as I've been talking about, and that's despite

12:30:09 21  the undesirable properties of the malate that I just talked

12:30:12 22  about a little bit earlier.

12:30:14 23           And as we heard from Dr. Shah yesterday,

12:30:17 24  crystalline cabozantinib malate has surprisingly better

12:30:20 25  dissolution properties than amorphous cabozantinib malate.

Trout - Direct

12:30:25 1  Q.     So starting with your first point, what are the

12:30:27 2  reasons that it would have been unexpected that the malate

12:30:29 3  salt would have provided the best suite of properties?

12:30:32 4  A.     Well, as I -- as I said, there's no way to predict

12:30:35 5  what the pharmaceutical properties would be until the salt

12:30:39 6  is made and characterized.  And it turns out that the malate

12:30:44 7  salt featured the best suite of properties despite the

12:30:48 8  potential issues with the low acidity, the high molecular

12:30:52 9  weight, the tendency to form pseudodimerism and also the

12:30:55 10 fact that it has two acid groups.

12:30:59 11 Q.     Focusing on your second point, what is your second

12:31:02 12 point?

12:31:02 13 A.     Well, okay.  So, again, that is from Dr. Shah's

12:31:08 14 testimony yesterday having to do with the fact that it turns

12:31:11 15 out unexpectedly the crystalline material has better

12:31:15 16 dissolution properties than the amorphous material.

12:31:17 17          MR. PRUSSIA:  If we go to PDX --

12:31:19 18          THE COURT:  Mr. Prussia, excuse me a second.

12:31:21 19 Dr. Trout, the thing you said a minute ago, that malate

12:31:24 20 features the best suite of properties, that's based on the

12:31:27 21 salt screen; right?

12:31:28 22          THE WITNESS:  That's -- that's -- yes,

12:31:30 23 Your Honor.  It's based on the salt screen as disclosed in

12:31:32 24 the asserted patents here.  Correct.  It wouldn't have been

12:31:36 25 known before that.

Trout - Direct

12:31:36  1          THE COURT:  Okay.  Right.  Okay.

12:31:38  2          Sorry, go ahead.

12:31:40  3          MR. PRUSSIA:  That's okay.  It's for you,

12:31:41  4  Your Honor.  Any questions you have, please feel free.

12:31:44  5          PTX-225, please.

12:31:44  6  BY MR. PRUSSIA:

12:31:46  7  Q.     What is this document?

12:31:47  8  A.     That's the Shah declaration that Dr. Shah testified

12:31:51  9  about yesterday.

12:31:52 10          MR. PRUSSIA:  It's Tab 14 in the binders.  If we

12:31:54 11  could turn, please, to Figure 2.

12:31:54 12  BY MR. PRUSSIA:

12:31:59 13  Q.     What does this figure show?

12:32:01 14  A.     Well, this is a figure -- again, I think the Court

12:32:06 15  saw this yesterday.  So, this is dissolution, percentage

12:32:11 16  dissolution from zero to a hundred.  It goes up a little

12:32:15 17  farther, but it's basically zero to a hundred as a function

12:32:18 18  of time in minutes.

12:32:20 19          And you can see the curve with the squares,

12:32:24 20  zero percent amorphous.  In other words, a hundred percent

12:32:27 21  crystalline.  It dissolves very quickly, and in about

12:32:31 22  15 minutes that's very rapid.  And by contrast, with

12:32:35 23  20 percent amorphous, this lower curve hardly dissolves or

12:32:40 24  at least a small fraction dissolves even after an hour and a

12:32:43 25  half.

Trout - Direct

12:32:44  1   Q.      And what conclusions did you reach regarding this

12:32:48  2   data?

12:32:48  3   A.      Well, this was unexpected for a couple reasons.  One

12:32:52  4   is that in general, the skilled person would think that the

12:32:56  5   amorphous material would dissolve more quickly than the

12:32:59  6   crystalline material.  And then, secondly, just the sheer

12:33:03  7   fact that the crystalline material, even given its low

12:33:07  8   solubility, dissolves fully within 15 minutes would have

12:33:11  9   been unexpected.

12:33:12 10   Q.      You mentioned low solubility.  Did you hear

12:33:16 11   Dr. Steed's testimony yesterday that a person of skill would

12:33:18 12   expect that low water solubility will correlate with the

12:33:21 13   slow dissolution rate?

12:33:22 14   A.      Yes.

12:33:23 15   Q.      How does that statement from Dr. Steed relate to your

12:33:26 16   opinions regarding unexpected results?

12:33:27 17   A.      Well, that's the second aspect of my opinions on this

12:33:30 18   figure.  Despite the low solubility, it dissolves completely

12:33:35 19   within 15 minutes.  That's very rapid.

12:33:37 20           MR. PRUSSIA:  If we go to JTX-5, which is Tab 17

12:33:40 21   in its binders.

12:33:40 22   BY MR. PRUSSIA:

12:33:41 23   Q.      What is this document?

12:33:42 24   A.      This is part of a file history.

12:33:47 25           MR. PRUSSIA:  And if we go to Page 373 of JTX-5.

Trout - Direct

12:33:47 1    BY MR. PRUSSIA:

12:33:53 2    Q.     What is this portion of the prosecution history?

12:33:55 3    A.     This is an office action summary.

12:34:00 4             MR. PRUSSIA:  If we go to the next page, 374.

12:34:00 5    BY MR. PRUSSIA:

12:34:03 6    Q.     How did the examiner respond to the evidence

12:34:07 7    submitted in the Shah declaration?

12:34:08 8    A.     Well, if we look right under the heading -- and thank

12:34:11 9    you for highlighting that -- "Declaration of Khalid Shah,"

12:34:14 10   it says, "The declaration of Khalid Shah" -- and I won't

12:34:18 11   read the legal aspect of it -- "filed March 19, 2021, is

12:34:24 12   sufficient to overcome the rejection of Claims 16-20 based

12:34:29 13   upon" -- and then again the legal -- "as being unpatentable

12:34:32 14   over Bannen in view of Berge."

12:34:36 15   Q.     Now, let's focus on that.  There's a reference to a

12:34:39 16   Bannen patent application ending in the Number '928 and a

12:34:43 17   Berge reference.  Do you see that?

12:34:44 18   A.     Yes.

12:34:45 19   Q.     Are those the same, '928 patent application and the

12:34:48 20   Berge reference, that Dr. Steed relied upon during his

12:34:51 21   testimony to the Court?

12:34:52 22   A.     Yes.

12:34:52 23   Q.     So, what happened after submission of the Shah

12:34:56 24   declaration during prosecution?

12:34:58 25   A.     Well, based on the Shah declaration, the patent

12:35:02  1    examiner concluded that that evidence made it sufficient to

12:35:06  2    overcome the rejection of the claims.  In other words,

12:35:09  3    allowed the claims of the patent.

12:35:10  4           MR. PRUSSIA:  Okay.  If you could turn to

12:35:13  5    PTX-421, Tab 15 of the binders.

12:35:13  6    BY MR. PRUSSIA:

12:35:16  7    Q.     What is this document?

12:35:17  8    A.     Well, this is the cover page of an edited volume.

12:35:21  9    The relevant chapter that we'll talk about is by Guillory.

12:35:25 10           MR. PRUSSIA:  And can we go to that chapter on

12:35:27 11    Page 3 of the document.

12:35:28 12    BY MR. PRUSSIA:

12:35:30 13    Q.     Who is the author?

12:35:31 14    A.     Again, Keith Guillory.

12:35:35 15           MR. PRUSSIA:  And if we turn to Page 208, under

12:35:38 16    the section titled, "Methods employed to obtain amorphous

12:35:42 17    materials."

12:35:42 18    BY MR. PRUSSIA:

12:35:44 19    Q.     Focusing on the very bottom of that page, what does

12:35:48 20    Guillory disclose regarding the relationship between the

12:35:50 21    dissolution rate of crystalline amorphous solids?

12:35:53 22    A.     Well, again, Guillory discloses what the skilled

12:35:56 23    person would expect.  He says, "While crystalline solids

12:36:00 24    offer the advantages of chemical and thermodynamic

12:36:04 25    stability, amorphous solids are occasionally preferred

Trout - Direct

12:36:07  1   because they undergo dissolution at a faster rate."

12:36:11  2   Q.    Okay.  Just a few more questions, Dr. Steed.

12:36:15  3              MR. PRUSSIA:  Can we have PDX-39, please.

12:36:17  4              THE WITNESS:  Trout.

12:36:17  5   BY MR. PRUSSIA:

12:36:17  6   Q.    Oh, Dr. Trout.  Sorry about that.

12:36:24  7              What are your opinions on clinical and

12:36:26  8   commercial success?

12:36:27  9   A.    Well, again, the Court's heard this, that Cabometyx

12:36:32 10   is the commercial or marketed pharmaceutical in which the

12:36:38 11   cabozantinib -- the crystalline cabozantinib (L)-malate is

12:36:40 12   incorporated as the API.

12:36:43 13              And as I've read from Dr. George's report and

12:36:49 14   Mr. Tate's report, it is both a commercial and clinical

12:36:53 15   success.

12:36:54 16   Q.    Now, what is the commercial embodiment of the

12:36:56 17   asserted crystalline malate salt patents?

12:36:59 18   A.    Well, again, that's the Cabometyx.  That's the brand

12:37:03 19   name.

12:37:03 20   Q.    And what is the API in Cabometyx?

12:37:05 21   A.    Crystalline cabozantinib (L)-malate.

12:37:09 22   Q.    What benefits does the crystalline cabozantinib

12:37:12 23   (L)-malate invention provide?

12:37:14 24   A.    Determinative benefits, it allows it to be

12:37:18 25   manufactured and it allows it to be formulated or developed

Trout - Direct

| | | |
|---|---|---|
| 12:37:22 | 1 | into a formulation that's stable and safe and effective for |
| 12:37:26 | 2 | patients. |
| 12:37:28 | 3 | MR. PRUSSIA:  Thank you, Dr. Trout. |
| 12:37:29 | 4 | Your Honor, Plaintiffs would proffer the |
| 12:37:30 | 5 | following exhibits:  JTX-1, JTX-2, JTX-3, JTX-5, 6, 7, 9, |
| 12:37:41 | 6 | 10.  PTX-283, 225, 252, 258, 327, 421, 625, 774, and 783. |
| 12:38:00 | 7 | And with that, I pass the witness. |
| 12:38:02 | 8 | MR. LOMBARDI:  No objections to any of them. |
| 12:38:03 | 9 | THE COURT:  All right.  Well, why don't we admit |
| 12:38:05 | 10 | them without objection. |
| 12:37:32 | 11 | (JTX Exhibit Nos. 1, 2, 3, 5, 6, 7, 9, 10, were |
| 12:37:32 | 12 | admitted into evidence.) |
| 12:37:32 | 13 | (PTX Exhibit Nos. 225, 252, 258, 283, 327, 421, |
| 12:37:53 | 14 | 625, 774, and 783, were admitted into evidence.) |
| 12:38:06 | 15 | THE COURT:  And since I was going to take a |
| 12:38:08 | 16 | lunch break in five minutes anyhow, why don't we take the |
| 12:38:11 | 17 | lunch break now and we can have cross-examination when we |
| 12:38:13 | 18 | return. |
| 12:38:14 | 19 | So, we'll take an hour and we'll start again at, |
| 12:38:18 | 20 | by that clock, 20 minutes of 2. |
| 12:38:22 | 21 | All right.  We'll be in recess. |
| 12:38:25 | 22 | DEPUTY CLERK:  All rise. |
| 01:39:52 | 23 | (Recess was taken.) |
| 01:39:52 | 24 | Deputy CLERK:  All rise. |
| 01:39:53 | 25 | THE COURT:  All right.  Let's sit down and |

Trout - Cross

01:39:55  1    continue.

01:40:06  2            MR. LOMBARDI:  Your Honor, we're taking care of

01:40:08  3    cross binders right now, if that's okay.

01:40:10  4            THE COURT:  It's okay.

01:39:59  5                    CROSS-EXAMINATION

01:39:59  6    BY MR. LOMBARDI:

01:41:08  7    Q.    Good afternoon, Dr. Trout.

01:41:09  8    A.    Good afternoon.

01:41:09  9    Q.    I'm George Lombardi.  We haven't had a chance to

01:41:13 10    meet.

01:41:13 11    A.    No.  Nice to meet you.

01:41:14 12    Q.    Nice to meet you.

01:41:15 13            Dr. Trout, you talked a lot about crystalline

01:41:18 14    salts today; is that right?

01:41:20 15    A.    Crystalline salts, yes.

01:41:22 16    Q.    Crystalline salts may exist in multiple different

01:41:26 17    polymorphic forms; is that right?

01:41:28 18    A.    Yes.

01:41:29 19    Q.    It is important in the pharmaceutical industry to

01:41:33 20    identify and isolate different polymorphs of a crystalline

01:41:38 21    salt; true?

01:41:42 22    A.    Broadly speaking, true.

01:41:44 23    Q.    This is because the fact that significant differences

01:41:48 24    in chemical and physical characteristics may arise with

01:41:52 25    changes in crystalline form; true?

Trout - Cross

01:41:56 1    A.    Yes.

01:41:59 2    Q.    These difference can affect the manufacturability,

01:42:02 3    the performance, and the quality of a drug product; correct?

01:42:08 4    A.    Correct.  They may.

01:42:11 5    Q.    Different crystalline forms of a salt can be

01:42:14 6    characterized in various ways; is that right?

01:42:18 7    A.    Yes.

01:42:19 8    Q.    There are various ways that are available this to the

01:42:25 9    person of skill in the art; correct?

01:42:27 10   A.    Yes.

01:42:28 11   Q.    One method is XRPD; correct?

01:42:30 12   A.    Yes.

01:42:33 13   Q.    And you talked about that this morning, that's with

01:42:35 14   the peaks; right?

01:42:36 15   A.    Correct.

01:42:39 16   Q.    And there are others, but different forms create

01:42:43 17   different XRPD -- are they called diffractograms, is that

01:42:51 18   what you call the result of the next part of the XRPD

01:42:52 19   analysis?

01:42:52 20   A.    Yes, diffractogram is the word.

01:42:54 21   Q.    Okay.  So different forms -- crystalline forms create

01:42:57 22   different XRPD diffractograms; correct?

01:43:00 23   A.    Generally correct.

01:43:03 24         And, Counsel, it's important that you clarify

01:43:05 25   crystalline forms because we know without that crystalline

01:43:09 1   modifier it has a different meaning.

01:43:12 2   Q.    I've been asking you about crystalline forms.  You

01:43:15 3   understand that?

01:43:15 4   A.    Yes.

01:43:16 5   Q.    Okay.  A substance can be identified by its

01:43:20 6   characteristic XRPD peaks; correct?

01:43:21 7   A.    A particular polymorph generally can be, yes.

01:43:27 8   Q.    And XRPD gives unique fingerprints of a crystalline

01:43:31 9   form; correct?

01:43:34 10  A.    Again, generally correct.

01:43:35 11  Q.    There are other ways to identify crystalline forms or

01:43:39 12  other ways that can be used to characterize crystalline

01:43:42 13  forms?

01:43:42 14  A.    Yes.

01:43:45 15  Q.    Such as thermal characterization.  You can do thermal

01:43:51 16  characterization of a crystalline form?

01:43:53 17  A.    Yes.

01:43:53 18  Q.    You can do differential scanning calorimetry; is that

01:43:59 19  right?

01:43:59 20  A.    Yes.  It's a type of thermal method, as you

01:44:02 21  mentioned.

01:44:02 22  Q.    Moisture absorption is another one you can use?

01:44:06 23  A.    Yes.

01:44:06 24          MR. LOMBARDI:  Okay.  Now, you talked about the

01:44:09 25  patent here, so let me pull up JTX-1, which is the

Trout - Cross

01:44:09  1    '439 patent.

01:44:09  2    BY MR. LOMBARDI:

01:44:15  3    Q.    I'm going to put it on the screen.  If you want to

01:44:18  4    pull it up in front of you, you can.  I'm just going to be

01:44:22  5    showing you the claims, so... If that helps you in

01:44:24  6    determining what you want to do.

01:44:26  7    A.    Okay.  If you could just point me to the place in the

01:44:29  8    binder, too, that would be helpful.

01:44:30  9    Q.    It should be the first one in the first binder, I

01:44:33 10    think.

01:44:34 11    A.    Perfect.

01:44:35 12    Q.    Got it?

01:44:36 13    A.    Yes.  Thank you.

01:44:37 14    Q.    Okay.  So, let's go to where the claims are.

01:44:42 15    A.    Oh, I apologize, Counsel.  The first one is the '473.

01:44:46 16    Is that what you...

01:44:47 17    Q.    It should -- is that Binder 1?

01:44:52 18    A.    Yes.

01:44:58 19    Q.    Excuse me.  My mistake.  It's about halfway through

01:45:00 20    Volume I.  My mistake.

01:45:05 21           Do you have the number?  JTX-1.  It will say it

01:45:09 22    on the tab.

01:45:11 23    A.    Okay.  I've got it now.  Thank you.

01:45:22 24    Q.    Okay.  All right.  And -- and I'm back at the claims

01:45:27 25    at the very end, Doctor.

Trout - Cross

01:45:38 1          Are you there?

01:45:38 2  A.     Yes.

01:45:39 3  Q.     Okay.  And that's what's displayed on the screen;

01:45:41 4  right?

01:45:42 5  A.     Yes.

01:45:43 6  Q.     And which claim is at issue here?

01:45:45 7  A.     That's claim -- well, the asserted claim is 4.

01:45:50 8  Q.     Right.  And then it -- it's dependent and it goes

01:45:53 9  back up, eventually, to 1; is that right?

01:45:55 10 A.     Correct.

01:45:55 11 Q.     And 1 is where you see the word "crystalline"; right?

01:45:59 12 A.     Yes.

01:45:59 13 Q.     And that carries through all the way down to Claim 4;

01:46:02 14 correct?

01:46:03 15 A.     Yes.

01:46:06 16 Q.     Okay.  So, if you -- I want you to -- I'm going to

01:46:10 17 give you a hypothetical, Doctor.  I want you to assume that

01:46:15 18 Claim 1 says "Wherein said salt is a crystalline form."

01:46:21 19 Okay?

01:46:22 20 A.     Okay.

01:46:23 21 Q.     Would that cover all forms -- crystalline forms of

01:46:30 22 the malate salt of the -- is that the (L)-malate salt -- of

01:46:36 23 the malate salt?

01:46:40 24 A.     All polymorphic forms you're asking about?

01:46:43 25 Q.     I'm asking if it would cover all forms -- all

01:46:46 1    crystalline forms of the malate salt, if it had the word

01:46:50 2    "form" after crystalline?

01:46:54 3    A.    Well, again, under this hypothetical, if you read in

01:47:00 4    form, it would incorporate at least the forms that we know

01:47:05 5    today, the N-1, N-2, and the S.

01:47:09 6    Q.    Okay.  And any forms that arose in the future; right?

01:47:13 7    A.    It could.  One would have to do the analysis.

01:47:17 8    Q.    Okay.  Now, if you read it without my hypothetical,

01:47:22 9    if you read it and it says "Wherein said salt is

01:47:26 10   crystalline," it will still cover all crystalline forms;

01:47:32 11   isn't that correct, as you understand it?

01:47:34 12   A.    No, Counsel.  I don't think that's the way to think

01:47:39 13   about it.  It covers cabozantinib malate, which is

01:47:44 14   crystalline having the property of crystalline.

01:47:47 15   Q.    Does it cover form S?

01:47:48 16   A.    Yes.

01:47:51 17   Q.    Does it cover form N-1?

01:47:53 18   A.    Yes.

01:47:54 19   Q.    Does it cover form N-2?

01:47:56 20   A.    Yes.

01:47:57 21   Q.    Does it cover every form that we know to exist today?

01:47:59 22   A.    Yes.

01:48:02 23   Q.    Will it cover every form that comes to being in the

01:48:04 24   future?

01:48:05 25   A.    That I'm not sure about.

Trout - Cross

01:48:08  1   Q.     Okay.  At least it would literally fall within those

01:48:11  2   words; correct?

01:48:12  3   A.     In -- on a high level, yes.

01:48:18  4   Q.     Okay.  So, the asserted claims in this patent, the

01:48:25  5   '439 patent, are not limited to forms N-1 and N-2; is that

01:48:31  6   right?

01:48:31  7   A.     Yes.

01:48:37  8   Q.     And I think you've said this, but just to be sure:

01:48:39  9   It covers MSN's form S; correct?

01:48:44 10   A.     Yes.

01:48:46 11   Q.     All right.  Now, we know, as a factual matter,

01:48:50 12   Doctor, that Exelixis did not invent form S.

01:48:58 13          We know that as a factual matter; correct?

01:49:00 14   A.     That's my understanding.  Yes.

01:49:03 15   Q.     And we know that the -- the inventors actually did

01:49:07 16   not -- the Exelixis inventors actually did not invent any

01:49:10 17   forms beyond N-1 and N-2; correct?

01:49:13 18   A.     Speaking of polymorphic forms, that's correct.

01:49:17 19   Q.     And if we look at the specification, and you're

01:49:21 20   welcome to look at it if you want to, I think you'll be able

01:49:24 21   to answer this without, but there is extensive description

01:49:28 22   of the forms that were invented by Exelixis in the

01:49:32 23   specification; correct?

01:49:33 24   A.     Again, crystalline or polymorphic forms.  Yes.

01:49:38 25   Q.     And you used those terms synonymously; right?

01:49:41  1    A.      Yes.

01:49:43  2    Q.      Okay.  And there's an extensive description -- in the

01:49:48  3    specification, there is a disclosure of techniques used to

01:49:53  4    identify forms N-1, and N-2; is that right?

01:49:57  5    A.      Yes.

01:49:58  6    Q.      And then they are, in fact, identified according to

01:50:02  7    those techniques as N-1 and N-2; correct?

01:50:05  8    A.      Correct.

01:50:06  9    Q.      And the techniques are XRPD; correct?

01:50:09 10    A.      Yes.

01:50:11 11    Q.      Thermal characterization; correct?

01:50:13 12    A.      Yes.

01:50:14 13    Q.      Differential scanning calorimetry; correct?

01:50:17 14    A.      Yes.

01:50:18 15    Q.      If I say -- am I saying that wrong?

01:50:20 16    A.      Differential scanning calorimetry.

01:50:24 17    Q.      Calorimetry.

01:50:25 18    A.      They're a type of thermal method.

01:50:27 19    Q.      And moisture selection; correct?

01:50:29 20    A.      Yes.

01:50:29 21    Q.      All right.  And the specification gives very specific

01:50:36 22    descriptions of how to prepare N-1 and N-2; is that correct?

01:50:40 23    A.      Yes.

01:50:41 24    Q.      And there's no question that the inventors have

01:50:45 25    provided sufficient information to identify N-1 and N-2; is

Trout - Cross

01:50:52 1    that correct?

01:50:52 2    A.      Correct.

01:50:53 3    Q.      Okay.  There's no reference in the specification to

01:50:56 4    form S; is that correct?

01:50:58 5    A.      Correct.

01:50:59 6    Q.      There's no reference in the specification to any form

01:51:03 7    other than N-1 and N-2; correct?

01:51:05 8    A.      And again, I -- I apologize, but it's important that

01:51:08 9    we differentiate salt form from crystalline form.  That's

01:51:13 10   why if you say form --

01:51:14 11   Q.      And I'm not meaning to make it -- if I short -- I'll

01:51:17 12   try not to shortcut it.  I'll try not to shortcut it.

01:51:20 13           There's no description in the specification of

01:51:23 14   any crystalline form other than N-1 and N-2; is that right?

01:51:27 15   A.      Correct.

01:51:29 16   Q.      And the working examples in the specification relate

01:51:32 17   only to N-1 and N-2; correct?

01:51:34 18   A.      Those -- no, not correct.

01:51:41 19   Q.      Okay.  Well, the only forms described in example --

01:51:47 20   working examples of the specification are forms N-1 and N-2,

01:51:51 21   the only crystalline forms are N-1 and N-2; is that correct?

01:51:54 22   A.      With that adjective, correct.  Crystalline

01:51:58 23   polymorphic forms, yes.

01:52:00 24   Q.      There are no examples in the specification of how to

01:52:03 25   make the crystalline forms of cabozantinib (L)-malate other

Trout - Cross

01:52:08 1    than forms N-1 and N-2; correct?

01:52:11 2    A.    Crystalline forms, yes.

01:52:14 3    Q.    Okay.  There is, also -- so you've got forms N-1 and

01:52:19 4    N-2 described in the specification.  My question now is:

01:52:25 5    There's -- a person of skill in the art would not know

01:52:29 6    whether other forms -- crystalline forms even existed based

01:52:35 7    on the disclosure of the specification; isn't that right?

01:52:38 8    A.    Yes.

01:52:40 9    Q.    Is there is nothing in the specification that enables

01:52:44 10   the person of skill in the art to predict whether there

01:52:48 11   would be other forms?

01:52:52 12   A.    Correct.

01:52:53 13   Q.    A person of skill in the art cannot predict

01:52:56 14   additional polymorphic forms based on the knowledge of forms

01:53:01 15   N-1 and N-2; correct?

01:53:03 16   A.    That's generally correct.  And, I apologize, just to

01:53:06 17   make the very clear, I'm assuming for all this, when you say

01:53:08 18   "form" without the proviso, you don't mean salt form, you

01:53:13 19   mean polymorphic form.

01:53:14 20   Q.    I'm talking about crystalline form.

01:53:16 21   A.    I know, but it's very important to make sure that we

01:53:19 22   understand that that's what we're talking about.

01:53:22 23   Q.    Okay.  And even if one had a crystalline form in

01:53:35 24   hand, there would be no way to predict in advance what other

01:53:40 25   crystalline forms of the same compound you might obtain;

Trout - Cross

01:53:43 1    correct?

01:53:44 2    A.      Without any information, no.

01:53:47 3    Q.      There is just no way a person of skill in the art can

01:53:51 4    predict which polymorph can be obtained before starting

01:53:55 5    actual testing; is that right?

01:53:57 6    A.      Correct.  Not with accurate -- not with great

01:54:00 7    accuracy, correct.

01:54:01 8    Q.      It's only through actual testing that one can

01:54:05 9    determine whether there are other polymorphic forms; is that

01:54:10 10   correct?

01:54:10 11   A.      Yes.

01:54:12 12   Q.      There is no way to know how many polymorphs there

01:54:16 13   will be based simply on the compound itself; correct?

01:54:20 14   A.      I don't think that's fully correct.

01:54:24 15   Q.      Okay.

01:54:25 16   A.      In broad terms.

01:54:26 17   Q.      Okay.  There are many factors that can influence

01:54:36 18   crystallization; correct?

01:54:37 19   A.      Yes.

01:54:46 20   Q.      Just one moment, Doctor.  Oops.

01:54:58 21           There are many factors that can influence

01:55:00 22   crystallization and that makes the process of identifying a

01:55:05 23   given crystalline form highly unpredictable; correct?

01:55:10 24   A.      Again, you mean in the absence of any information?  I

01:55:16 25   mean, you can identify a sample with the methods we've been

Trout - Cross

01:55:20 1    talking about.

01:55:21 2    Q.    You can identify the sample.  I'm talking about

01:55:24 3    identifying other crystalline forms of a compound that you

01:55:28 4    don't know about yet.

01:55:29 5          I'll give you the question again:  There are

01:55:31 6    many factors that can influence the crystallization process,

01:55:36 7    and you said yes to that; right?

01:55:38 8    A.    Yes.

01:55:39 9    Q.    And the process of identifying a given crystalline

01:55:44 10   form is highly unpredictable; correct?

01:55:47 11   A.    Again, if -- if you mean discover a new form, yes.

01:55:54 12   Q.    Okay.  That's what I mean.  Thank you.

01:55:56 13         And there's no way to know how many polymorphs

01:56:06 14   can be obtained from a particular compound before doing the

01:56:11 15   actual testing; is that right?

01:56:12 16   A.    Well, I don't think that's fully correct.

01:56:17 17   Q.    Okay.  Why is that not correct?

01:56:19 18   A.    Because, as we talked about before, about half of

01:56:25 19   crystalline materials have only one polymorph.  Most of the

01:56:30 20   others just have a handful.  And I think we talked about the

01:56:33 21   extreme number was 14.  So, you may not know the exact

01:56:37 22   number, but you have a ballpark that it's going to be

01:56:41 23   relatively small.

01:56:42 24   Q.    You can't know until you actually do the testing,

01:56:45 25   though; correct?

Trout - Cross

01:56:45 1    A.     You can't know the results of the test, but again,

01:56:52 2    you have the ballpark, as I've explained.

01:56:54 3    Q.     Okay.  There are many factors that affect the

01:57:05 4    formation of crystalline forms; correct?

01:57:07 5    A.     In broad terms, yes.

01:57:11 6    Q.     And the some of those factors include the process of

01:57:20 7    manufacture; right?

01:57:20 8    A.     Yes.  I mean --

01:57:25 9    Q.     Evaporation can effect --

01:57:27 10   A.     Okay.  Now I understand what you're saying.  Yes.

01:57:30 11   Q.     Melting can have an effect?

01:57:32 12   A.     Again, your question is -- I think you mean process

01:57:41 13   parameters.  I'm --

01:57:44 14   Q.     If that makes --

01:57:46 15   A.     -- you are --

01:57:46 16   Q.     If that makes it easier for you, Doctor.

01:57:47 17   A.     Okay.

01:57:49 18   Q.     Did you answer that one?

01:57:51 19          Melting can have an effect on the formation of

01:57:53 20   polymorphs?

01:57:54 21   A.     Again, how you do the melting, I think, is what

01:57:59 22   you're getting at.  I wouldn't -- it doesn't quite fit the

01:58:02 23   way you're asking it.

01:58:03 24   Q.     Well, there are a multitude of factors that can

01:58:06 25   influence the crystallization of a salt; correct?

Trout - Cross

01:58:08  1    A.     Yes.

01:58:09  2    Q.     And among those factors are evaporation, melting --

01:58:21  3    A.     Again, I would say it that way, Counsel.

01:58:23  4    Q.     Well, let's -- well, let me complete the list.

01:58:29  5           Melting.  Grinding could have an effect?

01:58:32  6    A.     Again, I think you're asking the way you do each of

01:58:35  7    those might have an effect.  And the answer is yes, if

01:58:38  8    that's what you're asking.

01:58:39  9    Q.     That's what I'm asking.

01:58:40 10    A.     Yes.

01:58:41 11    Q.     Sublimation?

01:58:42 12    A.     The way you do it might have an effect, yes.

01:58:45 13    Q.     Okay.  They could -- these kinds of methods can have

01:58:48 14    an effect on the formation of polymorphs; correct?

01:58:52 15    A.     Yes.

01:58:55 16    Q.     And there were a large number of other factors that

01:58:58 17    can influence the crystallization of a salt; correct?

01:59:02 18    A.     Yes.

01:59:03 19    Q.     Such as concentration of salt in solution?

01:59:06 20    A.     Yes.

01:59:08 21    Q.     Such as types of solvent used?

01:59:10 22    A.     Yes.

01:59:12 23    Q.     Such as seeding and agitation?

01:59:15 24    A.     Yes.

01:59:16 25    Q.     Such as interconversion of solid forms?

Trout - Cross

01:59:18  1    A.      I mean, that's not a choice.  That's a result.

01:59:24  2    Q.      Okay.  But all of those things can or -- well, the

01:59:29  3    presence of additives or impurities can have an effect, too;

01:59:33  4    right?

01:59:34  5    A.      I didn't hear the --

01:59:35  6    Q.      The presence of additives and impurities can have an

01:59:39  7    effect, too; is that right?

01:59:40  8    A.      Yes.

01:59:41  9    Q.      Okay.  Solid forms of compound or salt are affected

01:59:46 10    by how they are prepared; correct?

01:59:49 11    A.      They might be or might not be.

01:59:53 12    Q.      Okay.  You just don't know until you do it; correct?

01:59:57 13    A.      You have to do the experiment, correct.  Or have

02:00:00 14    information already.

02:00:01 15    Q.      Okay.  Okay.

02:00:04 16            So, Doctor, one moment.

02:00:19 17            In short, many factors can influence the

02:00:23 18    crystallization of a molecule; correct?

02:00:24 19    A.      Yes.

02:00:26 20    Q.      And that makes the process of identifying a given

02:00:30 21    crystalline form highly unpredictable and far from routine;

02:00:34 22    correct?

02:00:34 23    A.      Yes, assuming you don't have information, again.

02:00:41 24    Q.      Okay.  Now, just to give us more real-world examples

02:00:51 25    of different polymorphs -- different polymorphs are created

Trout - Cross

| 02:00:53 | 1 | through different manufacturing processes, we talked about |

02:00:53  1  through different manufacturing processes, we talked about

02:00:55  2  that; right?

02:00:56  3  A.     Yes, for example.

02:00:58  4  Q.     And so form N-1 is created one way; is that right?

02:01:03  5  A.     Yes.

02:01:04  6  Q.     And form N-2 is different in the way it's created;

02:01:09  7  correct?

02:01:09  8  A.     Yes.

02:01:10  9  Q.     And form N-1 is actually not equivalent to form N-2;

02:01:14  10  correct?

02:01:14  11  A.     Well, I think, as I've said, they have similar

02:01:19  12  properties and they can be representative of each other.

02:01:24  13  Q.     Okay.  But, for instance, N-2 is by -- is not

02:01:29  14  bioequivalent to N-1; correct?

02:01:34  15         Do you know?

02:01:34  16  A.     I'm not sure about that.

02:01:36  17  Q.     Okay.  Well, do you know that a batch of N-2 is not

02:01:41  18  bioequivalent to a batch of N-1; do you know one way or the

02:01:46  19  other?

02:01:46  20  A.     I don't know.  I know the company decided to pursue

02:01:52  21  N-2.

02:01:52  22  Q.     Okay.  And you know that form S, MSN's form S is

02:01:57  23  manufactured differently than form N-2; correct?

02:02:00  24  A.     Correct.

02:02:02  25  Q.     And you know that it differs -- well, do you know

Trout - Cross

02:02:05 1    what part of the manufacturing process is different in that

02:02:08 2    instance?

02:02:08 3    A.    I've read.  I don't have them memorized.

02:02:12 4    Q.    Okay.  But there is a difference which leads to the

02:02:15 5    difference in the crystalline structure; correct?

02:02:17 6    A.    Correct.

02:02:18 7    Q.    All right.  Now, there are other polymorph forms that

02:02:24 8    exist beyond form S -- well, you agree that form S is a

02:02:31 9    different polymorphic form, a different crystalline

02:02:33 10   structure than N-1 and N-2; correct?

02:02:35 11   A.    Yes.

02:02:36 12   Q.    Okay.  There are other forms beyond that; correct?

02:02:41 13   A.    Well, I think I've called into question that, and I

02:02:46 14   can elaborate more if you'd like.  But I think that those

02:02:50 15   are the three known or bona fide forms.

02:02:54 16   Q.    Okay.  Well, you have testified, or you were involved

02:02:59 17   in the first case involving cabozantinib; correct?

02:03:03 18   A.    Yes.

02:03:05 19   Q.    And in that first case, you provided an expert

02:03:09 20   report; correct?

02:03:09 21   A.    Yes.

02:03:10 22   Q.    And in that expert report, you talked about the

02:03:13 23   number of reported forms of the malate crystalline salt

02:03:21 24   correct?

02:03:21 25   A.    I did talk about, I think, the same ones we've been

02:03:24  1    talking about in this trial; correct.

02:03:25  2    Q.    And in that expert report, you stated that there --

02:03:31  3    well, why don't we just put this up?

02:03:34  4            MR. LOMBARDI:  Let's go to the Cabo rebuttal

02:03:36  5    report on Paragraph 313.

02:03:54  6            THE WITNESS:  And, counsel, could you -- it's a

02:03:55  7    little easier for me to read it, if you don't mind.

02:03:58  8    BY MR. LOMBARDI:

02:03:58  9    Q.    Okay.  Your rebuttal report is going to be, I think,

02:04:00  10   at the back of the second volume.

02:04:01  11   A.    Okay.  Thank you.

02:04:05  12           Oh, yes.

02:04:06  13   Q.    Tell me when you're ready, Doctor.

02:04:28  14   A.    I'm ready.

02:04:28  15   Q.    Okay.  I'm at Paragraph 313.  It should be Page 108.

02:04:43  16   A.    I'm there.

02:04:44  17   Q.    Okay.  And you note what -- you were testifying on

02:04:48  18   behalf -- providing expert report on behalf of Exelixis in

02:04:52  19   that case; correct?

02:04:53  20   A.    Correct.

02:04:54  21   Q.    And about -- one, two, three -- fourth line down, you

02:04:58  22   see, "As Dr. Steed concedes."

02:05:00  23           Do you see that?

02:05:01  24   A.    Oh, yes.

02:05:07  25   Q.    And it says, "As Dr. Steed concedes, the BMS team

Trout - Cross

02:05:11  1    reports form N-1, N-5 and several others."

02:05:16  2            BMS refers to what?

02:05:17  3    A.    Well, that's a company that did a polymorph screen.

02:05:22  4    Q.    And the company --

02:05:23  5    A.    Oh, Bristol-Myers-Squibb.

02:05:25  6    Q.    Thank you.

02:05:26  7            "Further, and as explained above, additional

02:05:29  8    documents identified in discovery make clear that there are

02:05:32  9    at least 12 reported forms of the cabozantinib (L)-malate

02:05:37 10    salt."

02:05:38 11            Do you see that?

02:05:39 12    A.    Yes.

02:05:40 13    Q.    And then it says, "Form M and form S, that MSN

02:05:44 14    represents it has created M-1 to M-4 forms and C-2 to C-5

02:05:50 15    forms in addition to form N-1 and N-2."

02:05:55 16            Do you see that?

02:05:55 17    A.    Yes.

02:05:55 18    Q.    And then you say, "Thus discovery plainly refutes

02:05:59 19    Dr. Steed's opinion."

02:06:01 20            Correct?

02:06:02 21    A.    That's what's written, yes.

02:06:04 22    Q.    Okay.  And then on page -- the next paragraph,

02:06:07 23    paragraph -- or excuse me, two paragraphs down,

02:06:11 24    Paragraph 315.  This will be more towards the top, about --

02:06:22 25    let's see, again, four lines down.

Trout - Cross

02:06:26 1          Doctor, we'll highlight it.  It begins, "As

02:06:27 2   discussed above."

02:06:30 3          Do you see that?

02:06:30 4   A.     Yes.

02:06:31 5   Q.     And you said, "As discussed above, there are at least

02:06:35 6   12 reported forms of the (L)-malate salt:  Form M and form S

02:06:41 7   that MSN represents it has created, M-1 to M-4 forms and C-2

02:06:46 8   to C-5 forms, in addition to form N-1 and N-2."

02:06:52 9          Do you see that?

02:06:53 10  A.     Yes.  Yes.

02:06:54 11  Q.     And this is what you said in that litigation;

02:06:57 12  correct?

02:06:57 13  A.     Yes.  And in this litigation, Dr. Steed also thought

02:07:01 14  that was the case and I did a deeper analysis, as I

02:07:05 15  elaborated in my reports, and unfortunately that calls into

02:07:08 16  question those documents.

02:07:11 17  Q.     Okay.  Well, Doctor, at this time, it was in

02:07:16 18  Exelixis' interest -- well, at this time, I mean, at the

02:07:19 19  time you wrote the report we have on the screen.  Got that

02:07:23 20  time -- time frame; right?

02:07:25 21  A.     Yeah.  Let me just confirm just to make sure I have

02:07:29 22  the exact date, but yes, I have the time frame, but let me

02:07:32 23  just look at the date.

02:07:39 24          Okay.  I've got it.  Thank you.

02:07:41 25  Q.     So, you were involved in the *Cabo I* case, and you

Trout - Cross

02:07:44  1    filed an expert report?

02:07:45  2    A.      Correct.

02:07:46  3    Q.      And at that time, it was in Exelixis' interest that

02:07:52  4    you recognized 12 reported forms; is that right?

02:07:56  5    A.      Counsel, I'm trying to report the best science I

02:07:59  6    could.  That's what everyone thought at the time, including

02:08:03  7    Dr. Steed, as of a few months ago.  A deeper analysis that I

02:08:08  8    did calls into question the clarity of that and those

02:08:12  9    documents.

02:08:13 10    Q.      Okay.  And so, in this litigation, it's in Exelixis'

02:08:17 11    best interest for you to say there are a smaller number of

02:08:21 12    forms; is that right?

02:08:22 13    A.      I tried to do the scientific analysis.  Exelixis'

02:08:27 14    interest is their own business.  I went through those in

02:08:31 15    some depth over many pages, and I can demonstrate to you and

02:08:35 16    the Court why in additional depth these putative forms are

02:08:40 17    at least not clearly new forms.

02:08:42 18    Q.      Now, Doctor, I understand and you -- what you showed

02:08:46 19    the judge this morning, what you chose to show was form M;

02:08:50 20    right?

02:08:50 21    A.      From Mylan?

02:08:53 22            Yeah, well, there are two form Ms.  It's a

02:08:58 23    little confusing.  One was form M from MSN.  And one was

02:09:03 24    form M-1 from Mylan.

02:09:05 25    Q.      And it was form M-1 from Mylan that you showed the

917

Trout - Cross

02:09:08 1    judge this morning; is that right?

02:09:10 2    A.    Well, I showed both, but, yes, including M-1,

02:09:13 3    correct.

02:09:14 4    Q.    Okay.  All right.  Now, in any event, as you agree

02:09:20 5    that -- well, strike the question.

02:09:24 6              Now, polymorphs -- properties of polymorphs

02:09:30 7    differ; is that right?

02:09:34 8    A.    In general, they -- they can differ.  The question

02:09:37 9    is:  Is it significant?

02:09:38 10   Q.    Okay.  And the physical properties of a crystalline

02:09:43 11   salt can differ; is that right?

02:09:45 12   A.    I'm sorry.  Again, you're talking about polymorphs?

02:09:53 13   Q.    Yes.  Polymorphic forms, crystalline forms.

02:09:57 14   A.    Okay.

02:09:57 15   Q.    Their properties can differ; right?

02:09:59 16   A.    They -- they might differ.  They might not

02:10:02 17   significantly.

02:10:02 18   Q.    Okay.  Different crystal forms of a particular salt

02:10:11 19   can have different chemical properties; correct?

02:10:14 20   A.    They can.  Again, the question is:  Are they

02:10:17 21   significantly different?

02:10:18 22   Q.    Okay.  Crystalline solids -- and you don't find that

02:10:22 23   out until you do the testing; right?  Whether they're

02:10:25 24   significantly different or not?

02:10:26 25   A.    Yes.

Trout - Cross

02:10:29 1    Q.      You don't find -- you agree?  You don't find out

02:10:32 2    until you do the testing; correct?

02:10:33 3    A.      Agreed.

02:10:35 4    Q.      Crystalline solids have the same chemical composition

02:10:38 5    but different crystal structures.  And, therefore, different

02:10:42 6    properties; correct?

02:10:43 7    A.      Again, I think I know what you mean, but you're not

02:10:49 8    using the terminology properly.  I think you mean different

02:10:53 9    crystalline polymorphs.  But ask your question as you will.

02:10:58 10   I'll answer it.

02:10:59 11   Q.      Crystalline solids have the same chemical

02:11:01 12   composition, but different crystalline structures.  That

02:11:05 13   much is right; correct?

02:11:06 14   A.      Again, I think to be precise, you're saying different

02:11:14 15   crystalline polymorphs, not just -- I think that's what you

02:11:18 16   mean, but...

02:11:18 17   Q.      Okay.  Crystalline solids --

02:11:20 18   A.      Yes.

02:11:21 19   Q.      -- can be classified into polymorphs; correct?

02:11:23 20   A.      If you -- if you divide them up into polymorphs, yes.

02:11:29 21   Q.      And those are forms having the same chemical

02:11:32 22   composition but different crystal structures; correct?

02:11:35 23   A.      Crystalline forms, yes.

02:11:37 24   Q.      And, therefore, they can have different densities?

02:11:40 25   A.      They can.

Trout - Cross

02:11:41 1    Q.      They can have different melting points?

02:11:43 2    A.      Yes.

02:11:44 3    Q.      They can have different solubilities?

02:11:46 4    A.      Yes.

02:11:47 5    Q.      And they can differ in other properties as well;

02:11:49 6    correct?

02:11:50 7    A.      They can, yes.

02:11:51 8    Q.      They could be different in hygroscopicity; correct?

02:11:55 9    A.      They can be.

02:11:56 10   Q.      They can be different in solubility; correct?

02:11:59 11   A.      Yes.

02:12:00 12   Q.      They can be different in stability; correct?

02:12:01 13   A.      They can be.

02:12:04 14   Q.      They can be different in vapor pressure; correct?

02:12:08 15   A.      They can be.

02:12:10 16   Q.      They can be different even in color; correct?

02:12:14 17   A.      Correct.

02:12:15 18   Q.      Changes in a polymorphic form of a pharmaceutical

02:12:18 19   compound can impact chemical stability?

02:12:22 20   A.      Changes, meaning there's a transformation, if that's

02:12:27 21   the --

02:12:29 22   Q.      Changes in the polymorphic form.

02:12:31 23   A.      Yes.  Yes.

02:12:32 24   Q.      Okay.  It is true, sir, that in addition to these

02:12:41 25   differences in polymorphic form affecting those properties,

Trout - Cross

02:12:45  1    the result can be a difference -- it could be variable

02:12:48  2    potency of a compound.

02:12:50  3    A.      That's a possibility.  Yes.

02:12:52  4    Q.      And by "potency," you mean how strong the compound

02:12:55  5    is?

02:12:55  6    A.      Well, I guess bioavailability perhaps, yes.

02:13:04  7    Q.      Okay.  Which is important in the pharmaceutical

02:13:07  8    world; correct?

02:13:07  9    A.      Yes.

02:13:08 10    Q.      Very important in the pharmaceutical world?

02:13:11 11    A.      Yes.

02:13:11 12    Q.      And the prior art taught that the range and

02:13:15 13    combinations of crystal growth conditions are virtually

02:13:19 14    infinite; isn't that right?

02:13:22 15    A.      Yes.

02:13:27 16    Q.      And there is no way to guarantee the preparation of

02:13:31 17    additional polymorphs of a substance, much less the

02:13:34 18    generation of all of them; correct?

02:13:36 19    A.      Could you please repeat that?

02:13:40 20    Q.      Well, let me -- you actually wrote that -- you quoted

02:13:44 21    somebody in your -- in your expert report in the prior case;

02:13:48 22    correct?

02:13:48 23    A.      I just didn't hear the first part of the statement.

02:13:50 24    Q.      Okay.  Well, let me show it to you.

02:13:54 25              MR. LOMBARDI:  Let's go to the rebuttal report

Trout - Cross

02:13:55 1   at Paragraph 277.  It's the same report you were looking at

02:13:59 2   before if you want to look at it.

02:14:00 3   A.    Okay.

02:14:15 4   Q.    Do you see 277?

02:14:19 5   A.    I do.  Yes.

02:14:20 6   Q.    Okay.  And we can just start this at the beginning.

02:14:28 7   This is your report, and let's make sure that your opinions

02:14:32 8   are the same today, okay?

02:14:34 9   A.    Oh, absolutely correct.

02:14:36 10  Q.    "Further, even if a crystalline form is attained,

02:14:39 11  there was no way at the priority date to predict in advance

02:14:42 12  what crystalline form (or forms) that compound would

02:14:45 13  assume."

02:14:47 14        You agree with that today?

02:14:48 15  A.    Yes.

02:14:49 16  Q.    Okay.  "Critically, as explained" -- and then you

02:14:52 17  have a reference to a section -- "solid forms of a compound

02:14:57 18  or salt are affected by how they are prepared, which include

02:15:01 19  factors such as solvents, temperatures, concentration,

02:15:05 20  agitation, and pH."

02:15:09 21        Do you still have that opinion today?

02:15:10 22  A.    Yes.

02:15:11 23  Q.    "There is no standard approach, and there was no

02:15:14 24  teaching in the prior art regarding the parameters to use in

02:15:17 25  forming an (L)-malate salt of cabozantinib."

Trout - Cross

02:15:22  1          That's still true today?

02:15:24  2    A.     Yes.

02:15:25  3    Q.     "Without information, there was no way a POSA would

02:15:29  4    have had any reasonable expectation of which form" -- "solid

02:15:35  5    form" -- I'm sorry -- "which solid form, if any, would be

02:15:38  6    obtained, nor any reasonable expectation of preparing the

02:15:42  7    N-2 crystalline form."

02:15:44  8          Is that your opinion still today?

02:15:45  9    A.     Yes.

02:15:47 10    Q.     And then as the prior art taught -- and here you

02:15:51 11    quote.  Okay?

02:15:51 12          The range and combinations of crystal growth

02:15:54 13    structures are virtually infinite and there is no way to

02:15:58 14    guarantee the preparation of additional polymorphs of a

02:16:02 15    substance, much less the generation of all of them.

02:16:08 16          Is that still your opinion, today?

02:16:11 17    A.     Yes.

02:16:15 18    Q.     Now, not every crystalline form or polymorph -- well,

02:16:22 19    you're using those synonymously; right?

02:16:24 20    A.     Yes.  Yes.

02:16:25 21    Q.     Okay.  Can be used in a pharmaceutical composition;

02:16:29 22    right?

02:16:29 23    A.     I mean, it's a very general question.  So, yes.

02:16:37 24    Q.     Let me make sure -- I might have put a negative in

02:16:39 25    there.  I just want to make sure we're clear.

Trout - Cross

02:16:41 1        It is true that you cannot use every crystalline

02:16:47 2   form of a particular compound in a pharmaceutical

02:16:50 3   composition; is that right?

02:16:51 4   A.    Oh.  Maybe or maybe not, it depends on the situation.

02:16:58 5   Q.    And you'd have to do the testing to know; right?

02:17:01 6   A.    Yes, if you had no other information.

02:17:03 7   Q.    Okay.  And the FDA actually requires manufacturers to

02:17:10 8   provide information about polymorphic forms; correct?

02:17:14 9   A.    I mean, there's guidelines but you could say de facto

02:17:21 10  requirements.  Technically, they're guidelines.  But yes,

02:17:24 11  guidelines.

02:17:24 12  Q.    And significant differences and -- well, strike the

02:17:28 13  question.

02:17:28 14        And in the guidelines, they talk about the fact

02:17:32 15  that the manufacturer must make a determination whether

02:17:39 16  there are multiple solid state forms; right?

02:17:44 17        You have to do that.  You have -- a solid state

02:17:46 18  form refers to something like crystalline forms; right?

02:17:48 19  A.    Correct.

02:17:50 20  Q.    Okay.  Whether there are multiple solid state forms

02:17:53 21  and whether these affect the dissolution and bioavailability

02:17:57 22  of the drug?

02:18:00 23  A.    Yes.  That's correct.  Yes.

02:18:02 24  Q.    Okay.  And they want you to do that because not every

02:18:06 25  polymorph will have an effect?

924

Trout - Cross

02:18:11  1    A.      Again, the concern is that might be the case.

02:18:13  2    Q.      And you can only know by doing the testing; is that

02:18:18  3    correct?

02:18:18  4    A.      Yes.

02:18:20  5    Q.      Okay.  Now, there are examples of polymorphs that

02:18:27  6    worked for pharmaceutical purposes and polymorphs of the

02:18:31  7    same compound that didn't work; correct?

02:18:34  8            You've talked about this before; right?

02:18:37  9    A.      I'm sure I have.  And, yes, there are.

02:18:40 10    Q.      Okay.  And I just ask again:  I mean, you understand

02:18:43 11    that N-1 is -- is not used in a pharmaceutical composition.

02:18:49 12    Form N-1 from Exelixis; correct?

02:18:50 13    A.      That's my understanding.  Exelixis commercialized

02:18:55 14    form N-2, yes.

02:18:56 15    Q.      Right.  Okay.

02:18:57 16            And so, that's one example of a polymorph for

02:19:00 17    the same compound where one -- polymorphs of the same

02:19:04 18    compound where one worked and one didn't work; correct?

02:19:07 19    A.      No, I wouldn't say that.

02:19:09 20    Q.      Oh, okay.  All right.  Well, how about -- Norvir is

02:19:13 21    an example that you've talked about; correct?

02:19:15 22    A.      Yes.

02:19:16 23    Q.      And Norvir was a situation where one polymorph of a

02:19:19 24    compound worked for pharmaceutical purposes in a

02:19:24 25    pharmaceutical composition; right?

Trout - Cross

02:19:26  1    A.      Yes.

02:19:27  2    Q.      And another polymorph emerged which did not work; is

02:19:32  3    that right?

02:19:32  4    A.      I think that's right.  I'm trying to remember

02:19:34  5    specifically Norvir, but that sounds right.

02:19:37  6    Q.      Okay.  Now, form S is, in fact, different than forms

02:19:46  7    N-1 and N-2 in several ways; isn't that right?

02:19:51  8    A.      There are differences and there are similarities.

02:19:56  9    Q.      Okay.  Form S is hygroscopic?

02:19:59 10    A.      It's been characterized as hygroscopic, yes.

02:20:02 11    Q.      Form N-2 is not -- I'm sorry.  I didn't mean to

02:20:04 12    interrupt you.

02:20:05 13    A.      Sorry.  I just wanted to make sure it's clear to the

02:20:07 14    Court, it's nonhygroscopic enough to be used in MSN's

02:20:13 15    product.

02:20:15 16    Q.      And form N-2 is not hygroscopic; right?

02:20:19 17    A.      That's how it's been characterized, correct.

02:20:22 18    Q.      Form S has a low melting point; is that correct?

02:20:25 19    A.      No, I wouldn't say it that way.

02:20:28 20    Q.      Well, it has a -- it has a melting point lower than

02:20:31 21    186 to 187; correct?

02:20:33 22    A.      That's correct.

02:20:35 23    Q.      And you would characterize that -- that would be

02:20:37 24    considered -- well, that would be considered lower than the

02:20:40 25    form N-1, N-2 melting point; isn't that right?

Trout - Cross

02:20:43 1   A.     Well, it has a lower melting point than the form N-1

02:20:48 2   or N-.2, I think I explicitly didn't say it's a low melting

02:20:54 3   point.

02:20:54 4   Q.     Okay.  And you talked about, I think you said, and I

02:20:59 5   might get the words wrong, but -- correct me if I've got it

02:21:02 6   wrong, but I think you said that form N-2 is the very best

02:21:05 7   in terms of stability of the polymorphs, the crystalline

02:21:09 8   forms of the cabo malate salt; is that right?

02:21:14 9   A.     I don't think that's what I said.  I think that

02:21:16 10  overall -- well, first of all, I think I said overall the

02:21:20 11  crystalline (L)-malate has the best suite or combination of

02:21:23 12  properties.

02:21:24 13  Q.     Okay.  And are you aware that Exelixis has said that

02:21:27 14  form S has a lower stability than N-2, a lesser stability?

02:21:31 15  A.     I don't remember the specific document.  But if you

02:21:38 16  say so, I'm sure that's the case.  MSN says it's stable

02:21:42 17  enough to be a product.

02:21:52 18  Q.     Just a few questions on your obviousness-type double

02:21:56 19  patenting.  So, I'm changing gears, just so you know.

02:22:00 20  Obviousness-type double patenting now, Doctor.

02:22:03 21         So, the malate salt was known for use in

02:22:09 22  pharmaceutical compositions as of the priority date in this

02:22:12 23  case; is that right?

02:22:13 24  A.     Again, your question -- I think what you mean is

02:22:20 25  malic acid, but...

Trout - Cross

02:22:22 1   Q.     Well, or the malate salt that results from use of

02:22:25 2   malic acid.

02:22:26 3   A.     There were, as we heard this morning, a small number

02:22:30 4   of examples in the past, yes.

02:22:31 5   Q.     Yeah.  (L)-malate salt was known to be a

02:22:35 6   pharmaceutically acceptable salt as of the early 2000s; is

02:22:38 7   that right?

02:22:39 8   A.     Again, I'm just trying to help you with -- yes, for

02:22:45 9   specific compounds.

02:22:48 10   Q.     Okay.  And a person of skill in the art -- well, and

02:22:54 11   Sutent -- S-U-T-E-N-T, I think it is -- you've heard of

02:22:58 12   that; correct?

02:22:58 13   A.     Yes.

02:22:59 14   Q.     That's a pharmaceutical product?

02:23:00 15   A.     Yes.

02:23:01 16   Q.     And it's a pharmaceutical product that's an example

02:23:04 17   of a malic acid -- or being used in a formulation of

02:23:10 18   crystalline malate salt; correct?

02:23:12 19   A.     It's a malate salt.  I think that's the way to say

02:23:18 20   it.

02:23:18 21   Q.     Okay.  And that -- and it's used for treating cancer;

02:23:21 22   is that right?

02:23:21 23   A.     Yes.

02:23:22 24   Q.     And it's right there on the label of the Sutent

02:23:26 25   pharmaceutical product, that it's described as an (L)-malate

Trout - Cross

02:23:29 1    salt; correct?

02:23:30 2    A.      Correct.  And it's a different molecule than

02:23:32 3    cabozantinib.

02:23:33 4    Q.      Right.  Exactly.

02:23:34 5            So -- and so, you talked a little bit about some

02:23:44 6    lists -- some articles that listed potential counterions for

02:23:51 7    use in making salts; correct?

02:23:52 8    A.      Yes.

02:23:55 9    Q.      And when -- just so for vocabular purposes, when we

02:23:59 10   talk about counterions we're talking about something like

02:24:02 11   malic acid; right?

02:24:03 12   A.      Yeah.  Ionized form, yes.

02:24:05 13   Q.      And that's what will react with the base and

02:24:07 14   hopefully make the salt, if that's what is going to happen;

02:24:10 15   correct?

02:24:10 16   A.      The nonionized form reacts with the base to hopefully

02:24:16 17   make the ionized salt.

02:24:17 18   Q.      Okay.  And one of the -- you actually cited an

02:24:24 19   article in your expert report concerning discussions of

02:24:30 20   counterions that might be suitable for use; correct?

02:24:33 21   A.      There were several articles cited.  Yes.

02:24:37 22   Q.      And -- yeah.  And you took a chart -- a table out of

02:24:40 23   one of those articles; correct?

02:24:42 24   A.      You mean the Stahl article?

02:24:46 25   Q.      Yes, exactly.

Trout - Cross

02:24:47  1   A.      Yes.

02:24:47  2   Q.      The Stahl article.

02:24:48  3              MR. LOMBARDI:  So let's put the Stahl article up

02:24:50  4   on the screen, PTX-610.

02:24:54  5              THE WITNESS:  Again, please point me to the --

02:24:54  6   BY MR. LOMBARDI:

02:24:55  7   Q.      I'm sorry.  Volume II, and look at the tabs.  It

02:25:00  8   will -- the tabs will tell you.

02:25:02  9   A.      I got it.  I got it.  Thank you.

02:25:11 10              Oh, actually, I went to my report.  You want to

02:25:13 11   go to the article.  Do you know the PTX?

02:25:23 12   Q.      It's PTX-610.

02:25:30 13   A.      Okay.  I got it.  Thank you.

02:25:32 14   Q.      Okay.  Tell me when you're there.

02:25:34 15   A.      I'm there.

02:25:35 16   Q.      Okay.  And this is the Stahl article, S-T-A-H-L;

02:25:40 17   correct?

02:25:41 18   A.      Yes.

02:25:43 19   Q.      And this is the one you cited in your report;

02:25:46 20   correct?

02:25:46 21   A.      I believe so.  Yes.

02:25:53 22              MR. LOMBARDI:  And Stahl, at Page 333 -- Exhibit

02:26:04 23   Page 333.

02:26:04 24   BY MR. LOMBARDI:

02:26:04 25   Q.      That's in the middle at the bottom, Doctor.

Trout - Cross

A.      Okay.

Q.      On that page, he refers to other reviews of

pharmaceutical salts; correct?

A.      The first sentence.

Q.      Yes, exactly.  That first sentence.

        And he talks about comprehensive reviews on

pharmaceutical salts by -- you say that Berge.  Is that how

you say it?

A.      I think there's been some debate this week whether

Berge or Berge.

Q.      Whichever you want is fine with me.

A.      French or German, I would say.  Whatever.

Q.      All right.  Berge, Bighley and Monkhouse.

        Do you see that?

A.      Yes.

Q.      And I think you said you've been here during trial

and you saw the counsel for Exelixis discussed Bighley with

Dr. Steed, I believe it was.

        Do you remember that?

A.      Yes.

Q.      And you remember putting a chart up based on Bighley?

A.      Yes.

Q.      Okay.  And if you go down to the third line in the

middle.  It says, "While these authors presented the results

of a survey on the approval status of drug salts 25 years

Trout - Cross

02:27:16 1   ago, the present-day situation is different."

02:27:20 2          Do you see that?

02:27:21 3   A.    Yes.

02:27:23 4   Q.    "And accumulated knowledge and experience has led to

02:27:26 5   a reduction of the number of acids and bases regarded as

02:27:29 6   innocuous."

02:27:31 7          Do you see that?

02:27:32 8   A.    Yes.

02:27:34 9   Q.    "Therefore, it was" -- I'm skipping a line.

02:27:36 10         "Therefore, it was deemed timely to put up a

02:27:39 11  revised list of useful salt-forming acids and bases."

02:27:44 12         Do you see that?

02:27:45 13  A.    Yes.

02:27:46 14  Q.    And is that one of the reasons you selected Stahl for

02:27:49 15  your expert report, was its updated information?

02:27:53 16  A.    I selected Stahl because of the table and what I

02:27:57 17  discussed in my report.

02:27:58 18  Q.    Okay.  And it talks about -- in Stahl, it talks

02:28:05 19  about -- well, let me strike the question.

02:28:07 20         A person of skill in the art would have been

02:28:10 21  aware of something called Tong's Rule-of-2?

02:28:14 22  A.    Yes.  They've we've talked about that.

02:28:16 23  Q.    Okay.  And you talked about that.

02:28:18 24         It's a well-known rule of thumb; correct?

02:28:20 25  A.    That's fair.

932

Trout - Cross

02:28:22 1    Q.    And it was well-known in the early 2000s?

02:28:24 2    A.    Yeah.  Somewhere in the early 2000s, yeah.

02:28:31 3    Q.    And a person of skill in the art would have been

02:28:33 4    aware of the Tong reference in that time frame; correct?

02:28:35 5    A.    Yes.

02:28:38 6    Q.    And a person of skill in the art would have been

02:28:42 7    motivated to select a counterion for salt screening with a

02:28:48 8    p$K_a$ at least two units lower than the base, based on Tong's

02:28:53 9    rule of thumb; correct?

02:28:56 10   A.    No, Counsel.  I can't agree with that.  I think I've

02:28:58 11   talked about that extensively.

02:29:01 12   Q.    Okay.  Well, let me just make sure that we're talking

02:29:05 13   about the same thing here so that there's no confusion.

02:29:23 14         Do you agree that a person of skill in the art

02:29:26 15   would have been motivated to select counterions for

02:29:30 16   screening that had a p$K_a$ of at least two pH units lower than

02:29:35 17   the compound being screened?

02:29:38 18         Do you agree with that?

02:29:39 19   A.    I think that would be a consideration that would not

02:29:44 20   be -- it would not be exclusive as we've been talking about

02:29:47 21   today.

02:29:48 22   Q.    Okay.  Okay.  And -- but it's something that a person

02:29:51 23   of skill in the art would consider in determining what acid

02:29:56 24   to choose in trying to make a salt; correct?

02:29:59 25   A.    The skilled person would know it and taking it into

Trout - Cross

02:30:02 1   account, and it wouldn't be exclusive.

02:30:04 2   Q.    Okay.  And there were techniques at the time that a

02:30:10 3   person of skill in the art would be able to undertake to

02:30:13 4   determine p$K_a$; right?

02:30:15 5   A.    Yes.

02:30:17 6   Q.    That was within the level of skill in the art at the

02:30:19 7   time; is that right?

02:30:20 8   A.    If the person wanted to, yes.

02:30:23 9   Q.    And I think you've said you've heard in Court, but

02:30:26 10  just so we say it, the p$K_a$ for cabozantinib is 5.9, or

02:30:32 11  around there at least?

02:30:33 12  A.    That's the number Dr. Steed used.  He never

02:30:36 13  referenced that, but...

02:30:38 14  Q.    Right.  And the acceptable acids or counterions under

02:30:43 15  the rule of thumb would have a p$K_a$ of 3.9 or more; is that

02:30:48 16  right?

02:30:48 17  A.    Again, I think you mean less, but...

02:30:55 18  Q.    I do.

02:30:56 19  A.    Just trying to help you.

02:30:57 20  Q.    Yeah, that's fine.  That's fine.  Do you want me to

02:31:00 21  restate the question?

02:31:00 22          THE COURT:  I think we've got it.

02:31:02 23          MR. LOMBARDI:  Okay.  That's fine.

02:31:03 24  BY MR. LOMBARDI:

02:31:03 25  Q.    So -- so, a person could determine -- well, let me

Trout - Cross

02:31:10  1    just ask this:  The Stahl chart also has a column that

02:31:16  2    indicates G-R-A-S; correct?

02:31:19  3    A.     Yes.

02:31:21  4    Q.     Okay.  And G-R-A-S stands for generally regarded as

02:31:25  5    safe; correct?

02:31:26  6    A.     Yeah, technically it's generally recognized as safe.

02:31:30  7    I think that's what we've been talking about.  I know it

02:31:33  8    says "regarded" in the reference, but just to be clear.

02:31:36  9    Q.     Okay.  That's fine.

02:31:37  10   A.     But that's close enough.

02:31:38  11   Q.     And I'm not going to make you repeat this because

02:31:41  12   you've done it already, but you've gone through in

02:31:44  13   questioning at a deposition and determined kind of the

02:31:47  14   overlap between G-R-A-S and Tong's Rule-of-2 for that chart

02:31:54  15   in Stahl; is that right, with respect to cabozantinib?

02:31:56  16   A.     I was asked GRAS --

02:32:03  17   Q.     Yeah.

02:32:03  18   A.     -- during my deposition; I do recall that.

02:32:05  19   Q.     And when you find things that fit within the rule of

02:32:07  20   thumb and things that are G-R-A-S from that chart, the Stahl

02:32:12  21   chart, you come up with about nine acids; is that right?

02:32:16  22          Do you remember?  If you don't remember...

02:32:18  23   A.     I don't remember the exact number, as I testified in

02:32:21  24   my deposition.  That would not exclude the skilled person

02:32:25  25   from incorporating others.  So, it's not a really accurate

Trout - Redirect

02:32:28   1    number.

02:32:29   2    Q.     Okay.   Okay.

02:32:30   3              MR. LOMBARDI:  No further questions, Your Honor.

02:32:31   4              THE COURT:  All right.   Any redirect?

02:32:33   5              MR. PRUSSIA:  Briefly, Your Honor.

02:32:34   6                       REDIRECT EXAMINATION

02:32:37   7    BY MR. PRUSSIA:

02:32:37   8    Q.     So, Dr. Trout, you were asked some questions about

02:32:40   9    paragraph 277 of your report in the first MSN case, do you

02:32:43  10    recall that?

02:32:43  11    A.     Yes.

02:32:44  12    Q.     And the issue that you were addressing in that

02:32:47  13    portion of your report was obviousness, do you remember

02:32:51  14    that?

02:32:51  15    A.     Yes.

02:32:52  16    Q.     And in the MSN one litigation, Dr. Steed was offering

02:32:56  17    the opinion that it was routine and predictable to arrive at

02:33:00  18    form N-2; does that refresh your memory?

02:33:03  19    A.     Yes.

02:33:03  20    Q.     And in this litigation, MSN and Dr. Steed are arguing

02:33:07  21    the direct opposite, that obtaining polymorphs would be

02:33:10  22    unpredictable; right?

02:33:11  23    A.     Yes.

02:33:13  24    Q.     Now, for 103, which was the issue that you were

02:33:16  25    discussing in your report, what's your understanding of

Trout - Redirect

02:33:20 1    whether the person of ordinary skill in the art would have

02:33:23 2    had the benefit of the teachings of the specification of the

02:33:28 3    crystalline malate salt patent?

02:33:29 4    A.    The person would not have had the benefit of those

02:33:31 5    teachings and even under 103.

02:33:34 6    Q.    Thank you.

02:33:36 7          So in -- at the time you were making those

02:33:38 8    statements, about what a person of ordinary skill in the art

02:33:41 9    would have expected, was that with or without the benefit --

02:33:45 10   with or without the benefit of the teachings of the

02:33:48 11   specification of the crystallize malate salt patents?

02:33:50 12   A.    That's without the benefit of those patents, the

02:33:53 13   asserted patents here.

02:33:54 14   Q.    And the issue that you're addressing in this case is

02:33:56 15   you're responding to their arguments with respect to written

02:33:59 16   description; right?

02:33:59 17   A.    Correct.

02:34:01 18   Q.    And what role does the specification play in

02:34:04 19   determining whether the inventor has had possession of the

02:34:07 20   invention under written description?

02:34:08 21   A.    Well, as I explained in my direct, there's a whole

02:34:12 22   host of detail in the specification, including experimental

02:34:18 23   detail -- I think there are 27 figures -- a lot of data, a

02:34:21 24   lot of information, including the text that we went over,

02:34:24 25   which demonstrate that the inventors possessed crystalline

Trout - Redirect

02:34:28 1    cabozantinib malate.

02:34:30 2    Q.    Now, with the guidance that's identified in the

02:34:36 3    common specification, coupled with the knowledge of a person

02:34:40 4    of ordinary skill in the art, would that have allowed a

02:34:42 5    person of skill to perform a polymorph screen, and with a

02:34:50 6    routine expectation of success, obtain and characterize

02:34:53 7    additional polymorphs of crystalline cabozantinib

02:34:56 8    (L)-malate?

02:34:56 9    A.    If they were routine polymorphs from a routine

02:34:59 10   screen, yes, they could have used the teaching to do that.

02:35:02 11   Q.    And did MSN cite the crystalline malate salt patents

02:35:06 12   in its patent application for form S?

02:35:08 13   A.    Yes.

02:35:09 14   Q.    And did Mylan and Cipla?

02:35:11 15   A.    Yes.

02:35:12 16   Q.    Now, you were asked some questions about form S.  And

02:35:15 17   just to make sure we're talking about the same thing,

02:35:19 18   does -- what is the form of crystalline malate that's in the

02:35:26 19   MSN ANDA product?

02:35:27 20   A.    That's the MSN form S.

02:35:30 21   Q.    And what form of crystalline cabozantinib malate is

02:35:35 22   used in Cabometyx?

02:35:36 23   A.    That's form N-2.

02:35:38 24   Q.    And you understand that MSN has submitted an

02:35:41 25   application to the FDA to market a generic version of

George - Direct

02:35:44  1    Cabometyx; do you understand that?

02:35:45  2    A.      Yes.

02:35:46  3    Q.      And has MSN represented to the FDA that its form S is

02:35:51  4    bioequivalent to form N-2?

02:35:54  5    A.      Yes.

02:35:55  6               MR. PRUSSIA:  Nothing further.

02:35:57  7               THE COURT:  All right.  Dr. Trout, thank you.

02:35:59  8    You may step down.  Watch your step.

02:36:01  9               THE WITNESS:  Yes.  Thank you.

02:36:08 10               MS. WIGMORE:  Your Honor, Exelixis calls for its

02:36:15 11    next witness Dr. Daniel George.

02:36:19 12               THE COURT:  All right.

02:37:01 13               DEPUTY CLERK:  Please state and spell your full

02:37:02 14    name for the record.

02:37:02 15               THE WITNESS:  Yes, it's Dr. Daniel James George.

02:37:06 16    It's D-A-N-I-E-L J-A-M-E-S G-E-O-R-G-E.

02:37:16 17               DANIEL JAMES GEORGE, the witness herein, after

02:37:16 18    having been duly sworn under oath, was examined and

02:37:23 19    testified as follows:

02:37:23 20               THE WITNESS:  I do.

02:37:25 21               MS. WIGMORE:  May I proceed, Your Honor?

02:37:26 22               THE COURT:  Yes.

02:37:27 23                     DIRECT EXAMINATION

02:37:27 24    BY MS. WIGMORE:

02:37:27 25    Q.      Good afternoon, Dr. George.  Would you please

George - Direct

02:37:29  1   introduce yourself?

02:37:29  2   A.      Hi, I'm Dr. Daniel George.

02:37:33  3   Q.      Have you been retained by Exelixis, Inc., as an

02:37:35  4   expert in this case?

02:37:36  5   A.      I have.

02:37:38  6   Q.      Generally speaking, what issues have you been asked

02:37:40  7   to address?

02:37:41  8   A.      I've been asked to address the clinical success

02:37:44  9   associated with Cabometyx and the nexus between this

02:37:47 10   clinical success and the patents in question.

02:37:50 11              MS. WIGMORE:  Let's have PDX-7.2.

02:37:50 12   BY MS. WIGMORE:

02:37:53 13   Q.      What is shown on this slide?

02:37:54 14   A.      That's a picture of me and my -- summary of my

02:37:57 15   education and experience.

02:37:58 16   Q.      Where are you employed?

02:37:59 17   A.      I am at Duke University.

02:38:01 18   Q.      What do you do at Duke?

02:38:02 19   A.      I'm a medical oncologist.  I specialize in

02:38:06 20   genitourinary cancers.  So kidney, bladder, prostate cancer.

02:38:10 21   And I also do research.  I'm a professor of medicine.

02:38:12 22   Q.      Have you been involved in any work involving tyrosine

02:38:16 23   kinase inhibitors?

02:38:16 24   A.      I have.  Yes.

02:38:18 25   Q.      Can you give us some examples?

George - Direct

02:38:19  1   A.     Sure.  Yeah, since my -- finishing my fellowship in

02:38:23  2   1998.  I was at Dana-Farber, did some early experiments with

02:38:27  3   the early clinical trials with VEGF tyrosine kinase

02:38:30  4   inhibitors.  I moved to Duke and I've continued that work on

02:38:33  5   up to the current day.

02:38:35  6   Q.     For how long have you been researching tyrosine

02:38:37  7   kinase inhibitors?

02:38:37  8   A.     25 years.

02:38:41  9   Q.     Approximately what portion of your work involves

02:38:43 10   treating patients?

02:38:43 11   A.     About 40 percent.

02:38:46 12   Q.     For how long have you been treating patients with

02:38:49 13   kidney cancer?

02:38:49 14   A.     For 25 years.

02:38:51 15          MS. WIGMORE:  Let's please have PDX-7.3.

02:38:51 16   BY MS. WIGMORE:

02:38:54 17   Q.     Dr. George, have you received any honors for your

02:38:57 18   clinical work?

02:38:58 19   A.     Yeah, overall, I mean, for my work at Duke, I was

02:39:00 20   recently awarded Eleanor Easley Distinguished Chair in

02:39:04 21   School of Medicine.  I've also been recognized as a fellow

02:39:07 22   of American Society of Clinical Oncology.  In 2021, I was

02:39:11 23   elected the chair of the Medical Steering Committee for the

02:39:13 24   Kidney Cancer Association.

02:39:15 25   Q.     What is the Kidney Cancer Association?

941

George - Direct

| | | |
|---|---|---|
| 02:39:17 | 1 | A.     It's a non-profit advocacy group for patients with |
| 02:39:21 | 2 | kidney cancer. |
| 02:39:22 | 3 | Q.     If you could please turn to Tab 1 in your binder. |
| 02:39:24 | 4 |         MS. WIGMORE:  And pull up PTX-775. |
| 02:39:24 | 5 | BY MS. WIGMORE: |
| 02:39:29 | 6 | Q.     What is this document? |
| 02:39:31 | 7 | A.     That's my CV. |
| 02:39:34 | 8 | Q.     Is this an accurate representation of your |
| 02:39:35 | 9 | experience, publications, and honors and awards? |
| 02:39:38 | 10 | A.     It is. |
| 02:39:39 | 11 |         MS. WIGMORE:  Your Honor, we offer Dr. Daniel |
| 02:39:41 | 12 | George as an expert in the treatment of cancer, including |
| 02:39:45 | 13 | renal cell carcinoma. |
| 02:39:47 | 14 |         MR. COOPER:  No objection. |
| 02:39:48 | 15 |         THE COURT:  You may proceed |
| 02:39:50 | 16 | BY MS. WIGMORE: |
| 02:39:51 | 17 | Q.     Dr. George, are you familiar with the patent claims |
| 02:39:52 | 18 | asserted in this case? |
| 02:39:54 | 19 | A.     I am. |
| 02:39:54 | 20 | Q.     Were you here when Dr. Trout testified the asserted |
| 02:39:57 | 21 | claims of the crystalline malate salt patents cover |
| 02:40:00 | 22 | Cabometyx? |
| 02:40:01 | 23 | A.     Yes. |
| 02:40:02 | 24 | Q.     And do you understand that Claim 3 of the low |
| 02:40:04 | 25 | impurity patent covers Cabometyx? |

George - Direct

02:40:06 1    A.      Yes.

02:40:07 2    Q.      Are you offering an ultimate opinion on the validity

02:40:10 3    of any of the asserted claims?

02:40:12 4    A.      Not an ultimate opinion.

02:40:14 5              MS. WIGMORE:  Let's have PDX-7.4.

02:40:14 6    BY MS. WIGMORE:

02:40:17 7    Q.      Could you briefly describe your opinions?

02:40:19 8    A.      Yeah, I have three opinions:  One that Cabometyx is

02:40:23 9    and has been a clinical success in kidney cancer, that

02:40:28 10   Cabometyx satisfies a long-felt unmet need in patients, and

02:40:33 11   that there's a direct nexus between this clinical success

02:40:37 12   and the asserted claims.

02:40:39 13   Q.      And we'll come to those in detail momentarily.

02:40:42 14             MS. WIGMORE:  But if we could please have

02:40:44 15   PDX-7.5.

02:40:44 16   BY MS. WIGMORE:

02:40:45 17   Q.      What information did you consider in forming your

02:40:47 18   opinions?

02:40:47 19   A.      I based this on a review of the literature as well as

02:40:51 20   my extensive clinical experience as well as conversations

02:40:55 21   with my colleagues, Dr. Trout and Dr. Myerson.

02:40:57 22   Q.      Are you familiar with defendants' expert, Dr. Anthony

02:41:01 23   Mega?

02:41:02 24   A.      I am.

02:41:02 25   Q.      Have you reviewed the opinions he has offered in this

George - Direct

02:41:05  1    case?

02:41:05  2    A.      Yes, I have.

02:41:07  3    Q.      Are you prepared to respond to those today?

02:41:08  4    A.      Yes.

02:41:10  5            MS. WIGMORE:  Let's have PDX-7.6.

02:41:10  6    BY MS. WIGMORE:

02:41:13  7    Q.      What is Cabometyx?

02:41:13  8    A.      This is Cabometyx.  It's a product that we prescribe

02:41:18  9    regularly in clinic to patients with advanced kidney cancer.

02:41:22 10    And shown here in three formulations, 60 milligrams,

02:41:26 11    40 milligrams and 20 milligrams.

02:41:27 12    Q.      Are you familiar with Cometriq?

02:41:29 13    A.      I am.  Yes.

02:41:30 14    Q.      And what is Cometriq?

02:41:31 15    A.      Cometriq is a capsule form of cabozantinib similar to

02:41:36 16    Cabometyx, and it's prescribed for the treatment of

02:41:39 17    medullary thyroid cancer.

02:41:41 18    Q.      What is the active ingredient in Cabometyx and

02:41:43 19    Cometriq?

02:41:43 20    A.      It's crystalline Cabometyx (L)-malate.

02:41:47 21    Q.      And is that cabozantinib?

02:41:49 22    A.      Sorry.  Yes.  Crystalline cabozantinib (L)-malate.

02:41:52 23    Q.      Now, for the purpose of your testimony today, will

02:41:54 24    you focus on Cabometyx?

02:41:56 25    A.      I will, yes.

George - Direct

02:41:57  1    Q.     When was Cabometyx first approved by the Food & Drug

02:42:01  2    Administration?

02:42:01  3    A.     In 2016.

02:42:04  4    Q.     Please turn to Tab 2 in your binder, which is PTX-1.

02:42:08  5           What is this document?

02:42:11  6    A.     This is a patent for the -- for cabozantinib.

02:42:22  7    Q.     I think you might be at the wrong tab.  We're looking

02:42:24  8    at PTX-1.

02:42:25  9    A.     Oh, sorry.  Oh, 1.  Sorry.

02:42:28 10    Q.     What is PTX --

02:42:29 11    A.     Oh, yeah, yeah.  Sorry, it's up on the screen.  This

02:42:31 12    is the prescribing information for Cabometyx.

02:42:35 13    Q.     Is this sometimes referred to as the label or the

02:42:37 14    package insert?

02:42:38 15    A.     That's right.

02:42:39 16    Q.     Now, if you could focus on the section in the

02:42:42 17    left-hand side of the first page titled "Indications and

02:42:45 18    Usage."

02:42:46 19           Do you see that?

02:42:47 20    A.     I do.  Yes.

02:42:48 21    Q.     Are you familiar with the approved indications for

02:42:51 22    Cabometyx?

02:42:51 23    A.     I am.  Yes.

02:42:53 24    Q.     What indications are you focusing on in your

02:42:55 25    testimony here today?

George - Direct

02:42:56 1   A.      The first two, where one is for advanced renal cell

02:43:02 2   carcinoma.

02:43:02 3   Q.      And what are those specific indications.

02:43:05 4   A.      The first is for patients with advanced renal cell

02:43:08 5   carcinoma, and the second is for patients with advanced

02:43:09 6   renal cell carcinoma as a first-line treatment in

02:43:12 7   combination with nivolumab.

02:43:15 8   Q.      What is renal cell carcinoma or RCC?

02:43:17 9   A.      Renal cell carcinoma refers to the most common form

02:43:20 10  of kidney cancer.  It's over 90 percent of kidney cancers

02:43:24 11  and its tumors are cancers that originate out of the kidney.

02:43:27 12  Q.      What is first-line treatment?

02:43:28 13  A.      First-line treatment refers to treatment that we give

02:43:32 14  to patients who have not received any prior systemic therapy

02:43:35 15  for advanced renal cell carcinoma.

02:43:37 16  Q.      What is subsequent line treatment?

02:43:39 17  A.      So subsequent line treatment refers to any treatment

02:43:42 18  that patients received after receiving a first-line

02:43:45 19  treatment.

02:43:45 20  Q.      What is nivolumab?

02:43:47 21  A.      Nivolumab is an immunotherapy.  It's an antibody

02:43:51 22  targeted against a protein PD-1.  It's also referred to as

02:43:55 23  an immuno checkpoint inhibitor.

02:43:57 24  Q.      Now, we'll focus on kidney cancer today, but

02:44:00 25  generally speaking is Cabometyx approved for any other

George - Direct

02:44:03 1   cancers?

02:44:03 2   A.     It's also approved, yes, for hepatocellular carcinoma

02:44:08 3   and differentiated thyroid cancer.

02:44:11 4   Q.     Are you familiar with a concept of breakthrough

02:44:14 5   therapy designation?

02:44:14 6   A.     I am, yes.

02:44:15 7   Q.     What is that?

02:44:16 8   A.     That's an FDA distinction for new drugs undergoing

02:44:21 9   review for indication.  It's regulatory approval --

02:44:26 10  regulatory process to accelerate the approval process.  And

02:44:29 11  it's granted at the request of the -- of the sponsor.

02:44:33 12  Q.     How, if at all, does breakthrough therapy designation

02:44:36 13  apply to Cabometyx?

02:44:38 14  A.     Cabometyx received breakthrough designation when it

02:44:42 15  was under review for the first indication of advanced renal

02:44:46 16  cell carcinoma.

02:44:46 17  Q.     Did Cabometyx receive that designation for any other

02:44:49 18  indication?

02:44:49 19  A.     Yes.  Also when it was under review for

02:44:54 20  differentiated thyroid cancer.

02:44:56 21          MS. WIGMORE:  If we could turn to Tab 3 in your

02:44:58 22  binder which is PTX-528.  I'd like to move to your first

02:45:03 23  opinion regarding clinical success.

02:45:03 24  BY MS. WIGMORE:

02:45:06 25  Q.     What is PTX-528?

02:45:08  1    A.      This is the NCCN, or *National Comprehensive Cancer*

02:45:12  2    *Network Practice Guidelines for Kidney Cancer*.

02:45:15  3    Q.      What is the date of the document?

02:45:16  4    A.      June 21, 2023.

02:45:19  5    Q.      How is this document used by clinicians?

02:45:22  6    A.      You know, this is helpful for clinicians in two ways.

02:45:24  7    One, it really helps guide our practice.  It gives us a -- a

02:45:28  8    reference in which to justify or back up the treatments that

02:45:33  9    we choose for our patients.  It also helps with approval

02:45:36 10    process with -- with papers.

02:45:39 11            MS. WIGMORE:  If we could please turn to Page 15

02:45:41 12    that ends in Bates Number 1680.

02:45:41 13    BY MS. WIGMORE:

02:45:45 14    Q.      What is clear cell histology?

02:45:48 15    A.      Yeah.  Clear cell histology refers to the most common

02:45:54 16    form of renal cell carcinoma.  It's about 75, 80 percent of

02:45:59 17    renal cell carcinomas.

02:46:01 18    Q.      Generally speaking, what does this table on Page 15

02:46:04 19    of the NCCN Guidelines address?

02:46:07 20    A.      So, this table is sort of a summary, if you will, of

02:46:11 21    the recommendations from the panel.  You'll see on the far

02:46:14 22    left, risk categories.  This refers to the prognostic status

02:46:19 23    of patients.  Favorable risk is obviously better than the

02:46:22 24    patients who have poor or intermediate risk features, and

02:46:25 25    then next to that is a column for preferred regimens.  These

George - Direct

02:46:28 1    are the recommendations from the panel consensus

02:46:32 2    recommendations.

02:46:32 3    Q.     Now, how does this table address Cabometyx

02:46:38 4    specifically?

02:46:38 5    A.     Yeah, Cabometyx is in several of these

02:46:41 6    recommendations.  You'll see for favorable risk preferred

02:46:43 7    regimens, cabozantinib or Cabometyx is listed in combination

02:46:48 8    with nivolumab.  It's a Category I recommendation, which is

02:46:51 9    the highest recommendation.  And then you'll see it listed

02:46:55 10   twice in the poor and intermediate risk categories, once

02:46:58 11   again, with -- in combination with nivolumab is Category I.

02:47:02 12   And then it's the only VEGF tyrosine kinase inhibitor listed

02:47:07 13   as a single agent in this category by itself as monotherapy.

02:47:13 14   Q.     Now, you've referred to this combination of Cabometyx

02:47:16 15   and nivolumab.

02:47:17 16   A.     Yes.

02:47:17 17   Q.     How, if at all, does Cabometyx contribute to the

02:47:20 18   success of that combination?

02:47:22 19   A.     Yeah, that combination is the most recent clinical

02:47:25 20   data around cabozantinib and nivolumab in the front-line

02:47:30 21   setting, and it demonstrated a significant improvement in

02:47:35 22   the delay to disease progression in overall survival for

02:47:39 23   patients.  In that study, the results of that combination

02:47:43 24   outperformed what either cabozantinib alone or what

02:47:47 25   nivolumab alone had been able to show.  So it was really the

02:47:51 1   combination of both drugs working together to produce those

02:47:53 2   results.

02:47:54 3   Q.    Now, you pointed out that that table refers to

02:47:57 4   cabozantinib.  Is there any other form of cabozantinib

02:48:01 5   approved to treat kidney cancer besides Cabometyx?

02:48:04 6   A.    No, there is not.

02:48:06 7   Q.    Could you please explain how Cabometyx has impacted

02:48:09 8   your patients?

02:48:10 9   A.    Yeah.  You know, for our patients since 2016, when

02:48:14 10  this first became available, Cabometyx really changed the

02:48:18 11  landscape for our patients.  This created a treatment option

02:48:20 12  for the first time that extended survival for patients for

02:48:23 13  the majority of patients in the subsequent lines of therapy.

02:48:28 14  And it was really a life extending therapy for patients.  It

02:48:31 15  gave them hope.

02:48:32 16       Since then we've been able to use this drug now

02:48:35 17  in the first-line setting where we're seeing extended

02:48:37 18  disease periods of control near complete responses in

02:48:41 19  patients.  I have patients now on this drug literally for

02:48:45 20  years.  It's changed the life of patients with kidney

02:48:48 21  cancer.

02:48:48 22  Q.    If you could please turn to Tab 4 in your binder

02:48:52 23  which is PTX-363.

02:48:54 24       What is this document?

02:48:55 25  A.    This is the *Lancet Oncology* publication for the

George - Direct

02:49:00  1   METEOR study.  This was the pivotal trial that led to the

02:49:03  2   first FDA indication for Cabometyx.

02:49:07  3   Q.      And what was compared in this study?

02:49:09  4   A.      So this is a Phase 4 study comparing cabozantinib

02:49:12  5   versus everolimus in patients with advanced renal cell

02:49:16  6   carcinoma treated with one or more prior VEGF tyrosine

02:49:20  7   kinase inhibitors.

02:49:20  8   Q.      If you could turn, please, to the section titled

02:49:23  9   "Interpretation" toward the bottom of the first page.

02:49:26 10   A.      Yes.

02:49:27 11   Q.      Please read the first two sentences in that

02:49:29 12   paragraph.

02:49:29 13   A.      "Treatment with cabozantinib increased overall

02:49:32 14   survival, delayed disease progression, and improved the

02:49:36 15   objective response compared with everolimus.  Based on these

02:49:40 16   results, cabozantinib should be considered a new standard of

02:49:44 17   care treatment option for patients previously -- previously

02:49:47 18   treated patients with advanced renal cell carcinoma."

02:49:50 19   Q.      If you could turn, please, to Tab 5 in your binder,

02:49:53 20   which is PTX-366.

02:49:56 21           What is this document?

02:49:56 22   A.      This is the *Journal of Clinical Oncology*, or JCO,

02:50:01 23   publication for the CABOSUN study, a comparison of

02:50:05 24   cabozantinib versus sunitinib as initial therapy for

02:50:08 25   patients with advanced renal cell carcinoma.

02:50:11 1   Q.      What is sunitinib?

02:50:12 2   A.      Sunitinib has otherwise been referred to as Sutent.

02:50:15 3   This is another spectrum selective VEGF tyrosine kinase

02:50:19 4   inhibitor that was really the standard of care in the

02:50:23 5   first-line treatment of patients with advanced renal cell

02:50:26 6   carcinoma at the time.

02:50:26 7   Q.      Could you please turn to the conclusion section on

02:50:29 8   the first page of this document, and read the conclusion for

02:50:33 9   the record?

02:50:34 10  A.      "Cabozantinib demonstrated a significant clinical

02:50:37 11  benefit in the progression free survival in overall response

02:50:42 12  rate over standard of care sunitinib as first-line therapy

02:50:46 13  in patients with intermediate or poor risk metastatic renal

02:50:50 14  cell carcinoma."

02:50:50 15  Q.      Let's turn to Tab 6 in your binder, which is PTX-367.

02:50:55 16          What is this document?

02:50:55 17  A.      This is the *New England Journal of Medicine*

02:51:00 18  publication for the CheckMate 9ER study.  This was a Phase 3

02:51:03 19  study comparing the combination of nivolumab plus

02:51:07 20  cabozantinib versus sunitinib for patients with advanced

02:51:09 21  renal cell carcinoma.

02:51:11 22  Q.      Could you please turn to the conclusions section?

02:51:14 23  A.      Yes.

02:51:14 24  Q.      And what does the first sentence of the conclusion of

02:51:18 25  the study show?

02:51:19  1    A.      Nivolumab plus cabozantinib had significant benefits

02:51:23  2    over sunitinib with respect to progression free survival,

02:51:27  3    overall survival and likelihood of response in patients with

02:51:31  4    previously untreated advanced renal cell carcinoma.

02:51:34  5              MS. WIGMORE:  Let's turn to Tab 7 in your

02:51:36  6    binder, which is PTX-470.

02:51:39  7              THE WITNESS:  Yes.

02:51:39  8    BY MS. WIGMORE:

02:51:39  9    Q.      What is this document?

02:51:40 10    A.      This is the Contact-03 publication from this year in

02:51:45 11    the journal *Lancet*, and it was a comparison -- a Phase 3

02:51:49 12    study comparing the combination of atezolizumab plus

02:51:53 13    cabozantinib versus cabozantinib monotherapy for patients

02:51:57 14    with renal cell carcinoma after progression with previous

02:52:00 15    immune checkpoint inhibitor.

02:52:02 16    Q.      What is atezolizumab?

02:52:04 17    A.      Atezolizumab is another immune checkpoint.  It's

02:52:10 18    monoclonal antibody targeting the PD-L1 protein, which is

02:52:12 19    the protein that activates the PD1 receptor, so similar

02:52:17 20    pathway.

02:52:17 21    Q.      Similar pathway to?

02:52:19 22    A.      To nivolumab sulfate.

02:52:21 23              MS. WIGMORE:  If you could turn to the findings.

02:52:21 24    BY MS. WIGMORE:

02:52:23 25    Q.      And I want to direct your attention to the sentence

George - Direct

02:52:25  1    beginning "median."

02:52:28  2              Do you see that?

02:52:28  3    A.      I do.  Yes.

02:52:29  4    Q.      What does that sentence convey about cabozantinib

02:52:35  5    versus the combination of cabozantinib and atezolizumab?

02:52:38  6    A.      Yeah.  So the top level results from the study

02:52:41  7    demonstrated that the median progression free survival for

02:52:44  8    the combination with atezolizumab and cabozantinib was

02:52:47  9    10.6 months, but for cabozantinib monotherapy it was

02:52:51 10    10.8 months.  Essentially, overlapping results in terms of

02:52:56 11    the effectiveness of these two arms, but with greater side

02:53:00 12    effects associated with the combination.

02:53:02 13    Q.      Does that mean that this was a failed study?

02:53:04 14    A.      Not at all.  I mean, clinical trials are designed to

02:53:07 15    answer a question and the question here was:  Is there value

02:53:10 16    to continuing with an immune checkpoint inhibitor in this

02:53:14 17    subsequent line of therapy, and this definitely answered

02:53:17 18    the question, just the answer is no, that cabozantinib

02:53:20 19    monotherapy was really as effective as any other -- as the

02:53:26 20    combination would be in this setting.

02:53:27 21    Q.      What, if anything, did this study reveal about

02:53:29 22    treatment with cabozantinib alone?

02:53:31 23    A.      Well, you know, this is the new landscape of renal

02:53:35 24    cell carcinoma.  When the METEOR study was done, there were

02:53:37 25    very few immune checkpoint inhibitor patients treated, so

954

George - Direct

02:53:41  1    now we're in a new situation where immune therapies are

02:53:44  2    really the standard of care.  This really provides a context

02:53:47  3    for what we can expect for patients receiving Cabometyx now

02:53:52  4    in this subsequent line therapy.  And the results were

02:53:55  5    actually better than what we saw with METEOR.  If anything,

02:53:58  6    this agent is even more relevant than it was seven years

02:54:01  7    ago.

02:54:02  8    Q.     Dr. George, from your perspective as a clinician, has

02:54:06  9    Cabometyx been clinically successful?

02:54:08 10    A.     Absolutely.

02:54:10 11    Q.     How does that clinical success bear on your decision

02:54:12 12    to prescribe Cabometyx?

02:54:14 13    A.     Yeah.  I prescribe Cabometyx routinely for my

02:54:18 14    patients, either in the first line or in the subsequent line

02:54:21 15    therapy, over 90 percent of my patients are receiving

02:54:23 16    Cabometyx at some point in their journey.

02:54:27 17    Q.     Would an oncologist continue to prescribe a drug that

02:54:30 18    does not work?

02:54:30 19    A.     No.  Oncologists base their decisions on both the

02:54:35 20    literature that we've just reviewed, as well as their own

02:54:37 21    clinical experience.  If a drug is not performing in their

02:54:41 22    experience with patients, if they're not tolerating it or if

02:54:44 23    the drug is not demonstrating clinical benefit, they're

02:54:46 24    going to stop using it.

02:54:47 25               MS. WIGMORE:  Let's turn to PDX-7.7.

George - Direct

02:54:47  1   BY MS. WIGMORE:

02:54:50  2   Q.      Now, what is the second opinion you're offering in

02:54:53  3   this case?

02:54:53  4   A.      That Cabometyx satisfied a long felt, unmet clinical

02:54:58  5   need.

02:55:00  6   Q.      As of 2011, was there a need for improved kidney

02:55:04  7   cancer therapies?

02:55:05  8   A.      Absolutely.

02:55:06  9   Q.      Was the same true as of 2009?

02:55:08  10  A.      Yes.

02:55:10  11  Q.      How, if at all, did Cabometyx address that need?

02:55:12  12  A.      Well, you know, at the time we had really kind of a

02:55:15  13  handful of these VEGF targeted TKIs or mTOR inhibitors, like

02:55:21  14  everolimus.  But the truth was if you look at our Medicare

02:55:24  15  data from that time, median survivals were about a year.

02:55:27  16  Our best patients, from clinical trial data, the median

02:55:30  17  survivals were a little over two years.  This isn't long

02:55:33  18  enough.  And these patients were all progressing on these

02:55:36  19  first line therapies within a year or so.  They needed other

02:55:39  20  therapy.

02:55:39  21          Everolimus, at the time, was the only approved

02:55:42  22  therapy and it was based on modest delay of progression of

02:55:46  23  disease with no survival benefit.  Cabometyx met that need.

02:55:49  24  It demonstrated greater survival, greater disease -- delay

02:55:54  25  in disease progression, and response.

956

George - Direct

02:55:57  1    Q.      To the extent Dr. Mega suggests that Cabometyx

02:56:00  2    offered only a difference of degree in comparison to

02:56:05  3    existing therapies, do you agree?

02:56:06  4    A.      No.  I don't.

02:56:07  5    Q.      What are the reasons you do not agree?

02:56:09  6    A.      Well, first off, this is a different drug.  Now, I

02:56:12  7    know all the VEGF inhibitor TKIs vary, but this is the only

02:56:16  8    one that was intentionally selected to be both a MET

02:56:20  9    inhibitor and a VEGF inhibitor.  And the reason for that was

02:56:23 10    the biology of MET, which we went over in the last trial,

02:56:26 11    and the reason why that was important in kidney cancer,

02:56:29 12    particularly kidney cancer that was resistant, where did

02:56:32 13    this study show the benefit first?  In exactly that patient

02:56:35 14    population.

02:56:35 15            And then we studied it in the other population,

02:56:38 16    the patients with the intermediate and poor risk patients

02:56:41 17    that were rapidly progressing on sunitinib in the front line

02:56:45 18    setting, and we demonstrated a superiority there that no

02:56:47 19    other VEGF tyrosine kinase inhibitor had been able to show

02:56:51 20    superiority versus sunitinib, even though others had tried.

02:56:55 21            So the clinical data really spoke to this drug

02:56:58 22    demonstrating unmet needs and also benefits that no other

02:57:02 23    VEGF TKI had shown.

02:57:04 24    Q.      Is there a need for additional kidney cancer

02:57:06 25    therapies today?

George - Direct

02:57:07 1   A.      Absolutely.

02:57:09 2   Q.      Does that change your opinion about whether Cabometyx

02:57:12 3   fulfilled a long felt, unmet need?

02:57:14 4   A.      Absolutely not.

02:57:15 5   Q.      Why not?

02:57:16 6   A.      Well, the truth is that our patients are still dying

02:57:20 7   today and the death rate associated with kidney cancer

02:57:23 8   hasn't gone down.  We've delayed that time, but -- and

02:57:26 9   people are living longer than ever, but they're still dying

02:57:29 10  from this disease.

02:57:30 11          What Cabometyx has done is it's changed the

02:57:32 12  landscape, it's allowed patients to live longer and that

02:57:36 13  matters.  Anybody that's known somebody who has died from

02:57:39 14  metastatic cancer, whether it's kidney cancer or any cancer,

02:57:42 15  knows that prolonging survival matters and it doesn't matter

02:57:46 16  if it's a few months or a year.  That time matters.

02:57:49 17          So having drugs that can do that, that can be a

02:57:51 18  bridge to another therapy, it's hope.  It's what our

02:57:55 19  patients are really after.

02:57:56 20          MS. WIGMORE:  Let's go to PDX-7.8.

02:57:56 21  BY MS. WIGMORE:

02:58:00 22  Q.      Have you considered whether there's a nexus between

02:58:02 23  the asserted claims in this case and the clinical benefits

02:58:06 24  of Cabometyx?

02:58:06 25  A.      I have.

George - Direct

02:58:07  1    Q.     What is your opinion?

02:58:08  2    A.     Well, Cabometyx is what has worked in our clinic.

02:58:12  3    Cabometyx is what I prescribe.  It's what our patients are

02:58:15  4    taking and they're taking it in the context -- not of a

02:58:18  5    clinical trial or controlled environment, but in real life

02:58:21  6    and they're dealing with it with the medications and the

02:58:26  7    concomitant drugs they have to take with the delays in

02:58:28  8    discontinuations they have to go through for other medical

02:58:31  9    issues and the travel or whatever circumstances they're

02:58:34  10   living in.  The drug is stable.  The drug is effective.  The

02:58:37  11   drug is safe.  The fact that we don't have this risk of --

02:58:44  12   you know, of genotoxic impurities.  All of this matters for

02:58:50  13   our patients.

02:58:51  14   Q.     You mentioned genotoxic impurities.  Just briefly

02:58:53  15   remind us what that is.

02:58:54  16   A.     Yeah.  So that refers to chemical degradated products

02:58:59  17   from -- from the compound, in this case Cabometyx, that

02:59:02  18   could be harmful, particularly damaging to DNA.

02:59:05  19   Q.     Are genotoxins the same as side effects?

02:59:08  20   A.     No.  Side effects refer to complications that

02:59:11  21   patients experience from the active pharmaceutical

02:59:15  22   ingredient, in this case Cabometyx.  And typically from

02:59:19  23   effects that are on targets, meaning when we block this VEGF

02:59:23  24   receptor, we're having effects not just on the cancer but in

02:59:26  25   the whole body.  That's why when we block that -- it

959

George - Direct

02:59:28 1    tightens the blood vessels, it's why we get diarrhea or high

02:59:31 2    blood pressure because we're blocking water absorption and

02:59:34 3    things like that.

02:59:35 4    Q.    And is genotoxic -- a genotoxic side effect different

02:59:39 5    from that?

02:59:39 6    A.    Yeah.  So genotoxic side effects are silent, patients

02:59:42 7    don't feel them.  Like they can't tell if something like

02:59:45 8    that is going on, but it could be going in insidiously in

02:59:48 9    their body and in their cells, and it has the risk over time

02:59:51 10   of ultimately causing cancer.

02:59:53 11   Q.    Have genotoxic impurities presented challenges for

02:59:57 12   any other drug products?

02:59:58 13   A.    Yeah, they have.

02:59:59 14   Q.    Can you give us an example?

03:00:01 15   A.    Yeah.  One that I'm aware of is this drug valsartan

03:00:05 16   or Diovan.  It was an antihypertensive drug that we used in

03:00:08 17   clinic and it got pulled because it was associated with --

03:00:11 18   it was found to have genotoxic impurities that were

03:00:14 19   increasing the risk of cancer.

03:00:16 20   Q.    Now what, if any, role does the formulation of

03:00:19 21   Claim 3 of the '349 patent play in the clinical success of

03:00:23 22   Cabometyx?

03:00:24 23   A.    Well, when I treat patients with Cabometyx,

03:00:27 24   I don't -- I don't worry about, you know, what form this is.

03:00:31 25   I know this is coming from -- you know, from Exelixis.  I

George - Direct

03:00:36  1   know what this is.  This is the crystalline form of

03:00:40  2   cabozantinib (L)-malate and that gives me confidence.  I

03:00:43  3   know what I'm prescribing to these patients and I know that

03:00:46  4   it's safe.

03:00:47  5            I know it has side effects and not everyone is

03:00:49  6   going to tolerate it, but I can manage those things.  It's

03:00:52  7   the things that we don't know, the things that we can't

03:00:54  8   measure that worry us, particularly now that we're using a

03:00:57  9   drug in a setting where patients are living potentially for

03:01:00 10   years on this drug.

03:01:01 11   Q.    Now, in the previous trial against MSN concerning the

03:01:06 12   '473 patent, you testified that the cabozantinib compound

03:01:08 13   contributed to the success of Cabometyx.

03:01:10 14            Do you recall that?

03:01:11 15   A.    I do.

03:01:13 16   Q.    Does the fact that the cabozantinib compound impacts

03:01:16 17   clinical success mean -- mean that the other features of

03:01:19 18   Cabometyx do not?

03:01:20 19   A.    Not at all.

03:01:21 20   Q.    Why not?

03:01:22 21   A.    Well, you know, cabozantinib (L)-malate in the

03:01:27 22   crystalline form, I mean that's -- that's the whole

03:01:29 23   molecule.  What we study in the laboratory, what was

03:01:31 24   designed and originally selected for, that -- that's not the

03:01:35 25   drug product that we're ultimately treating patients with.

George - Cross

03:01:38 1    It's Cabometyx.  It's the whole combination that ultimately

03:01:42 2    is playing out in our patients and that's important.

03:01:44 3              I can't distill down the pieces of this and put

03:01:48 4    percentages on what -- you know, how much -- what each is

03:01:51 5    working.  I just need to know that what I'm prescribing for

03:01:54 6    patients is associated with the clinical data that we've

03:01:58 7    studied and that I'm seeing play out on my patients

03:02:01 8    individually.

03:02:03 9              MS. WIGMORE:  Thank you, Dr. George.  I have no

03:02:05 10   further questions.

03:02:05 11             I would move to admit PTX-775, PTX-528, PTX-363,

03:02:13 12   PTX-366, PTX-367 and PTX-470.

03:02:19 13             MR. COOPER:  No objection.

03:02:21 14             THE COURT:  Admitted without objection.

03:02:23 15             (PTX Exhibit Nos. 363, 366, 367, 470, 528, and

03:02:08 16   775, were admitted into evidence.)

03:03:07 17             MR. COOPER:  May I proceed?

03:03:07 18             THE COURT:  Yeah.

03:02:24 19                      CROSS-EXAMINATION

03:02:29 20   BY MR. COOPER:

03:03:08 21   Q.    Good afternoon, Dr. George.  Good to see you again?

03:03:10 22   A.    Good to see you, too.

03:03:11 23   Q.    Now, Doctor George, in forming your opinions for this

03:03:14 24   case, you believed that any drug that extends the lives of

03:03:18 25   patients beyond previously available therapies is meeting a

George - Cross

03:03:23   1   long felt, unmet need; correct?

03:03:25   2   A.      Yes.

03:03:26   3   Q.      And of course you'd agree that there were drugs

03:03:29   4   available that were approved before Cabometyx that extended

03:03:34   5   the lives of patients beyond the available RCC treatments

03:03:39   6   that were then available; correct?

03:03:40   7   A.      Actually that's not true.

03:03:43   8   Q.      Well, let me ask you this:  After Cabometyx was

03:03:45   9   approved, there have been about six new regimens that have

03:03:48  10   extended the lives of RCC patients beyond previously

03:03:52  11   available therapies; correct?

03:03:53  12   A.      That's true.

03:03:54  13   Q.      And there is still an unmet need today to improve RCC

03:03:59  14   treatment on both the front line and subsequent line

03:04:03  15   treatments for RCC; correct?

03:04:04  16   A.      Yes.

03:04:05  17   Q.      All right.  Let's go back to 2009.

03:04:07  18           By 2009, there were eight TKIs that had been

03:04:12  19   approved for cancer treatment other than cabozantinib;

03:04:16  20   correct?

03:04:16  21   A.      Yes.

03:04:17  22   Q.      Those are imatinib; yes?

03:04:19  23   A.      I'm sorry?

03:04:19  24   Q.      Imatinib?

03:04:21  25   A.      No, imatinib wasn't approved in renal cell carcinoma.

George - Cross

| | | |
|---|---|---|
| 03:04:24 1 | Q. | That was -- my question was for cancer? |
| 03:04:26 2 | A. | Oh, for cancer, yes, absolutely.  Sorry. |
| 03:04:28 3 | Q. | Gefitinib; right? |
| 03:04:29 4 | A. | Yes. |
| 03:04:30 5 | Q. | Erlotinib? |
| 03:04:31 6 | A. | Yes. |
| 03:04:32 7 | Q. | Sorafenib? |
| 03:04:33 8 | A. | Yes. |
| 03:04:33 9 | Q. | Sunitinib? |
| 03:04:34 10 | A. | Yes. |
| 03:04:35 11 | Q. | Dasatinib? |
| 03:04:36 12 | A. | Yes. |
| 03:04:36 13 | Q. | Nilotinib? |
| 03:04:37 14 | A. | Yes. |
| 03:04:37 15 | Q. | Pazopanib; correct? |
| 03:04:40 16 | A. | Yes. |

03:04:41 17   Q.    And as a group by 2009, these TKIs had demonstrated

03:04:47 18   clinical efficacy or benefits in several tumor types,

03:04:51 19   including kidney cancer, lung cancer, breast cancer, and

03:04:55 20   chronic leukemia; correct?

03:04:57 21   A.    Yes.

03:04:57 22   Q.    And each of those eight TKIs I just mentioned, except

03:05:04 23   Gefitinib and erlotinib are known to be spectrum selective;

03:05:09 24   correct?

03:05:09 25   A.    That's correct.

George - Cross

| | |
|---|---|
| 03:05:11 1 | Q.     And the term "spectrum selective," that refers to a |
| 03:05:14 2 | drug that simultaneously inhibits multiple kinases that are |
| 03:05:19 3 | implicated in various forms of cancer; correct? |
| 03:05:21 4 | A.     That's correct. |
| 03:05:23 5 | Q.     And then there are also TKIs that were approved after |
| 03:05:28 6 | 2009 to treat various forms of cancer that are spectrum |
| 03:05:32 7 | selective as well; correct? |
| 03:05:34 8 | A.     That's right. |
| 03:05:34 9 | Q.     And a few of those are vandetanib, lenvatinib, and |
| 03:05:39 10 | axitinib are just a few; correct? |
| 03:05:41 11 | A.     Yes. |
| 03:05:41 12 | Q.     And each of the spectrum-selective TKI drugs has its |
| 03:05:47 13 | own unique inhibition profile when it comes to their TKI |
| 03:05:52 14 | targets; correct? |
| 03:05:53 15 |          Except for erlotinib and Gefitinib, of the ones |
| 03:05:57 16 | that I've -- we just talked about; is that true? |
| 03:05:59 17 | A.     Yeah, that's generally true, yes. |
| 03:06:01 18 | Q.     And even though none of them have the exact same TKI |
| 03:06:05 19 | targets, other TKIs have some overlapping targets with |
| 03:06:10 20 | cabozantinib; true? |
| 03:06:11 21 | A.     Yeah.  None of the ones you mentioned block MET. |
| 03:06:16 22 | Q.     Right.  But there are other overlapping TKI targets |
| 03:06:19 23 | that the -- that some of the other TKIs have with |
| 03:06:23 24 | cabozantinib; correct? |
| 03:06:24 25 | A.     That's true. |

George - Cross

03:06:26  1    Q.      Now, one of the TKI targets you mentioned that

03:06:29  2    Cabometyx inhibits is VEGFR; right?

03:06:32  3    A.      Yes.

03:06:33  4    Q.      And both in 2009 and at the time later at Cabometyx's

03:06:38  5    approval, anti-VEGFR treatment was the standard of care for

03:06:43  6    RCC therapy; correct?

03:06:44  7    A.      That's right.

03:06:46  8    Q.      And -- but sunitinib, sorafenib, and pazopanib, those

03:06:50  9    were the first three anti-VEGFR TKIs to be approved for

03:06:55 10    front line RCC treatment; right?

03:06:58 11    A.      Yes.  Sorafenib, actually, after cytokine therapy,

03:07:02 12    but the other two, yes.

03:07:04 13    Q.      And cabozantinib entered the market after those VEGFR

03:07:07 14    inhibitors; correct?

03:07:08 15    A.      That's right.

03:07:09 16    Q.      Cabometyx received an indication for RCC first-line

03:07:13 17    therapy in 2017; true?

03:07:15 18    A.      In 20 -- the first-line treatment --

03:07:18 19    Q.      First line?

03:07:19 20    A.      -- on the -- I think it was 2019.

03:07:21 21    Q.      Oh, okay.  Thank you.

03:07:22 22            So, let's -- looking at about the 2015 to 2017

03:07:27 23    time frame, before and after Cabometyx was first initially

03:07:30 24    approved at all, you prescribed sunitinib to about 40 to

03:07:35 25    50 percent of your RCC patients; correct?

George - Cross

03:07:37 1  A.      Yes.

03:07:38 2  Q.      And in that same time frame, both before and after

03:07:42 3  Cabometyx was approved, you prescribed pazopanib to around

03:07:47 4  30 percent of your RCC patients; true?

03:07:49 5  A.      Roughly, yes.

03:07:51 6  Q.      You showed us the NCCN guidelines, and so I'd like to

03:07:54 7  pull those up at PTX-528.

03:07:58 8           MR. COOPER:  Let's pull up the charts on Pages

03:08:00 9  15 to 16.

03:08:00 10 BY MR. COOPER:

03:08:02 11 Q.      And so, you talked to us about some of the

03:08:07 12 recommended regimens here, do you recall that?

03:08:10 13 A.      I do.  Yes.

03:08:11 14 Q.      And for first-line treatment of RCC, cabozantinib is

03:08:16 15 not the only preferred regimen here; agreed?

03:08:18 16 A.      Agreed.

03:08:18 17 Q.      For instance, axitinib and pembrolizumab combo

03:08:24 18 therapy is one of the preferred regimens; right?

03:08:27 19 A.      Something like that, yes.

03:08:28 20 Q.      Thank you.

03:08:28 21           And you prescribed that combo therapy as

03:08:32 22 first-line therapy for both your favorable risk and your

03:08:35 23 poor or intermediate risk patients; correct?

03:08:37 24 A.      I have.  Yes.

03:08:38 25 Q.      And same thing with the lenvatinib and pembrolizumab

George - Cross

03:08:42 1    combination therapy; correct?

03:08:44 2    A.    Yes, it's -- it's pembrolizumab.

03:08:47 3    Q.    Thank you for that.

03:08:48 4         But what you also did is you highlighted, in the

03:08:50 5    top -- the top box there, cabozantinib, and you pointed out

03:08:54 6    that that's the only monotherapy that is a preferred -- down

03:08:58 7    in the intermediate box is what we're highlighting.  There,

03:09:03 8    cabozantinib by itself is the only monotherapy that is

03:09:07 9    available that is in the preferred regimens, you remember

03:09:10 10   talking about that?

03:09:11 11   A.    I'm with you, Bryce.

03:09:12 12   Q.    Thank you.  Thank you.

03:09:13 13        But for most of your RCC patients, you don't

03:09:17 14   prescribe cabozantinib as monotherapy for first-line

03:09:21 15   treatment; correct?

03:09:22 16   A.    Yeah, that -- that's really for patients who are not

03:09:25 17   eligible or can't tolerate immunotherapy.  We have patients

03:09:30 18   with severe autoimmune diseases and whatnot.  And

03:09:32 19   cabozantinib there fills a really important unmet need.

03:09:35 20   Q.    Sure.  But I'm saying that you've got a list of

03:09:37 21   preferred regimens, and for most of your patients, you don't

03:09:40 22   prescribe cabozantinib as monotherapy for first-line

03:09:43 23   treatment; is that correct?

03:09:44 24   A.    That's correct.

03:09:45 25   Q.    And then looking at the other recommend regimens

George - Cross

03:09:48  1   there are drugs like pazopanib and sunitinib, those are

03:09:51  2   other TKIs that are listed for first-line treatment;

03:09:54  3   correct?

03:09:54  4   A.     Yes.

03:10:00  5   Q.     And then in the subsequent line therapy chart, you

03:10:05  6   see that cabozantinib is one of the recommended regimens for

03:10:10  7   prior IO therapy patients; correct?

03:10:13  8   A.     Yes.

03:10:13  9   Q.     And -- but there are three other TKIs in there -- or

03:10:17 10   three other regimens in there as well; correct?

03:10:19 11   A.     Yes.

03:10:21 12   Q.     And for patients in that category, you prescribe each

03:10:26 13   of those regimens to your patients in that category;

03:10:28 14   correct?

03:10:29 15   A.     Yes.

03:10:31 16   Q.     Okay.  You mentioned the CABOSUN trial, and that's

03:10:34 17   the trial that compared cabozantinib against sunitinib in

03:10:39 18   first line -- for first-line RCC treatment; right?

03:10:42 19   A.     That's correct.

03:10:43 20   Q.     Now -- and you were involved in that trial right?

03:10:45 21   A.     Yes, yes.

03:10:47 22   Q.     There's never been a head-to-head study comparing

03:10:50 23   overall survival or progression-free survival for

03:10:55 24   cabozantinib versus any other TKI drug other than sunitinib;

03:11:00 25   correct?

George - Cross

A.      That's true.

Q.      And so you aren't offering an opinion that Cabometyx

has been shown to be more effective than pazopanib, for

instance, for first-line RCC treatment; right?

A.      Yeah, I -- you know, I would just say that, you know,

on -- on my own experience, and based on the fact that

pazopanib, or what we call pazopanib, had been studied

head-to-head against sunitinib in a large Phase 3 study, and

demonstrated no difference between those two agents that --

like we do often in cancer.

        And we have to pick a treatment without Level 1

head-to-head evidence that extrapolate -- extrapolate from

that data to say that cabozantinib was superior to sunitinib

in the setting.  And there's no other agent that's superior

to sunitinib.  So it's my treatment of choice for those

patients in the front-line setting that can't receive

immunotherapy.

Q.      And, Doctor, I want to ask you about the opinions

you're offering in this case, so if you could listen

carefully?

A.      Okay.

Q.      You're not offering an opinion that Cabometyx has

been shown to be more effective than pazopanib as first-line

therapy for RCC; is that fair?

A.      No, I'm not.

George - Cross

03:12:10 1    Q.    And I don't think we mentioned, but the CABOSUN trial

03:12:14 2    was performed only with the intermediate or poor risk

03:12:18 3    patients population; correct?

03:12:20 4    A.    That's correct.

03:12:21 5    Q.    So there's actually never been any head-to-head study

03:12:24 6    between Cabometyx and another TKI for RCC patients with

03:12:28 7    favorable risk; correct?

03:12:30 8    A.    The Cabometyx and nivolumab versus as sunitinib --

03:12:36 9    Q.    I said monotherapy.

03:12:37 10   A.    Oh, monotherapy.  No, you're correct.

03:12:40 11   Q.    But getting to the point -- your point, that

03:12:42 12   Cabometyx has been now approved --

03:12:44 13           MR. COOPER:  You can take that down.  Thank you.

03:12:44 14   BY MR. COOPER:

03:12:45 15   Q.    -- been approved for combination therapy with

03:12:48 16   nivolumab as a first-line treatment for RCC; correct?

03:12:51 17   A.    That's correct.

03:12:52 18   Q.    And you mentioned the CheckMate trial, we put that up

03:12:56 19   real quick.  And that compared Cabometyx plus nivolumab

03:13:01 20   versus sunitinib; correct?

03:13:03 21   A.    That's correct.

03:13:04 22   Q.    Now, the combination therapy aspect of that is

03:13:07 23   important; right?

03:13:08 24   A.    Absolutely.

03:13:09 25   Q.    Right.  Because the IO drug that's part of that

George - Cross

03:13:11  1    combination therapy has been instrumental in improving

03:13:17  2    patient outcomes; correct?

03:13:19  3    A.      Yes.

03:13:20  4    Q.      There's no study testing the TKIs sunitinib or

03:13:24  5    pazopanib in combination with nivolumab as first-line

03:13:29  6    therapy to treat RCC; yes or no?

03:13:31  7    A.      That's because they were not tolerated.

03:13:33  8    Q.      Okay.

03:13:34  9            Is my question true?

03:13:35 10    A.      Yes, it's true.

03:13:36 11    Q.      Okay.  So the CheckMate trial -- and, also, the

03:13:39 12    CheckMate trial wasn't the first study that compared a TKI

03:13:43 13    and an IO combo therapy against just a TKI monotherapy;

03:13:48 14    right?

03:13:48 15    A.      That's true.

03:13:49 16    Q.      Right.  So there have been pembrolizumab plus

03:13:54 17    axitinib that had also been shown to be more effective than

03:13:57 18    sunitinib alone; right?

03:13:58 19    A.      Yes.

03:13:59 20    Q.      And avelumab and axitinib, that had also been shown

03:14:03 21    to be more effective than sunitinib alone; correct?

03:14:06 22    A.      Yes.

03:14:07 23    Q.      Okay.  So, this wasn't particularly unusual when you

03:14:11 24    take into account there were two others; right?

03:14:13 25    A.      It has differences in outcomes that we can go into if

George - Cross

03:14:17  1   you like.

03:14:18  2   Q.      Okay.  Now, you also talked about the METEOR trial,

03:14:25  3   you recall that?

03:14:25  4   A.      Yes.

03:14:26  5   Q.      You were involved in that trial, the working of that

03:14:29  6   trial as well; correct?

03:14:30  7   A.      That's true, yes.

03:14:31  8   Q.      And that one was where cabozantinib was tested

03:14:33  9   against everolimus -- you know, I did better in these in

03:14:37 10   your deposition -- cabozantinib versus everolimus?

03:14:41 11   A.      Yes.

03:14:41 12   Q.      And that was for second-line treatment; correct?

03:14:43 13   A.      It was in subsequent --

03:14:45 14   Q.      Subsequent line?

03:14:46 15   A.      -- yeah, so one or more prior TKIs.

03:14:48 16   Q.      And your -- other than with everolimus, there's never

03:14:53 17   been any head-to-head trials between Cabometyx and any other

03:14:56 18   TKI as subsequent-line RCC treatment; correct?

03:14:59 19             THE WITNESS:  That's true.

03:15:01 20   Q.      And you agree that other TKIs, like sunitinib and

03:15:05 21   sorafenib, have also been shown to successfully treat RCC

03:15:09 22   patients; correct?

03:15:10 23   A.      Only in the front-line setting.

03:15:12 24   Q.      All right.  And you also showed us real quick the

03:15:16 25   CONTACT-03 trial.  Do you recall that?

George - Cross

03:15:18  1    A.      I do.

03:15:19  2    Q.      And that was the trial where the cabozantinib combo

03:15:25  3    therapy performed about as well as the cabozantinib

03:15:29  4    monotherapy; right?

03:15:30  5    A.      Yes.

03:15:44  6    Q.      Doctor, one of your opinions on objective indicia is

03:15:48  7    that Cabometyx is "a clinical success."  That's what you've

03:15:51  8    termed it; right?

03:15:52  9    A.      Yes.

03:15:53 10    Q.      And you formed an opinion on this subject because you

03:15:55 11    received an instruction that quote/unquote clinical success

03:16:00 12    can serve as objective evidence of non-obviousness of a

03:16:03 13    patent.  That's why you did that; right?

03:16:04 14    A.      Well, I was asked to speak on the clinical success of

03:16:08 15    this drug.  I --

03:16:09 16    Q.      Okay.

03:16:09 17    A.      -- I didn't make it up.  It's real.

03:16:11 18    Q.      Right.  What I'm saying is that the reason you're

03:16:13 19    talking about it today is because you were instructed that

03:16:15 20    is an actual objective indicia.

03:16:17 21    A.      Yes.

03:16:17 22    Q.      Okay.  Now, cabozantinib does not improve clinical

03:16:21 23    outcomes for all patients it's prescribed to; correct?

03:16:24 24    A.      Absolutely.  No drug does.

03:16:26 25    Q.      And we can agree that RCC patients develop a

George - Cross

03:16:31  1  resistance to cabozantinib; correct?

03:16:33  2  A.     Most do.

03:16:35  3  Q.     Yeah.  And they -- just like other TKIs; right?

03:16:37  4  A.     Absolutely, yeah.

03:16:38  5  Q.     Some patients cannot tolerate Cabometyx; is that

03:16:41  6  true?

03:16:41  7  A.     That's true.

03:16:42  8  Q.     And Cabometyx has a similar toxicity profile to other

03:16:46  9  TKIs; correct?

03:16:47 10  A.     Yes.

03:16:48 11  Q.     You -- very briefly, you mentioned that Cabometyx had

03:16:53 12  received FDA -- had been designated as a breakthrough

03:16:58 13  therapy by FDA; is that right?

03:17:00 14  A.     Yes.

03:17:00 15  Q.     And that's a regulatory designation that the FDA

03:17:05 16  gives to certain drugs in development; is that true?

03:17:08 17  A.     That's true.

03:17:09 18  Q.     And but the definition for giving that breakthrough

03:17:14 19  therapy designation is that it's for a drug that treats a

03:17:17 20  serious or life-threatening condition; correct?

03:17:19 21  A.     That's right.

03:17:20 22  Q.     And we can agree that cancer is a serious or

03:17:22 23  life-threatening condition; right?

03:17:24 24  A.     Yes, but not all cancer therapies get breakthrough.

03:17:27 25  Q.     I understand that, but that's -- that then allows

George - Cross

03:17:31  1    accelerated review by the FDA of the drug; correct?

03:17:34  2    A.    Yes.

03:17:35  3    Q.    Okay.  You're -- shifting to just two questions

03:17:42  4    about:  You're familiar with MSN's expert, Dr. Mega;

03:17:46  5    correct?

03:17:46  6    A.    Yes.

03:17:46  7    Q.    You consider him a respected researcher in the

03:17:48  8    oncology field as well; yes?

03:17:50  9    A.    I do.

03:17:51 10    Q.    You mentioned at the end of your testimony a few

03:17:56 11    opinions about genotoxicity.  Do you recall that?

03:17:59 12    A.    I do.

03:18:00 13    Q.    You agree that in formulating a drug product, a

03:18:03 14    research team is motivated to avoid or minimize genotoxic

03:18:08 15    impurities as much as possible; correct?

03:18:10 16    A.    Yes.

03:18:11 17    Q.    And genotoxic impurities can, as I think you said,

03:18:13 18    increase the chances of lifetime risks of secondary cancer;

03:18:17 19    correct?

03:18:17 20    A.    That's right.

03:18:18 21    Q.    And regulatory agencies, I think you also said, such

03:18:21 22    as the FDA, provide guidelines for limits of genotoxic

03:18:26 23    impurities in drug substances and products; right?

03:18:29 24    A.    Yes.

03:18:29 25    Q.    And a research team who's developing a drug, they're

| | | |
|---|---|---|
| 03:18:32 | 1 | motivated to prepare a drug product under those FDA limits |
| 03:18:36 | 2 | when possible; correct? |
| 03:18:37 | 3 | A.    Sure. |
| 03:18:38 | 4 | MR. COOPER:  No further questions.  Thank you. |
| 03:18:40 | 5 | MS. WIGMORE:  No redirect, Your Honor. |
| 03:18:41 | 6 | THE COURT:  All right.  Dr. George, thank you. |
| 03:18:43 | 7 | Watch your step stepping down. |
| 03:18:45 | 8 | All right.  So why don't we take the break until |
| 03:18:50 | 9 | 25 minutes of 4:00. |
| 03:18:51 | 10 | All right? |
| 03:18:53 | 11 | DEPUTY CLERK:  All rise. |
| 03:18:56 | 12 | (Recess was taken.) |
| 03:34:02 | 13 | DEPUTY CLERK:  All rise. |
| 03:34:14 | 14 | THE COURT:  All right.  Let's be seated and -- |
| 03:34:17 | 15 | MS. PIROZZOLO:  Plaintiffs call Michael Tate. |
| 03:34:18 | 16 | THE COURT:  Okay.  Tate. |
| 03:34:30 | 17 | DEPUTY CLERK:  Please state and spell your full |
| 03:34:32 | 18 | name for the record. |
| 03:34:32 | 19 | THE WITNESS:  It's Michael, M-I-C-H-A-E-L, Tate, |
| 03:34:36 | 20 | T-A-T-E. |
| 03:34:37 | 21 | MICHAEL TATE, the witness herein, after having |
| 03:34:37 | 22 | been duly affirmed under oath, was examined and testified as |
| 03:34:37 | 23 | follows: |
| 03:34:50 | 24 | DIRECT EXAMINATION |
| 03:34:50 | 25 | BY MS. PIROZZOLO: |

Tate - Direct

03:34:52 1   Q.    Good afternoon, could you please introduce yourself?

03:34:54 2   A.    Good afternoon my name is Mike Tate.

03:34:57 3   Q.    Mr. Tate, have you been retained by Exelixis as an

03:35:01 4   expert in this case?

03:35:02 5   A.    I have, yes.

03:35:03 6   Q.    What issues have you been asked to address?

03:35:05 7   A.    So, I'm going to discuss the commercial success of

03:35:08 8   the cabozantinib products and in particular Cabometyx.

03:35:12 9          MS. PIROZZOLO:  Let's put Plaintiff's

03:35:13 10  Demonstrative Exhibit 8 on the screen and go to Slide 2.

03:35:13 11  BY MS. PIROZZOLO:

03:35:20 12  Q.    What is your educational background?

03:35:22 13  A.    So I about have a BBA in finance.  That is a bachelor

03:35:26 14  of business administration degree from the University of

03:35:28 15  Houston.  And then I entered -- upon graduating from U of H,

03:35:32 16  I entered the Krannert School of Management at Purdue

03:35:36 17  University where I received a master of science in

03:35:39 18  industrial administration degree which is similar to an MBA.

03:35:42 19  Q.    Where do you work?

03:35:43 20  A.    I am a vice president in the intellectual property

03:35:48 21  practice of Charles River Associates.  Charles River

03:35:51 22  Associates is an economic business consulting firm.

03:35:54 23  Q.    And what is the nature of your work at Charles River

03:36:00 24  Associates?

03:36:00 25  A.    So most of what I do involves the preparation of

Tate - Direct

03:36:03  1    financial and economic analyses for the purpose of

03:36:05  2    determining damages or assessing commercial success in

03:36:09  3    patent infringement cases.

03:36:10  4    Q.     Okay.

03:36:11  5           MS. PIROZZOLO:  Let's put Plaintiff's Exhibit

03:36:13  6    778 on the screen, and that's Tab 1 in your binder.

03:36:17  7    Q.     Could you identify Exhibit 778?

03:36:20  8    A.     Sure.  This is my current CV.

03:36:23  9    Q.     Does this exhibit provide an accurate summary of your

03:36:27 10    education and professional experience?

03:36:31 11    A.     It does, yes.

03:36:33 12           MS. PIROZZOLO:  Your Honor, Exelixis offers

03:36:34 13    Mr. Tate as an expert in the field of economic analysis as

03:36:39 14    it pertains to commercial success.

03:36:42 15           MS. GRDEN:  No objection.

03:36:42 16           THE COURT:  All right.  You may proceed.

03:36:44 17    BY MS. PIROZZOLO:

03:36:46 18    Q.     Did you focus on any particular product in your

03:36:50 19    analysis of commercial success?

03:36:51 20    A.     So I looked at both products, Cometriq and Cabometyx,

03:36:54 21    but for purposes of today, I'm going to focus on Cabometyx,

03:36:57 22    which represents about 95 percent of the revenue that

03:37:01 23    Exelixis has generated from the sale of the cabozantinib

03:37:04 24    products.

03:37:07 25    Q.     Do the Cabometyx tablets practice each of the four

Tate - Direct

1  asserted patents?

2  A.    That's my understanding.  Yes.

3  Q.    At a high level what did you conclude with regard to

4  commercial success?

5  A.    So based on the analyses that I did, I determined

6  that the Cabometyx product was a commercial success.

7        MS. PIROZZOLO:  Let's pull up Slide 3,

8  Plaintiff's Demonstrative 8.3.

9  BY MS. PIROZZOLO:

10  Q.    Could you explain the factors that you considered in

11  your analysis?

12  A.    So, I did a number of different analyses.  First, I

13  determined the number of patients treated with the

14  cabozantinib products.  Then I identified and analyzed the

15  relevant markets for Cabometyx.  And then within each of

16  those markets, I looked at various measures of market share,

17  and then lastly I determined the amount of revenue that

18  Exelixis generated from the sale of the product in the U.S.

19  marketplace.

20        MS. PIROZZOLO:  Let's turn to Plaintiff's

21  Exhibit 824 which is Tab 2 in your binder.

22  BY MS. PIROZZOLO:

23  Q.    Could you describe what Plaintiff's Exhibit 824

24  shows?

25  A.    Sure.  So, this is an internal Exelixis business

Tate - Direct

03:38:16  1    record.  And this shows the cumulative number of patients

03:38:19  2    treated by quarter with the cabozantinib product.  And if I

03:38:24  3    could focus everyone on the last bar on the right-hand side,

03:38:28  4    that represents the number of patients treated in total as

03:38:33  5    of about the end of April 2023.  And you can see at the very

03:38:37  6    top of the bar, there were approximately 55,000 patients

03:38:41  7    treated with the cabozantinib products over the course of

03:38:44  8    the products' life cycle.

03:38:46  9    Q.    Now, one of the indications for Cabometyx is renal

03:38:54 10    cell carcinoma; is that right?

03:38:55 11    A.    That's correct.  Yes.

03:38:57 12    Q.    What percentage of Cabometyx prescriptions are for

03:39:01 13    renal cell carcinoma?

03:39:02 14    A.    So depending on the time period, it varies a bit, but

03:39:07 15    I think greater than 92 or 93 percent of the patients of the

03:39:11 16    usage is in the RCC segment of the marketplace.  So that's

03:39:15 17    the largest segment of use.

03:39:17 18          MS. PIROZZOLO:  Let's put Plaintiff's

03:39:20 19    Exhibit 823 on the screen, which is Tab 4 in your binder,

03:39:25 20    and direct your attention to the second page of the exhibit

03:39:29 21    on the right-hand side.

03:39:31 22          THE WITNESS:  Okay.

03:39:31 23    BY MS. PIROZZOLO:

03:39:31 24    Q.    What does this page show?

03:39:32 25    A.    So, this again, is an internal Exelixis business

981

Tate - Direct

03:39:36  1    record, and this shows the TRX share of a market called

03:39:44  2    CISVL.

03:39:44  3              And the CISVL is the acronym, Your Honor, for

03:39:48  4    the products that you see listed in the key.  Each one of

03:39:52  5    those products is in this particular marketplace.  And those

03:39:55  6    products are in this marketplace because they are all TKIs

03:40:00  7    or tyrosine kinase inhibitors.  And so this is one way that

03:40:04  8    Exelixis monitors the market for Cabometyx and the

03:40:08  9    performance of Cabometyx.

03:40:09 10    Q.    Okay.  And does this graph pertain to certain

03:40:13 11    indications for Cabometyx?

03:40:14 12    A.    Yes.  My understanding is this relates to the RCC

03:40:18 13    indication in the U.S. marketplace.

03:40:22 14    Q.    What did you learn about the market share of

03:40:24 15    Cabometyx based on the data in exhibit -- Plaintiff's

03:40:28 16    Exhibit 823?

03:40:28 17    A.    So, if we could focus on the bottom of the chart,

03:40:33 18    you'll see the blue shaded areas.  Each one of these bars is

03:40:37 19    the quarterly -- represents quarterly market shares.  And

03:40:40 20    you can see that the blue shaded area, that's Cabometyx.

03:40:43 21    And we -- if we look at the left-hand bar -- the very

03:40:47 22    left-hand bar, you see in Quarter 3 of 2020, Cabometyx's

03:40:51 23    share in this particular market segment was 26 percent.

03:40:55 24              Now, that share grew a quarter -- over the

03:40:58 25    quarter until we get out into the 2022 time frame and it

Tate - Direct

03:41:02 1    maintained itself at about 39 percent, beginning of the

03:41:07 2    fourth quarter of 2022 into the first two quarters of 2023.

03:41:12 3              And as we can see, in this particular segment of

03:41:15 4    the market, Cabometyx has achieved market leadership

03:41:19 5    position in terms of TRxs and a TRx is the total number of

03:41:24 6    prescriptions written in the marketplace.  So Cabometyx has

03:41:26 7    a 39 percent share of that marketplace relative to the other

03:41:29 8    TKIs in the market.

03:41:30 9    Q.    Was Cabometyx the first tyrosine kinase inhibitor

03:41:34 10   approved for the treatment of renal cell carcinoma?

03:41:38 11   A.    It was not.  It was the third or fourth product which

03:41:42 12   received approval in that marketplace.  So it was able to

03:41:45 13   achieve these shares in spite of competition from products

03:41:48 14   that existed in the marketplace prior to its launch in 2016.

03:41:52 15   Q.    How, if at all, does that impact your analysis of

03:41:55 16   commercial success?

03:41:56 17   A.    Well, it shows me -- it's an indicator of commercial

03:41:59 18   success given that Cabometyx was able to grow and then

03:42:02 19   maintain its share and become the market leader.

03:42:06 20   Q.    Now, we've been discussing a comparison of Cabometyx

03:42:10 21   to other tyrosine kinase inhibitors.  Did you also look at

03:42:15 22   Cabometyx's share of the broader market for renal cell

03:42:19 23   carcinoma treatments?

03:42:21 24   A.    I did.  Yes.

03:42:22 25              MS. PIROZZOLO:  Let's put up Plaintiff's

Tate - Direct

03:42:23 1  Demonstrative 8.4.

03:42:23 2  BY MS. PIROZZOLO:

03:42:26 3  Q.      What does this chart show?

03:42:29 4  A.      So this charts reflects the overall RCC market and

03:42:33 5  it's based on what's called new patient share.  And I've

03:42:37 6  pictured on the chart at the top, I think, nine products in

03:42:41 7  the marketplace, but there are, depending on the time frame,

03:42:45 8  13 to 16 total products in the marketplace.  But I put the

03:42:48 9  top nine performers on the chart that you see here.

03:42:51 10         And so, this reflects the market shares of these

03:42:56 11 products from Quarter 4 of 2019 through Quarter 4, 2022.

03:43:02 12 And Cabometyx is found in two places on this chart, it's

03:43:06 13 reflected in two places.

03:43:07 14         One is the solid red line, which is about -- if

03:43:10 15 you look at about halfway down the chart, you see the solid

03:43:13 16 red line.  That's the share for Cabometyx in the overall RCC

03:43:16 17 market when used as a monotherapy, so when used alone.  And

03:43:20 18 you can see that during the first half of the period

03:43:23 19 reflected here, the share varied between 10 and 15 percent.

03:43:27 20 And then that share grew in the latter half of the period to

03:43:31 21 the 15 to 20 percent range.

03:43:34 22         Now, the second place that we need to focus on

03:43:37 23 is the dashed red line, which is toward the bottom of the

03:43:41 24 chart.  That is the market share Cabometyx used in

03:43:46 25 combination with Opdivo, that's the combination product.  As

03:43:51  1  you can see in the first half of the period, the share

03:43:54  2  varied between 1 and 4 percent and then it increased to the

03:44:00  3  5 to 8 percent range in the latter half of the chart.

03:44:04  4           Now, Cabometyx used a monotherapy, you can see

03:44:07  5  ranked second or third in the marketplace, depending on the

03:44:10  6  quarter that we're looking at.  But if you add the two

03:44:14  7  usages together, the monotherapy with the combination

03:44:17  8  product, you would find that in the latter period, in the

03:44:21  9  2022 period, Cabometyx became the market leader.

03:44:25 10           MS. PIROZZOLO:  Now, let's put up Plaintiff's

03:44:27 11  Demonstrative Exhibit 8.5.

03:44:27 12  BY MS. PIROZZOLO:

03:44:30 13  Q.    Could you explain what this chart shows?

03:44:32 14  A.    Sure.  So this is a similar chart and it is -- except

03:44:38 15  it's not the overall market.  Now, we're looking at the

03:44:40 16  second line segment of the market and we heard Dr. George

03:44:43 17  explain what -- what second-line therapy meant during his

03:44:46 18  testimony.  But here, again, we focus on two lines.  One is

03:44:52 19  the very top line that is the solid red line, that's

03:44:56 20  Cabometyx used as a monotherapy.  And you can see here that

03:44:59 21  the share varied depending on the quarter between 20 percent

03:45:03 22  and 35 percent.  But Cabometyx was the clear market leader,

03:45:07 23  even if we only look at the monotherapy alone.

03:45:11 24           But let's also focus then on the -- on the

03:45:15 25  bottom of the chart where the dashed red line is.  That,

Tate - Direct

03:45:19  1   again, reflects Cabometyx used in combination with Opdivo.

03:45:23  2   And there we can see the share varied depending on the

03:45:26  3   quarter between 2 and 5 or 6 percent.  And so, in the

03:45:30  4   second-line therapy, Cabometyx was the clear market leader

03:45:35  5   throughout the time frame that we're looking at here.

03:45:40  6   Q.      Now, did you also look at the revenue for Cabometyx?

03:45:43  7   A.      I did.  Yes.

03:45:45  8           MS. PIROZZOLO:  Okay.  Let's put Plaintiff's

03:45:47  9   Demonstrative Exhibit 8.6 up.

03:45:47 10   BY MS. PIROZZOLO:

03:45:51 11   Q.      Can you describe what is shown here?

03:45:53 12   A.      Sure.  So, this is a chart that reflects the annual

03:45:58 13   net product revenue for the Cabometyx product sold in the

03:46:02 14   U.S.  We start in 2016, which was the launch year, and we

03:46:09 15   see that year over year there was growth in net revenue in

03:46:14 16   the U.S. marketplace.  And we get to 2022 and we see

03:46:18 17   approximately $1.4 billion of revenue for 2022.  So, pretty

03:46:24 18   significant growth between the launch in 2016 and -- and the

03:46:28 19   most recent four-year data that we had in 2022.

03:46:32 20           Now, in total, for this time frame, there was

03:46:36 21   $4.9 billion of revenue generated in the U.S. market by

03:46:41 22   Exelixis from the sale of Cabometyx.

03:46:45 23   Q.      What sources did you use to prepare the summary of

03:46:47 24   revenue on PDX-8.6?

03:46:51 25   A.      Yeah.  So this -- this source here is PTX-802, which

03:46:56 1   is the profit and loss statement for Cabometyx.  It's

03:47:01 2   Exelixis' internal accounting document.

03:47:04 3   Q.    Mr. Tate, do you have an understanding of whether

03:47:06 4   there is a nexus between the commercial success of Cabometyx

03:47:09 5   and the asserted claims?

03:47:10 6   A.    I do.  Yes.

03:47:12 7   Q.    In summary, what did you -- and what is that

03:47:15 8   understanding?

03:47:16 9   A.    So, my understanding, the way I look at nexus in this

03:47:20 10  case is I'm relying on the technical experts for the

03:47:22 11  clinical benefits that -- the technical benefits that the

03:47:26 12  product provides.  It's those benefits that contribute to

03:47:30 13  the clinical success that you heard Dr. George speak of.

03:47:34 14  The clinical benefits then drive Dr. George, or oncologists

03:47:37 15  like him, to prescribe the product to the relevant patient

03:47:40 16  group.  Not all patients, but the relevant patient group.

03:47:43 17  Those prescriptions when filled, then generate the revenues

03:47:46 18  and market shares that you saw on the slides that I

03:47:49 19  presented here today.  And so, there's a direct link between

03:47:53 20  the technical aspects, the claims of the patent, and the

03:47:55 21  revenue that is generated.

03:47:59 22            MS. PIROZZOLO:  Thank you, Mr. Tate.

03:48:01 23            Your Honor, we would like to move the following

03:48:05 24  exhibits used with Mr. Tate into evidence:  Plaintiff's

03:48:09 25  Exhibit 778, Plaintiff's Exhibit 824, Plaintiff's

Tate - Cross

03:48:14 1   Exhibit 823, Plaintiff's Exhibit 791, Plaintiff's Exhibit

03:48:21 2   853, and Plaintiff's Exhibit 802.

03:48:23 3              MS. GRDEN:  No objection.

03:48:24 4              THE COURT:  All right.  Admitted without

03:48:26 5   objection.

03:48:10 6              (PTX Exhibit Nos. 778, 791, 802, 823, 824, 853,

03:48:22 7   were admitted into evidence.)

03:48:28 8              THE COURT:  Thank you.

03:48:29 9              MS. GRDEN:  We'll pass up some cross binders,

03:48:42 10  Your Honor, with your permission.

03:48:45 11             THE COURT:  Yeah.

03:49:05 12                      CROSS-EXAMINATION

03:49:07 13  BY MS. GRDEN:

03:49:07 14  Q.     Good afternoon, Mr. Tate.  Nice to see you again.

03:49:12 15  A.     Good afternoon.

03:49:14 16  Q.     Mr. Tate, the last question that your counsel asked

03:49:16 17  you was whether or not there is a nexus to the claimed

03:49:19 18  invention of the patents in this case; right?

03:49:20 19  A.     That's correct.

03:49:21 20  Q.     You opine that there is; yes?

03:49:22 21  A.     That's correct.

03:49:24 22  Q.     You've opined on the commercial success of Cabometyx

03:49:27 23  before this case; right?

03:49:28 24  A.     I did.  Yes.

03:49:29 25  Q.     That was the case that we have been calling

Tate - Cross

03:49:32  1    Cabozantinib 1 case?

03:49:33  2    A.    And MSN 1 or -- yes.  That's correct.

03:49:34  3    Q.    And one of the patents at issue there was the

03:49:36  4    '473 patent that we've also heard a bit about during this

03:49:39  5    case?

03:49:39  6    A.    Correct.  It was.

03:49:40  7    Q.    And in that case you said there was a nexus between

03:49:43  8    the '473 patent and Cabometyx; correct?

03:49:45  9    A.    I said in part, yes.  That part of the success was

03:49:48 10    attributable to that patent, yes.

03:49:50 11    Q.    Well, in fact, you concluded that the -- that

03:49:53 12    Cabometyx was a commercial success and that the success was

03:49:56 13    attributable to Claim 5 of the '473 patent; correct?

03:50:00 14    A.    That's correct.

03:50:01 15    Q.    And you went a little bit further.  Isn't it right

03:50:03 16    that you testified in Court there was a direct roadmap from

03:50:07 17    Claim 5 of the '473 patent to revenue generation for

03:50:11 18    Cabometyx; correct?

03:50:12 19    A.    That's correct.  All of these patents in combination

03:50:14 20    work together.  So, yes.  That is correct.

03:50:18 21                MS. GRDEN:  Thank you.

03:50:19 22                No further questions.

03:50:19 23                THE COURT:  All right.  Mr. Tate, you can step

03:50:23 24    down.

03:50:24 25                Right?  There's nothing more?

Mega - Direct

03:50:25  1          MS. PIROZZOLO:  Plaintiff's rest, Your Honor.

03:50:27  2          THE COURT:  Okay.  So, watch your step.

03:50:29  3          THE WITNESS:  Thank you.

03:50:30  4          THE COURT:  All right.  Defendant?

03:50:39  5          MR. COOPER:  MSN calls Dr. Anthony Mega.

03:50:52  6          DEPUTY CLERK:  Please state and spell your full

03:51:07  7    name for the record.

03:51:07  8          THE WITNESS:  Yes.  Anthony Emmanuel Mega.

03:51:12  9    A-N-T-H-O-N-Y, E-M-M-A-N-U-E-L, M-E-G-A.

03:51:12 10          ANTHONY MEGA, the witness herein, after having

03:51:12 11    been duly sworn under oath, was examined and testified as

03:51:12 12    follows:

03:51:12 13          THE WITNESS:  I do.

03:51:45 14          MR. COOPER:  May it please the Court?

03:51:46 15                     DIRECT EXAMINATION

03:51:46 16    BY MR. COOPER:

03:51:47 17    Q.     Good morning.  Could you please introduce yourself to

03:51:49 18    the Court?

03:51:49 19    A.     Yes.  I'm Anthony Mega, M.D.

03:51:53 20    Q.     Dr. Mega, have you prepared slides to assist in your

03:51:56 21    testimony today?

03:51:56 22    A.     Yes, I did.

03:51:57 23    Q.     For the record, those slides are on the screen marked

03:52:01 24    in the bottom right-hand corner as DDX Mega, and then the

03:52:04 25    slide number.

03:52:05  1            MR. COOPER:  Could we please pull up DTX-536,

03:52:10  2     and call out the second page.

03:52:10  3     BY MR. COOPER:

03:52:11  4     Q.      Dr. Mega, could you please identify this exhibit?

03:52:14  5     A.      Yes.  This is my curriculum vitae dated June 2023.

03:52:18  6     Q.      Does it accurately reflect your employment

03:52:21  7     credentials and education?

03:52:22  8     A.      Yes, it does.

03:52:23  9            MR. COOPER:  Can we turn to Slide DDX 2.

03:52:26 10     BY MR. COOPER:

03:52:26 11     Q.      Dr. Mega, are you a board certified physician?

03:52:28 12     A.      Yes.  I am board certified in medical oncology.

03:52:32 13     Q.      How long have you been practicing in the field of

03:52:34 14     medical oncology?

03:52:35 15     A.      Nearly 30 years.

03:52:38 16     Q.      Can you please briefly describe your current

03:52:40 17     employment?

03:52:40 18     A.      I'm a associate professor of medicine at Brown

03:52:46 19     University.  My clinical practice is via the Lifespan Cancer

03:52:53 20     Institute.  I'm employed by Brown Physicians, Incorporated,

03:52:56 21     as part of that practice.  So I'm medical director of

03:53:02 22     genitourinary oncology within that group and I direct the

03:53:06 23     multidisciplinary clinics in genitourinary oncology.  I'm a

03:53:11 24     staff oncologist practicing at the Lifespan Cancer

03:53:15 25     Institute.

Mega - Direct

03:53:15  1    Q.    So as part of your work, do you treat and -- see and

03:53:19  2    treat cancer patients?

03:53:20  3    A.    Yes, I do.

03:53:20  4    Q.    Have you published any articles over the course of

03:53:23  5    your career?

03:53:24  6    A.    Yes, I have.  I've published over 50 peer-reviewed

03:53:29  7    articles and over 20 abstracts.

03:53:33  8    Q.    Approximately how many times have you given testimony

03:53:35  9    as an expert in the field of medical oncology?

03:53:38 10    A.    I would say approximately 20 times.

03:53:41 11              MR. COOPER:  Your Honor, defendants proffer

03:53:42 12    Dr. Anthony Mega as an expert in the field of medical

03:53:45 13    oncology.

03:53:47 14              MS. WIGMORE:  No objection.

03:53:47 15              THE COURT:  All right.  You may proceed.

03:53:49 16              MR. COOPER:  Thank you.  You can take that down.

03:53:49 17    BY MR. COOPER:

03:53:52 18    Q.    Dr. Mega, have you reviewed the four patents-in-suit

03:53:54 19    in this case?

03:53:55 20    A.    Yes, I have.

03:53:56 21    Q.    Have you reviewed the claims that Exelixis has

03:53:59 22    asserted against MSN?

03:54:00 23    A.    I have.

03:54:02 24    Q.    Were you present in Court and did you hear the entire

03:54:04 25    testimony of Exelixis' expert Dr. George?

Mega - Direct

03:54:07 1    A.      I have.

03:54:09 2    Q.      Have you been engaged by MSN to provide opinions on

03:54:12 3    certain objective indicia related to those asserted claims,

03:54:16 4    namely long-felt and unmet need and what Dr. George has

03:54:21 5    termed clinical success?

03:54:22 6    A.      Yes.

03:54:24 7    Q.      All right.  Let's start with your brief background

03:54:27 8    discussion.  Dr. Mega, we've heard this term before, but can

03:54:30 9    you please briefly describe what a tyrosine kinase is?

03:54:34 10   A.      Yes.  A tyrosine kinase is an enzyme that regulates

03:54:43 11   cell growth through signal transduction.  So, it will bind

03:54:48 12   to proteins ligands, get -- get turned on.  And then

03:54:54 13   subsequently signal the cells to either proliferate,

03:54:58 14   differentiate, turndown, program cell death, increase cell

03:55:04 15   growth.

03:55:05 16   Q.      What is the relationship between tyrosine kinases and

03:55:08 17   cancer development?

03:55:09 18   A.      Well, tyrosine kinases themselves are normal --

03:55:14 19   regulate normal functioning cells.  But there are certain

03:55:18 20   mutations that can occur that turn on these tyrosine kinases

03:55:23 21   and don't allow them to get turned off, would be one example

03:55:27 22   of such mutation.

03:55:29 23           In that situation, you get dysregulated cell

03:55:32 24   growth, which we -- often then would lead to malignant or

03:55:36 25   cancerous situations.

03:55:38  1   Q.      What are tyrosine kinase inhibitors or TKIs?

03:55:41  2   A.      Tyrosine kinase inhibitors block this activation of

03:55:48  3   tyrosine kinases through pathways such as phosphorylation.

03:55:53  4   Q.      We've heard from Dr. George that cabozantinib is a

03:55:55  5   TKI.  Had TKI drugs been developed to treat cancer before

03:56:00  6   cabozantinib?

03:56:00  7   A.      Yes, absolutely, yes.

03:56:02  8            MR. COOPER:  Can we go to DDX-3?

03:56:02  9   BY MR. COOPER:

03:56:06 10   Q.      What was the first TKI drug approved to treat cancer?

03:56:10 11   A.      Yes, imatinib or the brand name Gleevec was the first

03:56:15 12   TKI.  This was launched in 2001.  And it's indicated by, you

03:56:20 13   know, what was really a momentous moment, even in my now

03:56:25 14   increasingly lengthy career, which is this TIME magazine

03:56:29 15   acknowledgment, that this represented a really profound

03:56:34 16   advancement.  It was new ammunition in cancer, just by the

03:56:39 17   mechanism in which it worked for chronic myelogenous

03:56:42 18   leukemia.

03:56:43 19   Q.      How did imatinib compare to the previous ways of

03:56:46 20   treating cancer?

03:56:49 21   A.      Extraordinary first in efficacy.  When you -- at that

03:56:53 22   point in my career, I was taking care of patients with

03:56:56 23   chronic myelogenous leukemia.  And this was a situation

03:57:00 24   where this was a uniformly lethal disease within a three to

03:57:05 25   five-year period of time.  And this -- this mechanism to

Mega - Direct

03:57:10  1   block tyrosine kinase pathways really led to a profound

03:57:15  2   difference in regards to the outcomes for people with this

03:57:19  3   leukemia.  So, that -- the efficacy component was certainly

03:57:23  4   one of the components.  But there were others.  It was an

03:57:27  5   oral agent.

03:57:29  6   Q.    As -- sorry.

03:57:29  7   A.    So it was an oral therapy for leukemia which was, you

03:57:33  8   know, one of the few oral therapies that you could

03:57:36  9   effectively treat cancer with.  And it had a much better

03:57:41 10   side effect profile comparatively to chemotherapy.

03:57:45 11   Q.    Were there in -- any other TKIs that were

03:57:48 12   subsequently approved by FDA to treat cancer by 2009?

03:57:52 13   A.    Yeah, I think the -- the advent of imatinib then just

03:57:58 14   opened the door, and we had then another sequence of TKIs

03:58:04 15   that subsequently were approved, which I have listed here.

03:58:07 16   Gefitinib, erlotinib, sorafenib, dasatinib, sunitinib,

03:58:14 17   lapatinib, nilotinib, and vandetanib.

03:58:19 18   Q.    And we heard about each of these -- some of these

03:58:21 19   drugs, I should say, are spectrum selective.  Do you recall

03:58:24 20   that testimony from Dr. George?

03:58:26 21   A.    Yes.

03:58:27 22   Q.    Can you remind us what that means?

03:58:29 23   A.    Well, spectrum selective is a -- there are multiple

03:58:34 24   pathways that -- tyrosine kinase pathways that these agents

03:58:40 25   affect, with the exception of the -- of some of the

Mega - Direct

03:58:43  1    EGFR-specific agents.  But -- so there were multiple

03:58:47  2    pathways that can be affected by these tyrosine kinases.

03:58:50  3    Q.    Does --

03:58:51  4    A.    Inhibitors.

03:58:52  5    Q.    And Dr. George mentioned that cabozantinib affects

03:58:56  6    c-Met as one of its pathways, do you recall that?

03:58:58  7    A.    Yes.

03:58:59  8    Q.    Does each TKI pathway play a different role in tumor

03:59:03  9    growth?

03:59:03 10    A.    Well, the pathways themselves are distinct.  But they

03:59:11 11    often merge together into more prominent pathways that then

03:59:17 12    influence cellular proliferation and growth, similar to,

03:59:21 13    say, secondary roads leading into interstate highways.

03:59:25 14    Q.    Okay.

03:59:25 15          MR. COOPER:  Can you take that down.  Thank you.

03:59:25 16    BY MR. COOPER:

03:59:27 17    Q.    Dr. Mega, let's turn to your opinion regarding

03:59:30 18    long-felt and unfelt need.

03:59:32 19          Can you please first just summarize for the

03:59:34 20    Court the opinions you are going to testify about on that

03:59:37 21    subject?

03:59:37 22    A.    Yes.  That cabozantinib did not meet a long-felt

03:59:43 23    unmet need in the treatment of cancer, specifically the

03:59:47 24    treatment of advanced renal cancer, or kidney cancer, and

03:59:52 25    the treatment of advanced kidney cancer in combination with

Mega - Direct

03:59:55 1    immune checkpoint inhibitor.

03:59:57 2    Q.    Now, has cabozantinib benefited individual RCC

04:00:03 3    patients?

04:00:04 4    A.    Oh, absolutely.  They -- the drug has had a benefit

04:00:11 5    for patients with advanced renal cell carcinoma, so there

04:00:16 6    have been individual patients that have certainly benefited

04:00:19 7    from it.

04:00:19 8    Q.    In your opinion, does that clinical effect represent

04:00:23 9    a difference in kind in the treatment of RCC?

04:00:26 10   A.    It does not.  I think it's an incremental improvement

04:00:32 11   in therapy that represents a difference in degree.

04:00:36 12   Q.    Okay.  Can we go to -- you recall the two -- the

04:00:47 13   indications that Dr. George referred to that Cabometyx

04:00:51 14   treats; is that right?

04:00:51 15   A.    Yes.

04:00:54 16   Q.    Were there treatment options available for RCC,

04:00:59 17   specifically, before cabozantinib received FDA approval for

04:01:03 18   that indication?

04:01:04 19   A.    Yes, there were -- there were numerous treatment

04:01:08 20   options, several within that category of tyrosine kinase

04:01:12 21   inhibitors.

04:01:13 22   Q.    Were there any other categories of drugs that were --

04:01:16 23   that treated RCC when Cabometyx -- or by 2009?

04:01:20 24   A.    Yes.  There was the angiogenic agent, bevacizumab.

04:01:25 25   There were cytokine agents, such as alpha interferon and

Mega - Direct

1    interleukin, too.  And there was also the mTOR inhibitors.

2    Q.    Since FDA first approved cabozantinib to treat RCC,

3    have there been new TKIs and other types of treatment that

4    have entered the market?

5    A.    Yes.  The growth has continued on a steady pace in

6    regards to newer tyrosine kinase inhibitors, and also the

7    advent of the immune checkpoint inhibitors within this

8    treatment space.

9    Q.    Dr. George discussed the NCCN guidelines for kidney

10   cancer.  Do you use those as part of your practice as well?

11   A.    I do use them as part of my practice in a similar way

12   that Dr. George noted.

13           MR. COOPER:  Can we please pull up PTX-528?  And

14   let's go to Page 15 and call out the chart.  All right.

15   BY MR. COOPER:

16   Q.    Do you discuss -- do you recall Dr. George discussing

17   this chart?

18   A.    Yes, I do.

19   Q.    Could you describe what types of consensus

20   recommendations are provided by these guidelines?

21   A.    Yes.  We can see these recommendations sort of listed

22   as preferred regimens, other recommended regimens, and

23   useful and in certain circumstances.  And there are a

24   variety of factors considered.

25   Q.    What are the criteria used for determining what

Mega - Direct

04:02:49 1   category a treatment regimen is placed in by the NCCN

04:02:53 2   guidelines?

04:02:53 3   A.     Well, it's a consensus determination that takes into

04:02:57 4   consideration efficacy, toxicity, maturation, you know,

04:03:04 5   where the data is from a maturation standpoint,

04:03:07 6   affordability.

04:03:09 7   Q.     And so are there criteria related to things other

04:03:12 8   than efficacy and safety that are taken into consideration?

04:03:16 9   A.     Yes, there are.

04:03:18 10  Q.     And Dr. George highlighted where cabozantinib falls

04:03:21 11  on this chart.  Are there other preferred and recommended

04:03:24 12  options for treatment of RCC in each of the patient risk

04:03:28 13  categories?

04:03:28 14  A.     Yes, we can see a number of options.  Principally,

04:03:36 15  axitinib, lenvatinib, and cabozantinib being in combination

04:03:40 16  with immune checkpoint inhibitor.

04:03:42 17  Q.     And can you describe exactly what an immune

04:03:44 18  checkpoint inhibitor is?

04:03:45 19  A.     Sure.  And immune checkpoint inhibitor is a class of

04:03:53 20  agents that essentially turn the switch on for our immune

04:03:58 21  system to detect and to use our own body's host defenses to

04:04:05 22  kill cancer cells.  And so it draws the curtain away from

04:04:09 23  the cancer cells so our own immune system can be activated

04:04:13 24  against it.

04:04:13 25  Q.     Is there a preferred standard -- or is there a

999

Mega - Direct

04:04:15 1    standard of care for treatment of RCC today?

04:04:18 2    A.     Yes.  I think the standard of care today is that all

04:04:22 3    patients that are appropriate should receive a combination

04:04:26 4    of an immune checkpoint inhibitor plus a tyrosine kinase

04:04:30 5    inhibitor.

04:04:31 6    Q.     And Dr. George identified one of these combination

04:04:35 7    therapies that includes cabozantinib.  In your opinion, are

04:04:39 8    any of the combination regimens in the preferred regimens

04:04:42 9    category or poor intermediate category better than the

04:04:47 10   others?

04:04:47 11   A.     Even the consensus is that they're all on relatively

04:04:54 12   equal footing.  And in regards to these reg -- these

04:04:58 13   combination regimens, they're either preferred regimens or

04:05:03 14   other recommended regimens.

04:05:04 15   Q.     We noticed that cabozantinib is a monotherapy that's

04:05:07 16   in a poor intermediate risk group for a preferred regimen.

04:05:12 17   Are physicians typically prescribing cabozantinib

04:05:15 18   monotherapy for first-line treatment today?

04:05:18 19   A.     Generally speaking, that first-line monotherapy is

04:05:21 20   not being utilized today.

04:05:22 21   Q.     And with regards to first-line RCC therapy, do you

04:05:27 22   recall Dr. George testified about the Sunitinib trial?

04:05:30 23   A.     Yes.

04:05:32 24   Q.     Generally what did the CABOSUN study show?

04:05:34 25   A.     Well, the CABOSUN trial was a randomized Phase II

Mega - Direct

04:05:39  1    study that looked at sunitinib versus cabozantinib as a

04:05:46  2    first-line therapy for advanced renal cell carcinoma in

04:05:52  3    previously untreated patients.

04:05:54  4    Q.    And what did the -- and what did the results show?

04:05:57  5    A.    Well, the results showed that there was a -- there

04:06:01  6    was a statistically significant, albeit modest, difference

04:06:05  7    in -- in progression-free survival, with cabozantinib being

04:06:11  8    approximately eight and a half months to five and a half

04:06:14  9    months for -- for sunitinib.  But there was no overall

04:06:19 10    survival benefit, because the study really wasn't designed

04:06:24 11    to be powered to show a survival benefit.

04:06:26 12    Q.    How did sunitinib perform in CABOSUN -- in the

04:06:29 13    CABOSUN trial compared to other trials that had included

04:06:34 14    sunitinib?

04:06:34 15    A.    CABOSUN truly underperformed in this study, even if

04:06:39 16    we -- if we look at other comparable studies in which

04:06:44 17    sunitinib was used as a -- was used as the control arm, the

04:06:51 18    progression-free survival rates were much better than what

04:06:54 19    it showed in the CABOSUN trial.

04:06:55 20    Q.    Now, cabozantinib has also been tested in combination

04:06:59 21    with nivolumab against sunitinib.  Did you hear Dr. George's

04:07:04 22    testimony about the CheckMate study?

04:07:06 23    A.    Yes, I did.

04:07:09 24    Q.    And, again, what type of drug is nivolumab?

04:07:11 25    A.    That's one of those immune checkpoint inhibitors.

Mega - Direct

04:07:14  1    Q.     Was the check point -- CheckMate study -- if I said

04:07:17  2    check point, I apologize -- CheckMate study the first study

04:07:21  3    comparing a combination drug regimen of a checkpoint

04:07:24  4    inhibitor and TKI drug versus sunitinib?

04:07:26  5    A.     No.  There were other studies that had reported out

04:07:33  6    pembrolizumab plus axitinib, which was a keynote study.  And

04:07:38  7    then nivolumab plus axitinib, and sort of simultaneously was

04:07:42  8    a study using the tyrosine kinase lenvatinib with the

04:07:48  9    pembrolizumab.

04:07:49 10    Q.     Have those TKI and IO combination regimens also shown

04:07:54 11    superiority against sunitinib?

04:07:56 12    A.     Yes, they have.

04:07:57 13    Q.     And just to make sure it's clear for the record, what

04:08:01 14    is an IO?

04:08:03 15           Was that referred to?

04:08:03 16    A.     Yeah, that's an immuno oncology agent.

04:08:08 17    Q.     And so that's a checkpoint inhibitor?

04:08:09 18    A.     That's a checkpoint inhibitor.

04:08:11 19    Q.     So was there anything new or unexpected about the

04:08:14 20    fact that cabozantinib plus nivolumab combination therapy

04:08:19 21    performed better than sunitinib alone in the CheckMate

04:08:21 22    study?

04:08:22 23    A.     No, I think there was already a lead-in that -- that

04:08:25 24    there was evidence that -- well, first of all, to just take

04:08:28 25    a step back.  We all -- even we knew going in that immune

Mega - Direct

04:08:33  1    checkpoint inhibitors as a single-class therapy was very

04:08:38  2    active in renal cell carcinoma, almost to the extent of, you

04:08:44  3    know, speaking to it as ground-breaking activity because of

04:08:47  4    the potential durable responses.

04:08:51  5           So, then, the addition of a tyrosine kinase

04:08:53  6    inhibitor to get what scientifically we believed is a

04:08:57  7    synergistic effect by blocking angiogenesis, affecting

04:09:03  8    immune modulation and then adding on top of that an immune

04:09:06  9    checkpoint inhibitor, I think was -- it was expected that

04:09:11 10    this combination was going to give us better response rates,

04:09:17 11    and it was evident that that was happening even before the

04:09:20 12    CheckMate 9ER study reported out.

04:09:24 13    Q.    Now, shifting to second-line treatment of RCC.

04:09:29 14    Dr. George identified cabozantinib as an option to treat

04:09:32 15    patients for that category.

04:09:37 16           Do you recall that?

04:09:37 17    A.    Yes.

04:09:38 18    Q.    Are there other recommended options that physicians

04:09:42 19    use in order to treat patients in that category?

04:09:45 20    A.    Yes, I think if we look again at the NCCN guidelines.

04:09:51 21    Q.    Sure.

04:09:51 22    A.    You see that --

04:09:52 23    Q.    That's PTX-528, Page 16.

04:09:57 24           Okay.  Go ahead.

04:09:58 25    A.    And we can see in those, I think, exceedingly

Mega - Direct

04:10:04  1    decreasing number of people who are -- who have not received

04:10:08  2    immune checkpoint inhibitor therapy we then have the option

04:10:11  3    of adding an immune checkpoint inhibitor.  And then the

04:10:15  4    people that, I think, is now the larger category, the ones

04:10:19  5    that have received prior immune oncology therapy, we can see

04:10:24  6    that there are four different tyrosine kinase -- tyrosine

04:10:28  7    kinase therapies that are recommended.

04:10:31  8    Q.    Do you recall Dr. George showed the METEOR study that

04:10:34  9    tested cabozantinib as subsequent-line RCC therapy?

04:10:37 10    A.    Yes, I do.

04:10:38 11    Q.    Could you briefly remind us what that study showed?

04:10:41 12    A.    Yeah.  So the METEOR study was a Phase 3 randomized

04:10:46 13    control trial comparing patients who had received at least

04:10:52 14    one prior VEGF inhibitor therapy or tyrosine kinase

04:10:58 15    inhibitor therapy and randomized them to compare

04:11:01 16    cabozantinib not to another tyrosine kinase inhibitor, but

04:11:04 17    to an mTOR inhibitor everolimus.

04:11:08 18    Q.    Has cabozantinib been tested head to head against any

04:11:11 19    TKIs for second-line treatment of RCC?

04:11:14 20    A.    No, it has not.

04:11:15 21    Q.    Dr. George also talked about the CONTACT-03 study.

04:11:18 22    Can you remind us what the objective of that study was?

04:11:21 23    A.    Yeah, the CONTACT-03 study was a study that was to

04:11:30 24    answer a very important question that -- many of us had

04:11:35 25    wondered if continuing -- continuing immune checkpoint

Mega - Direct

04:11:39 1    inhibitor therapy after you failed the regimen was still

04:11:43 2    beneficial say if you've changed the partner, the tyrosine

04:11:46 3    kinase inhibitor, and this was a study of continuation of

04:11:50 4    immune checkpoint inhibitor therapy with a TKI, namely,

04:11:54 5    cabozantinib versus just TKI therapy as monotherapy.  And so

04:11:59 6    the aim of the study was really to look at the benefit of

04:12:03 7    continuing the immune checkpoint inhibitor, and there was no

04:12:06 8    benefit in continuing it.  And it was more toxic.

04:12:12 9    Q.    Dr. Mega, in your opinion, is there a -- was there a

04:12:15 10   long-felt unmet need for additional or improved treatment

04:12:20 11   options for treating patients with RCC in a first or

04:12:24 12   second-line therapy?

04:12:29 13          Strike that.  Let me ask that --

04:12:33 14          In your opinion, does there remain a long-felt

04:12:43 15   and unmet need today for additional or improved treatment

04:12:46 16   options for treating patients with RCC in the first or

04:12:50 17   subsequent lines?

04:12:50 18   A.    I agree with Dr. George that the need remains for us

04:12:56 19   to continue to try to build on the therapies that have

04:13:01 20   advanced our options for treatment.  So, yes, I still

04:13:05 21   believe there is a an unmet need in the treatment for

04:13:10 22   advanced renal cell carcinoma.

04:13:12 23   Q.    How does cabozantinib's toxicity profile compare to

04:13:16 24   other TKIs?

04:13:17 25   A.    As a class of agents, they have their issues with

Mega - Direct

04:13:23  1   toxicity and patients usually will be experiencing side

04:13:28  2   effects and that includes cabozantinib.

04:13:30  3   Q.    Now, Dr. George provided an opinion on what he termed

04:13:34  4   clinical success.

04:13:35  5          Did you hear that testimony?

04:13:36  6   A.    I did.

04:13:38  7   Q.    And he talked about his personal experience with his

04:13:40  8   patients.  How does your experience with cabozantinib or

04:13:44  9   cabozantinib compare?

04:13:45 10   A.    Like many of the tyrosine kinase inhibitors available

04:13:50 11   for therapy, I've seen patients individually benefit and

04:13:57 12   some benefit significantly, and that's what cabozantinib and

04:14:02 13   a number of other agents -- as we have listed.

04:14:05 14          But I've also seen it not -- them not work,

04:14:09 15   including cabozantinib, and, unfortunately, a large number

04:14:12 16   of patients.  And I've seen them have significant toxicity

04:14:16 17   in a lot of patients.

04:14:19 18   Q.    So with respect to your opinions on the objective

04:14:22 19   indicia that you addressed, what is your opinion as to

04:14:25 20   whether Cabometyx represents a different kind of treatment

04:14:30 21   in the treatment of RCC?

04:14:31 22   A.    It's my opinion that it does not represent a

04:14:34 23   different kind of treatment.  There remains an unmet need

04:14:38 24   that it represents an incremental therapeutic growth and is

04:14:45 25   really just a difference in degree rather than a difference

Mega - Cross

04:14:49  1    in kind.

04:14:50  2                    MR. COOPER:  Thank you, Dr. Mega.  I pass the

04:14:52  3    witness.

04:15:00  4                    THE COURT:  So, before you begin, Doctor, so is

04:15:03  5    it your opinion that there's been a long-felt, unmet need

04:15:07  6    basically for a long period of time?

04:15:10  7                    THE WITNESS:  For advanced renal cell carcinoma?

04:15:14  8    Through my career, yes.

04:15:15  9                    THE COURT:  And so -- but your opinion is

04:15:18 10    Cabometyx didn't meet it?

04:15:20 11                    THE WITNESS:  No.  Cabometyx didn't meet it.

04:15:24 12    And I think the major advancement has been in

04:15:30 13    immunotherapeutics, not just for renal cell carcinoma, but

04:15:34 14    for a whole host of malignancies because of the ability to

04:15:38 15    get these very durable responses with treatment or that can

04:15:42 16    last for years.

04:15:44 17                    THE COURT:  All right.  Thank you.  Go ahead.

04:15:44 18                         CROSS-EXAMINATION

04:15:44 19    BY MS. WIGMORE:

04:15:47 20    Q.    Good afternoon, Dr. Mega.  You have prescribed

04:15:49 21    Cabometyx to treat patients with advanced renal cell

04:15:52 22    carcinoma; correct?

04:15:53 23    A.    Yes, I have.

04:15:54 24    Q.    And you do not dispute that Cabometyx had clinical

04:15:57 25    success in some patients; correct?

Mega - Cross

A.      No, I -- I agree that it did.

Q.      You have observed Cabometyx improve outcomes for certain patients; correct?

A.      I have similar to other TKIs, yes.

Q.      And you continue to prescribe Cabometyx today; correct?

A.      I do along with other TKIs yes.

Q.      You would not continue to prescribe an oncology therapy that was not effective; correct?

A.      No, I would not.

Q.      Multiple characteristics can contribute to the clinical success of a drug product; correct?

A.      I'm not sure I understand the multiple -- what multiple characteristics we're speaking of, but I could -- I could see how they could contribute to the success, yes.

Q.      Consistent dosage is critical to patient treatment; correct?

A.      Are you speaking about consistent absorption of a drug or -- when you say dosage, because every drug has a consistent dose.  So, I would say correct, yes.

Q.      Now, having a drug product optimized to promote absorption of the drug substance can be critical to the success of a cancer therapy; correct?

A.      I think consistency in all absorption is important, correct.

Mega - Cross

04:17:12  1   Q.      A cancer therapy would not be useful if it were

04:17:16  2   packaged in a drug product that prevented its absorption in

04:17:19  3   the patient's body; correct?

04:17:21  4   A.      No, you would need to get the absorbed -- the drug

04:17:25  5   absorbed for it to be useful, yes.

04:17:27  6   Q.      A successful cancer therapy requires a compound that

04:17:31  7   remains stable during the drug manufacturing process;

04:17:34  8   correct?

04:17:34  9   A.      I have limited knowledge about manufacturing, but I

04:17:40 10   would say that stability would be important, yes.

04:17:43 11   Q.      Preventing degradation of a drug substance is

04:17:45 12   necessary in order to administer the drug; correct?

04:17:48 13   A.      Again, the manufacturing process is not -- in my area

04:17:54 14   of expertise but I think that would be important to have an

04:17:57 15   effective drug, yes.

04:17:58 16   Q.      A genotoxic impurity can lead to secondary cancer;

04:18:03 17   correct?

04:18:03 18   A.      Yes, it can.

04:18:04 19   Q.      It is important to reduce genotoxic impurities in

04:18:08 20   drug development; correct?

04:18:10 21   A.      I believe it's uniformly important not just with

04:18:15 22   tyrosine kinase inhibitors, but a whole host of agents, yes.

04:18:19 23   Q.      If a patient is on a particular drug for a longer

04:18:23 24   duration, the risk of any genotoxic impurities goes on for a

04:18:28 25   longer period of time; correct?

Mega - Cross

04:18:29  1    A.      Yes, that's correct.

04:18:31  2    Q.      Now, resistance occurs when a patient stops

04:18:34  3    responding to a particular therapy; correct?

04:18:36  4    A.      Well, or does -- yeah, resistance would be not

04:18:41  5    responding.  Refractory would be never responding.

04:18:45  6    Q.      And every day in your practice, you see patients that

04:18:47  7    have developed drug resistance; correct?

04:18:50  8    A.      Yes, I do.

04:18:52  9    Q.      Having second and third-line therapies available is a

04:18:55 10    very important option for individuals suffering from

04:18:59 11    advanced renal cell carcinoma; correct?

04:19:01 12    A.      That is correct.

04:19:04 13    Q.      The treatment that might work best for one patient

04:19:07 14    will not necessarily work best for another; correct?

04:19:10 15    A.      Generally correct.  I mean, there are -- sometimes

04:19:16 16    the context is that changing a drug category, not just

04:19:22 17    changing a drug within a category is a more preferable way

04:19:27 18    to manage subsequent therapies.

04:19:29 19    Q.      It is helpful for oncologists to have multiple

04:19:32 20    therapies available to treat patients; correct?

04:19:34 21    A.      It is helpful, yes.

04:19:37 22    Q.      Now, you testified about the NCCN guidelines.  For

04:19:41 23    people who cannot tolerate immuno-oncology drugs, Cabometyx

04:19:45 24    is an important first-line option; correct?

04:19:48 25    A.      Cabo -- Cabometyx and all of the tyrosine kinase

Mega - Cross

04:19:53  1    inhibitors that were in recommended options would be

04:19:58  2    considered options, yes.

04:19:59  3    Q.      Cabometyx is the only preferred option for the

04:20:03  4    unfavorable risk patients who cannot tolerate

04:20:06  5    immuno-oncology; correct?

04:20:08  6    A.      Speaking to the NCCN guidelines?

04:20:11  7    Q.      Yes.

04:20:11  8    A.      Yes.

04:20:13  9    Q.      Now, your opinion is that Cabometyx offers a

04:20:15 10    difference in degree, but not a difference in kind; is that

04:20:19 11    right?

04:20:19 12    A.      Yes, it is.

04:20:19 13    Q.      A treatment's ability to extend the overall survival

04:20:23 14    of a cancer patient can be a difference in kind in some

04:20:27 15    circumstances; correct?

04:20:28 16    A.      In -- I think there are noteworthy circumstances

04:20:34 17    where that is true, but a lot of agents that are -- are

04:20:41 18    brought into the marketplace do show these smaller benefits

04:20:46 19    that are worthwhile, but don't represent a difference in

04:20:49 20    kind.

04:20:50 21    Q.      Every single month of increased survival matters to a

04:20:53 22    patient; correct?

04:20:53 23    A.      That could be a profound ethical discussion.  I would

04:21:00 24    say to you that a lot of factors play into that, including

04:21:07 25    quality of life.  Existential pain because, you know, you're

Mega - Cross

04:21:12  1    dying plays into that.  So, I think that it's a much more

04:21:16  2    complicated answer than yes or no.

04:21:19  3    Q.      Fair enough.

04:21:20  4            You don't dispute that Cabometyx can extend a

04:21:23  5    patient's life while maintaining quality of life, at least

04:21:26  6    in some circumstances; correct?

04:21:27  7    A.      Yes, I agree.

04:21:29  8            MS. WIGMORE:  Thank you.  No further questions.

04:21:31  9            THE COURT:  All right.  Anything more,

04:21:33 10    Mr. Cooper?

04:21:33 11            MR. COOPER:  No, thank you.

04:21:35 12            THE COURT:  All right.  Dr. Mega, thank you.

04:21:37 13    Watch your step stepping down.

04:21:39 14            MR. BOYLE:  Good afternoon, Your Honor.  Kevin

04:21:51 15    Boyle on behalf of Defendant, MSN.  Defendants call their

04:21:57 16    next witness, Dr. DeForest McDuff.

04:21:59 17            THE COURT:  All right.  Thank you.

04:22:02 18            MR. BOYLE:  And we have some binders, as well,

04:22:04 19    to bring up.

04:22:06 20            DEPUTY CLERK:  Please state and spell your full

04:22:14 21    name for the record.

04:22:14 22            THE WITNESS:  Robert DeForest McDuff.

04:22:19 23    R-O-B-E-R-T.  D-E, capital F, O-R-E-S-T.  M-C, capital D,

04:22:25 24    U-F-F.

04:22:25 25            ROBERT DeFOREST McDUFF, the witness herein,

1012

McDuff - Direct

1   after having been affirmed, was examined and testified as

2   follows:

3                   THE WITNESS:  Yes, I do.

4                       DIRECT EXAMINATION

5   BY MR. BOYLE:

6   Q.     Good afternoon, Dr. McDuff.  Could you please

7   introduce yourself?

8   A.     Good afternoon.  My name is DeForest McDuff, and I'm

9   an economist.

10  Q.     Have you prepared slides to assist with your

11  testimony today?

12  A.     Yes.  They're on the screen.

13  Q.     All right.  Dr. McDuff, I briefly want to talk about

14  your professional background.

15              MR. BOYLE:  Can we pull up DTX-530?

16  BY MR. BOYLE:

17  Q.     Dr. McDuff, what is DTX-530?

18  A.     This is a copy of my professional CV.

19  Q.     And does it accurately reflect your professional

20  qualifications?

21  A.     Yes, it does.

22              MR. BOYLE:  Can we go to DDX-2?

23  BY MR. BOYLE:

24  Q.     Dr. McDuff, can you please provide the Court with a

25  brief description of your educational background?

McDuff - Direct

04:23:18  1    A.     Sure.  I have bachelor degrees in economics and

04:23:20  2    mathematics from the University of Maryland and I have a

04:23:24  3    master's degree and Ph.D. in economics from Princeton.

04:23:26  4    Q.     And can you also describe your professional

04:23:28  5    background?

04:23:28  6    A.     Yes.  I work as an economic consultant at a firm

04:23:31  7    called Insight Economics, which I founded in 2017.  And I'm

04:23:35  8    an assistant teaching professor in the Department of

04:23:37  9    Economics at UNC, Chapel Hill.

04:23:39 10    Q.     And can you provide a summary of your experience

04:23:44 11    evaluating economics of the pharmaceutical industry?

04:23:45 12    A.     Yes.  I worked on more than 75 cases on topics of

04:23:49 13    commercial success, irreparable harm, damages, product

04:23:52 14    launches, and other issues.

04:23:54 15    Q.     And have you previously testified in this Court?

04:23:56 16    A.     Yes.

04:23:57 17           MR. BOYLE:  Your Honor, Defendants proffer

04:23:59 18    Dr. DeForest McDuff as an expert in economics and commercial

04:24:03 19    success.

04:24:06 20           MS. PIROZZOLO:  No objection.

04:24:07 21           THE COURT:  All right.  You may proceed.

04:24:08 22    BY MR. BOYLE:

04:24:08 23    Q.     Dr. McDuff, were you here in the courtroom for

04:24:13 24    Mr. Tate's testimony?

04:24:14 25    A.     Yes, I was.

McDuff - Direct

04:24:15  1   Q.      And did you prepare a slide summarizing the testimony

04:24:19  2   you plan to offer today?

04:24:21  3   A.      Yes.

04:24:22  4           MR. BOYLE:  Can we go to DDX-3?

04:24:22  5   BY MR. BOYLE:

04:24:26  6   Q.      Having listened to Mr. Tate's testimony, can you

04:24:28  7   please provide an overview of the opinions that you'll be

04:24:31  8   offering?

04:24:32  9   A.      Sure.  I have three main opinions.  The first is that

04:24:35 10   there's no commercial success due to blocking disincentives.

04:24:38 11   The second is that there's -- he has performed no analysis

04:24:41 12   of other patents which pertains to nexus.  And the third is

04:24:43 13   that his analysis of the product success itself is

04:24:46 14   incomplete.

04:24:48 15   Q.      All right.  Let's start with that first point, no

04:24:51 16   commercial success due to blocking disincentives.

04:24:55 17           Could you please explain the idea behind

04:24:58 18   blocking and market exclusivity as it relates to commercial

04:25:01 19   success?

04:25:02 20   A.      Sure.  Blocking via earlier patents or FDA

04:25:06 21   exclusivity deters other from pursuing the claimed subject

04:25:10 22   matter, even if it's obvious.  And so the inference about

04:25:13 23   obviousness from commercial success is no longer present if

04:25:16 24   there's a blocking patent or exclusivity.

04:25:19 25   Q.      And is that -- has that kind of deterrence been

McDuff - Direct

04:25:23  1   present in this case?

04:25:23  2   A.    Yes.

04:25:26  3          MR. BOYLE:  Let's pull up DTX-013.

04:25:26  4   BY MR. BOYLE:

04:25:31  5   Q.    Dr. McDuff, what is DTX-013?

04:25:34  6   A.    This is the '473 patent, which relates to the

04:25:37  7   cabozantinib compound.  We heard about this in testimony

04:25:40  8   this week.

04:25:41  9   Q.    And is this one of the patents at issue in the first

04:25:43 10   case?

04:25:43 11   A.    Yes.

04:25:46 12          MR. BOYLE:  Let's pull up DTX-192.

04:25:46 13   BY MR. BOYLE:

04:25:50 14   Q.    Dr. McDuff, what is DTX-192?

04:25:53 15   A.    This is the international publication date of the

04:25:57 16   application ending in 140A-2.  We also heard about this this

04:26:01 17   week relating to the cabozantinib compound where the

04:26:05 18   publication leading to the '473 was published in April 2005.

04:26:10 19   Q.    So, this is the earlier application that eventually

04:26:14 20   led to the '473?

04:26:16 21   A.    Yes.

04:26:19 22          MR. BOYLE:  Can we pull up DDX-4.

04:26:19 23   BY MR. BOYLE:

04:26:21 24   Q.    Let's start at the top here of DDX-4.

04:26:25 25          Dr. McDuff, can you please explain what you're

McDuff - Direct

04:26:27 1    showing in the first red line?

04:26:29 2    A.    Yes.  This is a timeline of the relevant events,

04:26:33 3    which I think helps illustrate the blocking analysis.

04:26:36 4          From 2002 to 2010, at the top, you can see

04:26:39 5    collaborations that Exelixis had with GlaxoSmithKline and

04:26:44 6    Bristol Myers Squibb.  Those were exclusive collaborations

04:26:48 7    that were announced in Exelixis' SEC filings.

04:26:51 8    Q.    And that collaboration started in October 2002?

04:26:55 9    A.    Yes.

04:26:57 10   Q.    And let's go to the second red line.

04:26:59 11         What are you showing in the second red line?

04:27:01 12   A.    This is the timeline for the '473 patent in the

04:27:06 13   cabozantinib compound claiming priority in September 2003

04:27:10 14   and the publication date we just talked about in April 2005.

04:27:15 15   Q.    All right.  And in blue, what are you showing in

04:27:18 16   blue?

04:27:18 17   A.    These are the patents-in-suits in the current case,

04:27:21 18   the malate salt patents with priority in -- claimed in 2009.

04:27:25 19   And the '349 patent with priority claimed in 2011.

04:27:29 20   Q.    And in green, what are you showing in green?

04:27:32 21   A.    The green are the sales of the products that were

04:27:35 22   discussed by Mr. Tate, Cabometyx and Cometriq.

04:27:38 23   Q.    So, what does this timeline show about blocking and

04:27:42 24   exclusivity as it relates to commercial success in this

04:27:45 25   case?

McDuff - Direct

04:27:46  1  A.     Because of the earlier development and the earlier

04:27:50  2  intellectual property, even if the sales were successful

04:27:54  3  there's no inference to be made about whether others would

04:27:57  4  have developed the malate salt patents or the '349 patent

04:28:00  5  had they been obvious.  There's just no inference one way or

04:28:03  6  the other because of the earlier intellectual property and

04:28:05  7  collaborations.

04:28:07  8  Q.     So looking at the time between April 2005 and

04:28:12  9  August 2009, which is the time between the publication of

04:28:15 10  the application, which is DTX-192, and the issuance of the

04:28:21 11  '473 patent, would other entities have been aware that

04:28:25 12  Exelixis was seeking patent protection related to

04:28:28 13  cabozantinib?

04:28:28 14  A.     Yes.  And that would have provided a deterrence based

04:28:33 15  on the patent issuing at a future point in time.

04:28:35 16  Q.     And does the priority date of both the malate salt

04:28:39 17  patents and the '349 patent fall within this blocking period

04:28:43 18  that you described?

04:28:43 19  A.     Yes, that's right.

04:28:47 20  Q.     And how do you evaluate the strength of the economic

04:28:52 21  deterrence that this blocking period would provide?

04:28:56 22  A.     I evaluated economic factors that come from the

04:28:59 23  *Acorda* case from the Federal Circuit.

04:29:02 24             MR. BOYLE:  All right.  Let's turn to the next

04:29:03 25  slide, DDX-5.

04:29:06  1    Q.      Dr. McDuff, what are the *Acorda* factors?

04:29:09  2    A.      The *Acorda* factors are economic factors that are

04:29:12  3    outlined in the -- in the case opinion which relate to how

04:29:17  4    strong the disincentives are -- how strong are the

04:29:19  5    disincentives for others to be deterred from that

04:29:22  6    development.

04:29:22  7    Q.      Can you please briefly explain the role that each of

04:29:26  8    these factors played in this case?

04:29:27  9    A.      Yes.  Number one, there's been no successful

04:29:30 10    challenge of the '473 patent that's been asserted against

04:29:33 11    entities like MSN.

04:29:34 12            Number two, there's been no development of

04:29:36 13    others in the 2009 to 2011 time frame that I've seen.

04:29:41 14            Number three, the invention race with Exelixis

04:29:44 15    is important because the holder of the patent is also

04:29:47 16    pursuing the product.  So, a third-party developer would be

04:29:51 17    concerned that even if they were going to pursue this

04:29:53 18    development, they would lose the invention race to Exelixis

04:29:56 19    and its partners.

04:29:57 20            Number four on licensing.  There's no evidence

04:29:59 21    that there's a good licensing opportunity here, not with the

04:30:02 22    exclusive collaborations with GSK and BMS.

04:30:06 23            And overall, number five, there's low economic

04:30:09 24    opportunity for others in light of the blocking patent.

04:30:12 25    Q.      So after evaluating these five *Acorda* factors, what

McDuff - Direct

1  did you conclude with respect to the blocking deterrence

2  here?

3  A.    There's a strong deterrence here.

4  Q.    And how does that relate to commercial success?

5  A.    As a result, commercial success, even if it's true

6  for the product, doesn't provide an inference of

7  nonobviousness for the patents.

8           MR. BOYLE:  All right.  We can take that down

9  for a moment.

10  BY MR. BOYLE:

11  Q.    Let's talk about your second opinion, no nexus

12  analysis.

13          Dr. McDuff, can you briefly explain what does it

14  mean to analyze nexus as it relates to commercial success?

15  A.    Sure.  Nexus is about the degree of connection

16  between what is the claimed subject matter and the product

17  performance.

18  Q.    And do you think Mr. Tate has provided an adequate

19  evaluation of nexus in this case?

20  A.    No, not in my opinion.

21  Q.    And why not?

22  A.    Because he's only analyzed the patents at issue in

23  this case.  He doesn't weigh them against the other patents

24  that are listed in the FDA Orange Book for the products at

25  issue.

McDuff - Direct

04:31:13  1    Q.      All right.  Let's take a look at those patents.

04:31:15  2            MR. BOYLE:  Can we pull up DDX-6?

04:31:15  3    BY MR. BOYLE:

04:31:20  4    Q.      And are these the patents listed in the Orange Book

04:31:23  5    that you're referring to?

04:31:24  6    A.      Yes, that's right.

04:31:25  7    Q.      And these refer to the Cabometyx product?

04:31:28  8    A.      Yes.  These are the patents listed for Cabometyx in

04:31:31  9    the FDA Orange Book.  You'll see there are 11 here; there

04:31:34 10    are four non-asserted patents, there are three patents from

04:31:37 11    the prior case, and there are four patents asserted in the

04:31:39 12    current case.

04:31:40 13    Q.      And did Mr. Tate's analysis of nexus evaluate all of

04:31:44 14    these patents?

04:31:45 15    A.      No, not at all.

04:31:47 16    Q.      And why is that a problem?

04:31:48 17    A.      Because we're trying to figure out if there is some

04:31:52 18    degree of market success what inference of obviousness to

04:31:56 19    draw on the patents-in-suit or some other patents.

04:31:59 20            So, without evaluating the contributions of the

04:32:02 21    claimed subject matter compared to what else covers the

04:32:05 22    product, there's no way to draw a nexus or an inference that

04:32:08 23    others would have developed the claimed subject matter

04:32:10 24    sooner.

04:32:11 25    Q.      And did you testify last year in the first trial, the

McDuff - Direct

04:32:14 1    MSN 1 trial?

04:32:15 2    A.    Yes.

04:32:16 3    Q.    And how did Mr. Tate's nexus analysis from that trial

04:32:20 4    regarding the '473 patent compare to his nexus analysis

04:32:23 5    here?

04:32:23 6    A.    It was exactly the same.  The product analysis was

04:32:27 7    exactly the same, the nexus analysis was the same, and I

04:32:29 8    think it shows a lack of differentiation for which patents

04:32:33 9    we're drawing an inference to.

04:32:36 10   Q.    For the '349 patent at issue in this case, what's

04:32:39 11   your understanding of the opinions offered by MSN's experts?

04:32:44 12   A.    My understanding from Dr. Donovan is that a

04:32:48 13   formulation could be created without the glidant as part of

04:32:51 14   the '349 patent.  And so as a result, it's not necessary for

04:32:54 15   the formulation that's claimed.

04:32:56 16   Q.    So, why does that matter for nexus, that the

04:32:59 17   '349 patent is not necessary?

04:33:02 18   A.    Because if you could get similar chemical performance

04:33:06 19   or clinical performance, and then ultimately market

04:33:09 20   performance without the '349 patent, then that's a lack of

04:33:11 21   nexus.

04:33:12 22            MR. BOYLE:  All right.  Let's go to DDX-7.

04:33:12 23   BY MR. BOYLE:

04:33:16 24   Q.    And are you showing the same thing with respect to

04:33:19 25   the patents listed in the Orange Book for Cometriq?

McDuff - Direct

04:33:22  1    A.      Yes, that's right.  There are seven of them.

04:33:24  2    Q.      And is there the same lack of nexus issue for

04:33:27  3    Cometriq?

04:33:28  4    A.      Yes.  It's basically unevaluated by Plaintiff's

04:33:31  5    commercial success analysis.

04:33:33  6    Q.      And could you explain again why that is a problem?

04:33:35  7    A.      Because you risk drawing an inference to patents that

04:33:39  8    are not relevant.  There needs to be some sort of weighing

04:33:42  9    of the importance of these various patents in driving the

04:33:44  10   commercial performance.

04:33:47  11   Q.      So, overall, what did you conclude about Mr. Tate's

04:33:50  12   nexus analysis?

04:33:51  13   A.      It's not sufficient to conclude nexus, in my opinion.

04:33:55  14   Q.      All right.  Let's talk about your third opinion, the

04:33:58  15   product performance.

04:34:00  16            MR. BOYLE:  Can we go to DDX-8?

04:34:00  17   BY MR. BOYLE:

04:34:04  18   Q.      What is your view of Mr. Tate's market analysis of

04:34:10  19   Cabometyx and the Cometriq product performance?

04:34:12  20   A.      That it's very high level and incomplete.  As you can

04:34:16  21   see, I've got three opinions here relating to definition of

04:34:19  22   success, development costs, and the market shares.

04:34:21  23   Q.      All right.  Let's take those one at a time.  What do

04:34:23  24   you mean by no definition of success?

04:34:25  25   A.      Here, I'm referring to the sales being presented in

McDuff - Direct

1  isolation.  We saw a bar chart of the sales over time, but

2  there's no comparison to know whether those are high,

3  average, low for this kind of product.

4           Same thing with number of patients.  We heard

5  55,000 patients, but I don't know if that's high, I don't

6  know if that's low.  There's no definition of what

7  constitutes success here.  And, ultimately, no evaluation of

8  whether others would have developed this product sooner.

9           THE COURT:  I'm sorry, when you are saying high

10  or low, high or low relevant to what?

11           THE WITNESS:  That's the point.  There's no bar

12  or benchmark or comparison to say this level of sales or

13  this level of patients would motivate others to pursue this

14  product.

15           THE COURT:  All right.

16  BY MR. BOYLE:

17  Q.    And turning to your second point, no development

18  cost.  What do you mean by no development costs?

19  A.    Here, I'm talking about the investment to bring the

20  product to market.  In pharmaceuticals, it's -- for

21  evaluating success, it's really a weighing of the many years

22  of investment, clinical trials, with the sales and profits.

23           But in Mr. Tate's analysis, there was no

24  evaluation of profits in comparison with the investment

25  required to bring this product to market.  So there's no

McDuff - Direct

04:35:43  1   evaluation of a return on investment or whether it's

04:35:45  2   successful or not.

04:35:47  3   Q.    And third, wide range of market shares, could you

04:35:52  4   explain what that means?

04:35:53  5   A.    Yes.  So in Mr. Tate's report, he had many market

04:35:56  6   definitions and market shares.  He presented two or three of

04:35:59  7   them today, but there were over 20 in his expert report,

04:36:03  8   some are very high, some are very low, in the single digits.

04:36:06  9         Here, again, there's no explanation or

04:36:09 10   definition of what constitutes success for this kind of

04:36:12 11   product.

04:36:14 12   Q.    So, taken together, what's your opinion of Mr. Tate's

04:36:18 13   product analysis?

04:36:19 14   A.    In my view, it's incomplete, it's not enough to draw

04:36:22 15   a conclusion on commercial success one way or the other.

04:36:25 16   Q.    All right.

04:36:26 17         MR. BOYLE:  Let's go to DDX-9.

04:36:26 18   BY MR. BOYLE:

04:36:28 19   Q.    Can you please re-summarize for the Court your three

04:36:31 20   main points again?

04:36:32 21   A.    Yeah.  Primarily, there's no inference of commercial

04:36:35 22   success due to the blocking disincentives, I think that's

04:36:38 23   the main point, due to the earlier IP.  In my opinion,

04:36:41 24   plaintiffs also have not shown that there's a nexus or that

04:36:44 25   the product itself has been successful.

McDuff - Direct

04:36:46  1   Q.    And what conclusion should be drawn from these three

04:36:49  2   points?

04:36:49  3   A.    No commercial success, in my view.

04:36:53  4             MR. BOYLE:  Thank you, Dr. McDuff.  I pass the

04:36:57  5   witness, but first defendants would like to introduce

04:37:00  6   DTX-530.

04:37:02  7             THE COURT:  All right.  Admitted without

04:37:03  8   objection?

04:37:05  9             MS. PIROZZOLO:  No objection, Your Honor.

04:37:06 10             THE COURT:  All right.

04:37:06 11             (DTX Exhibit No. 530 was admitted into

04:37:07 12   evidence.)

04:37:07 13             THE COURT:  Actually, Dr. McDuff, the point you

04:37:12 14   were making about the nexus and the glidant and the -- I

04:37:16 15   think it's the '439 patent, but the one with the essentially

04:37:20 16   free, can you just try running that one by me again?

04:37:25 17             THE WITNESS:  Sure.  As I understand it from

04:37:28 18   Dr. Donovan, technically you could have a formulation or a

04:37:32 19   process that produces a formulation with or without the

04:37:35 20   glidant, one of the claimed elements, as I understand it.

04:37:38 21             So, if that's true, you don't need to practice

04:37:41 22   the patent to get the same chemical, clinical, and market

04:37:44 23   performance, then there's no nexus to the patent.

04:37:48 24             THE COURT:  And so, does that depend because, of

04:37:51 25   course -- well, maybe this is -- "of course" is the wrong

Duff - Cross

04:38:00  1    words.

04:38:04  2             Dr. Donovan's opinion is there isn't a glidant

04:38:07  3    in the MSN product.  Exelixis' opinion is there is.  Your

04:38:18  4    opinion on that depends on Dr. Donovan being right rather

04:38:22  5    than Exelixis' technical experts?

04:38:25  6             THE WITNESS:  I think that's right.  It depends

04:38:27  7    on whether you could have a similarly performing product

04:38:30  8    without the '349 patent.

04:38:34  9             THE COURT:  All right.

04:38:34 10             All right.  Ms. Pirozzolo, you've got two

04:38:37 11    minutes max.

04:38:38 12             MS. PIROZZOLO:  Thank you, Your Honor.

04:38:40 13                        CROSS-EXAMINATION

04:38:41 14    BY MS. PIROZZOLO:

04:38:44 15    Q.    Dr. McDuff, you're not disputing that Exelixis'

04:38:48 16    product, Cabometyx, practices the asserted patents; correct?

04:38:53 17    A.    I'm not assessing that one way or the other.

04:38:56 18    Q.    You don't dispute that tens of thousands of patients

04:38:59 19    have taken Cabometyx and Cometriq instead of many other

04:39:03 20    drugs approved for treatment of cancer; correct?

04:39:06 21    A.    I'm not disputing the numbers, no.

04:39:09 22    Q.    Okay.  You agree that revenues reflect physicians'

04:39:13 23    decisions to prescribe a drug to patients; correct?

04:39:16 24    A.    Yes.  Downstream, first it's prescriptions and then

04:39:21 25    that's realized in revenues.

Duff - Cross

04:39:23  1   Q.    And you don't dispute Mr. Tate's summary of the

04:39:26  2   revenues for Cabometyx; correct?

04:39:28  3   A.    I'm not disputing the figures, no.

04:39:30  4   Q.    Okay.  Now, your blocking analysis pertains to the

04:39:34  5   effect of the '473 on the patents-in-suit; correct?

04:39:39  6   A.    Yes.

04:39:40  7   Q.    Okay.  You understand that MSN's defense is

04:39:45  8   obviousness-type double patenting, not obviousness, for the

04:39:48  9   malate salt patents; correct?

04:39:50 10   A.    I understand that's one defense, yes.

04:39:53 11   Q.    Okay.  And you understand that the '473 is not prior

04:39:58 12   art to the crystalline malate salt patents; correct?

04:40:00 13   A.    I'm not sure.

04:40:03 14         MS. PIROZZOLO:  I have no further questions,

04:40:05 15   Your Honor.

04:40:05 16         THE COURT:  All right.  Thank you.  Any

04:40:06 17   redirect.

04:40:07 18         MR. BOYLE:  No redirect, Your Honor.

04:40:08 19         THE COURT:  All right.  Dr. McDuff, you can step

04:40:10 20   down.  Watch your step.  Okay.

04:40:12 21         THE WITNESS:  Thank you, Your Honor.

04:40:14 22         THE COURT:  All right.  I guess we're done.

04:40:16 23         MR. COOPER:  Yeah, Your Honor, can I move in

04:40:22 24   from Dr. Mega's examination DTX-536.

04:40:27 25         MS. WIGMORE:  No objection.

Duff - Cross

04:40:28  1            THE COURT:  All right.

04:40:29  2            MR. COOPER:  And defendants rest their case.

04:40:31  3    Thank you.

04:40:32  4            THE COURT:  All right.  So that's admitted

04:40:34  5    without objection.

04:40:34  6            (DTX Exhibit No. 536 was admitted into

04:40:34  7    evidence.)

04:40:36  8            THE COURT:  I'm not entirely sure, but I think

04:40:38  9    I've been admitting some of these things multiple times

04:40:41 10    without objection.

04:40:42 11            Okay.  So, in any event, we're done with the

04:40:45 12    testimony; right?

04:40:47 13            MR. COOPER:  Yes, Your Honor.

04:40:47 14            MS. PIROZZOLO:  Yes, Your Honor.

04:40:48 15            THE COURT:  Okay.  So, we've got closing

04:40:53 16    arguments tomorrow morning at 9:30, and I want to talk about

04:40:57 17    that in a minute.

04:40:59 18            I can't recall in terms of the briefing to

04:41:05 19    follow, is that something that has been worked out or is

04:41:09 20    that something that's still to be determined?

04:41:13 21            MR. PRUSSIA:  I think, Your Honor, we have been

04:41:15 22    so caught up in the trial that we haven't had a chance to

04:41:17 23    discuss that.  I think myself and Mr. Cooper and the others

04:41:19 24    can probably caucus on it this evening and come to you

04:41:23 25    tomorrow.

Duff - Cross

04:41:24  1          THE COURT:  Yeah, so that would be better.  I'd

04:41:26  2     rather have you caucus first.  All right.  In terms of

04:41:28  3     closing argument.  So, how much -- as I recall, at least

04:41:37  4     it's partly because it's what I usually do.  When we talk

04:41:41  5     about closing argument, I said maybe 30 minutes, maybe

04:41:44  6     45 minutes, maybe somewhere in between.  At least I would

04:41:48  7     expect that I said that.

04:41:53  8          What do you-all think.

04:41:55  9          MR. PRUSSIA:  Your Honor, we would request

04:41:58 10     45 minutes, if that works for the Court.

04:42:00 11          MR. LOMBARDI:  And that's fine with us, too,

04:42:02 12     Your Honor.

04:42:02 13          THE COURT:  All right.  Well, so I'm willing to

04:42:05 14     do 45 minutes a side.  But one of the things that I want to

04:42:12 15     make sure that I'm not getting is an argument that's really

04:42:19 16     as though somebody is just reading a brief to me.  So, I've

04:42:25 17     been trying to think.  You know, earlier I tried to take

04:42:29 18     care of that concern by limiting the number of slides, but

04:42:36 19     that didn't really seem to necessarily achieve my objective.

04:42:40 20          So, I don't want you to read your arguments to

04:42:49 21     me.  I certainly expect you to have notes, topics, things to

04:42:57 22     remind you of, you know, what it is you want to talk about,

04:43:01 23     but I want to see your eyes looking at me for most of the

04:43:06 24     time, okay?

04:43:09 25          And I don't mind if you have -- I don't require

Duff - Cross

04:43:13  1    that you have any slides.  But particularly -- and I'm not

04:43:18  2    sure how actually important it is in this case.  But

04:43:22  3    particularly, if, you know, you want to be making arguments

04:43:24  4    about text, I don't object to having the text up there, and

04:43:32  5    I leave it to your judgment if you think there's a few

04:43:35  6    slides I really need to see.

04:43:37  7            But I -- again, I want to be looking mostly at

04:43:41  8    you at the podium.  And I can't look at the slide at the

04:43:44  9    same time.  So, if you need to -- if you need slides, yeah,

04:43:49 10    use slides in moderation.

04:43:56 11            And so partly -- partly I thought that maybe --

04:44:00 12    maybe I was shooting myself in the foot earlier because I

04:44:04 13    said, okay, 30 minutes.  And then you just felt like there

04:44:06 14    was so much stuff.  And by -- when I say you, I don't mean

04:44:09 15    any of you personally, but that lawyers thought there was so

04:44:13 16    much important stuff they had to tell me that they then, you

04:44:18 17    know, write down 45 minutes worth of stuff and deliver it in

04:44:22 18    30 minutes.  So, by giving you 45 minutes, hoping that won't

04:44:27 19    happen.

04:44:27 20            In any event, that's my hopes about that.

04:44:31 21            Is there anything else we need to discuss right

04:44:35 22    now or otherwise I'll let you go and get ready for tomorrow

04:44:41 23    and do whatever else you need to do.  And we can talk about

04:44:47 24    the briefing after you've done the arguments.

04:44:51 25            MR. PRUSSIA:  Nothing for Plaintiffs,

Duff - Cross

04:44:53  1   Your Honor.

04:44:53  2              MR. LOMBARDI:  Nothing for Defendants,

04:44:54  3   Your Honor.

04:44:54  4              THE COURT:  Okay.  All right.  Well, thank you

04:44:56  5   very much.  And I will see you tomorrow.

04:45:03  6              DEPUTY CLERK:  All rise.

        7              (Court was recessed at 4:45 p.m.)

        8              I hereby certify the foregoing is a true and

        9   accurate transcript from my stenographic notes in the

       10   proceeding.

       11              /s/ Heather M. Triozzi
                       Certified Merit and Real-Time Reporter
       12              U.S. District Court.

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25